JUDGE PATTERSON                    ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK    08 CRIM.        181
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,        :

       - v. -        :    **INDICTMENT**

                        :    08 Cr

MARIO S. LEVIS,
      a/k/a "Sammy Levis,"        :

             Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/4/08

### COUNT ONE

### (Securities Fraud)

       The Grand Jury charges:

### RELEVANT ENTITIES AND INDIVIDUALS

       1.    At all times relevant to this Indictment, Doral Financial Corporation ("Doral") was a Puerto Rico corporation with its headquarters in San Juan, Puerto Rico.

       2.    At all times relevant to this Indictment, Doral's common stock was registered with the United States Securities and Exchange Commission ("SEC") pursuant to Section 12(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). Doral's common stock was listed under the symbol "DRL" and traded on the New York Stock Exchange ("NYSE"), which is a National Securities Exchange registered with the SEC pursuant to Section 6 of the Exchange Act.

       3.    At all times relevant to this Indictment, in order to maintain public trading of its securities in the United States, Doral was required to comply with the federal securities

laws, including the Exchange Act and the rules and regulations promulgated thereunder, which are designed to ensure that a company's financial information is accurately recorded and accurately disclosed to the public. Specifically, at all times relevant to this Indictment, pursuant to the Exchange Act and the rules and regulations promulgated thereunder, Doral was required to: (a) file with the SEC annual financial statements (on SEC Form 10-K) that had been audited by independent certified public accountants; (b) file with the SEC quarterly financial reports (on SEC Form 10-Q); (c) make and keep books, records, and accounts that accurately and fairly reflected Doral's business transactions; and (d) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that Doral's transactions were recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP").

4.    From at least in or about 2000, the annual financial statements and quarterly reports filed by Doral with the SEC purported truthfully to disclose, among other things, Doral's financial condition, including its net income and net assets. After filing, Doral's annual financial statements and quarterly reports were made available to the investing public by the SEC and by Doral. Doral also communicated certain portions of its annual statements, quarterly reports, and other periodic information to the investing public by way of press releases and

other means.  Members of the investing public, including Doral's
stockholders and market analysts, considered and relied upon this
financial data and information in making investment decisions.

5.    At all times relevant to this Indictment, Doral
retained an independent auditor (the "Outside Auditing Firm")
that performed year-end audits of Doral's financial statements.

6.    At all times relevant to this Indictment, MARIO S.
LEVIS, a/k/a "Sammy Levis," the defendant, resided in Puerto
Rico, and held the position of Treasurer and, as of on or about
April 22, 2002, Senior Executive Vice President, of Doral.  Among
other things, LEVIS acted as Doral's primary liaison to investors
(and potential investors) and market analysts, fielding investor
and analyst telephone calls and emails, and representing the
company at investor presentations, road shows and in-person
meetings.

7.    As of March 1, 2005, MARIO S. LEVIS, a/k/a "Sammy
Levis," the defendant, beneficially owned 2.6 million shares
(approximately 2.4 percent) of Doral stock.  At the height of
Doral's stock price appreciation, LEVIS's shares and options were
worth approximately $130 million.  LEVIS also received, in
connection with those shareholdings, several additional millions
of dollars in dividend payments over the relevant time period,
which were premised in part on Doral's purported positive
earnings performance.  For each of the years 2002 and 2003, Doral

3

paid LEVIS, in salary and incentive bonus, a total of $825,000.

8.   As of March 1, 2005, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, and other close family relations (collectively, the "Levis Family") together beneficially owned a total of approximately 9.2 million shares (approximately 8.2 percent) of Doral stock.  At the height of Doral's stock price appreciation, the total of the Levis Family's Doral stock holdings was worth in excess of approximately $450 million.

## OVERVIEW OF THE FRAUDULENT SCHEME

9.   Between in or about 2000 and in or about 2005, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, and others known and unknown, corrupted the process by which Doral determined the publicly-stated value of certain non-cash assets carried on its financial books -- so-called "interest-only strips" ("IOs").  More specifically, in its public SEC filings, Doral represented that the value of its IOs was based, in part, on two "outside" and "independent" expert valuations provided to Doral on a quarterly basis.  LEVIS corrupted each of those "outside" valuations by taking steps to undermine their independence substantially or entirely, as described in detail below.  These outside valuations were used to justify the public reporting by Doral of fraudulently and materially inflated values of its IOs, and in turn, of its assets and its net income, and, among other things, enabled Doral to announce a 28-quarter streak

4

of "record earnings."  Further, LEVIS materially misrepresented
to the investing public, in direct communications with investors
and market analysts: (a) the financial condition and performance
of Doral, and more specifically, the value of the IOs and the
earnings associated therewith, (b) the valuation process relating
to the IOs, and (c) certain specific characteristics of the IO
portfolio (as described in more detail below).  Beginning in or
about mid-January 2005, when Doral announced an approximate $97.5
million write-down of the stated value of its IOs attributed to
rising LIBOR[1] rates, and LEVIS's scheme concerning the IO
valuations began to unravel, the market price of Doral's common
stock began to drop steadily from its high of almost $50 per
share.  By the time LEVIS resigned from Doral in late August
2005, the price of Doral's shares had fallen to approximately
$14.13 per share (i.e., more than a 70 percent drop), and the
company's shareholders had suffered an aggregate decline in
shareholder value of approximately $4 billion.  Doral's stock
price continued to fall thereafter as well.

---

LIBOR is an acronym for the London Interbank Offered
Rate, the interest rate that the most creditworthy international
banks charge each other for large loans.  LIBOR is frequently
used as the base rate for loans to less creditworthy customers
(i.e., less creditworthy customers are charged LIBOR plus a
specified percentage).

**BACKGROUND**

10. Doral was a financial holding company with, among other things, mortgage banking operations in Puerto Rico and New York, New York. At all times relevant to this Indictment, Doral was a leading residential mortgage lender in Puerto Rico, responsible for originating or purchasing approximately $7.8 billion and approximately $6.5 billion in loans during 2004 and 2003, respectively. In or about February 2006, Doral issued a restatement of its 2000-2004 annual financial statements. In its restated public financial filings, Doral reported consolidated assets of $17.8 billion and consolidated stockholders' equity of $1.3 billion as of December 31, 2004.

11. One of Doral's primary business activities was the origination, through its mortgage banking subsidiaries, of 15- and 30-year first mortgage loans secured by single family residences primarily located in Puerto Rico. These loans included what are commonly known as "non-conforming" mortgage loans -- that is, loans that exceed lending limitations (regarding, for example, size, credit terms, loan documentation, and income verification) established by the principal purchasers and guarantors of the secondary mortgage market (the Federal Home Loan Mortgage Corporation, and the Federal National Mortgage Association).

12. Subsequent to origination, and at all times

6

relevant to this Indictment, Doral customarily purported to sell
most of the residential mortgage loans that it originated.  Doral
generally purported to sell non-conforming loans in bulk to local
financial institutions (hereinafter, "Loan Pool Investors") in
negotiated transactions (hereinafter, "loan sales").  MARIO S.
LEVIS, a/k/a "Sammy Levis," the defendant, and another senior
representative of Doral (the "Doral Senior Representative")
negotiated the contracts for the loan sales, and LEVIS, in his
capacity as Doral's Treasurer, executed virtually all the loan
sale contracts.

13.  Typically, the written contracts for these sales
of pools of non-conforming mortgages provided that Doral retained
certain interests in the mortgages.  Most importantly, under
these contracts, Doral retained the right to receive a portion of
the interest payments to be made on the loans equal to the
difference, or "spread," between the interest rate paid by
mortgage borrowers to Doral and the interest rate (the "pass
through rate") paid by Doral to the Loan Pool Investor (minus a
servicing fee generally set at 0.25 percent, typically also kept
by Doral).

14.  At all times relevant to this Indictment, Doral
recorded on its financial statements the purported present value
of the anticipated future cash flows from the spread as IOs.  At
the time of each loan pool sale, Doral's practice was to

capitalize -- i.e., recognize the present value of -- the
resulting IO and record its value as "gain-on-sale" income.

15.  At all times relevant to this Indictment, the
interest rate paid by mortgage borrowers to Doral was typically
fixed.  The loan sale contracts established the pass through
rate, which was in some instances fixed, and in other instances
variable.  Beginning in or about 2000, however, the loan sale
contracts negotiated by Doral with the Loan Pool Investors
primarily provided for a variable interest rate, based on LIBOR,
to be paid by Doral to the Loan Pool Investors (hereinafter, the
"floating rate loan sales").  Under the terms of these floating
rate loan sale contracts, the pass through rate was reset on a
quarterly basis, consistent with fluctuations in LIBOR.

16.  Further, on a quarterly basis, Doral was required
to account for changes in the total aggregate value of its IOs.
Throughout most of the period covered by this Indictment, Doral
purported to use a three-pronged approach to value the IOs on a
quarterly basis.  First, Doral purported to value the IOs
internally, by calculating the present value of projected cash
flows resulting from the IOs.  Second, Doral purported to obtain
independent valuations of the IOs from two separate, outside
third-parties that used two distinct valuation methods.  Third,
Doral generally booked the IOs at what was purportedly the lowest
of these three valuations, which was typically the one produced

8

by Doral's internal calculation.

17.  As described in more detail below, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, was one of the primary people involved in the valuation process for Doral's IOs and, in particular, LEVIS was the primary person responsible for obtaining the two purportedly independent, third-party IO valuations.

18.  At all times relevant to this Indictment, Doral reported that one of its principal sources of income was net gains from mortgage loan sales and fees, and that the majority of such income was attributable to the IOs.  Specifically, Doral reported the following IO-related income in consolidated financial statements contained in reports filed with the SEC for the years ended December 31, 2000 through December 31, 2004 on Forms 10-K:  $72.7 million in 2000, $141.4 million in 2001, $197.9 million in 2002, $281 million in 2003, and $509 million in 2004.  In addition, in the same annual reports for the years ended December 31, 2000, 2001, 2002, 2003, and 2004, Doral reported that the carrying value of IOs reflected on the balance sheet was $158.0 million, $236.5 million, $359.2 million, $578.1 million, and $878.7 million, respectively.

19.  There were 107,921,799 shares of Doral common stock outstanding as of March 9, 2005.  Doral's stock price steadily increased from approximately $10 per share in or about

early 2000 to almost $50 at the end of 2004 (with two 3-for-2 stock splits).

20.  At all times relevant to this Indictment, with respect to Doral's floating rate loan sales, as LIBOR increased, the pass through rate increased, and the stated value of Doral's corresponding IOs decreased, and, conversely, as LIBOR decreased, the pass through rate decreased, and the stated value of Doral's corresponding IOs increased.

21.  From in or about 2001 through in or about early 2005, Doral internally used a fixed rate methodology, based on the so-called "spot rate," to compute the value of its IOs and gain on sale.  (With respect to each loan sale contract, the spot rate was the 90-day LIBOR rate in existence on a particular, contractually defined date during each fiscal quarter.)  This fixed rate method used by Doral in its quarterly internal valuation of IOs assumed, as MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, well knew, that interest rates would remain fixed (at the spot rate) for the life of the underlying mortgages, rather than fluctuate from quarter to quarter.

22.  At all times relevant to this Indictment, there existed in the public marketplace a mechanism for measuring the market's predictions of future movements in various interest rate indices -- including but not limited to anticipated future LIBOR rate movement -- which are commonly known as "forward curves."

10

(Hereinafter, the forward curve relative to LIBOR is referred to as "the forward curve"). In periods where interest rates were expected to rise, incorporating the forward curve into its internal IO valuation model would have reduced materially both the value of Doral's IOs and gains Doral recognized on sales of the underlying mortgages. However, and as MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, well knew by at least in or about the beginning of 2003, Doral's internal IO valuation method did not incorporate the use of the forward curve, or any other similar measure to account for the effect of anticipated future interest rate fluctuations on the value of Doral's IOs.

23. At all times relevant to this Indictment, Doral represented in its publicly filed financial statements, including those published in its Annual Reports on Form 10-K, that the values of its IOs, as stated therein, were accurate.

## THE SCHEME TO DEFRAUD

24. Beginning in or about 2001, and as Doral was increasing the percentage of its loan sales that were based on a floating rate, Doral's Outside Auditing Firm recommended to Doral that it improve the process by which its IOs were valued, including obtaining from outside third-party experts independent valuations of Doral's IOs.

25. In response to the Outside Auditing Firm's recommendation, beginning in or about 2001, MARIO S. LEVIS, a/k/a

11

"Sammy Levis," the defendant, caused Doral to obtain what Doral subsequently held out to the public to be two "independent," "outside" valuations of its IO portfolio, one each from third-parties hereinafter referred to, respectively, as "Outside Valuator 1" and "Outside Firm 2." From in or about 2001 through in or about 2005, LEVIS caused Doral to make the following false and misleading statements, among others, in its annual reports and other public statements regarding these valuations: (a) that Outside Valuator 1 performed a valuation, and that it was based on "market quotes," and (b) that Outside Firm 2 performed a valuation that was independently prepared, based on a discounted cash flow analysis. For example, Doral's Annual Report on Form 10-K for 2004, stated:

> To determine the fair value of its IO portfolio, Doral [] engages in two *external* valuations with parties *independent* of the Company and of each other. One of them consists of *dealer market quotes for similar instruments* and the other one consists of a cash flow valuation model in which *all economic and portfolio assumptions are determined by the preparer.*

(Emphasis supplied). Similar statements asserting the independence and objective methodologies of these purported outside valuations were made in, among other places, Doral's Annual Reports on Form 10-K for fiscal years 2002 and 2003. Specifically, Doral's Form 10-K for 2002, stated:

> To determine the fair value of its IOs, Doral [] *obtains dealer quotes for comparable instruments* and uses *external* and internal valuations based on *discounted cash flow models* that incorporate

12

assumptions regarding discount rates and mortgage prepayment rates. Doral Financial generally uses the lowest valuation obtained from these methods.

(Emphasis supplied). Doral's Form 10-K for 2003, stated:

To determine the fair value of its IOs, Doral [], on a quarterly basis, *obtains dealer quotes for comparable instruments* and compares these quotes with *external* and internal valuations *based on discounted cash flow models* that incorporate assumptions regarding discount rates and mortgage prepayment rates. Doral [] generally uses the lowest valuation obtained from these methods.

(Emphasis supplied).

## The Fraud Relating To The Outside Valuations

26.  MARIO S. LEVIS, a/k/a "SAMMY LEVIS," the defendant, was principally involved in obtaining the valuations from Outside Valuator 1 and Outside Firm 2, and responsible for communicating with and supplying information to Outside Valuator 1 and Outside Firm 2 regarding their valuations.

### (A)  Outside Valuator 1's Valuation

27.  As MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, well knew, Doral was required to account for its IOs at their fair value, and quoted market prices (to the extent they existed) were a widely accepted and preferred measure of fair value.

28.  Beginning in or about late 2001, through in or about early 2005, on a quarterly basis, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, requested and obtained from Outside Valuator 1 a document that purported to be a "market valuation"

13

of Doral's IO portfolio (collectively, the "OV-1 Valuations").

29.    From in or about December 2001 through in or about 2005, in communications with Doral's Outside Auditing Firm, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, repeatedly and falsely represented, and caused others to represent, that the OV-1 Valuations were based on "market quotes" for similar instruments, and cited the OV-1 Valuations as proof that Outside Valuator 1 had conducted such valuation work.  For example, in response to a specific request for information from the Outside Auditing Firm for use in connection with its annual audit of Doral's financial statements, in an email dated on or about February 19, 2003, LEVIS directed another Doral employee to represent to the Outside Auditing Firm that Outside Valuator 1's valuations were "a market quote."  LEVIS further wrote that "all [Outside Valuator 1] does is to call his trader in NYC and get a quote.  We have explained this to [the Outside Auditing Firm] in the past."

30.    Then and thereafter during the relevant time period, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, reviewed and approved Doral's annual reports filed with the SEC. As noted above, the statements contained in the annual reports were fraudulent in that, among other things, they falsely claimed that the aggregate value of Doral's IO portfolio was supported by market quotes obtained from a third-party entity, referring to

14

the work purportedly done by Outside Valuator 1.

      31.  In truth and in fact, as MARIO S. LEVIS, a/k/a
"Sammy Levis," the defendant, well knew, the representation that
Outside Valuator 1 had conducted valuations of Doral's IO
portfolio based on "market quotes" for similar or comparable
financial instruments was false, and the purported quarterly
valuation documents -- the OV-1 Valuations -- were fabricated at
LEVIS's direction.  No market quotes were ever obtained from or
supplied by any employee at Outside Valuator 1's firm (or
elsewhere), and Outside Valuator 1 never did any valuation work.
Instead, at LEVIS's instruction, beginning in or about late 2001,
and continuing through in or about early 2005, Outside Valuator 1
merely copied into his own handwriting certain "valuations"
provided by LEVIS to Outside Valuator 1, and then returned his
handwritten version to LEVIS.  These documents, containing
Outside Valuator 1's handwriting and signature, constituted the
OV-1 Valuations, which LEVIS caused Doral falsely to hold out to
the Outside Auditing Firm as the "independent" valuations
"consist[ing] of dealer market quotes for similar instruments."

      32.  Between in or about 2001 and in or about early
2005, the phony OV-1 Valuations typically purported to appraise
Doral's IO portfolio at a higher dollar value than Doral's
internal valuation model, thereby enabling Doral to justify
booking as the IO valuation the value Doral calculated using its

internal model.

> **(B)** **Outside Firm 2's Valuation**

33.  As MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, well knew, the public representations contained in its annual reports that Doral had obtained an *independent* valuation of Doral's IO portfolio, in which the valuator determined for itself the assumptions it would use, were also false. Specifically, among other things, LEVIS made materially false statements and provided materially false data to Outside Firm 2, which were relied upon by Outside Firm 2 and incorporated into Outside Firm 2's valuation of Doral's IO portfolio, thereby nullifying the independence of Outside Firm 2's resulting valuations.

34.  Specifically, beginning in or about September 2003, Outside Firm 2 employees informed the Doral Senior Representative that, in performing its valuation work for Doral, Outside Firm 2 intended to revise its methodology to, among other things, incorporate the forward curve into Outside Firm 2's analysis to reflect the impact of anticipated future interest rate increases on its valuation. Employees of Outside Firm 2 further explained that their proposed revised model would no longer assume that the pass through rate would remain constant over time. As MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, well knew, this proposed change, had it been

implemented in or about September 2003, would have resulted in a materially lower valuation of Doral's IO portfolio, because at that time, the market expected interest rates to increase in the near future.  In an effort to persuade Outside Firm 2 not to revise its methodology of calculating the value of the IOs in this way, LEVIS and the Doral Senior Representative lied to Outside Firm 2 about certain characteristics of Doral's IO portfolio.

35.  For example, on or about September 22, 2003, the Doral Senior Representative, speaking on behalf of MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, falsely represented to Outside Firm 2 employees that Doral had in place "caps" on the pass through rate in its floating rate loan sale contracts that would prevent the pass through rate from increasing above a certain level (thereby protecting the interest rate spread to which Doral was entitled, and, in turn, protecting the overall stated value of Doral's IO portfolio).  The Doral Senior Representative also falsely stated that the average "cap" rate on the floating IOs was approximately 3.4 percent.

36.  Subsequently, at various times relevant to this Indictment, LEVIS ratified these false statements relating to such caps in his various communications with Outside Firm 2.  For example, in or about September 2004, in connection with Outside Firm 2's valuation analysis, and in an effort to further convince

17

Outside Firm 2 that the value of Doral's IOs was protected from
potential increases in LIBOR, MARIO S. LEVIS, a/k/a "Sammy
Levis," the defendant, falsely claimed that the pass through rate
on 97 percent of Doral's IO portfolio was capped at 3.375
percent.

37.    Based on these false and misleading
representations by MARIO S. LEVIS, a/k/a "Sammy Levis," the
defendant, and others, the resulting analysis performed by
Outside Firm 2 did not accurately reflect anticipated future
changes in interest rates.

38.    As MARIO S. LEVIS, a/k/a "Sammy Levis," the
defendant, well knew, the representations to Outside Firm 2 that
the pass through rates on the vast majority of Doral's IO
portfolio were capped was false.  In truth and in fact, there
either were no caps on the pass through rate on the vast majority
of the loan sale contracts, or, in those limited number of
instances where caps did exist, they almost always far exceeded
3.4 percent.

39.    MARIO S. LEVIS, a/k/a "SAMMY LEVIS," the
defendant, also sought to, and did, require Outside Firm 2 to
materially alter certain key assumptions pertaining to loan
prepayment rates and discount rates used by Outside Firm 2 in its
IO valuation analysis, rather than permit Outside Firm 2 to
determine all economic and portfolio assumptions for itself.  As

18

a result, LEVIS further undermined the independence of Outside Firm 2's analysis. Typically, the assumptions imposed by LEVIS on Outside Firm 2 had the effect of increasing Outside Firm 2's ultimate valuation. To further convince Outside Firm 2 to use the assumptions LEVIS provided to Outside Firm 2, LEVIS falsely told Outside Firm 2 that, among other things, Outside Firm 2's valuations were being used by Doral for Doral's internal purposes only, when in truth and in fact, and as LEVIS well knew, Doral was using those valuations to justify Doral's publicly reported value of its IOs. Doral's Forms 10-K for the fiscal years ending December 2003 and 2004, which LEVIS reviewed and approved, were thus false and misleading in that they represented Outside Firm 2's valuations to be "external" and "independent," and based on a model "in which all economic and portfolio assumptions [were] determined by the preparer."

40. Between 2003 and 2004, Outside Firm 2's purportedly independent valuations typically appraised Doral's IO portfolio at a higher dollar value than Doral's internal valuation model. Through that period, Doral continued to tout Outside Firm 2's valuation as a basis for justifying the inflated value at which Doral was accounting for its IO portfolio in its financial statements.

**LEVIS's Direct Lies To Investors**

    **(A)**    **Background**

        41.  In addition to his participation in disseminating information to the public through Doral's public SEC filings, at various times relevant to this Indictment, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, provided information concerning Doral's financial results and operating performance directly to members of the investing public through various methods, including by interstate telephone calls and emails, and in face-to-face conversations, with analysts and investors in New York, New York and elsewhere.  Members of the investing public, including Doral's stockholders and market analysts, considered and relied upon the information provided by LEVIS in these direct communications in deciding whether to purchase, hold, or sell Doral securities, or to make recommendations relating to such decisions.

        42.  From in or about the Fall 2004 to in or about early 2005, in response to concerns raised by federal banking regulators, Doral hired an independent financial consulting firm (the "Consulting Firm") to review Doral's procedures for managing interest rate risk.  During that engagement, the Consulting Firm learned of Doral's IO valuation methodology and concluded that, because Doral was using a fixed rate assumption rather than the forward curve to value its IO portfolio, the value at which Doral

20

was carrying the IO portfolio on its books was overstated by in excess of approximately $450 million.

43. Starting at least in or about 2004, rising interest rates, and particularly rising LIBOR rates, began to depress substantially the value of Doral's IO portfolio as calculated under the fixed rate assumption methodology then being employed by Doral.

44. On or about January 18, 2005, without publicly disclosing the fact that Doral was utilizing a fixed rate assumption to value its IO portfolio, Doral publicly announced a $97.5 million write-down of the IOs (the "Impairment") with respect to the company's fourth quarter 2004 financial statements.

45. By the close of trading the following day, January 19, 2005, Doral's stock price had fallen $5.45, or 11 percent, from $49.45 to $44.00. The value of the Doral stock holdings of MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, correspondingly decreased proportionally by approximately $15 million on that day alone. On that same day, the Levis Family's Doral stock holdings lost approximately $53 million in value in the aggregate. Over the ensuing days, Doral's stock price continued to fall.

46. On or about February 8, 2005, Doral employees reported directly to MARIO S. LEVIS, a/k/a "Sammy Levis," the

defendant, that, among other things, (a) because Doral's IO portfolio was being valued using the spot rate, it was subject to substantial devaluation if the LIBOR rate were to rise, and (b) hedging the risk of such a devaluation would be prohibitively expensive.

47.  On or about February 23, 2005, the Consulting Firm recommended to the Asset and Liability Committee of Doral (the "ALCO"), of which MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, was a member, that Doral change its model for valuing its IO portfolio to reflect anticipated future changes in interest rates.  Further, the Consulting Firm informed the ALCO that, should Doral alter its valuation method in this way, the stated value of Doral's IO portfolio would decrease by hundreds of millions of dollars.

48.  On or about March 21, 2005, the Consulting Firm informed the Doral board of directors that Doral's use of a fixed rate assumption in its internal IO valuation methodology was inconsistent with how the market would value Doral's IOs. According to the Consulting Firm, the market would value Doral's IOs by incorporating an assumption that reflected anticipated future fluctuations in LIBOR rates.

**(B)**    **The Lies**

49.    Doral's January 2005 public announcement of the Impairment raised concerns among several investors and analysts in the marketplace about the accuracy and reliability of Doral's valuation of its IOs in its financial statements.

50.    From in or about January 2005 up to and including in or about April 2005, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, attended several meetings and communicated frequently by email and over the telephone with market analysts and investors.  During those meetings and in the course of those communications, LEVIS made numerous false and misleading statements concerning the anticipated effect of rising interest rates on Doral's IO portfolio, and concerning certain core characteristics of the contracts underlying the IOs, in an effort, among other things, fraudulently to support the stock price and protect the value of LEVIS's and the Levis Family's investments in Doral.  Among other things, LEVIS falsely represented to analysts and investors that: (a) the IOs were conservatively valued; (b) the IO valuation was supported by two external, independent valuations; and (c) rising interest rates would not negatively impact the value of the IO portfolio or cause further significant impairments to that value, because, among other things, the pass through rates owed to the Loan Pool Investors were capped at rates substantially below the interest

rate owed to Doral by the mortgage borrowers.

51. On or about February 1, 2005, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, met with a representative of an investor in New York, New York, and falsely stated that the reported value of Doral's IO portfolio was protected by caps, which would substantially limit any future decrease in that reported value.

52. On or about February 9, 2005, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, sent an email from Puerto Rico to an analyst in New York, New York, working for a potential investor. In that email, LEVIS falsely stated that "caps" "are embedded in the actual contract of the sale/purchase commitments . . . " and added that "All contracts (100%) have caps."

53. On or about February 10, 2005, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, sent an email from Puerto Rico to an analyst in New York, New York, and falsely stated that "all loans backing up our [IOs] have Caps embedded in the sale/purchase agreements." LEVIS's email also falsely stated that the "Caps" were "significantly below" the average interest rate to be paid by the mortgage borrowers to Doral, and that current interest rates were approaching those caps. Among other things, these statements were misleading in that they suggested that any future increases in LIBOR would not materially impair the value of Doral's IOs.

24

54.  On or about February 10, 2005, MARIO S. LEVIS,
a/k/a "Sammy Levis," the defendant, sent an email from Puerto
Rico to an analyst in Louisiana.  In the email, LEVIS falsely
stated that "all loans sold have a cap" "embedded in each
contract and all of them are significantly below" the average
interest rate to be paid by the mortgage borrowers to Doral, so
"Doral will always have a hefty and positive spread." Levis also
falsely stated that current interest rates were "close to" those
caps, thus falsely suggesting that any future increases in LIBOR
would not materially impair the value of Doral's IOs.

55.  On or about February 15, 2005, MARIO S. LEVIS,
a/k/a "Sammy Levis," the defendant, sent an email from Puerto
Rico to an analyst in New York, New York, in which LEVIS again
falsely claimed that there were caps on the pass through rates
owed to the Loan Pool Investors.  In the email, LEVIS repeated
that "[i]n all events, these caps are significantly lower" than
the average interest rate to be paid by the borrowers to Doral,
"[s]o at all times, Doral will enjoy a hefty positive spread,"
thus falsely suggesting that any future increases in LIBOR would
not materially impair the value of Doral's IOs.

56.  MARIO S. LEVIS, a/k/a "SAMMY LEVIS," the
defendant, well knew these representations regarding the
existence of caps were false because, among other things, LEVIS
negotiated most, and executed virtually all, of the loan sale

agreements with the Loan Pool Investors, which belie his
assertions.

## The Publication Of Doral's 2004 10-K

57.  On or about March 15, 2005, in its Form 10-K for
2004, Doral disclosed publicly, for the first time, that it used
a fixed rate assumption methodology to value its IOs.  Doral also
disclosed the magnitude of the potential impairments that future
increases in LIBOR would have on the stated value of the IOs
under Doral's method: for example, an increase in LIBOR of 0.25
percent would impair the value of Doral's IOs by approximately
$70 million, while a 2 percent increase in LIBOR would impair the
value of Doral's IOs by approximately $540 million.  Doral's
closing stock price plummeted after the filing of the Form 10-K,
falling $16.79, or 43.8 percent, to $21.50 by the close of the
market on March 18, 2005.

58.  On or about March 16, 2005, upon reading Doral's
Annual Report on Form 10-K for 2004, and, specifically, that
portion referring to "external" IO valuations, Outside Firm 2
contacted MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, to
confirm what Outside Firm 2 understood from LEVIS's prior
statements to Outside Firm 2, namely that the valuations Outside
Firm 2 had been providing to Doral were being used for internal
purposes only and, more specifically, that Outside Firm 2 was not
one of the "external" valuators described in the Form 10-K.  In

26

response, on or about March 16, 2005, LEVIS responded to Outside
Firm 2 that its IO valuation work was for internal purposes, and
that Outside Firm 2 was not one of the external independent
parties referenced in Doral's Form 10-K for 2004.  As LEVIS well
knew, that statement was false, because the reference in the Form
10-K for 2004 to the "external" valuations prepared by an
"independent" party "consist[ing] of a cash flow valuation model
in which all economic and portfolio assumptions are determined by
the preparer" was in fact a reference to Outside Firm 2.

**Doral Announces The Devaluation Of The IOs**

59.  On or about April 19, 2005, Doral announced that
it intended to correct the methodology it used to value its IO
portfolio to, among other things, incorporate the forward curve,
and further announced that doing so would decrease the stated
value of its IO portfolio by between $400 million and $600
million.  Doral's closing stock price dropped $0.70, or 4.6
percent, to $16.15 on that day.  As of that point in time, Doral
stockholders had suffered an aggregate market capitalization
loss, from Doral's high stock price of $49.45 in early January
2005, of approximately $3.59 billion.

60.  By in or about early 2005, as a result of the
scheme described herein, MARIO S. LEVIS, a/k/a "Sammy Levis," the
defendant, had caused the publicly stated balance sheet value of
Doral's IOs to be overstated by approximately in excess of $500

27

million, and had caused Doral to overstate its publicly disclosed net income by approximately in excess of $600 million dollars in the aggregate over the relevant period.

61. On or about August 22, 2005, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, was asked to and did resign from Doral.

## **Statutory Allegation**

62. From in or about 2001, up to and including in or about April 2005, in the Southern District of New York and elsewhere, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which

28

operated and would operate as a fraud and deceit upon purchasers
and sellers of Doral's securities.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18, United States Code, Section 2.)

## COUNTS TWO THROUGH FOUR

### (Wire Fraud)

The Grand Jury further charges:

63.   The allegations contained in paragraphs 1 through
61 of this Indictment are repeated and realleged as if fully set
forth herein.

64.   From in or about 2001, through and including in or
about April 2005, in the Southern District of New York and
elsewhere, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant,
unlawfully, willfully and knowingly, having devised and intending
to devise a scheme and artifice to defraud and for obtaining
money and property by means of false and fraudulent pretenses,
representations, and promises, to wit, a scheme to defraud market
analysts, investors, and potential investors in Doral securities,
did transmit and cause to be transmitted by means of wire
communication in interstate and foreign commerce the following
writings, signs, signals, pictures and sounds, for the purpose of
executing such scheme and artifice, to wit, on or about the dates
set forth below, in order to defraud market analysts, investors,
and potential investors in Doral securities, LEVIS transmitted by

29

interstate email (as specified) false statements pertaining to

the valuation of Doral's IO portfolio, as follows:

| Count | Wire Communication | Date | Sent From | Sent To |
|-------|--------------------|------|-----------|---------|
| 2 | Email from LEVIS to an analyst | February 9, 2005 | Puerto Rico | New York, New York |
| 3 | Email from LEVIS to an analyst | February 10, 2005 | Puerto Rico | New York, New York |
| 4 | Email from LEVIS to an analyst | February 15, 2005 | Puerto Rico | New York, New York |

(Title 18, United States Code, Sections 1343 and 2.)

### FORFEITURE ALLEGATION

65.    As the result of committing the securities fraud

and wire fraud offenses, in violation of Title 15, United States

Code, Sections 78j(b) & 78ff, Title 17, Code of Federal

Regulations, Section 240.10b-5, and Title 18, United States Code,

Sections 1343 and 2, as alleged in Counts One through Four of

this Indictment, MARIO S. LEVIS, a/k/a "Sammy Levis," the

defendant, shall forfeit to the United States pursuant to 18

U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461, all property, real

and personal, that constitutes or is derived from proceeds

traceable to the commission of the offenses alleged in Counts One

through Four of this Indictment.

## Substitute Asset Provision

66.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981 and 1343, Title 28, United States Code, Section 2461, Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5).

_____
Foreperson

_____
LEV L. DASSIN
Acting United States Attorney

31

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA**

- v -

**MARIO S. LEVIS,**
    **a/k/a "Sammy Levis,"**


**Defendant.**


## INDICTMENT

08 Cr.

(Title 15, United States Code, Sections
78j(b) & 78ff; Title 17, Code of
Federal Regulations, Section
240.10b-5; and Title 18, United
States Code, Sections 1343 and 2)



_____
                    LEV L. DASSIN
            Acting United States Attorney.

**A TRUE BILL**

_____
                              Foreperson.