UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **NO. 08-CR-181** |
| | ) | |
| MARIO S. LEVIS, | ) | |
| a/k/a "Sammy Levis," | ) | |
| | ) | |
| *Defendant.* | ) | |
| _____ | ) | |

**DEFENDANT'S MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO TRANSFER THIS
CASE TO THE DISTRICT OF PUERTO RICO**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.  The Location of the Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.  The Location of the Relevant Entities . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.  The Location(s) of the Known Witnesses . . . . . . . . . . . . . . . . . . . . . . . . 5

    D.  The Location(s) Where Relevant Events Occurred . . . . . . . . . . . . . . . . . . 7

    E.  The Location of the Relevant Documents and
        Computer Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    F.  The Location(s) of Defense Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III. VENUE SHOULD BE TRANSFERRED TO THE
    DISTRICT OF PUERTO RICO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    B.  Whether this Case Might Have Been Brought
        In Puerto Rico . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    C.  The *Platt* Factors Strongly Support Transfer
        of This Case To the District of Puerto Rico . . . . . . . . . . . . . . . . . . . . . . 12

        *1. Inconvenience to the parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        *2. Inconvenience to possible witnesses* . . . . . . . . . . . . . . . . . . . . . . . 15

        *3. Location of events likely to be at issue* . . . . . . . . . . . . . . . . . . . . 17

        *4. Location of documents and records likely*
          *to be involved* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

5. *Disruption of the accused's businesses* . . . . . . . . . . . . . . . . . . . . . . . . 19

6. *Expenses to the parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

7. *Location of counsel* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

8. *Relative accessibility to the place of trial* . . . . . . . . . . . . . . . . . . . . . 21

9. *Relative docket conditions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

10. *Other special factors* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

EXHIBITS

A:    Declaration of Maria D. Neyra, Esq.

B:    Doral Financial Corp. 2004 Form 10K (excerpts)

C:    Medical Certificates

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )    **NO. 08-CR-181** |
| | ) |
| MARIO S. LEVIS, | ) |
| a/k/a "Sammy Levis," | ) |
| | ) |
| *Defendant.* | ) |
| _____ | ) |

### DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO TRANSFER THIS CASE TO THE DISTRICT OF PUERTO RICO

Defendant MARIO S. LEVIS ("Levis"), through his undersigned counsel, has moved this Court, pursuant to Fed. R. Crim. P. 21(b), for an order transferring this case to the District of Puerto Rico for the convenience of the parties and witnesses and in the interest of justice.[1]  In support of this motion, Levis respectfully submits the attached Declaration of Maria D. Neyra, Esq. (Exhibit A), and the following memorandum of law.

Part I is an Introduction.  Part II summarizes the background of this case.  Part III demonstrates that under well-settled principles that govern requests to transfer in criminal cases, *see generally United States v. Alter*, 81 F.R.D. 524 (S.D.N.Y 1979) (transferring mail

---

[1] Rule 21(b) provides:

> **(b) For Convenience.**  Upon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties and witnesses and in the interest of justice.

and wire fraud case to the Southern District of Florida under Rule 21(b)), the convenience of the parties and witnesses and the interests of justice strongly favor the transfer of this case to the District of Puerto Rico.

## I.    INTRODUCTION

Mario S. Levis was born and raised in Puerto Rico. He currently resides in Puerto Rico with his wife and two young children. At all times material to this case, Levis worked for Doral Financial Corporation ("Doral"), a publicly-traded bank holding corporation headquartered in Puerto Rico which specialized in residential mortgage lending and commercial banking services in Puerto Rico.

All of the charges in this case arise out of his purported conduct while employed by Doral. In general terms, the government has charged Levis with one count of securities fraud and three counts of wire fraud relating to the "internal" valuations that Doral assigned to its primary asset – "interest-only" ("IO") strips – on its publicly-reported financial statements. Those IO strips represented the excess spread between the fixed interest rate on mortgage loans that Doral was being paid by residential borrowers and the floating rate (tied to LIBOR) that Doral negotiated and was paying the investors (primarily banks) that had purchased those same loans from Doral. In the government's view, Doral (with the approval of its accounting firm Price Waterhouse) inflated the "internal" valuations of its IO strips on its financial statements by using a "spot-rate" methodology instead of a "forward curve." Indictment, at pp. 10-11. In the government's view, a "forward curve" would have reduced

materially the value of the IO strips because that curve would have incorporated an expected rise in the LIBOR rate, which in turn would have increased the expected payments by Doral to the purchasers of the floating rate loans.  *Id.* at p.11.

The government alleges that there were two aspects to Levis's involvement in the alleged scheme.  First,  Levis allegedly manipulated the two "outside" valuations of Doral's portfolio of IO strips provided by independent investment bankers ***in Puerto Rico*** by allegedly misrepresenting to the public that one of the "outside" valuations was based on "market quotes" for similar instruments, and by allegedly providing false and inflated assumptions to the other outside valuator.  Indictment, at pp. 13-19.  According to the government, Levis did this so that Doral's inflated "internal" valuation (which was nonetheless lower than the "outside" valuations) would, to the investing public, seem justified by comparison.  Second, after Doral announced an "impairment" to the value of its IO strips, Levis allegedly made direct misrepresentations to certain institutional investors and research analysts by downplaying the risks of a further impairment to the value of the IO strips in the event of an increase in LIBOR.  *Id.* at pp.20-28.

Thus, with a few exceptions, the government's case against this Puerto Rican native for conduct that occurred largely in Puerto Rico will be based on the testimony of bankers, accountants, and employees who reside and work in Puerto Rico as well as documents generated in Puerto Rico.  In the interest of justice, and for the convenience of the witnesses and parties, the trial should be held in the District of Puerto Rico.

-3-

## II.    BACKGROUND

### A.    The Location of the Defendant

Levis resides in Puerto Rico and lived and worked there during the period of the alleged misconduct described in the Indictment. Levis's immediate family members live in Puerto Rico, including his parents, siblings, and children. Levis has two young children, ages two and six. The six-year-old is of school age and would be uprooted in the middle of the school year in Puerto Rico to be with his father during trial in New York. The government has indicated that its case-in-chief alone could take five weeks. The charges carry the potential for a long prison term in the event of conviction. Not only must Levis rely on his loved ones for support during the trial, but he must be present for his young children as much as possible during this time.

### B.    The Location of the Relevant Entities

Until August 2005, Levis held the positions of Treasurer and Senior Executive Vice President of Doral. Doral is a Puerto Rican bank holding corporation founded in 1972, with its primary place of business in Puerto Rico. Doral 2004 Form 10-K (excerpts attached as Exhibit B), at 1-2. At all times material, Doral and its subsidiaries were engaged in mortgage originations, mortgage banking, securitization and related activities. Exhibit B, at 2-6. At the time of Levis's employment, Doral was the leading mortgage banker and the fourth largest commercial bank in Puerto Rico. Exhibit B, at 1. Doral operated 58 mortgage banking offices in Puerto Rico and one in the United States mainland. Exhibit B, at 2.

-4-

Doral's primary service area and principal market is Puerto Rico; as of the end of 2004, Doral's Puerto Rico-based operations accounted for 97% of its consolidated assets and 99% of its consolidated revenues.  Exhibit B, at 10.  As of early 2005, Doral employed 2,613 people, with 2,515 employed in Puerto Rico.  Exhibit B, at 10.  While Doral, prior to 2005, maintained a commercial banking subsidiary with branch offices in New York City, the bank now maintains a single office in New York City.

### C.    The Location(s) of the Known Witnesses

Upon information and belief, most of the witnesses, for both the prosecution and the defense, reside in Puerto Rico.  While the defense has not received a requested witness list from the government, the alleged misconduct occurred primarily in Puerto Rico, and thus many of the government's witnesses will likely reside in Puerto Rico.  A smaller number of government witnesses are located in New York City and elsewhere.[2]

Some of the key witnesses will be Doral employees.  Doral's employees are located almost exclusively in Puerto Rico.  Exhibit B, at 10.  Virtually all of the other anticipated defense fact witnesses are also located in Puerto Rico.  Additionally, every potential character witness for the defense resides in Puerto Rico.  These witnesses are readily available to testify in Puerto Rico.  It is also possible, although difficult to determine this far in advance of any trial date, that not all defense witnesses will be able to travel to New York

---

[2] The government has agreed to provide a witness list 30 days before trial.  That is the subject of another motion being filed herewith.  As such, the defense will seek permission to file, ex parte, a list of potential defense witnesses in support of this motion for change of venue.

-5-

at the time of trial. Trial in Puerto Rico would likely ensure the availability of witnesses for trial.

Furthermore, if trial were held in Puerto Rico, where the defendant and all defense witnesses reside, the costs of transporting and housing those witnesses would be largely eliminated or at least greatly reduced. Trial in the Southern District of New York would impose a substantial financial burden on the defense, which would be required to transport every single defense witness to New York and house the witnesses in New York City during the trial. The cost of airfare alone, which is increasing almost daily, is significant. Moreover, lodging and living costs in Puerto Rico will be lower than those costs in New York City. Levis would already be required to pay for his and his attorneys' travel and lodging in New York for several months. Thus, the travel expenses for the witnesses will significantly increase the cost of defending this case.

Importantly, it is not only the defense who would be spared exorbitant transportation and housing costs, but also the government. Because so many of the government's witnesses reside in Puerto Rico, the government would be spared expensive transportation and housing costs as well. The number of the government's witnesses located in Puerto Rico is estimated to exceed the number of witnesses located in New York, so a transfer to the District of Puerto Rico would save both the government and the defense a significant sum of money. Finally, since a number of the government's witnesses are located across the United States, those

witnesses will be equally inconvenienced whether transported and housed in Puerto Rico or in New York City.

### D.    The Location(s) Where Relevant Events Occurred

The subject of the indictment is Levis's involvement in Doral's mortgage operations, all of which were directed from Puerto Rico. Doral's headquarters and its nerve center have always been in Puerto Rico.

The charges set forth in the Indictment are centered around the allegations that Levis (1) corrupted the "external" valuation of the IO strips made by the independent investment bankers *in Puerto Rico*; and (2) made false material statements to investors in person, via email, and by telephone. The three substantive wire fraud counts pertain to emails which originated in Puerto Rico. Levis purportedly attended meetings with investors or their representatives and analysts; one such meeting is alleged to have occurred on or about February 1, 2005, somewhere in New York City. Indictment, at p.24. In that meeting, the Indictment alleges that Levis falsely told the representative of an investor that the reported value of Doral's portfolio of IO strips was protected by caps. *Id.* The Indictment additionally alleges that Levis sent false or fraudulent emails from Puerto Rico to analysts located in New York City and Louisiana. It is clear that the vast majority of the communications from Levis to investors and analysts were made from Puerto Rico, via telephone or email. *Id.* at pp.24-25. While representations made by Levis from Puerto Rico

likely reached many jurisdictions, Puerto Rico was the nerve center of Levis's and Doral's activities.

Additionally, the Indictment alleges that Levis induced the making of false and misleading representations in Doral's forms 10-K. Indictment, at p.12. Levis's purported review of the forms 10-K occurred in Puerto Rico, not New York. Doral's forms 10-K, and other forms filed with the Securities and Exchange Commission, were not prepared in the Southern District of New York, but instead in Puerto Rico. Finally, the forms 10-K were filed with the Securities and Exchange Commission in Washington, D.C. Levis's part in all relevant events which form the basis for the Indictment, with the alleged exception of meeting with investors in New York City, thus occurred in the District of Puerto Rico.

### E.    The Location of the Relevant Documents & Computer Data

The government contends that the scheme was devised and operated at the direction of Levis out of company headquarters in Puerto Rico. It is there that the majority of the company's records were warehoused. Such records include incorporation records, Doral's annual and interim filings with the SEC, loan sale agreements, accounting records, internal and external audit work papers, human resources files, investor relations files, press releases, and valuation reports, spanning the scope of the Indictment, from 2000 to 2005. Given the nature of this case, these records are voluminous. The records produced in discovery comprise at least 27 CDs and a hard drive that consists of more than 130 gigabytes of

electronic data.  Moreover, many of these records are in Spanish and will need to be translated.

The government subpoenaed documents from Doral, and thus most documents are likely now located in the Southern District of New York.  However, the individuals who created or are responsible for those documents are primarily in Puerto Rico, where the original documents were created and reside.  Moreover, since most of the documents are being stored electronically, they could be easily transferred to another district for trial.

### F.   The Location(s) of the Defense Counsel

The following lead attorneys have been retained as counsel by Levis: Roy Black, Howard Srebnick, and Maria Neyra, of Black, Srebnick, Kornspan & Stumpf, in Miami, Florida.

### III.   VENUE SHOULD BE TRANSFERRED TO THE DISTRICT OF PUERTO RICO

### A.   Introduction

Federal Rule of Criminal Procedure 21(b) confers discretion on the Court to transfer criminal cases to other districts "for the convenience of the parties and witnesses and in the interest of justice."  One of the chief purposes of the rule is to protect defendants against abuses arising from an indictment by the government in jurisdictions far removed from their homes when the logical place for trial would be the place where they reside and carry on normal activities.  "[I]t is the public policy of this Country that one must not arbitrarily be sent, without his consent, into a strange locality to defend himself against the powerful

prosecutorial resources of the Government." *United States v. Burns*, 662 F.2d 1378, 1382

(11th Cir. 1981) (citation omitted); *see also United States v. U.S. Steel Corp.*, 226 F. Supp.

152, 156 (S.D.N.Y. 1964). Thus, while trial courts have considerable discretion in ruling on

motions to transfer, the improper denial of a motion, where prejudice is shown, constitutes

reversible error. *Cf. Burns*, 662 F.2d at 1383 (reversing conviction for district court's denial

of defendant's motion to transfer venue under Fed. R. Crim. P. 18, from Birmingham to

Huntsville, Alabama, due to inconvenience to defendants and witnesses).

The test to be applied to a Rule 21(b) motion for transfer was set out in *Platt v.

Minnesota Mining & Manufacturing Co.*, 376 U.S. 240, 243-44 (1964), and has since been

repeated in countless cases. *See, e.g.*, *United States v. Clark*, 360 F. Supp. 936, 941

(S.D.N.Y. 1973) (Griesa, J.); *United States v. Lopez*, 343 F. Supp. 2d 824, 835 (E.D. Mo.

2004); *United States v. McDonald*, 740 F. Supp. 757, 762 (D. Alaska 1990); *United States

v. Benjamin,* 623 F. Supp. 1204, 1212 (D.D.C. 1985); *United States v. Daewoo Indus. Co.*,

591 F. Supp. 157, 158 (D. Or. 1984); *United States v. Bein,* 539 F. Supp. 72, 73 (N.D. Ill.

1982).

The test requires that the Court first determine whether the case could have been

brought in the transferee court. If that threshold requirement is satisfied, the Court must then

analyze "various factors . . . to determine if a transfer to a more convenient forum is

justified." *Meterlogic, Inc. v. Copier Solutions, Inc.*, 185 F. Supp. 2d 1292, 1299 (S.D. Fla.

2002). These factors include:

1.    Location of the defendants;

2.    Location of possible witnesses;

3.    Location of events likely to be an issue;

4.    Location of the documents likely to be involved;

5.    Disruption of the accused's business unless the case is transferred;

6.    Expenses to the parties;

7.    Location of counsel;

8.    Relative accessibility of the place of trial;

9.    The docket conditions of each district; and

10.    Any other special elements which might affect the transfer.

*Platt*, 376 U.S. at 243-44.  Ultimately, the standard is one of pure convenience, meaning that the court should  weigh the balance of hardships and order the case be tried in whichever district is more convenient.  *See In re Balsimo,* 68 F.3d 185 (7th Cir. 1995) (Posner, J.) (standard under Rule 21(b) is "if, all relevant things considered, the case would be better off transferred to another district").  "Venue provisions are to be liberally construed so as to minimize inconvenience to the parties, ***especially the defendant***."  *Lopez*, 343 F. Supp. 2d at 835 (emphasis added).

### B.    Whether this Case Might Have Been Brought in Puerto Rico

Venue for most cases is governed by 18 U.S.C. § 3237, which provides, in pertinent part, that venue can lie "in any district in which [the] offense was begun, continued, or

completed." Since most of the acts alleged in connection with the purported "schemes" detailed in the Indictment occurred in or from Puerto Rico, venue plainly exists in the District of Puerto Rico for all of the charges in the Indictment. Under these circumstances, where venue exists in the District of Puerto Rico for all charges, the defendant has satisfied his threshold burden. *See Meterlogic, Inc.*, 185 F. Supp. 2d at 1299.

### C.    The *Platt* Factors Strongly Support Transfer of This Case To the District of Puerto Rico

When each of the factors set forth in *Platt* is analyzed in relation to the circumstances of this case, the merits of a transfer to the District of Puerto Rico are compelling.

### 1.    *Inconvenience to the parties.*

The *Platt* case involved a corporate defendant, and so the first factor was listed in that decision as "location of corporate defendant." *Platt*, 376 U.S. at 243. Subsequent cases have applied this factor without regard to whether the defendant is a corporation or an individual. *See, e.g., Clark*, 360 F. Supp. at 941 (the *Platt* factors "obviously apply to individual defendants"); *McDonald,* 740 F. Supp. at 762. In the instant case, a Puerto Rico-based corporation, Doral, is at the heart of the Indictment. Doral is domiciled in Puerto Rico, as is Levis. As a general rule, a criminal prosecution should be retained in the original district, *United States Steel Corp.*, 233 F. Supp. 154, 157 (S.D.N.Y. 1964), but "'courts in this district have afforded greater weight to the defendant's interest in being tried in the district of his residence than to any other factor.'" *United States v. Valdes*, No. 05-CR-156, 2006 WL 738403, at *4 (S.D.N.Y. Mar. 21, 2006) (citations omitted).

-12-

In this case, the factor of convenience to the defendant weighs heavily in favor of trial in the District of Puerto Rico. Defendant Levis resides and has his current business in Puerto Rico. Most of his family, including his parents, siblings, and his two small children, reside in Puerto Rico. Most of the defense witnesses live in Puerto Rico. Trial in New York would greatly disrupt the defendant's family, his child's schooling, and require the defendant to transport and house all of these people in New York, at great expense. "[F]amily obligations, including the care of children, militates (sic) in favor of transferring proceedings to the district in which a defendant resides." *United States v. Valdes*, 2006 WL 738403, at *4; *see also United States v. Hanley*, No. 94 Crim. 394, 1995 WL 60019, at *2 (S.D.N.Y. Feb. 10, 1995) (factor of convenience to the defendant "clearly favor[s]" transfer where defendant will be closer to his wife, three-year-old child, and elderly mother); *United States v. Russell*, 582 F. Supp. 660, 662 (S.D.N.Y. 1984) (fact that defendants live with their three college-aged children in transferee district "argues strongly" for transfer of venue).

Although the Court should also give some consideration to the possible inconvenience to the government as a party, *see United States v. Sklaroff*, 323 F. Supp. 296 (S.D. Fla. 1971), this factor should be "given little weight when other considerations of convenience suggest transfer of a trial under Rule 21(b)." *United States v. Gruberg*, 493 F. Supp. 234, 243 (S.D.N.Y. 1979). In amending Rule 21(b) in 1966, the drafters of the Rule specifically rejected a requirement that the government consent to transfer of venue. *See In re Application To Take Testimony,* 102 F.R.D. 521, 523 (E.D.N.Y. 1984). Some courts,

-13-

observing that government lawyers and agents have nationwide responsibility and are equipped to operate in every district in the country, have found that inconvenience to the government has minimum relevance in the venue inquiry. *Benjamin,* 623 F. Supp. at 1212-13; *see also Gruberg*, 493 F. Supp. at 242-43. Indeed, the government attorneys would likely have available to them support services from and in the offices of the United States Attorney for the District of Puerto Rico. *See Lopez*, 343 F. Supp. 2d at 837. And, as in *Meterlogic, Inc.*, "[t]his is not simply a case where . . . the party requesting transfer, wishes to shift the inconvenience to . . . the parties opposing transfer, who theoretically would be inconvenienced by the transfer." *Meterlogic, Inc.*, 185 F. Supp. 2d at 1301.

Thus, a fair analysis of the location of the parties weighs heavily in favor of transfer to the District of Puerto Rico. *See Lopez*, 343 F. Supp. 2d at 826 (reversing Magistrate and transferring health care fraud trial to the Southern District of Florida for convenience of the defendants and their witnesses); *see also Burns*, 662 F.2d. at 1382 (error to deny intra-district transfer where Huntsville, Alabama, was "the site of the alleged offenses, as well as the home of the defendants and twenty-two of the twenty-four Alabama witnesses"); *Benjamin*, 623 F. Supp. at 1212 (granting transfer of tax prosecution to the Eastern District of California where eight of nine defendants resided and where events involved in alleged misrepresentations to IRS occurred).

-14-

### 2.    *Inconvenience to possible witnesses.*

When the location of both prosecution and defense witnesses are considered, this factor also strongly favors transfer to the District of Puerto Rico.  That is so because the largest number of witnesses for both the prosecution and defense reside in the District of Puerto Rico.  *See Lopez*, 343 F. Supp. 2d at 826 ("I believe that defendant's right" to "call witnesses from Florida" may be "compromised by requiring the trial to take place" in Missouri); *Daewoo Indus.*, 591 F. Supp. at 164-65 (ordering transfer of corporate Customs violation case from Oregon to California where most witnesses resided and where corporate documents were located);  *United States v. Hurwitz*, 573 F. Supp. 547, 552 (S.D.W. Va. 1983) (granting motion to transfer case to New York where the "overwhelming majority of the potential witnesses in this action reside"); *Alter*, 81 F.R.D. at 826-27 (transferring case to Miami where "New York witnesses, compared to those based in Miami and elsewhere, are comparatively few in number").

The prosecution witnesses will undoubtedly include numerous Doral employees and executives in Puerto Rico, the bankers in Puerto Rico from Morgan Stanley and Popular Securities who performed the "external" valuations of the IO strips, and the accountants and auditors at Price Waterhouse in Puerto Rico who advised Doral on the internal valuation methodology for the IO strips.  While the prosecution may also call investors and analysts from outside Puerto Rico to testify about the alleged misrepresentations to them, the number of such witnesses will be far exceeded by the Puerto Rican witnesses.  Equally significant,

*almost every* anticipated defense witness resides in Puerto Rico. These defense witnesses

include Doral employees and character witnesses who have known Levis much of his life.

The inconvenience of a trial in the Southern District of New York is most burdensome

to *non*-party witnesses, such as unindicted Doral employees and character witnesses. *See*

*Mason v. Smithkline Beecham Clinical Labs*., 146 F. Supp. 2d 1355, 1361 (S.D. Fla. 2001)

("The convenience of non-party witnesses is an important factor in determining whether a

transfer should be granted."). Courts have also specifically considered the hardship that

would be involved where a defendant wishes to call prominent character witnesses from his

home district whose civic responsibilities would be disrupted by travel to a remote district.

*See Russell,* 582 F. Supp. at 663; *United States v. Aronoff*, 463 F. Supp. 454, 458 (S.D.N.Y.

1978) ("[T]he location of character witnesses is significant.").

> Very often the difference between liberty and imprisonment in
> cases where the direct evidence offered by the government and
> the defendant is evenly balanced depends on the presence of
> character witnesses . . . [t]he inconvenience, expense and loss of
> time involved in transplanting these witnesses to testify in trials
> far removed from their homes are often too great to warrant their
> use. Moreover, they are likely to lose much of their
> effectiveness before a distant jury that knows nothing of their
> reputations.

*United States v. Johnson*, 323 U.S. 273, 279 (1944). Importantly, courts have minimized the

burden of travel upon "victim" witnesses in cases where victims may be found nationwide,

or even throughout the world. *See, e.g.*, *Clark*, 360 F. Supp. at 943 (considering nationwide

distribution of stock, victim witnesses could be found near transferee court, and "[i]n any

-16-

event, I do not believe that the location of victim witnesses should weigh heavily on this transfer motion"); *Alter*, 81 F.R.D. at 526 (where proposed victim witnesses lived in eleven states, "[i]t is obvious that the non-New York and non-Miami witnesses will be inconvenienced no matter where the case is tried").

By transferring the case to the District of Puerto Rico, both prosecution and defense witnesses who reside in Puerto Rico will entirely avoid the burden of long and tiring flights and days away from homes and businesses. Instead, they will be able to discharge their responsibilities in a matter of hours. With a transfer, it is likely that the great majority of Puerto Rico prosecution and defense witnesses will feel relieved, rather than inconvenienced.

### 3.    *Location of events likely to be at issue.*

The bulk of the prosecution's case will deal with operations and directives from Doral's corporate headquarters in Puerto Rico. This factor weighs heavily in favor of venue in Puerto Rico. *See Alter*, 81 F.R.D. at 525 (significant factor in determining Rule 21(b) motion is location of events likely to be at issue).

In *Alter*, defendants operated a commodity futures business in Miami that solicited customers nationwide via telephone. 81 F.R.D. at 525. The court held that the "nerve center" of the operation was Miami, where the salespeople were trained, employed, and made telephone solicitations and mailings, even though the company maintained a New York office and defendants defrauded purchasers throughout the nation. *Id.* at 526.

Similarly, in *Clark*, a company's stock was listed on the American Stock Exchange in New York, the company's securities fraud victimized investors nationwide, and speeches were made to investor groups in New York. 360 F. Supp. at 942. Nevertheless, this Court transferred the case against some of the defendants to Oklahoma, in large part because "the great majority of the events and transactions which will be in question in the trial of this case . . . occurred in Oklahoma, or other Middle Western locations." *Id.* at 942-43.

The facts in this case are similar to the facts in *Clark*, where this Court granted a motion to transfer: The majority of the purportedly false or fraudulent communications from Levis to investors were made from Puerto Rico. Victims of Doral's alleged fraud could possibly be found nationwide. Potentially some small number of events occurred in New York – the Indictment alleges that a meeting with investors or their representatives took place in New York, around February 1, 2005. However, almost all of the acts giving rise to the charges occurred in Puerto Rico, the defendant and most of the witnesses are from Puerto Rico, and thus this factor weighs in favor of transfer. *See Clark*, 360 F. Supp. at 941-43.

### 4.    *Location of documents and records likely to be involved*.

The number and scope of the documents likely to be involved in this case is large. The largest group of documents came from Doral's headquarters in Puerto Rico. The fact that the government obtained the documents and computer data and moved them to New York does not make New York the more convenient forum, since they were originally located in Puerto Rico. *See United States v. Posner*, 549 F. Supp. 475, 478 (S.D.N.Y. 1982)

-18-

("The location of documents and records is not a major concern in these days of easy and rapid transportation."); *Lopez*, 343 F. Supp. 2d at 836 (viewing as neutral situation where documents "now exist" in Missouri but were "originally created in the Southern District of Florida").

Moreover, at least one court has observed that it would be "grossly unfair" to allow the government to "create" a convenient venue simply by shipping a mass of records to its office in the district where it indicts. *See Bein,* 539 F. Supp. at 74. Other courts have noted that this factor should not weigh heavily against transfer where the documents can easily be shipped back to the defendant's home district. *See McDonald,* 740 F. Supp. at 763; *Posner*, 549 F. Supp. at 478; *Alter*, 81 F.R.D. at 527. In any event, most of the documents in this case are now being stored electronically by the government and can be easily relocated. Thus, the location of the documents does not weigh in favor of keeping the case in New York.

### 5.    *Disruption of the accused's businesses.*

Although Levis works in his family business, he is devoting himself full-time to defending his criminal case at this time. Thus, this factor is neutral.

### 6.    *Expenses to the parties.*

Trial of this case in New York will be expensive for Levis. If trial is held in Puerto Rico, Levis and the vast majority of the trial witnesses will incur no travel and lodging expenses in connection with the case. If the trial is held in New York, however, the defendant will be forced to incur travel and lodging expenses, not only for himself but also

-19-

for his family, who wishes to support him and to attend the trial, and for his lawyers and witnesses. The government has estimated that its own case-in-chief could consume five weeks, requiring lodging and meals for at least one or two nights each for the prosecution witnesses. On the other hand, if the trial is held in Puerto Rico, none of the witnesses from Puerto Rico – an overwhelming majority – will require overnight hotel stays. The same applies to the defense case, which could also take weeks. Moreover, hotel stays for the defense team will be substantially more expensive in New York than in Puerto Rico.

Much of the expense would be avoided if the case was transferred to Puerto Rico. The magnitude of the foreseeable costs weighs heavily in favor of a transfer of this case to Puerto Rico. *Cf. United States v. Maldonado-Rivera*, 922 F.2d 934, 965-66 (2d Cir. 1990) (denial of change of venue from Connecticut to Puerto Rico affirmed where defendants had been granted *in forma pauperis* status and so cost of transporting witnesses from Puerto Rico would be paid by the government).

### 7.    *Location of counsel.*

The location of counsel "is entitled to the least consideration" among the factors considered on a motion to transfer. *See Meterlogic, Inc.*, 185 F. Supp. 2d at 1304. If this case is transferred to Puerto Rico, Levis's Miami counsel will still require travel to Puerto Rico and lodging during trial. The prosecutors in this case can likely obtain assistance from prosecutors in the U.S. Attorney's Office in Puerto Rico, and will not be prejudiced by

transfer. The only difference may be the lower cost of housing and living in Puerto Rico, as opposed to New York. Thus, this factor does not weigh heavily in favor of either party.

### 8.    *Relative accessibility of the place of trial.*

In determining Rule 21(b) transfer motions, courts have considered factors such as the relative number of flights, the percentage of direct and connecting flights, and travel times to bring the parties and witnesses to the place of trial. *See McDonald,* 740 F. Supp. at 763-64; *Russell,* 582 F. Supp. at 664. Puerto Rico is far more accessible to local witnesses, and just as accessible to witnesses located outside of New York as is New York. *Cf. Alter*, 81 F.R.D. at 526 (noting that while New York has excellent air service, the transferee court, as a vacation and resort area, will have substantial and direct air service from all major cities of the United States). Given the potential for a significant number of witnesses from Puerto Rico, the logic of trying this case in Puerto Rico, rather than New York, is manifest. Hundreds of hours of travel time for these witnesses would be saved, and thousands of dollars in transportation and lodging costs could be saved by ***both*** the prosecution and the defense.

### 9.    *Relative docket conditions.*

The docket of the Southern District of New York is substantially busier than that of the District of Puerto Rico. As of 2007, the District of Puerto Rico had only 352 criminal cases pending, as opposed to 3,568 in the Southern District of New York. According to government statistics, *see* http://www.uscourts.gov/judbus2007/contents.html, in Puerto Rico

-21-

it takes about 14.3 months from the date of filing to dispose of a criminal case as opposed

to 20.0 months in the Southern District of New York.  Because Levis's counsel needs time

to prepare for trial (given the volume of the discovery), that difference is not an important

factor.  Suffice it to say that the docket in the District of Puerto Rico is not an *impediment*

to having an expeditious trial in that district.

### 10.    *Other special factors*

Trial in Puerto Rico will minimize the trauma and disruption of the lives of Levis's

family.  Levis has two young children, ages two and six, the latter of whom would have to

be taken out of school for the duration of trial in New York.  *See Valdes*, 2006 WL 738403,

at *4 ("[F]amily obligations, including the care of children, militates (sic) in favor of

transferring proceedings to the district in which a defendant resides.").

In addition, Levis is currently under medical supervision for sensory neuropathy – a

pinched nerve and cervical herniated disc condition he has suffered for 20 years.  He takes

Lyrica 75 mg (two times a day) and Cataflan 50mg (once a day).  *See* Medical Certificates

(attached as Exhibit C).  Levis is treated by a physician in Puerto Rico who understands his

chronic condition.  He also suffers from hypertension.  (Exhibit C).  While there are

undoubtedly capable physicians in New York to treat these conditions, a trial in New York

will interrupt the continuity of his care.  Moreover, a trial away from the comforts of home

threatens to exacerbate this condition.  Courts have found that certain medical needs weigh

in favor of transfer.  *See, e.g.*, *United States v. Martino*, No. S1 00 CR 389, 2000 WL

1843233, at *6 (S.D.N.Y. Dec. 14, 2000) (transferring venue in part because defendant was under medical supervision in Florida and psychiatrist submitted an affidavit stating that trial in Florida would minimize impact on Martino's medical condition).   Levis's family responsibilities and medical condition thus weigh in favor of transfer to Puerto Rico.

## CONCLUSION

Mario S. Levis is entitled to a jury of his peers in the district where he has lived a majority of his adult life and where the overwhelming majority of the key events allegedly occurred, the witnesses are located, and the relevant documents were generated.  Therefore, for all of the foregoing reasons, the Court should exercise its discretion and transfer this case to the District of Puerto Rico.

Respectfully submitted,

 /s Roy Black
ROY BLACK, ESQ.
(FL Bar No. 126088)
HOWARD M. SREBNICK, ESQ.
(FL Bar No. 919063)
MARIA D. NEYRA, ESQ.
(FL Bar No. 074233)
Black, Srebnick, Kornspan & Stumpf, P.A.
201 South Biscayne Blvd., Suite 1300
Miami, Florida 33131
Tele: (305) 371-6421
Fax: (305) 358-2006
rblack@royblack.com

*Attorneys for Defendant Levis*

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| MARIO S. LEVIS, | ) |
| a/k/a "Sammy Levis," | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

**CASE NO. 08-CRIM-181**

## DECLARATION OF MARIA D. NEYRA, ESQ.

Maria D. Neyra hereby declares under penalty of perjury, pursuant to 28 U.S.C. §1746, that the following is true and correct to the best of her knowledge and belief:

1.     I am a partner with the law firm of Black, Srebnick, Kornspan & Stumpf, P.A. ("BSKS"), in Miami, Florida.  I am admitted to practice in the State of Florida.  I am a member in good standing of the Florida Bar, and have been admitted to practice before various district courts.

2.     Roy Black and Howard Srebnick, named partners at BSKS, are the lead trial lawyers for Mario S. Levis, the defendant in the above-styled action.

3.     This declaration is being filed in support of Mr. Levis's motion for a change of venue from the Southern District of New York to the District of Puerto Rico.

4.     I have reviewed the motion and I have personal knowledge of or have otherwise become familiar with the facts alleged therein.

5.    The factual statements in the motion are, to my knowledge, true and correct and

consistent with the information I have learned during the course of this case.

6.    I have also communicated with the prosecutors regarding Mr. Levis' request

for a change of venue. I have been advised that the government opposes this request for a

change of venue.

Dated this  17th day of July, 2008.

Maria Neyra
MARIA D. NEYRA, ESQ.

2

# Exhibit B

## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

### FORM 10-K

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal Year Ended December 31, 2004**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File No. 0-17224**

## Doral Financial Corporation
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Puerto Rico** | **66-0312162** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. employer identification no.) |
| **1451 Franklin D. Roosevelt Avenue San Juan, Puerto Rico** (Address of principal executive offices) | **00920-2717** (Zip Code) |

**Registrant's telephone number, including area code: (787) 474-6700.**

Securities registered pursuant to Section 12(b) of the Act:

| **Title of Each Class** | **Name of Each Exchange on Which Registered** |
|---|---|
| Common Stock, $1 par value. | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:

**Title of Each Class**

7% Noncumulative Monthly Income Preferred Stock, Series A
8.35% Noncumulative Monthly Income Preferred Stock, Series B
7.25% Noncumulative Monthly Income Preferred Stock, Series C

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    . No ☐    .

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2). Yes ☒    . No ☐    .

State the aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked

prices of such common equity, as of the last business day of the registrant's most recently completed second fiscal quarter.

$3,096,093,860, approximately, based on the last sale price of $34.50 per share on the New York Stock Exchange on June 30, 2004. For the purposes of the foregoing calculation only, all directors and executive officers of the registrant and certain related parties of such persons have been deemed affiliates.

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date:

Common Stock: 107,921,799 shares as of March 9, 2005.                              (continued)

## PART I

**I tem 1.   Business**

### GENERAL

Doral Financial Corporation ("Doral Financial" or the "Company") is a diversified financial services company engaged in mortgage banking, banking (including thrift operations), institutional securities operations and insurance agency activities. Doral Financial's activities are principally conducted in Puerto Rico and in the New York City metropolitan area. As of December 31, 2004, Doral Financial had consolidated assets of approximately $15.1 billion and consolidated stockholders' equity of approximately $2.0 billion.

Doral Financial's principal strategy is to further develop its core mortgage banking business while continuing to expand into other financial services such as branch banking, institutional securities services and insurance agency services that have natural synergies with its mortgage related businesses. Doral Financial seeks to leverage its reputation as the leading mortgage banker and the fourth largest commercial bank in Puerto Rico, as well as its base of over 400,000 clients, to cross-sell other financial services. Doral Financial also intends to continue to explore opportunities to expand geographically within the mainland United States, particularly within the New York City metropolitan area and other areas with large Hispanic or minority populations. Doral Bank, FSB, a federal savings bank, currently operates six branches in the New York City metropolitan area.

Doral Financial seeks to increase its volume of loan originations by emphasizing quality customer service and by maintaining the most extensive branch office system of any mortgage banking institution in Puerto Rico. Doral Financial strives to increase its servicing portfolio primarily through internal loan originations and supplements these originations with purchases of loans on a servicing-released basis and mortgage servicing rights from third parties. Doral Financial generally through its international banking entity subsidiary also purchases U.S. conforming loans without the related servicing rights which it generally securitizes and sells into the market.

Doral Financial seeks to maximize net interest income by holding mortgage-backed securities, primarily Puerto Rico tax-exempt mortgage-backed securities backed by Puerto Rico mortgages and guaranteed by the Government National Mortgage Association, or GNMA securities, for longer periods prior to sale than most U.S. mortgage banking companies. This strategy reduces Doral Financial's overall effective tax rate. Doral Financial's banking subsidiaries also seek to increase net interest income by funding and holding for investment loans and investment securities, consisting primarily of residential mortgage loans, mortgage-backed securities and United States government and agency obligations. Doral Financial also operates a Puerto Rico international banking entity subsidiary that invests in assets that generate interest and investment income that is generally not subject to income taxation for Puerto Rico or U.S. income tax purposes.

Doral Bank, Doral Financial's Puerto Rico banking subsidiary ("Doral Bank PR"), has opened 18 branches in the past five years. As of December 31, 2004, Doral Bank PR operated 40 branches in Puerto Rico, concentrated in the greater San Juan metropolitan area and the Island's northeast region. Many of the recently opened branches are larger in size than typical Doral Bank PR branches and are referred to as Doral Financial Centers. Doral Bank PR subleases space in these centers to affiliates thereby allowing clients to obtain bank loan and deposit products from Doral Bank PR, residential mortgage loans from one of Doral Financial's mortgage banking units, insurance products through Doral Insurance Agency, Inc., and securities services through representatives of UBS Financial Services Incorporated of Puerto Rico located at the branch under an agreement with Doral Bank PR.

Doral Financial was founded in 1972 under the laws of the Commonwealth of Puerto Rico. Doral Financial's principal executive offices are located at 1451 Franklin D. Roosevelt Avenue, San Juan, Puerto Rico, and its telephone number is (787) 474-6700.

## Mortgage Banking Business

Doral Financial conducts its mortgage banking activities in Puerto Rico through its four mortgage banking units – HF Mortgage Bankers, an operating division at the parent company level, Doral Mortgage Corporation, Centro Hipotecario de Puerto Rico, Inc. and Sana Mortgage Corporation. On the United States mainland, Doral Financial conducts its mortgage banking activities through its subsidiary, Doral Money, Inc. Doral Financial operates 58 mortgage banking offices in Puerto Rico and one office on the United States mainland.

### Mortgage Loan Origination

*Mortgage Loan Products.* Doral Financial is an approved seller/servicer for the Federal Home Loan Mortgage Corporation ("FHLMC") and the Federal National Mortgage Association ("FNMA"), an approved issuer for the Government National Mortgage Association ("GNMA") and an approved servicer under the GNMA, FNMA and FHLMC mortgage-backed securities programs. Doral Financial is also qualified to originate mortgage loans insured by the Federal Housing Administration ("FHA") or guaranteed by the Veterans Administration ("VA") or by the Rural Housing Service ("RHS").

Doral Financial makes available a variety of mortgage loan products that are designed to meet consumer needs and competitive conditions. Doral Financial has traditionally emphasized 15 to 30 year first mortgage loans secured by single family residences. Doral Financial generally classifies mortgage loans between those that are guaranteed or insured by the FHA, VA or RHS and those that are not. The latter type of loans are referred to as conventional loans. Conventional loans that meet the underwriting requirements for sale or exchange under standard FNMA or FHLMC programs are referred to as conforming loans, while those that do not are referred to as non-conforming loans.

Doral Financial's current principal mortgage loan products are summarized below:

FHA and VA loans . These are 15 to 30 year first mortgage loans that qualify for the insurance program of FHA or the guarantee programs of VA. As of December 31, 2004, the maximum loan amount for a VA loan was $240,000 and for FHA loans the maximum ranged from $172,632 to $247,000, for a one-family dwelling and, depending on the location of the mortgaged property, could go as high as $390,000 for a four-family dwelling.

RHS loans . These are 30 year first mortgage loans made to low income individuals that qualify for the guarantee program of RHS. As of December 31, 2004, the maximum loan amount for an RHS loan was based on an income table which is revised periodically.

Conforming conventional loans . These are loans that satisfy the underwriting criteria for standard sale or exchange programs of FNMA or FHLMC. As of December 31, 2004, the maximum loan amount for conforming conventional loans was $359,650 for a one-family dwelling.

Non-conforming loans . These are conventional mortgage loans that do not qualify for sale or exchange under the standard programs of FNMA or FHLMC. The principal deviations that do not permit non-conforming loans to qualify for such programs are more flexible requirements for income verification or credit history, and loan amounts in excess of those permitted by FNMA or FHLMC. Doral Financial uses its own credit system to evaluate these loans and generally requires lower loan-to-value ratios and higher borrower equity.

2

Second mortgage loans . Doral Financial has traditionally offered loans secured by second mortgage liens on single family residences as part of its non-conforming loan products.

Home equity mortgage loans . These loans are generally up to $40,000 and are secured by first or second mortgages on single family residences. They are generally made for debt consolidation, home improvements or other individual consumer credit needs.

Other mortgage loans . Doral Financial's mortgage banking units also originate construction loans for owner occupied single family residences and real estate development projects, as well as land loans and loans secured by income producing residential, multi-family and commercial properties. However, most construction loans for real estate development projects are originated by Doral Bank PR. See "Banking Activities."

For additional information on Doral Financial's mortgage loan originations, refer to Table H included in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section which is incorporated by reference in this report.

### Mortgage Origination Channels

Doral Financial's strategy is to increase the size of its mortgage servicing portfolio primarily by originations through its retail branch network. Doral Financial supplements retail originations with wholesale originations that encompass purchases of loans on a servicing-released basis from third parties and referrals from mortgage brokers. Doral Financial, generally through its international banking entity subsidiary, also purchases U.S. conforming loans without the associated servicing rights which are generally securitized into FNMA or FHLMC securities and sold in the market. In Puerto Rico, Doral Financial maintains specialized units for the origination of construction loans and loans to finance purchases of residences in new housing developments. The principal origination channels of Doral Financial's mortgage banking units are summarized below.

Retail branch network . Doral Financial operates 58 mortgage banking offices in Puerto Rico and one branch office in the United States. Customers are sought through aggressive advertising campaigns in local newspapers, as well as direct mail and telemarketing campaigns. Doral Financial emphasizes quality customer service and offers extended operating hours to accommodate the needs of customers.

Wholesale activities . Doral Financial purchases conforming mortgage loans on a wholesale basis from U.S. financial institutions without the related servicing rights which are generally securitized into FNMA or FHLMC securities and sold into the market. Doral Financial also purchases mortgage loans from other mortgage bankers in Puerto Rico consisting primarily of nonconforming mortgage loans and to a lesser extent FHA and VA loans for securitization into GNMA securities and resale to institutional investors. For the years ended December 31, 2004 and 2003 total loan purchases amounted to approximately $2.9 billion and $2.1 billion, respectively, of which $2.5 billion and $1.7 billion consisted of U.S. conforming loans.

New housing unit . In Puerto Rico, Doral Financial maintains a separate unit that works closely with residential housing developers and specializes in originating mortgage loans to finance the purchase of homes in newly developed housing projects. Doral Financial originated approximately $539 million of mortgage loans to finance the purchase of homes within new housing projects during the year ended December 31, 2004, compared to $519 million for the year ended December 31, 2003.

New York multi-family and commercial real estate lending subsidiary . During 1998, Doral Financial established Doral Money, Inc., a lending subsidiary in the New York City metropolitan area, that specializes in originating mortgage loans secured by income producing multi-family residential and commercial properties, including bridge loans and loans to finance the rehabilitation of multi-family residential buildings.

3

During the years ended December 31, 2004 and 2003, this subsidiary originated approximately $42 million and $45 million, respectively, of mortgage loans, consisting principally of this type of mortgage product.

Construction Loans . Construction loans on residential housing developments are originated by a specialized unit within the HF Mortgage Bankers Division and by Doral Bank PR. See "Banking Activities."

For more information on Doral Financial's loan origination channels, refer to Table I in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section incorporated by reference in this report.

### Loan Underwriting

All loan originations, regardless of whether originated through the retail network, purchased from third parties or obtained through mortgage brokers, must be underwritten in accordance with Doral Financial's underwriting criteria, including loan-to-value ratios, borrower income qualifications, debt ratios and credit history, investor requirements, and title insurance and property appraisal requirements. Doral Financial's underwriting standards also comply with the relevant guidelines set forth by HUD, VA, FNMA, FHLMC, federal and Puerto Rico banking regulatory authorities, private mortgage investment conduits and private mortgage insurers, as applicable. Doral Financial's underwriting personnel, while operating within Doral Financial's loan offices, make underwriting decisions independent of Doral Financial's mortgage loan origination personnel. Under Doral Financial's quality control plan, Doral Financial reverifies a portion of the mortgage loans funded each month, to provide reasonable assurance that Doral Financial's underwriting standards have been satisfied. The selection of mortgage loans for reverification is done on a sampling basis to provide quality control coverage for all mortgage loan programs and appraisers. In addition, Doral Financial reconfirms employment status, the source of down payment and other key items.

Conventional mortgage loans generally (i) do not exceed 80% (90% for certain qualifying home purchase transactions) of the appraised value of the mortgaged property or (ii) are insured by private mortgage insurance. The maximum loan-to-value ratio on second mortgages generally does not exceed 80% (including the amount of any first mortgage). Non-conforming loans, other than jumbo loans to finance home purchases, generally have a loan-to-value ratio below 70%.

### Loan Servicing

When Doral Financial sells originated or purchased mortgage loans, it generally retains the right to service such loans and to receive the related servicing fees, except in the case of U.S. conforming loans that are purchased without the servicing rights and generally securitized into FNMA or FHLMC securities and sold into the market. Doral Financial's principal source of servicing rights has traditionally been its mortgage loan production. Doral Financial also seeks to purchase servicing rights in bulk when it can identify attractive opportunities.

Servicing rights represent a contractual right and not a beneficial ownership interest in the underlying mortgage loans. Failure to service the loans in accordance with contract requirements may lead to a termination of the servicing rights and the loss of future servicing fees. In general, Doral Financial's servicing agreements are terminable by the investors for cause. There has been no termination of servicing rights by any mortgage loan owner because of the failure by Doral Financial to service loans in accordance with its contractual obligations.

Doral Financial's mortgage loan servicing portfolio is subject to reduction by reason of normal amortization, prepayments and foreclosure of outstanding mortgage loans. Additionally, Doral Financial may sell mortgage loan servicing rights from time to time to other institutions if market conditions are favorable. Refer to Table J in the "Management's Discussion and Analysis of Financial Condition and Results of

"Operations" section incorporated by reference in this report for detailed information on the composition and movement of Doral Financial's mortgage loan servicing portfolio.

The degree of risk associated with a mortgage loan servicing portfolio is largely dependent on the extent to which the servicing portfolio is non-recourse or recourse. In non-recourse servicing, the principal credit risk to the servicer is the cost of temporary advances of funds. In recourse servicing, the servicer agrees to share credit risk with the owner of the mortgage loans such as FNMA or FHLMC or with a private investor, insurer or guarantor. Losses on recourse servicing occur primarily when foreclosure sale proceeds of the property underlying a defaulted mortgage loan are less than the outstanding principal balance and accrued interest of such mortgage loan and the cost of holding and disposing of the underlying property. Doral Financial often sells non-conforming loans on a recourse or partial recourse basis. For additional information regarding recourse obligations, see "—Management's Discussion and Analysis of Financial Condition and Results of Operations — Off-Balance-Sheet Activities."

In the ordinary course of business, Doral Financial makes certain representations and warranties to purchasers and insurers of mortgage loans and to the purchasers of servicing rights. In connection with any purchases of certain servicing rights, Doral Financial may have a liability exposure as a guarantor to the representations and warranties of third party originators. If a loan defaults and there has been a breach of representations and warranties, Doral Financial may become liable for the unpaid principal and interest on defaulted loans. In such a case, Doral Financial may be required to repurchase the mortgage loan and bear any subsequent loss related to the loan. To date, the impact on earnings of loans repurchased as a result of borrower misrepresentations has not been material.

Doral Financial's servicing rights provide a significant continuing source of income. There is a market in Puerto Rico for servicing rights, which are generally valued in relation to the present value of the expected cash income stream generated by the servicing rights. However, the fair values of servicing rights cannot be determined with precision because they are not traded in a liquid secondary market. Among the factors which influence the value of a servicing portfolio are servicing fee rates, loan balances, loan types, loan interest rates, expected average life of underlying loans (which may be reduced through foreclosure or prepayment), the value of escrow balances, delinquency and foreclosure experience, servicing costs, servicing termination rights of permanent investors, and any recourse provisions.

The market value of, and earnings from, Doral Financial's mortgage loan servicing portfolio may be adversely affected if mortgage interest rates decline and mortgage loan prepayments increase. In a period of declining interest rates and accelerated prepayments, servicing income generated from Doral Financial's mortgage loan servicing portfolio may also decline through increased amortization and the recognition of impairment of servicing rights. Conversely, as mortgage interest rates increase, the market value of Doral Financial's mortgage loan servicing portfolio may be positively affected. Increases in the rate of delinquencies and foreclosures on mortgage loans tend to increase the costs associated with administering mortgage loans. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Interest Rate Risk Management" which is incorporated by reference in this report.

### Sale of Loans and Securitization Activities

*Residential Mortgage Loans.* Doral Financial customarily sells or securitizes most of the residential mortgage loans that it originates and purchases, except for certain residential loans held at its banking subsidiaries. As described below, Doral Financial utilizes various channels to sell its mortgage products. Doral Financial issues GNMA-guaranteed mortgage-backed securities, which involve the packaging of FHA loans, RHS loans or VA loans into pools of $1 million or more (generally $2.5 million for serial notes) for sale primarily to broker-dealers and other institutional investors. During the years ended December 31, 2004 and 2003, Doral Financial issued approximately $411 million and $375 million, respectively, in GNMA-guaranteed mortgage-backed securities.

5

Conforming conventional loans are generally either sold directly to FNMA, FHLMC or private investors for cash, or are grouped into pools of $1 million or more in aggregate principal balance and exchanged for FNMA or FHLMC-issued mortgage-backed securities, which Doral Financial sells to broker-dealers. In connection with such exchanges, Doral Financial pays guarantee fees to FNMA and FHLMC. The issuance of mortgage-backed securities provides Doral Financial with flexibility in selling the mortgage loans that it originates or purchases and also provides income by increasing the value and marketability of such loans. For the years ended December 31, 2004 and 2003, Doral Financial securitized approximately $2.8 billion and $2.3 billion, respectively, of loans into FNMA and FHLMC mortgage-backed securities. In addition, for the years ended December 31, 2004 and 2003, Doral Financial sold approximately $425.3 million and $593.0 million, respectively, of loans through the FNMA and FHLMC cash window program.

Mortgage loans that do not conform to GNMA, FNMA or FHLMC requirements (non-conforming loans) are generally sold in bulk to local financial institutions or to FNMA or FHLMC in negotiated transactions. Doral Financial's bulk sales generally operate very similar to securitization transactions because when Doral Financial sells a pool of loans to an investor it retains the servicing rights and agrees to pay the purchaser a specified pass-through rate for the entire pool being purchased. Any amounts received on the mortgages above the pass-through rate are retained by Doral Financial. The pass-through rate paid to the investors may be a fixed rate or more often a variable rate generally based on a spread over the three-month London Interbank Offered Rate ("Libor"). The present value of the future cash flow retained by Doral Financial above standard servicing fees for FNMA or FHLMC are recognized on Doral Financial's financial statements as interest-only strips ("IOs"). The fair values assigned to the IOs and the mortgage servicing rights reduce the carrying amount of the loan sold. The gain realized on the sale of the loan is determined by the difference of the sales price for the loan over the carrying amount. See "Management's Discussion Analysis of Financial Condition and Results of Operations—Critical Accounting Policies" incorporated herein by reference for a more detailed discussion of the impact of IOs on Doral Financial's Consolidated Financial Statements. Currently, a liquid secondary market for IOs does not exist in Puerto Rico. Doral Financial, however, in the past has been able to periodically sell IOs to financial institutions in private transactions.

The relative emphasis on the origination of FHLMC and FNMA conforming loans versus FHA, RHS and VA loans and non-conforming loans depends on market conditions, including the needs of borrowers, the relative pricing and return on sales of the different types of mortgage loans and the maximum amounts for the various types of loans.

Doral Financial generally sells non-conforming loans on a full or limited recourse basis. As of December 31, 2004 and 2003, Doral Financial was servicing mortgage loans with an aggregate principal amount of $3.9 billion and $2.4 billion, respectively, on a full or limited recourse basis. As of December 31, 2004 and 2003, Doral Financial's maximum aggregate recourse obligation relating to its mortgage servicing portfolio was approximately $3.3 billion and $1.9 billion, respectively. As of December 31, 2004, Doral Financial maintained a reserve of $10.8 million to absorb potential losses from such recourse arrangements. For the year ended December 31, 2004, Doral Financial recognized net credit losses of approximately $1.5 million on loans it was required to purchase pursuant to recourse arrangements.

**Puerto Rico Secondary Mortgage Market and Favorable Tax Treatment**

In general, the Puerto Rico market for mortgage-backed securities is an extension of the United States market with respect to pricing, rating of investment instruments, and other matters. However, Doral Financial has benefited historically from certain tax incentives provided to Puerto Rico residents to invest in FHA and VA loans and GNMA securities backed by such loans.

Prior to August 1, 1997, the interest received on FHA and VA loans secured by real property located in Puerto Rico and on GNMA mortgage-backed securities backed by these loans was exempt from Puerto Rico

6

income taxes. This favorable tax treatment has historically permitted Doral Financial to sell tax-exempt Puerto Rico GNMA mortgage-backed securities to local investors at higher prices than those at which comparable instruments trade in the mainland United States, and also to reduce its effective tax rate through the receipt of tax-exempt interest.

On July 22, 1997, the Puerto Rico Internal Revenue Code was amended to modify the tax-exempt treatment of FHA and VA loans secured by real property in Puerto Rico and GNMA mortgage-backed securities backed by such loans. Under the terms of the amendment, effective August 1, 1997, only FHA and VA loans used to finance the original purchase of newly constructed housing in Puerto Rico and mortgage-backed securities backed by such loans qualify for tax-exempt treatment. The amendment, however, provides a preferential tax rate of 17% for individuals to be withheld at source with respect to interest received on FHA and VA loans not qualifying for tax exemption. In addition, the amendment grandfathered the tax-exempt status of FHA and VA loans originated on or prior to July 31, 1997 and mortgage-backed securities backed by such loans.

## Banking Activities

Doral Financial is engaged in commercial banking activities in Puerto Rico through its subsidiary, Doral Bank PR. As of December 31, 2004, Doral Bank PR operated through 40 branches in Puerto Rico. Doral Bank PR offers a variety of mortgage products similar to those offered by Doral Financial's mortgage banking units. Doral Bank PR's lending activities are concentrated primarily on the origination of residential mortgage loans and are closely integrated with Doral Financial's mortgage banking units as described below. Residential mortgage loans originated by Doral Bank PR are usually sold through Doral Financial's mortgage banking units. As of December 31, 2004, Doral Bank PR had a portfolio of mortgage loans held-for-sale of approximately $1.1 billion, which includes mortgage loans held-for-sale by Doral Bank PR's wholly-owned subsidiaries, Doral Money and Doral International. As of December 31, 2004, Doral Bank PR had loans classified as loans receivable of approximately $1.6 billion of which $607.1 million consists of residential mortgage loans. Doral Bank PR is also actively involved in originating construction loans to finance the construction of residential home developments and, commercial real estate projects. Doral Bank PR continues to actively pursue commercial loans secured by real estate collateral.

Doral Bank PR's mortgage origination activities are closely integrated with Doral Financial's mortgage banking units through a Master Loan Production Agreement. Under this Agreement, Doral Financial's mortgage banking units have agreed to assist Doral Bank PR meet its stated mortgage loan production goals by, among other things, (i) advertising, promoting and marketing to the general public; (ii) interviewing prospective borrowers and conducting the initial processing of loan applications, consistent with Doral Bank PR's underwriting guidelines; and (iii) providing personnel and facilities with respect to the execution of loan agreements. Doral Bank PR independently underwrites all loans closed through the Master Loan Production Agreement. In the future, Doral Bank PR may determine to engage in direct mortgage loan originations through its branch network.

Doral Bank PR is also a party to a Master Servicing and Collection Agreement (the "Master Servicing Agreement") with Doral Financial's mortgage banking units, whereby these units have agreed to service all of Doral Bank PR's loans originated after the date of the Master Servicing Agreement. Doral Financial is entitled to receive a servicing fee, net of guarantee fees, ranging from 25 to 44 basis points of the outstanding principal amount of the loans being serviced. Doral Bank PR retains the right to terminate Doral Financial's servicing rights, without cause, upon notice to Doral Financial.

Doral Financial is engaged in the banking business in the New York City metropolitan area through its federal savings bank subsidiary, Doral Bank, FSB ("Doral Bank NY"). Doral Bank NY offers retail banking services and products and currently operates six branch locations in the New York City metropolitan area. Doral Bank NY plans to expand its network throughout the five New York boroughs with the goal of opening

7

seven more branches in 2005. To date, Doral Bank, NY has focused its lending activities on loans secured by multi-family apartment buildings and commercial properties located in the New York City metropolitan area. Doral Bank NY also purchases conforming residential loans from financial institutions.

Doral Bank NY is a party to Master Loan Production and Master Servicing and Collection Agreements with Doral Financial's mortgage banking units similar to those in effect for Doral Bank PR.

In addition to originating residential mortgage loans, construction loans and commercial loans secured by multi-family buildings, Doral Bank PR and Doral Bank NY also originate consumer loans, unsecured commercial loans and loans secured by undeveloped real property. See "Management's Discussion and Analysis of Financial Condition and Results of Operations – Loans Receivable" incorporated by reference into this Form 10-K for detailed information regarding Doral Financial's portfolio of loans receivable.

Doral Bank PR and Doral Bank NY complement their lending activities by earning fee income, collecting service charges for deposit accounts and other traditional banking services, as well as through trading activities through its international banking entity subsidiary, in the case of Doral Bank PR. See "Other Investment Activities" below.

For detailed information regarding the deposit accounts of Doral Financial's banking subsidiaries please refer to the Liquidity and Capital Resources section of the Management's Discussion and Analysis of Financial Condition and Results of Operations incorporated by reference into this Form 10-K.

**Institutional Securities Operations**

Doral Financial is involved in the securities business through Doral Securities, Inc., a broker-dealer firm registered with the Securities and Exchange Commission (the "SEC") and a member of the National Association of Securities Dealers, Inc. (the "NASD"). Doral Securities provides institutional brokerage, financial advisory and investment banking services. During 2002, Doral Financial sold its retail securities brokerage business to UBS Financial Services Incorporated of Puerto Rico ("UBS Financial Services"). As part of the transaction, UBS Financial Services agreed to provide retail securities services in selected Doral Financial bank branch locations and to pay Doral Financial a base rent plus a portion of all commissions earned with respect to sales of securities at these locations.

Following the sale of its retail unit, Doral Securities has concentrated its efforts on sales to institutional clients as well as investment banking services in both the public and private capital markets. During 2003, Doral Securities also began asset management services by acting as a co-investment manager to a local fixed income investment company. Doral Securities also earns interest revenues by acting as an intermediary between borrowers, including Doral Financial, and lenders of funds utilizing repurchase and reverse repurchase agreements. As of December 31, 2004, Doral Securities had $61.7 million in outstanding reverse repurchase agreements, of which approximately $12.5 million consisted of funds loaned to Doral Financial and its subsidiaries and which are eliminated in the preparation of Doral Financial's Consolidated Financial Statements. Doral Securities has made a strategic decision to reduce its repurchase operation.

**Other Investment Activities**

As a result of Doral Financial's mortgage securitization activities, Doral Financial maintains a substantial portfolio of mortgage-backed securities classified as held-for-trading. Doral Financial also invests in securities that are classified either as available-for-sale or held-to-maturity. In addition, Doral Financial operates an international banking entity subsidiary. Under Puerto Rico law, Doral Financial's international banking entity subsidiary is generally not subject to Puerto Rico income taxation on the interest earned on the securities held by it or on the gains from the sale of securities held by it. Among other activities, Doral Financial's international banking entity subsidiary generates investment income by purchasing U.S. whole loans,

8

securitizing them into mortgage-backed securities and selling them into the market. Because Doral Financial and its Puerto Rico subsidiaries, including its international banking entity subsidiary, are considered foreign corporations for U.S. income tax purposes they generally are not subject to U.S. income tax on the interest earned on such securities.

Refer to "Management's Discussion and Analysis of Financial Condition and Results of Operations—Investment and Trading Activities" and to Notes 5, 6 and 7 to Doral Financial's Consolidated Financial Statements for more detailed information on Doral Financial's investment activities.

**Insurance Agency Activities**

Taking advantage of the cross-marketing opportunities provided by financial modernization legislation, during 2000, Doral Financial entered the insurance agency business in Puerto Rico. Doral Insurance Agency currently earns commissions by acting as agent in connection with the issuance of insurance policies by unaffiliated insurance companies. During 2004 and 2003, Doral Insurance Agency produced insurance fees and commissions of $11.9 million and $7.9 million, respectively. Doral Insurance Agency anticipates continued growth as it expands the products and services it provides and continues to cross market its services to Doral Financial's existing customer base.

**Puerto Rico Income Taxes**

Doral Financial and each of its Puerto Rico subsidiaries is subject to a maximum marginal statutory corporation income tax rate of 39% pursuant to the Puerto Rico Internal Revenue Code of 1994 (the "PR Code"). Under the PR Code, corporations are not permitted to file consolidated returns with their subsidiaries and affiliates. Doral Financial is entitled to a 100% dividend received deduction on dividends received from Doral Bank PR, Doral Mortgage or any other Puerto Rico subsidiary subject to tax under the PR Code.

In computing its interest expense deduction, Doral Financial's interest deduction will be reduced in the same proportion that its average exempt obligations (including FHA and VA loans and GNMA securities) bear to its average total assets. Therefore, to the extent that Doral Financial holds FHA loans or VA loans and other tax exempt obligations, part of its interest expense may be disallowed for tax purposes.

On August 22, 2004, local legislation was enacted to provide a temporary reduction in the long-term capital gain tax rates. The law amends the Puerto Rico Internal Revenue Code of 1994 to reduce the long-term capital gain tax rates by fifty percent for transactions occurring from July 1, 2004, through June 30, 2005. The maximum long-term capital gain tax rate applicable to gains on sale of property located in Puerto Rico during this period has been reduced to 6.25% from 12.5% for corporations and partnerships. To take advantage of this reduction, during the fourth quarter of 2004, Doral Financial completed an intercompany sale of approximately $536.6 million in interest-only strips ("IOs") to accelerate the realization of long-term capital gains that had been deferred for tax purposes and resulted in the recognition of an income tax benefit of approximately $77.0 million and a reduction in the deferred tax liability associated with the IOs. This income tax benefit represents the difference between the deferred tax liability on the IOs and the new long-term capital gain tax rate of 6.25%.

Doral Financial's international banking entity subsidiary is generally not subject to Puerto Rico income taxes on interest earned on, or gain realized from the sale of, non-Puerto Rico assets including certain U.S. securities. The results of Doral Financial for the years ended December 31, 2004 and 2003 include the results of Doral Overseas, an international banking entity organized as a division at the parent company level. In connection with local legislation enacted on January 8, 2004, designed to encourage international banking entities to operate as separate legal entities rather than operating divisions, effective March 31, 2004, Doral Financial phased out the operations of Doral Overseas. The investing activities previously carried out by Doral Overseas are now conducted by Doral International, Inc., an international banking entity and a wholly-owned

9

subsidiary of Doral Bank PR. As a result, Doral Financial continues to enjoy 100% tax-exempt income from its international banking operation.

## United States Income Taxes

Except for Doral Bank NY and Doral Money, Doral Financial and its subsidiaries are corporations organized under the laws of Puerto Rico. Accordingly, Doral Financial and its subsidiaries are generally only required to pay United States income tax on their income, if any, derived from the active conduct of a trade or business within the United States (excluding Puerto Rico) or from certain investment income earned from United States sources. Doral Bank NY and Doral Money are subject to both federal and state income taxes on the income derived from their operations in the United States.

## Employees

At January 31, 2005, Doral Financial employed 2,613 persons, of which 2,515 were employed in Puerto Rico. Of these, 1,458 were employed in the mortgage banking units, with 852 involved in loan production activities and 219 involved in loan servicing activities. As of such date, Doral Financial's banking, broker-dealer and insurance agency operations employed 1,038, six, and 13 employees, respectively. None of Doral Financial's employees are represented by a labor union and Doral Financial considers its employee relations to be good.

## Segment Disclosure

For information regarding Doral Financial's operating segments, please refer to Note 33 to Doral Financial's Consolidated Financial Statements "Segment Information" and the information provided under the caption "Operating Segments" in the Management's Discussion and Analysis of Financial Conditions and Results of Operation incorporated by reference into this Form 10-K.

Puerto Rico is the principal market for Doral Financial. Doral Financial's Puerto Rico based operations accounted for 97% of Doral Financial's consolidated assets as of December 31, 2004 and 99% of Doral Financial's consolidated revenues for the year then ended. Approximately, 68% of total loan originations were secured by real estate properties located in Puerto Rico. The following table sets forth the geographic composition of Doral Financial's loan originations:

|  | December 31, | | |
|  | 2004 | 2003 | 2002 |
| --- | --- | --- | --- |
| Puerto Rico | 68% | 73% | 70% |
| United States [1] | 32% | 27% | 30% |

[1]    Includes wholesale purchases from U.S. financial institutions by Doral Financial's Puerto Rico based mortgage units.

## Market Area and Competition

Puerto Rico is Doral Financial's primary service area. The competition in Puerto Rico for the origination of mortgage loans is substantial. Competition comes not only from other mortgage bankers but also from major commercial banks, including affiliates of banks headquartered in the United States, Canada and Spain. Doral Financial competes principally by offering loans with competitive features, by emphasizing the quality of its service and pricing its range of products at competitive rates.

10

**The Commonwealth of Puerto Rico, USA**

*General.* Puerto Rico, the fourth largest and most economically developed of the Caribbean islands, is located approximately 1,600 miles southeast of New York, New York and 1,000 miles southeast of Miami, Florida. The average flying time from New York City is approximately 3½ hours and from Miami, Florida 2½ hours. Puerto Rico is approximately 100 miles long and 35 miles wide. According to the United States Census Bureau, the population of Puerto Rico was 3.8 million in 2000. The Puerto Rico Planning Board estimates that the San Juan metropolitan area has a population in excess of 1.0 million. The Caribbean region has a population of over 30 million located in more than 25 principal islands.

*Relationship of Puerto Rico with the United States.* Puerto Rico has been under the jurisdiction of the United States since 1898. The United States and Puerto Rico share a common defense, market and currency. As a U.S. commonwealth, Puerto Rico exercises virtually the same control over its internal affairs as a state government does. There is a federal district court in Puerto Rico and most federal laws are applicable to Puerto Rico. The U.S. postal service operates in Puerto Rico in the same manner as in the mainland United States. The people of Puerto Rico are citizens of the United States, but do not vote in national elections and are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but only limited voting rights. Most federal taxes, except those such as social security taxes which are imposed by mutual consent, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on ordinary income earned from sources within Puerto Rico, except for federal employees who are subject to taxes on their salaries.

*The Economy.* The economy of Puerto Rico is closely integrated with that of the mainland United States. During the fiscal year ended June 30, 2004, approximately 82% of Puerto Rico's exports went to the United States mainland, which was also the source of approximately 45% of Puerto Rico's imports.

The economy of Puerto Rico is dominated by the manufacturing and service sectors. The manufacturing sector has experienced a basic change over the years as a result of increased emphasis on higher wage, high technology industries such as pharmaceuticals and electronics. The service sector also plays a major role in the economy. It ranks second only to manufacturing in contribution to the gross domestic product and leads all sectors in providing employment. In recent years, the service sector has experienced significant growth.

Gross product increased from $38.3 billion for fiscal 1999 to $50.3 billion for fiscal 2004. Since fiscal 1985, personal income per capita has increased consistently each fiscal year. In fiscal 2004, personal income per capita was $12,031. Average employment increased from 1,147,000 in fiscal 1999 to 1,234,000 for fiscal 2004. Average unemployment decreased from 13.6% in fiscal 1998 to 12.1% in fiscal 2003 and remained stable at 11.4% during fiscal 2004.

Future growth in the Puerto Rico economy will depend on several factors including the condition of the United States economy, the relative stability in the price of oil imports, the exchange value of the U.S. dollar and the level of interest rates and changes to existing tax incentive legislation as discussed below. The Puerto Rico Planning Board's real gross product forecast for the fiscal year ending June 30, 2005, which was released in January 2005, projects an increase of 2.3%. In the past, the economy of Puerto Rico has generally followed economic trends in the overall United States economy.

The Small Business Job Protection Act, which was signed into law on August 20, 1996, provided for the repeal of Section 936 of the Internal Revenue Code over a ten year phase-out period for corporations with operations in Puerto Rico as of August 1995. Section 936 has traditionally provided tax incentives for U.S. corporations to invest in Puerto Rico. In addition, the Act eliminated the tax credit for corporations that established operations in Puerto Rico after October 1995. The elimination of the benefits of Section 936, without the substitution of another fiscal incentive to attract investment to Puerto Rico, could have an adverse effect on the future growth of the Puerto Rico economy. At this point, Doral Financial cannot predict the long-term impact of the repeal of Section 936 on the economy of Puerto Rico.

11

## REGULATION AND SUPERVISION

**Mortgage Banking Business**

Doral Financial's mortgage banking business is subject to the rules and regulations of FHA, VA, RHS, FNMA, FHLMC, HUD and GNMA with respect to the origination, processing, selling and servicing of mortgage loans and the issuance and sale of mortgage-backed securities. Those rules and regulations, among other things, prohibit discrimination and establish underwriting guidelines which include provisions for inspections and appraisals, require credit reports on prospective borrowers and fix maximum loan amounts, and with respect to VA loans, fix maximum interest rates. Moreover, lenders such as Doral Financial are required annually to submit to FHA, VA, RHS, FNMA, FHLMC, GNMA and HUD audited financial statements, and each regulatory entity has its own financial requirements. Doral Financial's affairs are also subject to supervision and examination by FHA, VA, RHS, FNMA, FHLMC, GNMA and HUD at all times to assure compliance with the applicable regulations, policies and procedures. Mortgage origination activities are subject to, among others, the Equal Credit Opportunity Act, Federal Truth-in-Lending Act and the Real Estate Settlement Procedures Act and the regulations promulgated thereunder which, among other things, prohibit discrimination and require the disclosure of certain basic information to mortgagors concerning credit terms and settlement costs. Doral Financial is also subject to regulation by the Office of the Commissioner of Financial Institutions of Puerto Rico (the "Office of the Commissioner"), with respect to, among other things, licensing requirements and maximum origination fees on certain types of mortgage loan products. Although Doral Financial believes that it is in compliance in all material respects with applicable federal and Puerto Rico laws, rules and regulations, there can be no assurance that more restrictive laws or rules will not be adopted in the future, which could make compliance more difficult or expensive, restrict Doral Financial's ability to originate or sell mortgage loans or sell mortgage-backed securities, further limit or restrict the amount of interest and other fees earned from the origination of loans, or otherwise adversely affect the business or prospects of Doral Financial.

Each of Doral Financial's mortgage banking subsidiaries that operate in Puerto Rico is licensed by the Office of the Commissioner as a mortgage banking institution. Such authorization to act as a mortgage banking institution must be renewed as of January 1 of each year. In the past, Doral Financial and its subsidiaries have not had any difficulty in renewing its authorization to act as a mortgage banking institution and management is unaware of any existing practices, conditions or violations which would result in Doral Financial being unable to receive such authorization in the future. Doral Financial's operations in the mainland United States are subject to regulation by state regulators in the states in which it conducts business.

Section 5 of the Puerto Rico Mortgage Banking Institutions Law (the "Mortgage Banking Law") requires the prior approval of the Office of the Commissioner for the acquisition of control of any mortgage banking institution licensed under the Mortgage Banking Law. For purposes of the Mortgage Banking Law, the term "control" means the power to direct or influence decisively, directly or indirectly, the management or policies of a mortgage banking institution. The Mortgage Banking Law provides that a transaction that results in the holding of less than 10% of the outstanding voting securities of a mortgage banking institution shall not be considered a change of control. Pursuant to Section 5 of the Mortgage Banking Law, upon receipt of notice of a proposed transaction that may result in a change of control, the Office of the Commissioner is obligated to make such inquiries as it deems necessary to review the transaction. Under the Mortgage Banking Law, the determination of the Office of the Commissioner whether or not to authorize a proposed change of control is final and non-appealable.

**Banking Operation**

### Federal Regulation

*General*

Doral Financial is a bank holding company subject to supervision and regulation by the Board of Governors of the Federal Reserve System (the "Federal Reserve") under the Bank Holding Company Act of 1956 (the "BHC Act"), as amended by the Gramm-Leach-Bliley Act of 1999 (the "Gramm-Leach-Bliley Act"). As a bank holding company that has elected to be treated as a financial holding company under the Gramm-Leach-Bliley Act, Doral Financial's activities and those of its banking and non-banking subsidiaries are limited to activities that are financial in nature. See "Financial Modernization Legislation" for a description of recent legislation expanding the powers of financial holding companies. Under the BHC Act, Doral Financial may

# Exhibit C



# Centro Especializado en
# Dolor de Cabeza y Neurología

**CEDOC de Puerto Rico**

*Dr. Héctor S. Miranda-Delgado*
*Neurólogo*

# MEDICAL CERTIFICATE

*This is to certified that Mario Levis Marquez is a patient of our office located in San Francisco Tower Suite # 409 in San Juan, Puerto Rico since December 20, 2007. His last visit to this office was on July 17, 2008.*

*The diagnoses of this patient are Cervical Radiculopathy and Sensory Peripheral Neuropathy, secondary to C5-C6 herniated disc and osteophytes. This patient is using Lyrica 75 mg tablet two times a day and Cataflan 50 mg one tablet before bedtime with some improve in his pain and numbness over the arms. At this time we do not recommend excessive traveling to avoid deterioration in this condition.*

*If you have any doubts or questions please feel free to call us. Thanks.*

July 17, 2008
Date

Héctor S. Miranda-Delgado, MD
Neurologist
Lic. # 9912

dps/cert med./07-05

*Torre San Francisco * Suite 409 * Ave. de Diego # 365 * San Juan, Puerto Rico 00923*
*Tels. (787) 767-5944 / 767-5100 Ext. 6050 / Fax. (787) 765-5786 e-mail:cedoc@coqui.net*



# San Francisco Neurophysiology Lab.

## Consorcio Cedoc

Name: MARIO S. LEVIS MARQUEZ          Age: 44          Date: JANUARY 15, 2008

Study #: 2008-01-15-07          Record: LMM          Referred by: DR. MIRANDA

### o   NERVE CONDUCTION STUDY UPPER EXTREMITIES

| NERVED TESTED | RIGHT SIDE | | | | LEFT SIDE | | | |
|---|---|---|---|---|---|---|---|---|
| | COND VELOCITY | AMP. (UV) | DISTANCE (CM) | PEAK LATENCY | COND VELOCITY | AMP. (UV) | DISTANCE (CM) | PEAK LATENCY |
| MEDIAN ELBOW (7) | 57 | 3.6 | 22 | 11.0 | 48 | 5.9 | 22 | 10.9 |
| ULNAR (BELOW ELBOW C8) | 52 | 3.7 | 23 | 11.7 | 55 | 2.9 | 23 | 12.2 |
| RADIAL (MOTOR) | 58 | 5.1 | 24 | 8.2 | 66 | 3.6 | 24 | 6.8 |
| F-WAVE (MEDIAN) | | | | 28.2 | | | | 28.2 |
| F-WAVE (ULNAR) | | | | 29.1 | | | | 30.0 |
| F-WAVE (RADIAL) | | | | 25.9 | | | | 27.1 |
| MEDIAN (SENSORY) | 28 | | | 4.1 | 28 | | | 4.2 |
| ULNAR (SENSORY) | 26 | | | 3.8 | 25 | | | 3.9 |
| RADIAL (SENSORY) | 41 | | | 3.4 | 32 | | | 3.0 |

### o   EMG STUDY UPPER EXTREMITIES

| EXTREMITIES | SPINAL ROOTS | RIGHT SIDE | | | | | LEFT SIDE | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | POS WAVES | FIB | CRD | FASC | RECRUIT | POS WAVES | FIB | CRD | FASC | RECRUIT |
| DELTOID | C5-C6 | POS | POS | NONE | NONE | POOR | POS | POS | NONE | NONE | POOR |
| BICEPS | C5-C6 | NONE | NONE | NONE | NONE | GOOD | NONE | NONE | NONE | NONE | GOOD |
| TRICEPS | C5-C6-C7 | NONE | NONE | NONE | NONE | GOOD | NONE | NONE | NONE | NONE | GOOD |
| EXT. DIG. COM. | C7-C8 | NONE | NONE | NONE | NONE | GOOD | NONE | NONE | NONE | NONE | GOOD |
| DORSAL INTEROSSEI | C8-T1 | NONE | NONE | NONE | NONE | GOOD | NONE | NONE | NONE | NONE | GOOD |
| ABD. POLLICIS BREV. | C8-T1 | | | | | | | | | | |
| PARASPINAL | | | | | | | | | | | |

### IMPRESSION AND INTERPRETATION:

**NCV:** Abnormal Nerve Conduction Velocity Study of Upper Extremities due to decrease conduction velocities, increase latencies and low amplitud of the Ulnar, Median and Radial sensory nerves bilaterally. The F-Waves were present, but delayed. This finding is suggestive of sensory Peripheral Neuropathy bilaterally.

**EMG:** There are evidence of positive waves and fibrillations with poor recruitment pattern over the Deltoids muscles bilaterally. Abnormal EMG of Upper Extremities due to above findings. This findings suggest C5 Radiculopathy bilaterally.

<u>January 15, 2008</u>
DATE

_____
HÉCTOR S. MIRANDA DELGADO, MD
NEUROLOGIST



# San Francisco Neurophysiology Lab.

*Consorcio Cedoc*

# SOMATO-SENSORY EVOKED POTENTIALS OF UPPER EXTREMITIES

| NOMBRE: MARIO LEVIS MARQUEZ | PATIENT NO: 2008-01-08-02 |
|---|---|
| REFERRED BY: DR. MIRANDA | AGE: 44 Y/O |

| VALUES IN MILISECONDS | RESPONSE R | RESPONSE L | LEFT TO RIGHT DIFFERENCE |
|---|---|---|---|
| N 10 ERBS | 9.4 | 9.3 | 0.1 |
| N 14 CERVICAL | 14.5 | 14.2 | 0.3 |
| N 20 CORTICAL | 19.0 | 19.5 | 0.5 |
| N 23 CORTICAL | 22.2 | 24.3 | 2.1 |

## COMMENTS:

*CONSISTENT RESPONSES WERE OBTAINED FROM BOTH MEDIAN NERVES.*

*THE PERIPHERAL POTENTIALS PEAKED AT NORMAL VALUES, BUT THE CERVICAL POTENTIALS WERE DELAYED BILATERALLY.*

## IMPRESSION:

*ABNORMAL MEDIAN NERVES SOMATO SENSORY EVOKED POTENTIALS DUE TO PROLONGED OF THE CERVICAL POTENTIALS BILATERALLY.*

*THE DIFFERENCE BETWEEN RIGHT AND LEFT SIDE IS NORMAL.*

*THIS FINDING SUGGEST CERVICAL LESION.*

JANUARY 8. 2008
Date

Héctor S. Miranda-Delgado, MD
Neurologist

Torre San Francisco • Suite 409 • Ave. de Diego #365 • San Juan, Puerto Rico 00923
Tels. (787) 767-5944 / 767-5100 Ext. 6050 / Fax (787) 765-5786 – e-mail: cedoc@coqui.net



# Dr. Carlos R Benítez Colón

**Medicina Interna**
**Medicina Deportiva**

July 17th, 2008

To whom it may concern:

I hereby certify that Mr. Mario S. Levis Marquez, is a patient of mine, and has been diagnosed with hypertension. Due to this condition, he needs to be medicated daily. If any other information is needed, please call at (787) 250-0084.

Sincerely;

Carlos Benítez, MD    11,135