UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **NO. 08-CR-181** |
| | ) | |
| MARIO S. LEVIS, | ) | |
| a/k/a "Sammy Levis," | ) | |
| | ) | |
| *Defendant.* | ) | |
| _____ | ) | |

# DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND NOTES PROVIDED BY THE DEFENDANT TO ATTORNEYS WITH LATHAM & WATKINS, LLP

Defendant Mario S. Levis, through counsel, and pursuant to the attorney-client privilege and the Fifth and Sixth Amendments, respectfully moves this Court for an Order suppressing from evidence certain statements and notes that he provided to attorneys with Latham & Watkins, LLP.  In support thereof, Mr. Levis submits the attached Declaration of Maria D. Neyra, Esq. (Exhibit A).

The prosecutors have advised that they have not yet decided whether to offer these statements and notes in evidence at trial.  Mr. Levis is filing this motion simply to ensure that the motion is preserved.  As such, Mr. Levis respectfully requests that the motion be held in abeyance, and that no memoranda of law be required, unless and until the government indicates that it intends to seek the admission of the evidence at trial.

## BACKGROUND

On April 19, 2005, Doral Financial Corp. ("Doral"), a publicly-traded bank holding company specializing in residential mortgage lending in Puerto Rico, announced that it would have to restate earnings and correct the methodology by which it calculated the fair value of one of its largest and most important assets – its "interest-only" strips ("IO strips"). *See* Press Release (attached as Exhibit B). Those IO strips, in general terms, represented the excess spread between the fixed interest rate on mortgage loans that Doral was being paid by residential borrowers and the floating rate that Doral negotiated and was paying to the investors that had purchased those same loans from Doral. According to the press release, the change in methodology would result in a significantly lower valuation (a decrease of between $400 million and $600 million) for the IO strips on Doral's 2004 year-end financial statements, thus requiring the restatement and likely triggering SEC scrutiny.

On the same date, Doral also announced that its outside directors "had retained Lathan & Watkins, LLP ("Latham") as its independent counsel to review the facts and circumstances relating to the IO valuation issues. . . ." *See* Exhibit B, at p.2. Latham assigned primary responsibility for this investigation to attorneys Kenneth Conboy, Alexandra Shapiro, and William Reckler. Latham also engaged the accounting firm of Ernst & Young LLP to assist Latham in the investigation. In connection with the investigation, Latham lawyers interviewed a number of Doral's officers and employees, including the Treasurer and Senior Executive Vice-President, Mario S. Levis.

Latham lawyers first met with and interviewed Mr. Levis on April 19, 2005, the very date of the press release announcing the retention of Latham as counsel. Mr. Levis believed that the Latham lawyers were retained to represent the bank *and its individual officers* and to protect them from a potential SEC investigation into the accounting methodology. At no point prior to or during that first meeting did the Latham lawyers directly warn Mr. Levis that they did not represent him individually or that his statements to them were not covered by the attorney-client privilege. Mr. Levis believed that his statements were going to be treated by Latham as privileged and confidential.

Thereafter, the Latham lawyers met with Mr. Levis on two additional occasions: June 1, 2005 and August 1, 2005.[1] During those occasions, the Latham lawyers not only posed questions but presented Mr. Levis with documents. The Latham lawyers also spoke briefly to Mr. Levis, by telephone, on June 7, 2005, when he called them to volunteer additional information that he had learned from speaking to someone in the Treasury department at Doral. Again, there was no warning to Mr. Levis during any of these conversations that the attorney-client privilege did not apply. To the contrary, the Latham lawyers led Mr. Levis to believe that they were trying protect him by instructing him not to have any additional conversations with Doral employees about the investigation. The Latham lawyers also lectured Mr. Levis that they were not his adversaries, that the SEC was going to be tougher than they were, and that he should relax and let them "help" him.

---

[1] At those two meetings, the Latham lawyers brought one or more accountants from Ernst & Young.

After each in-person interview, Latham lawyer William Reckler prepared a memorandum of the interview, presumably from his contemporaneous notes. *See* Memorandum of William Reckler of April 29, 2005 (Exhibit C); Memorandum of William Reckler of June 8, 2005 (Exhibit D); Memorandum of William Reckler of August 5, 2005 (Exhibit E).[2] After each interview, Mr. Levis also typed notes on the personal computer he used at Doral to memorialize his recollection of the interview by the Latham lawyers. Significantly, on or about August 8, 2005, after the final meeting, Latham lawyer William Reckler expressly requested that Mr. Levis provide Latham with Mr. Levis's own typewritten notes of the June 1 meeting and June 7 telephone call. In response to that request, Mr. Levis reviewed and edited his notes before sending them via facsimile to attorney William Reckler. The fax cover page, sent from the desk of Mr. Levis and signed by him (using his nickname "Sammy"), contained the following notations: "Privileged And Confidential Attorney-Client Communication" and "Will: Per Your Request."[3] *See* Exhibit F (USAO 000152). At no point did the Latham lawyers disabuse Mr. Levis of his belief that his communications with them were privileged and confidential. To the contrary, during the June 7 telephone call, one of the Latham lawyers told Mr. Levis that she was giving him "advice for your own protection given the SEC investigation. . . ." *See* Exhibit F (USAO 000162).

---

[2] Inasmuch as the government already has copies of these memoranda, Mr. Levis does not explicitly or implicitly waive his claim of privilege by filing them with the Court for its review.

[3] "Will" refers to attorney William Reckler.

Some time after Latham completed its investigation, Doral terminated its relationship with Mr. Levis.  Upon information and belief, Latham provided its interview reports (Exhibits C, D, and E) to the SEC and/or federal prosecutors, without first notifying Mr. Levis or affording him the opportunity to assert any privileges.  Latham also provided the notes that Mr. Levis faxed to Latham with the notation "Privileged and Confidential Attorney-Client Communication" (Exhibit F).

## CONCLUSION

Accordingly, Mr. Levis requests that the suppress all statements he made and notes he provided to attorneys with Latham & Watkins, LLP.  In the event the government seeks the admission of the evidence at trial, Mr. Levis respectfully requests an opportunity to file a memorandum of law and further requests an evidentiary hearing on this motion.

Respectfully submitted,

 /s Roy Black
ROY BLACK, ESQ.
(FL Bar No. 126088)
HOWARD M. SREBNICK, ESQ.
(FL Bar No. 919063)
MARIA D. NEYRA, ESQ.
(FL Bar No. 074233)
Black, Srebnick, Kornspan & Stumpf, P.A.
201 South Biscayne Blvd., Suite 1300
Miami, Florida 33131
Tele: (305) 371-6421
Fax: (305) 358-2006
rblack@royblack.com

*Attorneys for Defendant Levis*

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) **CASE NO. 08-CRIM-181** |
| | ) |
| MARIO S. LEVIS, | ) |
| a/k/a "Sammy Levis," | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

## **DECLARATION OF MARIA D. NEYRA, ESQ.**

Maria D. Neyra hereby declares under penalty of perjury, pursuant to 28 U.S.C. §1746, that the following is true and correct to the best of her knowledge and belief:

1.      I am a partner with the law firm of Black, Srebnick, Kornspan & Stumpf, P.A. ("BSKS"), in Miami, Florida. I am admitted to practice in the State of Florida. I am a member in good standing of the Florida Bar, and have been admitted to practice before various district courts.

2.      Roy Black and Howard Srebnick, named partners at BSKS, are the lead trial lawyers for Mario S. Levis, the defendant in the above-styled action.

3.      This declaration is being filed in support of Mr. Levis's motion to suppress certain statements and notes provided by Mr. Levis to attorneys with Latham & Watkins, LLP ("Latham"). Specifically, between April and August 2005, attorneys with Latham interviewed or spoke by telephone to Mr. Levis on at least four occasions as part of an

investigation Latham was conducting for Doral Financial Corporation. Latham prepared memoranda of those interviews. Mr. Levis also prepared personal notes pertaining to the interviews and provided one set of notes to Latham.

4.      I have reviewed the portions of the discovery which include three typewritten memoranda prepared by William Reckler, an attorney with Latham, summarizing their interview of Mr. Levis as well as the personal notes of interviews prepared by Mr. Levis.

5.      The factual statements in the motion are, to my knowledge, true and correct and consistent with the documents I have reviewed thus far in discovery.

6.      On Friday, July 11, 2008, I exchanged e-mails regarding this motion with AUSA Christopher Garcia, co-counsel for the government. According to AUSA Garcia, the government has not determined whether it will be calling as witnesses at trial the attorneys who interviewed Mr. Levis.

7.      This motion is being filed to preserve the issue in the event the government decides to seek admission of Mr. Levis's statements and/or personal notes to the Latham attorneys.

Dated this 17ᵗʰ day of July, 2008.

_Maria Neyra_

MARIA D. NEYRA, ESQ.

2

# Exhibit B



**DORAL FINANCIAL**
CORPORATION

April 19, 2005                          <u>FOR IMMEDIATE RELEASE</u>

Contact:

Salomón Levis                           Ricardo Meléndez
Chairman and Chief                      Executive Vice President
Executive Officer                       and Chief Financial Officer
Tel: (787) 474-1111                     Tel: (787) 474-1111

<u>DORAL FINANCIAL ANNOUNCES RESTATEMENT OF EARNINGS
RELATED TO FLOATING RATE IO VALUATION</u>

     San Juan, Puerto Rico, April 19, 2005 - Mr. Salomón Levis,
Chairman of the Board and Chief Executive Officer of Doral Financial
Corporation (NYSE: DRL), today announced that after consulting with
various financial institutions and other firms with experience in
valuation issues, the Company has determined that it is appropriate
to correct the methodology used to calculate the fair value of its
portfolio of floating rate interest only strips ("IOs"). The
Company's preliminary estimate is that this correction will result in
a decrease in the fair value of its floating rate IOs of between $400
million to $600 million as of December 31, 2004. The required
adjustment cannot be taken as a charge in current period earnings but
instead will have to be reflected in those periods during which the
origination of floating rate IOs had a material impact on the
Company's financial statements. The after-tax effect of the required
adjustments as of December 31, 2004 is estimated to range between
$290 million to $435 million. The Company has not yet determined how
such net impact will be distributed among the affected periods. The
required charge to income will be a non-cash item and will not reduce
the amount of the Company's cash and cash equivalents as of December
31, 2004.

     Based on the above, the Company's management concluded that the
previously filed interim and audited financial statements for the
periods from January 1, 2000 through December 31, 2004, could be
materially affected and, therefore, should no longer be relied on and
that the financial statements for some or all of the periods included
therein should be restated. The Company's management presented its

Confidential Treatment Requested by Doral Financial Corporation

conclusion to the Company's Audit Committee and Board of Directors. After a review of management's presentation and other pertinent facts and consulting with its independent counsel, the Company's Audit Committee and Board of Directors concurred with this decision. Management and the Audit Committee met with PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm, to discuss its preliminary revised estimate of the IO valuation and also discussed with them the Company's conclusion that a restatement is required. PricewaterhouseCoopers LLP has not yet performed audit procedures on the revised estimate.

As part of its mortgage business, the Company generates fixed rate non-conforming mortgage loans, pools them and sells most of them on a floating rate basis. Upon sale, the Company capitalizes and records for accounting purposes a floating rate IO. This IO represents the excess spread between the fixed rate the Company receives on the underlying mortgage loans and the floating rate based on 90 day LIBOR it pays to investors. The Company recognizes gain on sale of mortgages as part of these transactions. In the case of the floating rate IOs, the recorded gain on sale represents the estimated present value of the excess interest spread, discounted over the expected life of the underlying mortgages, using the prepayment experience of the mortgage portfolio to calculate estimated life. The Company has historically used the contractual or actual 90-day LIBOR rate at the end of each reporting period to compute the value of its IOs and gain on sale. The use of actual 90-day LIBOR rates instead of the forward LIBOR curve to value its floating rate IOs can have either a positive or negative impact on valuation depending on the relationship of existing 90-day LIBOR rates to the forward LIBOR curve at the time of valuation.

As noted above, after consulting with various financial institutions and valuation experts, the Company determined that its valuation model should incorporate the forward yield curve and that a substantial adjustment to the value of its floating rate IOs was required. The Company is working with First Manhattan Consulting Group, a risk management specialist, to assess its risk measurement and risk management techniques.

As a result of the restatement process, the Company will delay the release of its earnings for the first quarter of 2005. The Company stated that its objective was to release its unaudited earnings as soon as practicable but could not assure investors at this time when it would be in a position to release the restated results for prior periods and the results for the first quarter of 2005. As part of the restatement process, the Company will also be reviewing all the assumptions and processes used to value its IOs and mortgage servicing rights and to calculate the gains on sale as well as management's report on internal controls over financial reporting for 2004. The Company also stated that the outside directors had retained Latham & Watkins LLP as its independent counsel to review the facts and circumstances relating to the IO valuation issues identified by the Company.

2

Confidential Treatment Requested by Doral Financial Corporation

The Chairman reminded shareholders of the following core fundamentals of the Company:

- Doral continues to be the undisputed leader in residential mortgage originations in Puerto Rico;

- Doral's commercial and mortgage banking franchise in both Puerto Rico and the U.S. continues to grow with 97 retail branches in Puerto Rico and 6 in the New York metropolitan area; and

- Doral continues to maintain a strong capital position. Assuming a charge of $600 million, the Company would remain a well-capitalized institution in accordance with federal banking regulatory standards with a leverage capital ratio as of December 31, 2004 of approximately 10%, compared to the previously reported 11.8%. The capital of its two banking subsidiaries will not be affected by the restatement and both of them remain well-capitalized.

In terms of its prospective business model, the Company intends to retain a larger portion of its mortgage production to increase net interest income. In addition, subject to its ability to renegotiate existing mortgage delivery commitments, the Company intends to reduce the sales of loans that generate floating rate IOs and focus on cash gains on mortgage sales and the origination of fixed rate IOs, the interest spread on which is not subject to changes in short-term interest rates. Pending further analysis, the Company has discontinued the previously announced preliminary negotiations regarding the possible sale of a portion of its IO portfolio. The Company may engage in such discussions with one or more firms in the future.

The Company, a financial holding company, is the largest residential mortgage lender in Puerto Rico, and the parent company of Doral Bank, a Puerto Rico based commercial bank, Doral Securities, a Puerto Rico based investment banking and institutional brokerage firm, Doral Insurance Agency, Inc. and Doral Bank FSB, a federal savings bank based in New York City.

3

FORWARD LOOKING STATEMENTS

This press release contains certain "forward-looking statements" concerning the Company's economic future performance. The words or phrases "expect," "believe," "anticipate," "look forward," "should" and similar expressions are meant to identify "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.

The Company wishes to caution readers not to place undue reliance on any such forward-looking statements, which speak only as of the date made, and to advise readers that various factors, including regional and national economic conditions, changes in interest rates, competitive and regulatory factors and legislative changes, could affect the Company's financial performance and could cause the Company's actual results for future periods to differ materially from those anticipated or projected.

The Company does not undertake, and specifically disclaims any obligation, to update any forward-looking statements to reflect occurrences or unanticipated events or circumstances after the date of such statements.

4

Confidential Treatment Requested by Doral Financial Corporation

# Exhibit C

\THAM&WATKINS**LLP**

53rd at Third
885 Third Avenue
New York, New York 10022-4834
Tel: (212) 906-1200  Fax: (212) 751-4864
www.lw.com

FIRM / AFFILIATE OFFICES

| Boston | New York |
| Brussels | Northern Virginia |
| Chicago | Orange County |
| Frankfurt | Paris |
| Hamburg | San Diego |
| Hong Kong | San Francisco |
| London | Shanghai |
| Los Angeles | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| New Jersey | Washington, D.C. |

**MEMORANDUM**
April 29, 2005

**ATTORNEY WORK PRODUCT**
**ATTORNEY-CLIENT PRIVILEGED**

| To: | Files |
| From: | William Reckler |
| File no: | 039544-0002 |
| Copies to: | Kenneth Conboy, Alexandra Shapiro |
| Subject: | April 19, 2005 Meeting with Mario S. Levis |

      On April 19, 2005, Kenneth Conboy, Alexandra Shapiro, and William Reckler of Latham & Watkins LLP met with Mario S. Levis ("Sammy Levis"), Doral Corporation's Treasurer. The purpose of the meeting was to discuss issues relating to the valuation of Doral's assets and its restatement of earnings. This memorandum is not meant to be a verbatim or near verbatim account of the meeting with Mr. Levis. Rather, it summarizes the substance of the discussion and necessarily contains our thoughts, impressions and conclusions. As such, it is protected by both the attorney-client privilege and the work product doctrine.

<u>Decision to Restate Earnings.</u>

      Mr. Levis began the meeting by stating that he had no personal concerns regarding the restatement of earnings and change to a dynamic model of valuing Doral's Interest Only Strips ("IO Strips"). He has some professional concerns, but only because he believes it will be a tough stretch for the company, with investors questioning management credibility.

      Mr. Levis does not agree with the decision to restate earnings and believes that the change in valuation model is a mere accounting change that should be treated prospectively. He noted that PWC knew how Doral had been valuing the IOs and that approximately 2.5 years ago PWC spoke with Popular Securities about why it was using the spot Libor rate to perform its external valuation. At that time, Popular Securities told PWC that it was the proper method under the then present interest rate scenario, and that a forward curve would have increased the value of the IOs. Given that PWC was satisfied with that explanation at the time, Mr. Levis does not understand why it is now necessary to perform a restatement.

**FOIA Confidential**
**Treatment Requested**

**ATTORNEY WORK PRODUCT**
**ATTORNEY-CLIENT PRIVILEGED**

**THAM&WATKINS**ᴸᴸᴾ

Mr. Levis also does not agree with several other statements that were made in the press release announcing the restatement. He noted that Doral had never tried to hide its use of the spot rate and that its valuation method was in fact as clear as possible. He thinks that the static model is the proper method because mark-to-market valuation should be as of a given day and using a forward curve model could overstate the value if interest rates shift.

Mr. Levis assumes that Salomon Levis recommended the change to the forward curve because that is a management decision, but he believes that the change was based on PWC's demands. He noted that he was happy last week when PWC's local office said that no restatement was necessary, and he does not understand why PWC's national office overruled that decision.

<u>Valuation of the IO Strips Generally.</u>

Mr. Levis explained that he was not involved in Doral's internal valuation of the IO Strips. He stated that the CFO, Ricardo Melendez, and the Accounting Department were responsible for the internal valuation and he further claimed to not even understand how the static model works.

Mr. Levis explained that the decision to deal in IO Strips was first made several years ago and that are now seen as a trading security, even though they really are not. Mr. Levis explained that there is no real way to value the IOs because they are not traded, and that estimates as to their value vary greatly. In approximately 2000, Doral asked PWC how it should value the IOs, and PWC provided no solution. Mr. Levis said that Doral then decided to try to get market quotes for the IOs. He does not know who decided to bring in third-party valuers.

The valuation performed by Popular Securities is an investment banking valuation based on a cash flow analysis. The valuation performed by Morgan Stanley is a market quote, trading valuation based on multiples.

<u>Popular Securities' Valuation of the IO Strips.</u>

Mr. Levis was asked who could perform an outside valuation of the IOs, and he chose Carlos Juan Ortiz from Popular Securities. Mr. Ortiz is now at UBS and performed the recent UBS valuation. As discussed in more detail below, Mr. Ortiz has on several occasions spoken with Ramon Ponte of PWC. Mr. Ortiz was a very well-known investment banker in Puerto Rico and had done previous work for Doral in 1995. Mr. Levis provided Mr. Ortiz with written information received from the Doral accounting department and made additional oral representations about hedging. Generally, he would represent that Doral had hedges against rising interest rates but would not provide details. Mr. Levis said that those general representations were accurate.

Based on the information that Mr. Levis provided, Mr. Ortiz would provide a report on the value of the IOs using his own assumptions. Although Doral provided the data, Mr. Ortiz had his own model and used a First Boston program to perform the valuation. Mr. Levis described this model as static.

2

**FOIA Confidential**
**Treatment Requested**

ATTORNEY WORK PRODUCT
ATTORNEY-CLIENT PRIVILEGED

THAM•WATKINS ᴸᴸᴾ

Mr. Levis emphasized that nobody at Doral told the outside valuers what model to use. Mr. Ortiz told PWC on a call two or three years ago that he was using a spot Libor rate because mark-to-market accounting is typically as of the present day. Mr. Levis was not on that call but was told about it by Mr. Ortiz. Mr. Levis explained that what Mr. Ortiz meant was that you would not value any other type of instrument with a forward curve, and he reminded us that the forward curve does not predict the actual interest rate. Mr. Levis said that, at that time, Mr. Ponte agreed that the static model was proper.

Shortly after the call with Mr. Ponte, Mr. Ortiz left Popular Securities. He was replaced by Gregory Kaufman, although the real work was performed by Natalia Guzman, an analyst who had also worked under Mr. Ortiz.

Mr. Levis stated that, in addition to the written materials, he provided Ms. Guzman with additional information over the phone. Although Mr. Ortiz had never asked about caps and calls, Ms. Guzman did and Mr. Levis provided the information verbally. He said that he might have provided general estimates of the percentage of IOs that had caps, but that estimate would have been off the top of his head. He did not provide any detailed information on the caps or calls and certainly nothing in writing. He did note that the most recent packet of written information provided to Popular Securities did contain information on the caps and calls and the written data also specifies which IOs are floating rate and which are fixed.

Occasionally Ms. Guzman would also question certain large delinquencies and want to increase the prepayment rate. Mr. Levis would tell her over the phone that these had already been repurchased that that it was not right to treat them as a basis for increasing the prepayment rate.

Mr. Levis did not keep notes of his conversations with Popular Securities (or Morgan Stanley). He stated that when he was unavailable, his father David Levis would have spoken with the outside valuation experts.

Mr. Levis could not explain why there were two different contracts with Popular Securities in 2005. He thinks that Popular Securities' legal counsel requested the contracts, which were a change from the earlier letters that had stated what assumptions had been used. The valuations had always come with such letters. Mr. Levis also said that he never countersigned a letter that he received in March from Popular Securities in which it wanted him to acknowledge that the outside valuation was for internal purposes only.

<u>Morgan Stanley's Valuation of the IO Strips.</u>

Morgan Stanley provides a more general valuation than Popular Securities. According to Mr. Levis, Morgan Stanley's valuation was not meant to be a true external valuation, but rather was just supposed to support Doral's own internal valuation. Morgan Stanley's work was not based on an investment banking model and did not take into account cash flows. Rather, it simply compared Doral's IOs to those traded in the United States.

3

**FOIA Confidential
Treatment Requested**

ATTORNEY WORK PRODUCT
ATTORNEY-CLIENT PRIVILEGED

**THAM&WATKINS**LLP

Mr. Levis asked Joe Lopez at Morgan Stanley to value the IOs using multiples. Mr. Levis selected Lopez because had previously done mark-to-market valuation of Doral securities and there were not many other high quality options in Puerto Rico. Mr. Levis provided Mr. Lopez with the same information that he gave to Popular Securities. Mr. Lopez acted as a liaison, relying on the expertise of a trader. Mr. Lopez passed along the information provided by Doral to a trader in New York who actually performed the valuation. The trader would look on Bloomberg or other public resources to get quotes on US IOs. Using a multiple reflecting the difference between US and Puerto Rican mortgage prepayment rates, the trader would then value Doral's IOs. Generally Puerto Rico has lower prepayment rates than the United States.

Mr. Levis described the Morgan Stanley valuation as very simple and noted that Doral never even paid for it. He explained that it was common for firms like Morgan Stanley to provide these services without demanding payment. Those firms see it as a means of generating future business. Mr. Levis did not know why this valuation method could not have been performed internally.

At approximately the same time several years ago that PWC talked to Popular Securities, PWC also talked to Mr. Lopez. Mr. Levis remembers hearing about the conversation because Lopez was aggravated that PWC had called him while the stock market was still open.

Mr. Levis emphasized that Popular Securities and Morgan Stanley were sent exactly the same written information.

### Doral's Organizational Structure.

Although typically a CFO would handle interactions with investors, bankers, and rating agencies, at Doral that role is filled by Mr. Levis in his capacity as Treasurer. When Dick Bonini was CFO several years ago, however, he did the investor relations work. Mr. Bonini was not, however, involved in accounting operations. Under Mr. Bonini's replacement, Ricardo Melendez, the CFO's office at Doral now functions more as a pure accounting office. Mr. Levis is happy with that situation because he does not know or like accounting.

David Levis, Sammy Levis' father, retired in 1988 or 1989. For approximately two years after his retirement, he had no involvement with the company. However, he became bored and gradually reintegrated himself in the company. According to Sammy Levis, David Levis began by coming in to the office several days a week and hanging around Sammy Levis' office. Sammy Levis eventually asked that Doral give David his own office so that Sammy could have his office to himself. Mr. Levis said that David Levis was not busy and did not have many papers on his desk, so occasionally people would give him work to do.

Mr. Levis reports directly to Doral's CEO Salomon Levis. He does not report to the Board, although he is a member of the Asset Liability Management Committee (ALCO). Mr. Levis explained that ALCO is new, replacing the Risk Management Committee. He explained that all hedging had previously been done by Salomon Levis, but that Salomon recognized that was too much work for one person. Sammy said that First Manhattan was hired to set up a system of front, middle, and back offices to help with the hedging. Previously Doral had not had

4

**ATTORNEY WORK PRODUCT**
**ATTORNEY-CLIENT PRIVILEGED**

THAM&WATKINSᴸᴸᴾ

a back office and Salomon Levis was a one-man front office. Now, the back office is supposed to catch mistakes by comparing Doral's trading records with outside records. The middle office is independent and reports to ALCO on whether the front office is doing what it is supposed to. And Salomon Levis is no longer involved in the day-to-day hedging. That job is performed by Julio Macheo who runs the Funds Management Group (front office).

### Miscellaneous.

Mr. Levis explained that all of the loans underlying the floating rate IOs are fixed rate loans. He also noted that Doral had hedges but that they did not work. Mr. Levis did not expand on this last comment and it was unclear what he meant by it.

5

**FOIA Confidential**
**Treatment Requested**

**USAO 000005**

# Exhibit D



53rd al Third
885 Third Avenue
New York, New York. 10022-4834
Tel: (212) 906-1200  Fax: (212) 751-4864
www.lw.com

FIRM / AFFILIATE OFFICES

Boston          New York
Brussels        Northern Virginia
Chicago         Orange County
Frankfurt       Paris
Hamburg         San Diego
Hong Kong       San Francisco
London          Shanghai
Los Angeles     Silicon Valley
Milan           Singapore
Moscow          Tokyo
New Jersey      Washington, D.C.

**MEMORANDUM**
June 8, 2005

**ATTORNEY WORK PRODUCT**
**ATTORNEY-CLIENT PRIVILEGED**

| | |
|---|---|
| To: | Files |
| From: | William Reckler |
| File no: | 039544-0002 |
| Copies to: | Kenneth Conboy, Alexandra Shapiro |
| Subject: | June 1, 2005 Meeting with Sammy Levis |

      On June 1, 2005, Alexandra Shapiro and William Reckler of Latham & Watkins LLP and Mark O'Mara and Francisco Lombo of Ernst & Young met with Mario S. Levis ("Sammy Levis"), Treasurer of Doral Financial Corporation. Kenneth Conboy, also of Latham & Watkins, participated via video conference. The purpose of the meeting was to discuss issues relating to the valuation of Doral's assets and its restatement of earnings. This memorandum is not meant to be a verbatim or near verbatim account of the meeting with Mr. Levis. Rather, it summarizes the substance of the discussion and necessarily contains our thoughts, impressions and conclusions. As such, it is protected by both the attorney-client privilege and the work product doctrine.

<u>General Background</u>

      Mr. Levis graduated from Marquette with a Bachelor of Science degree in Business in 1985. In 1986, he earned an MBA from Depaul, majoring in Finance and minoring in Options. After finishing school, Mr. Levis worked as a trader for Merrill Lynch Capital Markets in Puerto Rico, trading tax exempt instruments. He eventually became Merrill's head trader in Puerto Rico, in which capacity he was also responsible for trading mortgage-backed securities. After two years, he also started running Merrill's repo book.

      In 1988, Mr. Levis left Merrill to start working with his father at Doral. Mr. Levis' title was Vice President of Trading and his primary job was selling mortgage-backed securities. Although technically he reported to Louis Alberrado, in practice he worked more closely with his father, David Levis, who was the CEO at the time and had been responsible for sales before

**FOIA Confidential**
**Treatment Requested**

**ATTORNEY WORK PRODUCT**
**ATTORNEY-CLIENT PRIVILEGED**



L   HAM&WATKINSᴸᴸᴾ

Sammy joined the company. David Levis remained in charge of Doral's hedging, although Sammy eventually took that over as well.

In 1991, Sammy Levis was promoted to be Vice President of Secondary Markets. He was in charge of both mortgage sales and the financing of securities. According to Levis, at that point he became the de facto Treasurer and was responsible for cash analysis. Eventually, when Alberrado retired, Levis was given the title of Treasurer.

Originally the Treasury Department was solely responsible for asset and liability management, handling the cash needs of the company. Today, however, Sammy Levis has two functions as Doral's Treasurer. He is responsible for the Secondary Markets Department, selling loans, and he is also responsible for Doral's cash needs.

In 1988 or 1989, David Levis retired and Salomon Levis became Doral's new CEO. At that point Sammy Levis was responsible for hedging, but in 1991 Salomon took over that responsibility as well. Sammy Levis stopped making hedging trades because he and Salomon had a disagreement over strategy. Mr. Levis explained that an August 14, 2001 email that he sent to Fred Teed and others (SLEV 0007489, Exhibit A) does not mean that he continued to make hedging trades. He interpreted it as simply referring to the fact that he signed Salomon's trades and had the authority to trade, which, he reiterated, he did not use.

Internal Valuation of the IO Strips

Mr. Levis said that his only involvement in valuing the IO Strips is to pass information from the Accounting Department to the outside valuers. He said that he has absolutely nothing to do with Doral's internal valuation of the IO Strips. Although he acknowledged seeing the August 8, 2003 Jorge Rodriguez memo stating that he helped develop the initial IO valuation (JROD 0002633, Exhibit B), Mr. Levis said that assertion was not a reference to the quarterly valuations but rather a reference to the initial valuation of the IOs when booked.

Mr. Levis clarified that his lack of involvement is with respect to the quarterly valuations. According to him, nobody in the Treasury or Secondary Markets Departments provides discount and prepayment assumptions for the valuation, as the valuation is a pure accounting issue. The prepayment assumption instead comes from the Servicing Department, and Pablo Perez more specifically. Mr. Levis said that he did not know whether the prepayment rate was adjusted for forward expectations and all he sees of the valuation spreadsheet is a stripped-down version that he sends to the outside valuers. Mr. Levis stressed that Treasury had no involvement in the internal valuation, which was Accounting's responsibility. According to Levis, Luis Berrios only worked with the MSRs and not the IO Strips.

When Treasury sells a mortgage and creates an IO, however, Mr. Levis does obtain a multiple from Morgan Stanley (his contact at Morgan Stanley is Joe Lopez) and sends a memo to Accounting with that multiple and other information about the IO and underlying mortgage so that Accounting can perform the initial valuation. Mr. Levis said that he gives Lopez information about the IO in order to allow him to provide a multiple. That information includes

2

**USAO 000007**

**ATTORNEY WORK PRODUCT**
**ATTORNEY-CLIENT PRIVILEGED**

HAM&WATKINSᴸᴸᴾ

the weighted average coupon, the weighted average maturity, and the principal amount outstanding. Mr. Lopez assumes that the IOs are all fixed rate, because they are valued at a precise moment in time. Lopez takes that information and gets a multiple from a New York trader, which the New York trader adjusts to take into account Puerto Rico's lower mortgage prepayment rate. Mr. Levis thinks that Lopez speaks with whichever trader happens to answer the phone when he calls the trading desk, and not any one particular individual. Mr. Levis said that he never spoke with Mr. Lopez about the adjustment and never even discussed the multiple with him. He simply reminded Lopez the first time that Morgan Stanley provided the multiple that it was necessary to make an adjustment for the Puerto Rican market.

Mr. Levis noted that he is the only person from Doral who speaks with Lopez. Although David Levis and Lopez did business together in the past, his understanding is that they never speak about the IO Strips. Sammy Levis does not believe that David Levis and Lopez have spoken in a long time.

According to Mr. Levis, Doral began performing this initial valuation in either 2000 or 2001 because the Accounting Department wanted better documentation. Prior to that, the only documentation was the schedule used to mark-to-market the IOs on a quarterly basis. Mr. Levis stated his belief that when you mark-to-market value an asset, it does not matter if you use a fixed or floating interest rate because the valuation is on a given day. Mr. Levis therefore does not think that a dynamic model is necessary.

### Outside Valuations of the IO Strips

Mr. Levis does not know if there were external valuations of the IO Strips performed before 2002. Although he thinks that he probably did receive it, Mr. Levis does not remember seeing the December 31, 2000 PWC Memorandum of Recommendations to Improve Internal Controls (RMEL 0002219-RMEL 0002238, Exhibit C) or its recommendation that Doral obtain outside valuations.

Mr. Levis also does not remember who asked him to find outside valuers, but he speculated that it was probably either Ricardo Melendez or Salomon Levis. He said that he was selected to find the outside valuers because he had the connections and traders would respond to him in an effort to develop business. Mr. Levis said that he selected Joe Lopez from Morgan Stanley for the market quote valuation because he believed that Mr. Lopez could do the job quickly. He did not consider at the time whether Doral also needed a more sophisticated investment banking analysis and stressed that the Morgan Stanley evaluation was very informal.

Levis believed that Lopez was providing him with a "market indication" as opposed to a "market quote" but thought that was acceptable since Doral was just looking to validate its internal valuations. Although he did not tell Lopez why he was asking for the valuation, they did discuss that it was for internal purposes, would be kept confidential, and that Doral would not use Morgan Stanley's name in connection with the valuation. Mr. Levis assumes that Lopez owned Doral stock and read the 10K, so he thinks that Lopez probably knew about the 10K's reference to outside valuations. Mr. Levis and Mr. Lopez did not discuss whether the valuation

3

**FOIA Confidential**
**Treatment Requested**



**ATTORNEY WORK PRODUCT**
**ATTORNEY-CLIENT PRIVILEGED**

L   ·HAM&WATKINS℠

would be shown to PWC. Mr. Levis did say that either or both PWC or the Doral Internal Audit Department spoke with Lopez.

Mr. Levis said that, soon after obtaining the first Morgan Stanley valuation, he was asked by either Salomon Levis or Ricardo Melendez to get a more formal investment banking analysis. Mr. Levis selected Carlos Ortiz at Popular Securities to perform the valuation because Mr. Ortiz was the best banker in Puerto Rico. Mr. Levis explained that Popular Securities had formerly been part of First Boston, which had very good valuation software. Mr. Levis told Mr. Ortiz that he would provide a schedule of information and that he wanted Ortiz to perform discounted future cash flow analysis. According to Mr. Levis, Ortiz developed his own prepayment rate using the data provided by Doral. He thinks that Mr. Ortiz might also have taken into account expected prepayment rates from Bloomberg adjusted for the Puerto Rican market. According to Mr. Levis, Popular Securities also used its own discount rate.

After Mr. Levis asked Ortiz to perform the valuation, Ortiz asked how Doral did its internal valuation. Levis told him that Doral used a static model, and, after doing his own analysis, Ortiz said that Popular Securities would also use a static model. That decision was discussed with Ramon Ponte of PWC. According to Levis, Mr. Ortiz knew that his valuation would be used as an independent valuation and did not object.

Popular Securities valued the IOs quarterly. Three of the yearly valuations were for internal purposes only and were sent as a short-form letter. The fourth was provided as a longer letter and was prepared for PWC. Doral paid more for the longer valuation and that higher fee was negotiated from the start of the relationship. Mr. Levis said that Popular Securities never raised the issue of reliance or use of the valuation in the Annual Report until 2005, although he believes that Ortiz knew that it was being referenced in the annual report.

Although Popular Securities used its own prepayment rate, it would discuss the prepayment rate with Mr. Levis when it noticed extraordinary prepayments. In those situations, it would ask Mr. Levis to make sure that the data was not flawed. Usually, the extraordinary prepayment rates were caused by repurchases from the loan pools and not true prepayments. Mr. Levis would give Popular Securities that information and Popular Securities would exclude the repurchases from the prepayment rate calculation.

Mr. Levis, from the very first time that Popular Securities performed a valuation, also provided Popular Securities with information about the caps and hedges. That information was not provided in writing, however, until 2005. Mr. Levis either already knew the information that he provided or he would call the Accounting or Servicing Departments (more specifically Tony Berrios or Jose Del Rio) to get it. He did not give exact figures and he said that he certainly never told Popular Securities that there was an implicit aggregate cap on the IOs of precisely 3.4%, as Popular Securities told Jorge Rodriguez on April 14, 2005 (*see* April 14, 2005 Jorge Rodriguez Memo, Exhibit D). While Mr. Levis never said that a specific percentage of the IOs had caps or hedges, he might have said that "substantially all" had them. He also might have told Popular Securities that the hedges were sufficient to mitigate against short-term interest rate increases, but he does not think that he ever used that information to support an argument that

-4

**USAO 000009**

ATTORNEY WORK PRODUCT
ATTORNEY-CLIENT PRIVILEGED

L.    HAM&WATKINS ᴸᴸᴾ

there was no need to use a dynamic valuation model. Mr. Levis believes that whether the caps and hedges affect the value of the IOs is a subjective determination.

Mr. Levis said that he did not discuss what discount rate to use with Popular Securities.

Although Mr. Levis might have asked Popular Securities once or twice if its valuation was really accurate, there was generally no discussion of its results. Mr. Levis said that, as Treasurer, he did not care if the outside valuations were always higher than the internal valuations.

When Carlos Ortiz left Popular Securities, Gregory Kaufman became responsible for the valuation. The only changes that Kaufman made, however, were to the language of the long-form letter. He did not consider using a dynamic model. Levis does think, however, that Popular Securities might have used a dynamic model for the most recent valuation, which was never provided to Doral.

Static v. Dynamic Model

Mr. Levis does remember PWC talking to Popular Securities about switching to a dynamic model for its outside valuation but concluding that a static model was acceptable. He remembers PWC's Ramon Ponte raising this issue two years ago and thinks that Ponte probably first spoke with Accounting. PWC then spoke with Carlos Ortiz at Popular Securities. Mr. Levis was not present but heard about the conversation from both Ponte and Ortiz. Ortiz told Ponte that the internal model was the correct valuation method.

Mr. Levis said that he never personally spoke to PWC but that he thinks PWC agreed that it was proper for Doral to use the static method for its internal valuation. Mr. Levis speculated that the issue probably did come up internally at Doral after PWC raised it with Popular Securities, but Doral thought that it made sense to stay with a static model (and PWC agreed) because switching to a dynamic model would have no impact given that interest rates were not increasing. Mr. Levis was not told at the time that most companies use a forward yield curve, although six months ago he did get into an argument with an analyst about whether Doral should be using a static or dynamic model.

Mr. Levis said that he only receives internal audit reports relating directly to the Treasury Department. Although audit reports relating to the IO valuation would be handled by Fred Teed or the Accounting Department, Mr. Levis acknowledged that he would likely receive copies. He does not, however, remember seeing the June 2003 internal audit reports that say that most companies use dynamic valuation models (RMEL 0002398-RMEL 0002413, Exhibit E). He does not remember discussing this issue with the Internal Audit Department and does not know why he did not sign the final draft of that report, but Mr. Levis said that he generally is not involved in accounting issues and he sees the valuation as a pure accounting issue.

Mr. Levis explained that after the 2004 fourth quarter results were released, he knew that there were issues with the IOs even though he did not know of First Manhattan's concerns

5

0



**ATTORNEY WORK PRODUCT**
**ATTORNEY-CLIENT PRIVILEGED**

L   HAM&WATKINS

until March 21 (see below). He said that investors began calling and questioning the assumptions used to value the IOs, but that he was unaware that the issue would become whether to value the assets with the forward curve or spot rate. He thought that PWC, however, would check every assumption. Mr. Levis said that he did not ask questions or talk to anyone about the valuation at that time because he felt that it was an accounting concern that was not his responsibility. Mr. Levis reviewed an email dated February 8, 2005 sent to him and others by Julio Micheo (Exhibit F) and said that he had read the email when he first received it. Based on a sentence in that email saying, "Given the efficiency in the markets, the cost would be very similar to the 'valuation adjustment' we would have to take if we priced the I/O model using forward rates instead of spot rates…", Mr. Levis is sure that the question of how to value the assets had been raised by that time. Mr. Levis said that, even after receiving the email, he was not aware of the exact nature of the debate.

Mr. Levis acknowledged that he was a member of the ALCO, but he said that he was excused from many meetings because of his travel schedule. Mr. Levis was in Switzerland on vacation during the February 23, 2005 ALCO meeting. Although he did participate in the meeting via telephone, he had a bad connection and was disconnected midway through. He was only on the call for half an hour and does not remember hearing the First Manhattan presentation or receiving the presentation materials. Further, he did not talk to anyone else who attended the meeting to find out what he had missed after being disconnected.

<u>Relationship with First Manhattan</u>

Mr. Levis said that he was one of the first Doral employees to meet with First Manhattan when it started working at Doral in the fall of 2004. First Manhattan asked him about hedging, and he said that he disagreed with Salomon Levis' hedging strategy. Other than that conversation and one brief follow-up discussion, Mr. Levis did not have contact with First Manhattan. He was not involved with the implementation of the middle office, because he delegated that task to Julio Micheo. Mr. Levis emphasized that he was traveling on business a great deal during the fall of 2004 and was not present to have meetings with First Manhattan.

Mr. Levis does not remember First Manhattan mentioning a specific value for Doral's IOs if they were valued with a dynamic model. The first time he heard of First Manhattan's estimate was when he saw Salomon and David Levis after the March 21, 2005 Board meeting. According to Sammy Levis, both Salomon and David Levis were shocked by that First Manhattan presentation. Although he might have heard that there was some question with the valuation a little earlier, Mr. Levis said that he thought that PWC and Accounting were looking into it.

<u>Fixed v. Variable Rate IOs</u>

According to Mr. Levis, he made the decision to shift Doral's focus from fixed to floating rate IOs in consultation with Salomon Levis. They made the decision to start selling floating rate IOs in 1999 when negotiating a deal for fixed rate IOs with Western Bank, which thought that interest rates would increase. Doral decided to accept the risk of increasing rates

6

**FOIA Confidential**
**Treatment Requested**



ATTORNEY WORK PRODUCT
ATTORNEY-CLIENT PRIVILEGED

L   HAM&WATKINSᵘᵖ

and make the sale on a floating rate basis. There was a great deal of demand in the market, and now even R&G sells floating rate IOs.

### 2005 Public Filings

Mr. Levis said that he did review four pages in the 2005 Annual Report that relate to the IO Strips. Mr. Levis was not entirely sure but thought that he might have been involved in adding the interest rate sensitivities chart because investors wanted more information and he thought that more information should be disclosed. Mr. Levis also noted that the inclusion of the charts might have been at PWC's request. He said that he was surprised by the numbers in the chart and that he provided the following language on page 30: " Since December 31, 2004, the Company has entered into new derivative instruments to protect the value of its IOs." Mr. Levis said that he also suggested including the language on page 40 of the report relating to the effect of varying prepayment speeds on the IO values.

### Refinancing of IO Mortgages

Mr. Levis said that the Doral Marketing Department was told not to encourage the refinancing of mortgages in the IO pools. That was a strategic decision made by Salomon Levis or top management, although Sammy Levis acknowledged that he might have suggested it informally. He said that it is also possible that David Levis might have suggested the policy. Doral was not afraid of losing its customers because Doral allowed its customers to modify their loans and because Doral is a market leader.

### Fourth Quarter 2004 Impairment

Mr. Levis was surprised by the $97 million impairment in the fourth quarter of 2004. He was not surprised that there was an impairment, but rather he was surprised by the amount. He believes that the IOs are easy to hedge and that Doral simply hedged improperly.

### Sale of IOs to Popular Securities

Mr. Levis confirmed that the accounting for certain sales of IOs to Popular Securities in 2002 or 2003 is now being changed because it had not previously taken into account a yield guarantee. Levis first heard about the need for this change several weeks ago. He knew about the yield guarantees, however, and he believes that the Accounting and Servicing Departments were aware of them as well. Mr. Levis said that he sent David Laboy in Servicing a copy of the guarantee side agreement, and that a copy would also have been sent to the Accounting Department. Mr. Levis also noted that the Accounting Department asked about the side agreement approximately one month after the transaction. Mr. Levis said that the two deals now under consideration were the only two that had side agreements.

### Julio Micheo's Role in Hedging

Mr. Levis said that he had the initial idea of getting Julio Micheo involved in hedging. In 2003, the Federal Reserve suggested hiring a risk management adviser and Doral

7

FOIA Confidential
Treatment Requested

**ATTORNEY WORK PRODUCT**
**ATTORNEY-CLIENT PRIVILEGED**

HAM*WATKINS ᴸᴸᴾ

hired Mario Iturrino as a consultant. In 2004, the Fed said that it wanted Doral to set up a middle office and a system for monitoring Salomon Levis' trades. At that point, Sammy Levis recommended Micheo for the position. Micheo initially said that he did not want to be involved unless he actually had the power to do the job properly, and the ALCO decided to take a strong position and put him in with legitimate authority. According to Levis, Micheo was not considered for an increased role in hedging in 2005.

### Investor Relations

Mr. Levis reviewed a number of comments that he made on the March 17, 2005 conference call. The page references below refer to the transcript of that call, attached as Exhibit G.

- Page 2: Mr. Levis said that he still stands by the statement that he made on the conference call that the assumptions underlying the IO valuation were correct and that the analysts who criticized them as too optimistic were incorrect.

- Page 2: When we asked about his statement on the call that prepayment rates were adjusted for future expectations, Mr. Levis said that statement was in a script prepared by Ignacio Alvarez, Doral's outside counsel.

- Page 5: Mr. Levis said that the new hedges that he referenced on the call were disclosed in the 2004 10K.

- Page 10: Mr. Levis said that, despite what he said on the call, there were no written confidentiality agreements with the outside valuers.

Since the March 17 conference call, Mr. Levis has had only a few calls with investors or analysts. Several days before our interview, he was told not to talk to any investors. He told us that recently a rumor had spread that Doral was going to be involved in a stock deal. At a wedding the weekend before, Dick Bonini spoke with an analyst from Brean Murray – Mr. Levis did not know the analyst's full name but his last name was Fletcher – and Fletcher told Bonini that Sammy Levis was the source of the rumors. Mr. Levis said that he was not the source of the rumor and that he called Fletcher to find out who had said that he was. Neither Fletcher nor his son was able to identify the source of the rumor. Mr. Levis last spoke to an analyst the day before our meeting and he simply referred them to a letter sent to all shareholders.

### Compensation

Mr. Levis said that he receives a fixed salary and a capped bonus that is based on the amount Doral's return on equity exceeds 15 percent. Mr. Levis said that his compensation was capped at $1.2 million and that half of his bonus is paid in options. He receives the standard vacation mandated by Puerto Rican law (two weeks) and the company forces him to use it all. He also takes occasional long weekends.

8

**FOIA Confidential**
**Treatment Requested**

ATTORNEY WORK PRODUCT
ATTORNEY-CLIENT PRIVILEGED

HAM&WATKINS ᴸᴸᴾ

      Mr. Levis said that he generally arrives in the office by 8 am and leaves by 6 or 8 pm.

### David Levis' Role

      According to Sammy Levis, David Levis is an unpaid advisor. He retired for two years and then gradually reintegrated into the company because he was interested in the business and the markets. He generally arrives at work at eleven in the morning and leaves by two or three in the afternoon.

### Follow-up Call on June 7, 2005

      On June 7, 2005, Sammy Levis called Alexandra Shapiro to follow-up on the June 1 interview. William Reckler participated on the call. Mr. Levis called to confirm that nobody from the Treasury Department was involved in the internal valuation of the IO Strips. He said that he had specifically spoken with Tony Berrios and asked Mr. Berrios if he ever provided prepayment information to the Accounting Department. According to Mr. Levis, Mr. Berrios said that he had never done so.

      Ms. Shapiro thanked Mr. Levis for the information but requested that he not conduct such conversations and informal investigations. She assured him that we would follow-up with other Doral employees as necessary. Ms. Shapiro also told Mr. Levis that we would appreciate any suggestions he might have as to whom we should talk to as part of our investigation..

9

FOIA Confidential
Treatment Requested

Exhibit E

53rd at Third
885 Third Avenue
New York, New York 10022-4834
Tel: (212) 906-1200  Fax: (212) 751-4864
www.lw.com

## LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Boston | New York |
| Brussels | Northern Virginia |
| Chicago | Orange County |
| Frankfurt | Paris |
| Hamburg | San Diego |
| Hong Kong | San Francisco |
| London | Shanghai |
| Los Angeles | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| New Jersey | Washington, D.C. |

**MEMORANDUM**
August 5, 2005

### ATTORNEY WORK PRODUCT
### ATTORNEY-CLIENT PRIVILEGED

| | |
|---|---|
| **To:** | Files |
| **From:** | William Reckler |
| **File no:** | 039544-0002 |
| **Copies to:** | Kenneth Conboy, Alexandra Shapiro |
| **Subject:** | August 1, 2005 Meeting with Sammy Levis |

On August 1, 2005, Alexandra Shapiro, Kenneth Conboy, and William Reckler of Latham & Watkins LLP and Mark O'Mara of Ernst & Young met with Mario S. Levis ("Sammy Levis"), Treasurer of Doral Financial Corporation. The purpose of the meeting was to discuss issues related to the valuation of Doral's assets and its restatement of earnings. This memorandum is not meant to be a verbatim or near verbatim account of the meeting with Mr. Levis. Rather, it summarizes the substance of the discussion and necessarily contains our thoughts, impressions and conclusions. As such, it is protected by both the attorney-client privilege and the work product doctrine.

#### Use of the Forward Curve to Value Doral's Interest Only Strips

Sammy Levis believes that Doral was hedging its IOs properly and that only its hedging was flawed. He did not know prior to the release of the 2004 Annual Report that a change in the IO valuation model was imminent, but he knew that it was a possibility. Mr. Levis said that he was not involved in Doral's accounting and therefore did not pay a great deal of attention to the IO valuation.

Mr. Levis stated that there had been discussion about whether to use a forward curve to value the IOs for two or three years, dating back to 2002 when PwC raised the issue in a meeting with Popular Securities. Mr. Levis was never involved in any discussions about the valuation method. Mr. Levis does not remember reading a January 6, 2005 email from Ricardo Melendez to Yigit Altintas and Salomon Levis, copying Sammy Levis and others (Exhibit A,

**FOIA Confidential
Treatment Requested**

USAO 000099

**ATTORNEY WORK PRODUCT**
**ATTORNEY-CLIENT PRIVILEGED**

:HAM•WATKINSᴸᴸᴾ

600757511), arguing that Doral should not change the formula that it used to value the IOs, but he assumes that Melendez was discussing whether to incorporate a forward curve.

Levis said that he never saw any memos to or from First Manhattan in October 2004 discussing the need to incorporate a forward curve or any other aspects of the IO valuation. He also said that he never saw the valuation of the IOs performed by Lidio Soriano in early February. Levis insists that he first learned the value of the IOs incorporating the forward curve after the March 21, 2005 Board meeting. He did not talk to Micheo, Soriano, or Melendez about the IOs in February. Although he acknowledge having seen the February 8, 2005 email from Micheo that mentioned a "valuation adjustment" (Exhibit B), he said that the issues discussed in the email did not involve him and he did not pay attention to it. He said that the email was about hedging, and not the IOs, and that it did not raise any concerns with him.

Levis did acknowledge that he reprimanded Micheo for including non-ALCO members on the email, but he downplayed the language in his February 9, 2005 email to Micheo. (Exhibit C). Levis explained that the comment that the IOs would be in "deep shit" if LIBOR increased was just a statement of the well-known fact that the value of the IOs would decrease if interest rates went up. He said that would be obvious to anyone who understood the market. Mr. Levis speculated that, at the time he wrote the email, he thought that the IOs would have to be marked down $50-80 million at the end of the first quarter. The references to "ammunition" and "secret weapons" are a reference to Levis' belief that Doral could have increased its net interest margins by buying interest-backed mortgages. Melendez did not agree with this strategy.

Levis reiterated that he participated in the February 23, 2005 ALCO presentation by phone and only for five to ten minutes. He does not remember making any comments and says that he did not discuss the meeting with anyone until after the March 21, 2005 Board meeting. He never saw the presentations made at the ALCO meeting.

<u>External Valuations</u>

Levis stated that he was just a mere messenger or facilitator for the outside valuations and did not pay a great deal of attention to them substantively.

Levis knew that Popular Securities incorporated the forward curve into its last valuation. He says that he learned about that change in March and did not discuss it with Melendez, Salomon Levis, David Levis, PwC, or the Audit Committee. He knew that the change would have an impact on earnings, but he did not discuss it with anyone because he was not involved with accounting. Moreover, Sammy Levis thinks that he learned about Popular Securities' change to the forward curve after Doral filed its 10K and that he learned it from David Levis, who had had a meeting with Popular Securities. Sammy Levis did not know that PwC had spoke with Popular Securities in January or February of 2005. He thinks that the Doral's internal auditors did have a meeting with Popular Securities, but he does not know if PwC attended. Moreover, Levis said that Melendez never told him about PwC's concerns with the Popular Securities valuation. He thinks it is possible, however, that Salomon Levis might have mentioned them.

2

**FOIA Confidential**
**Treatment Requested**

**USAO 000100**



**ATTORNEY WORK PRODUCT**
**ATTORNEY-CLIENT PRIVILEGED**

:HAM▴WATKINS⊔ᴾ

Levis explained that Joe Lopez is a broker who works with institutional accounts and Doral is one of his clients. He provides all types of investment banking services, including repo financing, hedging, and the purchase/sale of mortgage-backed securities. Doral does not do a significant amount of business with Lopez, and Morgan Stanley is among the lowest of the banks in terms of fees received from Doral. Levis has no personal business ventures or co-owned assets with Lopez. He does not know if Lopez owns Doral stock and does not know if any payments have made to Lopez.

Levis knows Joe Lopez' son, also named Joe Lopez (hereafter, "the son"). The son works in Doral's Secondary Markets Department, which is under Sammy Levis' supervision. Levis told us that the son is paid $15-18 thousand per year and has been at Doral somewhere between two and five years; he is in his late twenties. Levis helped him get a summer job at Doral and might have followed up on his application when he applied for a permanent position. The father had sent Levis a copy of the son's resume. Levis said that the son was qualified for his position. Levis approved a raise for the son this fall, but said that the raise was recommended by the son's supervisor, Jose Del Rio, and that he approves all raises that are recommended. Levis said that it is standard practice for all employees to receive raises each year if they perform satisfactorily, and that he reviews and approves all recommendations made for each employee in his departments. Levis later suggested that Del Rio recommended a range for the raise and that while the son's range was consistent with other employees' in the group, Sammy approved a raise at the top of the recommended range. Levis also recently helped the son look for a job in another department at Doral because he was not happy with his salary and responsibilities. He said that he was merely doing a favor for a business associate and that the son's raises have all been merit based.

Levis reviewed the contracts that he signed with Popular Securities' in March 2005 (Exhibit D) and said that they were consistent with Popular Securities' prior work.

Investor Relations

Levis explained that Watt Webb is an institutional investor with whom Levis exchanged a significant number of emails and met many times at road shows. Webb also spoke with Salomon Levis and Melendez, and in fact suggested to them that Sammy not speak with analysts. Levis had seen Webb's April 7, 2005 email (Exhibit E, 01372240) suggesting that Levis not have contact with investors and explained that Webb was trying to set up calls between Doral, Merrill Lynch, and Wachovia because he wanted Doral to convince those analysts to change their negative reports. Levis explained that Webb was upset with him because Doral's stock price had fallen. Levis said that he and others at Doral thought that Webb was a hassle. Levis does not know why Webb complained about Levis' presentation at an April road show (Exhibit F, 01371805), but said that the tour was actually cut short because it was so badly received by investors who were unhappy with the performance of Doral's stock.

Levis said that he did not have Doral's lawyers approve or screen his communications with investors. He did not think he was disclosing any information that was not already public, but admits that he may have made occasional mistakes. Levis said that he

3

**FOIA Confidential**
**Treatment Requested**

**USAO 000101**



**ATTORNEY WORK PRODUCT**
**ATTORNEY-CLIENT PRIVILEGED**

'HAM▲WATKINSᴸᴸᴾ

received hundreds of calls and tried to answer them immediately, and that in the course of doing so it was possible that he might have once or twice revealed information that he should not have.

Levis explained that after he distributed a memorandum on January 19, 2005 regarding Doral's reaction to its fourth quarter earnings, Doral's outside counsel made the bank file an 8k because the memo implied that the IO impairment and the tax benefit that Doral took were linked when in fact they were not. Levis said that he had merely chosen poor wording for the memo. Levis also acknowledged that in a March 9, 2005 email to Webb (Exhibit G, 01091245) he probably disclosed information about hedging to offset future impairments that had not yet been made public. Similarly, Levis said that information that he disclosed in a February 14, 2005 email to Ryan Schaper of Farallon Capital about the caps on the IOs had not yet been made public and that he should not have disclosed it. (Exhibit H, 01084097). He described the email as a mistake.

Levis does not know why he would have sent an email to Jim Shanahan of Wachovia on September 24, 2004 saying that the flattening of the yield curve would have a positive impact on the IO valuation. (Exhibit I, 00070176-178). He acknowledged that that statement was incorrect. Levis further explained that he forwarded Shanahan's January 31, 2005 email (Exhibit J) to Melendez because Melendez answered questions about the IOs. Levis said that by the time the email was sent he would have thought that a change to the forward curve would have resulted in a $25-30 million impairment. Shanahan was one of only several investors to ask about the forward curve. Levis typically replied to such questions by saying that Doral had always valued the IOs without using the forward curve. He said that the investors' questions did not make him think about whether Doral's valuation was correct.

When shown email correspondence (Exhibit K), Levis said that he probably did have a call with Andrew Collins and Peter Froehlich of Piper Jaffray but that Melendez would have answered most of the questions on the call because he knew more about accounting issues. Levis does not remember what specifically was discussed.

Levis explained a comment in a November 23, 2004 email to an investor that if rates went up, Doral would do even better (Exhibit L) as consistent with his longstanding belief. He said that he thought Doral could in fact do better because mortgage production would not decrease and net income margin would go up. Levis, however, claimed that he had not been aware of the extent of the impact of interest rates, which made the statement untrue.

<u>Internal Valuation Assumptions</u>

Levis said that he was not involved in the internal discussions regarding the assumptions used to value the IOs. He did not discuss the prepayment speed, the discount rate, or the impairment with anyone in Doral. And he did not see any correspondence or memos relating to those topics. Levis said that he did suggest making additional disclosures about those assumptions in the Annual Report. Sammy Levis said that David Levis and Ricardo Melendez worked together to calculate the impairment. He does not know how they did so and does not know whether they discussed any other possible impairment amounts.

4

**FOIA Confidential**
**Treatment Requested**

**ATTORNEY WORK PRODUCT**
**ATTORNEY-CLIENT PRIVILEGED**

LATHAM&WATKINS LLP

### The R&G Transaction

Levis said that he was involved in the December 2004 sale of the IOs to R&G and that he actually signed the contract. He found out about the purchase half of the transaction from Salomon Levis, who negotiated the deal and then instructed him to complete the sale portion. Sammy Levis does not view the transaction as a swap and did not discuss it with PwC. He thinks that the transaction was quite favorable to Doral because the sale included commercial loans which are difficult to sell. He thinks that the net gain on the transaction was $25 million.

### The 2004 Tax Benefit

Levis said that Doral took a one-time tax benefit of $77 million in the fourth quarter of 2004. He said that benefit, because it was pre-tax, effectively canceled out the $97 million impairment. Melendez was responsible for the tax benefit. Levis said that he did not consider either the tax benefit or the R&G transaction as the weapons in Doral's arsenal referred to in his February 9, 2005 email to Micheo. (Exhibit C).

### 2005 Stock Transactions

Levis said that he purchased 25,000 shares of Doral stock in January. Although he wanted to purchase more stock after the Annual Report was filed, Doral's outside counsel told him that he could not do so.

### Miscellaneous

Levis admitted that he had written a memo summarizing our June 1, 2005 interview with him. (Exhibit M). He said that it was his own personal record made from memory and that he had never showed it to anyone. He denied recording our conversation and said that he does not own a tape recorder. Sammy Levis said that he had spoke briefly with David Levis after that June 1 meeting.

5

**FOIA Confidential
Treatment Requested**

# Exhibit F

Aug-08-05   12:06pm   From-Doral Financial Corporation         767-474-6863      T-781  P.001  F-544

## FACSIMILE
## TRANSMITTAL

TO      :   *William Reckler*

FAX #   :

DATE    :   *11*

# OF PAGES:
(INCLUDING COVER PAGE)

RE

*PRIVILEGED AND CONFIDENTIAL*
*ATTORNEY - Client COMMUNICATION*

*Will: Per your request*

*Sammy*

From the desk of:

**Mario S. Levis**
Senior EVP & Treasurer
Doral Financial Corporation
1451 F.D. Roosevelt Avenue
San Juan, P.R. 00920-2998

Ph. (787) 474-6709
Fax (787) 474-6883

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged and confidential. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail. Thank You.

**FOIA Confidential
Treatment Requested**

**USAO 000152**

Aug-09-05   12:06pm   From-Doral Financial Corporation.         787-474-6883          T-791  P.002   F-544

6/1/05

Meeting with Judge Conboy (thru Video), Alexandra Shapiro (AS), Bill (B), Mark D Omare (MO), Fco. Lombo (FL). Last two from E&Y. Meeting about 4hrs (9:45am- 1:50pm)


Judge: Introduction & Explained to MSL the purpose of meeting and they wanted to follow up after discussions with other people. Also, talked about the restatement process and SEC informal inquiry.

MSL: Fine and count on my cooperation but before I begin I want to change subject for a moment and just inform you that right now we have an urgent matter to attend in regards to our recent 8K and confusion regarding Doral "default." I understand that we are working on a press release and since all lawyers are giving their input, we would appreciate their most quick feedback as there are a lot of confusion in the market place that need to be addressed, in my view. I just wanted to share this with you as this has been the most recent event from the Company perspective. Now, I'll be more than happy to answer any questions you may have.


AS: Can you give us your personal financial and business background?

MSL: Where you want me to start from college or actual work experience?

AS: From school

MSL: (This is the short version) Got a BSBA from Marquette in 1985, MBA from De Paul in 12/86, worked two summers at the CBT (by the way, AS didn't know what was the CBT!), then Merrill Lynch in 1986-late 1988 as a tax-exempt Trader (municipals bought by 936 Co. & GNMAS), later managed ML's repo book. Then ML closed and prior to accepting an offer with Drexel, my father made me an offer as a VP- Trading of Tax Exempt GNMAs. Joined in late 1988. All of this is in Proxy statement.


Note: My background took a lot more and AS and B asked very "stupid" detailed questions such as specific dates that didn't match their numbers regarding my MBS graduation date, ML final date, and starting date with the Company. The Judge interrupted many times and asked if I could be briefer with Yes or No answers. I replied that I would do my best but I am just -responding to AS questions and some of them cannot be answered with a simple yes or no.

FOIA Confidential
Treatment Requested

USAO 000153



AS: Joe Lopez. How did we select him?
MSL: Just like we could have selected any other from Merrill, or UBS.
There are not that many choices.

AS: Why didn't pay him and sign a contract?
MSL: It's customary for them to give market quotes as a service to their
clients.

AS: Did your father speak to him regarding I/O?
MSL: As far as I know, never.

AS: Do you father know Joe Lopez?
MSL: Yes, from the old days (80's) in the industry.

AS: Explain the process of the valuation.
MSL: I wasn't involved at all other than the main contact and facilitator
between the accounting dept. and Joe Lopez. I just forwarded the schedules
and gave him follow up so that he would do it in a timely manner.
AS: Any input from you?
MSL: Not at all
AS: How did they do the valuation?
MSL: First of all, it was based on a market quote or multiple of excess
servicing. I understand that he asked his MBS trader for multiples based on
the WAM and WAC and made some adjustment for the PR factor of lower
prepayment. This s a well known fact among MBS traders, that PR has
lower prepayment.

AS: Why Floating I/Os?
MSL: This resulted from the extraordinary demand from other banks around
the year 2000 when most people were bearish and thought that rates would
continue to rise. I remember specifically, one bank CFO who was so bearish
that he was looking for a floating PR mortgage asset and we decided to sell
these loans on a floating basis and took the risk. A risk that we hedged well
at the time. This time around, the hedges didn't help much because of the
flattening of the curve.

AS: We have information that someone from the Treasury dept provided
forward prepayment estimates for the internal valuation.

**FOIA Confidential
Treatment Requested**

**USAO 000154**



THAT

MSL: As I previously explained in past and for the benefit of E&Y, let me explain my role and that of Treasury dept. Our dept. deals with the secondary market with handle warehousing of loans, securitization, sale of loans, and the cash needs of the Company. (At this moment, the Judge tried to stop me so that I answer the question specifically at which I responded that I will. But he needed to bear with me so that the E&Y people would understand the answer. AS interrupted me and gave me a 5 minutes lecture on how they are trying to help us with the SEC investigation, so on and so on. After listening to her without interrupting her, I asked her if she would give me the same courtesy and allow me to respond without interruption and I'll promise her that I would indeed respond. I asked the Judge: Judge: as a former Judge, you do listen to people right? Yes, go ahead. Thanks a lot.) Anyway, I was about to finish. The Treasury dept deal with the above matters and have no involvement in the accounting aspect of valuations. So the answer is that there is no way that anyone from my dept nor I gave those estimates.
AS: So who did?
MSL: I have no idea, but not me.

B: Let me show you exhibit X, the transcript of the 10k investor conference call. Where you mentioned that the IO prepayments are based on historical activity and adjusted for expectations of future behavior.
MSL: This was standard legal prepared remarks by Ignacio, but if you take at a latter statement in which I mentioned that we don't use assumptions and this is a fact.
B: But didn't you read it after Ignacio wrote it?                    on factual ?
MSL: Yes, but not a big deal. It's standard practice by lawyers to include all possible scenarios. As far as I know, accounting used historical data. But if an assumption was used, I wasn't aware and I can assure you that it was not given by me or anybody from my department. By the way, assuming that was the case (which again, I wasn't aware of it), do you know who provided such estimate?
B: No, but we were told that it was form Treasury.
MSL: Well, then I can assure you 100% that it wasn't me at all and I don't know of anyone within my department that could.

–B & AS: Let's us show you exhibit X, an internal audit report. Have you seen it before before?
MSL: No. Never
AS: You never signed it?

**FOIA Confidential
Treatment Requested**



MSL: Because I never saw it

AS: Why then your name for signature was removed from final version?
MSL: I don't know; my guess is that it did not relate to my functions. Again,
and I am sorry to repeat this point so many times, but I am not involved in
any aspect of the accounting valuations other than assisting them in getting
those from third parties.

MO: Are you a CPA?
MSL: No and after all of this IO issue, I don't want to become one.
(Everybody laughed)

AS: What is your involvement in hedging?
MSL: Since 1991, I have not been involved in the day to day of the hedging,
other than recent involvement in the Risk Management Committee and later
in ALCO. New ALCO was formed sometime last year, but my participation
was very limited because of my extensive traveling. In 2004, I spent most of
my time in doing many road shows.

B: So you haven't done any hedging nor authorized them?
MSL: As I said earlier, I had not done an execution of a daily hedging
transaction in many years. These executions (in prior years, because now
this have changed) were done by Pedro Palou on behalf of Salomon. I did
authorize several transactions on behalf of Salomon on his absence but only,
after I was assured that these were his instructions.
B: So no hedging by you?
MSL: No! Other than participation in the committees.
B: Let me show you this email (Exhibit X). What is it?
MSL: An email by Julio Micheo with a lot of hedging ideas.
B: Can you look at the line that states that in order to perfectly hedge the IO,
we need to spend the same amount of money if we changed the IO
methodology. Didn't you read that either?
MSL: Yes, I most likely read it, but that doesn't mean that we need to change
the methodology. Do you see a recommendation by Julio or an implication
that we should do so? No, he is quantifying the cost of a perfect hedge. As
far as I know at that day there was no issue with the methodology of the IO.

MO: When was the first time you found out about the change and the
economic impact?

FOIA Confidential
Treatment Requested

USAO 000156



MSL: Until a recent Board meeting sometime in March when First
Manhattan Group presented their evaluation and I was later told about it. I
was in full shock to hear the change and the potential amount.

B & AS: We have minutes from February___ that Lidio made a presentation
to ALCO with similar numbers?
MSL: I was in Switzerland at that time and I did not participated in most of
the meeting. The meeting was delayed very late and with the 6 hours
difference it was very late there and I only lasted for about 15-30 minutes
(out in the cold with my cell) listening and commenting about another
subject unrelated to IOs. So if my name is in those minutes, they should
clarify that I was on the phone for a very short period of time. Do you see in
these minutes any comments made by me at all?

AS: Did you receive a package for that meeting?
MSL: NO.

At this moment, AS got upset and started to imply that I was not
remembering many emails (later used the word minutes) and the SEC is
tough on this. She again gave me a 5 minutes lecture (supported by the
Judge) on how I can't see them as my adversaries and that they are trying to
help out. AS told me to relax. After listening to both of them quietly and
they finished giving the lecture, I said: OK I really understand both of you,
but now, with all due respect, give me the same opportunity that I just gave
both you and listen to me for the same amount of time without interrupting
me. Understand that I am trying to cooperate as much as possible with my
best recollections, if you don't allow me to express myself freely and if AS
continues to interrupt me, then I'll have no choice but discontinue theses
conversations. Now, Judge, can you give me that same benefit and listen to
me? He replied: Go ahead!

MSL: First of all, I am no the one that need to relax but AS, you are the one
that needs to relax somewhat and quit picking immaterial things such as the
beginning whether I spent almost 2 yrs at Merrill or 1 yr and 10 months.
Now, let's start all over again. Alexandra, when you refer to me not
remembering information in emails and later in minutes, which are you
referring to the minutes or the emails?
AS: I meant the emails.
MSL: You see, we all need to calm down and start comparing apples with
apples and not apples with oranges and quit trying to confuse me. Now let's

FOIA Confidential
Treatment Requested

USAO 000157

(6)

go to both emails again. Can you give me the first one, so that I can address
it again (this was an email of Pedro reporting to SL and me for hedging) and SO
that all of you are very clear.
AS: No, that's OK.
MSL: No! No! You just implied that I was either forgetting or something
else and I do want to go back to that email.
AS: Well, actually the one that you have in your hands (Julio's perfect
hedging) came before so we should address that one instead.
MSL: With all due respect, you first showed me the other one and since
there have been questions rose on that one, I want to clarify it before I
continue.
AS: OK and she gave it back to me
MSL: So what is your concern or question?
AS: The fact that you mentioned that you don't do daily hedging and this
email says that Pedro report to Salomon and you.
MSL: With all due respect, I don't see the inconsistency. The fact that Pedro
reports to 2 persons (Salomon and I) doesn't mean that I actually instructed
him to do some hedges. I was authorized, but I am telling you for the 2nd
or 3rd time, I have not been in active hedging on a daily basis. Salomon,
before the changes, used to do all the hedging.
Judge and MO: Sammy we are OK and now understand.
MSL: Thanks, can we now go to the second email that I AS refers to
(Julio's)
AS: After reading this email, you didn't realize that there the model needed
to be changed from spot to forward?
MSL: NO, as a matter of fact, the email refers only to different hedging
ideas and just makes reference to a different method. It didn't even explain
what method he is referring to. I really don't see your point.

HEARD
B: So Sammy, when was the first time you head about First Manhattan
finding?
MSL: I already answered that, only after the Board meting sometime in
March.
B & AS: So you never knew about the potential write-down before?
MSL: Well I did know that if Libor rates did go up, we would have
additional write-downs, but under our existing Spot model?
AS: So you never knew about the change to forward curve?
MSL: NO!
MSL: Look with all due respect and I apologize to AS (being a lady present)
but there is only one word that comes to mind: If I knew late early January,

**FOIA Confidential
Treatment Requested**

**USAO 000158**

(7)

will I be so stupid as to buy 25,000 shares at $43.18. That's a big investment of $1mm that is now worth about $200m. In all leagues, that's a lot.

End of subject

AS or Judge: Did your father advised about prepayments speeds on the IOs?
MSL: No that I know of.

AS: Did Luis Berrios was involved and advised on prepayment for the IOs?
MSL: No. Mr. Berrios main job is to sell loans and just like me he acts as a facilitator in getting information to Gohane for MSR valuation. But he is not involved at all with IOs.
B: Are you sure?
MSL: Yes. He is not involved with IOs at all. (They were somewhat surprised)

MO: Initial IO valuations?
MSL: We just called Joe Lopez and he gives us an indication over the phone. and I made a memo and sent it to accounting. But these are later marked to market in quarterly valuations.

AS: Let's turn to Popular Sec. and Carlos Ortiz. Why him?
MSL: He is the best known investment banker in PR. He dealt with the largest municipal bond in the US market in 1987 while at First Boston. (Gave them same background info as last time)

AS: Why another valuation?
MSL: I don't know. It was requested from me and I just assisted them.
AS: Who did?
MSL: I don't remember, probably RM or somebody form accounting.
AS: PW?
MSL: I don't know. As a matter of fact, I never deal with them at all, except for a question from time to time. Again, I don't get involved in the accounting aspect of the Company.
AS: Did you tell Popular that the valuation was for internal or external purposes.
MSL: Well, they were told that 3 quarterly were for our own internal purposes, but the year-end was for PW's support. That's why the difference in the short format of the letter versus the longer one at year end.

FOIA Confidential
Treatment Requested

USAO 000159

Aug-08-05  12:08pm  From-Doral Financial Corporation        787-474-6883        T-791  P.009/011  F-544

$(8)$

AS: Did you provide Popular with other info?

MSL: When there were extraordinary changes in their information, they would inquire as weather it was a mistake on the data. Upon further investigation, I figure out that it was as a result of repurchases or construction loans.

AS: and you would give this information from top of your head like you told us last time?

MSL: In most cases, yes, because I know or remember the information in particular significant repurchases or inquired from the secondary market or investor accounting.

MO: Why deduct the repurchases from the valuation since these are for delinquencies and eventually paid off? And also, why include the hedges and Caps?

MSL: First of all, all contract have embedded caps, so if Libor rate go up indefinitely, it will have a positive impact. We also bough additional Caps to compensate for those embedded caps that were at higher levels. These caps and hedges are, in my view, important in the valuation of the IO. Because if the IO is hedge, then the net effect of rising rates is minimal. In 4th Q we saw a dramatic flattening of the curve ant the hedges didn't worked at that time.

MO: It seems odd to me that you would take these hedges into account for the valuation.

MSL: Not really, that's a subjective call and depend who you talk to. For instance, recently before the restatement, we were in conversations with a major institution to sell the IO and I remember the cost of hedges being part of the negotiations.

MO: Why did the internal valuation was always the lowest of the 3?

MSL: Really? I knew that many times ours was the lowest but wasn't aware that in each time it was the lowest.

MO: Any idea or guess why?

MSL: Again, I have never been involved with the internal valuation, so it would be pure speculations from my part.

AS: Did you ever told Popular (Natalia) that 3.4% of the hedges were _____

MSL: 3.4% of what??? I really have no idea what you are referring to.

AS: Did you tell Natalia that 97% of the IOS were hedged?

MO: What is your opinion of the Restatement?

MSL: Against it. This was an accounting change

FOIA Confidential
Treatment Requested

USAO 000160

Aug-08-05   12:09pm   From-Doral Financial Corporation          787-474-6983        T-791   P.010/011   F-544

⑨

MSL: It is not customary for me to give such a specific number. I probably
told them that substantially all floating IOs were hedged. As a matter of fact,
refer to our representation in their letter.

AS: At any time did Popular brought the issue of Spot versus Floating?
MSL: I remember about 2 yrs ago. When Ramon Aponte spoke to Carlos
Ortiz and they both concluded that the Spot was the right model at that time.

AS: How about now, with Natalia?
MSL: Not until 2005.

AS: Did you ever discuss the discount rate with them?
MSL: Never

Judge: In any conversation at all?
MSL: NO, as matter of fact, I don't even know what their last discount rate
they used was.

AS: Are you sure?
MSL: Yes, I am pretty much sure, but maybe at one moment I may have
asked them out of curiosity, but I really doubt it. Keep asking, but the
answer is NO. Do you have any information that I may not know? Please if
you do, help me recollect any information so that I can really help you.

AS: No, I really don't have any more questions.

B: I do have one more, how is your compensation? (AS interrupted and
explained me that this was standard question to all)
MSL: My compensation is salary plus bonus after 15% ROE. Half of bonus
is in stock options. (Refer to proxy)

They asked me about Bonini's

**FOIA Confidential
Treatment Requested**

**USAO 000161**

Aug-08-05   12:00pm   From-Doral Financial Corporation          787-474-6863        T-701   P.011/011   F-544



6/7/05
2:50pm(EST)    (CONFIDENTIAL—FOR MY RECORDS ONLY)

Alexandra Shapiro (Latham & Watkins) returned my call of 6/6/05, with Bill Reckler on the call:

Alexandra: Hi Sammy! What's up? With me, I have Bill, do I mind?

MSL: No at all! The reason I called was to follow up on our previous conversation in our last meeting a few days ago and to reiterate on my previous response to you regarding a question about prepayment information being given by our treasury dept to accounting. First, you inquired about me giving prepayment information, which I replied and reiterate again that I have never provided such information to accounting. Later I was asked the same about Luis Berrios, (who we call Tony) at which time, I replied in the negative as well. Upon your insistence regarding Tony, I kept thinking about it to make sure that I was giving you the right response. Well, yesterday we happened to have a meeting for another purpose, a local transaction that we are working with, which Tony was present. After that meeting was over, I separately asked Tony if he has ever given any information regarding prepayments of any kind, past, present, or future to accounting; and his response was NO WAY. Tony only provides accounting a tape from servicing containing the new WACs, WAMs, and updated outstanding balances, but no prepayment information of any type. I just want it to pass this information to all of you and reiterate my previous response.

Alexandra: Sammy thanks for the information and we definitely will make a note of it. It does helps. But Sammy, let me give you a word of advice for your own protection given the SEC investigation (I tried to interrupt her since I knew where she was coming from, but I let her speak anyway without any interruption.) If you think of any other person that we ought to talk regarding this mater, kindly let's us know.

MSL: Thanks for the advice, I definitely will do so. But feel confident that I asked Tony in a very informal and general way without telling him the purpose. I just asked him for my own knowledge, given your questioning of my original response.

Alexandra: Thanks a lot Sammy

FOIA Confidential
Treatment Requested

USAO 000162