UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA              :

     -v.-                             :      08 Cr. 181 (TPG)

MARIO S. LEVIS, and                   :
    a/k/a "Sammy Levis,"

                               :

            Defendant.           :

- - - - - - - - - - - - - - - - - -x


GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE TO
DEFENDANT'S PRE-TRIAL MOTIONS


MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York,
Attorney for the United States of
America


CHRISTOPHER L. GARCIA
JOAN M. LOUGHNANE
Assistant United States Attorneys

- Of Counsel -

# TABLE OF CONTENTS

PAGE

I. STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . 2

II. ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . 7

    A.   DEFENDANT'S MOTION TO TRANSFER
        VENUE SHOULD BE DENIED. . . . . . . . . . . . . . . . 7

        1.   Applicable Legal Standards.. . . . . . . . . . 7

        2.   A Transfer Of Venue Is Not In The Interests Of
              Justice. . . . . . . . . . . . . . . . . . . . 10

             a.   Residence of the Defendant. . . . . . . 10
             b.   Location of Witnesses.. . . . . . . . . 13
             c.   Location of Events. . . . . . . . . . . 21
             d.   Location of Relevant Documents
                 and Records.. . . . . . . . . . . . . . 28
             e.   Disruption of the Defendant's Business. . 30
             f.   Expenses to the Parties. . . . . . . . . 30
             g.   Location of Counsel.. . . . . . . . . . 35
             h.   Relative Accessibility. . . . . . . . . 35
             i.   Docket Conditions.. . . . . . . . . . . 36
             j.   Special Circumstances.. . . . . . . . . 37

    B.   DEFENDANT'S MOTION TO COMPEL CERTAIN PRE-TRIAL
        DISCLOSURES SHOULD BE DENIED. . . . . . . . . . . 39

        1.   Witness List.. . . . . . . . . . . . . . . . . 39

        2.   Exhibit List.. . . . . . . . . . . . . . . . . 46

        3.   404(b) Notice. . . . . . . . . . . . . . . . . 50

    C.   DEFENDANT'S MOTION TO SUPPRESS STATEMENTS SHOULD BE
        DENIED. . . . . . . . . . . . . . . . . . . . . . 51

III. CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . 53

## TABLE OF AUTHORITIES

PAGE

**CASES:**

Platt v. Minnesota Mining Co.,
   376 U.S. 240 (1964).. . . . . . . . . . . . . . . . . . passim

United States v. Ahmad,
   992 F. Supp. 682 (S.D.N.Y. 1998). . . . . . . . . . . . 41, 42

United States v. Alessi,
   638 F.2d 466 (2d Cir. 1980).. . . . . . . . . . . . . . . 41

United States v. Alter,
   81 F.R.D. 524 (S.D.N.Y. 1979).. . . . . . . . . . . . . . 27

United States v. Alvalle,
   1985 WL 2348 (S.D.N.Y. Aug. 22, 1985).. . . . . . . . . . 41

United States v. Alvarado,
   2001 WL 1631396 (S.D.N.Y. Dec. 19, 2001). . . . . . . . . 49

United States v. Antia,
   1999 WL 294788 (E.D.N.Y. Mar. 22, 1999).. . . . . . . . . 10

United States v. Aronoff,
   463 F. Supp. 454 (S.D.N.Y. 1978). . . . . . . . . . 8, 22, 31

United States v. Bejasa,
   904 F.2d 137 (2d Cir. 1990).. . . . . . . . . . . . . . . 41

United States v. Brooks,
   2008 WL 2944626 (S.D.N.Y. July 31, 2008). . . . . . . . 16, 22

United States v. Cannone,
   528 F.2d 296 (2d Cir. 1975).. . . . . . . . . . . . . . 41, 42

United States v. Carey,
   152 F. Supp. 2d 415 (S.D.N.Y. 2001).. . . . . . . . . . . 34

United States v. Carrington,
   2002 WL 31496199 (S.D.N.Y. Nov. 7, 2002). . . . . . . . . 49

ii

PAGE

United States v. Chalmers,
    474 F. Supp. 2d 555 (S.D.N.Y. 2007). . . . . . . . . . . . 50

United States v. Clark,
    360 F. Supp. 936 (S.D.N.Y. 1973). . . . . . . . . . . . 27, 28

United States v. Conner,
    2001 U.S. Dist. LEXIS 1110 (S.D.N.Y. Feb. 9, 2001). . . . . 10

United States v. Coriaty,
    2000 WL 1099920 (S.D.N.Y. Aug. 7, 2000). . . . . 13, 16, 29, 34

United States v. Culoso,
    461 F. Supp. 128 (S.D.N.Y. 1978). . . . . . . . . . . . . 10

United States v. Ebbers,
    2004 WL 2346154 (S.D.N.Y. 2004). . . . . . . 14, 16, 25, 27, 33

United States v. Feliciano,
    2002 WL 575662 (S.D.N.Y. April 16, 2002). . . . . . . . . 52

United States v. Giffen,
    379 F. Supp. 2d 337 (S.D.N.Y. 2004). . . . . . . . . . . . 49

United States v. Goldman,
    439 F. Supp. 337 (S.D.N.Y. 1977). . . . . . . . . . . . . 42

United States v. Greyling,
    2002 WL 424655 (S.D.N.Y. Mar. 18, 2002). . . . . . . . . . 49

United States v. Guastella,
    90 F. Supp. 2d 335 (S.D.N.Y. 2000). . . . . . . 8, 28, 34, 35

United States v. Hanley,
    1995 WL 60019 (S.D.N.Y. Feb. 10, 1995). . . . . . . 11, 29, 31

United States v. Juncal,
    1998 WL 473949 (S.D.N.Y. Aug. 7, 1998). . . . . . . . . . 14

United States v. Layne,
    2005 WL 1009765 (S.D.N.Y. May 2, 2005). . . . . 11, 28, 29, 35

United States v. Maldonado-Rivera,
    922 F.2d 934 (2d Cir. 1990), cert. denied,
    501 U.S. 1211 (1991). . . . . . . . . . . . . . . . 8, 9, 10

iii

PAGE

United States v. Martino,
    2000 WL 1843233 (S.D.N.Y. Dec. 14, 2000). . . . . . . . 29, 39

United States v. Matos-Peralta,
    691 F. Supp. 780 (S.D.N.Y. 1988). . . . . . . . . . . . . 51

United States v. Matthews,
    20 F.3d 538 (2d Cir. 1994). . . . . . . . . . . . . . . . 51

United States v. McDuffie,
    2002 WL 654136 (S.D.N.Y. April 18, 2002)).. . . . . . . . 52

United States v. Nachamie,
    91 F. Supp. 2d 565 (S.D.N.Y. 2000). . . . . . . . . . 45, 48

United States v. Nelson,
    606 F. Supp. 1378 (S.D.N.Y. 1984).. . . . . . . . . . . . 42

United States v. Ojeikere,
    299 F. Supp. 2d 254 (S.D.N.Y. 2004).. . . . . . . 41, 42, 43

United States v. Poindexter,
    727 F. Supp. 1470 (D.D.C. 1989).. . . . . . . . . . . . . 48

United States v. Posner,
    549 F. Supp. 475 (S.D.N.Y. 1982). . . . . . . . . . . . . 8

United States v. Quinn,
    401 F. Supp. 2d 80 (D.D.C. 2005). . . . . . . . . . . . 9, 10

United States v. Rosenthal,
    1991 WL 267767 (S.D.N.Y. Dec. 3, 1991). . . . . . . . . . 45

United States v. Ruiz,
    702 F. Supp. 1066 (S.D.N.Y. 1989), aff'd,
    894 F.2d 501 (2d Cir. 1990).. . . . . . . . . . . . . . . 42

United States v. Russell,
    582 F. Supp. 660 (S.D.N.Y. 1982). . . . . . . . . . . . . 10

United  States v. Santoro,
    2004 WL 2346621 (S.D.N.Y. Oct. 19, 2004). . . . . . . . . 43

United States v. Savin,
    2001 WL 243533 (S.D.N.Y. Mar. 7, 2001). . . . . . . . . . 49

iv

PAGE

United States v. Spy Factory, Inc.
    951 F. Supp. 450 (S.D.N.Y. 1997). . . . . . . . . . . . passim

United States v. Stein,
    429 F. Supp. 2d 633 (S.D.N.Y. 2006). . . . . . . . . . . 12, 16

United States v. Stephenson,
    895 F.2d 867 (2d Cir. 1990). . . . . . . . . . . . . . . . 9

United States v. Turkish,
    458 F. Supp. 874 (S.D.N.Y. 1978). . . . . . . . . . . . 41, 48

United States v. United States Steel Corp.,
    233 F. Supp. 154 (S.D.N.Y. 1964). . . . . . . . . . 8, 35, 40

United States v. Upton,
    856 F. Supp. 727 (E.D.N.Y. 1994). . . . . . . . . . . . . 48

United States v. Valdes,
    2006 WL 738403 (S.D.N.Y. Mar. 21, 2006). . . . . . . . . 11, 31

United States v. Valenti,
    60 F.3d 941 (2d Cir. 1995). . . . . . . . . . . . . . . . 51

United States v. Velasquez,
    1997 WL 414132 (S.D.N.Y. July 23, 1997). . . . . . . . . . 52

United States v. Victor Teicher & Co.,
    726 F. Supp. 1424 (S.D.N.Y. 1989). . . . . . . . . . . . . 42

United States v. Vilar,
    530 F. Supp. 2d 616 (S.D.N.Y. 2008). . . . . . . . . . 46, 50

United States v. Villanueva Madrid,
    302 F. Supp. 2d 187, 193 (S.D.N.Y. 2003). . . . . . . . . 52

United States v. Vinieris,
    595 F. Supp. 88 (S.D.N.Y. 1984). . . . . . . . . . . . . . 42

United States v. W.R. Grace,
    526 F.3d 499 (9th Cir. 2008). . . . . . . . . . . . . . . 46

United States v. Washington,
    813 F. Supp. 269 (D. Vt. 1993), aff'd, 48 F.3d
    73 (2d Cir. 1995), cert. denied, 515 U.S. 1151 (1995). . . . 8

PAGE

United States v. Wheaton,
    463 F. Supp. 1073 (S.D.N.Y. 1979), aff'd,
    614 F.2d 1293 (2d Cir. 1979). . . . . . . . . . . . . . 8, 10

United States v. Williams,
    437 F. Supp. 1047 (W.D.N.Y. 1977).. . . . . . . . . . . . . 8

United States v. Wilson,
    2001 WL 798018 (S.D.N.Y. July 13, 2001).. . . . . . . . passim


**STATUTES, RULES & OTHER AUTHORITIES:**

Fed. R. Crim. P. 21(b). . . . . . . . . . . . . . . . 7, 24, 38

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :

     -v.-                          :        08 Cr. 181 (TPG)

MARIO S. LEVIS, and               :
    a/k/a "Sammy Levis,"

                   :

          Defendant.          :

- - - - - - - - - - - - - - - - - -x

### GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT'S PRE-TRIAL MOTIONS

       The Government respectfully submits this Memorandum of Law in response to the motions of Mario S. Levis seeking an order from the Court: (1) transferring the case to the District of Puerto Rico; (2) compelling the disclosure of a witness list, an exhibit list, and notice of 404(b) evidence 90 days in advance of trial; and (3) suppressing certain statements made by the defendant. For the reasons set forth below, the defendant has failed to meet his burden of justifying a transfer of venue to Puerto Rico, and, accordingly, that motion should be denied.  For reasons additionally set forth below, the Court should deny the defendant's motion compelling the disclosure of a witness list, an exhibit list, and notice of 404(b) evidence 90 days in advance of trial and should adopt the Government's proposed schedule, which provides for the production of these materials 30 days in

advance of trial.  Finally, the Government respectfully submits that the defendant's motion to suppress certain statements made by the defendant be denied without prejudice to reinstatement should the Government decide to seek to admit the statements at trial.

## I. STATEMENT OF FACTS

At all times relevant to this matter, Doral Financial Corporation ("Doral") was a financial holding company with mortgage banking operations in Puerto Rico and New York, New York that had shares of common stock that were publicly traded on the New York Stock Exchange. (Indictment ("Ind.") ¶¶ 2, 10).  The leading residential mortgage lender in Puerto Rico, Doral purported to sell most of the residential mortgage loans it originated to local financial institutions.  (Id. ¶ 12).  As part of the sale of the mortgages to these financial institutions, Doral would retain the right to receive a portion of the interest payments made on the loans.  (Id. ¶ 13).  Doral recorded on its financial statements the purported present value of the anticipated future interest payments.  (Id. ¶ 14).  The value of these anticipated payments were recorded as interest-only strips, or "IOs".  (Id. ¶¶ 9, 14).

Doral purported to use a three-pronged approach to value the IOs.  (Id. ¶ 16).  First, Doral purported to value the IOs internally.  (Id.).  Second, Doral purported to obtain

independent valuations of the IOs from two separate, outside
parties that used two distinct valuation methods.  (Id.).  Third,
Doral generally booked the IOs at what was purportedly the lowest
of the three valuations, which was typically the one produced by
Doral's internal calculation.  (Id.).

At all relevant times, the defendant served as the
Treasurer and, as of on or about April 22, 2002, Senior Executive
Vice President of Doral.  (Id. ¶ 6).  In that connection, the
defendant negotiated and executed the contracts by which Doral
sold mortgage loans to other financial institutions; was the
officer of Doral who was primarily responsible for obtaining the
two purportedly independent, third-party valuations for the IOs;
acted as Doral's primary liaison to investors, potential
investors, and market analysts, which responsibilities included
representing the company at investor presentations, road shows,
and in-person meetings; and was one of the officers of Doral who
reviewed and approved Doral's annual reports filed with the
Securities and Exchange Commission ("SEC").  (Id. ¶¶ 6, 12, 17,
30).

Between in or about 2000 and in or about 2005, Doral
publicly reported fraudulently and materially inflated values for
its IOs.  (Id. ¶ 9).  First, in deriving a value for the IOs
internally, Doral, as the defendant well knew, used a methodology
that inflated the value of the IOs.  (Id. ¶¶ 21-22).  Doral then

3

justified these inflated values by representing that they were lower than two "outside" and "independent" expert valuations provided to Doral on a quarterly basis. (Id.). The defendant, however, corrupted each of these valuations. (Id.) For example, one of the third-party valuations was purportedly based on market quotes for similar financial instruments when, in fact, the valuation was simply fabricated by the third party at the direction of the defendant. (Id. ¶¶ 26-32). Similarly, the other third-party valuation was purportedly based on a discounted cash flow analysis and assumptions determined by the third party when, in fact, it was based upon materially false statements and materially false data provided to the third party by the defendant. (Id. ¶¶ 33-40). As a result of the defendant's conduct, the third-party valuations typically appraised the value of Doral's IO portfolio at a higher dollar value than Doral's internal valuation model, thereby enabling Doral to justify booking as the IO valuation the inflated value Doral calculated using its internal model. (Id. ¶¶ 32, 40).

The fraudulently and materially inflated values for the IOs, and, in turn, of Doral's assets and net income, were reported in various public filings with the SEC, which also included false and misleading descriptions of the manner in which the valuation of Doral's IO portfolio was derived. (Id. ¶¶ 9, 23, 25). These misrepresentations, caused by the defendant, enabled

Doral to announce a 28-quarter streak of "record earnings." (Id. ¶ 9). Additionally, the defendant made false and misleading statements relating to the value of Doral's IO portfolio, Doral's earnings, the IO valuation process, and certain core characteristics of the contracts underlying the IOs directly to market analysts and investors located in various places in the United States, including New York. (Id. ¶¶ 9, 50). The defendant made these misrepresentations in meetings and through emails and telephone calls to analysts and representatives of investors in New York and elsewhere. (Id. ¶¶ 50-56).

From in or about the Fall 2004 through in or about early 2005, in response to concerns raised by federal banking regulators, Doral hired an independent financial consulting firm based in New York, New York. (Id. ¶ 42). Soon after learning about the valuation methodology Doral used for its IO portfolio, the consulting firm concluded that the value of Doral's IO portfolio reported on its books was overstated by in excess of approximately $450 million. (Id.). The consulting firm further recommended that Doral change its method for valuing its IO portfolio and that such change would result in a decrease in the value of Doral's IO portfolio of hundreds of millions of dollars. (Id. ¶¶ 47-48).

From on or about January 19, 2005, when Doral first announced a $97.5 million write-down of its IO portfolio without

disclosing its flawed valuation methodology, until on or about
April 19, 2005, when Doral announced publicly that it was
changing its methodology and that the stated value of its IO
Portfolio would decrease by between $400 million and $600 million
as a result, stockholders suffered aggregate market
capitalization loss of approximately $3.59 billion.  (Id. ¶¶ 44-
45, 57, 59). At one point prior to the collapse of the share
price of Doral's stock, the defendant owned shares and options of
Doral stock worth approximately $130 million, and the defendant's
family beneficially owned Doral stock holdings in excess of
approximately $450 million.  (Id. ¶¶ 7, 8). The defendant also
received millions of dollars in dividend payments during the
relevant period –- payments predicated in part on positive
earnings performance –- and also received a substantial salary
and bonus.  (Id. ¶ 7).

On March 4, 2008, a grand jury sitting in the Southern
District of New York returned the Indictment, charging the
defendant with one count of securities fraud and three counts of
wire fraud.

Since the Indictment was returned in this case, the
Government has substantially completed its discovery, the
overwhelming majority of which has been produced in a searchable
computer format.  The Government has worked closely with the
defendant's lawyers to provide technical assistance with regard

to the electronic discovery and to direct the defendant to materials relevant to the allegations in the Indictment.

On July 18, 2008, the defendant filed motions seeking orders from the Court: (1) transferring the case to the District of Puerto Rico; (2) compelling the disclosure of a witness list, an exhibit list, and notice of 404(b) evidence 90 days in advance of trial; and (3) suppressing certain statements made by defendant.  For the reasons set forth below, each of the defendant's motions should be denied.

## II. ARGUMENT

### A.   DEFENDANT'S MOTION TO TRANSFER VENUE SHOULD BE DENIED

As described below, the defendant cannot satisfy his burden of showing that a transfer of this prosecution from the District in which it was brought is warranted.  Therefore, Defendant's motion to transfer venue should be denied.

#### 1.   Applicable Legal Standards

Rule 21(b) of the Federal Rules of Criminal Procedure provides that "for the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to that defendant or any one or more of the counts thereof to another district."  Fed. R. Crim. P. 21(b).  The "burden is on the moving defendant to justify a transfer under Rule 21(b)."  United States v. Spy

7

Factory, Inc., 951 F. Supp. 450, 464 (S.D.N.Y. 1997) (citing
United States v. Aronoff, 463 F. Supp. 454, 460 (S.D.N.Y. 1978));
see also United States v. Washington, 813 F. Supp. 269, 275 (D.
Vt. 1993), aff'd, 48 F.3d 73 (2d Cir. 1995), cert. denied, 515
U.S. 1151 (1995); United States v. Wheaton, 463 F. Supp. 1073
(S.D.N.Y. 1979), aff'd, 614 F.2d 1293 (2d Cir. 1979).
Furthermore, the moving defendant must provide "factual
substantiation" for his contentions that a transfer is in the
interests of justice. United States v. Williams, 437 F. Supp.
1047, 1051 (W.D.N.Y. 1977); see also United States v. Spy
Factory, 951 F. Supp. at 456 ("the court must rely on 'concrete
demonstrations'" of fact).

        The decision whether to grant a motion for change of
venue is "vested in the sound discretion of the district court."
United States v. Maldonado-Rivera, 922 F.2d 934, 966 (2d Cir.
1990), cert. denied, 501 U.S. 1211 (1991). "As a general rule a
criminal prosecution should be retained in the original district"
in which it was filed, unless a court finds it would not be in
the interests of justice to do so. United States v. United
States Steel Corp., 233 F. Supp. 154, 157 (S.D.N.Y. 1964); see
also United States v. Wilson, 2001 WL 798018, at *1 (S.D.N.Y.
July 13, 2001) (citing United States v. Guastella, 90 F.Supp.2d
335, 338 (S.D.N.Y. 2000)); Spy Factory, 951 F. Supp. at 464
(citing United States v. Posner, 549 F. Supp. 475, 477 (S.D.N.Y.

1982)).

In assessing a motion to transfer venue, the district
court should weigh a variety of factors, including (1) the
location of the defendant's residence; (2) the location of
possible witnesses; (3) the location of events likely to be at
issue; (4) the location of relevant documents and records; (5)
the potential for disruption of the defendant's business if
transfer is denied; (6) expenses to be incurred by the parties;
(7) the location of defense counsel; (8) the relative
accessibility of the place of trial; (9) the docket conditions of
each potential district; and (10) any other special circumstance
that might bear on the desirability of the transfer.  See Platt
v. Minnesota Mining Co., 376 U.S. 240, 244 (1964); Maldonado-
Rivera, 922 F.2d at 966.  No single factor is dispositive in this
analysis; rather, it is left to the district court to "strike a
balance and determine which factors are of greatest importance."
Maldonado-Rivera, 922 F.2d at 966; see also United States v.
Stephenson, 895 F.2d 867, 875 (2d Cir. 1990).

Generally speaking, the trend has been to deny such
motions.  See United States v. Quinn, 401 F.Supp.2d 80, 85-86
(D.D.C. 2005) (citing cases and treatises).  This trend
recognizes that, since the time that Platt was decided in 1964,
"the massive expansion of technology and the relative decline in
costs for long-distance travel over the past few decades" have

greatly reduced the circumstances where transfer is justified. Id. at 86.

## 2. A Transfer Of Venue Is Not In The Interests Of Justice

Analysis of each of the relevant factors makes clear that the defendant has failed to meet his burden of demonstrating that this case should not be prosecuted in the district in which it was brought.

### a. Residence of the Defendant

While there is no dispute that the defendant resides in Puerto Rico, this fact alone does not justify transfer. It is well established "that inconvenience of the defendant or his business is not, by itself, a sufficient basis for a transfer," United States v. Conner, 2001 U.S. Dist. LEXIS 1110, at *8 (S.D.N.Y. Feb. 9, 2001) (quoting United States v. Culoso, 461 F. Supp. 128, 136 (S.D.N.Y. 1978)); United States v. Antia, 1999 WL 294788, at *2 (E.D.N.Y. Mar. 22, 1999) (citing Wheaton, 463 F. Supp. at 1078), and that a defendant's residence should not be given "dispositive weight." Spy Factory, 951 F. Supp. at 456. In fact, the law is clear that "[a] Court should not give any one factor preeminent weight . . . ." Spy Factory, 951 F. Supp. at 455 (citing Maldonado-Rivera, 922 F.2d at 966 ("No one of these considerations [the Platt factors] is dispositive")). While it is true that courts should give consideration to trying defendants where they reside, United States v. Russell, 582 F.

10

Supp. 660, 662 (S.D.N.Y. 1982), courts have noted that this "policy" of trying defendants in their district of residence is "in tension with the more general presumption that a criminal prosecution should be retained in the original district." Spy Factory, 951 F. Supp. at 464. Accordingly, a defendant's desires alone are insufficient to warrant transfer. See United States v. Valdes, 2006 WL 738403, at *4 (S.D.N.Y. Mar. 21, 2006); United States v. Hanley, 1995 WL 60019, *2 (S.D.N.Y. Feb. 10, 1995). Such a rule recognizes that "a defendant would always like to be close to his loved ones," Valdes, 2006 WL 738403, at *4 (quoting United States v. Layne, 2005 WL 1009765, at *3 (S.D.N.Y. May 2, 2005)), and that such a consideration must be counterbalanced against the presumption that a criminal case is to be tried where it brought.

Here, the defendant does not complain that he is being forced to stand trial far from his family. On the contrary, he intends to move several of his family members to New York. Consequently, the defendant's principal complaint is that not that he will be personally inconvenienced by a trial in New York but rather that a trial in New York will be disruptive for his family. (Defendant's Memorandum of Law in Support of Motion to Transfer this Case to the District of Puerto Rico ("Venue Br.") at 4, 13).

While the Government understands the defendant's desire

11

to surround himself with family in New York for the trial, he underestimates the degree of disruption his family would experience even if the case were tried in Puerto Rico.  As the Court is obviously aware, trial is a grueling experience, demanding the attention of the lawyers and the defendant on trial typically around the clock.  As Judge Cote observed in denying a motion to transfer on the basis of convenience:

> Every life is significantly disrupted during trial wherever it is held. Besides the need to be in court every day, the evenings and weekends are usually consumed analyzing the evidence that has been admitted and preparing for the remainder of the trial.

Wilson, 2001 WL 798018, at *3; see also United States v. Stein, 429 F.Supp.2d 633, 645 (S.D.N.Y. 2006) (quoting Wilson and denying transfer motion).  Put differently, because the physical and emotional demands of trial will, regrettably, cause significant disruption to the defendant's family life no matter where it is tried, the disruption resulting from the case being tried in New York is entitled to only slight weight.

Additionally, the duration of the disruption, while not insignificant, is not nearly as long as other cases where motions to transfer on the basis of the defendant's convenience have been denied.  The parties anticipate the trial in this matter lasting approximately four to six weeks.  In Stein, Judge Kaplan denied a motion to transfer for the convenience of the defendants where trial was anticipated to last between six and eight months. 429

12

F.Supp.2d at 645.

Accordingly, while the fact of the defendant's residence in Puerto Rico means that this factor necessarily weighs in favor of transfer, it does so only slightly. See United States v. Coriaty, 2000 WL 1099920, at *2 (S.D.N.Y. Aug. 7, 2000) (finding factor weighed in favor of transfer only slightly where defendant lived in Florida with wife and three small children; application to transfer denied).

### b. Location of Witnesses

None of the remaining Platt factors weigh in favor of transfer. For example, the location of witnesses who are likely to be called at trial is not a factor that weighs in favor of transfer. The defendant asserts that most of the witnesses for both the prosecution and the defense reside in Puerto Rico and that travel and lodging expenses would, therefore, be greatly reduced if the trial in this matter were held in Puerto Rico. (Venue Br. at 5-7, 15-17). The vast majority of the witnesses the Government will likely call at trial, however, either live in the greater New York metropolitan area or are represented by counsel based in New York or both. Contrariwise, the defendant has made no claim that any witness he intends to call would be unable to testify in a trial held in New York. Accordingly, he has failed to carry his burden of demonstrating that the location of likely witnesses justifies the transfer of this case to Puerto

Rico.

A defendant claiming that the location of witnesses warrants a transfer of venue bears the burden of offering the Court "specific examples of witnesses' testimony and their inability to testify because of the location of trial." Spy Factory, 951 F. Supp. at 456 (emphasis added). The "naked allegation that witnesses will be inconvenienced by a trial in a distant forum will not suffice for transfer." Id.; see also United States v. Juncal, 1998 WL 473949, *5 (S.D.N.Y. Aug. 7, 1998) ("there is no basis to grant the motion to transfer" where defendant fails to make "a specific proffer of testimony from specific witnesses to allow the court to make an informed decision about the importance of these witnesses to [the defendant's] case"). Rather, "the court must rely on concrete demonstrations of the proposed testimony." Spy Factory, 951 F. Supp. at 456 (quotations and citations omitted). "[I]n this age of easy air travel, this factor is generally much less relevant than it was in 1964, when the Supreme Court decided Platt." United States v. Ebbers, 2004 WL 2346154, at *1 (S.D.N.Y. 2004).

Here, in the place of specific examples of witnesses who would be unable to testify if this case were tried New York, the defendant offers the general claim that an unspecified number of potential fact and character defense witnesses reside in Puerto Rico. Significantly, while defendants offer to make a

14

more detailed <u>in</u> <u>camera</u> proffer of their anticipated fact and character witnesses, they fail to allege that any of these potential witnesses would be <u>unable</u> to testify at a trial held in New York.[1]  In such circumstances, courts in this District have repeatedly found that the location of witnesses in the defendant's home district did <u>not</u> weigh in favor of transfer.

---

[1] The defendant correctly states that the Government objects to his application to the Court seeking leave to file a list of witnesses <u>ex</u> <u>parte</u> and under seal.  First, the interest of the public in open proceedings counsels against the sealing of court records unless some valid basis for sealing can be articulated, such as the need to ensure the security of a witness.  Here, the defendant seeks to file his application under seal simply to prevent the Government from knowing who he intends to call at trial.  Such strategic considerations do not provide a valid basis for sealing.

Second, the Government objects to the defendant filing a list of witnesses <u>ex</u> <u>parte</u> because it prevents the Government from being able to meet fairly defendant's claims concerning the proposed witnesses.  Here, despite bearing the burden on this motion, the defendant has provided no information about the number of witnesses he intends to call, about the likely content of their testimony, or even how many of them are anticipated to be character as opposed to fact witnesses.  As a result, it is virtually impossible for the Government to address whether these witnesses are likely to provide necessary or even relevant testimony or for the Government -- or for the Court, for that matter -- to assess defendant's claim that the location of likely witnesses in this case warrants transfer.

In any event, the Government respectfully submits that the Court can resolve this <u>Platt</u> factor without the defendant's list of potential witnesses.  Whoever the witnesses may be, the defendant has not alleged, as a threshold matter, that any of them would be unable to testify if the case were tried in New York.  Accordingly, the defendant has failed to carry his burden with regard to this <u>Platt</u> factor, his list of potential witnesses is not necessary to a determination of this matter, and his motion to file a witness list <u>ex</u> <u>parte</u> and under seal should be denied.

15

See, e.g., United States v. Brooks, 2008 WL 2944626, at *2
(S.D.N.Y. July 31, 2008) (denying motion to transfer and finding
that "bare assertion" of hardship was insufficient to tip this
Platt factor in favor of transfer); Stein, 429 F.Supp.2d at 645-
46 (finding that location of the witnesses did not support
transfer where defendants failed to put forward any evidence that
potential witnesses would be unable or unwilling to travel to the
Southern District of New York); Ebbers, 2004 WL 2346154, at *1
(denying transfer where defendant did not allege that "witnesses
would be unable to testify in New York, that he would be unable
to call them, or that he would be financially incapable of paying
such witness' expenses"); Wilson, 2001 WL 798108, at *2-3
(denying transfer and finding that location of witnesses did not
support transfer where all but two Government witnesses resided
outside of New York, there was no allegation that any trial
witness would be unable to appear for a trial in New York, and
even though defendants planned to call character witnesses from
city where defendants resided); Coriaty, 2000 WL 1099920, at *2
(finding that location of witnesses did not favor either party
where location of witnesses was split between the Southern
District of New York and the district of the defendant's home).

    Conversely, the Government can proffer that the vast
majority of its witnesses live in the greater New York

metropolitan area[2] or are represented by counsel based in New York.  For example, the Government anticipates that it will be calling a number of stock market analysts to testify about lies told directly to them by the defendant relevant to Doral's valuation of its IO portfolio, either through telephone calls made to New York, through emails sent to New York, or at a meeting held in New York.  Three of the analyst witnesses were the recipients of the emails that support the three wire fraud counts in the Indictment and are obviously essential witnesses. Each of them is based in New York. The Government intends to call one additional analyst witness, who will provide similarly critical testimony concerning lies told by the defendant.  This witness, too, is based in New York.  Such witnesses are essential fact witnesses because they enable the Government to prove the lies told by the defendant that were central to the scheme in which he participated and because several of the analysts subsequently made recommendations to the public or their employers about whether to invest in Doral based on the lies.

Additionally, the Government intends to call a total of seven New York-based witnesses from the following entities: a federal regulatory body, Doral's board of directors, an

---

[2] Hereinafter, witnesses are described as being New York-based when they live and/or work in New York or a readily accessible suburb of New York in either New Jersey or Connecticut.

17

independent financial consulting firm that provided advice to
Doral during the relevant period, and Doral's outside auditors
during the relevant period.  Each of these witnesses had
communications with Doral and the defendant concerning Doral's
valuation of its IO portfolio -- communications that clearly
demonstrate that the defendant knew that certain statements made
by him to analysts, investors, and the public about Doral's IO
portfolio were materially false and misleading.

Furthermore, the Government intends to call two New
York-based investment bankers from two different investment banks
who will provide direct testimony about Doral's efforts to obtain
an independent valuation of its IO portfolio.  Their testimony
will show that Doral and the defendant purposely sought to obtain
an "independent" valuation that placed a greater value on its IOs
than the inflated value generated by its own internal model and
that the valuation methodology deployed by one of the third-party
valuation providers was, in fact, not what the defendant
purported it was.

Moreover, the Government anticipates calling at least
two New York-based representatives of institutional victims of
the IO valuation fraud and two individual investor victims, each
of whom resides in New York.

The Government also anticipates calling at least one
New York-based representative of the New York Stock Exchange and

18

one New York-based representative of Bloomberg to testify about, among other things, facts relating to the fluctuation in the price and trading of Doral's stock during the relevant period.

Thus, in total, the Government currently intends to call nineteen New York-based witnesses at trial. If this case were transferred, the Government would bear the cost of transporting these witnesses to Puerto Rico and lodging them there. More importantly, the Government anticipates eliciting substantial testimony from the vast majority of these witnesses, which means that their testimony and preparation will consume a considerable amount of time and that having to prepare for and give testimony in Puerto Rico would impose a significant burden on them. Additionally, these witnesses are all innocent fact witnesses -- not one is a cooperating witness –- which renders any burden placed upon them particularly unfair. Finally, with respect to almost all of them –- perhaps excepting the two individual shareholder victims –- similar testimony cannot be secured from a Puerto Rico-based witness.

In addition to these nineteen New York-based witnesses, the Government intends to call approximately six witnesses who reside in Puerto Rico and worked during the relevant period either for: (1) Doral; (2) one of the institutions that provided a purportedly independent valuation of Doral's IO portfolio; or (3) Doral's auditors during the relevant period. All but one of

these witnesses, however, is represented by counsel based in New York.  This is significant for two reasons.  First, it reflects an expectation and willingness on the part of these witnesses to testify in New York.  Second, from a cost perspective, while these Puerto Rico-based witnesses would be reimbursed by the United States Marshals Service for travel and lodging expenses incurred in connection with a trial in New York, under the applicable federal regulations, costs associated with the travel and lodging of their New York-based attorneys would not be reimbursed if the case were transferred to Puerto Rico.

Finally, the Government will likely call four additional witnesses who reside neither in New York nor Puerto Rico to testify about lies told to them by the defendant concerning the valuation of Doral's IO portfolio.  These witnesses reside in Texas, Massachusetts, Illinois, and California, respectively.  The Government also anticipates calling a representative of the SEC who resided in Washington, D.C.  While none of these witnesses lives in New York, it is unquestionably true that travel to New York will be more convenient for them than travel to Puerto Rico, which is a greater distance away.

In short, because the defendant has failed to provide a single "specific example[] of witnesses' testimony and . . . inability to testify because of the location of trial," Spy

20

<u>Factory</u>, 951 F. Supp. at 456, he has simply failed to meet his burden of proving that the location of necessary and relevant witnesses compels a transfer to Puerto Rico. This is especially so given that the vast majority of the Government's witnesses either reside in New York or are represented by counsel in New York.

### c.    Location of Events

Likewise, the defendant has failed to demonstrate that the location of events in this case warrants transfer. The defendant contends that transfer is warranted because Doral's headquarters and "nerve center" were in Puerto Rico during the relevant period and because the fraud was directed from Puerto Rico. (Venue Br. at 7, 17). This argument ignores, however, that Doral also maintained offices in New York during the same period and that, more importantly, the fraud was <u>completed</u> in New York when, among other things, analysts, investors, and the public were lied to in New York, either by telephone, email or in one meeting held in New York, and when the defendant's conduct affected the trading of Doral's stock on the New York Stock Exchange. Defendant's argument also ignores a raft of additional activity relating to the fraud that occurred in New York and also misapprehends the current state of the law as applied in cases involving securities fraud schemes that are national in scope, such as is the case here.

At its core, the Indictment charges the defendant with misleading market analysts, investors, and the public about the valuation of Doral's IO portfolio.  The defendant's lies -- not the business of Doral generally -- will be the events centrally at issue at trial.  While these lies may have been largely uttered by the defendant from his desk in Puerto Rico, they were completed, and the fraud consummated, when analysts, investors, and the public received these lies, which were transmitted in part by email, telephone, and the dissemination of the company's regulatory and financial filings, in New York.  For example, as set forth above, the three wire fraud counts alleged in the Indictment relate to emails sent to stock market analysts based in New York.  In fraud cases, courts have routinely rejected attempts to circumscribe the "location of events" to places where the lies originate and have repeatedly found that the receipt of misstatements in the district of charging is a factor that militates against transfer.  See, e.g., Brooks, 2008 WL 2944626, at *2 (finding that location of events militated against transfer where false statements were made in Alabama but sent to New York); Aronoff, 463 F. Supp. at 459 (finding that although defendant's conduct involved preparing fraudulent documents in Michigan and mailing them to New York, "the center of significant events was in New York"; "one who uses the mails or a telephone to acquire the money of persons in New York by fraud should

22

hardly be heard to complain that he did nothing in New York.").

Of course, the fraud in this case involved much more extensive activity than the transmission of lies into the Southern District of New York.  The misrepresentations made by the defendant to stock market analysts prompted those analysts to make recommendations to the public -- from their offices in New York -- concerning investments in Doral stock.  On the basis of these recommendations and the misrepresentations contained in Doral's financial statements and SEC filings for which the defendant was responsible, investors -- including institutional and individual investors based in New York -- then purchased Doral stock on the New York Stock exchange.  A financial consulting firm based in New York provided advice to the defendant and Doral concerning Doral's valuation of its IO portfolio, conducting a substantial amount of its work in New York.  A regulatory body in New York raised questions with Doral concerning Doral's valuation of its IO portfolio.  And, of course, the defendant attended at least one meeting in New York in which he made a number of materially false and misleading representations regarding Doral's valuation of its IO portfolio. In short, while the defendant clearly engaged in activity in support of the fraud in Puerto Rico, a significant amount of activity relating to the fraud occurred in New York as well, which militates against transfer.  This defendant, who directed

23

his fraud at New York (New York victims, New York market analysts, New York advisers, New York regulators, etc.) simply cannot be said to suffer any injustice in being tried here.

Additionally, in cases like this one that involve accounting fraud schemes that are national in scope, the courts in this District have given little credit to the argument that the "location of events" is limited to where the fraudulent accounting occurred.  For example, in United States v. Ebbers, defendant Bernard J. Ebbers was charged with having committed securities fraud, among other crimes, relating to an accounting fraud perpetrated at WorldCom, Inc., a publicly traded telecommunications company.  Ebbers moved to transfer the case to Mississippi pursuant to Federal Rule of Criminal Procedure 21(b) in part on the ground that the company was headquartered in Mississippi and that the majority of events at issue in the trial took place in Mississippi, including entry of fraudulent accounting information on the company's books and records.  Judge Jones denied the motion for transfer, finding that the location of events did not support a transfer of the case to Mississippi. In denying the motion for transfer, Judge Jones specifically found that:

> the focus of this case will be on both the accounting
> entries . . . as well as the conversations Defendant
> had with securities analysts in New York.  Furthermore,
> WorldCom was a national company. . . . Its stock was
> listed on the NASDAQ, a national market system.  Many
> of its largest shareholders had offices in New York. .

24

> . . [T]he planning, execution and impact of the
> relevant events in this case were not limited by
> geography.

Ebbers, 2004 WL 2346154, at *1.

Like WorldCom, Doral is headquartered outside of New
York and the accounting activity underlying the alleged fraud
occurred outside of New York.  Also like WorldCom, however, Doral
is publicly traded on a national market system, and the fraud was
perpetrated through lies told to New York-based stock analysts.
Victims of the fraud are also based in New York.  Accordingly, as
in WorldCom, the "planning, execution and impact" of the
defendant's scheme was not limited to Puerto Rico but rather
encompassed New York, and, as a result, transfer is not warranted
on the basis of the location of events.

Similarly, in United States v. Wilson, four defendants
were charged with securities violations relating to an accounting
fraud at Aurora Foods, Inc., a food company publicly traded on
the New York Stock Exchange.  Judge Cote denied the motion of the
defendants to transfer the case to San Francisco.  Among other
things, Judge Cote found that the location of events in the case
did not weigh in favor of transfer.  Judge Cote acknowledged that
"[t]he principal activities in connection with the alleged scheme
occurred in San Francisco and in the division headquarters in
Columbus and St. Louis, including audit work by the outside
accountants."  Wilson, 2001 WL 798018, at *2.  But Judge Cote

25

also noted that certain activities were alleged to have occurred
in New York, including "conference calls with analysts based in
New York." Id. She further noted that "Aroura was a national
company, whose products were sold across the country and its
stock was listed on the NYSE." Id. In ultimately finding that
the location of events did not weigh in favor of transfer, Judge
Cote concluded that "[w]hile significant criminal activities are
alleged to have occurred in San Francisco, this was not a crime
whose planning, execution, or impact was limited by geography."
Id.

        As was true with regard to the Ebbers case, the facts
in Wilson are virtually identical to the facts here. The
decisions in both cases recognize that an accounting fraud at a
company that is publicly traded on a national exchange is
necessarily effectuated through conduct that extends beyond the
boundaries of the four walls of the corporate headquarters.
Similarly, they recognize, as is undoubtedly true here, that the
defendants in such cases, who are highly sophisticated
executives, amply appreciate the extent to which their conduct
reaches into jurisdictions where their stock is analyzed and
traded, which invariably means New York, the financial capital of
the country.

        The cases upon which the defendant relies in arguing
that the location of certain events in Puerto Rico justifies

transfer are either inapposite or contrary to current law.  The
Alter case involved a boiler room that operated out of Miami.
See United States v. Alter, 81 F.R.D. 524, 526 (S.D.N.Y. 1979).
The company was not registered on a national exchange, nor was it
followed by market analysts and experts in New York.  The
defendant was not alleged to have had any meetings in New York,
nor were there any allegations of important contacts with third
parties in New York of the kind that Doral had with the
consulting firm that advised it with respect to its valuation of
its IO portfolio or with certain regulators.  In short, the Alter
case is entirely distinguishable.

On its facts, the Clark case is plainly closer to the
instant case.  Among other things, it involved an accounting
fraud case where the company was publicly traded on a national
exchange.  This Court found that the location of events justified
transfer. See United States v. Clark, 360 F.Supp. 936 (S.D.N.Y.
1973).  The Government respectfully submits, however, that the
decision in that case, now 35 years old, is contrary to the
weight of current authority in this District, which uniformly
holds that the "location of events" does not weigh in favor of
transfer where a securities or accounting fraud is national in
scope.  See, e.g., Ebbers, 2004 WL 2346154, at *1; Wilson, 2001
WL 798018, at *2.  The analysis utilized in Clark and advocated
by the defendant here, which focuses on determining the location

27

of "center of gravity," 360 F.Supp. at 941, or "nerve center" of
the fraud, (Venue at 17-18), has been abandoned in cases
involving conduct that is national in scope.  Indeed, the modern
approach of rejecting transfer motions on the basis of the
"location of events" where a defendant's conduct is national in
scope even extends beyond securities fraud cases to fraud cases
generally.  See, e.g., Layne, 2005 WL 1009765, at *4 (finding in
context of advance fee fraud scheme that location of events
favored neither side because activity was national in scope);
Guastella, 90 F.Supp.2d at 339 (finding that location of events
did not justify transfer to Nevada even though investment scheme
was initiated there because criminal activity in the case was
"national and even international in scope"); Spy Factory, 951 F.
Supp. at 457 (finding that location of events did not justify
transfer where defendant company was headquartered in Texas,
unlawfully sold bugging and wiretapping equipment throughout the
country, had no stores in New York, and the company's contact
with New York was limited to telephone sales to New York-based
customers, including an undercover company operated by the United
States Customs Service).

      **d.   Location of Relevant Documents and Records**

      The defendant next argues that venue should be
transferred because "the documents in this case are now being
stored electronically by the government and can be easily

relocated," which to the defendant means that "the location of documents does not weigh in favor of keeping the case in New York." (Venue Br. at 19).

On the contrary, because the documents in this case are also being stored electronically by the defendant, who bears the burden seeking transfer, the location of documents does <u>not</u> weigh in favor of transfer. As the defendant acknowledges, the documents in this case, whatever their original physical location, have been produced to the defendant in electronic format in 27 compact disks and a computer hard drive. In this format, these documents, which the defendant describes as voluminous, would fit into in a single, small suitcase. Courts in this jurisdiction have repeatedly acknowledged that even in cases where documents have been produced in actual paper form, modern advances in transportation have essentially rendered the fourth <u>Platt</u> factor neutral in almost all cases. <u>See</u> <u>Layne</u>, 2005 WL 1009765, at *4 (S.D.N.Y. May 2, 2005); <u>United States</u> v. <u>Martino</u>, 2000 WL 1843233, at *5 (S.D.N.Y. Dec. 14, 2000); <u>Coriaty</u>, 2000 WL 1099920, at * 3; <u>Spy Factory</u>, 951 F. Supp. at 458; <u>Hanley</u>, 1995 WL 60019, at *3. Certainly, the location of documents does not weigh in favor of transfer when modern developments in electronics and computing render documents readily available to the defendant wherever he is located. In light of the presumption that cases are to be tried where they

are originally brought, the location of the documents in this case does <u>not</u> weigh in favor of transfer.

### e.    Disruption of the Defendant's Business

The defendant concedes that he is working full-time on his defense and that, as a result, a trial in New York will not result in the disruption of any business of his.  (Venue Br. at 19).  Accordingly, this factor does not weigh in favor of transfer.

### f.    Expenses to the Parties

The defendant next argues for transfer because a "[t]rial of this case in New York will be expensive for Levis," concluding that "the magnitude of the foreseeable costs weighs heavily in favor of transfer of this case to Puerto Rico." (<u>Id</u>. at 19-20).  The defendant's argument, however, ignores certain critical facts that, when considered, tip this factor strongly <u>against</u> transfer of the case to Puerto Rico.

First, and critically important, the defendant no where claims that the expenses he will incur will any way prejudice his defense.  In deciding whether to transfer a case for convenience, courts in this District focus on whether the expenses that the defendant will incur trying a case in New York will affect his ability to mount a defense.  Where courts have found that the expense of a trial in New York, no matter how significant, will not prejudice the defendant's ability to defend himself, courts

30

have denied transfer motions.  See Spy Factory, 951 F. Supp. at
459 (holding that factor of expenses did not weigh in favor of
the defendants where "defendants Kimball and Spy Factory, Inc.
have not demonstrated that they are financially incapable of
funding their defense"; motion for transfer denied); see, e.g.,
Wilson, 2001 WL 798018, at * 2 (denying transfer motion where one
defendant was paying for wife and two sons to relocate to New
York); Aronoff, 463 F. Supp. at 460-61 (denying transfer motion
where defendant "does not state that he would be financially
unable to either to return to Detroit periodically during trial,
or to bring his family with him.")  Conversely, courts in this
District will weigh the expense to the parties factor in favor of
the defendant where the defendant can show that he simply cannot
afford to stand trial in New York, such as in cases of indigence.
See Hanley, 1995 WL 60019, at *3 ("Transfer is appropriate where
the defendant 'cannot afford travel to New York and live here'
during trial.") (quoting Aronoff, 463 F. Supp. at 459).  As the
court in Valdes observed:

> Every criminal prosecution imposes expenses on
> defendants, but mere inconvenience and the normal
> burdens associated with a trial do not make the
> necessary showing that a transfer is warranted.  A
> successful transfer motion requires more than a bald
> assertion that a trial out of a defendant's home
> district would be more expensive than if the trial were
> held in the defendant's home district.  Defendants need
> to make a showing that, at least to some degree, they
> have insufficient funds to provide for their defense if
> the case is not transferred.

31

2006 WL 738403, at *7 (quotations and citations omitted).

Here, the defendant offers nothing more than "a bald assertion that a trial out of a defendant's home district would be more expensive than if the trial were held in the defendant's home district." Id. He makes no showing of how the expense of a trial in New York might prejudice the quality of his defense. Put differently, although a trial in New York will be expensive, it is something the defendant can plainly afford.  This is reflected in part in his stated intention to relocate numerous family members to New York for the duration of the trial.  See Wilson, 2001 WL 798018, at * 2 (denying transfer motion noting that defendant was able to pay for wife and two sons to relocate to New York from San Francisco).  In sum, while a trial in New York will certainly be costly for the defendant, the defendant has not carried his burden of showing that such expenses warrant a transfer of this case in the interests of justice.

The defendant also overstates the expenses that would be incurred during a trial in New York while at the same time ignoring expenses that would be incurred in connection with a trial in Puerto Rico.  For example, the defendant complains that he would incur considerable expenses for travel and lodging for his attorneys if the case were to proceed in New York.  (Venue Br. at 19).  However, as the defendant acknowledges elsewhere in his brief, he intends current counsel, who are based out of

32

Miami, to try the case no matter where it is tried.  (<u>Id</u>.).  This
means that he will have to incur considerable expenses for their
travel and lodging -- undoubtedly the single greatest cost of his
defense -- even if the case is transferred to Puerto Rico.  <u>Cf.</u>
<u>Wilson</u>, 2001 WL 798018 at * 2 (denying transfer motion where
"[n]either defendant has . . . presented evidence that the cost
of a New York trial will outweigh the cost of paying for their
New York counsel to try this case in San Francisco").  Likewise,
the defendant nowhere acknowledges that even with respect to
witnesses located in Puerto Rico, he will likely incur travel and
lodging expenses if they do not live near the courthouse.  Put
differently, the disparity in expense between a case tried in New
York and a case tried in Puerto Rico is not nearly as wide as the
defendant suggests.

     Finally, the defendant gives short shrift to the
tremendous expense that would be incurred by the Government if
the case were transferred to Puerto Rico.  Were this case
transferred to Puerto Rico, the Government would have to move two
Assistant United States Attorneys, a paralegal, and at least one
FBI agent to Puerto Rico in order to conduct the trial.  Courts
in this District have repeatedly denied transfer motions in part
because the expense of transfer to the Government was too
significant to warrant transfer.  <u>See</u>, <u>e.g.</u>, <u>Ebbers</u>, 2004 WL
2346154, at *2 ("It would impose an enormous burden on the

33

government to move the prosecutors, investigators, support staff, court staff, and others familiar with the case . . . to another jurisdiction"); <u>United States</u> v. <u>Carey</u>, 152 F.Supp.2d 415, 422-23 (S.D.N.Y. 2001) (denying transfer motion where "if venue is transferred to the District of Columbia, the effect is merely to shift the economic burden to the government"); <u>Coriaty</u>, 2000 WL 1099920, at *4 (denying transfer motion where "the Government would incur significant costs if it were required to prosecute this action in Florida"); <u>Guastella</u>, 90 F.Supp.2d at 341 (denying transfer motion where "the Government has demonstrated that transfer of this action would result in tangible expenses"); <u>Spy Factory</u>, 951 F. Supp. at 459 (finding "expense to the parties factor weighs in favor of keeping the trial in the Southern District of New York" where defendants were financially capable of funding defense and Government would incur significant expenses if case were transferred).

In sum, the Government respectfully submits that under this sixth <u>Platt</u> factor, the defendant has, again, failed to bear his burden of demonstrating that a transfer for convenience is warranted in this case. Indeed, where a defendant has failed to demonstrate that his defense would be prejudiced by a trial in New York and the expense to the Government of transferring the case is considerable, the expense to the parties factor weighs against transfer. <u>See</u> <u>Spy Factory</u>, 951 F. Supp. 450 at 459.

34

### g.    Location of Counsel

The location of counsel favors New York.  Two of the three Government attorneys who will be trying the case are located in New York.  A third is currently residing in Washington, D.C., which is only a brief train ride away.  On the other hand, the defendant's attorneys are located in Miami.  Accordingly, if this case were transferred to Puerto Rico, <u>all</u> of the attorneys in the case, both for the Government and the defendant, would have to relocate, while two of the three attorneys for the Government would not have to relocate if the case were to remain in New York.

### h.    Relative Accessibility

Because this case will involve witnesses from different parts of the country and because the courts in New York and Puerto Rico are of comparable accessibility, this factor does not favor transfer.  As Judge Weinfeld observed long ago, "the efficiency of modern air transportation" renders "sterile" any argument that one forum is more accessible than any other. <u>United States Steel Corp.</u>, 233 F. Supp. at 158.  Although the defendant seems to suggest otherwise, (Venue Br. at 21), the courts in this District have made clear that where fora are equally accessible, this <u>Platt</u> factor is neutral.  <u>See</u> <u>Layne</u>, 2005 WL 1009765, at *6; <u>Guastella</u>, 90 F.Supp.2d at 341; <u>Spy Factory</u>, 951 F. Supp. at 460.

### i.   Docket Conditions

Differences in docket conditions between the Southern District of New York and the District of Puerto Rico do not weigh in favor of transfer.  Defense counsel assembles statistics that show that the docket in the Southern District of New York is generally more congested than in the District of Puerto Rico and that cases take longer to reach disposition in the Southern District of New York than in the District of Puerto Rico. (Venue Br. at 21-22).  These statistics are irrelevant.  As Your Honor indicated during the pretrial conference held on May 19, 2008, this Court's docket is not so congested that a trial in this matter will be delayed at all.  Indeed, when the Government requested to set a trial date during the conference, the Court indicated that a trial date need not be set until after motions because the Court is available to try the case this fall and winter and next spring.  (Transcript of May 19, 2008 Conference "Tr." at 4) ("For Heaven's sake, [my schedule] is open, that whole fall and winter and spring right now is open. I haven't even begun to fill it."). Conversely, the speed with which a trial might occur in the District of Puerto Rico is largely speculative.  If the case were transferred, it very well could be assigned to a judge with a congested docket, and trial might be considerably delayed.  Certainly it is difficult to imagine that it could be tried any more swiftly than it could by tried before

36

this Court, especially considering that this Court, as a result
of this motion practice and prior conferences, now has some
familiarity with the case.  Accordingly, because there can be no
argument that this Court's docket is so congested that transfer
is warranted, this <u>Platt</u> factor weighs against transfer.  <u>See</u>
<u>Wilson</u>, 2001 WL 798018, at *3 (denying transfer to avoid calendar
congestion where court was prepared to try the case).

### j.    Special Circumstances

Finally, the defendant asks the Court to transfer the
case because it will minimize disruption to his family and
because of certain medical conditions he has.  (Venue Br. at 22).
For the reasons set forth <u>supra</u>, the Government respectfully
submits any disruption to the defendant's family resulting from a
trial in New York weighs only slightly in favor of transfer.

The Government further submits that the defendant's
pinched nerve, herniated disk and hypertension do not support a
transfer of this case to Puerto Rico.  The defendant acknowledges
that his pinched nerve and herniated disk are treatable by
medication, have been managed capably for 20 years, and can be
tended to adequately by physicians in New York.  None of the
medical papers supplied by the defendant suggest that these
conditions in any way affect his ability to be tried in New York.
Only one doctor offers any comment even relevant to the impact
that a trial in New York might have on the defendant's

conditions, indicating that "we do not recommend excessive
traveling to avoid deterioration in [the herniated disk]
condition." (Venue Br., Ex. C).  But this recommendation relates
only to "excessive traveling."  Not having appeared at any of the
Court's conferences to date, the defendant can hardly be said to
be engaging in excessive travel in connection with this case.
Additionally, traveling to New York to stand trial and then
potentially returning to Puerto Rico after trial in no way
implicates "excessive travel."  This case is different from
Martino, cited by the defendant, because there the doctor
expressed the view that it was preferable for the defendant to
stand trial near his home in light of his condition.  See
Martino, 2000 WL 1843233, at *6.  No such representation has been
made here.

        In sum, the defendant has failed to satisfy his burden
of demonstrating by concrete demonstrations of fact, see Spy
Factory, 951 F. Supp. at 456, that a transfer of this case to
Puerto Rico is required "in the interests of justice."  Fed. R.
Crim. P. 21(b).  Only one of the Platt factors, the residence of
the defendant, weighs in favor of transfer and only slightly so.
The remaining Platt factors either weigh against transfer
(expenses to be incurred by the parties, the location of counsel,
docket conditions of each potential district) or are neutral (the
location of witnesses, the location of events likely to be at

38

issue, the location of relevant documents and records, the potential for disruption to the defendant's business if transfer is denied, relative accessibility of the fora).  Additionally, the defendant has not shown that any special circumstances bear on the desirability of the transfer.

Put differently, the defendant has not established anything beyond the ordinary inconvenience and interference with normal personal activities that occur whenever a defendant is involved in the trial of serious criminal charges.  United States Steel Corp., 233 F. Supp. at 157, cited in Spy Factory, 951 F. Supp. at 458.  Accordingly, the Government respectfully submits that defendant's motion to transfer venue for convenience be denied.

**B.  DEFENDANT'S MOTION TO COMPEL CERTAIN PRE-TRIAL DISCLOSURES SHOULD BE DENIED**

The defendant urges the Court to compel the Government to provide a witness list, an exhibit list, and specific notice of Rule 404(b) evidence 90 days before trial.  For the reasons set forth below, the Court should deny the defendant's motion and adopt the Government's proposed schedule, which requires production of these materials 30 days in advance of trial.

### 1.  Witness List

The defendant seeks an order requiring the Government to provide a list of its witnesses 90 days in advance of trial.

The defendant has failed to make the threshold showing required for compulsion of a witness list, and his request therefore should be denied.  _

A defendant is entitled to disclosure of the Government's witnesses <u>only</u> if he makes "a <u>specific</u> showing that disclosure [is] both material to the preparation of his defense and reasonable in light of the circumstances surrounding his case." <u>United States</u> v. <u>Cannone</u>, 528 F.2d 296, 301 (2d Cir. 1975) (emphasis added); <u>see also United States</u> v. <u>Bejasa</u>, 904 F.2d 137, 139-40 (2d Cir. 1990); <u>United States</u> v. <u>Ojeikere</u>, 299 F.Supp.2d 254, 258 (S.D.N.Y. 2004); <u>United States</u> v. <u>Ahmad</u>, 992 F. Supp. 682, 685 (S.D.N.Y. 1998); <u>accord United States</u> v. <u>Alessi</u>, 638 F.2d 466, 481 (2d Cir. 1980) ("the prosecution [is] under no obligation to give [the defendant] advance warning of the witnesses who would testify against him") (citing <u>Weatherford</u> v. <u>Bursey</u>, 429 U.S. 545, 559 (1977)); <u>see also United States</u> v. <u>Turkish</u>, 458 F. Supp. 874, 881 (S.D.N.Y. 1978) (setting forth list of factors to be considered in determining whether a witness list should be turned over to the defense).

Because the defendant's "heavy burden" of demonstrating need, <u>United States</u> v. <u>Alvalle</u>, 1985 WL 2348, at *1 (S.D.N.Y. Aug. 22, 1985), can rarely be met, requests for witness lists are routinely denied by courts in this District.  <u>See, e.g.</u>, <u>United</u>

40

States v. Santoro, 2004 WL 2346621, at *3 (S.D.N.Y. Oct. 19, 2004) (money laundering charges);  Ojeikere, 299 F. Supp.2d at 258 (wire fraud charges); Ahmad, 992 F. Supp. at 685 (bank fraud charges); United States v. Victor Teicher & Co., 726 F. Supp. 1424, 1443 (S.D.N.Y. 1989) (insider trading charges); United States v. Ruiz, 702 F. Supp. 1066, 1071 (S.D.N.Y. 1989) (bank fraud and perjury charges), aff'd, 894 F.2d 501 (2d Cir. 1990); United States v. Nelson, 606 F. Supp. 1378, 1389 (S.D.N.Y. 1984) (commodities fraud and wire fraud charges); United States v. Vinieris, 595 F. Supp. 88, 91 (S.D.N.Y. 1984) (theft and obstruction charges); United States v. Goldman, 439 F. Supp. 337, 350-51 (S.D.N.Y. 1977) (mail fraud and tax charges).

Here, the defendant has demonstrated no particularized need for a witness list.  The defendant points to voluminous discovery, the time period covered by the Indictment, and the purportedly complex, non-violent subject matter of the charges against him, in arguing that he is entitled to a witness list, (Defendant's Memorandum of Law in Support of Defendant's Motion To Compel Disclosure ("Compel Br.") at 6-11), but such "abstract conclusory claim[s]" of need are not sufficient.[3]  See Cannone,

_____

[3] The Government respectfully submits that the defense estimate that it would take five professionals and an outside consulting firm five years of work, 365 days a year, to review 2.1 million pages of documents, is overstated.  Many of these documents are duplicative, and others (such as the accounting workpapers) are large documents, but contain only a small amount

41

528 F.2d at 301-02 (mere "abstract conclusory claim that such disclosure [is] necessary to [the] proper preparation for trial" is insufficient); Ojeikere, 299 F. Supp. 2d at 258 (defendant's claims that the charged offense was non-violent and involved a lengthy time period and complex paper trail are the type of "abstract, conclusory claim[s]" that the Court of Appeals has concluded are an insufficient basis for requiring disclosure).

In many respects, this case is similar to Wilson, where four defendants were charged in an accounting fraud scheme involving a large publicly-traded corporation, Aurora Foods, Inc. The defendants argued that a Government witness list was necessary to focus their trial preparation efforts, citing the large number of potential witnesses from Aurora, an accounting firm and other sources. Notwithstanding these assertions, Judge Cote found that such an argument "could be made in most criminal cases," and that

> [g]iven the detailed description of the
> Government's charges contained in the
> indictment, the relatively focused nature of
> those charges, the defendants' access to
> information while officers of Aurora, and the

of information related to the IO fraud. In addition, the defendant, by virtue of his position as the Treasurer of Doral, is familiar with the documents reflecting the financial condition of Doral and the value of its IOs, and is readily able to direct his counsel to the meaningful portions of those documents. Finally, the ability of the defendant and his counsel to access the most relevant portions of the discovery is dramatically increased by the searchable format in which it was provided.

>   voluminous discovery already provided in this
>   case, the defendants have not met their
>   burden of showing that a witness list should
>   be provided.

Id. at *2.

Here, as in Wilson, the defendant has the benefit of a

lengthy and detailed Indictment, which in this case numbers 31

pages and 66 paragraphs.  The charges relate to a fairly simple

scheme to lie about the process by which the defendant valued a

single asset on the books and records of Doral.  The defendant

has been provided discovery in a searchable electronic format.

There is simply nothing about the volume of the discovery in this

case or the purported complexity of the underlying facts that

warrant the extreme relief the defendant seeks in requesting that

the Court compel the Government to provide a witness list 90 days

before trial.  Because the defendant has failed to meet his

initial burden under Cannone, the Court should deny his motion

for disclosure of a witness list 90 days in advance of trial.

Because the Government nevertheless recognizes that

early disclosure of a witness list might be helpful to the

defendant in his preparation for trial -- even if he cannot show

a particularized need for such disclosure such that production

can be compelled -- the Government proposes to produce a

preliminary witness list to counsel 30 days before trial.[4]  This proposal provides the defendant with as much or more notice of the Government's witnesses than courts have ordered in many of the cases the defendant cites.  See, e.g., United States v. Nachamie, 91 F.Supp.2d 565, 580 (S.D.N.Y. 2000) (witness list to be provided 14 days before trial); United States v. Rosenthal, 1991 WL 267767, at *5 (S.D.N.Y. Dec. 3, 1991) (witness list to be provided one month before trial).  Indeed, courts in this district have endorsed provision of a witness list on this time table (30 days in advance of trial) in criminal cases far more complex than this one.  See, e.g., United States v. Phillip Bennett, 05 Cr. 1192 (NRB) (approving the provision of witness list 30 days in advance of trial in Refco securities fraud matter, in which approximately 12 million pages of discovery had been produced).

The cases upon which the defendant principally relies in arguing for disclosure 90 days in advance of trial are simply inapposite.  The defendant argues that the Vilar court ordered an exhibit list 60 days in advance of trial and the Grace court

---

[4] Naturally, the Government will make every good faith effort to make such list as accurate and complete as possible. The Government seeks leave of the Court, however, to amend the witness list from time to time after initial disclosure as new witnesses are identified closer to (and even during) trial, as invariably happens in every case.  The Government seeks similar leave with respect to the production of an exhibit list, which is discussed in more detail infra.

ordered a witness list a year in advance of trial.  The

defendants in both of those cases, however, were able to

demonstrate a particularized need that the defendant here cannot

demonstrate, as those cases involved pre-trial issues far more

complex than any in this case.  In United States v. Vilar, 530

F.Supp.2d 616 (S.D.N.Y. 2008), for example, the Court anticipated

potentially extensive pretrial litigation on the admissibility of

Government evidence, which the defense claims was tainted by an

overbroad search.  Id. at 619.  In ordering provision of the

witness list 60 days in advance of trial, the Vilar court made

specific reference to the "need to provide Defendants with a

realistic opportunity (1) to uncover any taint issues in this

case, and (2) to satisfy their burden at a potential taint

hearing." Id. at 639.  Likewise, United States v. W.R. Grace, in

which the Ninth Circuit upheld a Montana district court's order

of a final witness list a year in advance of trial, was far more

complex than the instant case.  The Grace prosecution, brought in

2005, addressed criminal acts occurring during the W.R. Grace

company's mining and processing of vermiculite ore outside Libby,

Montana from the early 1960s to the early 1990s, "a relevant time

period spanning nearly 30 years and potentially more than a

thousand victims."  United States v. W.R. Grace, 526 F.3d 499,

503 (9th Cir. 2008).  This case involves a single core fraud

taking place over a five-year period.  Provision of an exhibit

45

list 30 days in advance of trial is certainly not required and is perfectly adequate to provide the defendant assistance in preparing for trial.[5]

### 2.    **Exhibit List**

The defendant also requests an order compelling the Government to provide an exhibit list 90 days in advance of trial.    (Compel Br. at 10).    This motion also should be denied.

Federal Rule of Criminal Procedure 16(a) sets forth the Government's obligations in disclosing evidence in a criminal case.    While the discovery in this case has not been insubstantial, the Government has provided the overwhelming majority of it in the form of a searchable electronic database. Moreover, many of the documents at issue are Doral documents, which the defendant had access to by virtue of his employment at the company during the relevant time period.    Finally, the Government has had and will continue to have conversations with counsel in response to any questions about documentary support

---

[5]Indeed, the disclosure of a witness list any sooner in this case might be counterproductive for the defendant. A witness list disclosed 30 days in advance of trial will be much more accurate and complete than a witness list provided 90 days in advance of trial because the Government's decisions about who it will call at trial become clearer as trial approaches.  Disclosure of a witness list 90 days in advance of trial risks the defendant spending valuable preparation time on witnesses the Government may not ultimately call as a result of refinements made to its case during the final stages of trial preparation.

for specific allegations in the Indictment.

        Nevertheless, the defendant now argues that the
Government should be compelled under Rule 16 to identify
specifically which of the documents in its production it will use
during its case-in-chief.    (Compel Br. at 11).    Rule 16 imposes
no such obligation on the Government.    Indeed, Judge Scheindlin
reached exactly this conclusion in <u>Nachamie</u>.    Like the defendant,
the <u>Nachamie</u> defendants asked the Government to identify which
documents were intended for use at trial.    Judge Scheindlin
rejected this argument, noting that "[t]he clear language of Rule
16(a)(1) ... does not require the Government to identify which
documents fall into each [of the three] categor[ies specified in
Rule 16(a)(1)(C)] – it only requires the production of documents
responsive to <u>any</u> category."    91 F. Supp.2d at 569 (emphasis
added).    In reaching this conclusion, Judge Scheindlin considered
and rejected several of the District Court opinions relied on by
the defendant – <u>United States</u> v. <u>Upton</u>, 856 F. Supp. 727, 746
(E.D.N.Y. 1994); <u>Turkish</u>, 458 F. Supp. at 882; and <u>United States</u>
v. <u>Poindexter</u>, 727 F.Supp. 1470, 1484 (D.D.C. 1989) – observing
that "none of those decisions [is] supported by the language of
Rule 16(a)(1) or prior case law."    91 F.Supp.2d at 569.

        Since <u>Nachamie</u>, numerous District Courts have agreed
that Rule 16 does not require the Government to identify those

47

documents it intends to introduce at trial.  See, e.g., United
States v. Carrington, 2002 WL 31496199 (S.D.N.Y. Nov. 7, 2002)
("It is clear that Rule 16(a)(1)(C) does not require the
Government to identify specifically which documents it intends to
use as evidence"); United States v. Greyling, 2002 WL 424655
(S.D.N.Y. Mar. 18, 2002) (Rule 16(a)(1)(C) "does not require the
Government to identify which documents it intends to introduce");
United States v. Alvarado, 2001 WL 1631396 (S.D.N.Y. Dec. 19,
2001) (Rule 16(a)(1) does not require the Government to identify
which documents "it intends to use in its case-in-chief"); United
States v. Savin, 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) ("neither
Rule 16(a) nor the case law . . . support the notion that the
government must identify the documents it intends to offer at
trial").  For the same reasons, the defendant's request for an
order compelling the Government to identify the documents it
intends to introduce at trial should be denied.

       Finally, although it is under no obligation to do so,
the Government has agreed to provide to the defendant a list of
exhibits 30 days prior to trial, a period of time which will
provide ample notice to the defendant.  Here too, the schedule
proposed by the Government provides as much notice as the
schedules set in many of the defendant's own authorities.  See,
e.g., United States v. Giffen, 379 F.Supp.2d 337, 344 (S.D.N.Y.
2004) (ordering provision of exhibit list 30 days in advance of

trial); <u>United States</u> v. <u>Chalmers</u>, 474 F. Supp.2d. 555, 573
(S.D.N.Y. 2007) (ordering provision of preliminary list 30 days
in advance of trial where significant portion of discovery
documents were in Arabic and had not yet been translated).
Although the defendant again points the Court to the <u>Vilar</u>
decision, as set forth above, that case has very different facts.
While the <u>Vilar</u> court ordered provision of an exhibit list 60 --
rather than 30 -- days in advance of trial, it did so while
referencing the taint issue, and the accompanying pretrial
litigation, anticipated in that case.  <u>See</u> <u>Vilar</u>, 530 F.Supp.2d
616 at 640 ("disclosure of an exhibit list will aid in the fair
and efficient resolution of taint issues, if any, in this case by
. . . permitting Defendants to evaluate whether any of the
Government's proffered exhibits raise issues of taint").  And, in
that case the Court ordered the production of a witness list only
60 days in advance of trial, not 90 days as sought here.  Again,
in a recent securities fraud case much more complicated than this
one, involving nine years of conduct, multiple defendants, and 12
million pages of discovery, <u>United States</u> v. <u>Bennett</u>, 05 Cr.
1192, Judge Buchwald approved disclosure of an exhibit list 30
days in advance of trial.[6]

---

[6] Additionally, for reasons similar to those set forth in
footnote 4 <u>supra</u>, an exhibit list provided 30 days in advance of
trial will undoubtedly be more helpful to the defendant's trial
preparation than an exhibit list provided 90 days in advance of
trial.

### 3.    **404(b) Notice**

Finally, the defendant seeks an order compelling the Government to produce specific notice of all evidence it intends to offer pursuant to Federal Rule of Evidence 404(b) no later than 90 days before trial.  (Compel Br. at 15).  The defendant's request is unjustified under the facts of this case and the prevailing law of this Circuit.

Rule 404(b) sets no time limit for the Government to disclose evidence it intends to offer pursuant to the rule.  Such a limitation would be unworkable, because the Government cannot predict whether it will offer such evidence until the proof, and the anticipated defenses, begin to crystallize as the trial date nears.  See United States v. Matos-Peralta, 691 F. Supp. 780, 791 (S.D.N.Y. 1988).  Indeed, the Second Circuit has approved disclosure of Rule 404(b) evidence as late as several days before, and even during trial, depending on the circumstances of the particular case.  See United States v. Valenti, 60 F.3d 941, 945 (2d Cir. 1995) (notice four days prior to trial sufficient where Government provided documents to defense on same day they were obtained); United States v. Matthews, 20 F.3d 538, 551 (2d Cir. 1994) (notice during trial sufficient when balanced against need to avoid indirect disclosure of identity of Government witness).

50

Here, the Government, in part because it is unaware of any potential defense by the defendant to the charges,  is currently unaware of Rule 404(b) evidence that it would seek to introduce at trial.  To the extent that such evidence develops, the Government intends to provide notice of any Rule 404(b) evidence it intends to offer 30 days before the beginning of trial.  The Government respectfully submits that such notice is more than adequate under the governing law in this Circuit, and that the defendant's motion should therefore be denied.  <u>See</u> <u>Villanueva Madrid</u>, 302 F.Supp.2d 187, 193 (S.D.N.Y. 2003) (ordering 404(b) notice to be provided three weeks prior to trial); <u>United States</u> v. <u>McDuffie</u>, 2002 WL 654136 (S.D.N.Y. April 18, 2002) (rejecting request for disclosure of 404(b) evidence four weeks before trial; "Government has represented that it will disclose the substance of any 404(b) evidence sufficiently in advance of offering them so that the Court can make appropriate rulings . . . . We accept the Government's representation."); <u>United States</u> v. <u>Feliciano</u>, 2002 WL 575662 (S.D.N.Y. April 16, 2002) (same); <u>United States</u> v. <u>Velasquez</u>, 1997 WL 414132, at *5 (S.D.N.Y. July 23, 1997) (two weeks constitutes "reasonable notice" under Rule 404(b)).

## C.    **DEFENDANT'S MOTION TO SUPPRESS STATEMENTS SHOULD BE DENIED**

The defendant moves to suppress certain statements he

made during interviews with counsel retained by Doral's outside directors to investigate events relating to Doral's valuation of its IO portfolio.  The Government has advised the defendant that it has not yet determined whether it will be seeking the admission of any of the statements at trial.  The defendant has filed its motion as a placeholder to preserve its objection in the event the Government determines it will seek to introduce the statements.  Because the issue is not ripe for adjudication, the Government requests that the defendant's application be denied without prejudice to reinstating the application in the event the Government elects to seek the admission of the statements.  The Government proposes that it notify the defendant of its intentions with respect to the defendant's statements 45 days in advance of trial, which should provide sufficient time for any related litigation.

52

## III. CONCLUSION

For the reasons set forth above, the defendant's applications seeking orders transferring venue; compelling the disclosure of a witness list, an exhibit list, and notice of 404(b) evidence 90 days in advance of trial; and suppressing certain statements made by defendant, should be denied.


Dated:    New York, New York
          August 15, 2008



                        Respectfully submitted,

                        MICHAEL J. GARCIA
                        United States Attorney


                    By:_____/s/_____
                        CHRISTOPHER L. GARCIA
                        JOAN M. LOUGHNANE
                        Assistants United States Attorney
                        (212) 637-1022/2265

53