UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                                             ) | **NO. 08-CR-181** |
| ) | |
| MARIO S. LEVIS                        ) | |
| _____ ) | |

**DEFENDANT MARIO LEVIS'S OMNIBUS REPLY
MEMORANDUM IN SUPPORT OF PRETRIAL MOTIONS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................... 1

DISCUSSION ..................................................... 2

    I.    MOTION TO TRANSFER ...................................... 2

        A.    Location of the Defendant ............................... 4

        B.    Location of the Witnesses ............................... 5

        C.    Location of Events ..................................... 10

        D.    Location of Relevant Documents and Records ............... 12

        E.    Disruption of the Defendant's Business .................... 12

        F.    Expenses to the Parties ................................ 12

        G.    Location of Counsel ................................... 13

        H.    Relative Accessibility .................................. 14

        I.    Docket Conditions .................................... 14

        J.    Special Circumstances ................................. 14

        K.    Conclusion .......................................... 14

    II.    MOTION TO COMPEL DISCOVERY ............................ 15

Defendant MARIO S. LEVIS ("Levis"), through undersigned counsel, respectfully files this reply memorandum in support of his: 1) motion to transfer the case to the District of Puerto Rico (Docs. ##29, 30); and 2) motion to compel disclosure of a witness list, exhibit list, and Rule 404(b) evidence not later than ninety (90) days before trial (Docs. ##36, 37).[1]

## INTRODUCTION

The government's omnibus response (Doc. #39) is plagued by an obvious internal inconsistency. On one hand, the government argues that Levis's motion to transfer the case to Puerto Rico should be denied because the government "currently intends to call nineteen New York-based witnesses at trial." Gov't Mem., at 19. On the other hand, the government argues that the pretrial disclosure of those witnesses ninety (90) days before trial "might be counterproductive for the defendant" because the government's "decisions about who it will call at trial [will] become clearer as trial approaches." Gov't Mem., at 46 n.5. If it is true that, after more than three years since the commencement of the investigation, the government remains unclear about the witnesses it intends to call at trial, then the government's claim that it "currently intends" to call mostly New York-based witnesses should be discounted. A hearing should be held on Levis's motion to transfer the case.

---

[1] The government argues that Levis's motion to suppress certain statements (Doc. #31) is not ripe for adjudication because the government has not yet determined whether it will seek the admission of any of the statements. Because the government has not yet responded substantively to that motion, Levis will defer a reply until after the government decides whether to seek admission of the statements and files a substantive response.

1

**DISCUSSION**

I.     **Motion To Transfer**

In canvassing the law on Rule 21(b), the government asserts that the "trend has been to deny such motions" to transfer. Gov't Mem., at 9. The trend has not been as one-sided as the government suggests. Rather, recent decisions illustrate that the courts have not hesitated to transfer cases where an analysis of the *Platt* factors warranted a transfer. *See, e.g.*, *United States v. Radley*, 558 F. Supp. 2d 865 (N.D. Ill. 2008) (transferring wire fraud and price manipulation case from Northern District of Illinois to Southern District of Texas); *United States v. Rodriguez*, No. 1:06-CR-302, 2007 WL 1287710, at *1 (W.D. Mich. May 2, 2007) (transferring counterfeit securities case from Western District of Michigan to Northern District of Illinois where defendants and character witnesses live); *United States v. Ferguson*, 432 F. Supp. 2d 559, 564 (E.D. Va. 2006) (transferring securities fraud case from Virginia to Connecticut); *United States v. Valdes*, No. 05-CR-156 (KMK), 2006 WL 738403, at *1 (S.D.N.Y. Mar. 21, 2006) (transferring unlicensed money transmitter case from Southern District of New York to Southern District of Florida); *United States v. Layne*, No. 05 CR.87(HB), 2005 WL 1009765, at *1 (S.D.N.Y. May 2, 2005) (transferring wire fraud case from Southern District of New York to the Southern District of Florida); *United States v. Muratoski*, 413 F. Supp. 2d 8 (D.N.H. 2005) (transferring passport fraud case from New Hampshire to the Northern District of Illinois where the defendant lived and worked); *United States v. Fritts*, No. CR05-00216 WHA, 2005 WL 3299834, at *1 (N.D. Cal. Dec. 6, 2005)

(transferring tax evasion and conspiracy case from the Northern District of California to the District of Oregon); *United States v. Lopez*, 343 F. Supp. 2d 824 (E.D. Mo. 2004) (transferring health care fraud case from Missouri to the Southern District of Florida).

To be sure, courts have been especially receptive to transfer requests in cases where, as here, a defendant has young children whose lives would be disrupted by a trial in a foreign district. *Radley*, 558 F. Supp. 2d at 877 (noting that the location of the defendants weighs "significantly in favor of a transfer" because one of the defendants "has three young children" and another defendant "has an extended support network in Houston, including his parents, siblings, and three teenage children, and is being treated for depression by a doctor in the Houston area"); *accord Valdes*, 2006 WL 738403, at *4 ("[F]amily obligations, including the care of children, militates (sic) in favor of transferring proceedings to the district in which a defendant resides."); *United States v. Hanley*, No. 94 Crim. 394 (DAB), 1995 WL 60019, at *2 (S.D.N.Y. Feb. 10, 1995) (factor of convenience to the defendant "clearly favor[s]" transfer where defendant will be closer to his wife, three-year-old child, and elderly mother); *United States v. Russell*, 582 F. Supp. 660, 662 (S.D.N.Y. 1984) (fact that defendants live with their three college-aged children in transferee district "argues strongly" for transfer of venue). It is with this important factor in mind that we reply to the government's analysis of the *Platt* factors.

A.    **Location of the Defendant**

The government argues that Levis's residence in, and family ties to, Puerto Rico "only slightly" weigh in favor of transfer. Gov't Mem., at 13. However, the courts in this Circuit have continued to accord "greater weight to the defendant's interest in being tried in the district of his residence than to any other factor." *Layne*, 2005 WL 1009765, at *2 (quoting *United States v. Martino*, No. S1 00 CR 389 (RCC), 2000 WL 1843233, at *6 (S.D.N.Y. Dec. 14, 2000) and citing *United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990)).

Levis was born in Puerto Rico and has resided there virtually his entire adult life. His parents, siblings, wife, and two minor children (ages two and six, one of whom is in school, the other in pre-school) reside there. It would disrupt the lives of his children to move to New York for an anticipated six week trial, especially during the school year. And, if Levis sought to avoid such disruption by having his family remain in Puerto Rico for the trial, he would be away from his family for an extended period of time.[2] This factor weighs ***heavily***, not ***slightly***, in favor of a transfer to Puerto Rico. *Radley*, 558 F. Supp. 2d at 877; *Valdes*, 2006 WL 738403, at *4; *Hanley*, 1995 WL 60019, at *2; *Russell*, 582 F. Supp. at 662.

---

[2] The government asserts that Levis "does not complain that he is being forced to stand trial far from his family" because he "intends to move several of his family members to New York." Gov't Mem., at 11. But Levis does not know yet whether he will in fact move his wife and children to New York for the trial; such a decision will be made closer to the trial date (once it is determined). To the extent undersigned counsel suggested in the memorandum that such a decision had already been made, (Doc. #30, at 13, 22), that suggestion was premature. In fact, now that both of Levis's children are in school, it is unlikely that Levis would disrupt their lives by moving them to New York for the trial.

4

### B.     Location of the Witnesses

Doral is and was headquartered in Puerto Rico. Doral's Puerto Rico-based operations accounted for 97% of its consolidated assets and 99% of its consolidated revenues. The external valuations of the IO strips, which are at the heart of the government's case, were performed in Puerto Rico. Doral's current and former employees who may testify at trial are located in Puerto Rico. The government's witnesses who performed the "external valuations" are located in Puerto Rico. All of the conversations between Levis and the external valuators were held in Puerto Rico. The relevant e-mails relied on by the government were sent by Levis from his computer in Puerto Rico. All of the potential defense fact and character witnesses are located in Puerto Rico.

Notwithstanding that Puerto Rico is the obvious nerve center of this case, the government insists that "[t]he vast majority of the witnesses the Government will likely call at trial . . . either live in the greater New York metropolitan area or are represented by counsel based in New York or both." Gov't Mem., at 13. Specifically, the government asserts that it has "nineteen New York-based witnesses" who will testify at trial. *Id.* at 19. That claim should be viewed with skepticism because, in the same memorandum, the government professes not to have refined its witness list to the point where it would even be useful to provide the list to Levis. *Id.* at 46 n.5 ("Indeed, the disclosure of a witness list any sooner in this case might be ***counterproductive*** for the defendant. A witness list disclosed 30 days in advance of trial will be ***much more*** accurate and complete than a witness list

5

provided 90 days in advance of trial because the Government's decisions about who it will call at trial become clearer as trial approaches.") (emphasis added). Moreover, given the relative paucity of any alleged acts in New York – *i.e.*, only one relevant meeting – it seems certain that many of the unidentified witnesses alluded to by the government do not have direct knowledge of the defendant's purported conduct. *Id.* at 18 (two institutional victims, two individual investor victims, a NYSE representative, a Bloomberg employee, and an unidentified Doral board member).

In *United States v. Clark*, 360 F. Supp. 936 (S.D.N.Y. 1973) (Griesa, J.), an accounting and securities fraud case involving a publicly-traded company headquartered in Oklahoma, this Court granted a transfer to Oklahoma after appropriately discounting the government's broad claim that many of the witnesses were based in New York. In rejecting the virtually identical arguments advanced by the government in this case, the Court wrote:

> The Government has not fully indicated the character of the New York and East Coast witnesses, except to indicate that some of them will be from the American Stock Exchange, and some will be brokers and analysts who will testify as to false information disseminated to them. Apparently this group will also include certain experts.
>
> I must conclude that the kind of witnesses which the Government places in or near New York are *not* generally those who can testify about the really essential issues in this case – the business of Four Seasons and the other corporations, the planning of financings, the preparation of financial reports, etc. It is clear that almost all of the potential witnesses on the latter issues reside in Oklahoma, or much closer to Oklahoma than to New York. Very few of such witnesses live in New York.

6

*Id.* at 943. As for the "victim" witnesses, this Court observed that their location should not weigh heavily on the transfer motion because victim witnesses could be located near Oklahoma City and the testimony of such witnesses would be relatively short. *Id.*

The government also argues that Levis has failed to demonstrate that "any [defense] witness he intends to call would be unable to testify in a trial held in New York." Gov't Mem., at 13-15. It would be unfair to require such a demonstration at this stage. Discovery is not yet complete; more is forthcoming from the government. The defense has not yet been able to review all of the millions of pages of documents that *have* been provided. No trial date has been set. And, the government has not yet identified its witnesses. Thus, it is presently impossible for the defense to know which witnesses it intends to call, much less which ones would be unavailable to travel to New York at some unspecified future date.

The government fails to appreciate the logistical difficulties and tactical disadvantages that Levis and his counsel must confront in attempting to present a defense case in federal court in New York when virtually all potential fact and character witnesses for the defense will be coming from Puerto Rico. Because the government always goes first, the government will know prior to trial when its case-in-chief will commence and which witnesses it intends to call (and substantially in what order). The government will be able to prepare its witnesses to testify prior to trial. Thus, the government can effectively plan and organize its presentation with witnesses from across the mainland United States and Puerto Rico, even

7

if the trial is held in Puerto Rico, and the government will not suffer from any tactical disadvantages if the trial is held in Puerto Rico as opposed to New York.

By contrast, a defense case is necessarily reactive. The defense will not know, until long after trial commences, which potential defense fact witnesses have relevant rebuttal testimony, nor when the government's case-in-chief will be concluded.[3] Defense counsel cannot compel witnesses in Puerto Rico to travel to New York and sit for interviews during the government's case-in-chief. After the government completes its case-in-chief, defense counsel in New York would have to scramble to schedule, interview, prepare, and arrange for the travel of Puerto Rico-based defense witnesses to New York. The defense will be at a serious disadvantage. It is simply impractical (and uneconomical) for the defense to have dozens of potential witnesses from Puerto Rico waiting in New York while the defense decides whom to call. By contrast, a trial in Puerto Rico would enable the defense to meet with and interview potential defense witnesses during the evenings and on weekends while the government is presenting its case-in-chief. *See Clark*, 360 F. Supp. at 943 ("But the convenience factor should relate not only to the calling of witnesses, but to the process of interviewing and determining which witnesses should be called.").

---

[3] Levis has filed a motion to permit him to file a list of potential defense witnesses (and the subject matter of their testimony) *ex parte*, or to present that information *in camera*. (Docs. ##34, 35). The government opposes the motion, Gov't Mem., at 15 n.1, even though the government has acceded to this procedure in other cases, including one before this Court. *See, e.g.*, *United States v. Hamilton*, No. 98 CR. 393(TPG), 1999 WL 349697, *1 (S.D.N.Y. May 27, 1999) (Griesa, J.). Levis's motion is pending. Levis respectfully reiterates his request to make such a presentation to the Court *in camera* in advance of the Court's ruling on Levis's motion to transfer.

Moreover, a trial in New York will diminish the impact of Levis's character witnesses. Levis's potential character witnesses are respected members of the San Juan community, who will testify about Levis's character and reputation as a law abiding citizen. This district has consistently recognized that the location and availability of character witnesses is an important consideration, *see, e.g.*, *United States v. Aronoff*, 463 F. Supp. 454, 458 (S.D.N.Y. 1978), especially where character witnesses are well known in their community but "are likely to lose much of their effectiveness before a distant jury that knows nothing of their reputations." *United States v. Johnson*, 323 U.S. 273, 279 (1944) (Murphy, J., concurring); *see also United States v. Layne*, No. 05 CR.87 (HB), 2005 WL 1009765, at *3 (S.D.N.Y. May 2, 2005) (explaining that the location of character witnesses is important "since the character witnesses will come from the same neighborhood as the jury"); *United States v. Martino*, No. S1 00 CR 389 (RCC), 2000 WL 1843233, at *6 (S.D.N.Y. Dec. 14, 2000) ("[T]he impact of character witnesses is generally greater in the district where such witnesses live and work." (citing *United States v. Ohran*, No. 99 CR, 142 (JSM), 2000 WL 620217, at *3 (S.D.N.Y. May 12, 2000))). In cases involving allegations of fraud, the *mens rea* and character of the defendant are clearly at issue, so courts have given special weight to the location of character witnesses. *Russell,* 582 F. Supp. at 663 (giving the location of character witnesses "considerable weight" in a fraud case); *Radley*, 558 F. Supp. 2d at 878 (in cases involving fraud, "the location and availability of character witnesses is an important consideration"). Accordingly, the location of the witnesses weighs in favor of a transfer.

9

C.     **Location of Events**

"The location of where the events in issue took place carries considerable weight. For instance, while venue may attach in one district, when the 'nerve center' of the events at issue occurred in another district, transfer has been found appropriate." *Valdes*, 2006 WL 738403, at *6 (internal citation omitted).

The government does not dispute that Puerto Rico was the "nerve center" of the alleged fraud; that the alleged fraud was directed from Doral's headquarters in Puerto Rico; the internal valuations were performed there; the SEC filings originated and were reviewed there; the pertinent e-mails originated there; the investor conference calls were held from there; and the vast majority of conversations that Levis had with analysts and investors occurred while Levis was in Puerto Rico. Moreover, the government does not dispute that the external valuations were performed by investment bankers based in Puerto Rico. Nonetheless, the government argues that the location of events does not warrant transfer because Doral maintained offices in New York, the alleged fraud was "national in scope," and the alleged fraud was "completed" in New York. Gov't Mem., at 21.

The government overstates Doral's connection to New York when it states that Doral had "mortgage banking operations" in New York and "maintained offices in New York." *Id.* at 2, 21. As demonstrated in Levis's Memorandum of Law, Doral's headquarters were in Puerto Rico, 99% of its revenues were generated in Puerto Rico, and the overwhelming number of employees were based in Puerto Rico. (Doc. #30, at 7-8). While Doral had five

10

*bank* branches in New York, it had no significant residential mortgage lending operation in New York. Importantly, the IO strips at the heart of the government's case were unique to the Puerto Rico financial market; *none* of the IO strips were generated in New York. Equally significant, the government cites no evidence that any of the alleged conduct at issue occurred at Doral's bank branches in New York.

Moreover, the government's reliance on the "national scope" cases, Gov't Mem., at 24-26 (citing *United States v. Ebbers*, No. S4 02 CR. 1144 (BSJ), 2004 WL 2346154, at *1 (S.D.N.Y. Oct. 18, 2004), and *United States v. Wilson*, No. 01 CR. 53(DLC), 2001 WL 798018, at *1 (S.D.N.Y. July 13, 2001), is unavailing. Those large-scale accounting fraud cases involved WorldCom and Aurora Foods, both of which sold products and services and generated revenue across the entire United States (and in WorldCom's case, the entire world), and whose allegedly fraudulent accounting treatment involved expenses incurred across the entire country. *See Ebbers*, *supra*; *Wilson*, *supra* ("Aurora was a national company, whose products were sold across the country . . . ."). Here, by contrast, Doral generated 99% of its revenue by originating residential mortgages in Puerto Rico and selling them to banks in Puerto Rico. To the extent that Doral's operations were "national" in scope, the "nation" was Puerto Rico, not the United States.

The government argues that because Doral's stock was publicly traded, any accounting fraud necessarily extended beyond the four walls of its corporate headquarters. Gov't Mem., at 26. Taken to its logical extreme, the government's argument would mean

11

that no accounting fraud case involving a publicly-traded security would be susceptible to transfer under Rule 21(b). This Court rejected the very same logic that animates the government's argument when it granted a Rule 21(b) transfer in *Clark*, 360 F. Supp. at 942.

Finally, the government makes the conclusory argument that the fraud was "completed" in New York. But the government does not dispute that there was only one relevant meeting in New York, that all of the accounting decisions were made in Puerto Rico, and that all electronic communications with the analysts originated in Puerto Rico.

### D. Location of Relevant Documents and Records

The parties agree that, in the age of electronic discovery, this factor is neutral. Gov't Mem., at 29-30; *see Radley*, 558 F. Supp. 2d at 880 ("Where the government's documents have been computerized, this factor is essentially neutral.").

### E. Disruption of the Defendant's Business

The parties agree that this factor is neutral.

### F. Expenses to the Parties

The government argues that Levis overstates the expenses that would be incurred at a trial in New York while at the same time ignoring the expenses that he would incur in Puerto Rico. Gov't Mem., at 32. The government further argues that Levis has failed to show that the expense of a trial in New York would prejudice the quality of his defense. *Id.* Finally, the government argues that it would incur a "tremendous expense" if the case were transferred to Puerto Rico. *Id.* at 33. The government's arguments should be rejected.

12

Contrary to the government's contention, a trial in Puerto Rico would be much less expensive for Levis than a trial in New York. He would not have to incur travel and lodging expenses for himself (and any family members who might attend) if the trial is held in Puerto Rico. Moreover, the cost of lodging in San Juan for the defense would be significantly cheaper than the cost of lodging in Manhattan. Finally, the cost of travel and lodging for defense witnesses to travel to New York is substantial. In Puerto Rico, the cost would be trivial because all potential defense witnesses are within easy driving distance to San Juan.

The fact that the government might incur greater expenses as a result of a trial in Puerto Rico is not significant to the analysis. "[T]he United States of America has, for all practical purposes, unlimited financial resources to bring to bear. Unlike the defendant[], the Government can, and does, mint money." *Ferguson*, 432 F. Supp. 2d at 567 (quoting *United States v. Coffee*, 113 F. Supp. 2d 751, 757 (E.D. Pa. 2000)).

### G.  Location of Counsel

The government argues that the location of counsel favors New York because two of the three government attorneys who will be trying the case are located in New York, while defense counsel are based in Miami. The location of counsel "is entitled to the least consideration" among the factors considered on a motion to transfer. *See Meterlogic, Inc. v. Copier Solutions, Inc.*, 185 F. Supp. 2d 1292, 1304 (S.D. Fla. 2002). Significantly, during the course of this three year investigation, the United States Attorney's Office for the Southern District of New York has changed the lead prosecutors multiple times (from David

13

Siegal to Diane Gujarati to Christopher Garcia and Joan Loughnane). The only constant during this entire investigation and prosecution has been the prosecutor from the SEC, Jason Anthony, who currently resides in Washington, D.C., not New York.

### H.    Relative Accessibility

The parties agree that the courts of both New York and San Juan are of comparable accessibility. Gov't Mem., at 35.

### I.    Docket Conditions

The government argues that the relative docket conditions weigh against transfer because this Court's schedule is open. Gov't Mem, at 36. Because both sides will need sufficient time to prepare for trial, however, there is no impediment to trying the case in either district. Thus, this factor is neutral. It does not favor the government.

### J.    Special Circumstances

The special circumstance of Levis's two minor children deserves paramount consideration. As a man presumed innocent, he should not be forced to be away from his children, or alternatively to disrupt their lives, for such an extended period of time.

### K.    Conclusion

Simply put, this case involves the alleged actions of a lifelong Puerto Rican resident at a bank based in Puerto Rico, where all of the valuations and financial reporting were done from Puerto Rico, virtually all of the communications were made from Puerto Rico, and the majority of essential witnesses are based in Puerto Rico. The trial should be in Puerto Rico.

## II.  Motion to Compel Discovery

Levis has moved the Court for an Order compelling the government to provide the defense with a witness list, exhibit list, and Rule 404(b) notice not later than **ninety (90)** days prior to trial. (Doc. #36). The government has offered to provide the requested information **thirty (30)** days prior to trial. Both parties cite case law to support their respective positions, but there is not much consistency among the cases as each one presents its own unique challenges for defense preparation depending on the volume of the discovery, the number of anticipated witnesses, and the nature and complexity of the charges. This case presents far greater challenges than the normal case. Thirty (30) days prior to trial (a time period during which Levis's counsel will be packing their files, moving to the location of the trial, and setting up a local office there) is not sufficient time for the defense to adequately prepare.

As explained in Levis's Memorandum of Law in Support (Doc. #37 & Exh. A), the discovery in this case is unmanageable. It consists of a database containing approximately 130 gigabytes of electronic data, amounting to more than 2.1 million pages of documents as estimated by a computer specialist (an estimate not disputed by the government). Contrary to the government's claim that it "has substantially completed its discovery," Gov't Mem., at 6, the government previously indicated that there are an additional eight CDs (amounting to 100,000 pages), 9,400 additional hard copy pages, and Federal Reserve documents. (Doc. #37, at 4). Moreover, contrary to the government's claim that it has "direct[ed] the defendant to materials relevant to the allegations in the Indictment," Gov't Mem., at 7, the government

15

has not narrowed the universe of materials from which it may seek to offer evidence at trial. Because Levis and his counsel remain largely in the dark about which of the more than 2.1 million pages are relevant to the sixty-six paragraph indictment, the defense lawyers and paralegals continue to collectively waste thousands of hours culling through and translating documents which the government may already know are irrelevant to its case.

The government has also indicated that it intends to call at least thirty (30) witnesses but has not identified them to the defense. Gov't Mem., at 19-20. However, the government apparently knows who they are because the government confidently states that nineteen are from New York or have counsel there, six are from Puerto Rico, and the rest are from Texas, Massachusetts, Illinois, California, and the District of Colombia. Gov't. Mem., at 19-20. So, the defense must guess as to the identity of many of them, and will necessarily spend countless hours investigating and tracking down information about other witnesses whom the government does not intend to call. Requiring the government to provide a witness list to the defense ninety (90) days before trial would not prejudice the government; it would, however, permit the defense to save resources and avoid needless preparation for witnesses who will not testify.

The government characterizes Levis's claims about the need for a witness and exhibit list as "abstract" and "conclusory," Gov't Mem., at 41, but the government has submitted no evidence to refute the sworn affirmation from Levis's undersigned counsel outlining the obstacles to effective and efficient defense preparation. (Doc. #37–Exh. A). Although the

16

government argues that Levis "is readily able to direct his counsel to the meaningful portions" of the relevant documents, Gov't Mem., at 42 n.3, this is an accounting fraud case and Levis is not an accountant.  Equally significant, Levis's assistance becomes particularly useful only *after* the relevant documents have been identified because he is not prescient about which documents in the computer database may be relevant or where they are located within that database.  To successfully identify the relevant documents, the lawyers and paralegals must still engage in the arduous and time-consuming task of reviewing each document, page-by-page.

Finally, the government minimizes the complexity of the case by stating that "[t]he charges relate to a fairly simple scheme to lie about the process by which the defendant valued a single asset on the books and records of Doral." Gov't Mem., at 43.  A review of the indictment, brought after a three-year investigation, belies the government's contentions. There is nothing simple about IO strips, forward yield curves, hedges, caps below the weighted average coupon, and the like.  Accordingly, the Court should grant the relief requested in Levis's motion to compel: the disclosure of a witness list, exhibit list, and 404(b) notice at least ninety (90) days prior to trial.

17

    Respectfully submitted,

    /s Roy Black
ROY BLACK, ESQ.
(FL Bar No. 126088)
HOWARD M. SREBNICK, ESQ.
(FL Bar No. 919063)
MARIA D. NEYRA, ESQ.
(FL Bar No. 074233)
Black, Srebnick, Kornspan & Stumpf, P.A.
201 South Biscayne Blvd., Suite 1300
Miami, Florida 33131
Tele: (305) 371-6421
Fax: (305) 358-2006
rblack@royblack.com

*Attorneys for Defendant Levis*