UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,            :

       - v. -            :

MARIO S. LEVIS,            :
    a/k/a "Sammy Levis,"

                 :

       Defendant.            :

- - - - - - - - - - - - - - - x

**INDICTMENT**

S1 08 Cr. 181 (TGP)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/18/10

**COUNT ONE**

(Securities Fraud)

    The Grand Jury charges:

**Relevant Entities and Individuals**

    1.  At all times relevant to this Indictment, Doral Financial Corporation ("Doral") was a Puerto Rico corporation with its headquarters in San Juan, Puerto Rico.  Doral was a financial holding company with, among other things, mortgage banking operations in Puerto Rico and New York, New York.  Doral was also a leading residential mortgage lender in Puerto Rico, issuing approximately $7.8 billion and approximately $6.5 billion in loans during 2004 and 2003, respectively.  At all times relevant to this Indictment, Doral's common stock was traded on the New York Stock Exchange under the trading symbol "DRL."

    2.  At all times relevant to this Indictment, in order to maintain public trading of its securities in the United States, Doral was required to comply with the federal securities

laws, including the Securities Exchange Act of 1934 (the "Exchange Act") and the rules and regulations promulgated thereunder, which are designed to ensure that a company's financial information is accurately recorded and accurately disclosed to the public. Specifically, Doral was required to: (a) file with the United States Securities and Exchange Commission (the "SEC") annual financial statements (on SEC Form 10-K) that had been audited by independent certified public accountants; (b) file with the SEC quarterly financial reports (on SEC Form 10-Q); (c) make and keep books, records, and accounts that accurately and fairly reflected Doral's business transactions; and (d) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that Doral's transactions were recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles.

3.    From at least in or about 2000, the annual financial statements and quarterly reports filed by Doral with the SEC purported truthfully to disclose, among other things, Doral's financial condition, including its net income and net assets. After filing, Doral's annual financial statements and quarterly reports were made available to the investing public by the SEC and by Doral. Doral also communicated certain information regarding its financial condition and activities to

2

the investing public by way of press releases, statements made by Doral executives, and other means. Members of the investing public, including Doral's stockholders and market analysts, considered and relied upon this financial data and information in making and recommending investment decisions.

4.   At all times relevant to this Indictment, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, resided in Puerto Rico, and held the position of Treasurer and, as of on or about April 22, 2002, Senior Executive Vice President, of Doral. Among other things, LEVIS acted as Doral's primary liaison to investors, potential investors, and market analysts, fielding investor and analyst telephone calls and e-mails, and representing the company at investor presentations, road shows, and in-person meetings. For each of the years 2002 and 2003, Doral paid LEVIS, in salary and incentive bonus, a total of $825,000.

5.   At all times relevant to this Indictment, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, and his family owned a substantial number of shares, and options to purchase a substantial number of shares, of Doral common stock worth hundreds of millions of dollars. As of March 1, 2005, LEVIS, beneficially owned 2.6 million shares (approximately 2.4 percent) of Doral stock. At the height of Doral's stock price appreciation, LEVIS's shares and options were worth approximately

$130 million.  LEVIS also received, in connection with those
shareholdings, several additional millions of dollars in dividend
payments over the relevant time period, which were based in part
on Doral's reported positive earnings performance.

        6.  As of March 1, 2005, MARIO S. LEVIS, a/k/a "Sammy
Levis," the defendant, and other close family relations
(collectively, the "Levis Family") together beneficially owned a
total of approximately 9.2 million shares (approximately 8.2
percent) of Doral stock.  At the height of Doral's stock price
appreciation, the Levis Family's Doral stock holdings were worth
more than approximately $450 million.

### Doral's Business Operations

        7.  One of Doral's primary business activities was the
origination, through its mortgage banking subsidiaries, of 15-
and 30-year first mortgage loans secured by single family
residences primarily located in Puerto Rico.  These loans
included what are commonly known as "non-conforming" mortgage
loans--that is, loans that exceeded lending limitations
regarding, for example, size, credit terms, loan documentation,
and income verification established by the principal purchasers
and guarantors of the secondary mortgage market, including the
Federal Home Loan Mortgage Corporation and the Federal National
Mortgage Association.

        8.  After making these mortgage loans, Doral

customarily sold most of the loans to other financial institutions in Puerto Rico (the "Secondary Buyers"). MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, and another senior representative of Doral (the "Doral Senior Representative") negotiated the contracts for the loan sales, and LEVIS, in his capacity as Doral's Treasurer, executed virtually all the loan-sale contracts. Under the terms of these loan-sale contracts, the Secondary Buyers typically purchased large collections, or "pools," of mortgage loans.

       9. The terms of Doral's loan-sale contracts with the Secondary Buyers provided that the Buyers would be entitled to receive all of the principal repaid by the mortgage borrowers and a portion of the interest; Doral would be entitled to retain the remainder of the interest payments. The amount of the interest provided to the Secondary Buyer was called the "pass-through rate." Doral therefore collected the difference, or spread, between the pass-through rate and the interest rate paid on the underlying mortgage loans. The asset created by Doral's retained share of these interest payments was called an "interest-only strip" ("IO").

       10. At all times relevant to this Indictment, the interest rate owed by mortgage borrowers to Doral was typically fixed. Beginning in or about 2000, however, the loan sale contracts negotiated by MARIO S. LEVIS, a/k/a "Sammy Levis," the

defendant, and others at Doral with the Secondary Buyers often provided for a variable pass-through rate based on an international interest rate known as the LIBOR, plus a fixed percentage.  Under the terms of these loan-sale contracts, the pass-through rate was reset on a quarterly basis based on fluctuations in the LIBOR.

11.  Doral's spread therefore had an inverse relationship to the LIBOR.  If the LIBOR fell, then the pass-through rate also decreased, which increased Doral's spread between the pass-through rate and the mortgage interest rate. Falling interest rates therefore enabled Doral to retain a larger portion of the interest on the loans it had sold, increasing Doral's revenue and profits.  However, if the LIBOR rose, then the pass-through rate also increased, shrinking the spread between the pass-through rate and the mortgage interest rate.  A rising LIBOR therefore meant that Doral collected a smaller portion of the interest on the loans it had sold, reducing Doral's revenue and profits.

12.  At all times relevant to this Indictment, Doral recorded on its publicly filed financial statements the purported present value of the anticipated future cash flows from the spreads between the pass-through rate and mortgage interest rate on the pools of loans it had sold.

13.  At all times relevant to this Indictment, Doral

reported that one of its principal sources of income was income attributable to the IOs.  In fact, over time, the income that Doral recorded from the IOs became increasingly important to the company's profitability.  Specifically, Doral reported IO-related income in its consolidated financial statements contained in reports publicly filed with the SEC of $72.7 million in 2000, $141.4 million in 2001, $197.9 million in 2002, $281 million in 2003, and $509 million in 2004.  Doral also reported in those same publicly filed statements the present day value of the income that it expected to earn from all of its IOs in the future: $158.0 million in 2001, $236.5 million in 2002, $359.2 million in 2003, $578.1 million in 2004, and $878.7 million in 2005.

### Overview of the Fraudulent Scheme

14.  Between in or about 2002 and in or about 2005, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, and others known and unknown, directly and indirectly represented to others, including investors and market analysts, false and misleading information regarding the process by which Doral determined the publicly stated value of the IOs.  Specifically, in its public SEC filings, Doral represented that the reported value of its IOs was based, in part, on two "outside" and "independent" expert valuations provided to Doral on a quarterly basis.  LEVIS made similar representations to investors, market analysts, and

others.  As LEVIS well knew, however, these representations were
false and misleading.

15.  In addition to misrepresentations regarding the
existence of outside, independent valuations, MARIO S. LEVIS,
a/k/a "Sammy Levis," the defendant, and others known and unknown,
misrepresented certain characteristics of Doral's IOs.
Specifically, LEVIS falsely informed investors and analysts that
the sales contracts creating the IOs contained "caps" on the
pass-through rate paid to the Secondary Buyers that would prevent
the pass-through rate from increasing above a certain level; such
caps, LEVIS represented, would protect the interest-rate spread
to which Doral was entitled and thereby would enable Doral to
avoid decreasing the stated value of its IO portfolio, even if
interest rates increased.

16.  Overall, through these false and misleading
statements regarding the existence of independent valuations and
caps for pass-through rates, MARIO S. LEVIS, a/k/a "Sammy Levis,"
the defendant, and others known and unknown, made or caused to be
made false representations to the investing public that Doral
used reliable safeguards to confirm and preserve the reported
value of its IOs.

## The Valuation of Doral's IOs

17.  Beginning in or about 2001, MARIO S. LEVIS, a/k/a
"Sammy Levis," the defendant, and the Senior Representative began

increasing the percentage of those loan sales to the Secondary
Buyers that involved the pass-through rate fluctuating with the
LIBOR.  As explained above, Doral's income from the IOs varied
inversely with the LIBOR: if the LIBOR rose, then Doral's income
from the IOs would shrink.  Any valuation of the IOs therefore
needed to make an assumption about the pass-through rate during
the outstanding term of the mortgage loans.  For example, if the
average interest rate on a pool of mortgages was 7 percent, and
the pass-through rate was 5 percent, then Doral collected the
difference, or 2 percent.  If the pass-through rate rose to 6
percent a year later, then Doral's spread shrunk to 1 percent.

        18.  Two possible methodologies for taking the variable
nature of the pass-through rate into account were: (a) a "spot
rate" methodology, in which Doral would ignore predicted changes
in the LIBOR and instead value the future income generated from
the IOs based on the LIBOR that existed at the time of each
valuation, thus assuming, in effect, that LIBOR would remain
constant over the term of the relevant loans; and (b) a "forward
curve" methodology, in which Doral would value future IO-related
income based on the changes in interest rates predicted by the
marketplace.  In periods where interest rates were expected to
rise, incorporating the forward curve into its internal IO
valuation model would have reduced materially both the value of
Doral's existing IOs and income that Doral had already publicly

reported on sales of the underlying mortgages.  Doral, however, internally adopted a spot rate valuation methodology.  As MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, well knew, Doral's internal IO valuation method did not incorporate the use of the forward curve, or any other similar measure to account for the effect of anticipated future interest rate fluctuations on the value of Doral's IOs.

19.   Doral's independent auditor (the "Auditor") recommended to Doral that it improve the process by which its IOs were valued, including obtaining independent valuations of Doral's IOs by outside experts.  In response to the Outside Auditing Firm's recommendation, beginning in or about 2001, Doral obtained what Doral subsequently held out to the Auditor and to the investing public to be two "independent," "outside" valuations of its IO portfolio, one each from third-parties hereinafter referred to, respectively, as "External Valuator #1" and "External Valuator #2."

20.   LEVIS was involved in obtaining the purported outside, independent valuations, and principally responsible for communicating with and supplying information to External Valuator #1 and External Valuator #2 in connection with their valuations.

## Representations Regarding the Independence of the External Valuations

21.   MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, and others at Doral, represented to the

Auditor and investors that Doral compared its internal valuation of the IOs to the two independent valuations, and then selected the lowest of the three values for purposes of recording and reporting the value of its IOs.  In this way, LEVIS and Doral represented to investors that Doral was taking a conservative approach to ensure that the IOs were valued in a reliable manner.

22.  From in or about 2001 through in or about 2005, LEVIS caused Doral to make the following false and misleading statements, among others, in its annual reports and other public statements regarding these valuations: (a) that External Valuator #1 performed a valuation, and that it was based on "market quotes," and (b) that External Valuator #2 performed a valuation, using a discounted cash flow analysis, that was independent and based on External Valuator #2's own assumptions rather than assumptions provided by Doral.

23.  For example, Doral's Annual Report on Form 10-K for 2004 stated:

> To determine the fair value of its IO portfolio, Doral [] engages in two external valuations with parties independent of the Company and of each other.  One of them consists of dealer market quotes for similar instruments and the other one consists of a cash flow valuation model in which all economic and portfolio assumptions are determined by the preparer.

11

## External Valuator #1's "Market Valuation"

24.  As MARIO S. LEVIS, a/k/a "Sammy Levis," the
defendant, well knew, Doral was required to account for its IOs
at their fair value, and quoted market prices--meaning, quotes of
prices that prospective buyers would pay for an asset--were a
widely accepted and preferred measure of fair value.  Beginning
in or about late 2001, through in or about early 2005, on a
quarterly basis, LEVIS requested and obtained from External
Valuator #1 a document that purported to be a "market valuation"
of Doral's IO portfolio.

25.  From in or about December 2001 through in or about
2005, in communications with the Auditor, MARIO S. LEVIS, a/k/a
"Sammy Levis," the defendant, repeatedly and falsely represented,
and caused others to represent, that External Valuator #1's
valuations were based on "market quotes" for similar instruments,
and cited those valuations as proof that External Valuator #1 had
conducted such valuation work.  For example, in response to a
specific request for information from the Auditor for use in
connection with its annual audit of Doral's financial statements,
in an e-mail dated on or about February 19, 2003, LEVIS directed
another Doral employee to represent to the Auditor that External
Valuator #1's valuations were "a market quote."  LEVIS further
wrote that "all [External Valuator #1] does is to call his trader
in NYC and get a quote.  We have explained this to [the Auditor]

in the past."

26.   As noted above, the statements contained in
Doral's annual reports, which MARIO S. LEVIS, a/k/a "Sammy
Levis," the defendant, reviewed and approved, similarly stated,
among other things, that the value of Doral's IO portfolio was
supported by market quotes obtained from a third-party entity,
referring to the work purportedly done by External Valuator #1.

27.   In truth and in fact, as MARIO S. LEVIS, a/k/a
"Sammy Levis," the defendant, well knew, the representation that
External Valuator #1 had conducted valuations of Doral's IO
portfolio based on "market quotes" for similar or comparable
financial instruments was false, and the purported quarterly
valuation documents from External Valuator #1 were fabricated at
LEVIS's direction.  No market quotes were ever obtained from or
supplied by External Valuator #1 or any employee at External
Valuator #1's firm (or elsewhere), and External Valuator #1 never
did any valuation work.  Instead, at LEVIS's instruction,
beginning in or about late 2001, and continuing through in or
about early 2005, External Valuator #1 merely copied into his own
handwriting certain "valuations" provided by LEVIS to External
Valuator #1, and then returned his handwritten version to LEVIS.
These documents, containing External Valuator #1's handwriting
and signature, constituted the "market valuation" for Doral's
IOs, which LEVIS caused Doral falsely to hold out to the Auditor

13

and others as the "independent" valuations "consist[ing] of
dealer market quotes for similar instruments."

28.   Between in or about 2001 and in or about early
2005, the phony "market valuation" from External Valuator #1
typically purported to appraise Doral's IO portfolio at a higher
value than Doral's internal valuation model, thereby enabling
Doral use the value calculated using its internal model to record
and report the value of its IOs.

### External Valuator #2's "Independent" Valuation

29.   As MARIO S. LEVIS, a/k/a "Sammy Levis," the
defendant, well knew, the public representations contained in
Doral's SEC filings that Doral had obtained an independent
valuation of Doral's IO portfolio, in which the valuator
determined for itself all the assumptions it would use, were also
false and misleading.  Specifically, as LEVIS well knew, External
Valuator #2's valuation of Doral's IOs was based, in substantial
part, on instructions and information from Doral, which rendered
false and misleading representations about the independence and
integrity of External Valuator #2's valuation work.

30.   Beginning in or about September 2003, External
Valuator #2 employees informed the Doral Senior Representative
that External Valuator #2 intended to revise its methodology to,
among other things, incorporate a "forward curve," which would
reflect the impact of anticipated future interest-rate increases

on the value of Doral's IOs.  Employees of External Valuator #2
explained that their proposed revised model would no longer
employ a "spot rate" methodology, and thus would no longer assume
that the pass-through rate would remain constant over time.  This
proposed change, had it been implemented in or about September
2003, would have resulted in a materially lower valuation of
Doral's IO portfolio, because at that time, the market expected
interest rates like the LIBOR to increase in the future.

      31.  In response to External Valuator #2's stated
intention to use the forward curve in evaluating Doral's IOs, the
Doral Senior Representative provided false information to
External Valuator #2 about certain characteristics of Doral's IO
portfolio.  As set forth below, MARIO S. LEVIS, a/k/a "Sammy
Levis," the defendant, repeated a similarly misleading
representation to External Valuator #2.  Through these
statements, LEVIS and the Senior Representative falsely informed
External Valuator #2 that a forward curve methodology was
unnecessary because Doral's IOs were immune to any fluctuations
in the LIBOR beyond a certain point.  Specifically:

                        a.    On or about September 22, 2003, the Doral
                             Senior Representative, who stated that he was
                             speaking on behalf of LEVIS, falsely
                             represented to External Valuator #2 employees
                             that Doral had in place "caps" on the pass-
                             through rate that, for 95 percent of its IOs,
                             would prevent the pass-through rate from
                             increasing above approximately 3.4 percent,
                             on average.

       b.     In or about September 2004, in connection with External Valuator #2's valuation analysis, LEVIS falsely claimed that the pass-through rate on 97 percent of Doral's floating-rate IO portfolio was capped at 3.375 percent.  LEVIS further represented that Doral's spread on the remaining 3 percent of its IOs was protected in a different way.

External Valuator #2 relied on these false representations in valuing Doral's IOs.  This had the effect of increasing the value of the IOs substantially beyond the value that External Valuator #2 would otherwise have calculated had its valuation been independent and not based on the false representations of LEVIS and the Doral Senior Representative.

      32.  In addition to misleading External Valuator #2 regarding the existence of "caps" on the pass-through rate for Doral's IOs, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, also sought to, and did, direct External Valuator #2 to materially alter certain additional key assumptions used by External Valuator #2 in its IO valuation analysis, rather than permit External Valuator #2 to determine all economic and portfolio assumptions for itself.  As a result, LEVIS further undermined the independence of External Valuator #2's analysis.  Typically, the assumptions and information that External Valuator #2 utilized, at LEVIS's request and direction, had the effect of increasing External Valuator #2's ultimate valuation.  LEVIS also falsely told External Valuator #2 that, among other things,

External Valuator #2's valuations were being used by Doral for Doral's internal purposes only, when, in truth and in fact, and as LEVIS well knew, Doral was using those valuations to justify Doral's publicly reported value of its IOs.  In its SEC filings for 2003 and 2004, however, Doral represented that External Valuator #2's valuation was based on a model "in which all economic and portfolio assumptions [were] determined by the preparer."

33.  During 2003 and 2004, External Valuator #2's purportedly independent valuations typically appraised Doral's IO portfolio at a higher dollar value than Doral's internal valuation model, which enabled Doral to record and report a value for its IOs that Doral itself determined, and to represent to the public that such a value was the lowest of the three valuation figures it had obtained.

34.  On or about March 15, 2005, in its Form 10-K for 2004, Doral disclosed publicly, for the first time, that it used a spot-rate methodology to value its IOs.  Doral also disclosed the magnitude of the potential impairments that future increases in LIBOR would have on the stated value of the IOs--without taking into account any mechanisms that Doral had in place to limit or counteract such impairments--under Doral's method: for example, an increase in LIBOR of 0.25 percent would impair the value of Doral's IOs by approximately $70 million, while a 2

percent increase in LIBOR would impair the value of Doral's IOs
by approximately $540 million.  Doral's closing stock price
plummeted after the filing of the Form 10-K, falling $16.79, or
43.8 percent, to $21.50 by the close of the market on March 18,
2005.

        35.  On or about March 16, 2005, upon reading Doral's
Annual Report on Form 10-K for 2004, and, specifically, that
portion referring to "external" IO valuations, External Valuator
#2 contacted MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant,
to confirm what External Valuator #2 understood from LEVIS's
prior statements to External Valuator #2: namely, that the
valuations External Valuator #2 had been providing to Doral were
being used for Doral's internal purposes only and, more
specifically, that External Valuator #2 was not one of the
"external" and "independent" valuators described in the Form
10-K.  On or about March 16, 2005, LEVIS responded to External
Valuator #2 that its IO valuation work was for internal purposes
only, and that External Valuator #2 was not one of the external
independent parties referenced in Doral's Form 10-K for 2004.  As
LEVIS well knew, that statement was false, because the reference
in the Form 10-K for 2004 to the "external" valuations prepared
by an "independent" party "consist[ing] of a cash flow valuation
model in which all economic and portfolio assumptions are
determined by the preparer" was in fact a reference to External

Valuator #2.

36.   In or about March 2005, in response to requests
from investors and analysts for the identities of the external
valuators, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant,
made false statements to explain why he could not do so--
specifically, LEVIS falsely represented that he could not share
the identities of the external valuators due to the existence of
confidentiality agreements.

### Recommendations to Change Doral's IO Valuation Methodology

37.   In addition to his participation in disseminating
information to the public through Doral's public SEC filings, at
various times relevant to this Indictment, MARIO S. LEVIS, a/k/a
"Sammy Levis," the defendant, provided information concerning
Doral's financial results and operating performance directly to
members of the investing public through various methods--
including by interstate telephone calls, e-mails, and in
face-to-face conversations--with analysts and investors in New
York, New York and elsewhere.   Members of the investing public,
including Doral's stockholders and market analysts, considered
and relied upon the information provided by LEVIS in these direct
communications in deciding whether to purchase, hold, or sell
Doral securities, or to make recommendations relating to such
decisions.

38.   From in or about the Fall 2004 to in or about

early 2005, in response to concerns raised by federal banking
regulators, Doral hired an independent financial consulting firm
(the "Consulting Firm") to review Doral's procedures for managing
interest rate risk.  During that engagement, the Consulting Firm
learned of Doral's internal IO valuation methodology and
concluded that, because Doral was using a spot-rate methodology
to value its IOs--and was therefore, in effect, assuming that the
pass-through rate would remain fixed in the future, even though
the market expected interest rates to rise--Doral's calculation
of the value of its IOs was overstated by in excess of
approximately $450 million.

      39.  Starting at least in or about 2003, interest
rates, and particularly LIBOR, began to rise.

      40.  On or about January 18, 2005, without publicly
disclosing the fact that Doral was utilizing a spot-rate
valuation methodology that assumed the LIBOR remained fixed,
Doral publicly announced a $97.5 million write-down of the value
of its IOs (the "Impairment") with respect to the company's
fourth quarter 2004 financial statements.  Doral's stock price
began to decline, decreasing the value of the stockholdings of
MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, and his
family and also negatively affecting Doral's other shareholders.

      41.  On or about February 8, 2005, Doral employees
reported directly to MARIO S. LEVIS, a/k/a "Sammy Levis," the

defendant, that, among other things, (a) Doral's IO portfolio was subject to substantial devaluation if the LIBOR were to rise further, and (b) it was too expensive to hedge the risk of such a devaluation.

42.   On or about February 23, 2005, the Consulting Firm recommended to the Asset and Liability Committee of Doral, of which MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, was a member, that: (a) Doral change its model for valuing its IO portfolio to a method incorporating the forward curve, in order to account for anticipated future changes in interest rates; and (b) such a change would decrease the value of Doral's IO portfolio by hundreds of millions of dollars.

43.   On or about March 21, 2005, the Consulting Firm made a similar report and recommendation to the Doral board of directors.

### Levis's Misrepresentations Regarding Caps

44.   Following Doral's January 2005 public announcement of the Impairment, several investors and analysts in the marketplace questioned Doral about the accuracy and reliability of the valuation of its IOs in its financial statements, and about the possibility of future impairments.

45.   From in or about January 2005 up to and including in or about April 2005, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, communicated regularly with market analysts and

investors.  In the course of those communications, LEVIS made false and misleading statements concerning the anticipated effect of rising interest rates on Doral's IO portfolio, and concerning certain core characteristics of the contracts underlying the IOs. Among other things, LEVIS falsely represented to analysts and investors that rising interest rates would not have a significant negative impact on the value of Doral's IO portfolio or cause further impairments to that value, because, among other things, the pass-through rates owed to the Secondary Buyers were capped at rates substantially below the interest rate owed by the mortgage borrowers.

46.  Instances in which MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, made material misrepresentations regarding the existence of caps include the following, among others:

a.   On or about February 1, 2005, LEVIS met with a representative of an investor in New York, New York, and falsely stated that the reported value of Doral's IO portfolio was protected by caps, which would substantially limit any future decrease in that reported value.

b.   On or about February 9, 2005, LEVIS sent an e-mail from Puerto Rico to an analyst in New York, New York, working for a potential investor.  In that e-mail, LEVIS falsely stated that "caps" "are embedded in the actual contract of the sale/purchase commitments . . . [,]" and he added that "All contracts (100%) have caps."

c.   On or about February 10, 2005, LEVIS sent an e-mail from Puerto Rico to an analyst in New York, New York, and falsely stated that "all

loans backing up our [IOs] have Caps embedded
in the sale/purchase agreements." LEVIS's e-
mail also falsely stated that the "Caps" were
"significantly below" the average interest
rate to be paid by the mortgage borrowers to
Doral, and that current interest rates were
approaching those caps. Among other things,
these statements were misleading in that they
suggested that any future increases in LIBOR
would not materially impair the value of
Doral's IOs.

d. On or about February 10, 2005, LEVIS sent an
e-mail from Puerto Rico to an analyst in
Louisiana. In the e-mail, LEVIS falsely
stated that "all loans sold have a cap"
"embedded in each contract and all of them
are significantly below" the average interest
rate to be paid by the mortgage borrowers to
Doral, so "Doral will always have a hefty and
positive spread." Levis also falsely stated
that current interest rates were "close to"
those caps, thus falsely suggesting that any
future increases in LIBOR would not
materially impair the value of Doral's IOs.

e. On or about February 15, 2005, LEVIS sent an
e-mail from Puerto Rico to an analyst in New
York, New York, in which LEVIS again falsely
claimed that there were caps on the pass-
through rates owed to the Secondary Buyers.
In the e-mail, LEVIS repeated that "[i]n all
events, these caps are significantly lower"
than the average interest rate to be paid by
the borrowers to Doral, "[s]o at all times,
Doral will enjoy a hefty positive spread,"
thus falsely suggesting that any future
increases in LIBOR would not materially
impair the value of Doral's IOs.

47.   MARIO S. LEVIS, a/k/a "SAMMY LEVIS," the

defendant, well knew that these representations were false and/or

misleading because, with only limited exceptions, Doral's

contracts with the Secondary Buyers did not contain "caps" on the

23

pass-through rate that would have protected the value of Doral's IOs in the manner that LEVIS suggested.

## Impact of the Devaluation of the IOs

48.   On or about April 19, 2005, Doral announced that it intended to change the methodology it used to value its IO portfolio to, among other things, incorporate the forward curve, which would reflect the fact that the pass-through rate was not capped in the way that MARIO S. LEVIS, a/k/a "SAMMY LEVIS," the defendant, had stated, and further announced that doing so would decrease the reported value of its IO portfolio by between $400 million and $600 million.  Between the time following that disclosure and Doral's high stock price of $49.45 in early January 2005, Doral stockholders suffered an aggregate market capitalization loss of approximately $3.59 billion.

49.   On or about August 22, 2005, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, was asked to and did resign from Doral.

## Statutory Allegation

50.   From in or about 2001, up to and including in or about April 2005, in the Southern District of New York and elsewhere, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national

24

securities exchanges, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon purchasers and sellers of Doral's securities, to wit, LEVIS made false and misleading representations to the investing public regarding safeguards that purportedly existed to confirm and preserve the reported value of Doral's IOs.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18, United States Code, Section 2.)

## COUNTS TWO THROUGH FIVE

### (Wire Fraud)

The Grand Jury further charges:

51.   The allegations contained in paragraphs 1 through 49 of this Indictment are repeated and realleged as if fully set forth herein.

52.   From in or about 2001, through and including in or about April 2005, in the Southern District of New York and

elsewhere, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme to defraud market analysts, investors, and potential investors in Doral securities, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce the following writings, signs, signals, pictures and sounds, for the purpose of executing such scheme and artifice, to wit, on or about the dates set forth below, in order to defraud market analysts, investors, and potential investors in Doral securities, LEVIS transmitted by interstate e-mail (as specified) false and misleading representations regarding safeguards that purportedly existed to confirm and preserve the reported value of Doral's IOs, as follows:

| Count | Wire Communication | Date | Sent From | Sent To |
|---|---|---|---|---|
| 2 | E-mail from LEVIS to an analyst | February 9, 2005 | Puerto Rico | New York, New York |
| 3 | E-mail from LEVIS to an analyst | February 10, 2005 | Puerto Rico | New York, New York |
| 4 | E-mail from LEVIS to an analyst | February 15, 2005 | Puerto Rico | New York, New York |
| 5 | Form 10-K for 2004 | March 15, 2005 | Puerto, Rico | Washington, District of Columbia |

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATION

53.   As the result of committing the securities fraud and wire fraud offenses, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Sections 1343 and 2, as alleged in Counts One through Five of this Indictment, MARIO S. LEVIS, a/k/a "Sammy Levis," the defendant, shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One through Five of this Indictment.

## Substitute Asset Provision

54.   If any of the above described forfeitable property, as a result of any act or omission of the defendant:

(1)   cannot be located upon the exercise of due diligence;

(2)   has been transferred or sold to, or deposited with, a third person;

(3)   has been placed beyond the jurisdiction of the Court;

(4)   has been substantially diminished in value; or

(5)   has been commingled with other property which cannot be subdivided without difficulty;

27

it is the intent of the United States, pursuant to 21 U.S.C. §

853(p), to seek forfeiture of any other property of said

defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981 and 1343, Title 28,
United States Code, Section 2461, Title 15, United States Code,
    Sections 78j(b) and 78ff, and Title 17, Code of
        Federal Regulations, Section 240.10b-5).


_____
Foreperson

_____
PREET BHARARA
United States Attorney

28

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v -

MARIO S. LEVIS,
      a/k/a "Sammy Levis,"

                    Defendant.

## INDICTMENT

S1 08 Cr. 181 (TPG)

(Title 15, United States Code, Sections
78j(b) & 78ff; Title 17, Code of
Federal Regulations, Section
240.10b-5; and Title 18, United
States Code, Sections 1343 and 2)

PREET BHARARA
United States Attorney.

A TRUE BILL

_____ Foreperson.

3/18/10  Filed Indictment          Fox
                                   U.S.J.