

**United States Attorney**
**Southern District of New York**

---

FOR IMMEDIATE RELEASE   CONTACT:   U.S. ATTORNEY'S OFFICE
MARCH 6, 2008                              YUSILL SCRIBNER,
                                                    REBEKAH CARMICHAEL
                                                    PUBLIC INFORMATION OFFICE
                                                    (212) 637-2600

                                                    FBI
                                                    JIM MARGOLIN
                                                    PUBLIC INFORMATION OFFICE
                                                    (212) 384-2720

## FORMER EXECUTIVE OF DORAL FINANCIAL CHARGED IN MASSIVE SECURITIES FRAUD SCHEME

     LEV L. DASSIN, the Acting United States Attorney for the Southern District of New York, and MARK J. MERSHON, the Special Agent-in-Charge of the Federal Bureau of Investigation, New York Division ("FBI"), announced today the indictment of MARIO S. LEVIS, a/k/a "Sammy Levis," on charges stemming from a scheme to defraud investors and potential investors in the stock of Puerto Rico-based Doral Financial Corporation ("Doral") that took place while he was the Treasurer and Senior Executive Vice President of Doral. The scheme, occurring between 2001 and 2005, involved the fraudulent manipulation of the publicly reported value of certain core assets of Doral in order artificially to inflate the market price of Doral's common stock. An aggregate decline in shareholder value of approximately $4 billion followed the unraveling of the scheme. LEVIS is expected to surrender and appear in Manhattan federal court later today. According to the Indictment filed today:

     Doral, with mortgage banking operations in Puerto Rico and New York City, was a leading residential mortgage lender in Puerto Rico. Between 2001 and 2005, LEVIS corrupted the process by which Doral determined the publicly reported value of certain non-cash assets carried on Doral's financial books -- so-called "interest-only strips" ("IOs"). Doral represented to the public, in its annual financial statements, that the aggregate value of its IOs was increasing substantially year after year: $158 million in 2000, $236.5 million in 2001, $359.2 million in 2002, $578.1 million in 2003, and $878.7 million by the end of 2004. Similarly, company earnings associated with those IOs were also

DEFENDANT'S EXHIBIT
Levis 103

reported to be steadily increasing over that time: $72.7 million in 2000, $141.4 million in 2001, $197.9 million in 2002, $281 million in 2003, and $509 million in 2004. By the beginning of 2005, Doral publicly announced a streak of 28 quarters of "record earnings" based in significant part on the stated value of its IOs.

During the same time, Doral's stock price steadily increased from approximately $10 per share in early 2000 to almost $50 at the end of 2004. Also during this time frame, LEVIS and other members of his family were substantial holders of Doral securities. As of March 1, 2005, LEVIS beneficially owned 2.6 million shares (approximately 2.4%) of Doral stock, and at the height of Doral's stock price appreciation, LEVIS's shares and options were worth approximately $130 million. Collectively, the LEVIS family beneficially owned a total of approximately 9.2 million shares (approximately 8.2%) of Doral stock, and at the height of Doral's stock price appreciation, the total of the LEVIS family's Doral stock holdings was worth more than approximately $450 million.

In its public filings with the Securities and Exchange Commission ("SEC"), Doral represented that the value of its IOs was based, in part, on two "outside" and "independent" expert valuations provided to Doral on a quarterly basis. LEVIS corrupted each of the "outside" valuations by taking steps to undermine their independence substantially or entirely. For example, at LEVIS's direction, one set of valuations, which LEVIS portrayed as being based on "dealer market quotes for similar instruments," was in fact fabricated. No market quotes were ever obtained from or supplied by any outside valuator, and the person LEVIS claimed was performing those valuations never did any valuation work. Instead, at LEVIS's instruction, beginning in late 2001 and continuing through early 2005, the purported valuator merely copied into his own handwriting certain valuations provided by LEVIS and then returned his handwritten version to LEVIS.

LEVIS also portrayed another set of valuations provided by a company (the "Outside Firm") as "external" and "independent," and based on a model "in which all economic and portfolio assumptions [were] determined by the preparer." However, LEVIS repeatedly lied to the Outside Firm conducting that valuation work about key characteristics of Doral's IOs -- including falsely claiming that "caps" were in place to prevent the value of the IOs from falling substantially -- and required the Outside Firm to adopt several assumptions, rather than permit the firm to determine the assumptions for itself. In order to

convince the Outside Firm to use the assumptions LEVIS provided to it, LEVIS told the Outside Firm that its valuations were being used by Doral for Doral's internal purposes only, when Doral actually was using those valuations to justify the publicly reported value of its IOs.  Typically, the assumptions imposed by LEVIS on the Outside Firm had the effect of increasing its ultimate valuation, thereby enabling Doral to report an inflated IO value.

Beginning in mid-January 2005, when Doral announced an approximate $97.5 million write-down of the stated value of its IOs attributed to rising interest rates, and LEVIS's scheme concerning the IO valuations began to unravel, the market price of Doral's common stock began to drop steadily from its high of almost $50 per share.  By the time LEVIS resigned from Doral in late August 2005, the price of Doral's shares had fallen to approximately $14.13 per share (more than 70%), and the company's shareholders had suffered an aggregate decline in shareholder value of approximately $4 billion.

LEVIS also materially misrepresented to the investing public, in direct communications with investors, investor representatives, and market analysts: (a) the financial condition and performance of Doral, and more specifically, the value of the IOs and the earnings associated therewith, (b) the valuation process relating to the IOs, and (c) certain specific characteristics of the IO portfolio of Doral.  Among other things, he falsely claimed that the stated value of the IO portfolio was protected by caps, and was further corroborated by external independent valuations.

LEVIS is charged with one count of securities fraud and three counts of wire fraud.  If convicted, he faces a maximum penalty of 20 years on the securities fraud count and 20 years on each of the wire fraud counts.  LEVIS also faces a maximum fine of the greatest of $5,000,000 or twice the gross gain or loss from the offense on the securities charge and a maximum fine of the greatest of $250,000 or twice the gross gain or loss on each of the wire fraud charges.

LEVIS, 44, lives in Puerto Rico.

This case was assigned to United States District Judge ROBERT P. PATTERSON, before whom LEVIS is expected to be arraigned today at 2:00 p.m.

In a related case, on February 27, 2008, JOSE LOPEZ pleaded guilty in Manhattan federal court before United States

District Judge THOMAS P. GRIESA to two counts of making false statements to an FBI agent. Specifically, LOPEZ admitted that he had lied when, in Fall 2005, he claimed to an FBI agent that he had performed actual independent valuation work in connection with Doral's IOs, when in fact LOPEZ did no such work.

LOPEZ, age 58, lives in Puerto Rico.

Mr. DASSIN praised the work of the FBI, and thanked SEC for its assistance, in the investigation of this matter. Mr. DASSIN added that the investigation is continuing.

The case is being prosecuted by the Securities and Commodities Fraud Task Force of the United States Attorney's Office. Assistant United States Attorneys DIANE GUJARATI and DAVID M. SIEGAL, and Special Assistant United States Attorney JASON ANTHONY, are in charge of the prosecution.

The charges contained in the Indictment are merely accusations, and the defendant is presumed innocent unless and until proven guilty.

08-56                              ###