

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 26, 2010

<u>BY HAND DELIVERY TO CHAMBERS</u>

The Honorable Thomas P. Griesa
United States District Judge
United States Courthouse, Chambers 1630
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Mario S. Levis*, No. 08 Cr. 181 (TPG)

    The Government respectfully submits this letter in response to the defendant's request for an adjournment of the March 22, 2010 trial date. For the reasons set forth below, the Government respectfully opposes that request.

    The defense has requested an indefinite adjournment of the trial date based on its receipt of additional materials from the Government in December of 2009. While the defense characterizes those documents as additional "discovery," the Government has explained to opposing counsel — and wants the record to reflect, as well — that we have not produced these materials based on any determination that they are subject to the discovery obligations set forth in Rule 16 or elsewhere.[1] Rather, the Government

---

    [1]    In sending the computer disks containing these materials to the defense, the Government inadvertently used a form cover letter indicating that the disks were being produced pursuant to Rule 16(a). We regret that oversight. Opposing counsel has quoted the cover letter in his January 7, 2010 letter to the Court requesting an adjournment of the trial date, even though in late December, we explained to defense counsel that the Government does not view this material as falling within the scope of Rule 16, and that it was not produced to satisfy the requirements of that rule or any other discovery obligation. We were therefore surprised to read, in defense counsel's letter to Your Honor, the representation that the prosecution has recognized its "obligation" to produce these documents. (Def. 1/7/10 Ltr. at 5). That is incorrect. It is not unusual, especially in



DEFENDANT'S
EXHIBIT
Levis 130

The Hon. Thomas P. Griesa
January 26, 2010
page 2

produced these disks because: (1) defense counsel asked us to do so, and we sought to accommodate them; (2) defense counsel represented that Assistant United States Attorneys who previously handled this case had agreed to turn the material over; and (3) we were not aware of any reason not to produce it. Significantly, however, the Court should not form the impression that the Government has determined that these documents will be offered as part of its case in chief at trial, or that they are material to the defense. Relatedly, and for the reasons explained below, the Government respectfully submits that the production of these materials approximately three months prior to trial does not require or warrant another adjournment.

### A.  Relevant Facts

In order to explain the Government's position that the materials contained on the computer disks are not sufficiently important to justify a further adjournment of the trial, it is necessary to provide some background regarding the fraudulent scheme alleged in the indictment, particularly because of the manner in which the defense has characterized that charge and the Government's anticipated proof at trial. The Government will then discuss the nature of the materials contained on the computer disks, and the limited significance of those materials for purposes of this case.

#### 1.  The Fraudulent Scheme

The defendant served as the Treasurer and Executive Vice President of Doral Financial Corporation ("Doral"), which (through its subsidiaries) was a large mortgage lender in Puerto Rico. After issuing mortgage loans, Doral then sold groups or "pools" of loans to other Puerto Rican financial institutions, including FirstBank, WESTERNBANK, Banco Santander, Banco Popular, and R&G Financial ("R&G"). The defendant is familiar with the terms of these transactions, because he personally negotiated many of the loan sales and personally executed virtually all of the agreements setting forth the terms of the sales during the time period that is relevant to this case.

Typically, under the terms of the loan-sale transactions that Doral, through the defendant, entered into during the relevant time period, banks that purchased the pools of loans were entitled to collect (1) all payments of the outstanding principal balance of the loans in the pool, and (2) a portion of the interest payments, called the "pass-through

---

a case of this nature, for the Government to produce records voluntarily, without regard to whether such production is required.

The Hon. Thomas P. Griesa
January 26, 2010
page 3

rate." Doral, in turn, retained (1) a fixed fee for continuing to service the mortgage loans (called a Mortgage Servicing Right or "MSR"), and (2) the right to collect the difference, or "spread," between the pass-through portion of the interest payments and the remainder of the interest that the borrowers paid.[2] This "spread" — Doral's share of the interest paid on the pooled loans that other banks had purchased — was an asset known as an interest only strip, or "IO."

Moreover, during the relevant time period, Doral often retained "floating rate" IOs under the terms of its loan-sale transactions; that is, the pass-through rate paid to the purchaser of the loans was based on an interest rate — specifically, the London Interbank Offered Rate, or "LIBOR," which fluctuated — plus a fixed specified percentage (typically about 1.5%). Accordingly, with respect to these floating-rate IOs, Doral's spread varied inversely with changes in interest rates: as LIBOR increased, the pass-through rate paid to the purchasers of the loans increased, and in an opposite and corresponding way, Doral's income from its IOs decreased.

As alleged in the indictment, Doral capitalized and recorded its anticipated future income from these IOs, which rapidly became a highly significant source of the company's income and revenue. Because Doral's actual income from the IOs depended on the spread between a fluctuating interest rate (that is, LIBOR) and the underlying average interest rate on the pooled loans, which did not change, Doral was required to incorporate an important assumption regarding future interest rates in valuing its portfolio of IOs. The method that Doral employed in that regard was to use an assumption that LIBOR would remain fixed at a certain level, called a "spot rate," that existed at a particular point in time during the financial quarter in which Doral was evaluating its IOs. This spot-rate method, of course, did not account for anticipated changes in interest rates that could have a substantial impact on Doral's IO income. In order to address that variable, Doral could have incorporated a "forward curve" — that is, a publicly available market forecast of future changes in interest rates — into the model it used for valuing its IOs; however, it did not do so until in or about April of 2005. At that time, as a result of events alleged in the indictment and following a precipitous decline of its stock price, Doral changed its IO valuation model to incorporate the forward curve.

---

[2]     The agreements setting forth these terms were not lengthy or complex, and typically consisted of ten pages or less. (See Ex. A (attached to this letter), providing for a sale of loans in the aggregate amount of $2 million to WESTERNBANK)).

The Hon. Thomas P. Griesa
January 26, 2010
page 4

The indictment alleges that the defendant committed securities fraud and wire fraud by making false and/or misleading statements regarding the process that Doral used to determine and report a value for its IOs, and regarding the extent to which the value of the IOs would be vulnerable to increases in interest rates. These false and misleading statements had the overall effect of conveying to investors that the reported value of Doral's IO portfolio was trustworthy, even if interest rates increased.

The indictment contains a more detailed description of the fraud, and of the misrepresentations that the defendant made to further the scheme. In general, however, those misrepresentations fall into two principal categories: (1) lies about "independent" valuations of its IOs that Doral purportedly obtained; and (2) lies about the existence of purported terms in Doral's loan-sale contracts with other banks that provided for "caps" on the pass-through rates owed to those banks, which ostensibly functioned to protect and preserve Doral's spread — that is, the portion of the interest payments that it retained as floating-rate IOs — in the event that interest rates increased.

With respect to the "independent" valuations, Doral — through, for example, the defendant's personal statements to investors and market analysts, and through public reports filed with the SEC — repeatedly stated, among other things, that in addition to determining the value of its IOs using its own internal model, it (1) obtained two external valuations from sources that were independent of each other and independent of Doral, and (2) then selected the lowest of the three alternative values for purposes of its own books and its public filings. The indictment alleges, however, that these external valuations, as the defendant well knew, were not independent and did not serve as a meaningful check on the reliability of Doral's internal model. In fact, one external valuation, which purported to be based on a method in which the valuator obtained "market quotes" for the IOs — meaning, prices that prospective buyers were willing to pay for similar assets in the marketplace — consisted of nothing more than the valuator copying down a series of figures that the defendant sent him, signing his name, and returning those figures to the defendant; in other words, this individual did no actual work to evaluate Doral's IOs, and his "valuation" was a complete fabrication. The other external valuation was performed by a group of investment bankers who, like Doral, used a model that incorporated several important assumptions regarding the characteristics and predicted performance of Doral's IOs. Although Doral and the defendant made representations to the market indicating that this valuation work was "independent" — and similarly, that all of the assumptions used in the valuation were those of the external valuators — such representations were false. In fact, as the defendant well knew, the investment bankers performing this valuation believed, based largely on the defendant's

The Hon. Thomas P. Griesa
January 26, 2010
page 5

assurances, that their work was being used only for Doral's internal purposes, because the defendant — and to a lesser extent, others at Doral — exercised considerable influence over the assumptions that the bankers employed in the valuation model. Doral also provided false information to these investment bankers that had the effect of influencing and distorting the results of the valuation.

With respect to the purported contractual "caps" on the pass-through rates owed to the purchasers of Doral's loan pools, the defendant made false representations (1) that such caps did, in fact, exist, and (2) that they functioned to protect Doral from adverse consequences of rising interest rates. Such misrepresentations were particularly important during the relevant time period, because interest rates were rising and were widely predicted to continue rising; in such an economic environment, Doral's income from its floating-rate IOs — which, again, represented a critical component of its profitability — could be drastically diminished, and even eliminated, because of the increasing pass-through rates owed to the banks that had purchased Doral's loans.[3]

---

[3] Defense counsel's January 7 letter to the Court contains surprising and potentially significant misstatements regarding this aspect of the fraudulent scheme alleged in the indictment. Specifically, in his letter, counsel incorrectly attributes to the Government the position that the defendant falsely suggested that Doral's loan-sale contracts contained caps that would protect Doral from a "negative cash flow" attributable to its IOs (Def. 1/7/10 Ltr. at 2); relatedly, defense counsel states that he has located "many documents that corroborate Mr. Levis' genuine belief that there was no risk that the future stream of interest income would result in a negative cash flow for Doral." (*Id.* at 3). The indictment does not allege, however, and the Government does not intend to prove, that the defendant made false statements regarding the existence of caps that prevented Doral's spread from diminishing to such an extent that it went past zero and into the negative, thus requiring Doral, in effect, not only to pass through all of the interest payments on the loans it had sold, but also to supplement those payments with its own funds. The Government is well aware that, in various instances, Doral was indeed protected from such a risk of "negative cash flow." The defendant, however, as the indictment plainly and consistently alleges, falsely stated that as a result of caps contained in its contracts, Doral was assured of a significant *positive* spread, and similarly, that additional increases in interest rates would not materially impair the value of its IOs. (*See* Indictment 08 Cr. 181, ¶¶ 51-56 (quoting, for example, an e-mail in which the defendant stated that as a result of caps embedded in Doral's contracts, "Doral will always have a hefty and positive spread")). Those representations were false. Accordingly, to whatever extent the defense is seeking more time to locate evidence of caps that protected Doral

The Hon. Thomas P. Griesa
January 26, 2010
page 6

In early 2005, the truth emerged that there were no caps that provided meaningful protection of Doral's spread and that there were no independent valuations corroborating its internal valuation. The company then adopted a forward-curve model and restated its prior earnings, devaluing its IOs by hundreds of million of dollars.

2.  **The Materials Produced To The Defense**

It is the Government's general understanding that beginning in 2005, the SEC conducted regulatory investigations of both FirstBank and R&G. This Office did not participate in the SEC's inquiries; moreover, we did not rely in any way on the results of the SEC's regulatory work in the investigation that led to the filing of charges against the defendant. Members of the prosecution team therefore have only limited knowledge of the SEC's activities relating to FirstBank and R&G.[4] We have been advised, however, that the regulatory investigation focused, at least in part, on the manner in which those banks accounted for the loans that they purchased from Doral. With respect to R&G (but not FirstBank), the SEC also focused, to some extent, on IOs that the bank retained from sales of its loans to other institutions.

To date, members of the prosecution team have not carefully reviewed the materials that FirstBank and R&G produced to the SEC in connection with its regulatory investigations. Given our assessment of the limited potential relevance and usefulness of those materials, such an undertaking has not been a priority. Our understanding, however, is that the documents include a large volume of the banks' internal records, as well as work papers from audits that the accounting firm PricewaterhouseCoopers ("PwC") performed for FirstBank and R&G. PwC also provided auditing services to Doral.

---

from a negative cash flow, they are attempting to disprove an allegation that the indictment does not contain and to establish a fact that, in the Government's view, is of no consequence and should not be used to mislead or confuse the jury.

[4] In an apparent effort to hold the prosecution team more accountable for the results of the SEC's regulatory work, defense counsel has pointed out that an SEC attorney is assigned to this case as a Special AUSA. Precisely because of that attorney's participation in the criminal investigation that led to this prosecution, however, he was walled off from the SEC's regulatory investigations focusing on Puerto Rican financial institutions.

After the SEC provided this Office with computer disks containing materials that the agency obtained from FirstBank and R&G, the Government alerted the defense that it was in possession of such records. For the reasons stated above, even though the Government had not made (and still has not made) any determination that the documents fall within the scope of Rule 16 or are subject to any other disclosure requirement, we agreed to produce them in response to a request from defense counsel. In order to accomplish that, the Government replicated the computer disks it had received from the SEC and forwarded those copies to defense counsel.

The Government initially believed that the FirstBank and R&G files were copied onto a set of computer disks containing other materials defense counsel had requested, which the Government produced on November 9, 2009, after waiting for defense counsel to agree to a protective order that the Government had proposed and that the Court ultimately issued. When defense counsel alerted us in November of 2009 that they were still seeking the FirstBank and R&G materials, the Government located, copied, and produced them, subject to another protective order, on December 21, 2009.

B. Discussion

In his January 7 letter, defense counsel requests an indefinite adjournment of the trial so that the defense team and its experts can review and analyze the FirstBank and R&G documents.[5] While defense counsel spends much of his letter criticizing the Government for not producing this material sooner, he provides little explanation or support for his view that the material is important in order to prepare for trial. The arguments that he does advance in that regard are unavailing.

In several paragraphs, starting on page two of his letter and continuing onto page three, defense counsel states that the documents are important to the defense for several reasons. First, he states: "In order to prove the accuracy of the internal and external valuations and the *bona fides* of the representations made by Mr. Levis, the defense intends to present to the jury the documents that memorialize the terms and the agreements between Doral and the counter parties, including First Bank and R&G." (Def. 1/7/10 Ltr. at 2-3). He then goes on to explain, in particular, his view that the terms of these agreements, just as the defendant told others, will include provisions that would prevent Doral's floating-rate IOs from generating a "negative cash flow." This argument

---

[5] The defense has provided no notice that it intends to call an expert witness as part of its case at trial.

The Hon. Thomas P. Griesa
January 26, 2010
page 8

fails for several reasons. First, as the Government has explained above, contractual provisions operating to ensure that Doral's IO income (or spread) would not be reduced to less than zero, resulting in a "negative cash flow," have no bearing on the scheme alleged in the indictment; to the contrary, the indictment alleges that the defendant furthered that scheme by making misrepresentations regarding the existence of caps that guaranteed Doral a substantial *positive* spread and protected the value of its IOs from exposure to higher interest rates. Defense counsel cannot make any good-faith representation that he could ever locate evidence of such caps — regardless of how much time he has to review records from FirstBank or R&G — because as the defendant well knows from having personally negotiated and executed the loan-sale agreements, the agreements contain no such terms. Second, Doral's own records include various copies of its loan-sale agreements with other banks, such as FirstBank and R&G, as well as numerous other records describing terms of those transactions. Such materials were among those provided to the defense in the initial phase of discovery, long ago. To whatever extent the FirstBank and R&G materials recently produced contain additional loan-sale agreements that are not duplicative of those already provided through discovery, the Government anticipates that the terms of such agreements will not differ materially, for purposes of this case, from those the defense originally received; in particular, such agreements will not contain "caps" resembling those that the defendant described in his alleged statements to investors and others.[6]

Second, defense counsel states that he will rely on PwC's audit work papers to show that the external auditors (at PwC) "approved the internal and external valuation [of Doral's IOs]." (*Id.* at 3). The Government has already produced numerous documents reflecting the work that PwC did in auditing Doral. We understand from counsel for PwC that it has agreed to produce additional documents, relating to its work in connection with Doral's 2005 restatement, in response to a trial subpoena that defense counsel served

---

[6] The Government recognizes that loan-sale agreements between Doral and other banks, and other documents reflecting the terms of such agreements, are relevant to this case and will be offered into evidence at trial. At this time, as stated above, the Government has not identified any documents on the disks produced last month that it intends to introduce as part of its case in chief. We will notify the defense in advance of trial, and will identify the specific documents that the Government intends to offer at trial, if those plans change.

The Hon. Thomas P. Griesa
January 26, 2010
page 9

several months ago.[7] The defense may well try to demonstrate at trial that PwC approved the manner in which Doral valued its IOs. Regardless of how successful they are in doing so — or how such an effort, even if successful, could provide Levis with a defense — defense counsel has not explained, and the Government cannot discern, how PwC's audits of R&G or FirstBank could be enlisted in this regard. From the Government's perspective, PwC's audit work papers relating to FistBank and R&G are irrelevant and should not be used for any purpose at trial.[8]

Finally, defense counsel claims that it intends to use these documents to confront witnesses from FirstBank, R&G, and PwC who might be called to testify at trial. Again, this is not a persuasive basis to seek an adjournment of the trial date. Based on (1) the volume of materials that have already been produced, (2) information based on the defendant's firsthand dealings with representatives of FirstBank, R&G, and PwC, (3) the pre-marked exhibits and witness list that the Government will produce well before trial, and (4) the 3500 material that it will also produce in advance of trial, the defense will be well-equipped to cross-examine witnesses called as part of the Government's case. Defense counsel has offered no reason to believe otherwise.

---

[7]   Defense counsel has served other trial subpoenas, as well, seeking various documents and testimony from potential witnesses. The Government is not aware of any subpoenas that the defense has served on FirstBank and R&G.

[8]   In our conversations with defense counsel, they have pointed out — while remaining careful not to disclose any theory they intend to advance at trial — that R&G used a spot rate to evaluate its IOs, and that PwC audited R&G. The Government submits that such facts are irrelevant. R&G is not a defendant in this case. Moreover, Mario Levis is not facing criminal charges merely because Doral used a spot rate, instead of a forward curve, to evaluate its IOs. Doral's use of a spot rate is a relevant fact, because of the issues it created for Doral and the manner in which the defendant responded to those issues in the course of committing the alleged fraud. If, however — regardless of whether Doral was using a spot rate or a forward curve to evaluate its IOs — the defendant had not made false and misleading statements to the investing public, in order to create a false sense of confidence that the reported value of Doral's IOs was reliable and not vulnerable to substantial impairment even if interest rates rose, he would not be charged with the crime alleged in the indictment. The defense should therefore not be permitted to distract the jury and misuse the Court's time by litigating the issue of whether other banks used a spot rate, or whether the use of that method, in and of itself, was valid. Those are not the issues in this case.

The Hon. Thomas P. Griesa
January 26, 2010
page 10

      In sum, the recently produced materials, while voluminous, are not relevant for the uses proffered by the defense, and adhering to the March 22 trial date will not undermine the defendant's opportunity to receive a fair trial. The Government therefore respectfully opposes the defendant's request for another adjournment of the trial date.

                                          Yours sincerely,

                                          PREET BHARARA
                                          United States Attorney
                                          Southern District of New York

By: _____
                   Daniel A. Braun
                   William J. Stellmach
                   Assistant United States Attorneys
                   (212)637-2215/2101

                   Jason M. Anthony
                   Special Assistant United States Attorney
                   (202)551-4420