0224LEVC.txt

1

0224LEVC
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  UNITED STATES OF AMERICA
3
4           v.                          08CR181(TPG)
4
5  MARIO LEVIS,
6           Defendant.
6
7  ------------------------------x
7
8                                   New York, NY
8                                   February 2, 2010
9                                   2:50 p.m.
9
10 Before:
10
11               HON. THOMAS P. GRIESA
11
12                                   District Judge
12
13                       APPEARANCES
13
14 PREET BHARARA
14      United States Attorney for the
15      Southern District of New York
15 DANIEL BRAUN
16 WILLIAM STELLMACH
16      Assistant United States Attorneys
17 JASON ANTHONY
17      Special Assistant United States Attorney
18
18 BLACK SREBNICK KORNSPAN & STUMPF
19      Attorneys for Defendant
19 ROY BLACK
20 HOWARD SREBNICK
20 MARIA NEYRA
21
22
23
24
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

2

0224LEVC
1           (Case called)
2           THE COURT:  Good afternoon.  Thank you for coming up
3  from Florida.  Let's start by letting the government say what
4  its case is.
5           MR. BRAUN:  Thank you, your Honor.  We appreciate the
6  opportunity to do so.  We covered some of this ground in our
7  phone conference last week and we will pick up essentially
8  where we left off.
9           THE COURT:  You'd better start, don't assume that I
10 retained, don't give me a test on it.
11          MR. BRAUN:  I will not, judge.  I note from what you
12 said during the phone conference that you had not read the
13 letter we submitted but we set this forth in the letter as well
                        Page 1

DEFENDANT'S
EXHIBIT
Levis 132
Blumberg No. 5114

0224LEVC.txt
14   but I won't assume that either.
15        THE COURT:  You tell me what the case is.
16        MR. BRAUN:  Sure, your Honor.  I think it would be
17   helpful if we use the charts here that we have and defense has
18   copy of this as well.  I am going to turn these around on the
19   easel.  I will hand up a smaller set.
20        THE COURT:  If the defense lawyers or anybody wants to
21   move around, please do so.
22        MR. BRAUN:  Your Honor, this is a securities fraud
23   case and the case relates to a particular asset that was held
24   by the financial institution in Puerto Rico that the defendant
25   worked at as an officer, as an executive officer of Doral
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

3

0224LEVC
1    Financial.  Doral Financial held on its books an asset called
2    an interest-only strip, and that's what is depicted on this
3    chart.
4         What Doral did, they were in the business of making
5    loans; they were the leading mortgage lender in Puerto Rico.
6    After making loans to borrowers, they would pool these loans in
7    large groups, your Honor.  These groups were $50 million, $100
8    million on up to $1 billion in a pool.  They would sell these
9    pools of loans to other financial institutions in Puerto Rico.
10        Under the terms of Doral's contracts with these other
11   financial institutions, which include the two at issue here,
12   First Bank and R&G, but there were others as well.  The banks
13   that bought these pools of loans were entitled to receive from
14   Doral, Doral would continue to service the loans, your Honor,
15   they would continue to interact with the borrowers, so they
16   would receive the payments on the loans from borrowers.
17        Doral would then pass along to the purchasers of these
18   loans, the other banks in Puerto Rico, all of the principal
19   that was owed on the loan, as well as a portion of the
20   interest.  That portion of the interest, your Honor, depicted
21   in the lighter green color on the first chart was called the
22   pass-through rate.
23        What Doral kept under the terms of these contracts,
24   your Honor, was the remaining portion of the interest and a
25   servicing fee of a quarter percent.  So they would get .25
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

4

0224LEVC
1    percent as a fee for continuing to service the loans and then
2    of the interest payments that came in, they would split those
3    with the purchasers of the loan pools.
4         THE COURT:  They would split what.
5         MR. BRAUN:  The interest, the interest part of the
6    payments made on these large pools of loans.  If you are a
7    borrower and you borrow 50 or $100,000 from Doral, all of your
8    principal payments on that loan go to the bank that has bought
9    the pool of loans from Doral.
10        The defendant personally negotiated these deals with
11   the other banks and he signed all of the contracts with the
12   other banks that set forth the terms of these deals, so he is
13   quite familiar with the terms of Doral's contracts and
14   transactions with these other banks that would buy the loans.
15        Let me repeat what the nature of these transactions
16   was.  If you are a borrower, you borrow $100,000, that $100,000
17   as it gets paid back, the principal portion, would go to the
18   purchaser of the loan pool, the other bank, not Doral.  That
                              Page 2

0224LEVC.txt

19   other bank, your Honor, would also get a piece of the interest
20   that the borrower paid back.  That was called the pass-through
21   rate.  Doral would retain its right to the remainder of the
22   interest payments that were made on those outstanding loans.
23         They would then determine how much that interest was
24   worth, over the projected term of the outstanding loans in the
25   pool and they would record that amount on their books as a

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

5

0224LEVC

1   profit, as a gain on the sale of the pool of loans that Doral
2   had originated and then sold to the counterparty banks, the
3   banks like First Bank, R&G, Western Bank down in Puerto Rico.
4   There were others as well who would buy these large pools of
5   loans from Doral Financial.
6         This was a very important asset for Doral.  It became
7   a very significant part of Doral's balance sheet.  It became a
8   very significant part of Doral's profitability and of its
9   reported revenue streams.
10        THE COURT:  The numbers on the left-hand side, what
11   are they.
12        MR. BRAUN:  These are just hypothetical numbers to
13   show the way in which these various interests might be divided
14   up.  So, in a hypothetical loan where the interest is up here
15   at the top, judge, the .25 in red would be the servicing fee
16   that Doral gets to keep between 3.5 and 9.  This 5.5 percent
17   would be Doral's retained spread, the portion of the interest
18   that Doral would get to keep.
19        The other numbers are just again hypothetical examples
20   to show you how these interests are broken down under the terms
21   of the deals that the defendant negotiated and signed; they are
22   not drawn from an actual example.
23        THE COURT:  3.5 percent of what.
24        MR. BRAUN:  Of the interest, of the interest that the
25   borrower would owe.  So if the borrower owed 7 or 8 percent

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

6

0224LEVC

1   interest on the loan, 3.5 of that in this example would be
2   passed through to the banks that purchased the loan, a
3   remaining 5.5 percent would be kept by Doral, retained by
4   Doral, and .25, the remaining .25 would be the servicing fee.
5         This is an example, your Honor, of an interest-only
6   strip.  This piece, the yellow, it was called an interest-only
7   strip.  That's the asset that this case revolves around.  In
8   this particular example as it indicates at the top of the
9   chart, this would be a fixed rate interest-only strip, because
10   the pass-through rate, as I am about to explain, was fixed in
11   this example at 3.5 percent.
12        Doral would typically enter into these deals, your
13   Honor, earlier on in time and that practice changed as we got
14   further away from 2000, closer in time.  So 2000, 2001, 2002,
15   Doral started to change the terms of these transactions with
16   the other banks in Puerto Rico in a way that's very meaningful
17   to our case.
18        So moving on from the fixed-rate IOS, where this 3.5
19   percent as an example is fixed, that's the amount of the
20   interest that the other bank is going to get going forward,
21   Doral started to enter into more and more of these loan sale
22   transactions that provided for a floating pass-through rate.
23        The share of the interest payments that the other bank

Page 3

0224LEVC.txt
24   was entitled to under these deals, your Honor, was not fixed at
25   3.5 percent or at any percent for that matter. Doral started

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

0224LEVC
1   entering into more and more transactions in which the banks
2   that purchased these large pools of loans were entitled to a
3   pass-through rate, a share of the interest that would be paid
4   on these loans that would vary with an interest rate called the
5   London interbank offered rate. It's an interest rate that you
6   and I can't get when we go to the bank to seek a loan; it's an
7   interest rate that banks can get from other financial
8   institutions or government-lending institutions.
9       So LIBOR, as the London interbank offered rate is
10   called, is set out there. It typically goes up and down with
11   the Fed rate and under the terms of these floating rate IO
12   transactions, Doral agreed that it would pass through to the
13   purchasers of the loan pools, a share of the interest that
14   varied with LIBOR. It would typically be, your Honor, it
15   varied contract to contract how much these other banks would
16   get, but it was usually in the neighborhood of LIBOR plus
17   roughly one-and-a-half percent. You see some deals at 1.2
18   percent, some at 1.4, some perhaps as high as 1.6, but all in
19   that range, you get the idea.
20       THE COURT: The smaller, those are passing through to
21   the banks less than the 3.5.
22       MR. BRAUN: Sorry to interrupt. It would entirely
23   depend on LIBOR.
24       THE COURT: Maybe it's not relevant, but was it
25   generally smaller than had been before or is that not relevant.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

0224LEVC
1       MR. BRAUN: In some of the deals there was a floor on
2   the pass-through rate that said the banks that purchased the
3   loan pools would always get X amount, perhaps 3.5 percent,
4   whatever it happened to be. In most of the contracts, this
5   pass-through rate could vary as interest rates went up and
6   down. These are just examples that are made up to illustrate
7   the nature of this instrument, of this asset. So if it's LIBOR
8   plus a point and a half, which is what the other banks get is
9   3.5, here is Doral's spread like it was in the last chart, 5.5.
10       Let's say interest rates go up, as happened in 2003
11   and 2004. Interest rates were very low, your Honor, in 2001,
12   particularly after September 11, 2001, and the way the economy
13   was struggling here and elsewhere, interest rates were kept low
14   for a period of time. Then they started to creep up and they
15   continued rising during the relevant time period in this case.
16       As interest rates come up, the pass-through rate, the
17   part of the interest payments that the other banks are going to
18   receive, also increases, and as LIBOR drops, if it does drop,
19   the pass-through rate decreases. Doral's spread, your Honor,
20   therefore has an inverse relationship with interest rates. As
21   interest rates rise, the portion of the interest payments they
22   have to give to the other banks also rises, and Doral's spread,
23   what they are allowed to retain, diminishes, it compresses; as
24   interest rates drop, Doral's spread increases, the pass-through
25   rate compresses, gets smaller.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

Page 4

0224LEVC.txt

0224LEVC

1      So that's why as you will hear, your Honor, sometimes
2  these instruments, they are not very common, but when they do
3  exist they are called inverse floating IOSs, because the value
4  of them varies inversely with interest rates.  And they can go
5  up and down with interest rates under the terms of the
6  transactions that Doral entered into with these other Puerto
7  Rican banks which were buying the pools of loans.
8      With that background in place, your Honor, here is our
9  case.  It is our case that the defendant deceived people in the
10 investing public to provide them with false assurances
11 regarding these interest-only strips that Doral had on its
12 books and that again were very important to the financial
13 condition and profitability of Doral during the relevant time
14 period.  These false representations regarding the IOS that the
15 defendant made to other banks fall into two categories.
16     One category of misrepresentations described in the
17 indictment relates to statements the defendant made telling
18 others that the pass-through rate, the share of the interest
19 that other banks were entitled to under the terms of these
20 floating rate contracts, was capped.  That's what this red line
21 on the third chart represents.
22     Just for context, this is important, this historical
23 context, in early 2005, Doral issued a public statement
24 informing the investing public that it was reducing the value,
25 reducing the reported value of its IOS portfolio, interest-only

0224LEVC

1  strip portfolio, which was at the time up in the 8 to $900
2  million range.
3      They said we are actually reducing that by $97 million
4  or thereabouts; it could have been $97.5 million.  That takes
5  place in January 2005 where they publicly state an impairment
6  by close to $100 million of the value of these IOSs on Doral's
7  books.  Needless to say, there were plenty of questions about
8  the IOSs from investors and market analysts prior to that time.
9  Needless to say, when you tell the world, you know what, they
10 are worth $100 million less than we said before, it raises
11 additional concerns and questions.
12     It was particularly in the aftermath of that, your
13 Honor, and in an economic environment in which interest rates
14 were rising and were predicted to continue rising that the
15 defendant assured a number of people --
16     THE COURT:  The first representation to the public was
17 what again.
18     MR. BRAUN:  The statement that they made to the public
19 in January 2005 is our collection of IOSs, our portfolio of
20 interest-only strips is worth over $97 million less than we had
21 said; we are going to impair the value, we are going to state
22 an impairment to the value of our interest-only strips.
23     THE COURT:  Does the government claim that was false.
24     MR. BRAUN:  No, but that fact is significant because
25 it's in that context, your Honor.  What we do claim is false is

0224LEVC

1  what the defendant said in response to people who were very
2  worried about the value and the stability of the value of the
3  IOSs, of the portfolio of IOSs that Doral held.
4      In that context, after they said it's worth $100

Page 5

0224LEVC.txt

5  million less, I am approximating, it was 97.5 to be precise,
6  what the defendant says to others, and he says this on email
7  and in personal meetings, is our contracts with these other
8  banks have caps on the pass-through rates.  The pass-through
9  rates that the purchasers of those loans pools are entitled to
10  obtain are capped at a certain point.  So those caps, we are
11  about to hit them he says to some people, so even if interest
12  rates continue to go up which they had been doing, our spread
13  is protected.
14        The pass-through rate can only hit the red line, in
15  other words, and he would sometimes quantify it and sometimes
16  he would simply say we are just at about that point, interest
17  rates have risen to the point we are about to hit the cap.
18  Some people he actually told them we are always going to have 2
19  to 3 percent; in some representations it's 3.3 percent.  The
20  numbers change depending on who he is talking to, your Honor.
21  But he says to a number of folks, the pass-through rate is
22  capped.
23        LIBOR goes up, it doesn't hurt us; you are not going
24  to see another one of these big impairments to the value of our
25  interest-only strip portfolio.  We are protected; there is a
           SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300
                                              12

0224LEVC

1  cap.  There is a cap in the contracts; all these contracts have
2  caps.  So when the pass-through rate hits the red line, that's
3  it.  The banks that purchased these loan pools can't do any
4  better; we can't do any worse.  That's one category of
5  misrepresentation that our case is based on.
6        THE COURT:  And the government is saying that there
7  was no such cap.
8        MR. BRAUN:  We are saying that to the extent there
9  were caps, and this is important given the argument the other
10  side is making, some contracts had caps, your Honor, some, not
11  all, some, and those caps are all the way up here.  They
12  prevent Doral's spread from being reduced past nothing.  They
13  allow Doral's spread to be reduced to zero.
14        THE COURT:  Say that again.
15        MR. BRAUN:  The red line here, when you look at the
16  contracts, when you look at the defendant's representations, he
17  is saying it's here, in substance.  When you look at the
18  contracts that have caps, they don't all, but when you look at
19  the ones that have the caps, your Honor, those caps are written
20  all the way at the top so that Doral's spread, the yellow here,
21  can be reduced to zero.
22        But in the event that interest rates rise so high that
23  the pass-through rate, which is LIBOR plus a point and a half,
24  let's say the borrower, your Honor, is borrowing at 8 percent
25  from Doral so that 8 percent is all there is, and let's say
           SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300
                                              13

0224LEVC

1  LIBOR gets to 7 percent so that the pass-through rate is 7 plus
2  1-1/2, 8-1/2, right, that's .5 percent higher than the interest
3  that the borrower is paying.
4        So what these caps do, your Honor, is they say Doral's
5  spread can't get any less than zero, it can go to zero, but
6  once LIBOR plus a point and a half gets higher, then the entire
7  interest payment that's being paid by the borrower, once it
8  gets higher than that 8 percent that the borrower is paying on
9  his mortgage loan, it can't get any higher than that.
                     Page 6

0224LEVC.txt

10      So even if a bank that purchases a pool of loans from
11 Doral might otherwise be entitled to 8-1/2 percent, because
12 that's LIBOR plus a point and a half, if there is only 8
13 percent coming in in total in interest on this loan, that's it.
14 That's the most that Doral is going to pass through to the
15 purchaser of the loan pool. That's a very different kind of
16 cap, your Honor, than the kind of cap the defendant was
17 describing.
18      THE COURT: That's the most that Doral is going to
19 pass through. I don't understand the significance of that; I
20 just don't get that.
21      MR. BRAUN: Absolutely. I am going to mark up this
22 chart a little bit. In a floating rate IOS, the pass-through
23 rate, which is the light green portion of the chart, the dark
24 green is principal, that's all going to the purchasers of the
25 loan pool, the terms of these deals say we are going to split

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

0224LEVC

1 the interest. Doral is going to keep some; the buyer of the
2 loan pool is going to get some. The buyer gets the green, the
3 lighter green here; Doral gets the yellow.
4      The defendant is telling folks that there are caps in
5 the contracts such that they are going to protect Doral's
6 spread, the yellow, the part Doral gets to keep from getting
7 smaller. And that would result in another downgrade of the
8 value of this asset like they already suffered, right. So he
9 is saying to everybody, we are not going to get hurt again like
10 that, it's not going to keep happening, it's not going to get
11 even worse than it is.
12      The caps that we see in the contracts, some of them,
13 have caps on the pass-through rate that say the pass-through
14 rate can't get any higher than all the way at the top. So all
15 of this yellow can go away; that's gone. Doral's interest-only
16 strip in that scenario once LIBOR plus a point and a half gets
17 higher, once interest rates plus a point and a half get all the
18 way up to here to 9 in this example, then the pass-through rate
19 paid to the purchasers of the loan pools is equal to all the
20 interest being paid on these loans.
21      All of the interest goes to the buyer of the pool.
22 Doral gets zero. Right. Its yellow piece on this graph is
23 gone. The caps that are in these contracts, some of them, say
24 that's as bad as it gets for Doral and as good as it gets for
25 the other party. In this example, it's at 9 percent. So, if

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

0224LEVC

1 LIBOR is at 7.5, and LIBOR plus a point and a half is 9, then,
2 that's it; everything gets passed through to the buyer, Doral
3 gets zero, and the cap says no more. Without that cap --
4      THE COURT: I don't quite understand the significance
5 of such a cap. In other words, if there was not such a cap
6 then would Doral owe even more interest than the borrower.
7      MR. BRAUN: That was what the cap addressed. Let's
8 say you are already up here at the top and interest rates keep
9 climbing, let's say they go to 8, so that if there were not
10 that cap in these kinds of contracts, the borrower would be
11 paying 8 percent, the person who takes out the mortgage loan,
12 but the pass-through rate would be 8-1/2.
13      THE COURT: A cap would prevent that, the kind of cap
14 that you say was in the contract would prevent that.

Page 7

0224LEVC.txt

15      MR. BRAUN:  Some of them.  Correct.  They prevent
16  Doral from having to reach into its own pocket to add even more
17  money to the interest payments that its receiving from
18  borrowers in these original loans that it has bundled and sold
19  to the other banks.  Right.
20      So in his letter seeking an adjournment, Mr. Black
21  says we have exculpatory evidence.  We have found in these
22  First Bank documents evidence of caps that prevented Doral from
23  suffering a negative cash flow.  Your Honor, our response to
24  that is of course some of these caps existed.  That's not only
25  evident from what they received recently; it has been evident

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              16

0224LEVC
1  from the original discovery materials provided in this case.
2      Those caps, what they found, which we knew about,
3  which they knew about, which the original discovery disclosed,
4  Doral's own documents inventoried these contracts, your Honor,
5  and described their terms, so it's not news to anybody that
6  there were caps all the way up here.  But the allegations in
7  the indictment, in this part of the indictment, are that caps
8  were being placed at a lower level that would actually answer
9  the concerns of the investors and market analysts that had
10  concerns.
11      THE COURT:  What you are saying is the cap that was
12  represented meant that Doral's spread wouldn't be eaten up.
13      MR. BRAUN:  That's right.  So the defendant said, for
14  example, we will come back to this allegation, the indictment
15  contains a paragraph that summarizes and quotes from an email
16  the defendant sent saying that the caps are about to kick in
17  and therefore Doral's spread, the yellow, will always be hefty
18  and positive; as a result of the caps in the contracts, we will
19  always maintain a hefty and positive spread.  Not our spread
20  can't get any worse than zero, it can go to zero, investor, but
21  it can't get any worse than that, it can't go negative.  That's
22  not what he said.
23      He said as a result of these caps, the yellow, Doral's
24  spread, will remain hefty and positive, not it can go to zero,
25  but it can't get any worse.  We know about those caps that say

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              17

0224LEVC
1  it can't get any worse than zero.  But that's not what he told
2  to the investing public.  He didn't say it can't get worse than
3  zero.  He said it's going to remain hefty and positive as a
4  result of these caps in our contracts.  They don't exist to our
5  knowledge nor do they exist as far as anybody else we talked to
6  knows nor do they exist according to the documents.
7      THE COURT:  Where is the allegation about that
8  representation.
9      MR. BRAUN:  The one I had in mind and I only used it
10  as an example because it's one that the defense discusses in
11  one of their letters to your Honor, it's in paragraph 55 of the
12  indictment.  There are other similar allegations but that's the
13  one I just tried to summarize for you.  It's page number 25.
14      THE COURT:  Paragraph 55.
15      MR. BRAUN:  That's the one I had in mind, your Honor.
16      THE COURT:  I see paragraph 55.  Go ahead.
17      MR. BRAUN:  There are some similar representations
18  described and quoted in the indictment.  That's the one I had
19  in mind when I was trying to explain what the nature of the
                            Page 8

0224LEVC.txt

20 case was and what this type of allegation is categorically,
21 right.
22          So, they are saying we have Brady, these new materials
23 we have just gotten, they are very important, they show that
24 there were caps in place that prevented Doral's spread from
25 going negative.  Our response to that is that's not what the
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    18

0224LEVC

1 indictment says.  That's not what this investor was asking
2 about.  It's not what Mr. Levis was telling him.
3          He is not saying there is a cap up here that protects
4 us from going negative.  He is saying there is a cap down here
5 that makes sure our spread, the yellow part of this, will
6 remain hefty and positive.  He makes similar misrepresentations
7 we allege to other folks.
8          That takes place on February 15, your Honor, 2005,
9 which is about a month after Doral tells the world and the
10 world becomes alarmed about it, you know what, the value of our
11 interest-only strips is almost $100 million less than we said
12 it was.  So the context for this is people are worried that
13 it's going to happen again.
14          And a cap up here, that's important, because a cap up
15 here doesn't prevent it from happening again.  A cap up here
16 let's this continue getting smaller and smaller and smaller
17 until it goes to zero which means another impairment is quite
18 possible especially if interest rates continue to go up.
19          THE COURT:  OK.
20          MR. BRAUN:  That's one category of misrepresentation.
21 We allege it's a material one for purposes of the securities
22 fraud alleged.  The other category of representation that we
23 say was false and material and that is related to this one and
24 had the same overall purpose and effect of providing false
25 assurances regarding the IOSs that Doral had on its books was
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    19

0224LEVC

1 they told people in the investing public through their public
2 filings, and defendant made these statements as well in his
3 dealings with investors.
4          Your Honor, Doral's main point of contact with
5 investors and potential investors and market analysts was the
6 defendant.  That was part of his job as the treasurer of Doral
7 and as one of their executive officials.  He was the guy that
8 dealt with investors and he was also the guy that dealt with
9 these counterparty banks that were purchasing loan pools.
10          The other category of lies is that they told the
11 investing public that in order to determine the value of its
12 collection of interest-only strips, its portfolio of
13 interest-only strips, Doral ran its own model.
14          THE COURT:  Ran it's own what.
15          MR. BRAUN:  Its own model internally, we have our own
16 method of doing this that we run internally.  Our own people
17 determine the projected income that we are going to get over
18 the outstanding terms of all these loans in the pools and we
19 are going to figure out as best we can how long these loans are
20 going to be out there, how much money is going to come to us
21 over the course of these loans from these sales transactions
22 that we have entered into.
23          We are going to figure out how much all of that is
24 going to be worth.  We are going to discount it to present
                           Page 9

0224LEVC.txt
```
25    value and we are going to put that on our books as our gain on
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
0224LEVC
 1    sale, our profit from the sale of these loans.  We do that
 2    internally.  We figure out a number for that.
 3                But we don't just rely upon our own number.  We also
 4    obtain independent valuations from two sources.  What we do is
 5    we compare our number that we determine in-house with the
 6    numbers we get from our independent valuations and we pick the
 7    lowest of the three, right, because we are being safe and
 8    conservative about this and we are going to pick the lowest of
 9    the three values.
10                One of these independent valuations is based on what
11    Doral describes as market quotes meaning whoever it's going to
12    for the valuation is figuring out as best he or she can what
13    similar assets are going for in the marketplace and what buyers
14    might be willing to pay for them.
15                If Doral was going to actually sell an interest-only
16    strip out in the marketplace, it's possible, what would they
17    get, what are prospective buyers saying they would pay for this
18    asset.  That's one source of independent valuation.  That's the
19    one that comes along first in time.  The indictment alleges,
20    your Honor, that that independent valuation, the one based on
21    the market quotes, was not a valuation at all.
22                The person who was providing Doral with that
23    independent valuation is somebody who was getting a series of
24    numbers from the defendant, copying them down in his own
25    handwriting on spreadsheets that the defendant provided him,
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
0224LEVC
 1    signing his name, and sending them back.  He wasn't calling a
 2    trading desk.  He wasn't calling anybody other than the
 3    defendant who we have alleged knew what he was doing because he
 4    was doing it on the defendant's instructions.
 5                No doubt that will be denied at trial.  No doubt we
 6    will hear something about this guy lying to the defendant as
 7    well.  The indictment alleges that the defendant knew well that
 8    the person providing the market quote independent valuation was
 9    doing nothing other than copying numbers he got from the
10    defendant on instructions from the defendant and sending them
11    back to Doral.  So that was a fabrication according to the
12    indictment.
13                The second independent valuation was also the
14    indictment alleges not independent.  It was one that the
15    defendant arranged for in his dealings with folks at an
16    investment banking group within another Puerto Rican bank,
17    Popular Securities which is part of Banco Popular.  There is a
18    group of investment bankers at Popular Securities which is a
19    small group within a larger financial institution.
20                The defendant is providing them with information about
21    all of these loan pools that he has sold to other banks and he
22    is telling the world it's up to them, they are independent,
23    they are going to decide what it's worth, we are going to
24    decide on our own what it's worth.  And again we are talking
25    the lowest of these three values.  One is Doral's in-house
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

0224LEVC

0224LEVC.txt
1  number.  The other the indictment alleges is simply a
2  fabrication.  Then we have this investment bank.
3           The investment bank, the indictment alleges, and I am
4  not going to get into particulars, I am trying to give you the
5  gist, it's not independent the indictment alleges because it is
6  taking directions and information from the defendant that
7  changes and controls its whole approach to the valuation.
8           To give you an example that's in the indictment, your
9  Honor, they decide in the fall of 2003, when Doral is doing
10 this in-house, your Honor, they have to figure out how much
11 this is all worth over the projected term of these outstanding
12 loans.  In order to do that, of course, in a floating rate IOS,
13 they have to make some assumption about what interest rates are
14 going to do because interest rates determine how much of the
15 interest they are going to keep and how much has to be passed
16 through to the purchaser of the pool.
17          Their assumption in-house is we are just going to
18 assume that interest rates are going to remain the same.  We
19 are going to look at interest rates where they are during this
20 quarter.  Let's say interest rates are wherever they are; they
21 are here or they are here.  Whatever that pass-through rate is
22 in the quarter, we are going to assume that stays where it is
23 over the projected lifespan of these loans.
24          There was another way to do it, your Honor, and the
25 investment bank providing the independent valuation to the
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                              23

1  defendant, to Doral, and he was the one dealing with them
2  primarily, they decided they wanted to use a different method.
3  They wanted to take into account something called a forward
4  curve which is a publicly available market prediction about
5  where interest rates are going to go.
6           So they are not going to assume any longer that
7  interests rates are going to stay where they are.  They are
8  going to go to a public source of financial forecasting
9  information, Bloomberg, and they are going to pull off
10 something called a forward curve, there is a number of them
11 they could use, and they are going to incorporate that into
12 their model.
13          First the defendant's father then the defendant said
14 that's not necessary because we've got caps, right, so, we've
15 got caps.  First they say they are at 3.4 percent then they say
16 they are 3.375 percent.  Anyway, your Honor, they say never
17 mind the forward curve, that's not going to matter, because
18 even though everybody is expecting interest rates to go up,
19 that's not going to hurt us.  You don't need to take that into
20 account in your valuation.
21          Because the people at Popular Securities don't think
22 they are independent, they actually just think they are doing
23 something that's helping Doral internally.  They think they are
24 the internal model.  They don't think they are the external
25 independent model.  They think they are just running numbers
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                              24

0224LEVC
1  for Doral.  They don't know they are supposed to be exercising
2  their independent judgment.  If they were exercising their
3  independent judgment, they would be doing something very
4  different than Doral was telling them to do and specifically
5  what the defendant was telling them to do.
                        Page 11

0224LEVC.txt

6      There were a number of other instances, your Honor, in
7   which we can show they were simply taking direction from the
8   defendant rather than providing a truly independent valuation
9   of the interest-only strips.  That's the second category of
10  misrepresentation alleged in the indictment.
11      1, the misrepresentations about the caps, 2, the
12  misrepresentations about the independent valuations, and they
13  overlap, your Honor because the defendant and his father tell
14  the second source of purportedly independent valuation that
15  they've got caps and they should assume that there is such a
16  cap in place in valuing this asset.
17      Your Honor, overall, these two kinds of
18  misrepresentation that the government is alleging are similar
19  in that they provide an overall sense of assurance to the
20  investing public that they can count on Doral with respect to
21  its valuation of interest-only strips and they don't need to be
22  worried about the erosion of that value in a time period in
23  which interest rates were rising after January 05 in a time
24  period in which Doral had already stated that the overall value
25  of this asset was worth a good deal less than they had been
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              25

0224LEVC
1   saying in the recent past.  So that is the basic nature of the
2   government's case.
3       What I want to make sure the court understands, and
4   it's important for purposes of trial and it's important for
5   purposes of the defendant's request to adjourn the trial, is
6   what the government's case is not about.  What Mr. Black said
7   on the phone last week, and you see this to some extent in his
8   letters as well, is that their defense is that Doral was
9   valuing this asset in a reasonable manner.  So apparently he
10  wants to consult with his experts and perhaps call them,
11  although we have received no experts notice, and have people
12  testify that what Doral was doing internally was OK and that
13  the assumptions it was using were defensible and the number it
14  was putting on this asset, whether it was 700, 800, $900
15  million, we can defend that number.
16      Your Honor, that's beside the point from the
17  government's perspective.  The government's case is about the
18  defendant deceiving people about the caps and the independent
19  valuations.  This is not a kind of traditional accounting fraud
20  case which is perhaps what the defense has in mind in which the
21  government is alleging that a corporation has simply cooked its
22  books and is telling the world we have something that it
23  actually doesn't have or we have something worth X when
24  actually that thing is worth half of X.
25      That's not this case; it doesn't fit into that model.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              26

0224LEVC
1       THE COURT:  What happened to these interest-only
2   strips.
3       MR. BRAUN:  In 2005, after the events alleged in the
4   indictment, the indictment does explain this well, in the
5   spring of 2005, after Doral has some people in because the
6   Federal Reserve has concerns about what's going on at Doral,
7   Doral hired these consultants in the fall of 2004.  Over the
8   course of time from 2004 into the spring of 2005, more and more
9   information comes to light inside Doral about how it's been
10  evaluating these IOSs.
                        Page 12

0224LEVC.txt

11      Doral itself with its accountants and with these
12 consultants, decides in the spring of 05 that the IOSs, we're
13 going to change our method for determining their value and we
14 are going to say that they are worth hundreds of millions of
15 dollars less than we had been saying before.  Before we said
16 they were worth 8, $900 million.  Now we are going to say they
17 are worth maybe 3, $400 million.  I don't have the exact
18 numbers handy, but they are taking hundreds of millions of
19 dollars off the declared value of this asset.
20      Again, this is important from the government's
21 perspective, the fight that we have here, the case that we
22 intend to try is not, ladies and gentlemen of the jury, they
23 said this asset was worth 9, it was only worth 3.  I was
24 answering your Honor's question about what happened; that's
25 what happened.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

0224LEVC

1      Over the course of time in 2005, starting in January
2 then continuing through March and April, the defendant was
3 making various statements to the investing public that didn't
4 make sense to the people and the value of the stock was just
5 declining, declining, and declining.  Then finally in the
6 spring, the April-May time period, is when they come around to
7 changing definitively their method for doing this.  That's when
8 they knock hundreds of millions of dollars off the value of
9 this asset.
10      Again, we are not going to say to this jury, ladies
11 and gentlemen, in truth, this asset was worth 3 and they told
12 everybody it was worth 12.  It's not that kind of case.  What
13 we are going to say to the jury is they lied to everybody about
14 protections that they had in place.  They lied to everybody to
15 give them a false sense of security that they can count on what
16 Doral was doing; we had independent valuations checking us,
17 right, we had caps in place that protected us from further
18 erosion of our spread.  That's what we are going to tell the
19 jury.
20      We are not going to tell the jury the defendant lied
21 by saying that this asset, again this is all a prediction of
22 what the thing is worth, your Honor.  They have to look in the
23 future and make a bunch of assumptions and predictions about
24 what's going to happen.  So it's a difficult asset to put a
25 number on.  We all recognize that.  It's in part for that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

28

0224LEVC

1 reason that we can't say definitively this thing is actually
2 worth 3 and the defendant told everybody it's worth 10 even
3 though ultimately that's what Doral decided to do.
4      The defendant no doubt would like to say Doral didn't
5 have to do that; they did that because they were pressured to
6 do it, they felt they had no choice, and actually it was
7 reasonable and defensible for them to tell the world it was
8 worth what they were saying previously.  That's not the case we
9 are going to try.  We don't think that's the case alleged in
10 the indictment.
11      That's another reason why we fail to understand the
12 defendant's argument as to why these documents they just
13 received are so critical.  This comes up specifically with
14 respect to R&G documents.  I will come back to the First Bank
15 documents in a moment.  What they say about R&G, one of the

Page 13

0224LEVC.txt
16   banks that purchased their loans, later than Doral and to a
17   somewhat more limited extent, R&G started doing what Doral was
18   doing.  They started generating interest-only strips and
19   selling their own mortgage loans.
20         The defense says in the context of their adjournment
21   request, these R&G documents are highly significant because
22   they show R&G was using an assumption to put a number on its
23   interest-only strips that was similar to the method that Doral
24   was using in a way.  One of the critical assumptions that R&G
25   was using was the same one that Doral was using which shows
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    29

0224LEVC
1    that in their view that what Doral was doing internally was
2    justifiable.  They are not the only ones doing it; there is
3    another bank doing it.
4          Again, we are not he here to quarrel about whether or
5    not what Doral was doing internally was unprecedented.  We
6    could try a bunch of collateral issues as to what other banks
7    were doing with their assets.  Perhaps R&G was doing it similar
8    to the way Doral was doing it.  Perhaps the government can go
9    find 20 banks that were doing it differently.  We can get a
10   bunch of accountants and a bunch of experts in here and they
11   can all dispute what the best way is.
12         That's not the case we are going to try.
13         THE COURT:  I had better hear from the other side.
14         MR. BRAUN:  Time permitting, your Honor, I would like
15   to explain the government's view as to why the documents that
16   we produced to them recently are not as important as they say
17   they are.
18         THE COURT:  You have indicated that.
19         MR. BRAUN:  Thank you for the opportunity, judge; we
20   do appreciates your time, your attention.
21         MR. BLACK:  May it please the court, I must admit we
22   do have a fundamentally different view of this case and the
23   indictment than the government does.  Just to give a little
24   preface to the court, Mr. Levis was the treasurer of Doral
25   Financial Corporation, located in San Juan, Puerto Rico.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    30

0224LEVC
1          Doral was the number 2 bank in Puerto Rico at the
2    time.  They sold mortgages; they put them together in pools and
3    they sold them mainly to First Bank, which is one set of
4    discovery documents we are talking about, and they sold similar
5    kinds of instruments that R&G Financial sold and that's why we
6    are interested in those documents.
7          As the government said, I am not going to quarrel with
8    their definition of the IOS, but to tell the court, over four
9    years they sold 166 pools of these loans.  What would happen is
10   there would be an original document saying we will sell you X
11   number of loans then over a substantial period of time they
12   would fund that pool and they would have separate documents for
13   all of that.  To advise the court there are caps; there are
14   caps all over the place at different amounts.
15         But what happened with these pools, because they are
16   pools, everything is averaged.  It's not like you have to worry
17   about one cap being at 9, one at being 6, one being at 3.  All
18   the pools were averaged so they would have weighted averages of
19   everything dealing with maturities, dealing with interest
20   rates.  There are all kinds of weighted averages.  That's what
                              Page 14

0224LEVC.txt
21  makes this very complicated, because we have 166 of these
22  pools, things were treated as weighted averages, and there is a
23  huge amount of figures involved in working this out.
24          The government told the court on the phone last week
25  and they tell the court today, they are not accusing Mr. Levis
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    31
0224LEVC
1   of making a fraudulent statement about the worth of this asset.
2   When Doral would sell its pool of mortgages, it would sell it,
3   let's take First Bank, let's say it sold $100 million worth of
4   these mortgages to First Bank, First Bank would give Doral $100
5   million.  So it would be sold at par.  Nobody makes a dime yet.
6          The agreement then is the principal and part of the
7   interest goes to First Bank and the other part of the interest
8   goes to Doral.  Doral's obligation was to put that asset on its
9   books and value it at some amount.  What we are first of all
10  saying is that the government today says that value they put on
11  the books, we are not going to argue is fraudulent; we are
12  going to argue that Mr. Levis lied about caps and while
13  interest rates would affect the assets, but there is no fraud
14  with the original valuation on the sale of these mortgages.
15         We believe that the indictment says otherwise.  I am
16  going to hand up to the court what we have marked as Exhibit 1.
17  This exhibit has first of all the statements of Mr. Braun that
18  he made on the phone which we don't really have to go into
19  because he made the same statements today.  But the second page
20  is paragraph 60 of the indictment in which it accuses the
21  defendant of overstating by approximately $500 million the
22  worth of these IOSs and that he overstated the net income of
23  Doral in excess of $600 million.
24         Far from not charging this in the indictment, that is
25  the main charge in the indictment.  In the indictment in
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    32
0224LEVC
1   paragraph 9, it accuses Mr. Levis of materially inflating the
2   value of its IOSs and the earnings associated with it.  That
3   was page 3.  On page 4, paragraph 42 of the indictment, it says
4   at the bottom of the paragraph --
5          THE COURT:  What was it, paragraph 9.
6          MR. BLACK:  Paragraph 9 is the one in the last
7   sentence it says the value of the IO and the earnings
8   associated with it were materially inflated.  That is the
9   original value put on the books by the internal method used by
10  Doral that the government now says is not fraudulent.
11         In paragraph 42 of the indictment, the grand jury
12  charged and the last four lines --
13         THE COURT:  I am still at paragraph 9; paragraph 9 is
14  a long paragraph.
15         MR. BLACK:  That's why I retyped it.  It says they
16  materially inflated the value of its IOS.  That is what the
17  grand jury alleges on paragraph 9.
18         THE COURT:  But it says, you excerpt, these outside
19  valuations were used and so forth.  That's what Mr. Braun was
20  talking about, the outside valuations.
21         MR. BLACK:  What Mr. Braun has done is saying we are
22  only charging the outside valuations, but the indictment does
23  not say that.  It says that the outside valuations were used to
24  cover up the fact that the internal valuation was materially
25  inflated, and as paragraph 60 said, it's inflated by an amount
                           Page 15

0224LEVC.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

33

0224LEVC
1  of $500 million.
2          THE COURT:  Just a minute.
3          (Pause)
4          MR. BLACK:  Back to paragraph 60, the second page of
5  our exhibit, that is where it says the asset was overstated by
6  approximately $500 million.  In paragraph 42 of the indictment
7  which is attached there, it says at the bottom, the last four
8  lines, because Doral was using a fixed rate assumption rather
9  than the forward curve to value its IO portfolio, the value at
10 which Doral was carrying its IO portfolio on its books was
11 overstated by an excess of $450 million.
12         So clearly the indictment alleges over and over again,
13 and there is a couple more I attached, I think it's to the same
14 amount, it keeps saying that the original asset was materially
15 inflated.  To show the court how the government has changed its
16 theory of the case --
17         THE COURT:  Can I just say this.  What I am looking at
18 is a very, very lengthy indictment, full a lot of material.
19 The indictment will never go to the jury.  And it has happened
20 before and it will happen again that the government does not
21 seek to prove everything in the indictment and the government
22 does not have to.
23         If we were at the trial and the government were past
24 the opening statement, if the government were putting on its
25 case, and the government put on a case based on part of the
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

34

0224LEVC
1  indictment and if that case included the elements of a
2  violation of the relevant antifraud securities statute, that
3  would be a sufficient case to go to the jury.  If it came time
4  for the defense to put on a case, I don't think any judge would
5  allow the defense to start talking about things that were not
6  in the government's case simply because they happened to be in
7  the indictment.
8          This is a huge piece of writing, this indictment.  So
9  maybe what we are really coming to grips with is what is the
10 government's case going to be.  It seems to me obviously they
11 can't go beyond the indictment.  There are a lot of things they
12 cannot do because the indictment is controlling.  But it seems
13 me, I could be wrong, but it seems to me that so long as they
14 put on a case in which certain allegations of the indictment
15 are proven, if that case proves a crime, they have a case, do
16 they not.
17         MR. BLACK:  Yes, your Honor, but in this particular --
18         THE COURT:  The answer is yes.  Isn't that where we
19 are coming out here.  The government has stood up in court and
20 said what its case is.
21         Mr. Braun, is this your case, what you told me.
22         MR. BRAUN:  It is, your Honor.
23         THE COURT:  Now it seems to me Mr. Black is pointing
24 out things in the indictment that go beyond what you have said
25 this afternoon.  What about those things.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

35

0224LEVC
1          MR. BRAUN:  Thank you, judge.  In one or two
Page 16

0224LEVC.txt

2   instances, he has pointed out one or two things in a lengthy
3   charging instrument that suggest something beyond what I said,
4   particularly paragraph 60.  Before we walked in here today, I
5   went through the indictment and found everything I could that
6   could conceivably characterize our case in the way that the
7   defense has.  We have told them in the past that's not our case
8   and these conversations again have led me to go through this
9   document and find everything I could that could be taken out of
10  context to say this is the government's case.
11          THE COURT:  Mr. Black is not taking anything out of
12  context.  He has a right to come in and refer to the
13  indictment.  It's the government's indictment; this is the
14  animal that you produced.
15          MR. BRAUN:  Indeed he does, your Honor.  When he talks
16  about paragraph 42 and he says the government is alleging there
17  was an overvaluation of the asset, but if you read the whole
18  paragraph it says not that there was, it says a consulting firm
19  came in in 04 and they decided that it was.
20          The allegation in 60, which is the one that is the one
21  that troubles the government the most, I will be candid about
22  that, your Honor that's the one that out of everything in the
23  indictment, that's the one that allows them to grab on to this
24  and say the government has changed its theory which my
25  predecessors have assured me we have not done.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                              36

0224LEVC
1           It's just drafted a bit imprecisely, I will
2   acknowledge that, and we are thinking very seriously of going
3   back to the grand jury precisely to get rid of that allegation.
4   It's under a heading that says Doral denounces the devaluation
5   of the IOSs.  Really what the government should have said there
6   if it said anything along those lines, I think we said too much
7   here, was this is what Doral decided, your Honor.
8           The government in this part of the indictment is
9   telling the story of what happened and what Doral decided to do
10  in the spring of 05 as alleged here is to devalue the IOS
11  portfolio by this margin.  That is what Doral did.
12          THE COURT:  Look here.
13          MR. BRAUN:  That's not our case.
14          THE COURT:  I have an appointment uptown to judge a
15  moot court.  What I want to say is this.  I have not read the
16  indictment, but I begin to see that it is a very lengthy
17  document; it is overly lengthy.  I don't know what the rules
18  are about indictments, but the rules about complaints in civil
19  actions, there is a rule, short and plain statements.  Nobody
20  even bothers with it.  You get a complaint in a civil action to
21  read like Encyclopedia Britannica.  They are enormous things.
22  People have given up trying to enforce that pleading rule.
23          I don't know what the pleading rules are for
24  indictments I, have no idea, but I think this is an overly big
25  animal.  I used that word twice.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                              37

0224LEVC
1           But you can hardly blame Mr. Black and his colleagues
2   for taking the indictment seriously and thinking that the
3   government meant what it said when it procured this indictment
4   and you may have caused Mr. Levis to incur some extra legal
5   expense in having lawyers answer the allegations you never
6   really meant to prove, which is unfortunate.
                            Page 17

0224LEVC.txt

7    But we are at the stage where it seems to me the
8  government has a right, obviously within certain rules of law,
9  to define the government's case and that's the case that will
10  be tried.  Under no circumstances am I go going to make the
11  time of trial something that is unfair to the defense.  If the
12  defense needs more time, the defense will get it.  But right
13  now, I think as far as the issues we are trying to address
14  today, I think the scales are tipping in favor of the
15  government, simply because it's the government's case, and the
16  defense does not have any reason to defend another case.
17        But there has to be a definition of the government's
18  case, and I don't know enough to say whether you have to go
19  back to the grand jury, but it seems to me that in some form,
20  that you have to make the record very, very clear as to the
21  limitations that the government is establishing as to what it
22  will prove in its case.  Then it's a matter of seeing whether
23  that constitutes a case.
24        Our present trial date is what.
25     MR. BRAUN:  March 22, we are scheduled to start
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                                    38

0224LEVC
picking a jury.
1  
2        THE COURT:  I don't know the history of all the
3  communications between the government lawyers and the defense
4  lawyers, I don't know that, but it seems to me that right now,
5  unless there is something that I really don't appreciate and
6  know about, it seems to me that the indictment has been too
7  expansive and maybe has led to some uncertainty on the part of
8  the defense as to what the government's case really is.  Maybe
9  it was all made clear long ago; I don't really know.
10        What I would like to do and I will say this.  If I
11  believe that as of this day, the scope of the government's case
12  was not clear, I will grant an adjournment simply for that
13  reason.  If I am apprised very quickly that the scope of the
14  government's case was made clear at an earlier stage, I will
15  hesitate to prolong the time before trial.
16        I can't really have any more of this hearing tonight
17  or this afternoon.  But the government has got to give me some
18  kind of letter and I mean by the end of the day tomorrow what
19  is your position as to when, if it was some time before today,
20  you may made clear the scope of the government's case.  The
21  other side can respond right away too.  Then I will of course
22  by the end of the week decide whether we are going to adjourn
23  the trial because everybody has to know.
24        That's all we can do this afternoon.  Thank you.
25                        -   -   -

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                       Page 18