

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 22, 2010

**BY HAND DELIVERY**

Honorable Thomas P. Griesa
United States District Judge
United States Courthouse, Chambers 1630
500 Pearl Street
New York, New York 10007

   Re: <u>United States v. Mario S. Levis</u>, 08 Cr. 181 (TPG)

Dear Judge Griesa:

   The defendant in this case, Mario "Sammy" Levis, has submitted a flurry of last-minute pre-trial motions. Those motions include, among others, (1) a request to dismiss the indictment on speedy trial and due process grounds, and (2) a request to exclude (a) documents relating to FirstBank, which is one of the financial institutions that purchased groups of mortgage loans from Doral Financial Corportation ("Doral"), and (b) evidence relating to Doral's use of a "spot rate" to determine the value of its interest-only strips ("IOs"). Because the defendant's motion to dismiss and his motion to exclude the FirstBank documents raise related issues, the Government addresses both of them in this letter. We also address the "spot rate" issue, because the defense raised it in the same motion that contains its argument regarding the FirstBank documents. The defendant's motions to dismiss the indictment and to exclude evidence are without merit and should be denied for the reasons set forth below.

   Before turning to the particular claims that the defendant has advanced, the Government notes that the defense has now resorted to baseless attacks on the integrity and good-faith of the Government attorneys who have handled this case. Those attacks are regrettable and unfounded.

**A. Factual Background**

   As Your Honor will recall, the defense has consistently requested adjournments of the trial in this case from the early stages of litigation. The original



DEFENDANT'S
EXHIBIT
*Levis* 133
Blumberg No. 5114

March 2, 2009 trial date was adjourned at the defense's request until September 14, 2009, and then again at their request until March 22, 2010. Most recently, in January, the defense requested an indefinite adjournment based on its receipt of additional materials from the Government in December 2009. The defense then attempted to obtain an adjournment by arguing that the Government had altered its theory of the case, which therefore required additional time to prepare a defense. Your Honor recently denied that request.

In a presumably final gambit to delay or avoid trial, the defense now moves to dismiss the indictment on speedy trial grounds. Specifically, defense counsel argues that the current prosecution team engaged in a deceptive plot to goad the defense into seeking an adjournment of the September 2009 trial date, so that the Government would have more time to prepare. As explained below, that claim is flatly belied by the facts and should be swiftly denied.

1.     **Defense Counsel's Repeated Requests for Adjournments Prior To May Of 2009**

From the outset, the defense has consistently sought to adjourn and delay the trial. Following the return of the Indictment on March 4, 2008, the defense sought and received an adjournment before entering a plea. (3/6/08 Tr. at 2-3). Several weeks later, at the first appearance before Your Honor, defense counsel advised Your Honor that it would be seeking a trial date sometime in 2009. (3/31/08 Tr. at 3). At the next appearance before Your Honor, in May of 2008, the Government proposed a trial date in early 2009. Defense counsel opposed that request, explaining that it had not had an adequate opportunity to review and assess the voluminous discovery that the Government had produced. (5/19/08 Tr. at 4).

The parties appeared before Your Honor to argue the defendant's change of venue motion several months later, in October of 2008. At that time, when the Court raised the issue of setting a trial date, the Government proposed a date in the spring of 2009, to accommodate defense counsel's request for additional time to review discovery. (10/7/08 Tr. at 44). The defense opposed that request, stating that it "would need a lot more time" in order to prepare. (*Id.* at 45). Your Honor set a trial date of March 2, 2009. (*Id.* at 46). Defense counsel objected to that date, and requested instead a trial date of no sooner than October of 2009. (*Id.* at 51). Your Honor noted, in response, that while the Court was not determined to begin trial on March 2, an adjournment until the following fall was simply too long. (*Id.*). at 52. The March 2, 2009 trial date was then adjourned at defense counsel's request until September 14, 2009, based on the defense claim that it would otherwise be unable to prepare for trial "in a constitutionally effective manner."

2

(Docket Entry 50).  The Court set a new trial date of September 14, 2009, and indicated that the date was intended to be "firm." (*Id.*).  Throughout these stages of the case, time was properly excluded under the Speedy Trial Act.

## 2.    The Adjournment Of The September 2009 Trial Date

In the spring of 2009, in large part because of staffing problems that arose because of the adjournment of the trial date, the current prosecution team—consisting initially of AUSA Stellmach, and then AUSA Braun—was assigned to the case and proceeded to identify steps necessary to prepare for the September 14, 2009 trial, then still several months away.  Special AUSA Jason Anthony, from the SEC's Division of Enforcement, continued to represent the Government, as well.

In familiarizing ourselves with the case, we learned that several computer disks containing documents obtained by regulators at the Federal Reserve Bank had not been produced to the defense.  We also learned that the defense was seeking materials obtained during regulatory investigations focusing on two banks in Puerto Rico—FirstBank and R&G Financial—that had done business with Doral.  These materials, we understood, included sensitive proprietary and other confidential information.  From our predecessors, we learned that the delay in production had arisen from the absence of a protective order, which had been the subject of ongoing negotiations between prior Government counsel and the defense.  Counsel for the Federal Reserve had also been actively engaged in conversations with the Government regarding this issue, and had raised significant concerns regarding the production of materials that the Federal Reserve had obtained or generated during its regulatory work.

Defense counsel raised the issue of the additional materials that they were seeking during our early conversations with them in the spring of 2009.  They represented that our predecessors on this case had agreed to produce the documents they had identified.  Our predecessors confirmed that understanding. In no way did the AUSAs currently assigned to the case state or suggest that we had just received these materials, or that they were important.  We did not possess any of the requisite knowledge to make such representations, because—beyond assuming that the materials existed, and that the Government had already agreed to produce them—we did not have any information about the substance of the documents contained on the disks, or when the disks had first come into our office's possession.  Moreover, based on our basic understanding of the nature of the case, we did not perceive how materials from the Federal Reserve or from regulatory inquiries at banks other than Doral could be of any great importance.  On the other hand, precisely because we had not reviewed the contents of the disks, we could not represent that the materials under discussion were utterly and categorically irrelevant, particularly

3

when defense counsel expressed their view that the documents would be important to them.

Under these circumstances, when defense counsel raised the subject of another adjournment of the trial date, the Government determined that it could not reasonably oppose such a request, even though, from the Government's perspective, a further delay was regrettable. We resigned ourselves to that outcome even though—as stated above, and as best we could determine—the Federal Reserve materials, and the materials that regulators had obtained from banks other than Doral, did not seem to have any appreciable bearing on the real issues in the case.

In their motion, defense counsel now claims that members of the current prosecution team purposefully deceived them into requesting an adjournment of the September 2009 trial date—which is hard to fathom, given that the defense has consistently sought even lengthier adjournments of the trial date, whereas the Government has consistently sought to proceed to trial sooner—by telling them that the Government had recently received, and intended to produce, relevant discovery materials that the defense would need time to review. (*E.g.*, Def. Mot. at 10-11). That representation is utterly false. As the Government made abundantly clear to the defense in the spring of 2009—and as they acknowledge, albeit fleetingly, in their motion (Def. Mot. at 11, ¶ 19)—we were generally aware of the existence of materials the defense was seeking, but we had not reviewed them, let alone sought to determine whether they were relevant. What we understood, from defense counsel and our predecessors, was simply that these materials existed, and that the Government had agreed to produce them. In no conceivable way did we mislead defense counsel regarding these issues. Indeed, they had been alerted to the existence of the materials before the current prosecution team was assigned to the case, and they were well aware that we did not have any knowledge regarding the contents of the computer disks at issue. We did not, and could not have, sought to convince the defense that the materials were at all important, let alone essential. To the contrary, as we made perfectly clear: we were new to the case; we were not familiar with the contents of any unproduced computer disks; we doubted that the materials were particularly relevant, even though defense counsel was suggesting otherwise; and regardless of whether or not the documents ultimately proved to be relevant, we would attempt to uphold the existing agreement between the parties by producing them, as soon as an appropriate protective order could be finalized and entered.[1]

---

[1] In their motion, defense counsel emphasizes the fact that SAUSA Anthony was involved in early stages of the SEC's regulatory inquiry at FirstBank and R&G, and was the enforcement attorney who requested documents from those banks. It was SAUSA

Although we viewed the prospect of a further delay as unfortunate, we also determined that it was, in all likelihood, unavoidable, under the circumstances presented. As the record of this case makes clear—notwithstanding the outlandish and baseless allegations in the defendant's motion—defense counsel has always sought to adjourn the trial in this case, for their own tactical reasons, and their particular request to adjourn the September 2009 trial date was not a result of any deceptive scheme perpetrated by the Government.[2]

On May 27, 2009, defense counsel submitted a letter seeking an adjournment of the trial date until March of 2010, based on its anticipated receipt of additional discovery from the Government and its need to review those materials in order to prepare for trial. The defense also agreed, in the same letter, to an exclusion of time under the Speedy Trial Act *between September 14, 2009 and March 2010*. The Government did not oppose the request. Your Honor granted defense counsel's request by endorsing their letter on May 29, 2009. That endorsement, of course, necessarily

---

Anthony's colleagues at the SEC, however, who assumed primary responsibility for the regulatory investigations at FirstBank and R&G, because of SAUSA Anthony's focus on events at Doral. Thus, although SAUSA Anthony was generally familiar with the SEC's activities involving FirstBank and R&G, from his interactions with his colleagues, it was not his job to engage in any sort of comprehensive review of the evidence the SEC had obtained from those banks. Rather, his focus on FirstBank and R&G was limited to the dealings between those banks and Doral, such as the loan-sale agreements and related communications that are relevant to this case. Those kinds of documents were provided to the U.S. Attorney's Office during the criminal investigation in which SAUSA Anthony participated, and they were produced to the defense during the early stages of discovery in 2008.

[2] If the Government had wanted to adjourn the trial date, we cannot imagine why it would have needed to concoct a deceptive scheme to goad the defense into making the request. Indeed, as the record made clear, and as our predecessors confirmed, the defense had been seeking adjournments since the defendant's initial appearance and had sought more lengthy delays of the trial than the Court had been willing to grant. Thus, we would have had every reason to expect that the defense would have eagerly joined any suggestion from the Government to adjourn the trial beyond September of 2009. Because that is what the defense plainly wanted all along, there is no conceivable reason why the Government would have thought it necessary, let alone acceptable, to trick the defense into seeking an adjournment. The very suggestion that we hatched and executed such a brilliantly deceptive plot is, to members of the current prosecution team, at least as astounding as it is insulting.

5

encompassed the exclusion of speedy-trial time to which the defense had explicitly agreed, based on the reasons they had set forth in their letter. The Court's endorsement also indicated that it would set a new trial date at a conference sometime after August 1, 2009.

In subsequent conversations with defense counsel, the Government expressed its desire to commence trial in January 2010. Defense counsel initially seemed amenable to that time frame. By August, however, defense counsel advised the Government that since the adjournment of the September trial in this case, Mr. Black had agreed to try a civil suit involving Rolls Royce in January of 2010, and therefore would not be available to try this case until, at the earliest, late March of 2010. Defense counsel sought the Government's consent to propose a trial date of April or May of 2010. The Government took the position that such an adjournment was too lengthy.

The parties participated in a telephone conference with Your Honor on August 18, 2009. The Government advised the Court that it would be prepared to proceed with trial at the Court's convenience. Mr. Black stated that the defense was still awaiting Federal Reserve documents, subject to a protective order that had not been completed. Mr. Black further stated that he was scheduled to start a three-week trial on January 11, 2010, and he sought a trial date in late March or early April of 2010. Your Honor set a trial date for March 22, 2010, with no objection from the defense.

## 2.    The Production Of Federal Reserve, FirstBank, and R&G Documents

Following the telephone conference in August, in communications with the Government, defense counsel focused their requests on materials from the Federal Reserve. The Government then proposed a protective order to the defense so that it could produce those materials. Defense counsel, however, did not execute that proposed order for some time; as a result, the order could not be submitted to the Court for Your Honor's approval, and the materials could not be produced.

Initially, defense counsel asked the Government to include language in the proposed protective order permitting them to share protected materials with the law firm of Greenberg Traurig. This raised two concerns for the Government, which we shared with the defense. First, because Greenberg Traurig is a large firm employing hundreds of lawyers in various offices around the world, the Government asked defense counsel to identify the particular attorneys at Greenberg who would be authorized to review the protected documents. Second, defense counsel had previously advised both the Government and the Court that Greenberg Traurig was playing only an administrative role in serving as the defendant's local counsel, rather than a substantive role in assisting

6

with Mario Levis's defense. (3/31/08 Tr. at 5). This was important—as the Government first advised the Court in March of 2008, when the defendant was arraigned—because Greenberg Traurig represented the defendant's father, David Levis, who remained a subject of the investigation and who participated in conduct alleged in the indictment. Accordingly, if contrary to defense counsel's previous representation, the Greenberg firm was continuing to represent Mario Levis in any substantive way, a *Curcio* hearing would be necessary. (*Id.*). The Government then asked defense counsel to provide an explanation of Greenberg's role. Instead, the defense advised the Government that it would simply withdraw its request to include the Greenberg firm in the protective order. It did not, however, approve the protective order that the Government had proposed. On October 19, 2009, AUSA Stellmach sent an e-mail to a member of Mr. Black's firm and stated that he would submit the order to Your Honor as soon as counsel indicated approval of the draft. In response, that attorney sent an e-mail message stating: "Bill, *I had put the protective order on Roy's desk ages ago.* I will check with his secretary." (emphasis added). A short time later, defense counsel advised the Government that they consented to the protective order, and the Government submitted the order to the Court. After the protective order was entered, the Government promptly produced a group of computer disks to the defense, believing that those disks contained all of the materials that defense counsel had sought—including the documents relating to FirstBank and R&G.

In November of 2009, defense counsel contacted the Government and asked about the production of the FirstBank and R&G documents. This was a surprise, because, as stated above, the AUSA who had produced the disks containing the Federal Reserve documents believed that those disks also contained the materials relating to FirstBank and R&G. When we received this inquiry from defense counsel, as we explained at the time, we were traveling on business but would ask for assistance, from office staff in New York, to locate any missing materials. When we returned to New York, we located the additional computer disks containing the FirstBank and R&G documents and arranged to have them copied and produced. We also realized, however, that the terms of the existing protective order would not cover these documents. Accordingly, the Government proposed a second protective order to defense counsel. When counsel approved that order that order, we submitted it to the Court. After the order was entered, the Government produced computer disks containing the documents on December 21, 2009—still three months prior to the commencement of trial.

Your Honor is already familiar with the litigation that followed, in which the defense sought an indefinite adjournment of the trial date based on the production of the materials relating to FirstBank and R&G. We will not review those recent events in detail here. It is worth noting, however, that during the recent litigation, the defense

7

claimed that the newly produced documents contained *Brady* material, because they showed that Doral's contracts with FirstBank contained certain terms (called "caps") that guaranteed a certain level of profitability for Doral. According to the indictment, and to all the evidence of which the Government is aware—including the contracts themselves, information from witnesses, Doral's internal records, and the defendant's own contemporaneous written description of these contracts—such terms did not exist. The Government asked the defense to identify this *Brady* material, explaining that if it existed, the Government would have to reassess its view that the FirstBank documents were of limited relevance, at most, to the issues in this case. Such a revelation, the Government also stated, might also cause it to reconsider its position that an adjournment was not warranted. Defense counsel declined to reveal the *Brady* material it claimed to have identified, choosing instead to preserve the tactical advantage of surprise; thus, defense counsel stated that he did not owe the Government a bill of particulars and that we would "see [the exculpatory evidence] at trial."

The defense also complained about the volume and accessibility of the materials that had been produced on computer disks, claiming that some of the files were corrupted. The Government endeavored to address those problems as quickly and effectively as possible. In January 2010, we provided another complete set of the FirstBank and R&G materials on a computer hard drive; we also offered to make them available, electronically, at a Government office in Miami, where defense counsel is based. Although defense counsel has never explicitly acknowledged that the Government's efforts ultimately resolved the technical problems they initially encountered, they have not continued to raise these issues.

The defense has continued to complain about the large volume of these documents. It has never acknowledged to the Court, however, that the materials from FirstBank and R&G were produced in an electronically searchable database and therefore can be reviewed particularly quickly, especially because so many of those documents quite obviously have no relevance whatsoever to this case. For example, although the FirstBank database contains (by its count) 39,474 documents, entry of the search term "Levis" identifies only 674 documents, which can then be quickly identified and reviewed by proceeding from one such document to the next with a single keystroke.[3]

Finally, although the defendant's most recent request to adjourn the trial indefinitely was based, in part, on Mr. Black's anticipated unavailability during January 2010, because of his civil trial involving Rolls Royce—which, the defense claimed,

---

[3] By no means are all the FirstBank documents containing the word "Levis" relevant to this case, which is readily apparent.

8

would make it impossible for him to review documents or to prepare for trial—he never informed Your Honor that the case settled in early January before trial commenced, leaving Mr. Black and his colleagues free to focus on this case to whatever extent they chose to do so.

### 3. The Government's Production Of Pre-Marked Exhibits Relating To FirstBank

As discussed at the court appearance before Your Honor in October of 2008, the Government made a good-faith effort, 45 days in advance of the March 22 trial date (which was subsequently adjourned by one week, to March 29), to provide the defense with a pre-marked set of the exhibits that it might introduce at trial. In making that production, it identified various documents relating to FirstBank. The defense claims that all of those documents were only produced recently, among the voluminous records contained on the computer disks they received in December of 2009. That is simply incorrect. More than 100 of the pre-marked FirstBank exhibits were produced during the initial phase of discovery in this case, in the spring of 2008. The Government does not presently intend to offer all of the remaining FirstBank documents at trial, but it identified them as potential exhibits in an abundance of caution; those documents or others might become more relevant, in the Government's view, depending on how the defense takes shape at trial.

## B.   Discussion

### 1.   The Motion To Dismiss

For the reasons set forth above, the Government never misled anyone regarding the potential relevance of the materials that it had obtained from the Federal Reserve, or from the regulatory investigations focusing on FirstBank and R&G. Similarly, we could not have conceived of, let alone carried out, a plan to trick the defense into seeking an adjournment of the September 2009 trial date. Not long ago, in seeking to adjourn the trial indefinitely, defense counsel criticized the Government for its failure to examine the materials on the computer disks produced in December 2009. The defense now reverses course—while still acknowledging that the Government, in the spring of 2009, had not reviewed the records the defense was seeking—and contends that the Government knew that the materials were of no real relevance, but pretended that it had just obtained important records in order to goad the defense into seeking an adjournment. It has always been defense counsel, however, and not the Government, that has characterized these materials as important. And it has always been defense counsel, long before the spring of 2009, that has sought repeated adjournments of the trial date.

9

The Government has not acted in bad faith, and defense counsel's assertions to the contrary are entirely baseless.  The defendant's motion should be denied.

### 2.     The FirstBank Documents

The defense next moves to exclude at trial the introduction of approximately 139 documents that relate to FirstBank.  As discussed previously, FirstBank was one of the counterparties that purchased mortgages from Doral.  Its contracts with Doral, and several communications regarding those contracts, are highly relevant to this case.

The documents produced to the defense relating to FirstBank fall into two broad categories: (1) documents produced in Rule 16 discovery shortly after return of the Indictment in 2008, which were largely obtained from Doral itself and consisted mainly of the sales contracts; and (2) documents produced by FirstBank to the SEC in an unrelated regulatory investigation (the "SEC production"), which the Government provided to the defense pursuant to a protective order in December 2009.

The defense now argues that allowing introduction of the 139 exhibits is unfair because it enables the Government to "cherry pick" those documents favorable to the prosecution while denying the defense a meaningful opportunity to review the full scope of the SEC production.  That argument ignores the facts.  First, the overwhelming majority of the 139 exhibits about which defense counsel complains were produced during the initial phase of discovery.  Counsel may well have traced a number of those exhibits to the SEC production, as they claim, but their suggestion that all of those exhibits were only produced in December is entirely wrong.  Over 100 of the FirstBank exhibits that the Government has marked as part of its pretrial disclosure were produced long before December 2009.  For example, all of the sales contracts marked as exhibits were produced to the defense in the initial rounds of discovery, more than two years ago. Second, as stated above, the defense received the SEC production at issue at least three months prior to the commencement of trial, and in a format that allowed computer text searches.  Third, the Government produced pre-marked exhibits from the FirstBank production 45 days in advance of the original trial date, which was adjourned another week, even though it had no legal obligation to make such a disclosure.  The defense has therefore had the exhibits, and has been on notice regarding the relevant topics and evidence, well in advance of trial.

Absent bad faith—which, for the reasons discussed herein, does not exist—the preclusion of evidence is rarely an appropriate sanction for a discovery delay.  Rather, a continuance is the preferred remedy, "because it gives the defense time to

alleviate any prejudice it may have suffered from the late disclosure." <u>United States v. Marshall</u>, 132 F.3d 63, 69 (D.C. Cir. 1998).   The Second Circuit and other courts have repeatedly upheld the admission of evidence disclosed only on the eve of or even during trial, even without the granting of a continuance. <u>See, e.g.</u>, <u>United States v. Sanchez</u>, 912 F.2d 18, 20-21 (2d Cir. 1990) (allowing introduction of wallet taken from defendant upon arrest but disclosed only 5 days prior to trial); <u>United States v. Giraldo</u>, 822 F.2d 205, 212 (2d Cir. 1987) (where tape was given to defense counsel during trial, "it was well within the trial court's discretion to receive the tape in evidence after more than a week had elapsed since defendants' inspection of it").

At present, especially because the vast majority of the FirstBank documents that the Government has identified as potential trial exhibits were produced to the defense more than two years ago, the Government does not perceive the need for any continuance, and disagrees with defense counsel's claim that they have somehow been prejudiced.  In any event, however, the defendant's motion to exclude the FirstBank documents should be denied.

### 3.    The Spot Rate Methodology

Throughout the pretrial litigation, the defense purported to read the indictment as alleging that the defendant used the wrong methodology in valuing the IOs, and sought a lengthy adjournment based on what it described as a "shift" in the Government's theory of the case under the current prosecution team.

However, as we explained to the Court throughout the pretrial litigation, the position we articulated to the defense and Your Honor has always been consistent with the original indictment, and with conversations between defense counsel and the Government before that indictment was returned.  The allegations—expressed even more plainly in the Superseding Indictment, so as to eliminate any purported cause for confusion—are that the defendant manipulated the process by which Doral valued its IOs and made misrepresentations regarding safeguards that purportedly existed within that process.

Doral employed a "spot rate" methodology that, during the relevant time period, resulted in a higher valuation than an alternative "forward curve" methodology. Whereas the spot rate approach incorporated an assumption that interest rates would remain constant, use of the forward curve would have accounted for predicted increases in interest rates—which, in turn, would have diminished the estimated present value of Doral's IOs. Doral's use of a spot rate also meant that in each successive financial quarter, if interest rates continued to rise, Doral would face the prospect of impairing (that

is, writing down) the previously stated value of its IO portfolio. The risk of such impairments created significant concerns among investors in early 2005, after Doral announced one such write-down in an amount of $97.5 million.

In September of 2003, investment bankers at Popular Securities—who, at least according to Doral's public filings and the defendant's statements, were purportedly performing an "independent" valuation of Doral's IOs, based entirely on their own economic assumptions—decided to employ a forward curve methodology. The defendant and his father then gave them instructions that negated that change of approach. In that manner, and in other ways, the defendant undermined the independence and integrity of the external valuation, which, as a result, failed to provide a meaningful check within Doral's valuation process. It also caused Popular Securities to produce far higher valuations of Doral's IOs, which corresponded with Doral's internal valuation and enabled Doral to record the values that it had determined.

The following year (2004), in response to concerns expressed by bank examiners from the Federal Reserve, Doral's Board of Directors retained experts at a firm called the First Manhattan Consulting Group to help Doral create an adequate system for measuring and managing risk. First Manhattan reviewed the manner in which Doral was valuing its IOs and determined that the use of the spot rate was not justifiable, because the market would not value the IOs based on an assumption that interest rates would remain constant in the future. Accordingly, in 2005, First Manhattan advised Doral's Board of Directors and management that the IOs were, in its opinion, overvalued by hundreds of millions of dollars. Doral's auditors at PriceWaterhouse Coopers, who did not learn of First Manhattan's work until after Doral filed its 10K filing for 2004 (which occurred on March 15, 2005), agreed with First Manhattan's assessment. On April 19, 2005, the company announced that it was going to change its valuation methodology and that the expected result would be an earnings restatement in the range of $400 to $600 million.

Prior to that time, in response to investor concerns that Doral would suffer significant additional impairments to the value of its IO portfolio, as it had in January 2005, the defendant made false statements to assure investors and analysts that terms within Doral's contracts with other banks protected Doral from such an outcome. In fact, however, those contractual provisions did not exist in the vast majority of Doral's contracts. To the contrary, the risk of additional impairments was both real and apparent, and that risk resulted, in part, from Doral's use of a spot rate to value its IOs.

Doral's use of a spot rate to value its IOs is therefore of obvious relevance to the series of events that form a central part of the Government's case. However, the fraud charged—as the Government has repeatedly made clear to the defense, and as the

12

indictment reflects—is <u>not</u> that the defendant set about to commit a fraud by choosing to employ a spot rate methodology that, as he knew, artificially inflated the value of the IOs; that has never been the basis of the Government's case, as a plain reading of the charging instruments in this case demonstrates.[4]  Accordingly, the objective merits or shortcomings of the spot rate methodology has never been at issue in this case.  Rather, the defendant is charged with manipulating the valuation process by undermining and fabricating safeguards, and by making false representations to conceal the risks to which Doral was exposed, which included risks attendant to its use of a spot rate. For example, the defendant manipulated the purportedly independent valuations from Popular Securities and Morgan Stanley. In doing so, the defendant ensured that Doral's internal valuation, which used the spot rate methodology, would not be rejected by Doral's auditors.  Thus, to understand the context for the defendant's misrepresentations regarding the independent valuations, jurors need to appreciate the differences between the spot rate and the forward curve, and the corresponding differences in the valuations each would have assigned to the IOs during the relevant period.  The jurors will also need to understand that others—including the bankers at Popular Securities, and the consultants from First Manhattan—concluded that Doral's IOs should be valued using the forward curve, and at a general level, the reasons why they held those views.

Evidence surrounding the use of the spot rate is therefore direct evidence of

---

[4]  In recent litigation, defense counsel sought to interpret every reference in the original indictment to "overstated" or "overvalued" IOs as necessarily expressing a theory that the defendant committed a fraud by choosing to employ a spot rate methodology, rather than a forward curve methodology.  The Government has already explained why that is untrue. (*See* Govt. Ltr. to Court dated Feb. 3, 2010).  As the indictment alleges, the defendant's misrepresentations regarding the existence of independent valuations enabled Doral to continue recording higher and higher values for its IOs; if the defendant had allowed the external valuations to serve their purpose, and to produce results that were truly independent, the reported value of Doral's IOs would have been far less.  Simlarly, the defendant's misrepresentations regarding "caps" in Doral's contracts with other banks characterized the IO portfolio as having greater economic value, and less risk, than it had in reality.  Such forms of overvaluation are not predicated on an argument that the spot rate methodology was objectively deficient or that its use was, in and of itself, fraudulent.

the charged crime. The Government is not alleging that the defendant caused the IOs to be overvalued by employing a spot rate, but that he engaged in an extensive course of fraudulent conduct that directly related to Doral's use of that methodology.

Respectfully yours,

PREET BHARARA
United States Attorney
Southern District of New York

By: _____

William J. Stellmach
Daniel A. Braun
Assistant United States Attorneys
(212) 637-2101/2215

Jason M. Anthony
Special Assistant United States Attorney
(202) 551-4420

cc:    Roy Black, Esq.

14