

**BLACK**
**SREBNICK**
**KORNSPAN**
**STUMPF**

TRIAL ATTORNEYS

Roy Black
Howard M. Srebnick
Scott A. Kornspan
Larry A. Stumpf
Maria Neyra
Jackie Perczek
Mark A.J. Shapiro
Jared Lopez

———

Jessica Fonseca-Nader
Kathleen P. Phillips
Marcos Beaton, Jr.
Jenifer J. Soulikias
Noah Fox
Joshua Shore

Email:   *rblack@royblack.com*

November 10, 2010

Honorable Thomas P. Griesa
United States District Judge
500 Pearl Street, Room 1630
New York, New York 10007-1312

> **Re:**   ***United States v. Levis*, No. 08-CR-181 (TPG)**
> **Defendant's Initial Sentencing Memorandum**

Dear Judge Griesa:

We write to set forth Mr. Levis's position with respect to sentencing, scheduled for November 16, 2010.  The initial PSR calculated an advisory guidelines range of **24-30** months.  The revised PSR, issued yesterday, calculated an advisory range of **57-71** months.  *See* PSR, at ¶130.

At sentencing, we will ask the Court to impose a reasonable sentence, one that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing.  *See* 18 U.S.C. §3553(a).  We submit that, after consideration of all the factors in §3553, the reasonable sentence in this case is one that is consistent with the 24-30 months guideline range.

Judge Griesa (continued)
November 10, 2010
Page 2

## I.    **Overview**

On April 29, 2010, the jury convicted Mr. Levis of one count of securities fraud (Count 1) and two counts of wire fraud (Counts 3 & 5) arising out of alleged misrepresentations that Mr. Levis made about Doral's portfolio of interest-only strips (IO). The misrepresentations allegedly fell into two categories. First, Mr. Levis represented to investors that Doral's internal valuation of its IO portfolio was lower than two external valuations that Doral had obtained from "independent" parties. Second, Mr. Levis represented to a few investors and analysts that the pass-through rates owed to secondary buyers of Doral's mortgage portfolio were capped at rates substantially below the interest rate owed to Doral by the underlying borrowers.

Having presided over the trial, this Court had the opportunity to hear and consider the evidence. Therefore, we will not burden the Court with a detailed recitation of the evidence. But while the Court had an opportunity to hear about the charged **offenses**, it did not learn much about the charged **offender**.

The primary feature of Mr. Levis's defense at trial was that he lacked the intent to defraud because he did not seek to gain anything from the offense conduct. The essence of that defense is captured by the following excerpt from Mr. Black's summation:

> Sammy Levis never acted for any personal greed. He never tried to profit by anything. He only bought stock. What better evidence that he believed in what he was saying that right in the middle of this he kept buying stock. He never sold a single share, and you will see from the exhibits that we introduce today, Defense Exhibits 130 and 131, he still owns every single share of stock. It went from that number 60 million that you heard of down to about $500,000, but he has held on to them to this day.
>
> He hasn't sold a single share. He's not tried to profit, not tried to put money in his pocket, not steal money from somebody for his own enrichment, not to buy houses and yachts and planes or any of those things that you've seen and heard about throughout the length and breadth of this land for I don't know how many years. This is not this case. This is not this person. This is not

Judge Griesa (continued)
November 10, 2010
Page 3

> who he is.  This is not greed and avarice that's driving
> him.

(Tr. 3581).

While the absence of greed, enrichment, or other financial motive was an important component of Mr. Levis's defense at trial, it is an even more important component of Mr. Levis's sentencing presentation because it defines who he is as a human being.  Mr. Levis's life story is recounted in the PSR, at ¶¶82-122.  The quantity and quality of the letters that have been submitted on his behalf, which are attached to the revised PSR, speak volumes about Mr. Levis as a person.  Three common themes emerge from these letters: 1) Mr. Levis is a dedicated and loving husband and father; 2) Mr. Levis would never intentionally cause financial harm to anyone; and 3) Mr. Levis has contributed to making the world a better place for those less fortunate, including children with cancer and the homeless.  We cite just a few examples.

Joseph Gladue, an equity analyst who has known Mr. Levis for eight years, writes:

> I firmly believe Sammy would never purposely harm
> anyone.  I ask you to remain compassionate when
> sentencing him, please consider his good deeds, the
> needs of his wife and young daughters, and the utmost
> wish of this dear friend who continues to trust and
> support him.

Francisco Rexach, Jr., a friend of more than 17 years who met Mr. Levis through civic activities, writes:

> The man who stands before your Honor merits leniency.
> He is small in frame but big in heart. Our community is
> most constructively served by having Sammy continue to
> help and contribute, especially in these difficult times. I
> have faith that your Honor will do what is fair and just.

James Rodriguez Colom, the President and CEO of Santander Securities, who has known Mr. Levis for more than twenty years as a competitor and customer, writes about Mr. Levis's charitable efforts:

> Mr. Levis also has a commitment and responsibility to
> some other, very important children. For the last 15

Judge Griesa (continued)
November 10, 2010
Page 4

years, he has raised funds and donated time to the
charity, Ninos Que Quieren Sonreir (Children Who Want
to Smile). This charity, established by the Levis family in
Puerto Rico, is dedicated to assisting needy children
stricken with Cancer. The charity provides pediatric
patients and their loved ones with temporary housing,
medical assistance and financial aid while undergoing
treatment. Mr. Levis has been instrumental in collecting
contributions and organizing fundraisers needed in order
to operate the organization whose facility is open seven
days a week, 24 hours a day.

Jose Antonio Andreu Garcia, a retired judge who formerly served as Chief
Justice of the Puerto Rico Supreme Court, has known Mr. Levis's family for more
than 35 years and has gotten to know Mr. Levis especially well over the past ten
years. He writes:

Sammy's human side is incredibly warm and one filled
with community devotion, especially to the homeless and
children with cancer in Puerto Rico. I have been a
witness to his compassion through the organization
"Ninos Que Quieren Sonreir" founded by Sammy and his
family around 15 years ago. By personally attending
their many fund raisers one instantly gets to know the
real Sammy. This is a person who gives a helping hand
to anyone needing it. Put simply, Sammy gives far more
than he will ever receive.

Lillian Santos, the CEO of the American Cancer Society of Puerto Rico, has
known Mr. Levis for 15 years in his capacity as a volunteer in the Children Who
Want to Smile committee of the Pediatric Program. She writes:

Thanks to his ability to bring people together and good
relations with the community, Mr. Levis is one of the
most successful and dedicated fundraisers for the
Children Who Want to Smile Committee. His hard work
makes it possible to provide free of charge medical
services to indigent, low income families and individuals
facing a cancer diagnosis.

Judge Griesa (continued)
November 10, 2010
Page 5

Alberto Moreno, who has known Mr. Levis for approximately 30 years, writes about his observations of Mr. Levis's selflessness:

> Beyond his dedication to his family, Sammy's generous and caring ways are perhaps best exemplified hy his continuous and unselfish devotion to helping others, including the homeless and uneducated, and especially to Children with Cancer.  I have had the personal pleasure of working for many years in his "Children Who Want to Smile" program, which he and his family started so that Children whose families can't afford cancer treatment would have a place to be treated and cared for. The numerous lives of dying children that he has helped save through his tireless efforts in this noble cause are certainly a testimony to Sammy's good nature and compassion for others.
>
> Perhaps the best example of this that sticks out in my mind is when those children we were treating were invited to the annual gala for the first time - some barely strong enough to he there- and after the slide show presentation, when the music started, Sammy started dancing with them and I remember a certain Mom who was at our table, who had 2 sick children there, started crying out of happiness and said, "God Bless Sammy, his family and all of you that made this possible for my children to have hope."

Finally, Mr. Levis's character is best described by Santa Lara, a family caretaker who has observed Mr. Levis on a daily basis for almost twenty years.

> Time after time, I have personally seen Sammy go out of his way to help others. I remember once, during the midst of a tropical storm, Sammy rushed into the house. He quickly gathered supplies for a homeless man who he needed to get to safety. Year after year, Sammy helps me gather toys and other necessities for orphans and needy kids living in my home country. On one occasion in particular, while working at Mr. Levis's home, my daughter had a medical emergency, Sammy immediately took it upon himself to drive me home and then insisted

Judge Griesa (continued)
November 10, 2010
Page 6

> on accompanying my daughter and I to the hospital. I
> will never forget that day.

The human qualities that friends and colleagues have observed in Mr. Levis are not reflected in the Guidelines' blind allegiance to mathematical computations, where a single factual finding, based on uncertain data and using a preponderance standard, can mean the difference between two years and thirty years in prison.

## II.    The Guidelines Calculation

Nowhere is that flaw in the Guidelines better exemplified than in this case. The  initial PSR calculated an advisory range of 24-30 months.  The revised PSR calculates an advisory range of 57-71 months.  And the government's request is for an advisory range of 324-405 months.

Of course, the driving force behind the various computations is the calculation of loss.  In that regard, we agree with the position reflected in the revised PSR that the loss proximately caused by Mr. Levis's offense, if any, "reasonably cannot be determined" and, therefore, the Court should use the "gain" that resulted from the offense as an alternative measure of loss.  *See* U.S.S.G. §2B1.1 n.3(B); PSR, at ¶¶ 58-60, 67.  However, as discussed below, we differ with the revised PSR on the appropriate measure of "gain" in this case.  We believe the appropriate measure of "gain" is $38,000, not $835,000 recommended by the revised PSR, and that the appropriate guideline range is 24-30 months.

The government, on the other hand, informed us by e-mail on November 8, 2010, that it will be objecting to the PSR and seeking the application of additional enhancements for "loss" in excess of $50,000,000 (§2B1.1(b)(1)(M)), and for the "number of victims" in excess of 250 (§2B1.1(b)(2)(C)).  The government's requests for enhancements should be rejected.

### A.    The Government has Waived its Right to Object

For the six months between the return of the verdict and the disclosure of the initial PSR, the government did not submit any information to the Probation Office regarding loss or any other adjustments.  The initial PSR was disclosed to both parties on October 19, 2010, twenty-eight days prior to the scheduled sentencing date.[1]  The initial PSR recommended an advisory guidelines range of

---

[1] Fed.R.Crim.P. 32(e)(2) requires initial disclosure of the PSR 35 days prior to sentencing.

Judge Griesa (continued)
November 10, 2010
Page 7

24-30 months.  By rule – and by express notice in the initial PSR – all written objections were due within fourteen (14) days, or by November 2, 2010.  *See* Fed.R.Crim.P. 32(f)(1).  Thus, we expected that the government would file its objections by November 2, 2010.  Moreover, we expected that the objections would be presented in a way that would permit Mr. Levis a meaningful opportunity to respond.

On November 4, 2010 – two days ***after*** its written objections were due – the government asked the Court to cancel the scheduled *Fatico* hearing because the government intended to rely on trial testimony and trading summaries in an effort to establish loss.  Thereafter, in the late afternoon of November 8, 2010 – eight days prior to sentencing and only one day before the revised PSR was due to be submitted by the Probation Office, *see* Fed.R.Crim.P. 32(g) – the government sent an e-mail briefly addressing its sentencing position.  Even then, the government's e-mail claimed simply that investors suffered trading losses, without any "proximate cause" analysis.  Thus, as of this submission, we have no indication from the government regarding how it intends to prove that Mr. Levis "proximately caused" a loss to investors.  *See* Section II.B.1, *infra.*

In the government's e-mail of November 8, 2010, Mr. Levis was notified for the first time that Doral was claiming losses in excess of $131 million.  For the first time today – six days prior to sentencing – Mr. Levis received a "victim impact statement" purportedly substantiating that figure.  The documents consist of no less than 51 exhibits.  One exhibit alone is 1085 pages long.  We have not had any time to analyze them.[2]  Moreover, despite Mr. Levis's request of the government for trading records of the alleged investor-victims, the documents that have been provided by the government are not trading records at all, but rather purport to be trading summaries that are difficult to understand and do not cover the entire time period alleged in the Superseding Indictment.  The absence of complete trading records is significant because we know that certain alleged investor-victims, such as Fidelity, actually realized ***gains*** in Doral stock in 2002-04 which would completely offset their losses.  *See United States v. Laurienti*, 611 F.3d 530, 557 (9th Cir. 2010).  Mr. Levis is waiting for the complete trading records from the government.

Accordingly, Mr. Levis respectfully submits that the government has waived its objections to the initial PSR or its right to seek any additional enhancements in this case.  Given that the verdict was returned on April 29, 2010, more than six months ago, and that the prosecutors have been aware of the November 16, 2010,

_____

[2] Mr. Levis objects to the restitution numbers submitted by Doral and the government.

Judge Griesa (continued)
November 10, 2010
Page 8

sentencing date since the telephonic conference on September 8, 2010, the government cannot establish "good cause" for failure to comply with the applicable deadlines.  *See* Fed.R.Crim.P. 32(i)(1)(D).

## B.   Determination of "Loss" under U.S.S.G. §2B1.1

Even on the merits, the government cannot establish the applicability of an enhancement for "loss" under U.S.S.G. §2B1.1(b)(1).  Certainly, the jury verdict alone does **not** establish that Mr. Levis's offense conduct caused any loss to investors.  There was no special verdict on loss.  Moreover, neither the securities fraud nor the wire fraud charges required the jury to find either "causation" or "loss" as an element of the offense.  To the contrary, as to the wire fraud counts, the jury was instructed that the terms "injury" and "harm" are not limited to financial harm to investors, but also included the harm to the investor's ability to "make investment decisions based on the actual facts."  (Tr.3728).

### 1.   *General Legal Principles*

It is well-settled that the burden rests squarely with the government at sentencing to prove the "loss" attributable to Mr. Levis's offense conduct by a preponderance of the evidence.  *United States v. Irving*, 554 F.3d 64, 72 (2d Cir. 2009) (burden of proving facts relevant to sentencing enhancements is on the government).  In determining the loss amount in fraud cases, one rule is paramount – *"[t]he loss must be the result of the fraud."*  *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006) (emphasis added); *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007).  "Losses from causes other than the fraud must be excluded from the loss calculation."  *Ebbers*, 458 F.3d at 128.

To be faithful to that overarching rule, a district court must look to the "principles governing recovery of damages in civil securities fraud cases."  *Rutkoske*, 506 F.3d at 179 (applying *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 340-46 (2005)).  As the Supreme Court explained in *Dura Pharmaceuticals*, a plaintiff in a civil securities fraud case must prove that a defendant's misrepresentation "proximately caused the economic loss."  544 U.S. at 346.  There, the Supreme Court expressly held that a plaintiff in a civil stock fraud case cannot establish loss causation simply by showing that the purchase price was inflated because of the defendant's misrepresentation.  *See Dura Pharmaceuticals*, 544 U.S. at 339.  Indeed, it is not enough that the defendant bought or held stock in reliance upon a misrepresentation; there must be loss **causation**.  *Id.* at 341-46.

Judge Griesa (continued)
November 10, 2010
Page 9

Thus, "there is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines." *United States v. Olis*, 429 F.3d 540, 546 (5th Cir. 2005) (*cited with approval* in *Rutkoske*, 506 F.3d at 179). Moreover, even where a company's share price declines after the truth is revealed, "the portion of a price decline caused by other factors must be excluded from the loss calculation." *Rutkoske*, 506 F.3d at 179. "[T]he court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes." *United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007).

Although an artificially inflated price **might** cause an investor's loss when the investor sells a company's shares after the truth is revealed, other factors, such as changed economic conditions, might also contribute to a stock's decline in price. *See Dura Pharmaceuticals*, 544 U.S. at 343.[3] As the Supreme Court explained:

> [T]he logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the marketplace, an inflated purchase price *might* mean a later loss. **But that is far from inevitably so**. When the purchaser subsequently resells such shares, even at a lower price, **that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events**, which taken separately or together account for some **or all** of that lower price.

*Id.* at 342-43 (emphasis added).

---

[3] This is especially true where the company is a real company that provides real goods or services. By contrast, where a defendant fraudulently promotes worthless stock in a worthless company, a district court may justifiably attribute the entire loss to the defendant's fraud. *See, e.g., Olis*, 429 F.3d at 546.

Judge Griesa (continued)
November 10, 2010
Page 10

When the loss from the offense "reasonably cannot be determined," the Guidelines expressly instruct courts to use the gain to the defendant as an alternative. *See* U.S.S.G. §2B1.1 n.3(B). The revised PSR recommends the use of "gain" as an alternative measurement of loss in this case. *See* PSR, at pp. 19, 38. For the reasons stated below, we agree with the revised PSR's use of "gain" as the appropriate measurement but we disagree with the amount of "gain" attributed to Mr. Levis.

## 2.      *The Loss, if Any, Cannot Reasonably Be Determined*

The government has informed us that it intends to rely on trial testimony and stock trading summaries to prove that certain Doral shareholders lost money after buying or holding Doral stock based on Mr. Levis's misrepresentations. That evidence will not establish that Doral's share price was inflated as a result of the misrepresentations.   Regarding the caps, the substantively charged misrepresentations occurred from February 9-15, 2005. *See* Superseding Indictment, Counts 2-4. These misrepresentations were not made in any public filings or disseminated by Mr. Levis to the public at large. There is no evidence of a spike in Doral's share price or volume in early to mid-February 2005.

Regarding the valuations, it was undisputed at trial that Mr. Levis was not responsible for the *internal* valuation of the IO portfolio that Doral reported on its financial statements. (Tr. 2675).  That *internal* valuation was reviewed and verified by Price Waterhouse Coopers (PWC), an independent auditor.  Doral's internal valuation necessarily depended upon assumptions about the speed with which borrowers would prepay their mortgages (the "prepayment speed") and the discount rate.  Those internal assumptions were published to the market on a quarterly basis.  PWC spent four to five thousand hours per year independently testing Doral's financials and internal assumptions and valuations.  PWC used assumptions about prepayment speed and the discount rate that were "independent from management" and not influenced by Mr. Levis or Doral. (Tr. 1665).  The model used by PWC yielded a *higher* valuation than Doral's internal valuation, as confirmed at trial by government witness Carlos Mendez. (Tr. 1684).   There is no evidence that Mr. Levis's alleged corruption of, or misstatements about, the independence of the two other *external* valuations inflated Doral's share price.

Equally significant, the government cannot establish that the decline in the share price of Doral stock was "proximately caused" by the revelation of the truth about the matters previously misrepresented by Mr. Levis, as opposed to other firm-specific and industry-wide factors. *Dura Pharmaceuticals, supra*; *Rutkoske, supra*. Under the prevailing law set forth above, the government cannot establish

BLACK SREBNICK KORNSPAN STUMPF

Judge Griesa (continued)
November 10, 2010
Page 11

a "loss" for sentencing purposes merely by showing that an investor lost money after purchasing or holding the stock in reliance upon Mr. Levis's misrepresentations.

As the Court will recall, the watershed event in the history of Doral's financial reporting was the correction of its accounting methodology to incorporate the "forward curve" instead of the "spot rate." *See* GX206; Superseding Indictment, pp.9-10, at ¶18; Tr.2670. Mr. Levis was not involved in the choice of methodology. And, as the government conceded at trial, there was nothing criminal associated with the use of the spot rate or the accounting change. Thus, any analysis of trading losses must invariably account for, and disentangle, the effect on Doral's share price of the use of the spot rate and the subsequent change to the forward curve.

We anticipate that the government will focus on the decline in Doral's share price from $38 to $21 during the three days following the release, on March 15, 2005, of Doral's 2004 Form 10-K and Annual Report. *See* GX-6203 (attached as **Exhibit A**). The 2004 Form 10-K and Annual Report consumed 519 pages and contained a substantial amount of information about Doral that would naturally affect its stock price. The 2004 Form 10-K and Annual Report disclosed, for the first time, that Doral used the spot-rate method to value its IO portfolio. *See* Superseding Indictment, p.17, at ¶34; **Exh. A, at p.37.** As noted above, Mr. Levis was **not** the person who determined that Doral should use the spot rate, as opposed to the forward curve.

The 2004 Annual Report also disclosed significant new information about Doral's revenue from mortgage production, assumptions that influenced the internal valuation of the IO portfolio (*i.e.*, prepayment speed and discount rate), and a host of other industry-wide and firm-specific factors. The 2004 Annual Report also included a chart demonstrating the sensitivity of Doral's IO portfolio to a hypothetical rise in interest rates. **Exh. A, at p.74.** This disclosure was inconsistent with Mr. Levis's statements to certain investors about the effect of the embedded caps.

On March 17, 2005, following the disclosure of the 2004 Form 10-K and Annual Report, Doral held its first ever 2004 10K Earnings Call. *See* Transcript of 2004 10K Earnings Call (DX124) (attached as **Exhibit B**). The callers asked questions about many subjects, including but not limited to Doral's internal valuation assumptions, its level of mortgage originations, adequacy of hedging, the prospect of a share repurchase program, new taxes on financial institutions in Puerto Rico, a particular mortgage swap transaction with competitor R&G, outside valuations, and caps in the contracts. *See* **Exh. B.**

Judge Griesa (continued)
November 10, 2010
Page 12

Given the volume of information disclosed in the 2004 Annual Report, and the questions posed in the 2004 10K Earnings Call, the overwhelming majority of which had nothing to do with caps, it reasonably cannot be determined whether, or to what extent, the fall in Doral's share price from March 16-18, 2005, was proximately caused by the disclosure about the sensitivity of the IO portfolio to a possible rise in interest rates. The only investors who logically could complain about this revelation are those few who Mr. Levis allegedly misled about the caps. Of those few investors, most held their shares long after the release of the 2004 Form 10-K and Annual Report or never purchased shares at all. It is unknown how many actually sold their shares (and how many total shares were sold). More importantly, the analysts themselves expressed concern with other then-existing problems, not just the future hypothetical risk to the IO portfolio of an increase in interest rates, especially in view of Doral CEO Salomon Levis's statement at the Earnings Call that any potential losses to the IO portfolio would be offset "fully or in part by the hedging gains." **Exh. B, at p. 18.**

In sum, it "reasonably cannot be determined" whether, and to what extent, the disclosure of the truth regarding Mr. Levis's misrepresentations regarding the caps and the external valuations affected Doral's share price. The government has not produced an "event study" nor offered any expert testimony to link the decline in the share price to the offense conduct in this case. Evidence that investors lost money after relying on Mr. Levis to either purchase or hold their shares in Doral does not establish that Mr. Levis "proximately caused" their loss.

### 3.    The "Gain" to Mr. Levis is $38,000

When the loss from the offense "reasonably cannot be determined," the Guidelines instruct courts to use gain as an alternative.  *See* U.S.S.G. §2B1.1 n.3(B).

Mr. Levis never exploited his alleged misrepresentations to profit from the offense because he never sold a single share of Doral stock, much less during the period when the price was inflated. In fact, almost at peak price, on January 24, 2005, Mr. Levis purchased an additional $1,074,982 worth of Doral stock.

However, Mr. Levis did receive a salary and bonus from Doral in his capacity as an officer of the company. His annual compensation is set forth in the revised PSR, at ¶120. Mr. Levis's total bonus for 2002 and 2003 was $425,000 per year. He received no bonus in 2004. Mr. Levis's bonus was based, in part, on Doral's reported financial results. The most logical measure of Mr. Levis's gain, therefore, should reflect the difference between the bonus he actually received for 2002-04, which was based on the financial results originally reported by Doral, and the

Judge Griesa (continued)
November 10, 2010
Page 13

bonus he would have received had it been based on Doral's restated financials.[4] As reflected in the revised PSR, at ¶¶59-60, that gain is $38,000.

The revised PSR, however, relies upon the calculation submitted by Doral, which simply combines the bonus that Mr. Levis received in 2000 ($410,000) with the bonus he received in 2003 ($425,000). PSR, at ¶72. According to the PSR, the total amount – $835,000 -- represents an amount to which Mr. Levis was not entitled based on the restated numbers.

We object to this calculation, and would note that the bonus in 2000 was outside the time period charged in this case. *See* Superseding Indictment, at ¶¶17, 50, 52. Moreover, the calculation assumes that Mr. Levis was not entitled to any bonus in 2003. Yet, even based on the restated numbers, Doral had positive earnings in 2003 and Mr. Levis was entitled to a bonus of $387,000. Thus, the "gain" is $38,000 ($425,000 less $387,000).

### III.   **Motion for Downward Departure**

To the extent that the Court determines that the range is higher than the 24-30 months recommended in the initial PSR, we respectfully move for a downward departure on the grounds that: 1) the offense level determined under the advisory Guidelines "substantially overstates the seriousness of the offense." U.S.S.G. §2B1.1, n.19(c) (2009); and 2) the unique facts of this case take it outside the "heartland" of fraud cases. U.S.S.G. §5K2.0; *Koon v. United States*, 518 U.S. 81, 95-96 (1996). The central feature of both bases for departure is that the alleged offense was not motivated by, and did not result in, any significant financial gain to Mr. Levis.

Despite his purported knowledge that Doral was overvalued, Mr. Levis never sold a single share of Doral stock, not even after the alleged misrepresentations were revealed. To the contrary, as noted above, Mr. Levis actually invested an additional $1,074,982 in Doral near its peak price in January 2005. As a result, Mr. Levis's Doral stock portfolio, once valued at more than $60 million, is now valued at less than $200,000. Thus, as alleged fraud schemes go, this was one of the few in history where the defendant suffered along with the investors during the course of the alleged fraud. Mr. Levis did not exploit the alleged misrepresentations for his financial benefit, placing this case far outside the "heartland" of fraud cases.

---

[4] The bonus he earned in 2004 – calculated at $660,000 – is not included because Mr. Levis was terminated on August 19, 2005, before actually receiving that bonus.

Judge Griesa (continued)
November 10, 2010
Page 14

In the classic fraud case, the defendant causes losses to the victim – *e.g.,* by promoting a non-existent or ineffective product, engaging in a Ponzi-scheme, or billing an entity such as Medicare for goods and services not provided, etc. – for the purpose of obtaining the victim's money for the defendant's own enrichment. In that scenario, the fraud amounts to theft for the defendant's benefit, often to support the defendant's lavish lifestyle.  Thus, in the classic fraud case, the defendant's gain is comparable to, or bears some rational relationship to, the victim's loss.

That type of fraudulent scheme is qualitatively and **significantly** more egregious than a fraud case involving misrepresentations to the investing public in which the defendant does not benefit or seek to benefit from the misrepresentations, but rather suffers together with other shareholders. Yet, the Guidelines do not distinguish between theft-type fraud cases and fraud cases not motivated by gain.  In other words, this specific factor is not mentioned in the Guidelines and, therefore, may be considered as a ground for downward departure under both U.S.S.G. §2B1.1, n.19(c) and U.S.S.G. §5K2.0.

## IV.    Request for Downward Variance

To the extent that enhancements for "loss" and other factors produce a sentencing range that is disproportionate to Mr. Levis's offense conduct and offender characteristics, we respectfully request the Court to grant a downward variance from that range.  The variance request is based on, among other factors, a policy disagreement with how harshly the Guidelines treat offenders in accounting-related cases involving public companies, where the offenders do not exploit their alleged misconduct for financial gain.  *See generally United States v. Cavera*, 550 F.3d 180, 191-92 (2d Cir. 2008) (*en banc*) (holding that "a district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses"); *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007).

To be sure, the Guidelines often frustrate their very purpose of avoiding disparities in sentencing when they are mechanically applied to accounting-related fraud cases involving publicly-traded companies.  In such cases, the market capitalization loss alone can become the driving force behind a defendant's guideline range, to the exclusion of any other factor relating to a defendant or his particular conduct.  As Judge Rakoff recognized, the "guidelines' fetish with abstract arithmetic" can yield a "barbarity" and a "travesty of justice," especially in accounting-related securities fraud cases.  *See United States v. Adelson*, 441 F.Supp. 2d 506, 511-12 (S.D.N.Y. 2006), *aff'd* 301 Fed.Appx. 93 (2d Cir. 2008) (affirming 42 month sentence imposed upon defendant convicted of accounting

Judge Griesa (continued)
November 10, 2010
Page 15

fraud notwithstanding recommended guideline range of life).

The request for a variance is also based on the traditional factors under 18 U.S.C. §3553(a). The advisory range is "after all, but one of eight factors the sentencing judge must consider." *United States v. Ovid*, No. 09-Cr-216 (JG), 2010 WL 3940724, *1 (E.D.N.Y. Oct. 1, 2010) (Gleeson, J.). Moreover, the sentencing judge "may not presume that a Guidelines sentence is reasonable." *Cavera*, 550 F.3d at 189. While the advisory "Guidelines should be the starting point and the initial benchmark," they are "not the only consideration." *Gall v. United States*, 552 U.S. 38, 49 (2007). So while this Court must begin by calculating the applicable advisory Guidelines range, it also has broad discretion to impose a sentence far below that range. *See id.* at 49-51; *see also generally United States v. Booker*, 543 U.S. 220 (2005). It may sentence below the advisory Guidelines range either (a) because "the case at hand falls outside the 'heartland' to which the [Sentencing] Commission intends individual guidelines to apply, U.S.S.G. §5K2.0," i.e., a downward departure (already discussed above), or (b) because "the Guidelines sentence itself fails properly to reflect the §3553(a) considerations," i.e., a variance. *Rita v. United States*, 551 U.S. 338, 351 (2007).

After considering the Guidelines, a sentencing court "should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the Court] may not presume that the Guidelines range is reasonable. [The Court] must make an individualized assessment based on the factors presented." *Gall*, 552 U.S. at 49-50. This is based on the "federal judicial tradition" that a court "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Id.* at 52. Ultimately, the overarching consideration is that the sentence must be "sufficient, but not greater than necessary" to comply with the purposes of sentencing. 18 U.S.C. §3553(a). We discuss the relevant §3553(a) factors.

## A.   **The Nature and History of the Defendant**

Mr. Levis is a non-violent, first-time offender. There was no evidence at trial, nor any information in the PSR, to suggest the existence of any aggravating factors. Mr. Levis is not flashy. He does not live an extravagant lifestyle. Rather, he is a quiet and introverted person. Indeed, the Court had the opportunity to observe Mr. Levis throughout the trial. Mr. Levis displayed the utmost respect for the Court and the justice system during this case, even extending a handshake to the government prosecutors after the conclusion of the trial. The letters submitted to the Court portray a person who would never intentionally harm anyone, who is devoted to his family, and who has helped the community.

Judge Griesa (continued)
November 10, 2010
Page 16

In addition to Mr. Levis's good deeds, the PSR depicts Mr. Levis's life-long battle with alcoholism. This struggle has, at times, consumed Mr. Levis's life. At the sentencing, we may present or proffer testimony regarding this issue.

### B.  The Nature of the Offense

Although Mr. Levis was convicted of making misrepresentations to investors, it was clear from the evidence at trial that Mr. Levis was not the architect of any accounting irregularities at Doral.  He was not the CEO, President, or CFO. And, it is reasonable to infer from the evidence at trial that he was not calling the shots. Rather, he was miscast in the role of handling "investor relations," a position for which he was clearly not suited.

Moreover, as noted above, this securities fraud case is far different than some of the cases in this district that have resulted in astronomical sentences. Namely, Mr. Levis did not seek to profit from the misrepresentations. He believed in Doral and in its future and suffered along with the other shareholders.

In fraud cases, the motive is virtually always greed.  In the typical case, the fraudster exploits his offense conduct so that he can live beyond his means at the expense of the victims. This case is the exception. There was no evidence of that motive here. There was no evidence that Mr. Levis exploited his offense conduct. To be sure, the letters submitted on his behalf speak to the absence of greed and self-enrichment.

### C.  Deterrence, Punishment, and Rehabilitation

A lengthy term of imprisonment is not necessary to deter Mr. Levis from future criminal activity.  He has none of the hallmarks of a recidivist, especially in view of his previously-clean record at the age of 47 and the fact that the offense was not motivated by greed or self-enrichment.  There is no reason to worry that Mr. Levis is likely to commit future acts of fraud.  He will never again be in a position of influence within a public company.  No period of incarceration is necessary to teach him what he has already learned during this traumatic five-year ordeal.

Rehabilitation is not a concern because of his lack of prior convictions. The problems from which he suffers, such as alcohol abuse, can best be rehabilitated through therapy in the outside world, not through incarceration.  Given Mr. Levis's penchant for community service, this Court should consider the value that could be derived from a substantial community service requirement in lieu of a portion of incarceration. As one commentator has noted, "community service can

Judge Griesa (continued)
November 10, 2010
Page 17

utilize the expertise of the white-collar offenders for public advantage." Elizabeth Szockyj, *Imprisoning White-Collar Criminals?*, 23 S.Ill. U. L. J. 485, 498 (1998-99).

### D.   **The Sentences Available**

The offenses of conviction do not carry a mandatory sentence.  The Sentencing Guidelines are advisory and a guidelines sentence is not presumptively reasonable. Under *Cavera*, this Court has wide discretion to impose a sentence that is reasonable.

### E.   **The Need to Avoid Unwarranted Sentencing Disparities**

This factor does not apply because there are no co-defendants in this case.

### V.   **Conclusion**

For the reasons stated above, the Court should impose a sentence that is no greater than necessary to achieve the goals of sentencing as outlined in §3553(a).  A sentence consistent with the 24-30 months advisory range in the initial PSR would be fair and reasonable.

Respectfully submitted,

ROY BLACK

cc:   USPO Ross Kapitansky
      AUSA David Miller
      AUSA Marc Litt