UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                    :

    - v. -                    :          08 Cr. 181 (TGP)

MARIO S. LEVIS,                    :
    a/k/a "Sammy Levis,"

                :

        Defendant.

                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## **GOVERNMENT'S SENTENCING MEMORANDUM**


                             PREET BHARARA
                             United States Attorney for the
                             Southern District of New York

DAVID I. MILLER
MARC LITT
Assistant United States Attorneys

JASON ANTHONY
Special Assistant United States Attorney

    - Of Counsel -

## **TABLE OF CONTENTS**

RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

I.  APPLICABLE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

II. ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    A.    Application of the Sentencing Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        1.    Guidelines Computation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        2.    Loss Enhancement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        3.    More Than 250 Victims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        4.    Officer/Director of Publicly-Traded Company . . . . . . . . . . . . . . . . . . . . . 34

    B. Application of the Section 3553 Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        1.    The Nature and Circumstances of the Offense . . . . . . . . . . . . . . . . . . . . 34

            a. Importance of the IOs to Analysts and Investors . . . . . . . . . . . . . . . . . 34

            b. Effect of the "Independent" Valuations of the IOs . . . . . . . . . . . . . . . . . 38

            c. Financial Harm Caused By the Fraud . . . . . . . . . . . . . . . . . . . . . . . . 41

        2.    History and Characteristics of the Defendant . . . . . . . . . . . . . . . . . . . . . 43

        3.    The Need to Afford Adequate Deterrence . . . . . . . . . . . . . . . . . . . . . . . 44

        4.    The Need to Avoid Unwarranted Sentence Disparities . . . . . . . . . . . . . . . . 44

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                                    :

       - v. -                                                   :               08 Cr. 181 (TGP)

MARIO S. LEVIS,                                              :
      a/k/a "Sammy Levis,"
                                                            :

              Defendant.                                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in connection with the sentencing of defendant Mario S. Levis, a/k/a "Sammy Levis" ("Levis"), scheduled for November 16, 2010.

Defendant Levis's crimes were calculating and brazen. Levis systematically manipulated the reported value of one of Doral's most important assets – its interest-only ("IO") strips – by lying to analysts and investors about Doral's purportedly conservative, independent valuation methodology and the contracted protections ("caps") that purportedly were built into the IO strips. Through his misrepresentations, Levis succeeded in persuading certain individual investors and stock analysts of the propriety of the inflated valuations of the IO strips. As a consequence, Doral's stock price remained artificially high until Levis's scheme was disclosed.

As a major Doral shareholder and key executive, Levis had reason to lie and inflate Doral's stock: He increased his own personal wealth both by keeping the value of his stock holdings high and by earning bonus compensation. Ultimately, when Levis could no longer conceal his lies about the caps and "independent" valuations of the IO strips, Doral's house of cards came crashing down, and thousands of investors lost money when Doral's share price

dropped and Doral's market capitalization dropped by billions of dollars. Given the scope of

Levis's fraudulent conduct and the severity of its effects on individual investors and public

confidence in the banking system and in financial markets generally, Levis should receive a

substantial sentence that will deter others from engaging in such conduct. The advisory

Guidelines range of 324 to 405 months' imprisonment would serve that end as well as the other

legitimate purposes of sentencing set forth in 18 U.S.C. § 3553(a). Alternatively, the Court

should sentence Levis to a significant sentence that would promote general deterrence and

sufficiently punish Levis for the widespread impact of his crimes.

## RELEVANT FACTS

### Relevant Entities and Individuals

Doral Financial Corporation ("Doral") was a Puerto Rico corporation with its

headquarters in San Juan, Puerto Rico. (*See* Pre-Sentence Report ("PSR") ¶ 8). Doral was a

financial holding company with, among other things, mortgage banking operations in Puerto

Rico and New York, New York. (*Id.*). Doral was also a leading residential mortgage lender in

Puerto Rico, issuing approximately $7.8 billion and approximately $6.5 billion in loans during

2004 and 2003, respectively. (*Id.*) At all relevant times, Doral's common stock was traded on

the New York Stock Exchange under the trading symbol "DRL." (*Id.*).

In order to maintain public trading of its securities in the United States, Doral was

required to comply with the federal securities laws, including the Securities Exchange Act of

1934 (the "Exchange Act") and the rules and regulations promulgated thereunder, which are

designed to ensure that a company's financial information is accurately recorded and accurately

disclosed to the public. (*Id.* ¶ 9). Specifically, Doral was required to: (a) file with the United

States Securities and Exchange Commission (the "SEC") annual financial statements (on SEC Form 10-K) that had been audited by independent certified public accountants; (b) file quarterly financial reports with the SEC (on SEC Form 10-Q); (c) make and keep books, records, and accounts that accurately and fairly reflected Doral's business transactions; and (d) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that Doral's transactions were recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles. (*Id.*).

From at least in or about 2000, the annual financial statements and quarterly reports filed by Doral with the SEC purported to disclose truthfully, among other things, Doral's financial condition, including its net income and net assets. (*Id.* ¶ 10). After filing, Doral's annual financial statements and quarterly reports were made available to the investing public by the SEC and by Doral. (*Id.*). Doral also communicated certain information regarding its financial condition and activities to the investing public by way of press releases, statements made by Doral executives, and other means. (*Id.*). Members of the investing public, including Doral's stockholders and market analysts, considered and relied upon this financial data and information in making and recommending investment decisions. (*Id.*).

At all relevant times, Levis held the position of Treasurer and, as of on or about April 22, 2002, Senior Executive Vice President, of Doral. (*Id.* ¶ 11). Among other things, Levis acted as Doral's primary liaison to investors, potential investors, and market analysts, fielding investor and analyst telephone calls and e-mails, and representing the company at investor presentations, road shows, and in-person meetings. (*Id.*). For each of the years 2002 and 2003, Doral paid Levis $825,000, in salary and incentive bonus. (*Id.*).

3

Levis and his family owned a substantial number of shares – and options to purchase a substantial number of shares – of Doral common stock worth hundreds of millions of dollars. (*Id.* ¶ 12). As of March 1, 2005, Levis owned 2.6 million shares (approximately 2.4 percent) of Doral stock. (*Id.*). At the height of Doral's stock price appreciation, Levis's shares and options were worth approximately $130 million. (*Id.*). Levis also received, in connection with those shareholdings, several additional millions of dollars in dividend payments over the relevant time period, which were based in part on Doral's reported positive earnings performance. (*Id.*).

As of March 1, 2005, Levis and other close family relations (collectively, the "Levis Family") together beneficially owned a total of approximately 9.2 million shares (approximately 8.2 percent) of Doral stock. (*Id.* ¶ 13). At the height of Doral's stock price appreciation, the Levis Family's Doral stock holdings were worth more than approximately $450 million. (*Id.*).

### Doral's Business Operations

Doral's primary business activities included the origination, through its mortgage banking subsidiaries, of 15- and 30-year first mortgage loans secured by single family residences primarily located in Puerto Rico. (*Id.* ¶ 14). These loans included what are commonly known as "non-conforming" mortgage loans. (*Id.*). These were loans that exceeded lending limitations regarding, for example, size, credit terms, loan documentation, and income verification established by the principal purchasers and guarantors of the secondary mortgage market, including the Federal Home Loan Mortgage Corporation and the Federal National Mortgage Association. (*Id.*).

After making these mortgage loans, Doral customarily sold most of the loans to other financial institutions in Puerto Rico (the "Secondary Buyers"). (*Id.* ¶ 15). Levis and another

senior representative of Doral (the "Doral Senior Representative") negotiated the contracts for the loan sales, and Levis, in his capacity as Doral's Treasurer, executed virtually all the loan-sale contracts. (*Id.*). Under the terms of these loan-sale contracts, the Secondary Buyers typically purchased large collections, or "pools," of mortgage loans. (*Id.*).

The terms of Doral's loan-sale contracts with the Secondary Buyers provided that the Buyers would be entitled to receive all of the principal repaid by the mortgage borrowers and a portion of the interest; Doral would be entitled to retain the remainder of the interest payments. (*Id.* ¶ 16). The interest amount provided to the Secondary Buyer was called the "pass-through rate." (*Id.*). Doral therefore collected the difference, or spread, between the pass-through rate and the interest rate paid on the underlying mortgage loans. (*Id.*). The asset created by Doral's retained share of these interest payments was called an "interest-only strip" ("IO"). (*Id.*).

The interest rate owed by mortgage borrowers to Doral was typically fixed. (*Id.* ¶ 17). Beginning in or about 2000, however, the loan-sale contracts negotiated by Levis and others at Doral with the Secondary Buyers often provided for a variable pass-through rate based on an international interest rate known as the London Interbank Offered Rate ("LIBOR"), plus a fixed percentage. (*Id.*). Under the terms of these loan-sale contracts, the pass-through rate was reset on a quarterly basis based on fluctuations in LIBOR. (*Id.*).

Doral's spread therefore had an inverse relationship to LIBOR. (*Id.* ¶ 18). If LIBOR fell, then the pass-through rate also decreased, which increased Doral's spread between the pass-through rate and the mortgage interest rate. (*Id.*). Falling interest rates therefore enabled Doral to retain a larger portion of the interest on the loans it had sold, increasing Doral's revenue and profits. (*Id.*). If LIBOR rose, however, the pass-through rate also increased, shrinking the

5

spread between the pass-through rate and the mortgage interest rate. (*Id.*). A rising LIBOR therefore meant that Doral collected a smaller portion of the interest on the loans it had sold, reducing Doral's revenue and profits. (*Id.*).

Doral recorded on its publicly filed financial statements the purported present value of the anticipated future cash flows from the spreads between the pass-through rate and mortgage interest rate on the pools of loans it had sold, *i.e.* the IOs. (*Id.* ¶ 19). Doral reported that one of its principal sources of income was income attributable to the IOs. (*Id.* ¶ 20). In fact, over time, the income that Doral recorded from the IOs became increasingly important to the company's profitability. (*Id.*). Specifically, Doral reported IO-related income in its consolidated financial statements contained in reports publicly filed with the SEC of $72.7 million in 2000, $141.4 million in 2001, $197.9 million in 2002, $281 million in 2003, and $509 million in 2004. (*Id.*). Doral also reported in those same publicly filed statements the present day value of the income that it expected to earn from all of its IOs in the future: $158.0 million in 2001, $236.5 million in 2002, $359.2 million in 2003, $578.1 million in 2004, and $878.7 million in 2005. (*Id.*).

### Overview of the Fraudulent Scheme

Between in or about 2002 and in or about 2005, Levis directly and indirectly represented to others, including investors and market analysts, false and misleading information regarding the process by which Doral determined the publicly stated value of the IOs. (*Id.* ¶ 21). Specifically, in its public SEC filings, Doral represented that its IO's reported value was based, in part, on two "outside" and "independent" expert valuations provided to Doral on a quarterly basis. (*Id.*). Levis made similar representations to investors, market analysts, and others. (*Id.*). As Levis well knew, however, these representations were false and misleading. (*Id.*).

In addition to misrepresentations regarding the existence of outside, independent valuations, Levis misrepresented certain characteristics of Doral's IOs. (*Id.* ¶ 22). Specifically, Levis falsely informed investors and analysts that the sales contracts creating the IOs contained "caps" on the pass-through rate paid to the Secondary Buyers that would prevent the pass-through rate from increasing above a certain level. (*Id.*). Levis represented that such caps would protect the interest-rate spread to which Doral was entitled and thereby would enable Doral to avoid reducing the stated value of its IO portfolio, even if interest rates increased. (*Id.*).

Through these false and misleading statements regarding the existence of independent valuations and caps for pass-through rates, Levis and others made false representations to the investing public that Doral used reliable safeguards to confirm and preserve the reported value of one of its most important assets: its IOs. (*Id.* ¶ 23).

**The Valuation of Doral's IOs**

Beginning in or about 2001, Levis and the Senior Representative began increasing the percentage of loan sales to the Secondary Buyers that involved the pass-through rate fluctuating with the LIBOR. (*Id.* ¶ 24). As explained above, Doral's income from the IOs varied inversely with the LIBOR: If the LIBOR rose, then Doral's income from the IOs would shrink. (*Id.*). Any valuation of the IOs therefore turned in part on the pass-through rate during the outstanding term of the mortgage loans. (*Id.*). For example, if the average interest rate on a pool of mortgages was 7 percent, and the pass-through rate was 5 percent, then Doral collected the difference, or 2 percent. (*Id.*). If the pass-through rate rose to 6 percent a year later, then Doral's spread shrunk to 1 percent. (*Id.*).

7

There were at least two possible methodologies for taking into account the variable nature of the pass-through rate:  (a) a "spot rate" methodology, in which Doral would ignore predicted changes in LIBOR and instead value future income from the IOs based on LIBOR that existed at the time of each valuation – thus assuming that LIBOR would remain constant over the relevant loan term; and (b) a "forward curve" methodology, in which Doral would value future IO-related income based on changes in interest rates predicted by the marketplace.  (*Id.* ¶ 25).  In periods when interest rates were expected to rise, incorporating the forward curve into its internal IO valuation model would have reduced materially both the value of Doral's existing IOs and income that Doral had already publicly reported on sales of the underlying mortgages.  (*Id.*). Doral, however, internally adopted a spot-rate valuation methodology.  (*Id.*).  As Levis well knew, Doral's internal IO valuation method did not incorporate use of the forward curve, or any other similar measure to account for anticipated future interest rate fluctuations on the value of Doral's IOs.  (*Id.*).

Doral's independent auditor, PricewaterhouseCoopers ("PWC"), recommended to Doral that it improve the process by which its IOs were valued, including obtaining independent valuations of Doral's IOs by outside experts and accounting for fluctation of interest rates in the IO's valuation.  (*Id.* ¶ 26; GX-324[1]).  In response to PWC's recommendations, beginning in or about 2001, Doral obtained what Doral subsequently held out to PWC and to the investing public to be two "independent," "outside" valuations of its IO portfolio, one each from a third party. (*Id.*).  The first external valuation was purportedly performed by Jose Eugene Lopez, a Morgan

---

[1]  The Government exhibits cited herein are attached as exhibits to this memorandum in numerical order.

Stanley employee, working in San Juan, Puerto Rico. (*Id.*). Lopez knew the Levis family, and Lopez's son worked at Doral. (*Id.*). The second external valuation was performed by individuals employed at Popular Securities. (*Id.*).

Levis was involved in obtaining the purported outside, independent valuations and was principally responsible for communicating with and supplying information to Morgan Stanley and Popular Securities in connection with their valuations. (*Id.* ¶ 27).

### Representations Regarding the External Valuations's Independence

Levis and others at Doral represented to PWC and investors that Doral compared its internal valuation of the IOs to the two independent valuations and then selected the lowest of the three values for purposes of recording and reporting the value of its IOs. (*Id.* ¶ 28). In this way, Levis and Doral represented to investors that Doral was taking a conservative approach to the value of the IOs. (*Id.*). Indeed, this practice became incorporated as official company policy for Doral. (GX-2026 at DFC 00047728 (not admitted)).

From in or about 2001 through in or about 2005, Levis caused Doral to make the following false and misleading statements, among others, in its annual reports and other public statements regarding these valuations: (a) that Morgan Stanley performed a valuation, and that it was based on "market quotes"; and (b) that Popular Securities performed a valuation, using a discounted cash flow analysis, which was independent and based on Popular Securities's own assumptions rather than assumptions provided by Doral. (*Id.* ¶ 29).

For example, Doral's 2004 Annual Report on Form 10-K stated:

> To determine the fair value of its IO portfolio, Doral [] engages in two external valuations with parties independent of the Company and of each other. One of them consists of dealer market quotes for similar instruments and the other one consists of a cash flow valuation model

in which all economic and portfolio assumptions are determined by the preparer.

(*Id.* ¶ 30).

**Morgan Stanley's "Market Valuation"**

As Levis well knew, Doral was required to account for its IOs at their fair value, and quoted market prices – meaning, price quotes that prospective buyers would pay for an asset – were a widely accepted and preferred measure of fair value. (*Id.* ¶ 31). Beginning in or about late 2001, through in or about early 2005, on a quarterly basis, Levis requested and obtained from Morgan Stanley a document that purported to be a "market valuation" of Doral's IO portfolio. (*Id.*).

From in or about December 2001 through in or about 2005, in communications with PWC, Levis repeatedly and falsely represented, and caused others to represent, that Morgan Stanley's valuations were based on "market quotes" for similar instruments, and cited those valuations as proof that Morgan Stanley had conducted such valuation work. (*Id.* ¶ 32). For example, in response to a specific request for information from PWC for use in connection with its annual audit of Doral's financial statements, in an e-mail dated on or about February 19, 2003, Levis directed another Doral employee to represent to PWC that Morgan Stanley's valuations were "a market quote." (*Id.*). Levis further wrote that "all [Morgan Stanley] does is to call his trader in NYC and get a quote. We have explained this to [PWC] in the past." (*Id.*).

As noted above, the statements contained in Doral's annual reports, which Levis reviewed and approved, similarly stated, among other things, that Doral's IO portfolio's value was supported by market quotes obtained from a third-party entity, referring to the work purportedly done by Morgan Stanley. (*Id.* ¶ 33).

10

In truth and in fact, however, as Levis well knew, the representation that Morgan Stanley

had conducted valuations of Doral's IO portfolio based on "market quotes" for similar or

comparable financial instruments was false, and the purported quarterly valuation documents

from Morgan Stanley were fabricated at Levis's direction. (*Id.* ¶ 34). No market quotes were

ever obtained from or supplied by Morgan Stanley or any Morgan Stanley employee (or anyone

else, for that matter), and Morgan Stanley never did any valuation work. (*Id.*). Instead, at

Levis's instruction, beginning in or about late 2001, and continuing through in or about early

2005, Jose Lopez merely copied into his own handwriting certain "valuations" provided by Levis

to Morgan Stanley and then returned his handwritten version to Levis. (*Id.*). These documents,

containing Lopez's handwriting and signature, constituted the "market valuation" for Doral's

IOs, which Levis caused Doral falsely to hold out to PWC and others as an "independent"

valuation "consist[ing] of dealer market quotes for similar instruments." (*Id.*).

Between in or about 2001 and in or about early 2005, the phony Morgan Stanley "market

valuation" typically purported to appraise Doral's IO portfolio at a higher value than Doral's

internal valuation model, enabling Doral to use its internally-generated and artificially-inflated

valuation for purposes of financial reporting. (*Id.* ¶ 35).

### Popular Securities's "Independent" Valuation

As Levis knew, public representations contained in Doral's SEC filings concerning

Doral's second independent IO valuation was also false and misleading. (*Id.* ¶ 36). Specifically,

as Levis well knew, Popular Securities's valuation of Doral's IOs was based, in substantial part,

on instructions and information from Doral, not on assumptions determined independently by

Popular Securities, as Doral suggested to the public. (*Id.*). The direction provided by Doral's

11

management rendered those representations about the independence and integrity of Popular Securities's valuation work false and misleading. (*Id.*).

Beginning in or about September 2003, employees of Popular Securities informed the Doral Senior Representative that Popular Securities intended to revise its methodology to, among other things, incorporate a "forward curve," which would reflect the impact of anticipated future interest rate increases on the value of Doral's IOs. (*Id.* ¶ 37). Employees of Popular Securities explained that their proposed revised model would no longer employ a "spot rate" methodology, and thus would no longer assume that the pass-through rate would remain constant over time. (*Id.*). This proposed change, had it been implemented in or about September 2003, would have resulted in a materially lower valuation of Doral's IO portfolio, because at that time, the market expected interest rates, like LIBOR, to increase in the future. (*Id.*).

In response to Popular Securities's stated intention to use the forward curve in evaluating Doral's IOs, the Doral Senior Representative provided false information to Popular Securities about certain characteristics of Doral's IO portfolio. (*Id.* ¶ 38). As set forth below, Levis repeated a similarly misleading representation to Popular Securities. (*Id.*). Through these statements, Levis and the Senior Representative falsely informed Popular Securities that a forward curve methodology was unnecessary because Doral's IOs were immune to any fluctuations in the LIBOR beyond a certain point. (*Id.*). Specifically, on or about September 22, 2003, the Doral Senior Representative, who stated that he was speaking on Levis's behalf, falsely represented to Popular Securities employees that Doral had "caps" in place on the pass-through rate that, for 95 percent of its IOs, would prevent the pass-through rate from increasing above approximately 3.4 percent, on average. (*Id.*). Furthermore, in or about September 2004, in

connection with Popular Securities's valuation analysis, Levis falsely claimed that the pass-through rate on 97 percent of Doral's floating-rate IO portfolio was capped at 3.375 percent. (*Id.*). Levis further represented that Doral's spread on the remaining 3 percent of its IOs was protected in a different way. (*Id.*).

Popular Securities relied on these false representations in valuing Doral's IOs. (*Id.* ¶ 39). This had the effect of increasing the IO's value substantially beyond the value that Popular Securities would otherwise have calculated had its valuation been independent and not based on the false representations of Levis and the Doral Senior Representative. (*Id.*).

In addition to misleading Popular Securities regarding the existence of "caps" on the pass-through rate for Doral's IOs, Levis also sought to, and did, direct Popular Securities to materially alter certain additional key assumptions in Popular Securities's IO valuation analysis, rather than permit Popular Securities to determine all economic and portfolio assumptions for itself. (*Id.* ¶ 40). As a result, Levis further undermined the independence of Popular Securities's analysis. (*Id.*). Typically, the assumptions and information that Popular Securities utilized, at Levis's request and direction, had the effect of increasing Popular Securities's ultimate valuation of Doral's IOs. (*Id.*). Levis also falsely told Popular Securities that, among other things, Popular Securities's valuations were being used by Doral for Doral's internal purposes only, when, in truth and in fact, and as Levis well knew, Doral was using those valuations to justify Doral's publicly reported value of its IOs. (*Id.*). In its SEC filings for 2003 and 2004, for example, Doral represented that this purportedly indepdent valuation was based on a model "in which all economic and portfolio assumptions [were] determined by the preparer." (*Id.*).

During 2003 and 2004, Popular Securities's purportedly independent valuations typically appraised Doral's IO portfolio at a higher dollar value than Doral's internal valuation model. (*Id.* ¶ 41). This enabled Doral to record and report a value for its IOs that Doral itself determined, and to represent falsely to the public that the reported value was the lowest of the three valuation figures it had obtained. (*Id.*).

On or about March 15, 2005, in its 2004 Form 10-K, Doral disclosed publicly for the first time that it used a spot-rate methodology to value its IOs. (*Id.* ¶ 42). Doral also disclosed the magnitude of the potential impairments that future increases in LIBOR would have on the stated value of the IOs – without taking into account any mechanisms that Doral had in place to limit or counteract such impairments – under Doral's valuation methodology. (*Id.* ¶ 42). For example, an increase in LIBOR of 0.25 percent would impair the value of Doral's IOs by approximately $70 million, while a 2 percent increase in LIBOR would impair the value of Doral's IOs by approximately $540 million. (*Id.*). Doral's closing stock price plummeted after the filing of the Form 10-K, falling from $38.29 to $21.50, or 43.8 percent, by the close of the market on March 18, 2005. (*Id.*).

On or about March 16, 2005, upon reading Doral's 2004 Form 10-K, and, specifically, that portion referring to "external" IO valuations, Popular Securities contacted Levis to confirm what Popular Securities understood from Levis's prior statements to Popular Securities: namely, that Popular Securities's valuations were being used for Doral's internal purposes only and, more specifically, that Popular Securities was not one of the "external" and "independent" valuators described in the Form 10-K. (*Id.* ¶ 43). On or about March 16, 2005, Levis reiterated his lies, telling Popular Securities that the IO valuation work performed by Popular was for Doral's

14

internal use only, and that Popular Securities was not one of the external independent parties referenced in Doral's 2004 Form 10-K. (*Id.*). As Levis well knew, however, that statement was false, because the reference in the 2004 Form 10-K to the "external" valuations prepared by an "independent" party "consist[ing] of a cash flow valuation model in which all economic and portfolio assumptions are determined by the preparer," was, in fact, a reference to Popular Securities. (*Id.*).

In or about March 2005, in response to requests from investors and analysts for the identities of the external valuators, Levis made false statements to explain why he could not do so. (*Id.* ¶ 44). Specifically, Levis falsely represented that he could not share the identities of the external valuators due to the existence of confidentiality agreements. (*Id.*).

**Recommendations to Change Doral's IO Valuation Methodology**

In addition to disseminating information to the public through Doral's public SEC filings, Levis transmitted information concerning Doral's financial results and operating performance directly to members of the investing public through various methods, including through interstate telephone calls, e-mails, and face-to-face conversations (with analysts and investors in New York, New York and elsewhere). (*Id.* ¶ 45). Members of the investing public, including Doral's stockholders and market analysts responsible for following and opining on the value of Doral's stock, considered and relied upon the information provided by Levis in these direct communications in deciding whether to purchase, hold, or sell Doral securities, or in making recommendations relating to such decisions. (*Id.*).

From in or about the Fall 2004 to in or about early 2005, in response to concerns raised by federal banking regulators, Doral hired an independent financial consulting firm (the

15

"Consulting Firm") to review Doral's procedures for managing interest rate risk. (*Id.* ¶ 46). During that engagement, the Consulting Firm learned of Doral's internal IO valuation methodology and concluded that, because Doral was using a spot-rate methodology to value its IOs – and was therefore, in effect, assuming that the pass-through rate would remain fixed in the future, even though the market expected interest rates to rise – Doral's calculation of the value of its IOs was overstated by in excess of approximately $450 million. (*Id.*). Indeed, starting at least in or about 2003, interest rates, and particularly LIBOR, had begun to rise. (*Id.* ¶ 47).

On or about January 18, 2005, without publicly disclosing the fact that Doral was utilizing a spot-rate valuation methodology that assumed LIBOR remained fixed, Doral publicly announced a $97.5 million write-down of its IO's value (the "Impairment") with respect to the company's fourth quarter 2004 financial statements. (*Id.* ¶ 48). Doral's stock price began to decline, decreasing the value of the stockholdings of Levis and his family and also negatively affecting Doral's other shareholders. (*Id.*).

On or about February 8, 2005, Doral employees reported directly to Levis that, among other things, (a) Doral's IO portfolio was subject to substantial devaluation if LIBOR were to rise further, and (b) it was too expensive to hedge the risk of such a devaluation. (*Id.* ¶ 49).

On or about February 23, 2005, the Consulting Firm recommended to Doral's Asset and Liability Committee, of which Levis was a member, that: (a) Doral change its model for valuing its IO portfolio to a method incorporating the forward curve, in order to account for anticipated future changes in interest rates; and (b) such a change would decrease the value of Doral's IO portfolio by hundreds of millions of dollars. (*Id.* ¶ 50). On or about March 21, 2005, the

Consulting Firm made a similar report and recommendation to the Doral board of directors. (*Id.*
¶ 51).

### Levis's Misrepresentations Regarding Caps

Following Doral's January 2005 public announcement of the Impairment, several

investors and analysts in the marketplace questioned Doral about the accuracy and reliability of

its IO valuation and about the possibility of future impairments. (*Id.* ¶ 52). From in or about

January 2005 up to and including in or about April 2005, Levis communicated regularly with

market analysts and investors. (*Id.* ¶ 53). In the course of those communications, Levis made

additional false and misleading statements concerning the anticipated effect of rising interest

rates on Doral's IO portfolio and concerning certain core characteristics of the contracts

underlying the IOs. (*Id.*). Among other things, Levis falsely represented to analysts and

investors that rising interest rates would not have a significant negative impact on the value of

Doral's IO portfolio or cause further impairments to that value, because, among other things, the

pass-through rates owed to the Secondary Buyers were capped at rates substantially below the

interest rate owed by the mortgage borrowers. (*Id.*). Set forth below are some of Levis's

material misrepresentations concerning the existence of caps:

- On or about February 1, 2005, Levis met with an investor representative in New York, New York, and falsely stated that the reported value of Doral's IO portfolio was protected by caps, which would substantially limit any future decrease in that reported value. (*Id.* ¶ 54).

- On or about February 9, 2005, Levis sent an e-mail from Puerto Rico to an analyst in New York, New York, working for a potential investor. In that e-mail, Levis falsely stated that "caps" "are embedded in the actual contract of the sale/purchase commitments . . .[,]" and he added that "All contracts (100%) have caps." (*Id.*).

- On or about February 10, 2005, Levis sent an e-mail from Puerto Rico to an analyst in New York, New York, and falsely stated that "all loans backing up our

17

[IOs] have Caps embedded in the sale/purchase agreements." Levis's e-mail also falsely stated that the "Caps" were "significantly below" the average interest rate to be paid by the mortgage borrowers to Doral, and that current interest rates were approaching those caps. Among other things, these statements were misleading in that they suggested that any future increases in LIBOR would not materially impair the value of Doral's IOs. (*Id.*).

- On or about February 10, 2005, Levis sent an e-mail from Puerto Rico to an analyst in Louisiana. In the e-mail, Levis falsely stated that "all loans sold have a cap ... embedded in each contract and all of them are significantly below" the average interest rate to be paid by the mortgage borrowers to Doral, so "Doral will always have a hefty and positive spread." Levis also falsely stated that current interest rates were "close to" those caps, thus falsely suggesting that any future increases in LIBOR would not materially impair the value of Doral's IOs. (*Id.*).

- On or about February 15, 2005, Levis sent an e-mail from Puerto Rico to an analyst in New York, New York, in which Levis again falsely claimed that there were caps on the pass-through rates owed to the Secondary Buyers. In the e-mail, Levis repeated that "[i]n all events, these caps are significantly lower" than the average interest rate to be paid by the borrowers to Doral, "[s]o at all times, Doral will enjoy a hefty positive spread." (*Id.*).[2]

Levis knew that these representations were false and/or misleading because, with only limited exceptions, Doral's contracts with the Secondary Buyers did not contain "caps" on the pass-through rate that would have protected Doral's IO's value in the manner that Levis suggested. (*Id.* ¶ 55). This, of course, stands in stark contrast to Levis's representation that "All contracts (100%) have caps." (*Id.* ¶ 54).

### Doral's Announcement of the Write Down

On or about April 19, 2005, Doral announced that it intended to change the methodology it used to value its IO portfolio to, among other things, incorporate the forward curve. (*Id.* ¶ 56). The forward curve reflected that the pass-through rate was not capped in the way that Levis had

---

[2] As noted in the PSR, Levis was acquitted of the wire fraud count incorporating this conduct. (PSR ¶ 55 n. 2).

stated.  (*Id.*).  Doral further announced that incorporating the forward curve would decrease the reported value of its IO portfolio by between $400 million and $600 million.  (*Id.*).  Between Doral's high stock price of $49.45 in early January 2005, and the period following the April 19, 2005 disclosure, Doral stockholders suffered an aggregate market capitalization loss of approximately $3.59 billion.  (*Id.*).  On or about August 22, 2005, Levis was asked to and did resign from Doral.  (*Id.* ¶ 57).

**Levis Is Charged with Securities and Wire Fraud**

On or about March 5, 2008, a four-count indictment (08 Cr. 181) was unsealed charging Levis with one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2, and three counts of wire fraud, in violation of 18 U.S.C. § 1343 and 2.  On or about March 6, 2008, Levis was presented before the Honorable Robert P. Patterson, U.S. District Judge, and was released on bail.  On or about March 31, 2008, Levis pleaded not guilty to Indictment 08 Cr. 181.  On or about February 18, 2010, Superseding Indictment S1 08 Cr. 181 (TPG) was filed charging Levis with one count of securities fraud, and four counts of wire fraud.  (*See* PSR ¶¶ 1-3).  From late March 2010 through on or about April 29, 2010, a jury trial was conducted in this matter.  On or about April 29, 2010, the jury found Levis guilty of Counts 1 (securities fraud), 3 (wire fraud), and 5 (wire fraud).  (PSR ¶ 5).  The jury acquitted Levis of Count 4 (wire fraud).[3]  (*Id.* ¶ 55 n. 2).

The statutory maximum penalty for Count One (securities fraud) is twenty years' imprisonment; a maximum term of three years' supervised release; a maximum fine, pursuant to Title 15, United States Code, Section 78ff and Title 18, United States Code, Section 3571, of the

---

[3]  On April 26, 2010, the Court dismissed Count 2 (wire fraud).

greatest of $5,000,000, or twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense; and a mandatory special assessment of $100.  (*See* PSR ¶ 124).  The statutory maximum penalties for each of Counts Three and Five (wire fraud) is a maximum sentence of twenty years' imprisonment; a maximum term of three years' supervised release; a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000, or twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense; and a mandatory special assessment of $100.  (*See id.* ¶ 124).

## DISCUSSION

## I.   APPLICABLE LAW

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005).   Thus, the Guidelines are more than "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).   The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States v. Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005).  In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the

20

need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims."

*Booker*, 543 U.S. at 259-60 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

The Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines

sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Crosby*, 397 F.3d at 112. Second, the Court must consider whether a departure from that Guidelines range is appropriate. *Id.* Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose, whether it be a Guidelines or non-Guidelines sentence. *Id.* at 113. In so doing, it is entirely proper for a judge to take into consideration his or her "own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

II.   **ANALYSIS**

As discussed below, the Government respectfully submits that Levis's unlawful conduct warrants imposition of a Guidelines sentence in this case. Levis's fraud had a significant financial impact on numerous investors and Doral, and caused substantial financial losses. Given the brazen nature of Levis's systematic fraud, and the severity of its effects, the Guidelines sentencing factors and those factors set forth in 18 U.S.C. § 3553(a) justify a substantial sentence.

A.   **Application of the Sentencing Guidelines**

Under a conservative application of the pertinent applicable Sentencing Guidelines, Levis has an adjusted offense level of 41, and because he has no prior criminal convictions, is in Criminal History category I. This results in an advisory Guidelines range of 324 to 405 months' imprisonment. The Guidelines sentencing range incorporates a Guidelines enhancement based on the loss caused by Levis's offense conduct, the number of victims who were harmed by Levis's conduct, and Levis's status as an officer of a publicly-traded company.

22

1.        **Guidelines Computation**

Because the offenses of conviction are fraud-related, Section 2B1.1 of the Guidelines

determines the applicable offense level.[4]  The PSR adopts the defendant's position that the loss

amount cannot be "reasonably determined," and instead relies upon the "gain" that Levis

received – *i.e.*, Levis's bonus compensation in the amount of $835,000 – in computing the

Section 2B1.1(b)(1) enhancement.  (PSR ¶ 72).  The Government disagrees with the PSR's

position on loss for the reasons set forth below.  Accordingly, as shown herein, the Government

submits that the PSR's Guidelines range of 57 to 71 months' imprisonment is incorrect.

Under Section 2B1.1, a conservative calculation of the defendant's offense level is

computed as follows:  the base offense level is seven (§ 2B1.1(a)(1)); because the loss exceeded

$50,000,000 but did not exceed $100,000,000, the base offense level is increased by 24 offense

levels (§ 2B1.1(b)(1)(M));[5] because the offense involved 250 or more victims, the base offense

---

[4]  Under Section 3D1.2(d), Counts One, Three, and Five are grouped.  (PSR ¶ 70).

[5]  On November 8, 2010, Doral submitted its Victim Impact Statement and contends that
its loss caused by Levis's fraud is not less than $131,607,549.91.  Specifically, Doral alleges that
it suffered at least four distinct categories of compensable financial harm: Doral's legal and
investigative fees; compensation paid by Doral to Levis that Levis did not legitimately earn;
Doral's IO restatement costs; and Doral's payments to compensate current and former
shareholders for Levis's crimes (which is the largest portion of the $131.6 million figure).  The
Government received this submission only 48 hours before it had to file this memorandum and
has not had a chance to evaluate what portion, if any, of Doral's loss claim should be included in
the Guidelines calculation for loss under 2B1.1(b)(1).  Accordingly, the Government is not
currently including Doral's $131.6 million figure into its Guidelines calculation.  If the
Government was to include that figure, however, the loss enhancement would increase by four
offense levels (*see* U.S.S.G. § 2B1.1(b)(1)(O)), and result in a Guidelines sentence of life
imprisonment.  Because Levis is not charged with any offense that carries a maximum term of
life imprisonment, the Guidelines require that the Court add the applicable statutory maximums
on all counts of conviction, which results in a Guidelines sentence of 60 years' imprisonment.
*See* U.S.S.G. § 5G1.2(d).  Additionally, because the Government just received Doral's claim and
has not had a chance to evaluate it for restitution purposes, the Government hereby requests that

23

level is increased by six levels (§ 2B1.1(b)(2)(C)); and because the offense involved a violation

of securities law and, at the time of the offense, the defendant was an officer or director of a

publicly traded company, the base offense level is further increased by four levels (§

2B1.1(b)(17)(A)).[6]  (*See* PSR ¶¶ 71-81).  Levis's offense level is thus 41.  Levis has no prior

criminal convictions and is thus in Criminal History Category I.  (PSR ¶¶ 82-84).  Accordingly,

Levis's Guidelines sentencing range is 324 to 405 months' imprisonment.

### 2.    Loss Enhancement

In determining the amount of loss resulting from a fraud offense, the sentencing court is

not required to compute the loss "'with precision.'"  *United States* v. *Jacobs*, 117 F.3d 82, 95 (2d

Cir. 1997) (quoting U.S.S.G. § 2F1.1, comment. (n.9) (1987)).  Instead, the applicable Guidelines

provide that:

> The court need only make a reasonable estimate of
> the loss.  The sentencing judge is in a unique
> position to assess the evidence and estimate the loss
> based upon that evidence.  For this reason, the
> court's loss determination is entitled to appropriate
> deference.

U.S.S.G. § 2B1.1, comment. (n.3(C)); *see also United States* v. *Bennett*, 252 F.3d 559, 565 (2d

Cir. 2001) (court need only make reasonable estimate of loss).  As the Sentencing Commission

explained, following the passage of the Sarbanes-Oxley Act of 2002, Pub. Law 107-204, the loss

table was increased, as well as other enhancements added, to "punish adequately offenses that

---

the Court delay issuance of a restitution order for up to 90 days after sentencing for the
Government and the Court to evaluate this claim.  *See* 18 U.S.C. § 3664(d)(5).

[6]  As noted above, the Government disagrees with the PSR's position on loss and thus
believes that the PSR's computation of the total offense level as 25 is incorrect.

cause catastrophic losses of magnitudes previously unforseen" and "address congressional concern regarding particularly extensive and serious [corporate] fraud offenses." U.S.S.G. App. C, amend. 647.

The Government contends that a conservative estimate of the readily measurable Guidelines loss is the aggregate loss suffered by victims to whom Levis directly made misrepresentations, although the Government submits that, as articulated under the 3553(a) section below, Levis's fraud had a much more significant effect on the overall market than merely the losses suffered by these investors.[7]

At trial, the Government called three investors to testify about Levis's direct misrepresentations concerning caps and purported "independent" or "external" valuations. Those witnesses were Randy Saluck, who was employed at Meisenbach Capital Management, Stuart McDermott, who was employed at Holland Capital Management, and Valerie Friedholm, who was employed at Fidelity. As demonstrated below, Levis's misrepresentations to those individuals caused Meisenbach, Holland, and Fidelity to execute trades or hold their positions based on Levis's lies, resulting in direct losses to those entities.

**Meisenbach Capital Management**

Randy Saluck, the Portfolio Manager for Meisenbach Capital Management from 2002 through 2005, testified at trial. (April 5, 2010 Trial Testimony of Randy Saluck (excerpts of which are attached as Exhibit A) at 847-48). Beginning in 2003, Saluck became interested in Doral and began to have contact with Levis, who became his main contact at Doral. (*Id.* at 850-

---

[7] While the Government believes that the overall loss proximately caused by Levis's fraud is greater than that suffered by the three victims discussed herein, the Government is not currently able to quantify the full extent of the losses caused by Levis's fraud.

51).  Saluck began to invest, on Meisenbach's behalf, in Doral in 2003.  (*Id.* at 852).  Sometime

during the first quarter of 2004, Saluck sold the Doral stock he had purchased for Meisenbach

because the stock hit Meisenbach's target price.  (*Id.* at 854).  Subsequently, Saluck remained in

contact with Levis and had conversations with him about Doral and its financial status.  (*Id.* at

855-58).  In January 2005, Saluck took note of Doral's January 18, 2005 news release

announcing the $97.5 million write down to the IO's value.  (*Id.* at 859).  By this time, Levis had

told Saluck that the IO strips had been valued both internally at the company as well as by two

independent entities and that Doral used the lowest valuation of the three in reporting the asset's

value.  (*Id.* at 860).

Following Doral's January 2005 announcement, its stock price declined, an event that

drew Saluck's interest because he believed the stock might be undervalued.  (*Id.* at 861-62).

Furthermore, in an investor call following the announcement, Doral's management indicated that

Doral was being conservative in writing down the value of the IOs by using an interest rate figure

that took into account future increases in rates.[8]  (*Id.* at 864).  After the investor call, Saluck

decided to buy more stock.  (*Id.* at 866).

In early February 2005, Saluck attended the Brean Murray conference at New York's

Roosevelt Hotel.  (*Id.* at 866).  At this conference, Saluck had a one-on-one meeting with Levis.

(*Id.* at 867).  Saluck and Levis discussed the IOs, and during this conversation, Levis assured

Saluck that Doral's value of the IOs was sound because the IOs had contractual caps that

guaranteed that the interest Doral had to pay purchasers would not exceed a certain amount.  (*Id.*

---

[8]  Indeed, Levis made similar representations to analysts such as Jay Cunnigham (*see* GX-1203 and GX-1205), Stuart McDermott (*see* GX-1025 O and GX-1026), and Omotayo Okusanya (*see* GX-1510, GX-1512, and Okusanya 3522-1).

at 868-69).  Levis further stated that market interest rates were very close to those caps.  (*Id.* at 870).  According to Saluck, the existence of caps was "very" important to him because such caps were the "highest form of protection" on Doral's chief asset – unlike a hedging instrument that one could purchase in the marketplace in an attempt to mitigate interest rate risk.  (*Id.* at 870-71, 917-18).  As a result of Levis's fraudulent misrepresentations to Saluck about the contractual caps, Saluck bought even more stock.  (*Id.* at 871-72, 916).  After their conversation, and in reliance on Levis's continued misrepresentations, Saluck began to defend Doral publicly based on Levis's lies.  (*Id.* at 875-80).

On March 15, 2005, Doral filed its 2004 10-K report.  In response to the 10-K, Saluck's reaction was "close to panic" because Levis's contractual-caps representation was not in the report, much less any explanation that such caps were close to the current interest rate.  (*Id.* at 892).  Furthermore, the 10-K reflected that small upward movements in interest rates could cause a large write down in the IO's value.  (*Id.* at 892-94).  Following the 10-K's release, on March 17, 2005, Saluck participated in an investor call in which Levis was one of the Doral representatives.  (*Id.* at 896-97).  When Saluck inquired about the existence of caps on the call, Levis evaded the question and repeated the material in the 10-K, including the existence of market interest rate caps.  (*Id.* at 899-900).  Saluck further inquired about who had provided the "independent" valuations, and was told that such information could not be disclosed due to confidentiality concerns.  (*Id.* at 901).  While Saluck sought clarification on these issues from Levis by email following the call, Levis's replied with a non-response, simply stating that Doral stood by its valuations.  (*Id.* at 902).  Subsequently, when Saluck could not confirm Levis's prior representation, he sold Meisenbach's position in Doral, resulting in the largest loss Meisenbach

27

ever had.  (*Id.* at 903).  Attached hereto as Exhibit B is a Declaration from Mark Meisenbach, authenticating a table demonstrating Meisenbach's trading and loss calculation for its 2005 Doral investment.  As demonstrated by this Exhibit, and the testimony and exhibits at trial, Levis's misrepresentations caused Meisenbach to lose over $3 million.  (*See* Exhibit B).

### Holland Capital Management

Stuart McDermott, an equity analyst for Holland Capital during the relevant time period, testified at trial on Holland Capital Management's behalf.  (April 21-22, 2010 Trial Testimony of Stuart McDermott (excerpts of which are attached as Exhibit C) at 2892-93).  McDermott began communicating with Levis in or around January 2004.  (*Id.* at 2895).  In February 2004, Levis represented to McDermott that Doral's IOs were valued by two independent valuations and Doral's own internal one and that Doral took the lowest valuation in order to be the most "conservative compared to the industry standard." (*Id.* at 2906).  Levis's independent-valuation misrepresentation was important to McDermott.  (*Id.* at 2907).  Indeed, in March 2004, McDermott ultimately recommended to Holland Capital that Holland invest in Doral, and that recommendation was based in part on information Levis provided to McDermott.  (*Id.* at 2913-14).  Throughout 2004, Levis also made assurances to McDermott concerning Doral's lack of interest-rate risk.  (*Id.* at 2924).

After the release of Doral's January 18, 2005 press release, McDermott was concerned because the "stock sold off pretty substantially in the marketplace and the market was clearly worried about the fact that there was an impairment being taken on this IO." (*Id.* at 2928).  Because McDermott had concerns about possible additional writedowns of the IOs, he called Levis to get additional explanations for the IO loss, and according to McDermott, he was

28

satisfied by Levis's explanation.  (*Id.* at 2931-32).  Levis had represented to McDermott that

"hedges had nothing to do with the loss" and that Doral was being conservative in their valuation

approach (including at LIBOR plus 150 basis points)[9]; indeed, Levis repeated that Doral had

taken the lowest of two independent valuations of the IOs and Doral's internal valuation.  (*Id.* at

2933-36, 2943).

In early February 2005, McDermott became concerned that Levis, at the Brean Murray

conference, and Jay Cunningham in his Hibernia Southcoast Capital analyst report, had explained

that the January 2005 impairment had resulted from inadequate hedging.  (*Id.* at 2941-43).  This

was contrary to Levis's prior explanations to him.  As McDermott testified at trial, Levis "told

[McDermott] that hedges had nothing to do with the impairment" and that "definitely raised

some questions."  (*Id.* at 2943-44).  On February 2, 2005, McDermott sent Levis an e-mail

inquiring about the hedging issue: "I thought when we talked last week you said that the hedge

had nothing to do with the IO." (*Id.* at 2944).  Levis responded by saying that "the IO hit had

nothing to do with hedging, but rather to a valuation in a period in which LIBOR rates rose much

faster."  (*Id.* at 2945).

In early March 2005, Levis met with McDermott and other Holland representatives at

Holland Capital's offices.  McDermott testified that, during this meeting, Levis said that "all IOs

have caps 200 and 300 basis points below 7 and an [eighth]," that they were 50 basis points away

from hitting these contractual caps, and that once the caps were hit, Doral would not have any

additional interest rate risk.  (*Id.* at 2952-54).  According to McDermott, when Levis referred to

---

[9]  As noted above, Levis represented to investors and analysts that Doral was using a
LIBOR rate that took into account widely-predicted future increases in LIBOR.

caps, he was not referring to anything that could be bought and sold in the marketplace; rather, he was referring to caps in contracts between Doral and the banks that bought the securitized mortgages. (*Id.* at 2953-56, 2998). As a result of Levis's representations, McDermott recommended that Holland buy additional Doral stock, and Holland acted on this recommendation. (*Id.* at 2957).

When Doral released its 10-K in March of 2005, McDermott was concerned and disappointed. (*Id.* at 2975). McDermott noted that the 10-K referred to a call option for the mortgages, the existence of which Levis never communicated to McDermott, and McDermott testified that the option did not protect the income stream provided by the IOs. (*Id.* at 2973). Furthermore, the 10-K's analysis of the effect of LIBOR movement was very different from Levis's representations at the early March meeting that Doral was only 50 basis points away from the caps. (*Id.* at 2976). Indeed, McDermott was very surprised that, based on modest interest rate increases, Doral might have to write down over $500 million on its IO value. (*Id.* at 2976-77). But McDermott did not dump Doral's stock at that point. He testified that he felt an over $500 million write down was a worst case scenario, that Doral still dominated the mortgage market in Puerto Rico, and that they could offset such hypothetical losses with proper hedging. (*Id.* at 2977-98).

Following the April 19, 2005 press release, in which Doral announced its decision to restate income due to a change in the valuation methodology applied to the IOs, McDermott contacted Levis and asked what LIBOR rates were previously used to value the IO. (*Id.* at 2985-87). As McDermott testified, he felt Doral's announcement that it was going from a spot-rate to

forward-curve methodology stood in stark contrast to Levis's representations in January 2005

that the IO was valued conservatively. (*Id.* at 2986-88).

In sum, Levis's misrepresentations on caps and purported independent valuation caused

Holland to purchase and hold Doral stock. Attached hereto as Exhibit D is a Declaration from

Billie Mallie of Holland Capital, authenticating a table demonstrating Holland's trading and loss

calculation for its Doral investment. As demonstrated by this Exhibit, and the testimony and

exhibits at trial, Levis's misrepresentations caused Holland to lose over $29 million. (*See*

Exhibit D).

### Fidelity

Valerie Friedholm testified at trial on Fidelity's behalf. She was a Fidelity analyst in

2005. (April 2, 2010 Trial Testimony of Valerie Friedhom (excerpts of which are attached as

Exhibit E) at 624). In the first quarter of 2005, Fidelity owned 10% of Doral. (*Id.* at 628).

Friedholm began to follow Doral at the beginning of 2005, and she was focused on the

company's IO strips because "[i]t was their primary source of income." (*Id.* at 632-34). In

March of 2005, prior to the 10-K's release, Friedholm traveled to Puerto Rico to meet with

Doral's senior management. (*Id.* at 636). This was Friedholm's first real discussion with

company management. (*Id.*).

Friedholm met with Levis on this trip and took notes during their meeting. (*Id.*). Levis

explained to Friedholm that the fourth quarter 2004 impairment, as announced in January 2005,

was caused by increasing short-term interest rates and a resulting flattening of the yield curve.

(*Id.* at 641-47). Levis told Friedholm that 30 percent of the IO strips sold by Doral were at a

fixed rate and 70 percent were at a floating rate, which was based on LIBOR plus 1-1.5 percent.

31

(*Id.* at 651-52).   But Levis explained to Friedholm that there were contractual caps at 4 percent on the floating rate.  (*Id.* at 650-56, 661-62).   This was important to Friedholm.  (*Id.* at 660).

After the 10-K's release, a week or so after Friedholm returned from Puerto Rico, Friedholm participated on the March 17 investor call, a majority of which concerned the IO portfolio.  (*Id.* at 662-64).   After that conference call, Fidelity had a follow-up call with Levis to ask questions directly, and Friedholm took notes during that call.  (*Id.* at 664-66).   Levis explained that the IO's value was significantly reduced because LIBOR had increased, so the pass-through rate had increased.  (*Id.* at 666-67).   Levis also said Doral had a hedge in place, but that it was on the long end of the curve, so it was ineffective.  (*Id.* at 667).   Furthermore, he stated that they had corrected their hedges so that they would not have a large write down.  (*Id.* at 668-69).   Additionally, Levis told Friedholm that Doral had two independent valuations of the IO strips, which was also important to Friedholm.  (*Id.* at 670).

At bottom, the value of the IO strip was a significant focus for Friedholm because it was Doral's primary source of income, and Levis had told Friedholm that there were contractual caps in place on the floating rate portion of the IO.  (*Id.* at 678-80).   During this time period, Friedholm did not recommend a change in the prior analyst's stock rating of "buy," and in her report to the Fidelity portfolio managers taking this position, she discussed the existence of caps. (*Id.* at 679-80; GX-1609).   Indeed, the existence of caps was important to Joel Tillinghast, the Fidelity Portfolio Manager who made the investment decisions for the fund with the largest

holdings of Doral.[10]  (*Id.* at 629, 680-82).  Notably, Tillinghast had, in fact, asked Friedholm to

confirm the existence of the caps with Levis.  (*Id.* at 680-82).

Fidelity ultimately lost a substantial amount of money because of its Doral investment.

Attached as Exhibit F to this Memorandum is a Declaration from Jeffrey Gallant authenticating a

table demonstrating Fidelity's loss calculation for its Doral investment.  As demonstrated by this

Exhibit, and the testimony and exhibits at trial, Levis's misrepresentations caused Fidelity to lose

over $42 million.  (*See* Exhibit F).

*        *        *

As demonstrated above, between Meisenbach Capital, Holland Capital, and Fidelity,

Levis is responsible under the Sentencing Guidelines for a loss of approximately $75 million.

Consequently, the loss enhancement under Section 2B1.1(b)(1)(M) is 24 offense levels.  As

noted above, this is a conservative estimate given that other victims lost substantial sums of

money.

### 2.     More than 250 Victims

Pursuant to Section 2B1.1(b)(2)(C), the defendant's offense level should be enhanced six

levels because the offense involved more than 250 victims.  As detailed in Doral's 2004 Annual

Report, Doral had 482 shareholders as of the end of January 2005.  (GX-6204a at 30).

Additionally, Doral stock was held by multiple mutual funds, such as Fidelity, with numerous

institutional and individual investors.  Even though those investors were not direct shareholders

in Doral, they were victimized by Levis's fraud because of the decline in value of Doral's stock

---

[10]  According to Tillinghast's notes, in a February 3, 2005 conversation with Levis, the defendant represented that the IOs have caps so Doral always maintained a spread of 200 basis points.  (Tillinghast 3531-6).

33

in Fidelity's portfolio.  Indeed, the damage to Fidelity was particularly severe given the large

position in Doral that Fidelity had.

### 3.     Officer/Director of Publicly-Traded Company

Section 2B1.1(b)(17)(A)(i) provides that if an offense involved a violation of the

securities laws, and the defendant was, at the time of the offense, an officer or director of a

publicly traded company, the offense level should be enhanced four levels.  This enhancement

applies because Doral was a publicly traded company and Levis was an officer of Doral.  (*See*

PSR ¶¶ 8, 68, 120).  The enhancement, of course, makes sense given the "heightened fiduciary

duties imposed by securities law upon such individuals."  U.S.S.G. App. C, amend. 647.

### B.     The Section 3553(a) Factors

### 1.     The Nature and Circumstances of the Offense

Levis's crimes were serious, complex, and devastating to numerous Doral investors.

Through years of deceit and deception, Levis abused his position of trust at Doral, and misled

individuals and institutions.  (*See* PSR ¶¶ 21-55).  His crimes affected a publicly-traded

company's health and stability.  Indeed, as demonstrated below, his fraudulent conduct had

significant and severe effects in the market for Doral, causing Doral's share price to plummet.

While the Government submits that a conservative estimate of the loss for Guidelines purporses

is approximately $75 million, the Court should consider, under 18 U.S.C. § 3553(a)(1), the

severe financial impact of Levis's fraud in fashioning a reasonable and appropriate sentence.

### a.     Importance of the IOs to Analysts and Investors

From fiscal years 2001 through 2004, non-cash income from the IOs significantly

contributed to Doral's earnings, book value and stock performance.  For example, GX-812,

admitted during Robert Manchak's testimony, shows that Doral's IOs were a significant

percentage of Doral's overall gross income from 2001-2004.  (April 22, 2010 Trial Testimony of

Robert Manchak (excerpts of which are attached as Exhibit G) at 3098).  Similarly, GX-813, also

admitted during Mr. Manchak's testimony, shows that the balance-sheet value Doral assigned to

the IOs increased over time and peaked at nearly $900 million in 2004.  (*Id.* at 3098).  Because of

its importance to the Company's financial condition, Doral's stock price appreciated in virtual

lockstep with increases in the IO's valuation metrics.  (GX-818, Apr. 22 Tr. at 3110-3111).  It is

not surprising, therefore, that research analysts responsible for monitoring Doral and analyzing

its reported financial results focused on the value of the IO assets and the interest rate risk

associated with that value.

      For example, as UBS analyst Omotayo Okusanya testified, evaluating interest rate risk

was "probably one of the most critical things I would consider" in determining whether a

publicly traded bank was a good investment.  (March 30-31, 2010 Trial Testimony of Omotayo

Okusanya (excerpts of which are attached as Exhibit H) at 222).  Following the January 18, 2005

write-down of nearly $100 million of IO assets, Okusanya reported that "[t]he investors were

raising very similar concerns that I had in regards to what the write-down meant and how the

company was valuing its interest-only strips. . . . My phone was ringing off the hook.  Everyone

wanted to have answers on this issue."  (Mar. 31 Tr. at 294, 296).  After being reassured by Levis

that Doral was reporting a conservative valuation of the IOs, Okusanya issued a report

announcing that UBS's initial concerns about the write-down "were unwarranted."  (GX-1512).

      In February of 2005, Okusanya remained "focused heavily on doing analysis around the

. . . IO strips . . . [because] there were a lot of investors still asking questions about the IOs and

[there were] concerns about further write-downs." (Mar. 31 Tr. at 326). In March 2005, according to Okusanya, "[t]he main issue again remained the value of the interest-only strips and potential risk for further write-downs if interest rates kept rising." (*Id.* at 328). On March 9, 2005, Okusanya issued a report in which he opined that Doral presented a buying opportunity because there was a misperception in the marketplace about the risk of further write-downs in a rising interest rate environment. (Mar. 31 Tr. at 327-329; GX-1531). He issued that report after, among other things, receiving a message from Levis in which he falsely indicated that, due to contractual caps, "at all times Doral will enjoy a hefty positive spread." (Mar. 31 Tr. at 315-16; GX-1514). In mid-March, during the post-10K conference call, "the most important thing that investors wanted answered at that point [was] the valuation and the IOs and the continued risk of IO write-downs if interest rates kept rising." (Mar. 31 Tr. at 359). Of course, as described earlier, Levis lied about Doral's conservative valuation methodology during the conference call, claiming that there were independent valuations of the IO strips, but that the identities of the firms doing the valuations could not be revealed due to confidentiality agreements. (*Id.* at 397). Indeed, if Levis had represented that Popular Securities had conducted such a valuation, Popular Securities would have disclaimed responsibility for conducting an "independent" valuation.

UBS and Okusanya were not the only ones focused on the value of Doral's IO assets and the risk of write-offs based on rising interest rates. As described in greater detail above, Valerie Friedholm, an analyst at Fidelity (which owned nearly 10 percent of Doral's outstanding common stock), testified that from the time she became responsible for following Doral, she was "very much" focused on the IO strips because "[i]t was their primary source of income." (Apr. 2 Tr. at 634). The existence of contractual caps was an important fact because the IO strips were

"Doral's primary income stream" and because the caps guaranteed profitability regardless of the interest rate environment. (*Id.* at 658-60). Likewise, Levis's false representation that there were independent outside firms valuing the IO strips was important to Friedholm because "valuing these [IO strips] is not an easy thing to do. It takes . . . your best guess estimates, and so to have someone else say those [estimates] seem reasonable to me is valuable." (*Id.* at 671). Like Okusanya, Friedholm's focus on the IO strips and their proper valuation was a constant. (*Id.* at 678). Similarly, Jay Cunningham, who covered Doral while working as an analyst for Hibernia Southcoast Capital, expressed concerns about the IO strip valuation in February 2005. (April 8, 2010 Trial Testimony of John Cunningham (excerpts of which are attached as Exhibit I) at 1398). Levis responded in a February 10, 2005 e-mail:

> Regarding caps, all loans sold have a cap. Where are you getting the idea that some have no caps? That is not true at all. Maybe you are referring to the fixed IOs which don't need caps since they are fixed. These caps are embedded in each contract and all of them are significantly below the WAC of the loans, so Doral will always have a hefty and positive spread.

(Apr. 8 Tr. at 1399-1400; GX-1206a). Cunningham took comfort from the purported existence of the contractual caps, and he did not downgrade the stock from a Buy recommendation to a Hold recommendation for nearly a month, on March 7, 2005, when he no longer believed that the caps Levis claimed to exist really existed. (Apr. 8 Tr. at 1403, 1407-08; GX-1208).

The evidence provides a sound basis to conclude that these analysts' focus on the valuation of Doral's principal income-producing assets was representative of investors generally, and that investors making decisions about whether to buy, hold, or sell Doral stock, were likewise focused on the misrepresentations that Levis made to the marketplace – through analysts like Okusanya and Cunningham – in an effort to keep Doral's stock price up.

37

### b.      Effect of the "Independent" Valuations of the IOs

Doral's reported valuations of the IOs depended entirely on the legitimacy and reliability of Doral's estimates of the IO's value.  In 2000 and early 2001, an internally-produced valuation model was the sole source of the company's reported IOs value.  Because of the significance of the IOs to Doral's financial performance, however, Doral's external auditor, PWC, recommended that Doral obtain independent valuations of the IOs.  Ultimately, Doral's announced policy was to take the lowest of three individual valuations.  (GX-2025).

As Carlos Mendez of PWC testified, PWC first recommended that Doral obtain an independent valuation of the IOs in connection with the fiscal year 2000 audit.  (April 9, 2010 Trial Testimony of Carlos Rafael Mendez Fontanez (excerpts of which are attached as Exhibit J) at 1513).  The text of PWC's recommendation to Doral read "we [PWC] believe that at least once a year, the interest-only strips should be valued by an outside source to provide an independent valuation of the portfolio."  (GX-803; Apr. 9 Tr. at 1525).  Doral subsequently agreed to obtain an independent valuation.  (GX-803; Apr. 9 Tr. at 1525).

In 2001, Doral, through Levis, purported to obtain an independent valuation of the IOs from Jose Lopez at Morgan Stanley.  (April 19, 2010 Trial Testimony of Jose Lopez (excerpts of which are attached as Exhibit K) at 2496-2499).  Throughout 2001 and 2002 Levis represented to PWC that the Morgan Stanley valuation consisted of dealer market quotations for similar instruments and that Lopez obtained the quotations from Morgan Stanley traders.  (Apr. 9 Tr. at 1562).  Levis also arranged a conference call between Lopez and PWC in which Lopez made similar representations regarding the nature and independence of Morgan Stanley's valuations.  (*Id.* at 1562-1565).

In connection with the 2002 audit of Doral's financial statements, Doral indicated that it would obtain a second independent valuation from Popular Securities; this second opinion was designed to provide PWC with more audit evidence to support the reported value of the IOs. (*Id.* at 1551-1552). Levis claimed that the valuation performed by Popular Securities was based on an independent discounted cash flow model that estimated the IO's value. (*Id.* at 1573).

PWC relied upon the accuracy and legitimacy of these valuations in its yearly audits of Doral's financial statements. Indeed, as Mendez testified, the so called "external valuations carried significant weight" as audit evidence and provided PWC with comfort that the IOs were properly valued. (*Id.* at 1539, 1556-1557, 1570). And Doral's Form 10-Ks, which included the financial statements PWC audited, made numerous representations to investors about the source of the reported values for Doral's IOs.

For example, in Doral's fiscal year 2002 Form 10-K filed with the SEC, Doral described the process for valuing the IOs as follows: "To determine the fair value of its IOs, Doral Financial obtains dealer quotes for comparable instruments and uses external and internal valuations based on discounted cash flow models that incorporate assumptions regarding discount rates and mortgage prepayment rates." (GX-6202). Similarly, in 2004, Doral described the process for valuing the IOs as follows:

> To determine the fair value of its IOs portfolio, Doral Financial engages in two external valuations with parties independent of the Company and of each other. One of them consists of dealer market quotes for similar instruments and the other one consists of a cash flow valuation model in which all economic and portfolio assumptions are determined by the preparer.

(GX-6204a). Moreover, Levis made numerous similar representations to investors and analysts during one-on-one communications. (Apr. 5 Tr. at 860; Apr. 21 Tr. at 2906; Mar. 30 Tr. at 239).

At trial the jury determined that the government proved beyond a reasonable doubt that the representations Levis made about the existence of independent valuations were false. Both Lopez and representatives of Popular Securities testified that Levis's involvement in and control over the valuation process undermined the independence of the valuations. (Apr. 19 Tr. at 2498-2501; Apr. 12 Tr. at 1731-1734). Indeed, Lopez testified that he did not perform a valuation at all; he simply recopied "valuations" Levis created. (Apr. 19 Tr. at 2501-2502). Similarly, Gregory Kaufman and Natalia Guzman of Popular Securities testified that they performed valuations using material assumptions supplied by Levis. (April 12, 2010 Trial Testimony of Gregory Kaufman (excerpts of which are attached as Exhibit L) at 1723-1734; April 14, 2010 Trial Testimony of Natalia Guzman (excerpts of which are attached as Exhibit M) at 1927-1939). The use of the assumptions Levis supplied to Popular Securities – including assumptions about data, the appropriate discount rate, and the existence of caps and hedges – undermined the independence and integrity of Popular Securities's valuations. (Apr. 12 Tr. at 1723-1734). Ultimately, as Levis was fully aware, Doral was not obtaining any independent valuation of the IOs portfolio.

Unsurprisingly, investors like McDermott depended on the accuracy and reliability of Doral's financial statements, particularly the veracity of the representations about Doral's IOs, when making their investment decisions. (Apr. 21 Tr. at 2906-2907). Moreover, professional stock analysts like Mr. Okusanya believed these statements and incorporated them into their research reports, which were disseminated to their investor clients. (Mar. 30 Tr. at 239; Mar. 31 Tr. at 385-387; GX-1510; GX-1512). Investors relying on Levis's lies about the IOs were significantly harmed when the truth about Doral's IOs was revealed. Indeed, but for Levis's lies,

PWC, investors, and analysts would have discovered the IO's true value long before 2005, and a precipitous drop in Doral's share price in early 2005 could have been avoided.

      **c.**      **Financial Harm Caused By the Fraud**

On January 18, 2005, Doral's stock price reached a new split-adjusted all time high of $49.45, largely on the strength of its seemingly ever-increasing earnings driven by the IOs. (GX-818; GX-1509). This per-share-high price for Doral was short lived. When Doral released earnings on January 18, 2005, it reported a $97.5 million impairment of the value of its IOs. (GX-194). In other words, Doral reported that the income it reported from the IOs in prior periods (but had not received yet) was overstated by nearly $100 million. This announcement immediately caused a drop in the value of Doral's stock and called the legitimacy of Doral's IOs valuations into question. (GX-818; GX-1510; Apr. 2 Tr. at 634-635; Mar. 30 Tr. at 267-268). Moreover, investors and analysts were concerned that Doral would take similar impairments going forward. (Mar. 31 Tr. at 292-294; Apr. 21 Tr. at 2898-2899). If impairments were taken in the future, it would mean that the IO-related earnings Doral previously reported were even more overstated than that implied by the nearly $100 million write-down announced in January. And this would suggest that Doral's stock price was similarly inflated.

Based partially on Levis's lies about caps, Doral was able to contain the damage to its stock price from future impairment concerns until it released its 2004 Form 10-K on March 15, 2005. But not only did the 2004 Form 10-K reveal that future IOs impairments possible, the 10-K revealed that such impairments could reach $500 million if short-term interest rates rose two percent. (GX-6204a; GX-1523; GX-1210). This news caused stock analysts like Cunningham and Okusanya to downgrade the stock and/or lower target prices and sent the price of Doral stock

into freefall.  (GX-818; GX-1523; GX-1210).  Ultimately, on April 19, 2005 – after Doral's Board of Directors initiated an internal investigation – Doral announced that it was going to have to restate its earnings to account for a $400-to-$600 million decrease in the value of its IOs. (GX-209).   This announcement caused yet another precipitous drop in Doral's stock price. (GX-818).

Doral's Board of Directors made the determination to re-value its IOs "after consulting with various financial institutions and valuation experts[.]" (GX-209).  Only after they were advised that Doral had inadequate risk management did the Board obtain what Levis told PWC and investors that Doral had already been doing – namely obtaining an independent valuation of Doral's IOs portfolio.  If Levis had actually obtained independent valuations of the IOs, Doral's IOs would have never been wildly over-valued in the first place, and Doral's stock price would have never been set up for its precipitous fall.  In this manner, Levis's lies about the nature of the supposedly independent Morgan Stanley and Popular valuations were directly responsible for inflating the price of Doral stock from 2001 through 2004 and for the investor losses that occurred when interest rates rose and Doral valued its assets properly.  As discussed above, following Doral's disclosures about the true value of its assets, Doral suffered a market capitalization loss amounting to billions of dollars.

Accordingly, in fashioning a reasonable and appropriate sentence, the Court should take account for the severity of Levis's fraud's impact.   The loss to Doral's investors was nothing short of extreme, and even if the exact market loss attributable to Levis is not readily quantifiable, the Court should consider under 18 U.S.C. § 3553(a)(1) that Levis's fraud did impact Doral's market price in fashioning an appropriate sentence.

## 2.      History and Characteristics of the Defendant

Levis's history and characteristics also support a lengthy sentence in this case.  Unlike many criminals who come before the Court, Levis enjoyed enormous privileges.  He was well-educated, an experienced and successful professional, and he enjoyed the support of a loving and close-knit family.

Dissatisfied with ample compensation that placed him in a tiny percentage of the public in terms of earnings, he set about to inflate Doral's value, which ensured future bonuses and the value of his personal holdings.  By doing so, he blatantly and repeatedly lied to and violated the trust placed in him by individuals and institutions that invested in Doral.  Levis has demonstrated his lack of respect for the law, basic ethical norms, and the investments of others.  Notably, Levis did not hatch his scheme in the face of economic privation – he was fully capable of making a living lawfully.  As noted in the PSR, his family had ample means and Levis himself made from $550,000 to $1,200,000 annually between 1999 to 2004.  (PSR ¶¶ 114-119).

Finally, the duration of Levis's criminal conduct speaks for itself.  His crimes were not a one-time event arising, for example, from a split-second decision made under financial duress.  Rather, Levis's crimes were the product of a series of decisions made over the course of years, and it was within his power to stop his crimes at any point in time.  Although Levis could have ended his scheme at any time, he chose not to do so.  Instead, Levis allowed the fraud to be disclosed only when he could no longer satisfy market concerns with his lies about caps and purported independent valuations of the IOs.

### 3.      The Need To Afford Adequate Deterrence

Under Section 3553(a), the need for the sentence to "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), must also be considered.  Here, the Government respectfully submits that a Guidelines sentence is necessary to serve this purpose.  There are thousands of officers and directors in this and other jurisdictions who are entrusted to manage and operate publicly-traded companies ethically, legally, and responsibly.  These professionals, however, are equally well-situated to exploit their inside positions for personal profit at the expense of ordinary investors.  Imposing a substantial term of imprisonment in this case will serve to deter other officers and financial professionals who are tempted to steal, cheat or otherwise dishonor their profession.

### 4.      The Need to Avoid Unwarranted Sentence Disparities

Under 18 U.S.C. § 3553(a)(7), the Court should consider the "need to avoid unwarranted sentencing disparities."  In light of the extent and impact of Levis's fraud, as discussed above, there are very few defendants who compare with him and the scope of his offenses.  Given his position and role, the scope and complexity of his schemes, and the egregious manner in which he carried them out, a very substantial sentence would simply not implicate any "unwarranted" disparity with other similarly situated felons.

44

## CONCLUSION

Levis committed serious offenses that spanned several years and caused substantial damage to individual investors, his former employer, and public confidence in the market. His crimes were calculating, manipulative, and had far-reaching effects. In these circumstances, a sentence within the Guidelines advisory range of 324 to 405 months' imprisonment is reasonable and would meet the statutory imperatives of Section 3553(a). In any event, the Court should sentence Levis to a significant sentence that would promote general deterrence and sufficiently punish Levis for the widespread impact of his crimes.

Dated:   New York, New York
        November 10, 2010

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York


By: _____/s/_____
    DAVID I. MILLER
    MARC LITT
    Assistant United States Attorneys
    (212) 637-2295 / 2484

    JASON ANTHONY
    Special Assistant United States Attorney
