# Exhibit I

# In The Matter Of:

*UNITED STATES OF AMERICA v.*
*MARIO S. LEVIS A/K/A SAMMY LEVIS*

---

*VOLUME 9*
*April 8, 2010*

---

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 048WLEVF.txt, Pages 1298-1464 (167)

**Word Index included with this Min-U-Script®**

Page 1398

[1]       THE COURT: Received.
[2]       (Government Exhibit 1206 received in evidence)
[3]   BY MR. STELLMACH:
[4]   Q. If we could go, Mr. Cunningham, to your e-mail that starts
[5]   the chain on Page 3, the e-mail dated February 10th that you
[6]   sent to Mr. Levis, and if we could just highlight the final
[7]   paragraph beginning "Finally."
[8]       Would you please read that for us.
[9]   A. Sure. "Finally, while you have said that the typical rate
[10]   you pay is LIBOR plus 150, it is my understanding that some of
[11]   the loans you have sold have no caps in place. Therefore,
[12]   there is certainly the possibility that Doral could be
[13]   underwater on some of these at some point in the future. Can
[14]   you quantify the amount that do not have caps?"
[15]   Q. What was your basis for saying that it was your
[16]   understanding that some of these did not have caps?
[17]   A. Right, I had spoken with other institutions and other
[18]   people in Puerto Rico regarding these loan sales.
[19]   Q. Do you recall speaking about these loan sales with anyone
[20]   from Western Bank, including an individual named Freddie
[21]   Maldonado?
[22]   A. Yes.
[23]   Q. What do you recall from those conversations?
[24]   A. I had asked Western Bank if they had any of these
[25]   instruments, and if they did or if they didn't, if they were

Page 1399

[1]   aware of the existence of any caps. I believe then that they
[2]   did -- whether they had them or not, I do believe they did own
[3]   some of these and they said that they did not have caps within
[4]   the contracts.
[5]   Q. And so what were you trying to communicate when you said
[6]   there was a possibility that Doral could be underwater on some
[7]   of the contracts at some point in the future?
[8]   A. Well, right. If Doral is receiving X and having to pay out
[9]   some lower rate at least at this given time, but that lower
[10]   rate then is variable, then feasibly there is no, there is no
[11]   protection. At some point they could be paying -- if they're
[12]   receiving 10, hypothetically they could be paying 20 percent,
[13]   30 percent, 40 percent. These are gross numbers, but that is
[14]   the point. They would be underwater paying out far more than
[15]   they're receiving.
[16]   Q. By "underwater," you just meant the pass-through rate Doral
[17]   is paying could be higher?
[18]   A. Correct.
[19]   Q. Than what it is received on the coupon from the borrower?
[20]   A. Correct.
[21]   Q. Could we go to Mr. Levis' response on the same date,
[22]   February 10th of 2005. If you could blow that up and highlight
[23]   the section beginning with regarding caps. Could you read that
[24]   for us, Mr. Cunningham.
[25]   A. "Regarding caps, all loans sold have a cap. Where are you

Page 1400

[1]   getting the idea that some have no caps? That is not true at
[2]   all. Maybe you are referring to the fixed IOs which don't need
[3]   caps since they are fixed. These caps are embedded in each
[4]   contract and all of them are significantly below the WAC of the
[5]   loans, so Doral will always have a hefty and positive spread.
[6]       "Also it's important to note that most existing net
[7]   yields paid to investors are close to the caps. The pricing
[8]   ranges from LIBOR plus 100 to 150, probably for an average of
[9]   125. Hope this helps, regards, Sammy."
[10]       THE COURT: Just one minute.
[11]       MR. STELLMACH: Sorry, your Honor?
[12]       THE COURT: I just would like to read this.
[13]       (Pause.)
[14]       THE COURT: Go ahead.
[15]       MR. STELLMACH: Yes, your Honor.
[16]   BY MR. STELLMACH:
[17]   Q. Prior to receiving this e-mail, Mr. Cunningham, had
[18]   defendant ever mentioned contractual caps to you before?
[19]   A. No.
[20]   Q. What did you understand when he wrote that the caps were
[21]   embedded in the contracts?
[22]       Did you understand that to be referring to a
[23]   particular type of cap?
[24]   A. Just that caps were, indeed, part of the contracts.
[25]   Q. What did you understand when he wrote that the caps were

Page 1401

[1]   significantly below the WAC of the loans?
[2]   A. That the WAC then would be the rate that the underlying was
[3]   paying, and then the cap then would be below that so that there
[4]   would, indeed, be a spread that Doral would be able to realize.
[5]   Q. So that --
[6]   A. A minimum spread in the worst case, if you want.
[7]       THE COURT: Just keep your voice up.
[8]       THE WITNESS: Yes.
[9]       THE COURT: What did you just say?
[10]       THE WITNESS: Can you repeat?
[11]   BY MR. STELLMACH:
[12]   Q. I was asking Mr. Cunningham what you understood the
[13]   defendant to mean when he wrote that the caps were
[14]   significantly below the WAC of the loans?
[15]   A. So the WAC then is a weighted average coupon that is being
[16]   received by Doral. The cap then presumably, as he stated, is
[17]   below that rate that they received. So, therefore, should be
[18]   some positive spread maintained because of the existence of
[19]   that cap.
[20]       THE COURT: Positive spread, the money that Doral can
[21]   keep?
[22]       THE WITNESS: That's correct.
[23]       THE COURT: Okay.
[24]   BY MR. STELLMACH:
[25]   Q. In fact, it is described as a hefty and positive spread,

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 9
April 8, 2010

---

Page 1402

[1] right?

[2] **A.** Yes, yes.

[3] **Q.** What did you understand the defendant to mean when he wrote

[4] most existing net yields paid to investors are close to the

[5] caps?

[6] **A.** (A) That the yield that the investors are receiving

[7] currently, that whatever the time of this was would not go any

[8] higher. Therefore, all else equaled, any further increase in

[9] LIBOR would not negatively affect Doral, no further impairments

[10] all else equal.

[11] **Q.** Now, there are financial hedging instruments that Doral

[12] could have purchased that would have made money as interest

[13] rates went up. Is that right?

[14] **A.** Correct.

[15] **Q.** Is there a difference between a cap that's contained in a

[16] sales contract versus a hedge you can buy in the market?

[17] **A.** Well, certainly. The cap again is within the contract.

[18] Assuming the contract is upheld and both parties know the

[19] absolute interest rate or the reference rate at which point the

[20] receiving party won't get more, Doral won't pay out more than

[21] that.

[22]      The hedge then has nothing to do with the IO or the cap.

[23] It is a total separate instrument. Really they don't relate to

[24] each other at all except that hopefully the hedge then will

[25] offset what's going on with the value of the IO.

---

Page 1403

[1] **Q.** We'll come back to that point later.

[2]      From your perspective, in evaluating Doral and making

[3] recommendations for investors, is there any difference in the

[4] comfort that you take from a contractual cap versus a hedge you

[5] can buy in the marketplace?

[6] **A.** Yes. Again the contractual cap, and assuming everyone

[7] upholds both sides, as I said, the cap -- you're going to know

[8] with absolute certainty what Doral would be paying out.

[9]      The hedge, on the other hand -- (A) it is not clear what it

[10] is. There is a multitude of different hedging instruments, and

[11] you have absolute behavior, it isn't an absolute is probably

[12] the best way to say that. Hedges can behave very differently

[13] in different interest rates. That is what we are talking about

[14] here, different interest rate environments.

[15]      **THE COURT:** Go ahead.

[16]      **MR. STELLMACH:** Yes, your Honor.

[17] **BY MR. STELLMACH:**

[18] **Q.** If you turn to page -- we are still on Page 2 -- if you go

[19] further up to an e-mail that the defendant sends you at 1:12 on

[20] February 10th, can you explain to us -- I am sorry. I think we

[21] were still on Page 2. It is the e-mail from Mr. Levis,

[22] dated -- that's it. Thank you.

[23]      Can you explain to us what's reflected in that exchange

[24] with Mr. Levis.

[25] **A.** Oh, right. In the previous e-mail or in the chain I had

---

Page 1404

[1] asked when the K, the 10K would be out. Near the end of the

[2] month in February? No, probably early March. New disclosure,

[3] that's what people are looking for in essence.

[4] **Q.** If you go to Page 1, which is one of your responses, if you

[5] blow up the first paragraph, this is also February 10th, can

[6] you walk us through those first few sentences.

[7] **A.** You mean read it or summarize?

[8] **Q.** If you want to read it and then summarize, that is fine or

[9] if you just want to read it.

[10] **A.** (Pause) I am going through here with Mr. Levis that, Sammy

[11] Levis, that, indeed, more disclosure, meaning more information

[12] than their 10K would be very helpful. There are a lot of

[13] question marks in the marketplace over the valuations assigned

[14] specifically to the IO.

[15]      Think like an investor, give what you would want --

[16] you being Mr. Levis -- as an investor and then more, basically

[17] the crux of that paragraph there.

[18] **Q.** You write about wanting more clarity on gain on sale

[19] margin, the valuation of the IO and hedging. Do you recall

[20] what questions you had about hedging at this point?

[21] **A.** Not specifically, no.

[22] **Q.** If you go to Government Exhibit 1207, I'll ask you whether

[23] you recognize that document?

[24] **A.** Yes, another e-mail correspondence.

[25] **Q.** With?

---

Page 1405

[1] **A.** With Sammy Levis.

[2]      **MR. STELLMACH:** Your Honor, the government offers

[3] Exhibit 1207.

[4]      **THE COURT:** Received.

[5]      (Government Exhibit 1207 received in evidence)

[6] **BY MR. STELLMACH:**

[7] **Q.** If we go, Mr. Cunningham, to your e-mail that starts on the

[8] bottom of Page 2 and continues on Page 3, if you could walk us

[9] through the concerns you express. You write I have been doing

[10] more work on the IO and I have found the following. It starts

[11] at the bottom of the page.

[12] **A.** The bottom of 2?

[13] **Q.** That's right.

[14] **A.** Okay. Do you want me to read this aloud?

[15] **Q.** Just walk us through in general terms what your concerns

[16] are.

[17] **A.** Right. So it says I've done more work on the IO. The

[18] estimates that I've found -- there is roughly 6 to 6 and a half

[19] billion in notional balances or mortgages supporting those.

[20]      Average life is 7 years and note that this could be

[21] consistent with comments that the company has made in the past.

[22] **Q.** I am sorry to interrupt. I was looking at the second to

[23] the last paragraph right where you wrote "I estimate." Could

[24] you read that for us. If you could just highlight that.

[25] **A.** I am sorry. "I estimate that there could be another 190

---

---

Page 1406

[1] million in impairments on the current portfolio should rates go
[2] past 4.25 percent."
[3] **Q.** After you write that, could you take us through Mr. Levis'
[4] response which is on Page 2. If you can read that for us,
[5] please?
[6] **A.** Sure. I cannot comment much until the 10K is out.
[7] However, your final conclusion that gain on sale margin will
[8] have to be declining may not necessarily be true. First the
[9] gain on sale is determined by the sale of new originations
[10] which already has a higher coupon in nonconforming since we
[11] have already increased the WAC charged to borrowers on new
[12] nonconforming by about 50 basis points.
[13]     Bear in mind that these loans have very low balances,
[14] 50 to 60 million, amortized over 30 years. So a change in the
[15] WAC does not affect much the monthly payment the borrower pays.
[16] So in a way these loans are less price sensitive. In other
[17] words, although mortgage rates have not increased much in the
[18] U.S., at our company we already increased the rate offers for
[19] the nonconforming, and so far no impact on originations. The
[20] higher coupon offset the higher LIBOR rate. Secondly, in the
[21] text exempt on the new housing, the premium has not changed at
[22] all because of the local market.
[23] **Q.** Mr. Levis doesn't mention anything about contractual caps
[24] in his response to you, does it?
[25] **A.** No.

---

Page 1407

[1] **Q.** In fact, after Government Exhibit 1206, the e-mail from
[2] February 10th, did Mr. Levis ever raise the issue of
[3] contractual caps with you again?
[4] **A.** I don't believe.
[5] **Q.** If you look at Government Exhibit 1208, do you recognize
[6] that document?
[7] **A.** Yes, I do.
[8] **Q.** How do you recognize it?
[9] **A.** It was a downgrade of the shares that I published.
[10] **Q.** If you could --
[11]     **THE COURT:** What is the date?
[12]     **MR. STELLMACH:** March 7th, 2005, your Honor. The
[13] government offers Exhibit 1208.
[14]     **THE COURT:** Received.
[15]     (Government Exhibit 1208 received in evidence)
[16] **BY MR. STELLMACH:**
[17] **Q.** If you see up top, it indicates change in recommendation
[18] right beneath the date at the top, and you downgraded Doral to
[19] a hold. Is that right?
[20] **A.** Correct.
[21] **Q.** Looking at the key points under the section entitled "IO,
[22] IO, down the hold we go," could you just walk us through the
[23] factors that led you to downgrade Doral.
[24] **A.** Sure. The estimates that we had were that future
[25] impairments on the IO were forthcoming, that the gain on sale

---

Page 1408

[1] margin was likely to be falling. Capital --
[2] **Q.** Sorry to interrupt. What do you mean by gain on sale
[3] margin is falling?
[4] **A.** In recent quarters, to the best that I recall, in recent
[5] quarters a gain on sale margin had been quite high. I think at
[6] times, and this won't be exact, but in the high teens, maybe
[7] near 20 percent.
[8]     Historically, if you look over the past many, many years,
[9] the gain on sale margin had been markedly lower. We believe
[10] that was going to be falling.
[11]     Then in the third point, we point out that due to the IO,
[12] there is risk here, we don't think the capital, the capital
[13] ratios were strong. There was perhaps some believed and with
[14] the risks that we saw, we had moved to a hold rating and
[15] lowered it, I believe we lowered the target price.
[16] **Q.** What about the representation that had been made to you
[17] about the existence of caps?
[18]     At this point what weight are you placing on that
[19] representation?
[20] **A.** I would have to say by going, going to a hold or seeing or
[21] believing that there were more impairments, that I didn't
[22] believe that the -- I didn't believe caps were in existence.
[23] **Q.** If we could just jump back to Government Exhibit 1207 on
[24] Page 3, and I think we can also follow along, Mr. Cunningham,
[25] on the screen, the last two sentences in the first paragraph,

---

Page 1409

[1] if we can have that blown up, and those sentences beginning, "I
[2] estimate that the impairment"?
[3] **A.** Right. "I estimate that" --
[4]     **THE COURT:** What exhibit is this?
[5]     **MR. STELLMACH:** From the previous exhibit, your Honor,
[6] Government Exhibit 1207, the e-mail exchange that precedes this
[7] report.
[8]     **THE COURT:** Whose language is this?
[9]     **MR. STELLMACH:** This is an e-mail from Mr. Cunningham
[10] to the defendant.
[11]     **THE COURT:** Just a minute. Go ahead with your
[12] questioning, please.
[13] **BY MR. STELLMACH:**
[14] **Q.** Can you read that to us, Mr. Cunningham.
[15] **A.** Yes. "I estimate that the impairment represented a change
[16] in LIBOR assumptions of about 35 basis points. I believe that
[17] the cap on the existing portfolio is, on average, about 4.4
[18] percent. It appears that the impairment was for roughly 600
[19] million in supporting balances."
[20] **Q.** What was your basis for believing that the cap was on
[21] average at 4.4 percent?
[22] **A.** I believed it was a combination then of, combination of
[23] conversations with the company and of our own estimates, and
[24] within that we tried to, as I recall, stratify or go through
[25] each and every quarter of the past many years to see, to

---

# Exhibit J

# In The Matter Of:

## UNITED STATES OF AMERICA v.
## MARIO S. LEVIS A/K/A SAMMY LEVIS

---

### VOLUME 10
### April 9, 2010

---

### TRIAL
### SOUTHERN DISTRICT REPORTERS
### 500 PEARL STREET
### NEW YORK., NY 10007
### 212-805-0300

Original File 049WLEVF.txt, Pages 1465-1620 (156)

**Word Index included with this Min-U-Script®**

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

Page 1513

[1] Q. Can you describe to the jury why they were part of the
[2] audit plan?
[3] A. They were considered a significant balance to the financial
[4] statements.
[5]   THE COURT:  They were what?
[6]   THE WITNESS:  Considered a significant balance, amount
[7] in the financial statements.
[8] BY MR. ANTHONY:
[9] Q. Could you describe what the term "material" means?
[10] A. Material, in simple words is basically what is significant
[11] to the users of the financial or may be significant to the user
[12] of the financial statements.
[13] Q. Is it fair to say that the IOs were a material item in the
[14] company's financial statements?
[15] A. Yes.
[16]   MR. ANTHONY:  Your Honor, permission to approach.
[17]   THE COURT:  Sure.
[18] BY MR. ANTHONY:
[19] Q. Mr. Mendez, I'm bringing you a copy of Government Exhibit
[20] 6201. I believe you have an excerpt from this document in your
[21] binder. Mr. Mendez, if you could grab the actual exhibit
[22] there, please, and take a look at it for me.
[23]   Do you recognize this document, sir?
[24] A. Yes.
[25] Q. How do you recognize it?

Page 1514

[1] A. I have seen it before. It's a cover page of a form 10K.
[2] Q. Can you describe for us what that document is?
[3] A. It's a company, Doral Financial's form 10K for the year
[4] ended December 31, 2001.
[5]   MR. ANTHONY:  Your Honor, at this time, the government
[6] would offer Exhibit 6201 in evidence.
[7]   THE COURT:  Received.
[8]   (Government's Exhibit 6201 received in evidence)
[9] BY MR. ANTHONY:
[10] Q. Mr. Mendez, if you could flip to the first tab in your
[11] document, I believe there should be a excerpt there from the
[12] larger document that you have there, is that correct?
[13] A. Yes.
[14] Q. I'd like to draw your attention to what is the fourth page
[15] of your excerpt. Can you describe for the jury what is
[16] contained on this page?
[17] A. This is a copy of the audit report issued by Price
[18] Waterhouse Coopers for the year ended December 31, '01.
[19] Q. Mr. Mendez, I'd like to draw your attention to a few spots
[20] on here. Do you see in the first sentence, there are items
[21] listed, statements of income, comprehensive income, changes in
[22] stock quotes, equity, and cash flows?
[23] A. Yes.
[24] Q. What are those?
[25] A. It refers to the financial statements that are behind the

Page 1515

[1] audit report.
[2] Q. Mr. Mendez, do you see down there on the eighth line,
[3] there's a sentence that reads, "These financial statements are
[4] the responsibility of the company's management and our
[5] responsibility is to express an opinion on these financial
[6] statements based on our audits"?
[7] A. Yes.
[8] Q. Could you explain to the jury what that means?
[9] A. The first part of the sentence indicate that management is
[10] responsible for the company's financial statements, the
[11] financials prepared by management, and describes our
[12] responsibility as auditors, which is to express an opinion
[13] based on the work performed in the audit.
[14] Q. Could you read the next line for us, beginning "We
[15] conducted"?
[16] A. "We conducted our audits of these statements in accordance
[17] with auditing standards generally accepted in the United States
[18] of America, which require that we plan and perform the audit to
[19] obtain reasonable assurance whether the financial statements
[20] are free of material misstatement."
[21] Q. Mr. Mendez, can you describe what auditing standards
[22] generally accepted in the United States are?
[23] A. In simple terms, those are the rules that are followed by
[24] the, we follow, followed by the auditors to perform the audits.
[25] Q. And this document says those rules require you to "plan and

Page 1516

[1] perform the audit to obtain reasonable assurance." Can you
[2] explain to us what reasonable assurance means?
[3] A. Reasonable means that it's not an absolute assurance,
[4] meaning that not all the transactions and balances in the
[5] financial statements are fully tested. They are tested on a
[6] test basis.
[7] Q. And lastly, it reads "about whether the financial
[8] statements are free of material misstatements." Can you
[9] describe for us what material misstatement means?
[10] A. Material misstatement means something that will be
[11] significant to the financial statements that may not be
[12] presented correctly.
[13] Q. I believe the next line reads, "An audit includes examining
[14] on a test basis evidence supporting the amounts and disclosures
[15] in the financial statements, assessing the accounting
[16] principles and significant estimates used by management and
[17] evaluating the overall financial statement presentation." Can
[18] you describe what that sentence is talking about?
[19] A. It has, that's basically a broad description of the work
[20] that auditors perform in the audit, so the first element in
[21] that sentence indicates that it's on a test basis, right, not
[22] everything is tested. And then it describes --
[23]   THE COURT:  It's a sampling?
[24]   THE WITNESS:  Sampling, correct.
[25]   THE COURT:  Not every single transaction of the

Page 1525

[1] Q. Mr. Mendez, can I draw your attention to page 4 of this
[2] document. Do you see the recommendation that you're referring
[3] to on this page?
[4] A. Yes.
[5] Q. Could you read the recommendation for us, please?
[6] A. "Management should consider obtaining a valuation of the
[7] interest-only strips from an outside source at least once a
[8] year."
[9] Q. And could you read the following paragraph for us also,
[10] please.
[11] A. "Currently, the company values the interest-only strips --"
[12]     THE COURT: Can it be highlighted again?
[13] A. "Currently the company values the interest-only strips
[14] internally utilizing actual prepayment statistics of the
[15] portfolios. However, we believe that at least once a year, the
[16] interest-only strips should be valued by an outside source to
[17] provide an independent valuation of the portfolio. Given the
[18] high sensitivity of this type of asset to interest
[19] fluctuations, especially in the current downward trend of
[20] interest rates, it is important that the portfolio of
[21] interest-only strips be valued by an expert independent
[22] source."
[23]     (Continued on next page)
[24]
[25]

Page 1526

[1] Q. Mr. Mendez, can you describe for us your understanding of
[2] what is meant by the term expert, independent source.
[3] A. My understanding is a competent, objective source of
[4] valuation outside management.
[5] Q. Do you have an understanding of why PWC, the audit team in
[6] Puerto Rico made this recommendation?
[7] A. To my understanding, it was a good practice to obtain an
[8] external valuation for the instruments.
[9] Q. Why is that a good practice?
[10] A. For an area of judgment and for this type of instruments
[11] obtaining external valuations will provide further information
[12] to assess the management estimate.
[13] Q. Is it just one more item to give you reasonable assurance?
[14] A. Yes.
[15] Q. Mr. Mendez, how does management respond to this
[16] recommendation?
[17] A. They obtained an external valuation.
[18] Q. Is this management's response, agree, we expect to have
[19] this independent valuation report during the second half of
[20] 2001?
[21] A. Yes.
[22]     THE COURT: Are you reading from something now?
[23]     MR. ANTHONY: Yes, the following page of this exhibit.
[24]     THE COURT: Can we highlight that.
[25]     MR. ANTHONY: The top of Page 5.

Page 1527

[1] BY MR. ANTHONY:
[2] Q. Mr. Mendez, did management, indeed, get another valuation
[3] of the IOs in 2001?
[4] A. Yes.
[5] Q. Where did they obtain that valuation from?
[6] A. Valuation from Morgan Stanley.
[7] Q. Was this the valuation we just referred to when we looked
[8] at the 10K a moment ago?
[9] A. Yes.
[10] Q. Mr. Mendez, I would like to draw your attention now to the
[11] next tab in your binder, Government Exhibit 318. Mr. Mendez,
[12] do you recognize this document?
[13] A. Yes.
[14] Q. What is this document -- sorry -- how do you recognize this
[15] document?
[16] A. It is a typical working paper in the audit file. I
[17] remember it from the audit.
[18] Q. This is from the 2001 audit?
[19] A. Yes.
[20] Q. You were a member of the audit team in that year?
[21] A. Yes.
[22]     MR. ANTHONY: The government offers Exhibit 318 into
[23] evidence.
[24]     THE COURT: Received.
[25]     (Government Exhibit 318 received in evidence)

Page 1528

[1]     THE COURT: This is from the 2001 audit?
[2]     THE WITNESS: Yes.
[3]     THE COURT: Okay.
[4] BY MR. ANTHONY:
[5] Q. Mr. Mendez, can you read for us the first line in this
[6] document under the word, "Description."?
[7] A. "The company's policy is to classify IOs as trading
[8] securities. Therefore, securities should be marked to market
[9] with changes in value recorded in earnings. These instruments
[10] are complex and marketability is limited."
[11] Q. Trading securities, is that that category we just looked at
[12] in the 10K?
[13] A. Yes.
[14] Q. Can you describe what marked to market means.
[15] A. Record the balance of the IOs at fair value.
[16] Q. Fair value, is that a term we just defined earlier?
[17] A. Yes.
[18] Q. What does it mean that changes in value are recorded in
[19] earnings?
[20] A. Changes in value are recorded, were recorded in this
[21] statement of income, in this case earnings similar to statement
[22] of income.
[23] Q. The next paragraph, the last line reads, "Currently the
[24] following procedures are performed by management to
[25] obtain/calculate the fair value of the IOs."

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 10
April 9, 2010

---

Page 1537

[1] were getting. So that's the actual spread which ranged between
[2] 4, 5, 6 percent.
[3]   MR. ANTHONY: Your Honor, we may have a more legible
[4] copy.
[5]   THE COURT: If you take 131 million and you take 3
[6] percent of that, it gives you --
[7]   MR. BLACK: Your Honor, I think it is 191. It is hard
[8] to read, but that first column says 191.
[9]   THE COURT: Let's start with 191.
[10]   MR. ANTHONY: We may have a more legible example we
[11] can use, if that will be okay?
[12]   THE COURT: We want to get the method. We can
[13] certainly benefit from the figures, too. That is 5.7 million,
[14] roughly. Where do we go from there?
[15]   THE WITNESS: And then the last factor was 3.884, the
[16] multiple.
[17]   THE COURT: That was a multiple to sort of estimate
[18] the market value. Is that right?
[19]   THE WITNESS: Yes.
[20]   THE COURT: All right. Go ahead, please, go ahead.
[21]   MR. ANTHONY: Thank your Honor.
[22] BY MR. ANTHONY:
[23]   Q. Mr. Mendez, do you recognize what looks like initials to
[24] the right of this document?
[25]   A. Yes.

---

Page 1538

[1]   Q. Do you have an understanding of whose initials those are?
[2]   A. My understanding was Jose Lopez from Morgan Stanley was
[3] signing of those initials.
[4]   Q. Can you turn to the 5th page of this document.
[5]   A. Yes.
[6]   Q. Would you explain for us what is at the bottom of this
[7] document beginning with, "Tota"?
[8]   A. Would you give me the question again, please.
[9]   Q. Can you explain for us what is at the bottom of this
[10] document beginning with the total.
[11]   A. That was the totalization of the IOs aggregate for value.
[12]   Q. What is this below there? It looks like a signature?
[13]   A. The signature from Jose Lopez from Morgan Stanley.
[14]   Q. Mr. Mendez, could you flip back to Government Exhibit 318.
[15] Could you go to the second page at the top. Could you explain
[16] what the section under obtained management's internal
[17] evaluation of the portfolio and tested its mathematical
[18] exceptions meets, what that is referring to?
[19]   A. It refers that we obtained this constant cash flow model
[20] provided by management and checked the mathematical accuracy,
[21] which is the math of the schedule.
[22]   Q. I think when we were talking earlier, you also mentioned
[23] that PWC did something additional and came up with some kind of
[24] additional value for the IOs. Can you explain what you meant
[25] by that.

---

Page 1539

[1]   A. Well, we didn't come up with our valuation of the IOs. We
[2] performed an analysis to evaluate the valuation of the IOs as
[3] provided by management. To do that, we evaluated a number of
[4] assumptions to see -- ended up using the evaluation. Then that
[5] is described a little bit later in the working paper from what
[6] I see.
[7]   Q. Amongst these three, I will refer to them as valuations, I
[8] realize yours was a limited exercise to do something, but
[9] amongst those three, the work the audit team did, the internal
[10] model and Morgan Stanley model, what was your understanding of
[11] which one of those carried the most weight in your audit
[12] evidence?
[13]   THE COURT: I am sorry. Could you just state the
[14] question again.
[15]   MR. ANTHONY: Sure.
[16] BY MR. ANTHONY:
[17]   Q. Mr. Mendez, amongst the work the audit team did, the Doral
[18] internal model and the Morgan Stanley valuation, which of those
[19] three carried the most weight as audit evidence at this point
[20] in time?
[21]   A. The external valuation carries the most weight.
[22]   Q. Why is that?
[23]   A. Because an external valuation was considered competent
[24] evidence in assessing the valuation of the instruments.
[25]   Q. I think you also mentioned earlier that part of your audit

---

Page 1540

[1] work during this period was to speak with someone at PWC about
[2] the IO valuations. Is that right?
[3]   A. Yes.
[4]   Q. What can you tell us about that exercise?
[5]   A. We asked someone in the U.S. mortgage banking industry with
[6] experience to provide us with input as to what the company was
[7] doing to value the instruments. So I talked to the people
[8] about it and provided the Excel calculation from management and
[9] the analysis that we were performing to ask for this feedback.
[10]   Q. Which feedback did you receive from this person?
[11]   A. He basically described the purpose of the discounted cash
[12] flow model that the company was using served to corroborate
[13] what the company was receiving from Morgan Stanley, that the
[14] mathematical accuracy of present value, of present valuation
[15] declaration was okay, the formula.
[16]   He also indicated that management should consider
[17] segregating the portfolio into different characteristics of the
[18] loans, like terms or maturity dates and so forth and the
[19] consideration of the floating versus fixed payments that
[20] investors were getting.
[21]   Q. Did anyone from the valuation group ever visit Puerto Rico
[22] as part of this exercise?
[23]   A. No.
[24]   Q. Did they meet with anyone at Doral?
[25]   A. No.

---

Page 1549

[1] understand further the embedded assumptions that MS uses in its
[2] valuation of the IOs.
[3] **A.** As an indicated area, the company was receiving a valuation
[4] from Morgan Stanley, and we wanted to have the opportunity to
[5] understand further how Morgan Stanley was developing the
[6] valuation.
[7] **Q.** Did you make a recommendation in connection with that
[8] desire, I guess, to better understand what it was Morgan
[9] Stanley was doing?
[10] **A.** Yes, we asked to have a conversation with Morgan Stanley.
[11] **Q.** In this memo do you also make an observation regarding the
[12] internal valuation model?
[13] **A.** Could you repeat the question again, please.
[14] **Q.** Do you also make an observation regarding the internal
[15] valuation model?
[16]      May I direct your attention to the section labeled
[17] observations of PWC on DFC's valuation model.
[18] **A.** Yes, sir. That paragraph refers to recommendations related
[19] to the internal model.
[20] **Q.** What recommendations is it referring to?
[21] **A.** The disaggregation of pools of IOs between fixed and
[22] floating pools.
[23] **Q.** Does that recommendation, does that relate to the
[24] recommendation in the internal control memorandum we just
[25] looked at?

Page 1550

[1] **A.** Yes.
[2] **Q.** Is it meant to cover both of the points in that memo?
[3] **A.** Yes.
[4] **Q.** Can you remind us what those points were.
[5] **A.** The disaggregation of the pool, pool of loans between the
[6] different, among the different characteristics because the
[7] loans were comprised of different terms and maturities and
[8] interest rates and also between the fixed and floating nature
[9] of the IOs.
[10] **Q.** Can you explain for us what is being discussed under Item
[11] 3, alternatives for the periodic valuation.
[12] **A.** Can you repeat the question again, please.
[13] **Q.** Sure. Mr. Mendez, can you explain for us what is being
[14] discussed under Item 3, alternatives for the periodic valuation
[15] at the bottom of Page 2.
[16] **A.** This was a recommendation to management to, I guess,
[17] evaluate whether Cohane, an external firm, will be able to
[18] value the IOs, and at that time Doral was using Cohane to value
[19] servicing assets.
[20] **Q.** Is this a recommendation for Doral to obtain yet another
[21] external valuation?
[22] **A.** Yes.
[23] **Q.** Mr. Mendez, would you turn to Government Exhibit 306 in
[24] your binder. Mr. Mendez, do you recognize this document?
[25] **A.** Yes.

Page 1551

[1] **Q.** How do you recognize this document?
[2] **A.** It is a chain of e-mails in which I participated and I
[3] remember from my period in the audit.
[4]      **MR. ANTHONY:** The government now moves for the
[5] admission of Government Exhibit 306.
[6]      **THE COURT:** Received.
[7]      (Government Exhibit 306 received in evidence)
[8]      **THE COURT:** I have a note that you marked for
[9] identification 342. I don't have a note that it is received.
[10] Did you offer it? Did you mean to offer it?
[11]      **MR. ANTHONY:** Actually, your Honor, I did not. May I
[12] have that permission?
[13]      **THE COURT:** Received.
[14]      (Government Exhibit 342 received in evidence)
[15] **BY MR. ANTHONY:**
[16] **Q.** Mr. Mendez, could you turn to Exhibit 306, your e-mail
[17] dated 7-30-2002 at 3:16 pm. Do you see that?
[18] **A.** Yes.
[19] **Q.** Would you explain for us what prompted you to write this
[20] e-mail?
[21] **A.** It was in response to an e-mail I received from Ricardo
[22] Melendez, where he advised that the company was going to obtain
[23] a second valuation for the IOs on a quarterly basis.
[24] **Q.** Do you see that e-mail from Ricardo Melendez as part of
[25] this document?

Page 1552

[1] **A.** It is on the next page.
[2] **Q.** 7-30-02 at 8:55 am?
[3] **A.** Yes.
[4] **Q.** Could you translate for us what it is Mr. Melendez writes
[5] to you.
[6] **A.** It says it was decided to obtain two independent valuations
[7] for the IOs on a quarterly basis.
[8] **Q.** Mr. Mendez, turning back to your 7-30-2002 e-mail, could
[9] you explain for us what you're asking in Item 1.
[10] **A.** I was asking who was the second valuation, who was going to
[11] provide the second valuation.
[12] **Q.** The one referred to by Mr. Melendez in the earlier e-mail?
[13] **A.** Yes.
[14] **Q.** Would you explain to us what you're referring to in Item 3.
[15] **A.** It was advising Ricardo Melendez that PWC, the valuation
[16] team, were going to ask for independent confirmation of the
[17] valuations to be provided by external sources.
[18] **Q.** Can you explain how the independent confirmation process
[19] usually works.
[20] **A.** It is a process in which the auditors asked for, made a
[21] request to the external source. That letter is signed by
[22] management and provided to us. We mail it to the external
[23] source and we ask them to respond to our request, to request a
[24] repeat to us.
[25] **Q.** Would you explain to us what is being discussed in Item 5.

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 10
April 9, 2010

---

Page 1553

[1] A. It was advising Ricardo Melendez that we wanted to have a
[2] conversation with the sources of the valuation to inquire of
[3] them about their approach and valuation process.
[4] Q. When you say sources of evaluations, what are you referring
[5] to?
[6] A. The two external parties that were going to be providing
[7] the valuation.
[8] Q. So Morgan Stanley is one of them?
[9] A. Morgan Stanley was one of them, yes.
[10] Q. The second would be an unidentified second broker?
[11] A. Yes.
[12] Q. How about Item 7?
[13] A. It was asking Ricardo whether they have evaluated Cohane as
[14] a potential evaluator for the IOs and what kind of decision had
[15] they reached on that.
[16] Q. Mr. Mendez, if Doral already had an internal valuation and
[17] the Morgan Stanley valuation, what value would another external
[18] valuation be?
[19] A. It will provide further information about the evaluation of
[20] the instruments which were a significant estimate.
[21] Q. Are two external valuations better than one?
[22] A. Yes.
[23] Q. Mr. Mendez, what happened after you sent this e-mail?
[24] A. I remember that I coordinated or Ricardo coordinated a
[25] meeting, and we had a meeting with management to talk about the

---

Page 1554

[1] e-mail in further detail.
[2] Q. Drawing your attention to the e-mail at the top of the
[3] page, 7-30-2002, 7:22 pm, can you read the section beginning
[4] memo.
[5] A. "Memo. Don David feels comfortable with the requests but
[6] they want to meet with us to continue refining the process. I
[7] told them that you will be out until Wednesday, but they want
[8] to meet with me tomorrow afternoon to start talking about the
[9] process. I will attend the meeting with Arturo."
[10] Q. Was this the meeting that you were just referring to?
[11] A. Yes.
[12] Q. What do you remember happening at that meeting?
[13] A. I remember it was a meeting that took place in Ricardo
[14] Melendez's office at Doral. Arturo and Don David Levis and Ricardo
[15] members, and myself attended and Don David Levis and Ricardo
[16] Melendez participated, and I remember Sammy Levis participated
[17] at least a portion of the meeting.
[18] Q. The items you mentioned in the e-mail you just looked at,
[19] were those discussed?
[20] A. Yes.
[21] Q. Did you learn anything about what Morgan Stanley was doing
[22] at this meeting, the type of work it was to be performing?
[23] A. Yes, I recall that during the portion of the meeting that
[24] Sammy Levis participated, he indicated that based on his
[25] conversations with Morgan Stanley, he learned that Morgan

---

Page 1555

[1] Stanley was obtaining valuations from a trading desk in the
[2] U.S.
[3] Q. Did you learn anything about whether or not Morgan
[4] Stanley's valuation was considering a floating nature of the
[5] IOs?
[6] A. He indicated that they were, they were aware, but it would
[7] not impact the valuation of the IOs.
[8] Q. I think you said he indicated. Can you tell us who
[9] indicated?
[10] A. Sammy Levis indicated to us in the meeting that Morgan
[11] Stanley, Jose Lopez from Morgan Stanley had told him that.
[12] Q. Mr. Mendez, was this meeting, was this documented by PWC in
[13] the work papers?
[14] A. Yes.
[15] Q. Could I ask you to turn to Government Exhibit 332. Mr.
[16] Mendez, do you recognize this document?
[17] A. Yes.
[18] Q. How do you recognize this document, Mr. Mendez?
[19] A. It is a working paper of the audit for the year ended
[20] December 31, '02.
[21]     MR. ANTHONY: The government moves for the admission
[22] of Government Exhibit 332.
[23]     THE COURT: Received.
[24]     (Governmnet Exhibit 332 received in evidence)
[25] BY MR. ANTHONY:

---

Page 1556

[1] Q. Mr. Mendez, I would like to turn your attention to the
[2] third page of this document. Can you identify the date for us
[3] on this document.
[4] A. July 31st, 2002.
[5] Q. And the subject?
[6] A. "Minutes-meeting with top management."
[7] Q. Who were the participants, according to this memo?
[8] A. It is described David Levis, Ricardo Melendez, Mario Levis,
[9] myself and Arturo Tous.
[10] Q. Would you read the first bullet point for us, please.
[11] A. "To be obtained from two independent brokers on a quarterly
[12] basis, one month prior to quarter-end. PWC will send the
[13] requests of quotation for the third quarter independently from
[14] the client and will receive direct replies from the brokers."
[15] Q. Can you explain what this bullet point is in reference to.
[16] A. It has two elements to it. The first sentence refers that
[17] management was going to obtain valuations from the two sources
[18] on a quarterly basis. The second sentence refers to the
[19] confirmation that it received was going to send to the
[20] evaluators.
[21] Q. Can you read the third bullet point for us in its entirety.
[22] A. "Prior to the meeting, Mario Levis discussed with Jose
[23] Lopez, Morgan Stanley, the process presently used by MS to
[24] obtain the quotations. On discussion with Mr. Levis, PWC
[25] learned that the quotes are obtained from Morgan Stanley's

---

Page 1557

[1] loans and loan derivative instruments trading desk in the U.S.
[2] "Mario represented that Mr. Lopez indicated that the
[3] portfolio characteristics that determine the valuation factors
[4] are the WAC and the WAM. Mr. Levis stated that the valuation
[5] is not affected by the variable factor of the IOs and that
[6] according to his experience in the market and his discussions
[7] with Mr. Lopez, should not be."
[8] **Q.** Mr. Mendez, following this meeting did Doral, indeed,
[9] obtain a second external valuation of the interest-only strips?
[10] **A.** Yes.
[11] **Q.** Who did it obtain that valuation from?
[12] **A.** Popular Securities.
[13] **Q.** I think we have seen a couple of references to an external
[14] confirmation process. Is that right?
[15] **A.** Yes.
[16] **Q.** Did PWC engage that external confirmation process during
[17] this year?
[18] **A.** Yes.
[19] **Q.** Turn your attention to Government Exhibit 313. Mr. Mendez,
[20] do you recognize this document?
[21] **A.** Yes.
[22] **Q.** How do you recognize this document?
[23] **A.** It is a cover page of our working papers.
[24] **Q.** Do you recognize the documents behind it?
[25] **A.** Yes.

Page 1558

[1] **Q.** Are these documents from your work papers as well?
[2] **A.** Yes.
[3] **MR. ANTHONY:** Your Honor, the government moves for the
[4] admission of Government Exhibit 313.
[5] **THE COURT:** Received.
[6] (Government Exhibit 313 received in evidence)
[7] **BY MR. ANTHONY:**
[8] **Q.** Mr. Mendez, could you turn to the fourth page of this
[9] document. Can you explain to us what this page is, what this
[10] document is.
[11] **A.** This page refers to the audit confirmation I mentioned
[12] earlier signed by management and addressed to the external
[13] evaluator Popular Securities in this case.
[14] **Q.** Why was Mario Samuel Levis sending this letter?
[15] **A.** He was at that time the treasurer of the company and the
[16] contact for the IOs.
[17] **Q.** Did you also understand he was the contact with the
[18] external valuation parties?
[19] **A.** Yeah, that was my understanding.
[20] **Q.** Would you turn to the next page, please. What is this
[21] document?
[22] **A.** The audit confirmation request to Jose Lopez from Morgan
[23] Stanley.
[24] **Q.** I think you described for us earlier a process by which
[25] these confirmations were sent. Could you briefly remind us

Page 1559

[1] what that process is.
[2] **A.** Management of the company will provide us a signed letter
[3] addressed to the party providing the confirmation. That letter
[4] will be provided to us, and we will mail, send a confirmation
[5] to the external party, and in a confirmation letter he will ask
[6] the external evaluator to provide a copy directly to the
[7] auditors.
[8] (Continued on next page)

Page 1560

[1] **BY MR. ANTHONY:**
[2] **Q.** Mr. Mendez, may I ask you to turn to the second and third
[3] pages of this document and ask you to identify what those pages
[4] are.
[5] **A.** This was a letter containing the valuation provided by
[6] Popular Securities.
[7] **Q.** Let me also ask you to turn to the 12th page of this
[8] document. Mr. Mendez, this 12th page, through the end of the
[9] document, can you identify what these pages are?
[10] **A.** The response from Morgan Stanley to the valuation request.
[11] **Q.** Is this similar to the Morgan Stanley valuation we looked
[12] at earlier?
[13] **A.** Yes.
[14] **Q.** Does it work in the same way?
[15] **A.** Yes.
[16] **Q.** By the end of calendar year 2002, had anyone on the PWC
[17] audit team in Puerto Rico been able to speak with Morgan
[18] Stanley or anyone at Banco Popular?
[19] **A.** Could you repeat the question again, please?
[20] **Q.** Sure. By the end of the calendar year 2002, had anyone on
[21] your audit team in Puerto Rico working on the Doral audit, had
[22] anyone spoken with Morgan Stanley or Popular Securities
[23] regarding the valuation work they were doing for Doral?
[24] **A.** No.
[25] **Q.** Did you make any additional attempts in connection with the

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 10
April 9, 2010

Page 1561

[1] year end 2002 audit to do so?

[2] **A.** Yes.

[3] **Q.** What did you do?

[4] **A.** I remember the meetings or conversations with Morgan
[5] Stanley, Popular Securities, with management, and at some point
[6] in early 2003, before the completion of the audit we had the
[7] opportunity of meeting or talking to the valuators.

[8] **Q.** May I ask you to turn to Government Exhibit 307.
[9] Mr. Mendez, do you recognize this document?

[10] **A.** Yes.

[11] **Q.** How do you recognize this document?

[12] **A.** It's an e-mail where I'm, I participate or I received, and
[13] I remember it from my time in the audit period.

[14]    **MR. ANTHONY:** Your Honor, the government moves for the
[15] admission of Government Exhibit 307.

[16]    **THE COURT:** Received.

[17]    (Government's Exhibit 307 received in evidence)

[18] **BY MR. ANTHONY:**

[19] **Q.** Mr. Mendez, while I realize you didn't send it, could you
[20] read the first e-mail in this chain, the one on Tuesday,
[21] February 17, at 2:35 for us, please?

[22] **A.** "Carlos Mendez from PWC is requesting telephone meetings
[23] with Joe Lopez and Juany Ortiz to understand and document in
[24] their work papers the underlying assumptions used by them to
[25] arrive at values shown in November valuations."

Page 1562

[1] **Q.** Why were you requesting such meetings with Joe Lopez and
[2] Juan Ortiz?

[3] **A.** To have the opportunity of obtaining further understanding
[4] as to the sources of their valuations.

[5] **Q.** Mr. Mendez, could you read the response from Sammy Levis in
[6] February 19, 2003, at 10:30 a.m.?

[7] **A.** "Tell him that Joe Lopez doesn't use assumptions. It is a
[8] market quote. Juany's valuation is an investment banking
[9] valuation which uses assumptions. If he wants to, he can talk
[10] to Juany, 766-4164. He should not speak to Joe because all
[11] that Joe does is to call his trader in New York City and get a
[12] quote. We have explained this to him in the past."

[13] **Q.** Had Mr. Levis explained this to you in the past?

[14] **A.** Yes.

[15] **Q.** And when was that?

[16] **A.** In the meeting that was in the summer, in the summer of
[17] 2002.

[18] **Q.** Is that the one that was just recorded in the memo we just
[19] looked at?

[20] **A.** Yes.

[21] **Q.** Mr. Mendez, could I ask you now to turn to Government
[22] Exhibit 308.

[23]    Mr. Mendez, do you recognize this document?

[24] **A.** Yes.

[25] **Q.** How do you recognize this document?

Page 1563

[1] **A.** It's a chain of e-mails where, that I received, and I
[2] remember it from my period in the engagement.

[3]    **MR. ANTHONY:** Your Honor, the government moves the
[4] admission of Government Exhibit 308.

[5]    **THE COURT:** Received.

[6]    (Government's Exhibit 308 received in evidence)

[7] **BY MR. ANTHONY:**

[8] **Q.** Mr. Mendez, I know it's a bit of a long e-mail, but would
[9] you mind reading for us your e-mail on February 19, 2003, at
[10] 4:08 p.m.?

[11] **A.** "Ricardo, as discussed with you, I'm fully aware of Don
[12] David and Sammy's explanation about the source of pricing used
[13] by Joe Lopez. However, my concern is not the source of the
[14] pricing, but if the source is considering all the
[15] characteristics of the instruments. Furthermore, the GAAP
[16] definition of fair value is the following:

[17]    "The amount at which that asset (or liability) could be
[18] bought (or incurred) or sold (or settled) in a current
[19] transactions between willing parties, that is, other than in
[20] forced or liquidation sale.

[21]    "Based on this, the provisional standards require PWC to
[22] ascertain that the market quotations received from Morgan
[23] Stanley represent indeed the fair value of Doral's IOs
[24] considering all their characteristics. These standards also
[25] require us to corroborate management's explanation.

Page 1564

[1]    "I believe that Joe Lopez and/or Morgan Stanley's trading
[2] desk can answer our question in a few minutes and will permit
[3] us to comply with the professional standards. I will call you
[4] to discuss. Regards Carlos."

[5] **Q.** Why do you quote the GAAP language in this e-mail?

[6] **A.** To make it clear as to what was the fair value definition
[7] and what we wanted to confirm with Morgan Stanley.

[8] **Q.** Can you read the response at the top of the page?

[9] **A.** "Ricardo, make sure that PWC understands that we do not
[10] oppose them talking to Joe Lopez nor Juany Ortiz. I just want
[11] to make sure that this action is really required since they
[12] have already talked to them in the past. Also, these people
[13] are busy, and I don't want to bother them unless it is
[14] absolutely necessary. If they really need to talk to Joe or
[15] Juany, they have my okay to call them. I would appreciate it
[16] if I can be in the call just to make sure that there are no
[17] misunderstandings; sometimes the brokers use different
[18] terminology. If they don't want me in the call, that's fine
[19] too. Let me know when and if I can be in the call. Regards,
[20] Sammy."

[21] **Q.** Did you have any objection to Sammy Levis participating in
[22] the call?

[23] **A.** No.

[24] **Q.** Did you indeed speak with people at Morgan Stanley and
[25] Popular Securities in connection with your work on the 2002

VOLUME 10
April 9, 2010

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

Page 1565

[1] Doral?

[2] A. Yes.

[3] Q. Let's start with Morgan Stanley. What can you tell us
[4] about that conversation?

[5] A. I remember it was a telephone conversation that I took a
[6] call when I was in my PWC office, and I received a called from
[7] Ricardo Melendez and Jose Lopez from Morgan Stanley, and I
[8] believe but don't recall if Sammy Levis was on the call.

[9] Q. What did you learn during this call about the type of work
[10] that Morgan Stanley was performing?

[11] A. That they were obtaining the valuation for the IOs from the
[12] trading desk in the U.S.

[13] Q. Did you repeat the GAAP language that we just looked at
[14] from your e-mail?

[15] A. Yes, I described the language to Mr. Lopez.

[16] Q. What was your purpose for doing that?

[17] A. Confirm that he had an understanding of the GAAP
[18] definition, which was the purpose of the valuation.

[19] Q. Did you discuss the fixed rate feature of some Doral IOs at
[20] all?

[21] A. I inquired Mr. Lopez if he had an understanding of the
[22] feature, and whether they had, Morgan Stanley had all the
[23] information that they needed to provide a GAAP valuation for
[24] the IOs.

[25] Q. And what did Mr. Lopez say in response?

Page 1566

[1] A. Yes. He affirmed that.

[2] Q. Did you also have a conversation with Popular Securities?

[3] A. Yes.

[4] Q. Can you tell us about that conversation?

[5] A. For Popular Securities, we had a meeting, at Popular
[6] Securities. That meeting, Ramon Ponte, Arturo Tous, there were
[7] a number of participants, and from PWC, Ramon Ponte, Arturo
[8] Tous, and myself went to the meeting. From Doral, Ricardo
[9] Melendez participated. And I believe that based on my
[10] recollection, Luis Aponte participate. From Popular
[11] Securities, Carlos Ortiz and a number of his staff
[12] participated.

[13] Q. And during that meeting, did you learn what type of
[14] valuation that Popular Securities was performing?

[15] A. Yes.

[16] Q. What type were they performing?

[17] A. They were doing a discounted cash flow valuation.

[18] Q. Who was determining the inputs to that language, at least
[19] as you understood it?

[20] A. Could you repeat the question again.

[21] Q. Sure. I'll move on.

[22] Mr. Mendez, did you document the conversations you had
[23] with Joe Lopez at Morgan Stanley and Popular Securities in the
[24] work papers.

[25] A. Yes.

Page 1567

[1] Q. Could I now turn your attention to Government Exhibits 325?

[2] Mr. Mendez, do you recognize this document?

[3] A. Yes.

[4] Q. How do you recognize this document?

[5] A. It is a working paper for the audit of the financial
[6] statement for 2002.

[7] MR. ANTHONY: Your Honor, the government moves for the
[8] admission of Government Exhibit 325.

[9] THE COURT: Received.

[10] (Government's Exhibit 325 received in evidence)

[11] BY MR. ANTHONY:

[12] Q. Mr. Mendez, I'd like to turn your attention to the second
[13] page of this document, to the second just below the icon in the
[14] middle of the page. Could you read the sentence on top of that
[15] session beginning "throughout the year"?

[16] A. Can you repeat, indicate where the sentence again?

[17] Q. Just below the icon, the sentence beginning "throughout the
[18] year."

[19] A. Okay. "Throughout the year and driven by both, PWC's
[20] recommendations and management initiative, the company
[21] continued enhancing its procedures as follows."

[22] Q. Can you describe how the company enhanced its valuation
[23] procedures as part of the 2002 audit year?

[24] A. They obtained a fair value valuation from Popular
[25] Securities.

Page 1568

[1] Q. Mr. Mendez, just below that bullet point, it reads, "Note
[2] that we met Carlos Ortiz and his assistants from PS and Ricardo
[3] Melendez, and we discussed the following matters."

[4] What is the sentence below that referring to?

[5] A. It summarizes information that we learned during the
[6] meeting with Popular Securities.

[7] Q. Let's talk about how or the types of inputs that go into
[8] the Popular Securities model.

[9] A. Yes.

[10] Q. What are some of those inputs.

[11] A. Prepayment speeds, discount rates, and those were some of
[12] the basic assumptions.

[13] Q. Was it your understanding that Popular Securities was
[14] independently determining those inputs, those assumptions?

[15] A. Yes.

[16] Q. If you could turn to the next page, do you see the second
[17] point in the top of the page labeled the "floating IOs versus
[18] fixed IOs"?

[19] A. Yes.

[20] Q. Could you read that section for us?

[21] A. "He explained that they have not included the floating
[22] aspect of the IOs in the valuation because he considers that it
[23] will add another variable to the model which is offset in some
[24] way by the impact in the prepayment speed of the portfolios.
[25] Furthermore, his views are that in periods of interest rate

Page 1569

[1] curves that are fairly flat (i.e., 2002), the effect may be
[2] considered minor and the static analysis is considered more
[3] accurate. Nonetheless, he said that the impact of such
[4] variable should be considered in other scenarios where the
[5] spread obtained could be impacted by higher LIBOR."
[6] Q. Is it your understanding that if Popular Securities did
[7] decide that higher LIBOR could impact the valuations they would
[8] take that particular fact into account?
[9] A. That was my understanding.
[10] Q. Mr. Mendez, at this point, what was the process that the
[11] company was using to determine the fair value of its IOs in its
[12] financial statements?
[13] A. The company was obtaining valuations from Morgan Stanley
[14] and Popular Securities and having an internal valuation on
[15] their discounted cash flow models.
[16] Q. This paper also refers at the beginning of the middle of
[17] the third page to assessment of fair value and underlying
[18] assumptions section. Do you see that?
[19] A. Sorry. What page are you referring to?
[20] Q. On the third page, just under the icon, the IO schedule
[21] icon.
[22] A. Okay. I see it.
[23] Q. In that first bullet point, it says, "Management and
[24] Popular Securities both indicated that the variable spread
[25] factor is typically not considered in determining fair value

Page 1570

[1] and that the impact, if any, would not be significant,
[2] considering the subjective nature of the estimates involved.
[3] Further, static analysis is the prevailing model used in market
[4] transactions."
[5] Did PWC do anything to test those representations?
[6] A. We inquired them about their basis for those
[7] representations and we performed some high-level analysis to
[8] valuate potential impacts of IO rates in the valuation that
[9] management was providing, and we performed some analysis.
[10] Q. In connection with the 2002 audit, the analysis that you
[11] performed, the internal model, the Popular Securities model,
[12] and the Morgan Stanley model, which of those carried the most
[13] weight insofar as the audit team was concerned when assessing
[14] the value of Doral's IOs?
[15] A. The external valuations carried significant weight, both
[16] valuations from the additional parties.
[17] Q. Mr. Mendez, can I ask you to turn to the next exhibit in
[18] your binder, GX6202, and I believe this is an excerpt from a
[19] document that is already in evidence.
[20] Mr. Mendez, do you recognize this document?
[21] A. Yes.
[22] Q. Can I get you to turn to the fourth page? Sorry. It's the
[23] fifth page. What is contained here on the fifth page of this
[24] document?
[25] A. It is the audit report for the year ended December 31,

Page 1571

[1] 2002.
[2] Q. Is this audit report or audit opinion similar to the one we
[3] looked at in connection with the 2001 audit?
[4] A. Yes.
[5] Q. I ask you to turn the page and find for us the place on the
[6] balance sheet where the IOs are contained.
[7] THE COURT: Are you offering this?
[8] MR. ANTHONY: Your Honor, I believe this is already in
[9] evidence.
[10] THE COURT: It is, okay. That's right. For 2002.
[11] MR. ANTHONY: 2002 10K.
[12] THE COURT: Okay.
[13] A. Under the caption "other investment securities, trading
[14] securities at fair value."
[15] Q. Could you read for us the value in 2001 and 2002?
[16] A. For 2002, the balance was 412,846,000, and for 2001,
[17] 236,829,000.
[18] Q. Could I ask you to turn the page and find the location
[19] where Doral's noncash gain-on-sale income -- let's just refer
[20] to where its gain-on-sale income for the IOs is contained.
[21] A. It was included under the caption noninterest income net
[22] gain on mortgage loan sales increase.
[23] Q. Could you read for us the values for 2000, 2001 and 2002?
[24] A. For 2002, 220,585,000. For 2001, 187,221,000. For 2000,
[25] it was 134,339,000.

Page 1572

[1] Q. Mr. Mendez, could I ask you to turn to the 13th page of
[2] this document, note 2, summary of significant accounting
[3] policies. Can you remind us what a significant accounting
[4] policy is?
[5] THE COURT: What was the question?
[6] MR. ANTHONY: If Mr. Mendez could remind us what a
[7] significant accounting policy is.
[8] A. It is a description of the significant accounting policies
[9] followed by the company in preparing its financial statements.
[10] Q. Could you turn the page and read for us the section
[11] beginning with "in connection," that carries over to the next
[12] page.
[13] A. "In connection with the securitization transactions and the
[14] sale of loans, the company recognizes as interest-only strips
[15] (IOs) the rights to cash flows remaining after the payment of
[16] the servicing fees and the contractual payments to the buyers
[17] of the loans. The contractual payments to the buyers are
[18] generally based on a spread over LIBOR. The contractual
[19] payments are either fixed over the life of the loans or
[20] floating with quarterly resetting. These IOs are carried at
[21] fair value, which is generally determined based on dealers'
[22] quotes or market prices for sales of similar assets. The
[23] company also evaluates the fair value of IOs using external and
[24] internal valuations based on discounted cash flow models that
[25] incorporate assumptions regarding discount rates and mortgage

VOLUME 10
April 9, 2010

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

Page 1573

(1) prepayment rates."
(2) **Q.** Mr. Mendez, the dealer quotes referenced in this section,
(3) did you have an understanding of what that referred to?
(4) **A.** The Morgan Stanley valuation.
(5) **Q.** And how about the external valuation based on discounted
(6) cash flow models?
(7) **A.** Sorry. Could you repeat the question again?
(8) **Q.** Yes. How about the external valuation based on discounted
(9) cash flow models?
(10) **A.** That was the one provided by Popular Securities.
(11) **Q.** Mr. Mendez, when you were at PWC, and the audit team was
(12) assessing the value of Doral's interest-only strips, did the
(13) audit team take the value of any hedges Doral had into account
(14) when assessing the value of the interest-only strips?
(15) **A.** No.
(16) **Q.** Why not?
(17) **A.** Because those were separate contracts.
(18) **Q.** They're separate from the IOs?
(19) **A.** Yes.
(20) **MR. ANTHONY:** Your Honor, if I may have just one
(21) second to confer with my colleagues.
(22) **Q.** Mr. Mendez, just one or two more questions for you. May I
(23) turn your attention to page 28 of this excerpt, note 5,
(24) securities held for trading. We're still in Government Exhibit
(25) 6202.

Page 1574

(1) **A.** Yes.
(2) **Q.** Describe for us what is here in note 5.
(3) **A.** A description of the securities owned by the company
(4) classified as trading securities.
(5) **Q.** And can you read the value for the interest-only strips
(6) contained in this note 5?
(7) **A.** At December 31, 2002, it was 359,185,000. At December 31,
(8) 2001, it was 236,468,000.
(9) **MR. ANTHONY:** Your Honor, at this time, the government
(10) has no further questions.
(11) **THE COURT:** I just want to make sure that I
(12) understand. As of the end of your work on the 2002 audit, it
(13) was your understanding that Doral had two independent
(14) evaluators, right?
(15) **THE WITNESS:** Yes.
(16) **THE COURT:** And then Doral made its own evaluation,
(17) right?
(18) **THE WITNESS:** Yes.
(19) **THE COURT:** And maybe I didn't get this, but, for the
(20) independent evaluators, were there two different methods that
(21) they were using, according to your understanding?
(22) **THE WITNESS:** Yes, that's correct.
(23) **THE COURT:** I think you described it, and it's
(24) probably in the documents, but do you mind describing it again?
(25) What method was Morgan Stanley using?

Page 1575

(1) **THE WITNESS:** Based on market multiples or market
(2) valuations. Based on information that they had from their
(3) trading desk.
(4) **THE COURT:** So the trading desk would give them some
(5) information that would lead them to this market multiple,
(6) right?
(7) **THE WITNESS:** Yes.
(8) **THE COURT:** And the market multiple was to take the
(9) total face value of the mortgages, right?
(10) **THE WITNESS:** Yes.
(11) **THE COURT:** And then multiply that by a percentage,
(12) right?
(13) **THE WITNESS:** Yes.
(14) **THE COURT:** And the percentage or average percentage
(15) that they were getting on the interest-only strips, right?
(16) Their portion. Let me say it again.
(17) For each pool, there was a percentage that they were
(18) getting on their interest-only strip, right?
(19) **THE WITNESS:** Yes.
(20) **THE COURT:** And those interest-only strip amounts were
(21) average for all the pools, right? Am I right or wrong?
(22) **THE WITNESS:** Yes. They were getting different
(23) interest rates from the different transactions that they made.
(24) **THE COURT:** And to get the figure they used in this
(25) calculation of value, were they average, or not?

Page 1576

(1) **THE WITNESS:** My understanding was providing multiples
(2) by different set of pools, so, I'm trying to follow your
(3) comment.
(4) **THE COURT:** How did it work? In other words, was
(5) there a calculation for each pool?
(6) **THE WITNESS:** Yes, for a group of pools, Morgan
(7) Stanley would provide a multiple that multiplying that --
(8) **THE COURT:** Before we get to the multiple --
(9) **THE WITNESS:** Yes.
(10) **THE COURT:** -- we've got to get the percentage for the
(11) interest-only strip.
(12) **THE WITNESS:** Right.
(13) **THE COURT:** Don't we?
(14) **THE WITNESS:** Yes.
(15) **THE COURT:** And that percentage is multiplied by the
(16) whole value of the mortgages, right?
(17) **THE WITNESS:** Yes.
(18) **THE COURT:** All right. So in some way, and I won't
(19) get into this, they had a percentage figure for the
(20) interest-only strips?
(21) **THE WITNESS:** Yes.
(22) **THE COURT:** And that was multiplied by all the
(23) mortgages?
(24) **THE WITNESS:** Yes.
(25) **THE COURT:** And so that would result in some figure,

# Exhibit K

# In The Matter Of:

## UNITED STATES OF AMERICA v.
## MARIO S. LEVIS A/K/A SAMMY LEVIS

---

## VOLUME 16
### April  19, 2010

---

## TRIAL
## SOUTHERN DISTRICT REPORTERS
## 500 PEARL STREET
## NEW YORK., NY 10007
## 212-805-0300

Original File 04JWLEVF.txt, Pages 2375-2580 (206)

**Word Index included with this Min-U-Script®**

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 16
April 19, 2010

Page 2495

[1]        I said I don't think you should be a broker because,
[2]   my son, since he was raised in Puerto Rico, he wasn't that
[3]   fluent in English, and I thought he would have a hard time.
[4]        Give me a chance and let me see if I could help you
[5]   get a job. I checked around a couple of places. I checked
[6]   with Sammy. Sammy gave me one of his subordinates to call. I
[7]   gave my son the information. My son called that person. He
[8]   was interviewed and hired as a clerk, worked in Doral for 2005
[9]   making about low 20,000 a year. He didn't have a big position,
[10]  just a clerk there.
[11]  Q. When did your son leave Doral?
[12]  A. He left Doral in 2006.
[13]  Q. When did you first meet the defendant, Sammy Levis?
[14]       You said your relationship with the family began back
[15]  in 1982 with David Levis. When did you first meet Sammy Levis?
[16]  A. I met Sammy Levis when Sammy Levis joined Doral Financial,
[17]  for Sammy Levis used to work for Merrill Lynch back in the late
[18]  80's, early 90's.
[19]       When there was a downsizing in Merrill Lynch, Sammy
[20]  more or less was out of a job and he was hired by Doral. That
[21]  is when I met Sammy.
[22]  Q. Prior to 2001, the only business you were doing with Doral
[23]  were these transactions where you were loaning them money in
[24]  exchange for collateral they were putting up?
[25]  A. Yes, sir.

Page 2496

[1]   Q. Did you socialize with the defendant at all?
[2]   A. My wife and I are not too socially-going people. We go to
[3]   a lot of activities, but the Levis family had a fundraiser that
[4]   we would do once a year to help children with cancer. My wife
[5]   and I always went to that activity.
[6]        The only other activity I remember socializing with
[7]   Sammy was when he got married, he invited me to the wedding and
[8]   I went with my wife. When we got to the hall, everybody from
[9]   the street was there, all his friends, bankers and brokers and
[10]  everything. Basically those are the only times I really
[11]  socialized with Sammy.
[12]  Q. How would you describe your professional relationship with
[13]  the defendant?
[14]  A. Well, Sammy and I had a very good relationship over the
[15]  years. We talked a lot about the market and we tried to do
[16]  business, sometimes we couldn't because they were a very
[17]  competitive firm. We had two components with other brokers. I
[18]  considered it a very good relationship and at the time I
[19]  considered Sammy a good friend.
[20]  Q. Approximately when did the issue of you performing a
[21]  valuation of Doral's IOs first come up?
[22]  A. They came up in 2001.
[23]  Q. Can you tell us how it came up, who contacted you?
[24]  A. I got a call from Sammy one day, I don't remember morning
[25]  or afternoon. He called me and said I need to you to help me

Page 2497

[1]   with something. What I can help you? I will send you
[2]   something by messenger. When you get it, call me and we'll
[3]   discuss it. He sent me an envelope and he sent me a listing,
[4]   and I called him, and it was a listing of IOs.
[5]        Sammy started describing this type of instrument, the
[6]   first time I heard about it when he showed it to me.
[7]   Q. How familiar were you with IOs?
[8]   A. I never dealt with IOs before then. Basically IO is Doral
[9]   used to sell their nonconforming mortgages to financial
[10]  institutions in Puerto Rico because in Puerto Rico there is a
[11]  scarcity of Puerto Rico assets and the banks have these ratios
[12]  they have to maintain. In Puerto Rico they have to have so
[13]  many Puerto Rico assets against U.S. assets.
[14]       The banks would go to mortgage bankers like Sammy, and
[15]  they would buy nonconforming mortgages, and Sammy would sell
[16]  them at a floating rate. I was never involved in the setting
[17]  up what, what price he would sell it to them. Basically Doral
[18]  had a transaction where they were getting a fixed rate. For
[19]  example, 8 percent fixed coupon and they would sell it to a
[20]  bank at a floating rate on monthly basis, maybe the bank was
[21]  getting 5 percent, so Doral was really getting a 3 point spread
[22]  carry, meaning they would getting 8 percent on the mortgages at
[23]  issue and paying the banks 15.
[24]       So that 3 points is like a cash flow because you get
[25]  more cash in than what you're paying out. So you have to price

Page 2498

[1]   that cash flow because it is really a part of a security that
[2]   is generating an income. He started explaining to me that
[3]   these mortgages have a weighted average coupon, weighted
[4]   average maturity, and that they act familiar to regular
[5]   mortgages in Puerto Rico, and you have to get a similar
[6]   security that has the same characteristics, meaning 8 percent
[7]   coupon, 2 -- as an example, 233 months, divide by 12 and gives
[8]   you X amount of years, say 15 years and go into the market and
[9]   theoretically find matching or close to matching security with
[10]  those characteristics.
[11]       And what you would do is you would go into a simple
[12]  example, you call into Bloomberg, you find a similar security
[13]  and that system will analyze it for you and tell you how those
[14]  mortgages with those characteristics are repaying. Mortgages
[15]  prepay on monthly basis because people make principal payment
[16]  every month and that affects the group of of mortgages. Every
[17]  month they keep paying down.
[18]  Q. This is all -- sorry, Mr. Lopez -- this is all information
[19]  that the defendant is explaining to you?
[20]  A. Yes, yes. For a minute I thought Sammy, I don't know how
[21]  to do this. This is Chinese to me. I really don't know. We
[22]  talked. He said I don't need your help to do this. Somebody
[23]  will do this for you. He said I can't. He told me one or two
[24]  other people.
[25]       Since the relationship I had with him, I considered

Page 2499

[1] him a friend, respected the family, an executive vice president
[2] and treasurer, I figured he said this will be used for my
[3] internal use only, and he convinced me and I signed off. What
[4] Sammy Levis was giving me was the numbers that he used, and I
[5] would sign off I was doing the numbers.
[6]       Since those mortgages were generated from Doral and
[7] Doral had all the information on those mortgages, the way
[8] they're prepaid, if anybody knew what those mortgages were
[9] prepaying and what they were more or less worth, it would be
[10] Sammy. So I trusted him and signed off. This went on for a
[11] couple of years, from 2004 he would send me -- not every
[12] quarter, send me every couple of months send me a short listing
[13] and I would initial I had done it. I would take the
[14] information he gave it to me and send it back by messenger.
[15] Q. Let's step back. In that conversation with the defendant,
[16] you asked him whether he had anybody else pricing these
[17] instruments, these interest-only strips?
[18] A. Yes, he did. He told me he had one or two other people
[19] doing it on the street, but he didn't tell me who.
[20] Q. Did he tell you why?
[21] A. Because it was confidential.
[22]       THE COURT: Look, you need to try to speak slower.
[23]       THE WITNESS: Okay.
[24]       THE COURT: You are very, very fast. It is hard to
[25] get it.

Page 2500

[1]       THE WITNESS: Sorry, your Honor.
[2] BY MR. STELLMACH:
[3] Q. And when the defendant told you that the numbers that he
[4] wanted from you would be used for his internal purposes, what
[5] did you understand that to mean?
[6] A. He was going to use it for his probably his own personal
[7] use. I was never told they were going to be used for anything
[8] other than that.
[9] Q. I think you said that this was all new to you and you
[10] didn't really understand it?
[11] A. Yes, sir.
[12] Q. Did you tell that to Mr. Levis?
[13] A. He knew it. I said Sammy, like I said before, this is
[14] Chinese to me. I don't trade these instruments. I don't know
[15] how to price these. He said Joe, trust me, you are not doing
[16] anything wrong. I decided to help him.
[17] Q. Did you tell Mr. Levis you would try to do this valuation
[18] yourself?
[19] A. No.
[20] Q. Did he ever ask you whether anyone else at Morgan Stanley
[21] that you knew could possibly do this type of evaluation?
[22] A. No.
[23] Q. Or whether you could recommend somebody else either at
[24] Morgan Stanley or another firm that could actually do the
[25] valuation?

Page 2501

[1] A. No.
[2] Q. Mr. Lopez, why did you agree to do something, sign off on
[3] something you're not actually doing?
[4] A. You know, in Puerto Rico, the Puerto Rico market is a small
[5] market. Everybody knows each other and after a while clients
[6] are more friends than clients, and it is a closely-held
[7] community. After a while you respect people, and I figured
[8] that he wasn't doing anything wrong, I decided to do it. I
[9] trusted him.
[10] Q. How long was this conversation?
[11] A. Very brief, maybe 10, 15 minutes.
[12] Q. So after this conversation where you agreed to sign off on
[13] the numbers, what happens next? You said you received
[14] packages?
[15]       THE COURT: Received what?
[16]       THE WITNESS: When I agreed to do the numbers for
[17] Doral, he was sending me a package, an envelope with the
[18] documents I would have to initial and sign and I would send it
[19] back to him.
[20] BY MR. STELLMACH:
[21] Q. How were those packages delivered to you?
[22] A. By one of his messengers.
[23] Q. Explain to us what was inside the packages you received
[24] from the defendant.
[25] A. He would send me a listing with all the numbers already

Page 2502

[1] done and he would send me another listing that didn't have the
[2] numbers. What I would do is transpose numbers from listing to
[3] another, initial and signed it and send it back.
[4] Q. When you said listing --
[5] A. A spreadsheet that had the IOs information, the coupon,
[6] maturity, the amount.
[7] Q. So one spreadsheet, these spreadsheets were identical?
[8] A. Yes, they were identical.
[9] Q. Except one spreadsheet already had valuations written on
[10] it?
[11] A. Yes, sir.
[12] Q. You would transpose the numbers. Could you just explain
[13] what you mean by that.
[14] A. He would send me a listing that was completely filled out
[15] that had the valuation, the multiple, which is a number you
[16] arrive at after you look at the prepayment speeds and make
[17] adjustments because in Puerto Rico mortgages, he would send me
[18] two identical sheets, set of sheets. One of them had the
[19] numbers and one was in blank. I transposed the numbers to the
[20] one that was in blank and filled out the blanks and just send
[21] it back to him.
[22] Q. When you spoke with the defendant, did he make clear to you
[23] that all you were supposed to do was just recopy the numbers?
[24] A. Yes, sir.
[25] Q. So what independent work did you do on this project?

Exhibit L

# In The Matter Of:

## *UNITED STATES OF AMERICA v.*
## *MARIO S. LEVIS A/K/A SAMMY LEVIS*

---

## *VOLUME 11*
### *April  12, 2010*

---

## *TRIAL*
## *SOUTHERN DISTRICT REPORTERS*
## *500 PEARL STREET*
## *NEW YORK., NY 10007*
## *212-805-0300*

Original File 04CWLEVF.txt, Pages 1621-1755 (135)

**Word Index included with this Min-U-Script®**

VOLUME 11
April 12, 2010

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

---

Page 1721

[1] years and moved on to investment banking at a firm called at
[2] that time Paine Webber, which is now part of UBS.
[3]     After a few years at UBS, I left to go into government, in
[4] the Puerto Rico, called the Government Development Bank for
[5] Puerto Rico, which is their central bank. I was executive vice
[6] president in charge of public and private financing, executive
[7] director of the Puerto Rico industrial, medical, and pollution
[8] control facilities financing authority and Caribbean financing
[9] authorities as well.
[10]     After approximately 3.3 years in government, I went, became
[11] a consultant in the waste energy field, with the San Juan Waste
[12] Management Authority in Puerto Rico, ran a micro-fund for them,
[13] then after that, I went to Prudential Securities in Puerto
[14] Rico and went to offices in New York, head of Latin American
[15] banking for them and head of international banking at
[16] Prudential Securities.
[17]     After Prudential, that sold to Wachovia, which is now part
[18] of Wells Fargo, I decided to come back to Puerto Rico and
[19] joined Popular Securities in 2003.
[20]     Q.  Was that approximately September of 2003?
[21]     A.  First week of September 2003.
[22]     Q.  Can you explain to us what the relationship is between
[23] Popular Securities and Banco Popular?
[24]     A.  They're affiliates. Both are owned by Popular, Inc., which
[25] is the publicly traded company, Banco Popular and Popular

---

Page 1722

[1] Securities.
[2]     Q.  And in general terms, what were your responsibilities at
[3] Popular Securities?
[4]     A.  I was hired to be the head of the investment banking area.
[5] We had a group of at that time four other employees in
[6] investment banking and we were a division of Popular Securities
[7] that also included an institutional trading area as well as any
[8] retail brokerage area. That was the three parts of Popular
[9] Securities at that time.
[10]     Q.  And so just in general terms, what were your
[11] responsibilities on a day-to-day basis in the investment
[12] banking division at Popular Securities?
[13]     A.  I was obviously to make sure that the, as any manager, to
[14] run the operation, be responsible for, ultimately responsible
[15] for the decisions that the group made, the going after new
[16] business as well as executing on existing business that we had.
[17] Personnel issues, compliance issues, all the normal issues that
[18] a manager would have in running a business.
[19]     Q.  Are you familiar with a company called Doral Financial
[20] Corporation?
[21]     A.  Yes, I am.
[22]     Q.  At the time that you joined Popular Securities, was Doral a
[23] client of the firm?
[24]     A.  It was.
[25]     Q.  And what types of services was Popular Securities providing

---

Page 1723

[1] to Doral?
[2]     A.  At the time I arrived in September of 2003, in the
[3] investment banking area specifically, we were undertaking a,
[4] what we call valuation of their IO mortgage portfolio at that
[5] time.
[6]     Q.  And prior to joining Popular, what experience did you have
[7] in valuing assets?
[8]     A.  As an investment banker, in previous firms that I
[9] mentioned, I had done valuations of companies in Mexico. I was
[10] in charge of the valuation of the sugar industry for the
[11] Mexican government, then purchase of a broker-dealer for
[12] Prudential internally being their mergers and acquisition
[13] banker in the transaction. So I was familiar with valuing
[14] assets and valuing companies.
[15]     Q.  Were you familiar with the concept of an independent
[16] valuation?
[17]     A.  I was and I am familiar with the concept of an independent
[18] valuation.
[19]     Q.  And could you explain for us what makes a valuation
[20] independent, from your perspective?
[21]     A.  I think it's, from my perspective, it's something that the
[22] word "independence" connotes. You don't -- you do it on,
[23] basically, your own, your own value judgments, your own
[24] criteria. You're supposed to be independent, arm's length from
[25] the company or the entity that you're working for. You're

---

Page 1724

[1] supposed to come up with a value, depending on what the nature
[2] of the transaction. If it's a valuation, you're supposed to do
[3] it independently. I think it's something that, you know, facts
[4] and circumstances, but I think intrinsically you're not swayed.
[5] You have your own independent judgment when you undertake that
[6] valuation, and the criteria you use are independent in material
[7] respects.
[8]     Q.  And we'll go through this in more detail later, but was the
[9] valuation that Popular was performing of Doral's IO portfolio
[10] independent?
[11]     A.  In my, in my mind, no, it was not.
[12]     Q.  Why not?
[13]     A.  Well, from the get-go, the -- if somebody is relying or
[14] there is a certain notion that it's supposed to be independent,
[15] I think the ultimate value that you're trying to ascertain has
[16] to come from the criteria that you've established as being
[17] something that you're comfortable with that you would arrive at
[18] on your own judgment and on your own work product, and I think
[19] from the start, just to give you an example, the mortgages that
[20] we were, the raw data that we were getting from Doral when I
[21] arrived there and I was explained the nature of the assignment,
[22] we weren't even checking those mortgages existed. We didn't do
[23] any diligence, which is a word you use when you go and check
[24] and make sure that the actual assets exist.
[25]     In the case of valuing an oil company, you want to make

---

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 11
April 12, 2010

Page 1725

[1] sure there's oil in the gas tanks. You go kick the tires of
[2] the business, to make sure it exists. Fundamentally we didn't
[3] even check that the mortgages were there. We took it at face
[4] value, so to me that's, No. 1, a kind of criteria I wanted to
[5] ascertain that they actually existed.
[6]   I can keep going, if you like.
[7]   Q. Just in general terms, were there other assumptions on
[8] which you just didn't kick tires, you accepted at face value
[9] representations from the company itself?
[10]   A. The nature of those mortgages, the coupons. The
[11] maturities, the actual documents that supported them, that
[12] existed in itself was one major criteria. There were other
[13] criteria that were material to the valuation that we got from
[14] Doral.
[15]   Q. We'll go through those in more detail later, could you just
[16] tell us what those other criteria were that you were getting
[17] from Doral?
[18]   A. Well -- as I say, there was like a, there was a fundamental
[19] one, which was the nature and especially important in an IO
[20] portfolio, the existence of a cap that we were told, you know,
[21] by them directly that there was a rate that they had
[22] negotiated, purchased at that time, we can get into how they
[23] explained it to us, but that basically affected the cash flows
[24] that were the nature of the valuation that we were doing.
[25] That's one criteria.

Page 1726

[1]   There were certain loans that were paid off that we would
[2] add back to the pools that we would normally have not done if
[3] we were doing an independent valuation, or at least we would
[4] have explained to whoever was relying on our opinion as to what
[5] we were doing that I thought also was important in the
[6] valuation.
[7]   Q. Who at Doral was your contact?
[8]   THE COURT: It was a long answer. But could the
[9] reporter read that.
[10]   (Record read)
[11] BY MR. STELLMACH:
[12]   Q. Who at Doral was your contact in providing the criteria
[13] that you were using in performing the valuation?
[14]   A. If I could take a step back, my relationship with the
[15] actual work product was as a manager. So I had very limited
[16] contact with Doral. At that time, when I arrived at Popular
[17] Securities, there was Francisco Brugueras, and at the same time
[18] joining me at Popular was Natalia Guzman, so those were the two
[19] employees that had the day-to-day contact with Doral. I only
[20] had contact with them, if I recall, three times, during the,
[21] during this period of time, from the time we did the work
[22] product for them.
[23]   THE COURT: Keep your voice up because I'm not
[24] hearing. Did you say were there two other employees and so
[25] forth? Can you explain that again?

Page 1727

[1]   THE WITNESS: Yes. The team, when I got to Popular,
[2] there was four employees at Popular when I joined. One of
[3] them -- two of them did not work on the Doral IO valuation
[4] mandate. And two did. The two that did, Francisco Brugueras
[5] and Natalia Guzman, were the ones that worked in the investment
[6] banking area with me that were the personnel that talked to
[7] Doral, interacted with Doral, and had contact with them on a
[8] more frequent basis.
[9] BY MR. STELLMACH:
[10]   Q. Could you explain for us, Mr. Kaufman, who it was at Doral
[11] that was the contact for Ms. Guzman and Mr. Brugueras in
[12] providing the criteria that they used in providing the
[13] calculations for the valuation?
[14]   A. Again, you know, it's very, we don't, the office space was
[15] pretty small, so we knew each other's business, even though I
[16] was the manager. And the contact that I saw them having was
[17] with phone calls with Sam, Sammy Levis and with Sonia, which
[18] was Mr. Levis' secretary, I believe.
[19]   THE COURT: Whose secretary?
[20]   THE WITNESS: Mr. Levis, Sammy Levis' secretary.
[21]   THE COURT: All right.
[22] BY MR. STELLMACH:
[23]   Q. At any point, did anyone inside Popular tell you that the
[24] valuation that you were supervising was supposed to be an
[25] independent valuation?

Page 1728

[1]   A. No.
[2]   Q. When was the first time approximately that you learned that
[3] the valuation Popular was performing was being used as an
[4] independent valuation or being held out, I should say, to other
[5] people as an independent valuation?
[6]   A. I remember clearly it was the time that they put out their
[7] 10K, somebody came into my office and said to me that they had
[8] filed a 10K, and I went to the computer and looked up the
[9] document that was available and saw that there was language in
[10] there that referenced the valuations that they were receiving
[11] as part of valuing that I don't portfolio. And I read the
[12] language, and I saw that they had referenced that there were
[13] these what they called external and internal. That was my
[14] recollection, and the words they used for both the internal and
[15] the external didn't seem to be the work product we were doing
[16] or didn't quite fit the fact pattern that I had been living, so
[17] more I felt we were reflected in the internal description and
[18] obviously not in the external.
[19]   So I sent off an e-mail to Sammy Levis just asking him,
[20] that I saw this language and I just wanted to be sure that I
[21] understood it correctly and that we were the internal and that
[22] he was, even though I had agreed that the words he used to
[23] describe our work, that he would clarify that for us.
[24]   Q. And what happened after you reached out to Mr. Levis; what
[25] did you learn?

VOLUME 11
April 12, 2010

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

---

Page 1729

[1] A. Subsequently, two events. One, I, he responded, he
[2] responded by phone call. I guess I must not have been in the
[3] office or something. He responded to Natalia Guzman, who spoke
[4] to him. And she informed me that he had said we were the
[5] internal.
[6]     THE COURT: He --
[7]     THE WITNESS: She being Natalia Guzman, Ms. Guzman.
[8]     THE COURT: Is that your secretary?
[9]     THE WITNESS: No. That's the banker that worked in
[10] the investment banking, one of the two employees that worked in
[11] investment banking with us that had the relationship on the
[12] account.
[13]     So she informed me that she received a call from
[14] Mr. Sammy Levis that said we were internal. Before I had
[15] received that confirmation, I had gone to lunch, I believe, and
[16] in the elevator bank I ran into another person that worked
[17] externally but worked closely with Doral, and I asked him. I
[18] was curious, that I had seen this language in the 10K and did
[19] he know what that referenced because it wasn't clear to me that
[20] it reflected accurately our role. He said he would go and
[21] check, so when we got back, I had got the confirmation later
[22] that afternoon from Natalia Guzman that Sammy had spoken to her
[23] and said we were the internal source.
[24]     THE COURT: Sammy had spoken to her?
[25]     THE WITNESS: Yes.

---

Page 1730

[1]     THE COURT: Okay.
[2] BY MR. STELLMACH:
[3] Q. Did there come a time when you learned that wasn't true?
[4] A. No, that he did speak to her.
[5] Q. No. Mr. Levis spoke to Ms. Guzman, but did there come a
[6] time when you learned that Popular's valuation had been held
[7] out to other people as an independent valuation?
[8] A. Later that afternoon as well, I got a call back from the
[9] gentleman that I had spoken to that had worked with Doral. He
[10] had checked with his sources at Doral, called me back, and said
[11] that he thought we were the independent, external source.
[12] Q. And could you remind us approximately when all this was
[13] taking place in connection with the filing of the 10K. What
[14] calendar year, what time period?
[15] A. Sorry. In March of 2005.
[16]     MR. STELLMACH: Your Honor, I was about to go through
[17] the story in some detail. I don't know whether this would be a
[18] convenient point.
[19]     THE COURT: It's a good time to take our break.
[20]     (Recess)
[21]     THE COURT: If it would be possible for you to speak a
[22] little louder, it would be good.
[23]     Go ahead, please.
[24]     MR. STELLMACH: Thank you, your Honor.
[25] Q. Mr. Kaufman, I'm going to go through your story from the

---

Page 1731

[1] beginning, but before we do, I do want to jump back to the
[2] events of March 2005. And if you take a look at Government
[3] Exhibit 202, I'll ask if you recognize that exhibit, what's
[4] been marked for identification as 202.
[5] A. Okay.
[6] Q. Do you recognize it.
[7] A. Yes, I do.
[8] Q. How do you recognize it, sir?
[9] A. This is the e-mail that I had sent upon hearing about the
[10] language in the 10K filing in March of 2005 that I sent to
[11] Mr. Levis.
[12]     MR. STELLMACH: Your Honor, the government offers
[13] Exhibit 202.
[14]     THE COURT: Received.
[15]     (Government's Exhibit 202 received in evidence)
[16]     MR. STELLMACH: If we could see the exhibit on the
[17] screen.
[18] Q. We'll go through this in more detail later, Mr. Kaufman,
[19] but this is the e-mail on the bottom from yourself to
[20] Mr. Levis, dated March 17, 2005, is that correct?
[21] A. That's correct.
[22] Q. If we blow up the second full paragraph, beginning "on a
[23] separate note," you wrote that "we noticed that you include in
[24] Doral's 10K released yesterday the following language." And if
[25] you could, tell us what in that language caused concern for

---

Page 1732

[1] you.
[2] A. As I said, you know, I had always believed that we were the
[3] internal, that we were, you know, providing a work product for
[4] Doral and working with them to come up as a tool, management
[5] tool for them with a valuation of this portfolio. So I read
[6] the language, it wasn't really, as I indicated earlier, there
[7] were two options here. You were the internal or you're one of
[8] the external. And as they referenced the external, it was
[9] obvious to me that we weren't that independent valuations
[10] because, one, I never believed we were an independent firm
[11] independently valuating their model, and it said, I think the
[12] language they used, "in which all economic and portfolio
[13] assumptions are determined by the preparer."
[14]     To me, that was obviously not us, because that's not, that
[15] was not what we did. So I was left then, you know, that the
[16] other choice being that we were internal, and when I read the
[17] language, it just wasn't clear to me that -- I knew that we
[18] were definitely in this, not the external, but not the
[19] independent, but the internal, but the language of the internal
[20] that they used didn't seem that clear, and I just wanted to
[21] clarify with him that we, you know, we were in fact the
[22] internal. But it's the language he used.
[23]     THE COURT: Were in fact the internal?
[24]     THE WITNESS: Internal, yes.
[25] BY MR. STELLMACH:

---

Page 1729 - Page 1732 (28)                    Min-U-Script®                    TRIAL

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 11
April 12, 2010

Page 1733

[1] **Q.** Because the 10K references three different valuations of
[2] the IOs, one being done internally and two others being done
[3] externally, in which all economic and portfolio assumptions are
[4] determined by the preparers. Is that right?
[5] **A.** That is correct. And we obviously, in my mind, you know, I
[6] know what we did for them, we were not independent valuation.
[7] We weren't those two independent valuations and those two
[8] external, because we did not, it was not -- all the economic
[9] and portfolio assumptions were not determined by us.
[10] **Q.** Could you just explain for us, Popular is obviously
[11] independent of Doral; it's not part of Doral. So the work
[12] Popular is doing could still be part of the internal valuation
[13] at Doral, was that your understanding?
[14] **A.** My understanding, exactly, was that. We were helping them
[15] in their internal valuation, in managing their portfolio and
[16] giving them a certain knowledge of what was there for them to
[17] make decisions about the portfolio.
[18] **Q.** And could you read that paragraph highlighted at the
[19] bottom, beginning, "Are we correct"?
[20] **A.** "Are we correct to assume that we are neither of the two
[21] external independent parties but a source you are using for
[22] your internal static cash flow model? The reason I presume
[23] that we are neither of the independent sources of valuation is
[24] because we rely (and so state in our letter/agreement) on
[25] portfolio and economic assumptions provided by Doral."

Page 1734

[1] **Q.** If we could go to Mr. Levis' reply at the top of the page,
[2] he just wrote, "I will call you on this later," is that right?
[3] **A.** That is correct, which he did do.
[4] **Q.** And that led to a conversation between him and Ms. Guzman,
[5] who works for you?
[6] **THE COURT:** Before you go on, did you offer 202?
[7] **MR. STELLMACH:** I did, your Honor.
[8] **THE COURT:** Oh. Oh, I did receive it.
[9] **BY MR. STELLMACH:**
[10] **Q.** And that led to a conversation between Mr. Levis and
[11] Ms. Guzman, who works for you at Popular?
[12] **A.** Right. As I understand, when I got back, Ms. Natalia
[13] Guzman informed me that she had received a call from Mr. Mario
[14] Levis, Sammy, and that he confirmed that we were the internal
[15] source being quoted, that was referenced in that 10K filing.
[16] **Q.** And after that conversation takes place, you learned from
[17] someone else that you in fact being used as one of the
[18] independent valuations?
[19] **A.** I received a call back from a party I had run into on my
[20] way to lunch that I asked, and he called back and said that he
[21] had called people at Doral, I don't know who, and said I
[22] believe that they think you are the independent valuation
[23] party.
[24] **Q.** All right. And so what I want to do now, Mr. Kaufman, is
[25] step back to the beginning, when you first joined Popular, in

Page 1735

[1] September of 2003, and begin working on this project. Now,
[2] when you started at Popular, in 2003, who were you replacing?
[3] **A.** I arrived in September of 2003, and the previous person
[4] that occupied the seat that I was hired to fill was Mr. Carlos
[5] Ortiz, also known as Juany Ortiz.
[6] **Q.** Did you know Mr. Ortiz?
[7] **A.** Yes, I did.
[8] **Q.** And what was your understanding of his relationship with
[9] the defendant?
[10] **A.** I understood that they had a close relationship.
[11] **Q.** Did they socialize together?
[12] **A.** I believe so, yes.
[13] **Q.** Did you know whether the defendant had been the best man at
[14] Mr. Ortiz's wedding?
[15] **A.** I did not know that.
[16] **Q.** How soon after you started at Popular did you learn that
[17] Popular was performing a valuation of Doral's IOs?
[18] **THE COURT:** I missed something. Did you replace
[19] Ortiz? Did he leave? I didn't understand.
[20] **THE WITNESS:** When I arrived, he had left
[21] approximately in June, July period. The time that I, between
[22] that, his leaving and my arriving, the president of Popular
[23] Securities, Ken McGrath, oversaw the investment banking area
[24] and then when I arrived in September, I took over the reins.
[25] **BY MR. STELLMACH:**

Page 1736

[1] **Q.** So you didn't overlap with Mr. Ortiz; once you started he
[2] was already gone?
[3] **A.** Yes.
[4] **Q.** And how soon after you started at Popular did you learn
[5] about this IO valuation project?
[6] **A.** Within hours or days. I was, you know, brought up to speed
[7] on the work we were doing. When I started work, and I think
[8] the, within probably the first day or two, I was visited by one
[9] of my colleagues who had some concerns about the mandate and
[10] wanted to talk to me about it.
[11] **Q.** How did you first learn; who at Popular first told you
[12] about the valuation project?
[13] **A.** I believe that we had a few different things going on, a
[14] few different deals going on, so it was one of a list of
[15] ongoing work product that we had. And I was, I believe,
[16] brought up to speed of what was on by each of the bankers who
[17] were handling the matters that related to them. At that time,
[18] Francisco Brugueras was handling the IO valuation.
[19] **Q.** And when you say handling the valuation, was Mr. Brugueras
[20] actually performing the calculations to execute the valuation?
[21] **A.** He was.
[22] **Q.** And did that continue after you started at Popular?
[23] **A.** It did.
[24] **Q.** So at any point during your tenure at Popular, are you the
[25] person at Popular who is actually crunching the numbers and

# Exhibit M

# In The Matter Of:

## *UNITED STATES OF AMERICA v.*
## *MARIO S. LEVIS A/K/A SAMMY LEVIS*

---

*VOLUME 13*
*April 14, 2010*

---

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 04EJLEVF.txt, Pages 1912-2080 (169)

**Word Index included with this Min-U-Script®**

VOLUME 13
April 14, 2010

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

Page 1924

[1] colleagues and your awareness of what was taking place at your
[2] firm during that period of time?
[3] **A.** Correct.
[4] **Q.** So it's not a recollection of the conference call itself?
[5] **A.** Exactly.
[6] **Q.** Did you remain involved in the project going forward from
[7] September of 2003 into the future?
[8] **A.** I was, yes.
[9] **Q.** Did there come a time when you became more responsible for
[10] the project yourself?
[11] **A.** Yes. When Francisco left, I became responsible for it.
[12] **Q.** And Francisco is Francisco Brugueras?
[13] **A.** Correct.
[14] **Q.** And about what time did he leave Popular Securities?
[15] **A.** He left at some point in the summer of 2004.
[16] **Q.** And where did he go?
[17] **A.** He went to do his MBA at University of Chicago.
[18] **Q.** So he went off to business school?
[19] **A.** Correct.
[20] **Q.** Did you essentially take his role within the valuation work
[21] at that time?
[22] **A.** Correct.
[23] **Q.** And you had been doing, working on the project in a more
[24] junior role over the course of the past year, is that right?
[25] **A.** Correct, yes.

Page 1925

[1] **Q.** As you became more responsible for the project and stepped
[2] in for Mr. Brugueras, did you have direct dealings with anybody
[3] from Doral Financial in connection with this work?
[4] **A.** After September? Or 2004 or before?
[5] **Q.** From the period of time in which you became more
[6] responsible.
[7] **A.** From that period of time on, I had interactions with Sammy
[8] Levis and Sonia Arroyo and Lorna, I believe. Soto is her last
[9] name. Secretaries of Sammy Levis.
[10] **Q.** All right. Both Sonia Arroyo and Lorna Soto were
[11] secretaries at Doral?
[12] **A.** That was my understanding, yes.
[13] **Q.** And your understanding was that they worked for Sammy
[14] Levis?
[15] **A.** Correct.
[16] **Q.** During the course of your conversations with Ms. Arroyo and
[17] Ms. Soto, did they indicate to you whether or not they were
[18] providing you with information on anyone else's behalf?
[19] **A.** Not from my understanding. From what I recall, it was
[20] always, they said that it came from Sammy.
[21] **Q.** All right. That was my question. I just phrased it very
[22] poorly.
[23] **A.** Oh, I'm sorry. Yes. Just from Sammy. It was always
[24] information that they were relaying, right, from Sammy, but not
[25] from somebody else.

Page 1926

[1] **Q.** Not from someone else at Doral?
[2] **A.** Yeah.
[3] **Q.** Were they ever answering, to your knowledge, based on your
[4] communications with them, were they ever able to provide you
[5] with information based on their own personal knowledge?
[6] **A.** None whatsoever. It was just all information that they
[7] were giving to us from someone else.
[8] **Q.** And if I understand you, the someone else they mentioned to
[9] you was Sammy Levis?
[10] **A.** Correct.
[11] **Q.** Did you have any direct dealings with David Levis?
[12] **A.** Only in March of 2005, when Greg and I went to meet with
[13] David Levis and Sammy Levis. That was my only interaction with
[14] him.
[15] **Q.** Right. Can you turn your attention to Government Exhibit
[16] 171, which should be in your binder?
[17] **A.** Yes.
[18] **Q.** It should be the next document.
[19]     **MR. BRAUN:** And this is already in evidence, your
[20] Honor.
[21] **Q.** Ms. Guzman, when you became more responsible for this
[22] project regarding the IO valuation, did you seek to obtain
[23] additional information regarding these caps that you understood
[24] had been described the previous September?
[25] **A.** Yes, we did.

Page 1927

[1] **Q.** And is this e-mail a part of that effort?
[2] **A.** Correct.
[3] **Q.** Can you read your message to Sammy in this e-mail, dated
[4] Tuesday, September 14, 2004?
[5] **A.** "Sammy, as per our conference call held September 19, 2003,
[6] with Gregory Kaufman, Francisco Brugueras, Jose Blasini and
[7] myself, we have applied an average cap rate of 3.40 percent to
[8] most pools of inverse IOs, in specific to those in group 3. We
[9] would like to confirm the method used to hedge interest rate
[10] risk. In particular, please explain the structure of the cap
[11] rate and any other derivative instruments used, as well as the
[12] pools that each instrument is hedging.
[13]     "Should you have any questions, please contact me at the
[14] number below. Thank you. Natalia."
[15] **Q.** What was your reason for seeking this information from
[16] Sammy Levis?
[17] **A.** We had internal discussions that the cap rate sounded low,
[18] and we --
[19]     **THE COURT:** You had internal discussions about the cap
[20] rate, and then what did you say?
[21]     **THE WITNESS:** That it sounded low for industry
[22] purposes, and we wanted to have more details about it.
[23] **BY MR. BRAUN:**
[24] **Q.** And this cap rate, let me take you a step back, what did
[25] you understand was actually being capped at 3.4 percent?

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 13
April 14, 2010

---

Page 1928

[1] A. The 3.4 percent was effectively capping or, the cap was
[2] capping the floating interest that Doral had to pay to the
[3] buyers of the loans. Right?
[4] Q. Okay.
[5] A. So the floating, the floater investors.
[6] Q. And it was that level of 3.4 percent, if I understand you,
[7] that sounded low?
[8] A. Correct.
[9] Q. You mentioned group 3 in your e-mail. Did that group stand
[10] out in any way?
[11] A. Yes, that was the largest group of the portfolio.
[12] Q. And as far as the composition of group 3, what
[13] characteristics did it have as far as the composition of fixed
[14] as opposed to floating rate IOs?
[15] A. I believe it was entirely floating.
[16] Q. Could it have been a couple of fixed portions to it?
[17] A. Maybe, but something like that.
[18] Q. This information regarding the caps and any other
[19] derivative instruments, did you consider it to be important?
[20] A. Absolutely.
[21] Q. Why was it important to you?
[22] A. Because it was effectively, I mean, the cap at 3.4 as Doral
[23] had disclosed, was effectively fixing their, or guaranteeing
[24] their excess spread in, I mean, their IO income, right, on the
[25] portfolio.

---

Page 1929

[1] Q. Was it having a significant impact on the valuation numbers
[2] that you were producing at Popular Securities?
[3] A. Yes. At that time, basically, it was almost capping
[4] entirely, so from, if we would run the cash flows, like almost
[5] like from day 1, from the day we did the valuation, the cap
[6] took, took effect, right, so the forward curve, increases in
[7] the forward curve weren't shown, weren't taking any effect in
[8] the portfolio's value.
[9] Q. Because you were hitting the cap so quickly?
[10] A. Right.
[11] Q. Do you recall receiving a response to the question that you
[12] posed in this September 14 e-mail?
[13] A. Can you repeat that again?
[14] Q. Yes. Do you recall receiving any information in response
[15] to the e-mail that we just looked at dated September 14, 2004?
[16] A. Yes, we did.
[17] Q. Can you turn to the next document in your binder? Do you
[18] recognize this document, Ms. Guzman?
[19] A. I do.
[20] Q. What do you recognize it as?
[21] A. These are my notes from the response from Doral. I would
[22] imagine probably I spoke to Sonia or Sammy, and this is a
[23] response to the e-mail that I sent.
[24] Q. And do you recall whether it was Sonia Arroyo, the
[25] secretary, or Mr. Levis himself?

---

Page 1930

[1] A. I don't recall specifically who did I speak with.
[2] Q. Was it one of those two people?
[3] A. I would imagine so, yeah, because those are the two people
[4] that I spoke to.
[5] Q. Can you explain what information is reflected here in your
[6] handwritten notes, dated September 14, 2004?
[7] THE COURT: I think this is not yet in evidence, is
[8] it?
[9] MR. BRAUN: I apologize, your Honor. We offer 170,
[10] Government Exhibit 170.
[11] THE COURT: Received.
[12] (Government's Exhibit 170 received in evidence)
[13] MR. BRAUN: Thank you.
[14] A. You want me to read it?
[15] Q. If you could either read it or perhaps more helpfully
[16] explain it to us.
[17] A. Okay, yeah. So basically, they're just telling us that the
[18] average cap rate for groups 1 through 4 was 3.4, except, of
[19] course, for the fixed pools that were in those groups, that it
[20] was a five-year cap, and that they also had European put
[21] options that locked in also the average cap rate of 3.4. That
[22] says group No. 3, all five-year caps. Then it says five-year
[23] caps, three and three-eighths, so I think that they were
[24] disclosing that it was three and three-eighths, not 3.4, just
[25] to be more specific. Mature in 2007 and 2008 and are

---

Page 1931

[1] renewable. This is information that they're giving us.
[2] Q. Okay. To be more precise, three and three-eighths, how
[3] does that compare to 3.4?
[4] A. It's just, point three and three-eighths means 3.375, so
[5] it's a difference between 3.4 and 3.75, which is .025.
[6] Q. And you understood that to be a more precise number as
[7] opposed to the 3.4?
[8] A. Correct.
[9] Q. Do you recall whether or not you had any conversations
[10] relating to the subject with Ms. Arroyo or Mr. Levis during
[11] this period of time? Could there have been other
[12] communications on the same subject?
[13] A. Yes, there were.
[14] THE COURT: I'm sorry. I didn't hear.
[15] THE WITNESS: Yes, there were other communications. I
[16] believe there's another e-mail that I sent out.
[17] BY MR. BRAUN:
[18] Q. Can you turn your attention to Government Exhibit 173,
[19] which is already in evidence?
[20] A. Mm-hmm. I have it here.
[21] Q. And can you read your message to Sammy Levis here on
[22] September 17, a few days later?
[23] THE COURT: What's the exhibit number?
[24] MR. BRAUN: This is 173, your Honor. It was admitted
[25] yesterday.

---

VOLUME 13
April 14, 2010

Page 1932

[1] **THE COURT:** All right.

[2] What's your question now?

[3] **MR. BRAUN:** I was asking Ms. Guzman if she could read

[4] the short e-mail here to Sammy Levis.

[5] **THE COURT:** Okay.

[6] A. "Sammy, before finalizing our results for the IO valuation,

[7] we would like to clarify the definition of the inverse IO cap."

[8] Q. Can I stop you there for a moment. Inverse IO, can you

[9] explain that?

[10] A. Yeah. That's basically, the inverse IO is what they are

[11] keeping in their books. So the floater portion, right, is

[12] what's being sold to the investors, and the remaining portion

[13] of the ones that are variable, is what they keep.

[14] Q. So the kind of floating rate IO Doral had also referred to

[15] as an inverse IO?

[16] A. Correct.

[17] Q. Okay. Please continue.

[18] A. "We are unclear about whether the cap rate is a cap on the

[19] LIBOR rate alone, or a cap on the gross funding cost (LIBOR

[20] plus spread) payable to investors."

[21] Q. When you refer to the gross funding cost, is that another

[22] way of referring to the pass-through rate that Doral is going

[23] to provide to the banks that buy these loans?

[24] A. Correct.

[25] Q. Please continue.

Page 1933

[1] A. "For instance, given a LIBOR rate of 3.50 percent and a

[2] spread of 150 basis points, which means 1.5 percent, how much

[3] would you pay the floating rate investor? Would you pay 3.375

[4] percent plus the spread or just 3.375 percent. In addition --"

[5] Q. Let me skip that next sentence.

[6] A. Okay.

[7] Q. So what, in essence, is the question here you're posing to

[8] Sammy Levis?

[9] A. So, in essence, what we're asking is whether the cap of

[10] 3.375 is capping just the LIBOR or capping the LIBOR plus

[11] spread.

[12] Q. So the entire pass-through rate or just the LIBOR?

[13] A. Exactly. So to the extent that, right, LIBOR rate was at 2

[14] percent and the spread was 1.5 -- yeah, whether they, whether

[15] they had to pay to the investor the 2 percent, right, plus the

[16] 1.5 because the 2 percent, in the case that the cap was just

[17] capping the LIBOR, they would be in effect then paying 3.5 to

[18] the investor. To the extent that the cap was capping the LIBOR

[19] plus the spread, then they wouldn't be paying 350, they would

[20] be paying 3.375.

[21] Q. Do you recall --

[22] **THE COURT:** I don't understand the last answer. In

[23] other words, say that again.

[24] **THE WITNESS:** Okay. So if the cap is capping just

[25] LIBOR and LIBOR is at 2 percent and the spread is at 1.5, the

Page 1934

[1] cap of 3.375 is still above, right, the 2 percent of the LIBOR.

[2] So then they would pay the investor the 2 percent plus the 1.5.

[3] If the cap is not only capping the LIBOR, but it's capping the

[4] LIBOR plus the spread, then it means that they are in effect

[5] just paying 3.375 to the investor. And not 3.5.

[6] **BY MR. BRAUN:**

[7] Q. Ms. Guzman, do you recall receiving a response to the

[8] question you posed regarding whether the cap was a cap on how

[9] high LIBOR went or whether or not it was actually capping the

[10] full pass-through rate consisting of LIBOR plus whatever spread

[11] the investor or the bank that bought these loans was going to

[12] receive?

[13] A. Yes. They told us it was capping the LIBOR plus the

[14] spread.

[15] Q. Can you now turn your attention to Government Exhibit 175

[16] that's been marked for identification?

[17] A. I have it in front of me.

[18] Q. Do you recognize the document?

[19] A. I do.

[20] Q. Are these your notes, Ms. Guzman?

[21] A. Yes, it's my handwriting, and the left is Marvin Diaz's

[22] handwriting, who is the analyst at that time.

[23] Q. I don't think you've mentioned Mr. Diaz before. Can you

[24] explain who he was and what role he was playing at Popular

[25] Securities?

Page 1935

[1] A. So after Francisco Brugueras left, we hired Mr. Diaz. He

[2] came straight from undergraduate studies at UPenn and started

[3] working that summer of 2004, so he, he and I worked on the

[4] Doral IO valuation going forward.

[5] **MR. BRAUN:** Your Honor, the government offers Exhibit

[6] 175 into evidence.

[7] **THE COURT:** Received.

[8] (Government's Exhibit 175 received in evidence)

[9] **BY MR. BRAUN:**

[10] Q. Turning to the top portion of this handwritten note,

[11] Ms. Guzman, going down to the figure 3.375 percent, can you

[12] explain what information you're receiving here that's reflected

[13] in your notes?

[14] A. It says the cap equals LIBOR plus the spread, 3.375. As

[15] confirmed.

[16] Q. And what part of this do you recognize as Mr. Diaz's

[17] handwriting?

[18] A. The part on the left that says, it says in it in Spanish,

[19] but it means conversation with Sonia regarding e-mail cap rate.

[20] That, that's his handwriting. The rest is mine.

[21] Q. Can you turn your attention to the next document in your

[22] binder, which is marked for identification as Government

[23] Exhibit 176?

[24] A. Yes, I have it in front of me.

[25] Q. Do you recognize this set of notes?

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 13
April 14, 2010

**Page 1936**

[1] A. I do.

[2] Q. Do they reflect another communication you had with folks

[3] over at Doral?

[4] A. Yes.

[5] MR. BRAUN: Your Honor, the government offers Exhibit

[6] 176.

[7] THE COURT: Received.

[8] (Government's Exhibit 176 received in evidence)

[9] BY MR. BRAUN:

[10] Q. Ms. Guzman, the set of notes appears to be dated September

[11] 17, 2004, correct?

[12] A. Correct.

[13] Q. And the top line, what does that mean to you, Sonia,

[14] conversation with Sammy?

[15] A. I'm not sure if it means that I first spoke to Sonia and I

[16] then spoke to Sammy, or if it means I'm speaking to Sonia and

[17] it's regarding what Sammy told her. Could be either of the

[18] two.

[19] Q. There's some information at the top with the two groups,

[20] No. 2 and 8, and a notation regarding the CPR. Can you first

[21] explain to us what CPR refers to?

[22] A. CPR is constant prepayment rate. And it refers to the

[23] percentage, so let's say CPR in one year is 6 percent. It

[24] refers to the percentage of the unscheduled principal, of the

[25] outstanding principal, right, that was prepaid during that

**Page 1937**

[1] year. So if the CPR is 6 percent, it means that 6 percent of

[2] the principal was prepaid through that year.

[3] Q. And did you provide information regarding the prepayment

[4] rates that you had determined in information that you gave to

[5] Mr. Levis prior to the time your valuation work was finalized?

[6] A. Can you repeat that again?

[7] Q. Yes. Prior to the time that you finalized an evaluation

[8] that you were working on for a particular quarter, say, was it

[9] your practice to provide Mr. Levis over at Doral with

[10] information regarding the numbers that you were coming up with?

[11] A. Yes. We would send them a draft of our valuation.

[12] Q. And did the draft of your valuation often include the

[13] prepayment rates or CPR numbers that you had determined during

[14] the course of your work?

[15] A. Yes.

[16] Q. And did you sometimes receive feedback from Mr. Levis or

[17] his secretaries regarding those numbers?

[18] A. Yes.

[19] Q. Where it says he approved the draft, is that the draft

[20] valuation table that you just described?

[21] A. I would imagine so, yes.

[22] Q. And then it says draft was finalized and sent to Doral?

[23] A. Correct, yes.

[24] Q. Was it your practice to send over the table reflecting your

[25] numbers in advance of the time you finalized it?

**Page 1938**

[1] A. Yeah, we always did that.

[2] Q. And was it your practice also to obtain Doral's approval

[3] before finalizing it and sending it to them in a letter form?

[4] A. Yes, in a way.

[5] Q. Now, can you turn your attention to the next document in

[6] your binder, which is Government Exhibit 177?

[7] THE COURT: It's already been admitted, your Honor.

[8] A. I have it in front of me.

[9] MR. BRAUN: Can we blow up what's already been

[10] highlighted at the bottom of that page?

[11] Q. Do you see the highlighted language on the screen,

[12] Ms. Guzman?

[13] A. Yes.

[14] Q. Can you read that language at the bottom of this September

[15] 17 letter?

[16] A. "We have relied on representations by the company that 97

[17] percent of its inverse IO portfolio has a gross funding cost

[18] (LIBOR plus spread) capped at three and three-eighths percent,

[19] and the other 3 percent of its inverse IOs are hedged through

[20] European put options. This hedging activity protects the

[21] current pass-through interest rate and excess interest spread

[22] in its floating IOs."

[23] Q. Is this information consistent with what you had been told

[24] in the conversations with Sammy Levis and Sonia Arroyo that

[25] you've described in your testimony this morning and that's

**Page 1939**

[1] reflected in your notes?

[2] A. Yes, it is.

[3] Q. Do you recall sending this September 17, 2004, letter to

[4] Doral?

[5] A. Yes.

[6] Q. After you sent the letter, what took place?

[7] A. Sammy called, and he sent the fax over with the letter from

[8] September 2003.

[9] Q. And when Sammy called, who took the call at Popular

[10] Securities?

[11] A. I did.

[12] Q. And do you recall the conversation that you had with

[13] Mr. Levis on that occasion?

[14] A. I do.

[15] Q. Can you describe the conversation for us, Ms. Guzman?

[16] THE COURT: Can we just say, the date of this draft is

[17] what?

[18] MR. BRAUN: It is September 17, 2004, your Honor.

[19] That's Government Exhibit 177.

[20] THE COURT: All right. And now the conversation,

[21] Mr. Levis called you?

[22] THE WITNESS: Yes.

[23] THE COURT: The question is? Let me hear the question

[24] again. I interrupted.

[25] MR. BRAUN: She indicated, your Honor, that Ms. Guzman