# GX 1531





**GOVERNMENT EXHIBIT 1531**
08 Cr. 181 (TPG)
**(ID)**

**Global Equity Research**

Americas

Diversified Financial

# UBS Investment Research

## Doral Financial

# After Digging Deep Into Issues, Reiterating Buy 2 Rating

■ **Misperception on key issues creates buying opportunity**

Doral's stock has been down sharply YTD due to concerns about its I/O strip valuation, and positioning for higher rates. Our analysis indicates that these concerns are overblown. We are reiterating our Buy 2 rating.

■ **I/O Strip Valuation Reasonable Given Local Dynamics**

1) 3rd party loan performance data supports Doral's low prepayment speed & discount rate assumptions 2) The MBS market can support Doral's I/O valuation, once adjusted for Doral's assumptions, and nuances of the Puerto Rican market. 3) We see less risk of large I/O writedowns from rising rates 4) We expect lower gain on sale margins, but low 2005E EPS risk

■ **Interest Rate Concerns Seem Overblown (This is Not 1999)**

Unlike during the last major rate rise & flattening of the yield curve in 1999/00, we believe that Doral is currently asset sensitive, and should be able to maintain margins due to its large pay fixed derivatives position & other management actions if long-term rates end the year close to UBS forecasts of 5.0%. A flatter than expected curve however would pressure earnings.

■ **Valuation: Maintaining 2005E EPS of $4.55, $60 Price Target**

We are maintaining our 2005E EPS of $4.55, and still believe there is potential for upside to our 2005E EPS. Our $60 price target is based on an 11x forward P/E on 2006E EPS of $5.44.

| Rating | Buy 2 |
|---|---|
| | Unchanged |
| Price target | US$60.00 |
| | Unchanged |
| Price | US$37.53 |

RIC: DRL.N   BBG: DRL US

**9 March 2005**

| Trading data | |
|---|---|
| 52-wk. range | US$49.45-30.88 |
| Market cap. | US$4.05bn |
| Shares o/s | 108m |
| Free float | 79% |
| Avg. daily volume ('000) | 970 |
| Avg. daily value (US$m) | 41.3 |

| Balance sheet data 12/04E | |
|---|---|
| Shareholders' equity | US$1,973bn |
| P/BV (UBS) | 2.3x |
| Tier one capital ratio | - |

| Forecast returns | |
|---|---|
| Forecast price appreciation | +59.9% |
| Forecast dividend yield | 1.6% |
| Forecast stock return | +61.5% |
| Market return assumption | 8.7% |
| Forecast excess return | +52.8% |

**EPS (UBS, US$)**

| | 12/04E | | | 12/03 |
|---|---|---|---|---|
| | From | To | Cons. | Actual |
| Q1 | 0.86 | 0.86 | *0.86* | 0.40 |
| Q2 | 0.96 | 0.96 | *0.96* | 0.43 |
| Q3 | 0.97 | 0.97 | *1.01* | 0.47 |
| Q4E | 1.22 | 1.22 | *1.22* | 0.78 |
| 12/04E | 3.95 | 3.95 | *4.05* | |
| 12/05E | 4.55 | 4.55 | *4.45* | |

| Highlights (US$m) | 12/02 | 12/03 | 12/04E | 12/05E | 12/06E |
|---|---|---|---|---|---|
| Revenues | 407,815 | 593,252 | 716,282 | 941,045 | 1,143,238 |
| Pre-tax profits | 260,976 | 393,365 | 501,723 | 660,887 | 795,805 |
| Net income | 207,238 | 300,211 | 456,325 | 528,454 | 635,176 |
| EPS (UBS, US$) | 1.26 | 2.72 | 3.95 | 4.55 | 5.44 |
| Net DPS (US$) | 0.19 | 0.40 | 0.55 | 0.60 | 0.70 |

| Profitability & Valuation | 5-yr hist. av. | 12/03 | 12/04E | 12/05E | 12/06E |
|---|---|---|---|---|---|
| ROE % | - | 32.7 | 37.7 | 32.4 | 29.6 |
| P/Op x | - | - | - | - | - |
| P/BVPS x | 3.9 | 1.9 | 2.3 | 1.8 | 1.5 |
| PE (UBS) x | 22.0 | 10.2 | 9.5 | 8.2 | 6.9 |
| Net dividend yield % | 0.9 | 1.4 | 1.5 | 1.6 | 1.9 |

*Source: Company accounts, Thomson Financial, UBS estimates. UBS adjusted EPS is stated before goodwill-related charges and other adjustments for abnormal and economic items at the analysts' judgement.*
*Valuations: based on an average share price that year, (E): based on a share price of US$37.53 on 09 Mar 2005*

**Omotayo Okusanya, II, CFA**

omotayo.okusanya@ubs.com
+1-212-713 1864

**Performance (US$)**



*Source: UBS*

www.ubs.com/investmentresearch

ANALYST CERTIFICATION AND REQUIRED DISCLOSURES BEGIN ON PAGE 20                                      1

UBS does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. Customers of UBS in the United States can receive independent, third-party research on the company or companies covered in this report, at no cost to them, where such research is available. Customers can access this independent research at www.ubs.com/independentresearch or may call +1 877-208-5700 to request a copy of this research.

Doral Financial 9 March 2005

# Reiterating Our Buy 2 Rating

Doral's stock is down 29% this year, primarily due to concerns about the appropriateness of the company's I/O valuation assumptions, as well the positioning of the company for a higher interest rate environment. We dug deep into these issues by contacting independent third parties, Doral's competitors and the UBS mortgage strategy team to develop our independent view on these concerns.

Based on our analysis, we believe that concerns about the company's accounting for I/O strips are overblown. We also believe that there is a misperception that the bank's net interest margins will decline significantly as it did in 1999/00 when rates rose and the yield curve flattened.

We believe that better disclosure in the forthcoming 10K on March 15th should help alleviate perceived accounting and interest rate risks. In addition, we expect that the conference call on March 17th, 2005 to discuss the 10-K will serve as a catalyst for the stock. We expect this event to help investors better understand not just the 10-K, but also the nuances of the Puerto Rican mortgage market, and how Doral's dominance in this market enables the company to generate superior returns.

Key conclusions from our analysis of Doral's I/O strips and interest rate sensitivity are:

## I/O Strips Analysis

1) The key differences in assumptions for Doral's I/O valuation versus U.S peers are prepayment speed and discount rates. Doral however uses assumptions similar to its local peers in Puerto Rico.

2) Independent third parties can confirm that prepayment speeds in Puerto Rico are 30-40% of the rate in the United States, indicating that Doral's assumptions could be reasonable given local market dynamics. We estimate that the lower prepayment speeds experienced in Puerto Rico increase I/O valuations for Puerto Rican banks by 150%.

3) The local market leaders (Doral has #1 market share) have been able to manage prepayment risk through industry practices such as prepayment penalties, and charging points on loan refinancing.

4) The local mortgage market duopoly in nonconforming loan origination has enabled Doral to charge attractive rates on these loans, and generate excess servicing spreads of 250 – 275 bps, or about 20-25 times larger than typical U.S excess servicing spreads of 10 – 20 bps. This again results in higher I/O valuations at Doral.

5) Market multiples on current I/O strips traded in the U.S. support Doral's current I/O valuation, once adjusted for nuances of the local mortgage market.

6) We estimate that potential for future write-downs of the I/O strips could be up to $20 million, if 90-day LIBOR rates rise to 4.0%. We believe the company is actively hedging against this event. 90-day LIBOR rates above 4% have minimal impact due to caps on the pass though rates paid on most of the securitized loans which support the I/O strips. In addition, should LIBOR rates end the year closer to 3.5% as the forward yield curve currently indicates, we estimate that Doral could legitimately reverse about $60m of the 4Q04 I/O write-down back into income.

7) We do expect a lower gain on sales margin in 2005 due to a flattening yield curve, with a gain of sale margin of 600 - 675 bps likely (down from about 750 - 800 bps in 2004). We have been modeling a 625 bps gain on sale margin for 2005, and thus see little risk to our 2005E EPS estimate.

8) Regulators have never raised I/O valuation as an issue at Doral.

## Interest Rate Risk Analysis

1) Doral is better prepared for rising rates than it was in 1999/00. Our analysis indicates that Doral has an asset sensitive balance sheet despite a large fixed rate asset base, which is largely funded by short-term non-core deposits.

2) Asset sensitivity of the balance sheet is due to a $4.0 billion net pay fixed derivatives position. In 1999, the net pay fixed derivatives position was only about $100 million. The derivatives used to protect net interest margins are kept very simple at Doral, and mostly comprise of interest rate swaps, floors and caps.

3) We found that a 200bp parallel rise in short-term rates and long-term rates from 3Q04 levels would result in Doral's net interest margin increasing to about 230 bps, and provide $0.15 - $0.20 upside to our 2005E EPS of $4.55.

4) At the current rate levels forecasted by UBS (4% short term rates and 5% long term rates by 2005 year end), we believe that Doral should be able to maintain net interest margins around 210 bps, as we believe that margin pressure from a flattening yield curve would be offset by management investing the $2.5 billion in cash and money market investments into higher yielding assets.

**Doral Financial**   9 March 2005

5) Long-term rates below 5.0% would however pressure earnings. We currently estimate that long-term rates at 4.0% by 2005 year-end would impact our 2005E EPS of $4.55 by $0.35.

We are maintaining our 2005E EPS of $4.55, largely due to our belief that the company has enough ammunition to protect margins in the flattening yield curve scenario forecasted by UBS. We still believe there is potential for upside to our 2005E EPS due to the temporary tax break on capital gains, the potential for some reversal of the I/O strip write-down in 4Q 2004, and how aggressively management invests the company's large cash balance in higher yielding assets as rates rise. Our current gain on sale margin could also prove conservative. We are maintaining a $60 price target, which is an 11x forward P/E on 2006E EPS of $5.44.

For more details, please read on...

# I/O Strips Analysis

### 1. The Key Difference In Assumptions For Doral's I/O Valuation Versus U.S Peers Is Prepayment Speed & Discount Rates

We compared Doral's I/O valuation assumptions with those used to value I/O strips in the U.S market. We found the assumptions do differ, particularly assumptions about prepayment speeds and discount rates.

### Chart 1: Assumptions Used To Value Residual Interests - 2003

| | Discount Rate | Prepayment Rate | Comments |
|---|---|---|---|
| **Bank of America** | 15 - 30% | 8 - 42% | (a) |
| **Wells Fargo** | 12% | 18% | (b) |
| **Washington Mutual** | 3% - 6% | 42 - 51% | |
| **Countrywide** | 20% | 31% | |
| **Wachovia** | 11% | 45% | |
| **SunTrust** | 10% | 16% | |
| **Cendant Mortgage Corp** | 5 - 15% | 7% - 25% | |
| **Doral Financial** | 9% | 18% | |

Source: Company 2003 10-K

(a)   - For entire commercial finance portfolio (ex credit cards)

(b)   - Aggregate for residential mortgage, commercial real estate, student loan, autos

### 2. Local Peers Have Similar I/O Assumptions

For example, as of September 30, 2004:

- Weighted average life assumptions for Doral's I/O strips was 7 years, in-line with assumptions by local peers.

- Prepayment speed assumptions at Doral was 175 PSA, only slightly slower than the 200 PSA for local peers. PSA is a conventional mortgage industry practice, whereby prepayment speeds are stated as a percentage of a PSA benchmark. A 100 PSA for seasoned mortgages implies 6% constant prepayment of all outstanding loan balances on an annual basis. Doral's 175% implies a 10.5% prepayment rate.

- Doral's discount rate was 8.25%. Local peers, who we spoke with, have been using discount rate assumptions between 8-10%, depending on the type of loan. Doral calculates its discount rate as the higher of FNMA 30-year required net yields and 10-year treasuries, plus 300 basis points. As such the discount rate is prone to movement based on the direction of rates.

Though Doral's assumptions for prepayment speeds and discount rates tend to be at the lower end of the spectrum in Puerto Rico (which does increase the company's I/O valuations), we believe there is reasonable justification for this:

- Doral's average loan size for the nonconforming loans, that generate its I/O strips, is about $60,000. This is in-line with Doral's focus on low to mid income housing in Puerto Rico. We believe that at least one of the local peers focuses more on upper middle income and high-income home loans, which tend to prepay quicker than lower income loans.

- The average FICO score on nonconforming loans, which generate the interest only strips at Doral, is about 680, versus 650 for another local peer. This indicates to us that this local peer originates and sells more sub prime loans, which again increases prepayment speeds versus Doral.

### 3. Independent Third Parties Can Confirm The Prepayment Rate Difference Between Puerto Rico and The U.S Mainland.

The lower prepayment speed assumption used by mortgage originators in Puerto Rico (not just at Doral) could be independently corroborated by independent third parties such as CDR-CPR, which provide loan-level data to companies that price mortgage-backed and asset-backed securities. Based on data we analyzed, it appears that prepayment speeds in Puerto Rico are about 30–40% of the rate in the United States. Given this, we are comfortable with Doral's current prepayment speed assumption of 175 PSA.

Our contacts at the local commercial banks in Puerto Rico who buy these mortgage loans, also confirmed that they generally experience about a seven-year weighted average life before the nonconforming loans are paid off.

We independently analyzed the current prepayment speeds being experienced on five I/O strips which have underlying loans that were originated in the United States and have a similar weighted average coupon rate (WAC) to Doral's nonconforming loans. We found these I/O strips had an average PSA of 575 as at December 2004, about what we expected if prepayment speeds in the United states are about three times higher than Doral assumes for its I/O valuation.

Doral Financial   9 March 2005

Chart 2: Prepayment Speed for I/O Strips: Doral Vs. Typical U.S I/O Strips

| I/O Strip | Underlying Mortage Rate (WAC) | Coupon Rate | PSA (Dec 2004) |
|---|---|---|---|
| FHS 205 | 7.5 | 7.0 | 494.0 |
| FNS 240 | 7.5 | 7.0 | 500.0 |
| FHS 177 | 7.5 | 7.0 | 501.0 |
| FNS 320 | 7.5 | 7.0 | 713.0 |
| FHS 221 | 7.6 | 7.0 | 667.0 |
| Average | 7.5 | 7.0 | 575.0 |
| Doral Financial | 7.5 | 7.5 | 175.0 |

Source: Bloomberg, Company Reports

Slower prepayment speeds increase the weighted average life of loans, and as a result, significantly increase the valuation of I/O strips in Puerto Rico. PSA values that are about a third of PSA values in the United States should increase I/O values by about 150%, all else being equal.

Chart 3: Impact of Slower Prepayment Speed On I/O Valuation

| I/O Strip | Valuation @ 175 PSA | Valuation @ Actual PSA | Increase Due To Slower PSA |
|---|---|---|---|
| FHS 205 | 33.8125 | 15.96875 | 112% |
| FNS 240 | 29.8125 | 15.0625 | 98% |
| FHS 177 | 31.84375 | 15.4375 | 106% |
| FNS 320 | 34.9375 | 10.96875 | 219% |
| FHS 221 | 35 | 11.84375 | 196% |
| Average | | | 146% |

Source: Bloomberg, Company Reports

The major players in Puerto Rico's nonconforming mortgage origination market actively limit prepayment risk in the nonconforming mortgage market due to their market dominance.   Key industry practices that lower prepayment risk include:

- Almost all of Puerto Rico's nonconforming loans have prepayment penalties. Prepayment penalties are not as prevalent in the U.S mortgage market due to the large number of players in the origination market, as well as GSE rules.

- Puerto Rican mortgage originators still have the ability to charge significant points on new mortgage loans, unlike in the U.S where the ability to charge points has waned significantly due to competition. Charging points discourages prepayment of mortgage loans through refinancings.

- Average loan sizes are smaller in Puerto Rico due to lower mean home prices (about $175K in Puerto Rico vs. $275K in the United States). As a result, larger changes in interest rates are generally needed to motivate mortgage holders in Puerto Rico to prepay loans.

- Our contacts believe that another reason for slower prepayment on nonconforming loans is that these loans tend to be originated outside the San Juan area where homeowners may not be as market savvy.

### 4. Lower Discount Rate Assumptions May Also Be Reasonable

Doral 's assumption of 9% in its 2003 10-K tends to be on the lower end of discount rates versus U.S peers. We believe that the lower discount rate is reasonable given the unique nature of the Puerto Rican market.

Our contacts in the mortgage backed securities industry suggest that discount rate assumptions of 8-10% for I/O strips are reasonable if the I/O strips are backed by mortgage loans issued to homeowners with strong credit. We believe that this is the case at Doral for the following reasons

- Average FICO score on the underlying loans is 680.

- Net charge-off rates for residential mortgages at Doral has been 0 bps since 1997, versus 5 to 10 bps during this same period for U.S based banks.

- Mortgage debt as a percentage of total disposable income is much lower in Puerto Rico (51%) than in the United States (90%). This supports the notion of lower charge-off rates given that mortgage debt appears to be less of a burden to the Puerto Rican consumer. Overall consumer debt as a percentage of total disposable income is also lower in Puerto Rico (95%) versus the United States (114%).

- Home prices appreciated 11% a year for the past five years. We expect the housing market in Puerto Rico to remain strong for the foreseeable future due to a limited amount of land to build on the island, and the continued local government support of home ownership.

- Cultural beliefs support lower risk of foreclosure. It is common for external family members to pitch in to help pay the mortgage of a family member in danger of falling behind on mortgage payments.

- Per management, except for the issue of low documentation, a large amount of the nonconforming loans that generate the company's I/O strips could qualify as conforming loans that would be saleable to GNMA or the GSE's.

### 5. Local Market Dynamics Allow For Strong Pricing

Only two banks in Puerto Rico originate over 90% of the nonconforming loans. Doral has about a 60% market share. We believe that this oligopoly power certainly helps pricing. At current LIBOR rates, we estimate that Doral earns an excess servicing spread of about 250 to 275bps between the interest rates being

paid on loans by homeowners, and the pass through rate to investors once the loans are securitized, less servicing fees.

In the U.S, taking a look at recent issuances of I/O strips indicates that the excess servicing spread between the pass through /coupon rate on I/O strips and the mortgage rate on the underlying mortgages is between 10-20 bps. The present value of the excess spread clearly results in much larger I/O values at Doral, as well as higher gain on sale margins.

**Chart 4: Excess Servicing Fee Estimates – Doral Vs. The U.S**

| I/O Strip | Underlying Mortage Rate (WAC) | Coupon Rate | Spread (bps) | Servicing Fee (bps) | Excess Servicing (bps) |
|---|---|---|---|---|---|
| FHS 205 | 7.5 | 7.0 | 51.4 | 37.5 | 13.9 |
| FNS 240 | 7.5 | 7.0 | 48.4 | 37.5 | 10.9 |
| FHS 177 | 7.5 | 7.0 | 53.1 | 37.5 | 15.6 |
| FNS 320 | 7.5 | 7.0 | 50.4 | 37.5 | 12.9 |
| FHS 221 | 7.6 | 7.0 | 56.1 | 37.5 | 18.6 |
| Average | 7.5 | 7.0 | 51.9 | 37.5 | 14.4 |
| Doral Financial | 7.5 | 4.6 | 293.6 | 25.0 | 268.6 |

Source: Bloomberg, Company Reports, UBS Mortgage Strategy Team

We believe the dominance of Doral in Puerto Rico's nonconforming loan market will enable the bank to continue enjoying excess servicing spreads and gain on sale margins that would be unattainable in the U.S, where the top three mortgage originators only have a market share of about 33%.

**6. Market Data Appears To Support Current I/O Valuations**

We spent time with the UBS mortgage strategy team to better understand how I/O's trade in the market, and how to evaluate if Doral's valuation for its I/O strips could be supported by current market values for popularly traded I/O strips. With guidance from our mortgage strategy team, our approach to this exercise was as follows:

- Identify actively traded I/O strips in the U.S market which are supported by a mortgage pool with mortgage rates similar to Doral's (the WAC or weighted average mortgage rate of the mortgage pool is a key driver of prepayment speeds).

- Use Bloomberg's MBS/ABS valuation tool to adjust the value of these traded I/O's for peculiarities of the Puerto Rican market (such as lower prepayment rates).

We observed that:


Doral Financial   9 March 2005

- At Doral's assumed prepayment speed of 175 PSA, we found the weighted average life of the U.S. I/O strips increased to 6.6 years, which is close to the 7-year assumption used by Doral.

- Our adjustments increased the market multiple on these I/O strips to an average of 4.7. The market multiple is a popular valuation convention in the MBS market that is basically the market value of the I/O divided by the coupon or pass through rate.

- Our observed average multiple using market data was in-line with Doral's assumptions (currently 4.75–5.50). Other Puerto Rican banks also use a 4.5 to 5.0 multiple.

## 7. Market Dynamics Can Explain Doral's Historical Increase In Gain On Sale Margins

Investors we have spoken with have long been concerned over how Doral's gain on sale margins have doubled over the past five years, and the write-down of $98 million of the company's I/O strips in Q4 2004 could have further heightened this concern. We believe that these concerns are overblown.

We estimate that Doral currently generates a 750 – 800 bps gain on sale margin. We calculate that margin based on our estimates of a 100 bps gain on sale margin from conventional conforming loans, a 250 bps gain on sale margin from tax-exempt FHA/VA loans, and a 1350 bps gain on sale margin from nonconforming loans

Chart 5: Doral – Gain On Sale Mix

| Loan Type | Gain On Sale Margin (bps) | Loan Mix | Margin Contribution (bps) |
|---|---|---|---|
| Conventional Conforming | 100 | 30% | 30 |
| FHA/VA | 250 | 20% | 50 |
| Nonconforming Loans | 1350 | 50% | 675 |
| | | | 755 |

Source: UBS Estimates

Doral's margin on conventional conforming loans sold to GNMA and the GSE's is in-line with margins generated by its U.S peers (Countrywide Financial, for example, had a gain on sale margin of 134 bps in December 2004 per our mortgage finance research team). The real driver behind the large margins is therefore in the nonconforming mortgage business.

At first glance, it appears that a 1350 bps gain on sale margin on nonconforming loans is way too high, but we independently confirmed this gain on sale margin by utilizing FASB 140 rules to determine the company's gain on sale margins on nonconforming loans, if the loans were sold today, at a value slightly above par.

Doral Financial   9 March 2005

**Chart 6:  Gain On Sale Margin For Doral's Nonconforming Loans**

| | |
|---|---:|
| FMV of Loans Sold | $7,175,000 |
| FMV - I/O Strips | $869,000 |
| Book Value Of Loans | $7,000,000 |
| | |
| Allocation of Book Value: | |
| To Loans Being Sold | $6,243,784 |
| To I/O Strips | $756,216 |
| | |
| Gain On Sale | $931,216 |
| Gain On Sale Margin | 13.3% |

Source: UBS

Higher margin nonconforming loan production has been on the increase in Puerto Rico. We estimate that Doral's market share in the nonconforming loan business has grown from about 40% in the late 1990's to about 60% in 2004. Per management, the nonconforming loans as a percentage of total loan securitized at the bank has also grown to 50%, from 30% five years ago. This has enabled the bank to generate extremely large excess servicing income over the years, leading to large I/O values, and larger gain on sale margins.

**Chart 7: Nonconforming loans as a percentage of loan origination in Puerto Rico (1996 – 2004)**



Source: Office Of The Commissioner of Financial Institutions

## 8. We Do Not Expect Much More Spread Shrinkage (And Hence Write Downs) On Current Interest Only Strips In 2005

The key driver behind the I/O write-down in Q4 2004 was the shrinkage in the excess servicing spread as a result of rising 90-day LIBOR rates. Although the high end of forecasts call for 90-day LIBOR to rise about 150 bps in 2005, we are not expecting much more spread shrinkage (and potential write-downs) on Doral's I/O strips, even if 90- day LIBOR rises above 4.0%. This is because most of the securitization contracts have caps on the pass through rate. Although cap limits tend to be contract specific, we believe that most caps are about 250 basis points above the initial variable rate paid to investors.

We estimate that the current underlying principal balance of the outstanding mortgages that support Doral's I/O strips represents about 1.5 years of nonconforming mortgage loan origination. Over the past 18 months, the average 90-day LIBOR rate has been about 1.5%, implying that most payout rates cap out with 90 day LIBOR at about 4%. Given our belief that the management team at Doral is currently valuing the I/O strips with a year end assumption of LIBOR close to 4%, we do not expect that rising 90 day LIBOR rates should have a material impact on the valuation of the current I/O strips in 2005.

We are estimating a maximum impact of $20 million, which occurs if management's current 90-day LIBOR forecast is not quite 4.0%, which is where we believe most of the caps effectively kick into place. Management also increased its derivatives book in the fourth quarter by buying Eurodollar options to hedge against any potential increase in LIBOR rates in 2005. The notional amount for this hedge is about $4 billion, close to the size of the $5.0 billion non-conventional loan portfolio that generated the variable rate interest only strips currently on the company's books.

We are mindful of the following statement in Doral's 4Q 2004 earnings press release - "If contrary to what is generally expected, LIBOR decreases, a portion of the impairment charges on the value of the IOs could be recovered". Given the above statement, we believe that there is potential for a portion of the I/O write-down to be recovered if rates do not rise as quickly as anticipated in 2005. We note that the forward LIBOR curve currently forecasts a year-end LIBOR rate of 3.25- 3.50%, below Doral's assumption, which we believe is closer to 4%

Doral Financial   9 March 2005

**Chart 8: Estimates Of Change In I/O Values To 90-day LIBOR rates (Assuming Management Expectations of 3.875% LIBOR at 2005 Year End)**

| LIBOR Rate | Additional (Writedown) or Recovery in $m |
|---|---|
| 3.25% | $97.5 |
| 3.50% | $60.0 |
| 3.75% | $20.0 |
| 4.00% | ($20.0) |
| 4.25% | ($20.0) |
| 4.50% | ($20.0) |

Source: UBS

### 9. Regulators Have Not Raised Doral's I/O Valuation Methodology As An Issue

We searched the FDIC and OTS enforcement databases to determine if regulators have ever raised any concern about Doral's I/O valuation during their audits of the bank or its thrift subsidiary in the United States. We did not find **any** citations of any kind (not just the I/O strip valuation) related to operations at Doral.

We also note that over the past five years we reviewed, the Puerto Rican banks have received unqualified audit opinions from all their respective external auditors.

**Doral Financial**  9 March 2005

# We See Potential For Lower Gain On Sale Margins

### This Event However Has Low Earnings Risk in 2005.

We believe that gain on sale margins from future nonconforming mortgage securitizations may face some compression in 2005 due to a flattening yield curve. This is because a flatter yield curve will lead to a lower mortgage rates on future nonconforming loan origination, in turn leading to a smaller excess servicing spread. A smaller excess servicing spread means a lower I/O valuation. This subsequently lowers gain on sale margins.

### Our Base Case Scenario Indicates Margins Around 625 bps Is Likely

Assuming that the $98 million charge in 4Q04 was an adequate reflection of the impact of rising 90-day LIBOR rates on Q4's servicing spreads, we estimate a 200 bps impact to the gain on sale margins for nonconforming loans (($98/$5.0B = 200 bps) due to rising rates on the short end of the curve on a going forward basis.

On the long-end of the curve, we believe that should the yield on 10-year treasuries remain at levels of about 4.25 to 4.5%, Doral would experience a 25 bps reduction in excess servicing spreads. We estimate that this reduction in the excess servicing spread would reduce gain on sale margins on nonconforming loans by about 50-75 bps.

In total, we thus expect gain on sale margins from the nonconforming loan securitization business could drop by about 250 – 300 bps due to a flattening yield curve. This would impact overall gain on sale margins by about 125 – 150 bps by our estimates, as non-conforming loans make up 50% of total securitizations at Doral.

We assume a 625 bps gain on sale margin in our models for 2005. Our worst case scenario for 2005 gain on sale margins would be about 600 bps, resulting in a negative 3% impact to our current 2005 EPS estimates. Our best case scenario for gain on sale margins is closer to 675 bps, and would result in a positive 5% impact to our current 2005 EPS estimate.

# Interest Rate Risk Analysis

Apart from concerns about I/O valuations, we believe the other factor weighing in on Doral's stock is concerns that rising rates will narrow its net interest margin. As of 3Q04, 67% of owned loans were fixed rate residential loans, and 50% of all assets were fixed rate securities. On the liability side, 50% of the bank's funding comes from shorter duration large time deposits (mainly brokered CD's) and repurchase agreements. It thus appears that Doral's balance sheet should be liability sensitive, and that net interest margins should deteriorate in a rising interest rate and/or flattening yield curve scenario. This is exactly what happened in 1999/00 when the bank's net interest margin fell by 70 bps due to an inverted yield curve.

Doral's disclosure in its third quarter 10-K states that a linear (parallel) 200 basis point increase in short and long term rates should result in net interest income increasing by 4.8% over one year, which indicates that the bank believes it is asset sensitive, not liability sensitive. Despite this disclosure, we continue to get calls from investors about concerns that the bank may be liability sensitive like it was in 1999/00. We believe investors generally discount bank disclosure on interest rates, as each bank includes different assumptions in its estimate, which makes it nearly impossible to determine which is being aggressive/conservative in estimating interest rate risk. To solve issues like this, we use an interest rate sensitivity model created by the UBS U.S banks research team to independently estimate a bank's interest positioning.

## Determining Bank's Funding Gap Allows Us to Estimate Interest Rate Sensitivity

We believe the key to estimating interest rate sensitivity is to compare a bank's fixed rate assets to its fixed rate funding. More fixed rate assets than fixed rate funding (a negative funding gap) implies a bank is liability sensitive and would be impacted by rising rates. On the other hand, if fixed rate funding is greater than fixed rate assets (a positive funding gap), then a bank is asset sensitive and should benefit from rising rates.

For Doral, this analysis generated the following conclusions:

### 1. Doral has a positive funding gap (i.e., asset sensitive) – a key difference from 1999/00

We found the bank has a positive funding gap, primarily due to a net pay fixed derivatives position with a notional value of about $4.0 billion. In 1999, the net pay fixed derivatives position was only about $100 million. The derivatives used to protect net interest margins are kept very simple at Doral, and mostly comprise of interest rate swaps, floors and caps.

Doral Financial   9 March 2005

## 2. We Estimate Positive Earnings Impact From a 200 bps Parallel Rise In Short Term and Long Term Rates..

Using this funding gap, we estimated the earnings impact of changes to interest rates. We found that a 200bp parallel rise in short-term rates and long-term rates from 3Q04 levels would result in Doral's net interest margin increasing to about 2.3%, and provide $0.15 to $0.20 upside to our 2005E EPS of $4.55.

## 3. We Expect Negative Earnings Impact From Long Term Rates Ending The Year at 5.0%, Assuming No Management Intervention.

UBS forecasts are for short-term rates of 4% and long-term rates of 5% by the end of 2005. Adjusting our interest rate sensitivity model to reflect UBS forecasts results in Doral's net interest margins dropping to about 2%, and $0.10 - $0.15 downside to our 2005E EPS of $4.55. We believe that this negative impact occurs only in the unlikely event that management takes no action to protect net interest margins.

## 4. We Maintain A 210 bps Margin Forecast Because We Expect Management Actions To Protect Margins

 Management has publicly stated that they will actively protect Doral's margins by moving a significant amount of the bank's $2.5B cash and money market balance into higher earning assets as rates start to rise. $2.5B represents about 15% of total assets that are currently earning about 2.5%. For our 2005 estimates, we assumed that the bank would move $1.5B in cash into assets earning 5.0-5.5%, which we believe is reasonable given UBS expectations for the 10-year treasuries to end the year at a 5.0% yield. This move roughly keeps Doral's net interest margins flat at our forecasted level. The 15 bps increase in net interest margins also offsets the potential $0.10 - $0.15 decrease in our 2005E EPS, which would arise under the "no-management involvement" scenario. We believe that management would also increase its net fixed pay derivatives position for the potential reduction in asset sensitivity from buying higher yielding fixed rate securities.

## 5. More Meaningful Flattening Of The Yield Curve Could Pressure Doral Earnings

While we believe Doral, on average, is slightly asset sensitive, a continued flattening of the yield curve such that long term rates fall below UBS expectations of 5% are likely to be negative for Doral's earnings. In this scenario, we expect spreads on assets funded with short-term borrowings (i.e., the carry trade) to decline. In addition, a flattening of the yield curve is likely to have negative impact on Doral's earnings as fixed rate assets are replaced with assets at a lower yield. Our interest rate sensitivity model indicates that long-term rates ending the year at about 4.0% would have a $0.35 negative impact on our 2005E EPS of $4.55.

Doral Financial   9 March 2005

## Chart 9: Estimating The Earnings Impact at DRL From Higher Interest Rates

Estimating earnings impact of rate changes

| | |
|---|---:|
| Short Term Rates - 3Q04 | 1.725% |
| Long Term Rates ( 10 Year) - 3Q04 | 4.120% |

| Scenario 1: ST and LT rates up 227.5 bps vs 3Q04 | |
|---|---:|
| - Short Term Rates (2005) | 4.000% |
| - Long term Rates (2005) | 6.395% |

| | | |
|---|---:|---:|
| Variable rate assets funded with fixed rate liabilities | | 95,376 |
| Spread benefit if rates rose by: | | 2.275% |
| Pre-tax earnings boost | | 2,170 |
| AT EPS boost (Current Period) | $ | 0.01 |
| NIM Impact (bps) - Current Period | | 1 |
| Expected NIM (bps) - 2005 | | 228 |
| Current NIM Margin In Model | | 210 |
| Upside/(Downside) | $ | 0.18 |
| upside/(Downside) Percentage to 2005E | | 4.0% |

| Scenario 2: ST rates up 227.5bps, LT rates up 87.5bps vs 3Q04 | |
|---|---:|
| - Short Term Rates | 4.00% |
| - Long term Rates | 5.00% |

| | | |
|---|---:|---:|
| Step 1: Earnings benefit from 227.5 bp rise in ST rates (same as scenario 1) | | 2,170 |
| | | |
| Step 2: Earnings impact of flatter yld curve | | |
| Fixed rate assets being replaced that are negatively impacted by flatter yield curve | | |
| Securities | | 1,317,854 |
| Mortgages | | 79,706 |
| Mortgage Warehouse | | 1,788,035 |
| Total | | 3,185,595 |
| | | |
| Assumed yield curve flattening (bps) | | 140 |
| Pre-tax earnings impact on assets impacted by flatter yield curve | | (44,598) |
| | | |
| Total boost (from step 1 and step 2) | | (42,429) |
| NIM Impact (bps) | | (28) |
| Expected NIM - 2005 | | 196 |
| Current NIM Margin In Model | | 210 |
| Upside/(Downside) from NIM Contraction | $ | (0.12) |
| Upside/(Downside) Percentage to 2005E ( No Management Action) | | -2.6% |

Source: UBS estimates

Doral Financial   9 March 2005

# Maintaining 2005E EPS of $4.55, Price Target of $60, and Buy 2 Rating

## 2005E EPS of $4.55 Unchanged

Our $4.55 EPS estimate for this year is based on the following assumptions:

- Loan origination growth of 12%. Our assumption is slower than the five-year historical 23% growth rate due to expectations of rising rates to somewhat dampen loan origination.

- Net interest margin of 2.10% (down 15 bps versus 2004 to reflect a flattening yield curve);

- Loan receivable and core deposit growth of 15% and 10%, respectively;

- An efficiency ratio of 29%; in-line with recent performance; and

- A tax rate of 15%. The reduction in tax rates reflects the tax benefit to Doral from a temporary 50% reduction in long-term capital gains rates in Puerto Rico.

We maintain our belief that the opportunity for upside to our earnings estimate for the following reasons:

- Our gain on sale margins of 625 bps could prove conservative.

- Potential for even lower tax rates. The company believes rates could be as low at 12% in 2005.

- Potential for some recovery in I/O impairment charges should LIBOR rates not rise as much as anticipated for the purpose of valuing the I/O strips.

## $60 Price Target Unchanged

Our $60 price target is based on an 11x forward P/E on our 2006E EPS of $5.44. We continue to maintain that Doral's stock is undervalued, as it currently trades at an 8.5x forward P/E, or 45% discount to its U.S peers (a basket of 60 regional banks with market cap between $1.0 to $6.0 billion). This is versus a 30% historical forward PE discount.

Doral has historically traded at a 10.5x forward P/E ratio. We use an 11.0x forward P/E as we believe there is a strong case to be made for multiple expansion of Doral's stock in the future. We agree that the majority of Doral's business is related to residential mortgages (67% of loans), but we argue that this is becoming less of a focus for the bank (80% of loans were residential loans in 1999). The current loan mix contribution from residential mortgages is

not as high as U.S. thrifts (76% of loans), yet Doral trades at a significant discount to other well-known U.S. thrifts such as Washington Mutual (13 times forward PE) and Golden West Financial (14 times forward PE). This discount occurs despite the superior earnings growth of Doral, the attractive positioning of the company in the Puerto Rican mortgage market (which is essentially an oligopoly), and the fact that mortgage originations are less sensitive to interest rates in Puerto Rico than the United States. Origination volumes of 20% was achieved by Doral in 2004 when U.S mortgage origination was down 25%. We believe this is a testament to the company's ability to deliver even in difficult interest rate environments. The company also posted a record high return on assets (ROA) of 3.85% last year, as well as a record return on common equity (ROE) of 39%.

### Still More To Come...

Our full report, also entitled " *After Digging Into Issues, Reiterating Buy 2 Rating*", will be issued in the next few days. This report goes into even more detail on I/O valuation and our interest rate sensitivity analysis, as well as our final thoughts on 4Q04 earnings. Stay tuned!

Doral Financial   9 March 2005

■ **Doral Financial**

Doral Financial Corp. is a Puerto Rican bank that engages in a wide range of mortgage banking activities, including the origination, purchase, sale and servicing of mortgage loans on single-family residences, and operates bank branches in Puerto Rico and New York City.

■ **Statement of Risk**

Doral Financial's results are sensitive to interest rate fluctuations. Changes in interest rates can materially affect the volume of loan originations, net interest income earned, gain on sales, the value of security holdings and the value of servicing assets and interest only strips

Doral Financial's business activities and credit exposure are concentrated in Puerto Rico. Consequently, its financial condition and results of operations are dependent on the economic conditions in Puerto Rico, as well as changes in legislation on the island

■ **Analyst Certification**

Each research analyst primarily responsible for the content of this research report, in whole or in part, certifies that with respect to each security or issuer that the analyst covered in this report: (1) all of the views expressed accurately reflect his or her personal views about those securities or issuers; and (2) no part of his or her compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed by that research analyst in the research report.

Doral Financial   9 March 2005

## Required Disclosures

This report has been prepared by UBS Securities LLC, an affiliate of UBS AG (UBS).

### UBS Investment Research: Global Equity Ratings Definitions and Allocations

| UBS rating | Definition | UBS rating | Definition | Rating category | Coverage[1] | IB services[2] |
|---|---|---|---|---|---|---|
| Buy 1 | FSR is > 10% above the MRA, higher degree of predictability | Buy 2 | FSR is > 10% above the MRA, lower degree of predictability | Buy | 36% | 32% |
| Neutral 1 | FSR is between -10% and 10% of the MRA, higher degree of predictability | Neutral 2 | FSR is between -10% and 10% of the MRA, lower degree of predictability | Hold/Neutral | 53% | 35% |
| Reduce 1 | FSR is > 10% below the MRA, higher degree of predictability | Reduce 2 | FSR is > 10% below the MRA, lower degree of predictability | Sell | 11% | 29% |

1: Percentage of companies under coverage globally within this rating category.
2: Percentage of companies within this rating category for which Investment banking (IB) services were provided within the past 12 months.

Source: UBS; as of 31 December 2004.

### KEY DEFINITIONS

**Forecast Stock Return (FSR)** is defined as expected percentage price appreciation plus gross dividend yield over the next 12 months.
**Market Return Assumption (MRA)** is defined as the one-year local market interest rate plus 5% (an approximation of the equity risk premium).
**Predictability Level** The predictability level indicates an analyst's conviction in the FSR. A predictability level of '1' means that the analyst's estimate of FSR is in the middle of a narrower, or smaller, range of possibilities. A predictability level of '2' means that the analyst's estimate of FSR is in the middle of a broader, or larger, range of possibilities.
**Under Review (UR)** Stocks may be flagged as UR by the analyst, indicating that the stock's price target and/or rating are subject to possible change in the near term, usually in response to an  event that may affect the investment case or valuation.
**Rating/Return Divergence (RRD)** This qualifier is automatically appended to the rating when stock price movement has caused the prevailing rating to differ from that which would be assigned according to the rating system and will be removed when there is no longer a divergence, either through market movement or analyst intervention.

### EXCEPTIONS AND SPECIAL CASES

**US Closed-End Fund ratings and definitions are:** Buy: Higher stability of principal and higher stability of dividends; Neutral: Potential loss of principal, stability of dividend; Reduce: High potential for loss of principal and dividend risk.
**UK and European Investment Fund ratings and definitions are:** Buy: Positive on factors such as structure, management, performance record, discount; Neutral: Neutral on factors such as structure, management, performance record, discount; Reduce: Negative on factors such as structure, management, performance record, discount.
**Core Banding Exceptions (CBE):** Exceptions to the standard +/-10% bands may be granted by the Investment Review Committee (IRC). Factors considered by the IRC include the stock's volatility and the credit spread of the respective company's debt. As a result, stocks deemed to be very high or low risk may be subject to higher or lower bands as they relate to the rating. When such exceptions apply, they will be identified in the Companies Mentioned table in the relevant research piece.

### Companies mentioned

| Company Name | Reuters | Rating | Price |
|---|---|---|---|
| Bank of America[2a,4b,6b,6a,6c,7,16] | BAC.N | Buy 1 | US$46.26 |
| Countrywide Financia[6a,6c,7,12,16,18] | CFC.N | Neutral 1 | US$35.05 |
| Doral Financial[2a,4a,6a,7,16] | DRL.N | Buy 2 | US$38.65 |

Dorel Financial   9 March 2005

| Company Name | Reuters | Rating | Price |
|---|---|---|---|
| First Bancorp Puerto[2b,16] | FBP.N | Not rated | US$48.52 |
| Golden West Finance[16] | GDW.N | Neutral 1 | US$61.01 |
| Popular Inc.[2a,6a,7,16] | BPOP.O | Neutral 1 | US$27.33 |
| SunTrust Banks Inc.[2b,4a,6b,16] | STI.N | Not rated | US$73.66 |
| W Holding Company[2a,4b,5,16] | WHI.N | Neutral 2 | US$11.74 |
| Wachovia Corp.[2a,4b,5,6b,6a,6c,7,16] | WB.N | Neutral 2 (RRD) | US$53.11 |
| Washington Mutual[2a,6a,6c,7,16] | WM.N | Neutral 2 | US$42.18 |
| Wells Fargo & Co.[2a,4b,5,6b,6a,6c,7,16] | WFC.N | Buy 2 | US$60.79 |

Price(s) as of 8 March 2005.  Source: UBS.

2a.    UBS AG, its affiliates or subsidiaries has acted as manager/co-manager in the underwriting or placement of securities of this company or one of its affiliates within the past 12 months.

2b.    UBS AG, its affiliates or subsidiaries has acted as manager/co-manager in the underwriting or placement of securities of this company or one of its affiliates within the past three years.

4a.    Within the past three years, UBS AG, its affiliates or subsidiaries has received compensation for investment banking services from this company/entity.

4b.    Within the past 12 months, UBS AG, its affiliates or subsidiaries has received compensation for investment banking services from this company/entity.

5.    UBS AG, its affiliates or subsidiaries expect to receive or intend to seek compensation for investment banking services from this company within the next three months.

6a.    This company is, or within the past 12 months has been, a client of UBS Securities LLC, and non-investment banking securities-related services are being, or have been, provided.

6b.    This company is, or within the past 12 months has been, a client of UBS Securities LLC, and investment banking services are being, or have been, provided.

6c.    This company is, or within the past 12 months has been, a client of UBS Securities LLC, and non-securities services are being, or have been, provided.

7.    Within the past 12 months, UBS Securities LLC has received compensation for products and services other than investment banking services from this company.

12.    A director or an employee of UBS AG, its affiliates or subsidiaries is a director of this company.

16.    UBS Securities LLC and/or UBS Capital Markets LP makes a market in the securities and/or ADRs of this company.

18.    A director of this company acts as a consultant to UBS Securities LLC.

Unless otherwise indicated, please refer to the Valuation and Risk sections within the body of this report.

**Doral Financial**   9 March 2005

## Doral Financial (US$)



Source: UBS; as of 8 March 2005.

Note: On October 13, 2003, UBS adopted new definition criteria for its rating system. (See 'UBS Investment Research: Global Equity Ratings Definitions and Allocations' table for details.) Between January 11 and October 12, 2003, the UBS ratings and their definitions were: Buy 1: Excess return potential > 15%, smaller range around price target; Buy 2: Excess return potential > 15%, larger range around price target; Neutral 1: Excess return potential between -15% and 15%, smaller range around price target; Neutral 2: Excess return potential between -15% and 15%, larger range around price target; Reduce 1: Excess return potential < -15%, smaller range around price target; Reduce 2: Excess return potential < -15%, larger range around price target. Prior to January 11, 2003, the UBS ratings and definitions were: Strong Buy: Greater than 20% excess return potential, high degree of confidence; Buy: Positive excess return potential; Hold: Low excess return potential, low degree of confidence; Reduce: Negative excess return potential; Sell: Greater than 20% negative excess return potential, high degree of confidence. Under both ratings systems, excess return is defined as the difference between the FSR and the one-year local market interest rate.

Doral Financial   9 March 2005

## Global Disclaimer

This report was produced by:UBS Securities LLC, an affiliate of UBS AG (UBS).

Head Office: UBS Limited, 1 Finsbury Avenue, London, EC2M 2PP, UK Phone: +44-20-7567 8000

Local Office: UBS Securities LLC, 1285 Avenue of the Americas, New York, NY 10019 Phone: +1-212-713 2000

This report has been prepared by UBS AG or an affiliate thereof ("UBS"). In certain countries UBS AG is referred to as UBS SA.

This report is for distribution only under such circumstances as may be permitted by applicable law. It has no regard to the specific investment objectives, financial situation or particular needs of any specific recipient. It is published solely for informational purposes and is not to be construed as a solicitation or an offer to buy or sell any securities or related financial instruments. No representation or warranty, either express or implied, is provided in relation to the accuracy, completeness or reliability of the information contained herein, except with respect to information concerning UBS AG, its subsidiaries and affiliates, nor is it intended to be a complete statement or summary of the securities, markets or developments referred to in the report. The report should not be regarded by recipients as a substitute for the exercise of their own judgement. Any opinions expressed in this report are subject to change without notice and may differ or be contrary to opinions expressed by other business areas or groups of UBS as a result of using different assumptions and criteria. UBS is under no obligation to update or keep current the information contained herein. UBS, its directors, officers and employees (excluding the US broker-dealer unless specifically disclosed under required disclosures) or clients may have or have had interests or long or short positions in the securities or other financial instruments referred to herein, and may at any time make purchases and/or sales in them as principal or agent. UBS (excluding the US broker-dealer unless specifically disclosed under Required Disclosures) may act or have acted as market-maker in the securities or other financial instruments discussed in this report, and may have or have had a relationship with or may provide or has provided investment banking, capital markets and/or other financial services to the relevant companies. Employees of UBS may serve or have served as officers or directors of the relevant companies. UBS may rely on information barriers, such as "Chinese Walls," to control the flow of information contained in one or more areas within UBS, into other areas, units, groups or affiliates of UBS.

The securities described herein may not be eligible for sale in all jurisdictions or to certain categories of investors. Options, derivative products and futures are not suitable for all investors, and trading in these instruments is considered risky. Past performance is not necessarily indicative of future results. Foreign currency rates of exchange may adversely affect the value, price or income of any security or related instrument mentioned in this report. For investment advice, trade execution or other enquiries, clients should contact their local sales representative. Neither UBS nor any of its affiliates, nor any of UBS' or any of its affiliates, directors, employees or agents accepts any liability for any loss or damage arising out of the use of all or any part of this report. Additional information will be made available upon request.

United Kingdom and rest of Europe: Except as otherwise specified herein, this material is communicated by UBS Limited, a subsidiary of UBS AG, to persons who are market counterparties or intermediate customers (as detailed in the FSA Rules) and is only available to such persons. The information contained herein does not apply to, and should not be relied upon by, private customers. Switzerland: Distributed by UBS AG to persons who are institutional investors only. Italy: Should persons receiving this research in Italy require additional information or wish to effect transactions in the relevant securities, they should contact Giubergia UBS SIM SpA, an associate of UBS SA, in Milan. South Africa: UBS South Africa (Pty) Ltd (incorporating J.D. Anderson & Co.) is a member of the JSE Securities Exchange SA. United States: Distributed to US persons by either UBS Securities LLC or by UBS Financial Services Inc., subsidiaries of UBS AG; or by a group, subsidiary or affiliate of UBS AG that is not registered as a US broker-dealer (a "non-US affiliate"), to major US institutional investors only. UBS Securities LLC or UBS Financial Services Inc. accepts responsibility for the content of a report prepared by another non-US affiliate when distributed to US persons by UBS Securities LLC or UBS Financial Services Inc. All transactions by a US person in the securities mentioned in this report must be effected through UBS Securities LLC or UBS Financial Services Inc., and not through a non-US affiliate. Canada: Distributed by UBS Securities Canada Inc., a subsidiary of UBS AG and a member of the principal Canadian stock exchanges & CIPF. A statement of its financial condition and a list of its directors and senior officers will be provided upon request. Hong Kong: Distributed by UBS Securities Asia Limited. Singapore: Distributed by UBS Securities Singapore Pte. Ltd. Japan: Distributed by UBS Securities Japan Ltd to institutional investors only. Australia: Distributed by UBS AG (Holder of Australian Financial Services Licence No. 231087) and UBS Securities Australia Ltd (Holder of Australian Financial Services Licence No. 231098) only to "Wholesale" clients as defined by s761G of the Corporations Act 2001. New Zealand: Distributed by UBS New Zealand Ltd.

© 2005 UBS. All rights reserved. This report may not be reproduced or redistributed, in whole or in part, without the written permission of UBS and UBS accepts no liability whatsoever for the actions of third parties in this respect.



GX 1609

GOVERNMENT
EXHIBIT
1609
08 Cr. 181 (TPG)    (ID)

Daily Note                                                                                       CONSUMER FINANCE

Rating: 2. Buy                                                               DORAL FINANCIAL CORP. (DRL)
Current Share Price: 23.900                                            Market Capitalization: $2,579.3M
TECH RATING:          QUANT RATING: 9                                    FRIEDHOLM, VALERIE (8-563-4217)

- *More information on the Interest Only strip.*

| DORAL FINANCIAL CORP — Close of Business 3/21/2005 (Currency, US DOLLAR) | | | | | | |
|---|---|---|---|---|---|---|
| Shares Outstanding (in Millions) | 107.9 | | Percent of Standard & Poor's 500 | | | 0.00% |
| Current Dividend Yield | 2.8% | | Days to Trade One Percent | | | 1 |
| Equity/Asset Ratio | 13.5 | | Percent Owned / Allowed | | | 9.96 / 9.99% |
| Long-Term Earnings Per Share Growth | 20 | | Shares Available (in Millions) | | | 0.0 |
| Fiscal Year Ending December 31 | **2003A** | **2004A** | **2005E** | **2006E** | **2007E** | **Q1 / 2005E** |
| Earning Assets (in Millions) | 8,621.0 | 12,297.0 | 14,757.0 | 17,708.0 | | 10,510.0 |
| Change in Earning Assets | 26.4% | 42.6% | 20.0% | 20.0% | --% | --% |
| Net Interest Margin | 210 | 225 | 225 | 235 | -- | -- |
| Book Value Per Share | 8.98 | 11.18 | 15.19 | 20.11 | -- | -- |
| Return on Equity | 32.7% | 38.6% | 36.1% | 33.0% | --% | --% |
| Return on Assets | 3.20 | 3.40 | 3.56 | 3.63 | -- | -- |
| Earnings Per Share — FMR Estimate | 2.72 | 4.03 | 3.97 | 4.88 | -- | -- |
| Earnings Per Share — Street Estimate | -- | -- | 3.66 | 4.44 | -- | 0.95 |
| Price/Earnings Multiple | 11.4x | 5.3x | 6.0x | 5.1x | --x | -- |
| Price/Book Value | 322% | 192% | 157% | 119% | --% | --% |

Sector relative rating.

### Business Description

*Largest mortgage bank in Puerto Rico.*

### Investment Thesis

1) picking up the stock from Andy Hatem

### News and Outlook

- I've spoken with DRL several more times since our call and wanted to pass on information related to the IO issue.


Source: FactSet.

I-O portfolio

- Actual pre-payment rate in Q4 was 7.2%.
- IO portfolio composed of non-conforming FHA/VA loans sold to local investors. 30% of the portfolio is fixed rate while 70% prices off LIBOR.
- There are caps in place on the floating rate portion so spread compression is limited.
- DRL basically has a monopoly on originating these non-conforming loans in Puerto Rico so demand for this product is very high and is the primary reason for their "out-sized" margins.
- Low balance loans ($60K on average) with low loan-to-value (LTV) of about 60% and high FICO scores of about 700.
- Historic charge-off rates have been close to zero.

Other items

- DRL's investment portfolio is made up entirely of government backed and agency AAA paper.
- The $2.5B cash balance is essentially being held in a money market account.
- DRL was placed on negative out-look by the rating agencies, but none of their credit facilities have rating triggers so a down-grade shouldn't have an impact.

Fid. 045
Confidential Treatment Requested
Pursuant to 17 C.F.R. 200.83

Bottom-line: DRL was not properly hedged for a flattening yield curve in Q4 and it came back to bite them. They are an excellent mortgage originator, but 70% of their income comes from the IO strip which is inherently volatile and the market didn't like covering up the derivative loss by lowering their pre-payment assumptions.

GX 2025



# DORAL FINANCIAL
## CORPORATION

## SERVICING ASSETS VALUATION

## POLICIES
## &
## PROCEDURES MANUAL



GOVERNMENT
EXHIBIT
2025
08 Cr. 181 (TPG) (ID)

WP-FRBNY-DO02837

**INDEX**

I.      OVERVIEW
II.     GENERAL ACCOUNTING GUIDANCE
III.    INITIAL VALUATIONS
        A.  MSRs
        B.  I/Os

IV.     PERIODIC VALUATIONS
        A.  MSRs
        B.  I/Os

V.      INVESTMENT LIMITS
VI.     REPORTING
VII.    OVERSIGHT

WP-FRBNY-DO02838



| **SERVICING ASSETS VALUATION** | Revised Date: 1/14/03<br>Approved by BOD:  4/23/03 |
|---|---|
| **Policies and Procedures Manual** | **Page 1 of 6** |

DORAL FINANCIAL CORPORATION

## I. OVERVIEW

<u>Mortgage Servicing Rights</u> - In the ordinary course of its mortgage banking activities, the Company sells or securitizes substantially all of the residential mortgage loans it originates and retains the related mortgage servicing rights ("MSRs").  On occasion, the Company will also purchase MSRs from third parties.  These MSRs entitle the Company to a future stream of cash flows based on the outstanding principal balance of the loans serviced and the contractual servicing fee.  Typically, FHA/VA loans receive an ongoing servicing fee of 44 basis points, conforming Freddie Mac and Fannie Mae loans are 25-37.5 basis points and nonconforming loans are generally 25 basis points.

<u>Interest Only Strips</u> – In addition to MSRs, some loan sales result in the creation of interest only strips ("I/Os"), formerly classified as excess servicing fees receivable.  In these transactions, the I/O is created because the pass through rate on the loans sold to the investor plus a normal servicing fee is less than the interest rate being received from the underlying loans.  I/Os entitle the Company to a future stream of cash flows based on the WAC of the loans sold in excess of the pass through interest rate paid to the investor plus a normal servicing fee.

The Company has both fixed rate I/Os and floating rate I/Os.  The fixed rate I/Os receive a fixed rate of interest from the underlying loans and pays a fixed rate of interest to the investor.  Fixed rate I/Os generally decline in value in a falling interest rate environment as the underlying loans pre-pay and increase in value in a rising rate environment as the life of the cash flow stream increases.  Floating rate I/Os receive a fixed rate of interest from the underlying loans and pay a floating rate of interest to the investor.  The fair value of floating rate I/Os generally moves inversely to the values for fixed rate I/Os.  In a declining interest rate environment the variable rate spreads widen.  Both the beneficial and negative changes to the fair value of the floating rate I/Os caused by interest rate movements are somewhat offset by the increased prepayments in declining interest rates and the reduced prepayments in rising interest rates.  Since the market values move inversely, fixed rate and floating rate I/Os act as a partial natural hedge against each other.  The sales contracts for the underlying loans on the floating rate I/Os contain imbedded protection through either a maximum rate cap or a "call" granting the Company the right to repurchase the underlying loans at the Company's sole option.  Additionally, the Company protects the variable I/O spreads through hedging.

<u>Valuation Issues</u> – It is very important to accurately value MSRs and I/Os at time of origination and to reevaluate these assets on an ongoing basis as they can exhibit a high degree of sensitivity to the underlying assumptions and have limited liquidity although the Company regularly sells I/Os to third parties.  For example, if prepayment speeds occur at a faster rate than anticipated, the values of the MSRs and I/Os could decline significantly and rapidly with an adverse impact on earnings and capital.  Therefore, the Company must use and document appropriate fair values,

WP-FRBNY-DO02839



| SERVICING ASSETS VALUATION | Revised Date: 1/14/03<br>Approved by BOD:   4/23/03 |
|---|---|
| **DORAL FINANCIAL**<br>CORPORATION   Policies and Procedures Manual | **Page 2 of 6** |

cash flow analyses, prepayment estimates and discount rates.

<u>Authorizations</u> – In order to maintain a segregation of duties for internal control purposes, the Chief Accounting Officer shall be responsible for the recording and periodic evaluations of all MSRs and I/Os on transactions generated by the secondary marketing department which reports to the Treasurer.  The Company employs both internal and independent third party valuations and market quotations for both MSRs and I/Os.

## II. GENERAL ACCOUNTING GUIDANCE

The transfer of assets that qualifies for sale treatment under SFAS 140 ("Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities") shall be accounted for by the Chief Accounting Officer by: (i) derecognizing all assets sold, (ii) recognizing all assets obtained and liabilities incurred at their relative fair value, and (iii) recognizing all assets retained at their previous allocated carrying amount based on relative fair values.  Prior to the issuance of SFAS 140, the I/Os were classified as excess servicing fees receivable.

I/Os are booked as a trading security and maintained at fair value meaning that the recorded value of the asset can go up or down based on current market conditions.  However, MSRs are maintained at the lower of fair values or the amortized book value. MSRs can never be recorded at an amount greater than the amortized value.

## III. INITIAL VALUATIONS

### A. MSRs

The Company recognizes MSRs when loans are sold and servicing rights retained or at the time of an outright purchase of MSRs. MSRs purchased from independent third parties are generally recorded at the price paid as this best represents the fair value as a current arms-length transaction.  Upon the sale or securitization of loans, DFC recognizes MSRs as an asset by allocating the carrying value of the loans between the assets sold and interest retained based on their relative fair values.

The fair value of the MSR is determined based on market prices for the sale of similar assets using recent sales and purchases in the local or U.S. market and/or external valuations prepared by Cohane Rafferty.  Based on current market conditions, MSRs on newly originated or purchased loans shall be capitalized using the following basis points of the principal balance of loans:



| | SERVICING ASSETS VALUATION | Revised Date: 1/14/03<br>Approved by BOD:  4/23/03 |
|---|---|---|
| **DORAL FINANCIAL**<br>**CORPORATION** | **Policies and Procedures Manual** | **Page 3 of 6** |

| | Internal Originations | Purchases |
|---|---|---|
| Loan Type | Basis Points | Basis Points |
| FHA/VA | 230 | 230 |
| Conforming | 175 | 170 |
| Non-Conforming | 150 | 140 |

The Chief Accounting Officer can only change the capitalization rates on newly created MSRs with the approval of the Treasurer.  The Treasurer is responsible for informing the Risk Management Committee when market conditions warrant changing the rates.  These changes shall be approved by the Risk Management Committee and shall be documented in the Committee minutes.  At the time the MSRs are recognized, the Chief Accounting Officer shall assign a useful life of the MSRs based upon the estimated life of the underlying pool of loans as a basis for amortizing the MSRs against earnings.  Approval of the Risk Management Committee is needed to employ an amortization period in excess of 10 years, with such approval documented in the minutes of the Risk Management Committee meeting.

B.  I/Os

I/Os are capitalized based upon market factors that incorporates prepayment speeds and an initial estimate of the anticipated discounted future cash flow retained by the Company.  The market value is based on a multiple of the spread usually in the range of 3.75% to 5.50%.  The Risk Management Committee approves the values and the Treasurer is in charge of informing the Committee of the going rates for these assets.  Approval of the Risk Management Committee is needed to employ an amortization period in excess of eight (8) years with such approval documented in the minutes of the Risk Management Committee.  The I/O is recorded as a trading security and is amortized based on its estimated useful life. That amortization is recorded as a reduction of the value of the I/O.

The primary valuation factors to be considered by the Chief Accounting Officer when valuing the I/Os are the discount rate and the prepayment speed/amortization.  Delinquency of loans and foreclosure losses are deemed immaterial for consideration based on the historically low amounts experienced by the Company in this area.

IV. PERIODIC VALUATIONS

In order to ensure that the Company is appropriately valuing its MSRs and I/Os, the following quarterly revaluation procedures shall be performed. The Chief Accounting Officer and the Treasurer shall monitor the prepayment activities on a monthly basis to identify prepayment patterns indicative of early payoffs in excess of the scheduled amortization of the underlying assets. The Chief Accounting Officer shall value the I/Os on at least a quarterly basis, and more



| | SERVICING ASSETS VALUATION | Revised Date: 1/14/03<br>Approved by BOD:  4/23/03 |
|---|---|---|
| **DORAL FINANCIAL**<br>**CORPORATION** | **Policies and Procedures Manual** | **Page 4 of 6** |

frequently when considered necessary.

A. MSRs

A pattern of excessive prepayments will result in a decline in value of the MSR that will be recorded through an impairment of the asset.  The Company shall obtain a quarterly valuation of the conforming servicing portfolio from a reputable and independent third party, such as Cohane Rafferty.  This valuation shall also be used as a reference by the Treasurer and the Chief Accounting Officer to determine the internally derived market values of the nonconforming servicing portfolio.  The Chief Accounting Officer shall assess the impairment of the MSRs on a stratum-by-stratum basis with any impairment recognized through a valuation allowance as required by GAAP.  In determining impairment, servicing assets are stratified based on their predominant risk characteristics, which have been determined to be the types of loans (conventional, conforming and non-conforming) and interest rates. The amortized value of the MSRs will be compared to the external valuations by strata and shall be adjusted if the external valuation is lower.

B. I/Os

On at least a quarterly basis, the Chief Accounting Officer shall determine the fair value of the I/O portfolio. Unless otherwise approved by the Risk Management Committee, the discounted cash flow calculation shall be based on a prepayment speed/useful life of not more than 8 years or not less than 12%.  For the purposes of the quarterly internal valuations, the discount rate shall be based on 300 basis points above the posted yields (priced at par) on FNMA 30 year fixed rate mortgage commitments for delivery within 30 days.  The Chief Accounting Officer shall maintain documentation (i.e., Wall Street Journal, Bloomberg, etc.) of the FNMA index rate.  The discount rate shall not be below 9.0% without the prior approval of the Risk Management Committee.  The market conditions warranting a discount rate of below 9.0% shall be fully documented in the minutes of the Risk Management Committee meeting at which such action was considered. In order to verify and test the accuracy of the in-house value estimate, the Company shall also obtain two quarterly independent quotations or valuations of the I/O portfolio from a reputable broker-dealer or investment banker. The Company shall record the fair market value of the I/Os at the lower of the internal or either of the two external valuations.

V.  INVESTMENT LIMITS

When done correctly and in a conservative manner, the sale and securitization of loans and the resultant creation of MSRs and I/Os are an efficient means of financial intermediation.  However, the potential pricing volatility warrants the imposition of certain limits on these assets.  Inasmuch



| SERVICING ASSETS VALUATION | Revised Date: 1/14/03<br>Approved by BOD:  4/23/03 |
|---|---|
| **DORAL FINANCIAL** CORPORATION<br>Policies and Procedures Manual | **Page 5 of 6** |

as a strong capital base is the best protection against declines in values, the Company shall limit its holdings in MSRs and I/Os to the level where its regulatory capital levels will not fall below the Well Capitalized regulatory requirements.  In determining the limits on the amounts of MSRs and I/Os, the Board shall consider the market value volatility of these assets in different stress scenarios as noted in the Reporting Section below.

VI. REPORTING

In order to ensure that the Board receives timely information relative to compliance with the investment limits set forth in this policy, the Chief Accounting Officer shall provide the Board and the Risk Management Committee with the following information on a quarterly basis:

<div align="center">

Quarter Ended

\_\_\_\_\_, 20\_\_

($000s)

</div>

|  | Adequately<br>Capitalized | Well<br>Capitalized |
|---|---|---|
| Tier 1 Capital Requirement |  |  |
|   Actual Excess Tier 1 Capital |  |  |
|  |  |  |
| Total Capital Requirement |  |  |
|   Actual Excess Total Capital |  |  |
|  |  |  |
| Leverage Capital Requirement |  |  |
|   Actual Excess Leverage Capital |  |  |

On at least a quarterly basis, the Chief Accounting Officer shall prepare and provide a report to the Board of Directors and the Risk Management Committee that includes the following information with respect to both MSRs and I/Os:

- Total exposure vs. policy investment limits
- Valuation factors utilized vs. policy requirements
- Book value vs. third party valuations
- A stress schedule estimating changes in the fair value assuming interest rate shocks of 100, 200 and 300 basis points (excluding the benefits of hedging).

Additionally, at such time as when the Company's excess capital with respect to any of the pro-forma Well Capitalized regulatory capital requirements ("excess capital") falls below $50 million, the CEO shall immediately advise the Board of Directors and seek its approval to continue to invest in and/or create MSRs and I/Os.  Should excess capital be further reduced to less than $25 million of any of the pro-forma Well Capitalized requirements, the CEO shall provide the Board

WP-FRBNY-DO02843



| | SERVICING ASSETS VALUATION | Revised Date: 1/14/03<br>Approved by BOD: 4/23/03 |
|---|---|---|
| **DORAL FINANCIAL**<br>CORPORATION | **Policies and Procedures Manual** | **Page 6 of 6** |

with a plan showing how the Company will continue to meet all of the Well Capitalized regulatory capital requirements.

## VII. OVERSIGHT

<u>Chief Accounting Officer</u> - The Chief Accounting Officer shall be responsible for maintaining documentation at all times to justify the valuations being assigned.

<u>Risk Management Committee</u> – On a quarterly basis the Risk Management Committee shall review and ratify the assumptions (i.e. capitalization rates, discount rates, prepayment speeds and amortization period) used during the quarter for the initial and periodic valuations of MSRs and I/Os. As previously noted, the primary means utilized by the Risk Management Committee for monitoring and measuring the accuracy of the internally derived valuations will be through the ongoing comparison between the internally derived valuations and the quarterly third party valuations. Persistent and/or significant overvaluations shall result in the Risk Management Committee imposing revisions to the valuation assumptions to more closely resemble the external valuations. Such review and ratification shall be documented in the minutes of the Risk Management Committee.

<u>Board of Directors</u> – The Board shall monitor the valuation of these assets through the monthly reporting of servicing portfolio prepayments, monthly financial statements, the disclosures in the Forms 10-Q and 10-K, and the reports required by Section IV of this policy. The Board shall also review and approve this policy on an annual basis.

WP-FRBNY-DO02844

GX 2026



# DORAL FINANCIAL CORPORATION

# Servicing Assets Valuation

# Policies
# &
# Procedures Manual

GOVERNMENT
EXHIBIT
2026
08 Cr. 181 (TPG) (ID)

Confidential Treatment Requested by Doral Financial Corporation

# Index

I.      OVERVIEW
II.     GENERAL ACCOUNTING GUIDANCE
III.    INITIAL VALUATIONS
        A.  MSRs
        B.  I/Os

IV.     PERIODIC VALUATIONS
        A.  MSRs
        B.  I/Os

V.      INVESTMENT LIMITS
VI.     REPORTING
VII.    OVERSIGHT

DFC00047723

| | Servicing Assets Valuation | Revised Date: 8/21/03<br>Approved by BOD:   4/23/03 |
|---|---|---|
| **DORAL FINANCIAL**<br>CORPORATION | **Policies and Procedures Manual** | **Page 3 of 6** |

# I. OVERVIEW

Mortgage Servicing Rights - In the ordinary course of its mortgage banking activities, the Company sells or securitizes substantially all of the residential mortgage loans it originates and retains the related mortgage servicing rights ("MSRs"). On occasion, the Company will also purchase MSRs from third parties. These MSRs entitle the Company to a future stream of cash flows based on the outstanding principal balance of the loans serviced and the contractual servicing fee. Typically, FHA/VA loans receive an ongoing servicing fee of 44 basis points, conforming Freddie Mac and Fannie Mae loans are 25-37.5 basis points and nonconforming loans are generally 25 basis points.

Interest Only Strips – In addition to MSRs, some loan sales result in the creation of interest only strips ("I/Os"), formerly classified as excess servicing fees receivable. In these transactions, the I/O is created because the pass through rate on the loans sold to the investor plus a normal servicing fee is less than the interest rate being received from the underlying loans. I/Os entitle the Company to a future stream of cash flows based on the WAC of the loans sold in excess of the pass through interest rate paid to the investor plus a normal servicing fee.

The Company has both fixed rate I/Os and floating rate I/Os. The fixed rate I/Os receive a fixed rate of interest from the underlying loans and pays a fixed rate of interest to the investor. Fixed rate I/Os generally decline in value in a falling interest rate environment as the underlying loans pre-pay and increase in value in a rising rate environment as the life of the cash flow stream increases. Floating rate I/Os receive a fixed rate of interest from the underlying loans and pay a floating rate of interest to the investor. The fair value of floating rate I/Os generally moves inversely to the values for fixed rate I/Os. In a declining interest rate environment the variable rate spreads widen. Both the beneficial and negative changes to the fair value of the floating rate I/Os caused by interest rate movements are somewhat offset by the increased prepayments in declining interest rates and the reduced prepayments in rising interest rates. Since the market values move inversely, fixed rate and floating rate I/Os act as a partial natural hedge against each other. The sales contracts for the underlying loans on the floating rate I/Os contain imbedded protection through either a maximum rate cap or a "call" granting the Company the right to repurchase the underlying loans at the Company's sole option. Additionally, the Company protects the variable I/O spreads through hedging.

Valuation Issues – It is very important to accurately value MSRs and I/Os at time of origination and to reevaluate these assets on an ongoing basis as they can exhibit a high degree of sensitivity to the underlying assumptions and have limited liquidity although the Company regularly sells I/Os to

Confidential Treatment Requested by Doral Financial Corporation



| | Servicing Assets Valuation | Revised Date: 8/21/03<br>Approved by BOD:   4/23/03 |
|---|---|---|
| **DORAL FINANCIAL**<br>CORPORATION | **Policies and Procedures Manual** | **Page 4 of 6** |

third parties. For example, if prepayment speeds occur at a faster rate than anticipated, the values of the MSRs and I/Os could decline significantly and rapidly with an adverse impact on earnings and capital. Therefore, the Company must use and document appropriate fair values, cash flow analyses, prepayment estimates and discount rates.

<u>Authorizations</u> – In order to maintain a segregation of duties for internal control purposes, the Chief Accounting Officer shall be responsible for the recording and periodic evaluations of all MSRs and I/Os on transactions generated by the secondary marketing department which reports to the Treasurer. The Company employs both internal and independent third party valuations and market quotations for both MSRs and I/Os.

## II. GENERAL ACCOUNTING GUIDANCE

The transfer of assets that qualifies for sale treatment under SFAS 140 ("Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities") shall be accounted for by the Chief Accounting Officer by: (i) derecognizing all assets sold, (ii) recognizing all assets obtained and liabilities incurred at their relative fair value, and (iii) recognizing all assets retained at their previous allocated carrying amount based on relative fair values. Prior to the issuance of SFAS 140, the I/Os were classified as excess servicing fees receivable.

I/Os are booked as a trading security and maintained at fair value meaning that the recorded value of the asset can go up or down based on current market conditions. However, MSRs are maintained at the lower of fair values or the amortized book value. MSRs can never be recorded at an amount greater than the amortized value.

## III. INITIAL VALUATIONS

### A.  MSRs

The Company recognizes MSRs when loans are sold and servicing rights retained or at the time of an outright purchase of MSRs. MSRs purchased from independent third parties are generally recorded at the price paid as this best represents the fair value as a current arms-length transaction. Upon the sale or securitization of loans, DFC recognizes MSRs as an asset by allocating the carrying value of the loans between the assets sold and interest retained based on their relative fair values.

The fair value of the MSR is determined based on market prices for the sale of similar assets using recent sales and purchases in the local or U.S. market and/or external valuations prepared by Cohane Rafferty. Based on current market conditions, MSRs on newly originated or

Confidential Treatment Requested by Doral Financial Corporation

| | **Servicing Assets Valuation** | Revised Date: 8/21/03<br>Approved by BOD:  4/23/03 |
|---|---|---|
| **DORAL FINANCIAL**<br>CORPORATION | **Policies and Procedures Manual** | **Page 5 of 6** |

purchased loans shall be capitalized using the following basis points of the principal balance of loans:

| | Internal Originations | Purchases |
|---|---|---|
| Loan Type | Basis Points | Basis Points |
| FHA/VA | 230 | 230 |
| Conforming | 175 | 170 |
| Non-Conforming | 150 | 140 |

The Chief Accounting Officer can only change the capitalization rates on newly created MSRs with the approval of the Treasurer.  The Treasurer is responsible for informing the Risk Management Committee when market conditions warrant changing the rates.  These changes shall be approved by the Risk Management Committee and shall be documented in the Committee minutes.  At the time the MSRs are recognized, the Chief Accounting Officer shall assign a useful life of the MSRs based upon the estimated life of the underlying pool of loans as a basis for amortizing the MSRs against earnings. Approval of the Risk Management Committee is needed to employ an amortization period in excess of 10 years, with such approval documented in the minutes of the Risk Management Committee meeting.

B.  I/Os

I/Os are capitalized based upon market factors that incorporates prepayment speeds and an initial estimate of the anticipated discounted future cash flow retained by the Company.  The market value is based on a multiple of the spread usually in the range of 3.75% to 5.50%.  The Risk Management Committee approves the values and the Treasurer is in charge of informing the Committee of the going rates for these assets. Approval of the Risk Management Committee is needed to employ an amortization period in excess of eight (8) years with such approval documented in the minutes of the Risk Management Committee.  The I/O is recorded as a trading security and is amortized based on its estimated useful life. That amortization is recorded as a reduction of the value of the I/O.

The primary valuation factors to be considered by the Chief Accounting Officer when valuing the I/Os are the discount rate and the prepayment speed/amortization.  Delinquency of loans and foreclosure losses are deemed immaterial for consideration based on the historically low amounts experienced by the Company in this area.

IV. PERIODIC VALUATIONS



| | **Servicing Assets Valuation** | Revised Date: 8/21/03<br>Approved by BOD:  4/23/03 |
|---|---|---|
| **DORAL FINANCIAL CORPORATION** | **Policies and Procedures Manual** | **Page 6 of 6** |

In order to ensure that the Company is appropriately valuing its MSRs and I/Os, the following quarterly revaluation procedures shall be performed. The Chief Accounting Officer and the Treasurer shall monitor the prepayment activities on a monthly basis to identify prepayment patterns indicative of early payoffs in excess of the scheduled amortization of the underlying assets. The Chief Accounting Officer shall value the I/Os on at least a quarterly basis, and more frequently when considered necessary.

A. MSRs

A pattern of excessive prepayments will result in a decline in value of the MSR that will be recorded through an impairment of the asset.  The Company shall obtain a quarterly valuation of the conforming servicing portfolio from a reputable and independent third party, such as Cohane Rafferty.  This valuation shall be used as a reference by the Treasurer and the Chief Accounting Officer to determine the internally derived market values of the conforming and nonconforming servicing portfolio.  The Chief Accounting Officer shall assess the impairment of the MSRs on a stratum-by-stratum basis with any impairment recognized through a valuation allowance as required by GAAP.  In determining impairment, servicing assets are stratified based on their predominant risk characteristics, which have been determined to be the types of loans (conventional, conforming and non-conforming) and interest rates. The amortized value of the MSRs will be compared to the external valuations by strata and shall be adjusted if the external valuation is lower.

Under certain circumstances it may be appropriate to record certain impairments of MSRs as permanent (i.e. non-recoverable).  On a annual basis within 45 days of the fiscal year end (commencing 12/31/03), the Chief Accounting Officer shall analyze each loan strata used to value MSRs and determine the correlation between actual prepayments and MSR values within each strata and the reserves allocated to that strata. Impairments determined to be permanent shall be charged off against the related strata. Impairments will be deemed permanent when actual prepayments exceed the estimated useful lives of the MSRs.

B. I/Os

On at least a quarterly basis, the Chief Accounting Officer shall determine the fair value of the I/O portfolio. Unless otherwise approved by the Risk Management Committee, the discounted cash flow calculation shall be based on a prepayment speed/useful life of not more than 8 years or not less than 12%.  For the purposes of the quarterly internal valuations, the discount rate shall be based on 300 basis points above the posted yields (priced at par) on FNMA 30 year fixed rate mortgage commitments for delivery within 30 days.  The Chief Accounting Officer shall maintain documentation (i.e., Wall Street Journal, Bloomberg, etc.) of the FNMA index

Confidential Treatment Requested by Doral Financial Corporation



| | **Servicing Assets Valuation** | **Revised Date: 8/21/03**<br>**Approved by BOD:  4/23/03** |
|---|---|---|
| **DORAL FINANCIAL**<br>CORPORATION | **Policies and Procedures Manual** | **Page 7 of 6** |

rate.  The discount rate shall not be below 9.0% without the prior approval of the Risk Management Committee.  The market conditions warranting a discount rate of below 9.0% shall be fully documented in the minutes of the Risk Management Committee meeting at which such action was considered. In order to verify and test the accuracy of the in-house value estimate, the Company shall also obtain two quarterly independent quotations or valuations of the I/O portfolio from a reputable broker-dealer or investment banker. The Company shall record the fair market value of the I/Os at the lower of the internal or either of the two external valuations.

## V.  INVESTMENT LIMITS

When done correctly and in a conservative manner, the sale and securitization of loans and the resultant creation of MSRs and I/Os are an efficient means of financial intermediation.  However, the potential pricing volatility warrants the imposition of certain limits on these assets.  Inasmuch as a strong capital base is the best protection against declines in values, the Company shall limit its holdings in MSRs and I/Os to the level where its regulatory capital levels will not fall below the Well Capitalized regulatory requirements.  In determining the limits on the amounts of MSRs and I/Os, the Board shall consider the market value volatility of these assets in different stress scenarios as noted in the Reporting Section below.

## VI. REPORTING

In order to ensure that the Board receives timely information relative to compliance with the investment limits set forth in this policy, the Chief Accounting Officer shall provide the Board and the Risk Management Committee with the following information on a quarterly basis:

<div align="center">

Quarter Ended<br>
_____, 20__<br>
($000s)

</div>

| | Adequately<br>Capitalized | Well<br>Capitalized |
|---|---|---|
| Tier 1 Capital Requirement<br>  Actual Excess Tier 1 Capital | | |
| Total Capital Requirement<br>  Actual Excess Total Capital | | |
| Leverage Capital Requirement<br>  Actual Excess Leverage Capital | | |

Confidential Treatment Requested by Doral Financial Corporation



| | **Servicing Assets Valuation** | Revised Date: 8/21/03<br>Approved by BOD:  4/23/03 |
|---|---|---|
| **DORAL FINANCIAL**<br>CORPORATION | **Policies and Procedures Manual** | **Page 8 of 6** |

On at least a quarterly basis, the Chief Accounting Officer shall prepare and provide a report to the Board of Directors and the Risk Management Committee that includes the following information with respect to both MSRs and I/Os:

- Total exposure vs. policy investment limits
- Valuation factors utilized vs. policy requirements
- Book value vs. third party valuations
- A stress schedule estimating changes in the fair value assuming interest rate shocks of 100, 200 and 300 basis points (excluding the benefits of hedging).

Additionally, at such time as when the Company's excess capital with respect to any of the pro-forma Well Capitalized regulatory capital requirements ("excess capital") falls below $50 million, the CEO shall immediately advise the Board of Directors and seek its approval to continue to invest in and/or create MSRs and I/Os. Should excess capital be further reduced to less than $25 million of any of the pro-forma Well Capitalized requirements, the CEO shall provide the Board with a plan showing how the Company will continue to meet all of the Well Capitalized regulatory capital requirements.

## VII. OVERSIGHT

<u>Chief Accounting Officer</u> - The Chief Accounting Officer shall be responsible for maintaining documentation at all times to justify the valuations being assigned.

<u>Risk Management Committee</u> – On a quarterly basis the Risk Management Committee shall review and ratify the assumptions (i.e. capitalization rates, discount rates, prepayment speeds and amortization period) used during the quarter for the initial and periodic valuations of MSRs and I/Os. As previously noted, the primary means utilized by the Risk Management Committee for monitoring and measuring the accuracy of the internally derived valuations will be through the ongoing comparison between the internally derived valuations and the quarterly third party valuations. Persistent and/or significant overvaluations shall result in the Risk Management Committee imposing revisions to the valuation assumptions to more closely resemble the external valuations. Such review and ratification shall be documented in the minutes of the Risk Management Committee.

<u>Board of Directors</u> – The Board shall monitor the valuation of these assets through the monthly reporting of servicing portfolio prepayments, monthly financial statements, the disclosures in the Forms 10-Q and 10-K, and the reports required by Section IV of this policy. The Board shall also review and approve this policy on an annual basis.

Confidential Treatment Requested by Doral Financial Corporation

GX 3522-1

UBS-S 27030

Writedown I/O.

We went up

$4\%$

Expecting 175   ( 225 - 375  on notes)

$3\frac{1}{2}$ LIBOR

Non confory loans  A - paper

higher WACC gong forward
due to sell out

GREAT QTY  a 5% rates ↑

WACC go up  on the
confory loans

303 290 4/70

O. Okusanya
**3522-1**

10189-UBS-02412

UBS-S 27031

(1) 97.9

95.4   / GAIN in Trading Activity

2.4

8M in deterioration in Comp
income        (OCI)

good
note        So no issues in 2005

(2) In 2005,

(all hedges) against any further
I/O writedowns by

① using fixed dollar option against
LIBOR.

new
notional
amount

on
short end
4B notional   } to 800 I/O        long GVD
amount
in short/end

(Against the loan
BALANCE  not I/O
BALANCE)

100 I/O

4B
Sell

800 I/O

1mm I/O

less gain

20

100 I/O

20

10189-UBS-02413

GX 3531-6

<u>Doral Financial</u>  2/3/2005  Sammy Levis
Next earnings release - will do investor conf call
Trading loss on IO has nothing to do with hedging
    Have IO resulting from selling nonconforming
but not subprime loans -- are low
balance (50K) loans. Nonconforming
    30% fixed   IO ⎫ backed by 8 B in of loans
    70% floating IO ⎭ avg life 7 years
Take  0.025% servicing fee
Interest only  spread between interest earned
and interest paid.
    selling fixed rate loans as floating rate - the
    IO
Have lot of caps on floating - so always maintain
    Spread of 200 bp. Have to hedge entire curve
Most adverse situation: inverted yield curve or
    flat yield curve with accelerating prepayment
If severe flattening, caps kick in
~~Tax benefit~~ extraordinary gain
    will have low tax rate as result

If the curve stays flat - have sold forward
    commitment, ~~backs would~~
$50K loans - 3 year loan to consolidate loan
16% of assets held in cash

<u>Parallel</u> to '98-'01  inverting yield curve
<u>Refi</u> = 56% of volume

Fid. 483
Confidential Treatment
Requested

<u>Banking</u> = growing well, New branches break even
    in 6-8 months. Have 40 branches - avg 60-70MM/branch
7% deposit market share. All state of art drive thru
Cost 1 MM  (vs 3 MM for W Holding luxurious branches)

*J. Tillinghast*
3531-6

<u>insurance</u> almost doubled last year
at now selling auto, credit protection, homeowner
is all fee income not insurance risk.

Fid. 484
Confidential Treatment
Requested

GX 6202



# UNITED STATES OF AMERICA

## SECURITIES AND EXCHANGE COMMISSION

# ATTESTATION

I HEREBY ATTEST

that:

*Attached is a copy of, annual report on Form 10-K, for the fiscal year ended*

*December 31, 2002, received in this Commission March 28, 2003, under the*

*name Doral Financial Corporation, File No. 1-31579, pursuant to the provisions*

*of the Securities Exchange Act of 1934.*

on file in this Commission

*March 23, 2010*
_____
(Date)

*Larry Mills*
*Records Officer*

It is hereby certified that the Secretary of the U.S. Securities and Exchange Commission, Washington, D.C., which Commission was created by the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.) is official custodian of the records and files of said Commission, and all records and files created or established by the Federal Trade Commission pursuant to the provisions of the Securities Act of 1933 and transferred to this Commission in accordance with Section 210 of the Securities Exchange Act of 1934, and was such official custodian at the time of executing the above attestation, and that he/she, and persons holding the positions of Deputy Secretary, Assistant Director, Records Officer, Branch Chief of Records Management, and the Program Analyst for the Records Officer, or any one of them, are authorized to execute the above attestation.

For the Commission

*Elizabeth M. Murphy*
_____
Secretary

SEC 334 (10/07)

**GOVERNMENT EXHIBIT**
**6202**
08 Cr. 181 (TPG)
**(ID)**

[page 31]

payable to investors may be either a fixed or floating rate. In the case of non-conforming loan pools, it is generally a floating rate based on a spread over the 90-day London Interbank Offered Rate ("LIBOR"). MSRs are classified as servicing assets and IOs are classified as trading securities on Doral Financial's Consolidated Statements of Financial Condition.

The determination of the fair values of MSRs and IOs at their initial recording and on an ongoing basis requires considerable management judgment. Unlike U.S. Treasury and agency mortgage-backed securities, the fair value of MSRs and IOs cannot be determined with precision because they are not traded in active securities markets. For MSRs, Doral Financial determines their initial fair values on the basis of prices paid for comparable mortgage servicing rights. Doral Financial also receives on a quarterly basis a third party valuation of its MSRs related to its FNMA, FHLMC and GNMA servicing portfolio. During 2002, the market prices used to value Doral Financial's MSRs varied from 1.40% to 2.30% of the principal amount of the loans subject to the servicing rights, with servicing rights for GNMA (FHA/VA loans) mortgage-backed securities having higher values than comparable servicing rights for conventional loans. For 2001, the market prices used varied from 1.50% to 2.30%. The unamortized balance of Doral Financial's servicing asset reflected on Doral Financial's Consolidated Financial Statements as of December 31, 2002, 2001 and 2000 was $159.9 million, $154.3 million and $139.8 million, respectively. These amounts do not include the fair value of servicing rights with respect to approximately $488.2 million in loans internally originated prior to 1995, which under prior accounting rules are not reflected in Doral Financial's Consolidated Financial Statements.

To determine the fair value of its IOs, Doral Financial obtains dealer quotes for comparable instruments and uses external and internal valuations based on discounted cash flow models that incorporate assumptions regarding discount rates and mortgage prepayment rates. Doral Financial generally uses the lowest valuation obtained from these methods. While Doral Financial has consistently sold some IOs in private sales, currently there is no liquid market for the purchase and sale of IOs. Doral Financial recognized IOs with recorded fair values of $197.9 million, $141.4 million and $72.7 million for the years ended December 31, 2002, 2001 and 2000, respectively. As of December 31, 2002, 2001 and 2000, the carrying value of IOs reflected in the Consolidated Financial Statements was $359.2 million, $236.5 million and $158.0 million, respectively.

AMORTIZATION AND IMPAIRMENT OF MSRs AND VALUATION OF IOs

The value of Doral Financial's MSRs and IOs is very sensitive to interest rate changes. Once recorded, Doral Financial periodically evaluates its MSRs for impairment. Impairment is defined generally as a reduction in current fair value below carrying value. If the MSRs are impaired, the impairment is recognized in current period earnings. Prior to July 1, 2002, Doral Financial recorded impairment charges as a direct write down of servicing assets. Effective July 1, 2002, Doral Financial records impairment of MSRs through a valuation allowance. The valuation allowance is adjusted to reflect the amount, if any, by which the cost basis of MSRs exceeds their fair value. If the value of MSRs subsequently increases, the valuation allowance is decreased through a credit to current period earnings. As of December 31, 2002, the impairment allowance for MSRs was $9.2 million. As discussed above, changes in the fair value of IOs are recognized in current earnings as a component of trading activities.

MSRs are also subject to periodic amortization. The amortization of MSRs is based on the amount and timing of estimated cash flows to be recovered with respect to the MSRs over their expected lives. To the extent changes in interest rates or prepayment rates warrant, Doral Financial will increase or decrease the level of amortization. Amortization of MSRs is recorded as a reduction of servicing income.

For impairment and valuation purposes, Doral Financial continues to monitor changes in interest rates to determine whether the assumptions used to value the MSRs and IOs are still appropriate in light of market conditions. It also attempts to corroborate the values assigned to these assets through the use of internal valuation models that incorporate assumptions regarding the direction of interest rates and mortgage prepayment rates. The reasonableness of management's assumptions is corroborated through valuations performed by independent third parties on a quarterly basis. In the case of MSRs, Doral Financial stratifies the mortgage loans underlying a mortgage pool or mortgage-backed security on the basis of their predominant risk characteristics, which Doral Financial has determined to be type of loan (conventional, conforming and non-conforming) and interest rates.