Substantially all of the mortgage loans in Doral Financial's servicing portfolio are secured by single (one-to-four) family residences located in Puerto Rico. At December 31, 2004 and 2003, less than 2% (4% at December 31, 2002) of Doral Financial's mortgage-servicing portfolio was related to mortgages secured by real property located on the U.S. mainland.

The amount of principal prepayments on mortgage loans serviced by Doral Financial was $2.3 billion, $2.4 billion and $1.7 billion for the years ended December 31, 2004, 2003 and 2002, respectively. Doral Financial reduces the sensitivity of its servicing income to increases in prepayment rates through a strong retail origination network that has permitted Doral Financial to increase the size of its servicing portfolio even during periods of declining interest rates and high prepayments.

## Mortgage Loans Held for Sale

Substantially all of the residential mortgage loans originated by Doral Financial mortgage banking units are classified as held for sale because Doral Financial intends to sell these loans in the ordinary course of its mortgage banking and banking business. Mortgage loans held for sale are carried on Doral Financial's Consolidated Statements of Financial Condition at the lower of net cost or market value on an aggregate portfolio basis. Market values are determined by reference to market prices for comparable mortgage loans. The amount by which costs exceed market value, if any, is accounted for as a loss during the period in which the change in valuation occurs. As of December 31, 2004, Doral Financial owned approximately $1.6 billion in mortgage loans held for sale, of which approximately $1.3 billion consisted of residential mortgage loans. Given traditional consumer preferences in Puerto Rico, substantially all of Doral Financial's residential mortgage loans held for sale are fixed-rate loans. Note 9 to Doral Financial's

Consolidated Financial Statements contains additional information with respect to Doral Financial's portfolio of mortgage loans held for sale.

## Loans Receivable

Doral Financial originates mortgage loans secured by income-producing residential and commercial properties, construction loans, land loans, certain residential mortgage loans originated through Doral Bank-PR and other commercial and consumer loans that are held for investment and classified as loans receivable. During 2004, the Company experienced significant increases in its commercial loan activity. Secured commercial loan production increased 124% from $96 million in 2003 to $215 million in 2004. Also during 2004, the Company entered into the auto and equipment finance leasing business through Doral Leasing, a division of Doral Bank-PR. A significant portion of Doral Financial's loans receivable represent loans made to entities or individuals located in Puerto Rico.

The maximum aggregate amount in unsecured loans that Doral Bank-PR could make to a single borrower under Puerto Rico banking regulations as of December 31, 2004, was approximately $59.8 million. Puerto Rico banking regulations permit larger loans to a single borrower to the extent secured by qualifying collateral. The maximum aggregate amount in loans that Doral Bank-NY could make to a single borrower under the Office of Thrift Supervision ("OTS") banking regulations as of December 31, 2004, was $7.2 million. Doral Financial's largest aggregate authorized indebtedness to a single borrower or group of related borrowers as of December 31, 2004, was $73.9 million, and consists principally of secured construction loans for residential housing projects.

The following table sets forth certain information regarding Doral Financial's loans receivable:

## Table K – Loans Receivable, Net

|  | As of December 31, | | | | |
|---|---|---|---|---|---|
| (In thousands) | 2004 | 2003 | 2002 | 2001 | 2000 |
| Construction loans | $ 629,913 | $ 603,909 | $ 465,020 | $ 358,659 | $ 203,259 |
| Residential mortgage loans | 609,148 | 529,147 | 282,059 | 63,546 | 74,862 |
| Commercial – secured by real estate | 368,699 | 152,016 | 138,270 | 123,414 | 66,064 |
| Consumer – secured by real estate | 320 | 375 | 821 | 870 | 2,107 |
| Consumer – other | 70,579 | 66,516 | 62,279 | 39,109 | 16,652 |
| Lease financing receivable | 7,488 | – | – | | |
| Commercial non-real estate | 36,848 | 22,006 | 13,291 | 16,874 | 4,790 |
| Loans on savings deposits | 9,354 | 8,769 | 8,720 | 10,523 | 10,836 |
| Land secured | 51,853 | 65,818 | 79,996 | 46,602 | 26,935 |
| Loans receivable, gross | 1,784,202 | 1,448,556 | 1,050,456 | 659,597 | 405,505 |
| Less: | | | | | |
| Unearned interest and deferred loan fees, net | (10,966) | (17,998) | (18,132) | (9,484) | (2,476) |
| Allowance for loan losses[1] | (20,746) | (19,709) | (9,982) | (6,000) | (4,838) |
|  | (31,712) | (37,707) | (28,114) | (15,484) | (7,314) |
| Loans receivable, net | $ 1,752,490 | $ 1,410,849 | $ 1,022,342 | $ 644,113 | $ 398,191 |

(1)  Does not include $7.7 million, $8.5 million, $8.26 million, $6.5 million and $4.5 million of allowance for loan losses allocated to mortgage loans held for sale as of December 31, 2004, 2003, 2002, 2001 and 2000, respectively.

The following table sets forth certain information as of December 31, 2004, regarding the dollar amount of Doral Financial's loans receivable portfolio based on the remaining contractual maturity. Expected maturities may differ from contractual maturities because of prepayments and other market factors. Loans having no stated schedule of repayments and no stated maturity are reported as due in one year or less.

## Table L – Loans Receivable by Contractual Maturities

|  | As of December 31, 2004 | | | |
|---|---|---|---|---|
| (In thousands) | 1 Year or Less | 1 to 5 Years | Over 5 Years | Total |
| Construction loans | $ 387,963 | $ 238,877 | $ 3,073 | $ 629,913 |
| Residential mortgage loans | 2,892 | 35,001 | 571,255 | 609,148 |
| Commercial – secured by real estate | 105,568 | 207,991 | 55,140 | 368,699 |
| Consumer – secured by real estate | 24 | 158 | 138 | 320 |
| Consumer – other | 42,028 | 28,272 | 279 | 70,579 |
| Lease financing receivable | 101 | 4,729 | 2,658 | 7,488 |
| Commercial non-real estate | 30,557 | 4,652 | 1,639 | 36,848 |
| Loans on savings deposits | 3,734 | 5,572 | 48 | 9,354 |
| Land secured | 8,806 | 35,100 | 7,947 | 51,853 |
| Loans receivable, gross | $ 581,673 | $ 560,352 | $ 642,177 | $ 1,784,202 |

Scheduled contractual amortization of loans receivable does not reflect the expected life of Doral Financial's loans receivable portfolio. The average life of these loans is substantially less than their contractual terms because of prepayments and, with respect to conventional mortgage loans, due-on-sale clauses, which give Doral Financial the right to declare a conventional mortgage loan immediately due and payable in the event, among other things, that the borrower sells the real property subject to the mortgage and the loan is not repaid. The average life of mortgage loans tends to increase when current mortgage loan rates are higher than rates on existing mortgage loans and, conversely, decrease when

current mortgage loan rates are lower than rates on existing mortgage loans. Under the latter circumstance, the weighted-average yield on loans decreases as higher-yielding loans are repaid or refinanced at lower rates.

The following table sets forth the dollar amount of total loans receivable at December 31, 2004, as shown in the preceding table, which have fixed interest rates or which have floating or adjustable interest rates.

## Table M – Loans Receivable by Fixed and Floating or Adjustable Rates

| (In thousands) | 1 Year or Less | Due After One Year Fixed-rate | Floating or Adjustable-Rate | Total |
|---|---|---|---|---|
| Construction loans | $ 387,963 | $ 22,902 | $ 219,048 | $ 629,913 |
| Residential mortgage loans | 2,892 | 406,113 | 200,143 | 609,148 |
| Commercial – secured by real estate | 105,568 | 225,560 | 37,571 | 368,699 |
| Consumer – secured by real estate | 24 | 296 | -- | 320 |
| Consumer – other | 42,028 | 28,447 | 104 | 70,579 |
| Lease financing receivable | 101 | 7,387 | – | 7,488 |
| Commercial non-real estate | 30,557 | 4,895 | 1,396 | 36,848 |
| Loans on savings deposits | 3,734 | 5,620 | – | 9,354 |
| Land secured | 8,806 | 9,982 | 33,065 | 51,853 |
| Loans receivable, gross | $ 581,673 | $ 711,202 | $ 491,327 | $ 1,784,202 |

Doral Financial originates floating or adjustable and fixed-interest rate loans. Unlike its portfolio of residential mortgage loans held for sale, a significant portion of Doral Financial's construction, land, and other commercial loans classified as loans receivable carry adjustable rates. At December 31, 2004, 2003 and 2002, approximately 52%, 40% and 52%, respectively, of Doral Financial's gross loans receivable were adjustable rate loans. The increase in proportion of adjustable rate loans for 2004, compared to 2003, was due to the purchase of a $200.1 million adjustable-rate residential mortgage loan pool from a local financial institution. The Company is entitled to interest on the loans underlying the mortgage pool based on a floating rate, over the applicable 3-month LIBOR, adjusted on a quarterly basis subject to a cap. In a separate transaction the Company sold $200.0 million of first and second residential mortgage loans and commercial loans to the same local financial institution. A gain of $24.8 million was recognized during 2004 as a result of said sale. The decrease in proportion of adjustable rate loans for 2003 is due to the reclassification of approximately $212.0 million in fixed-rate, non-conforming residential mortgage loans by Doral Bank-PR from mortgage loans held for sale to loans receivable in 2002. Loans with similar characteristics originated during 2003 and 2004 by Doral Financial's banking units were classified as loans receivable. The adjustable rate construction, commercial and land loans have interest rate adjustment limitations and are generally tied to the prime rate, and often provide for a maximum and minimum rate beyond which the applicable interest rate will not fluctu-

ate. Future market factors may affect the correlation of the interest rate adjustment with the rate Doral Financial pays on the different funding sources used to finance these loans. Substantially all construction, commercial and land loans held by Doral Financial are adjustable rate loans maturing, generally within 10 to 70 months. Note 10 to Doral Financial's Consolidated Financial Statements contains additional information with respect to Doral Financial's portfolio of loans receivable.

### Credit Risks Related to Loan Activities

With respect to mortgage loans originated for sale as part of Doral Financial's mortgage banking business, Doral Financial is generally at risk for any mortgage loan default from the time it originates the mortgage loan until the time it sells the loan or packages it into a mortgage-backed security. With respect to FHA loans, Doral Financial is fully insured as to principal by the FHA against foreclosure loss. VA loans are guaranteed within a range of 25% to 50% of the principal amount of the loan subject to a maximum, ranging from $22,500 to $50,750 in addition to the mortgage collateral. Loan-to-value ratios for residential mortgage loans generally do not exceed 80% (85% for certain qualifying home purchase transactions through Doral Bank-PR) unless private mortgage insurance is obtained.

In the ordinary course of business, Doral Financial sells some loans on a full or partial recourse basis. When the Company sells a loan with recourse, it commits, if the loan defaults, to

make payments to remedy the default or to repurchase the defaulted loan. See "Off-Balance Sheet Activities" for more information regarding recourse obligations.

Doral Financial is also subject to credit risk with respect to its portfolio of loans receivable. Loans receivable represents loans that Doral Financial holds for investment and, therefore, Doral Financial is at risk for the term of the loan. Loans secured by income-producing residential and commercial properties involve greater credit risk because they are larger in size and more risk is concentrated in a single borrower. The properties securing these loans are also more difficult to dispose of in case of foreclosure.

Doral Financial manages credit risk by maintaining sound underwriting standards, monitoring the quality of the loan portfolio, assessing reserves and loan concentrations, recruiting qualified credit officers, implementing and monitoring lending policies and collateral requirements, maintaining appropriate collection procedures, and procedures to ensure appropriate actions to comply with laws and regulations. Underwriting guidelines facilitate the uniform application of underwriting standards to all borrowers regardless of race, religion or ethnic background and also provide means for measuring credit risk. The Company's conventional conforming and government underwriting guidelines comply with the guidelines established by Fannie Mae and Freddie Mac and in the case of FHA-insured and VA-guaranteed mortgage loans, comply with guidelines established by the U.S. Department of Housing and Urban Development and the Veterans Administration. Borrower quality includes consideration of the borrower's credit and capacity to pay, mainly assessed through the use of credit reports. Doral Financial's collateral requirements for loans depend on the financial strength of the borrower and the type of loan involved. Collateral quality includes consideration of property value, condition and marketability. Acceptable collateral principally includes cash, deposit and investment accounts and real estate, and, to a lesser extent, liens on accounts receivable, leases receivable, inventory and personal property. In the case of non-conforming loans sold subject to recourse, Doral Financial also generally requires lower loan-to-value ratios to protect itself from possible losses on foreclosure.

Because most of Doral Financial's loans are made to borrowers located in Puerto Rico and secured by properties located in Puerto Rico, Doral Financial is subject to greater credit risks tied to adverse economic, political or business develop-

ments and natural hazards, such as hurricanes, that may affect Puerto Rico. For example, if Puerto Rico's real estate market were to experience an overall decline in property values, the Company's rates of loss on foreclosures would probably increase.

## Non-performing Assets and Allowance for Loan Losses

Non-performing assets ("NPAs") consist of loans past due 90 days and still accruing, loans on a non-accrual basis and other real estate owned. Conventional mortgage loans held for sale by Doral Financial's mortgage banking units are placed on a non-accrual basis after they have been delinquent for more than 180 days to the extent concern exists as to ultimate collectibility based on the loan-to-value ratio. When the loan is placed on non-accrual, all accrued but unpaid interest to date is reversed. Doral Financial believes that its non-accrual policy for mortgage loans held for sale in its mortgage banking units is reasonable because these loans are adequately secured by real estate, generally have low loan-to-value ratios, and the amounts due on the delinquent loans have historically been recovered through the sale of the property after foreclosure or negotiated settlements with borrowers. Doral Financial's banking subsidiaries place all loans more than 90 days past due on a non-accrual basis, at which point all unpaid interest previously accrued is reversed. For such banking subsidiaries, interest income is recognized when the borrower makes a payment, and the loan will return to an accrual basis when it is no longer more than 90 days delinquent and collectibility is reasonably assured. As of December 31, 2004, 2003, 2002, 2001, and 2000, Doral Financial would have recognized $4.7 million, $7.5 million, $5.8 million, $2.0 million, and $911,000, respectively, in additional interest income had all delinquent loans been accounted for on an accrual basis.

The decrease in non-performing loans in the mortgage banking business from 2003 to 2004 is due in part to the sale of $67.0 million of delinquent conventional residential mortgage loans during 2004. See "Liquidity and Capital Resources." The increase in non-performing loans in the banking sector is principally due to a $13.5 million construction loan that was designated a non-performing loan during 2004.

The following table sets forth information with respect to Doral Financial's non-accrual loans, other real estate-owned ("OREO") and other non-performing assets as of the dates indicated. Doral Financial did not have any troubled debt restructuring as of any of the years presented.

**Table N – Non-performing Assets**

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| (Dollars in thousands) | 2004 | 2003 | 2002 | 2001 | 2000 |
| **Mortgage banking business:** | | | | | |
| Non-accrual loans: | | | | | |
| Construction loans | $ 1,865 | $ 2,901 | $ 497 | $ 705 | $ 1,155 |
| Residential mortgage loans[1] | 9,540 | 20,818 | 17,153 | 3,742 | — |
| Construction loans past due 90 days and still accruing | 128 | — | 2,413 | — | — |
| Loans held for sale past due 90 days and still accruing[2] | 55,894 | 62,270 | 60,054 | 55,966 | 53,288 |
| OREO | 18,028 | 18,176 | 12,375 | 7,924 | 5,936 |
| Total NPAs of mortgage banking business | 85,455 | 104,165 | 92,492 | 68,337 | 60,379 |
| **Other lending activities through banking subsidiaries:** | | | | | |
| Non-accrual loans: | | | | | |
| Construction loans | 14,774 | 1,503 | 638 | 1,184 | 1,029 |
| Residential mortgage loans | 8,105 | 11,664 | 8,746 | 5,276 | 4,965 |
| Commercial real estate loans | 8,535 | 5,166 | 5,152 | 1,651 | 1,513 |
| Consumer loans | 1,457 | 1,681 | 1,152 | 463 | 312 |
| Commercial non-real estate loans | 512 | 586 | 676 | 418 | 178 |
| Land loans | — | — | — | 70 | — |
| Total non-accrual loans | 33,383 | 20,600 | 16,364 | 9,062 | 7,997 |
| OREO | 2,044 | 1,077 | 682 | 490 | 322 |
| Total NPAs of banking subsidiaries | 35,427 | 21,677 | 17,046 | 9,552 | 8,319 |
| Total NPAs of Doral Financial (consolidated) | $ 120,882 | $ 125,842 | $ 109,538 | $ 77,889 | $ 68,698 |
| Total NPAs of banking subsidiaries as a percentage of their loan portfolios, net and OREO | 1.24% | 0.76% | 0.62% | 0.44% | 0.65% |
| Total NPAs of Doral Financial as a percentage of consolidated total assets | 0.80% | 1.21% | 1.30% | 1.16% | 1.26% |
| Total non-performing loans to total loans | 3.02% | 3.13% | 2.99% | 3.56% | 3.56% |
| Ratio of allowance for loan losses to total non-performing loans at end of year (consolidated) | 28.17% | 26.47% | 18.91% | 17.95% | 15.03% |

(1) During the second quarter of 2002, the Company adopted a new policy in which mortgage loans held for sale by its mortgage banking units are placed on a non-accrual basis after they are delinquent for more than 180 days to the extent that the loan-to-value ratio indicates that there is a concern as to ultimate collectibility of the loan. From the beginning of 2001 until the second quarter of 2002, mortgage loans held for sale by Doral Financial's mortgage banking units were placed on a non-accrual basis if they had been delinquent for over a year and if the loan-to-value ratio indicated concern as to ultimate collectibility of the loan. Prior to 2001, Doral Financial did not place mortgage loans held for sale in its mortgage banking units on a non-accrual basis following default.

(2) Does not include approximately $10.1 million, $10.4 million, $13.4 million, $12.7 million and $26.5 million of 90 days past due FHA/VA loans as of December 31, 2004, 2003, 2002, 2001, and 2000, respectively, which are not considered non-performing assets by Doral Financial because the principal balance of these loans is insured or guaranteed under applicable FHA and VA programs and interest is, in most cases, fully recovered in foreclosure proceedings.

Doral Financial believes that the value of the OREO reflected on its Consolidated Statements of Financial Condition represents a reasonable estimate of the properties' fair values, net of disposition costs. During the fourth quarter of 2004, the Company decided that is not necessary to maintain a separate allowance for OREO, since the balance of such allowance represented the adjustment required to record the properties at the lower of cost or fair value,

net of disposition cost. The fair value of the OREO is normally determined on the basis of internal appraisals and physical inspections.

The following table summarizes certain information regarding Doral Financial's allowance for loan losses for both Doral Financial's banking and mortgage banking businesses for the years indicated.

## Table O – Allowance for Loan Losses

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| (Dollars in thousands) | 2004 | 2003 | 2002 | 2001 | 2000 |
| Allowance for loan losses:[1] | | | | | |
| Balance at beginning of year | $ 28,211 | $ 18,243 | $ 12,472 | $ 9,387 | $ 6,136 |
| Provision for loan losses | 5,507 | 14,085 | 7,429 | 4,445 | 4,078 |
| | | | | | |
| Charge-offs: | | | | | |
| Mortgage loans held for sale | (1,459) | (426) | (103) | (584) | (201) |
| Construction loans | (831) | (699) | – | – | – |
| Residential mortgage loans | (20) | (13) | – | – | (24) |
| Commercial real estate loans | – | – | – | – | – |
| Consumer loans | (2,521) | (2,956) | (1,500) | (694) | (529) |
| Commercial non-real estate loans | (723) | (417) | (103) | (91) | (239) |
| Other | – | – | (116) | (42) | (122) |
| Total charge-offs | (5,554) | (4,511) | (1,822) | (1,411) | (1,115) |
| | | | | | |
| Recoveries: | | | | | |
| Mortgage loans held for sale | 89 | – | – | – | 14 |
| Construction loans | 100 | 2 | – | – | – |
| Residential mortgage loans | – | – | 14 | – | 103 |
| Commercial real estate loans | – | – | 1 | – | – |
| Consumer loans | 202 | 234 | 155 | 161 | 115 |
| Commercial non-real estate loans | 45 | 8 | 15 | 37 | 50 |
| Other | – | – | 11 | – | 6 |
| Total recoveries | 436 | 244 | 196 | 198 | 288 |
| Net charge-offs | (5,118) | (4,267) | (1,626) | (1,213) | (827) |
| Other adjustments | (199) | 150 | (32) | (147) | – |
| Balance at end of year | $ 28,401 | $ 28,211 | $ 18,243 | $ 12,472 | $ 9,387 |
| | | | | | |
| Allowance for loan losses as a percentage of total loans | | | | | |
| outstanding, including loans held for sale, at the end of year | 0.85% | 0.83% | 0.57% | 0.48% | 0.54% |
| | | | | | |
| Net charge-offs to average loans outstanding | 0.15% | 0.13% | 0.06% | 0.06% | 0.05% |

(1)  Includes the allowance of mortgage loans held for sale of $7.7 million, $8.5 million, $8.26 million, $6.5 million and $4.5 million as of December 31, 2004, 2003, 2002, 2001 and 2000, respectively, and the allowance for loans receivable held for investment of $20.7 million, $19.7 million, $9.98 million, $6.0 million and $4.8 million as of December 31, 2004, 2003, 2002, 2001 and 2000, respectively.

The following table sets forth information concerning the allocation of Doral Financial's allowance for loan losses by loan category and the percentage of loans in each category to total loans as of the dates indicated:

### Table P – Allocation of Allowance for Loan Losses

| | As of December 31, | | | | | | | | | |
| | 2004 | | 2003 | | 2002 | | 2001 | | 2000 | |
| (Dollars in thousands) | Amount | Percent | Amount | Percent | Amount | Percent | Amount | Percent | Amount | Percent |
|---|---|---|---|---|---|---|---|---|---|---|
| Mortgage loans held for sale | $ 7,655 | 47% | $ 8,502 | 58% | $ 8,261 | 68% | $ 6,472 | 75% | $ 4,549 | 77% |
| Loans receivable: | | | | | | | | | | |
| Construction | 12,371 | 19% | 8,027 | 18% | 2,837 | 14% | 3,305 | 14% | 2,617 | 11% |
| Residential mortgage loans | 974 | 18% | 6,316 | 15% | 2,184 | 9% | 569 | 2% | 822 | 4% |
| Commercial – secured by real estate | 4,048 | 11% | 1,806 | 4% | 2,279 | 4% | 1,105 | 5% | 725 | 4% |
| Consumer – secured by mortgage | 50 | 0% | 12 | 0% | 2 | 0% | 8 | 0% | 23 | 0% |
| Consumer – other | 1,973 | 2% | 1,810 | 2% | 2,570 | 2% | 350 | 1% | 183 | 1% |
| Lease financing receivable | 150 | 0% | – | 0% | – | 0% | – | 0% | – | 0% |
| Commercial non-real estate | 599 | 1% | 411 | 1% | 98 | 0% | 151 | 1% | 53 | 0% |
| Loans on savings deposits | – | 0% | 236 | 0% | 12 | 0% | 94 | 0% | 119 | 1% |
| Land secured | 581 | 2% | 1,091 | 2% | – | 3% | 418 | 2% | 296 | 2% |
| Total | $ 28,401 | 100% | $ 28,211 | 100% | $ 18,243 | 100% | $ 12,472 | 100% | $ 9,387 | 100% |

The allowance for loan losses relating to loans held by Doral Financial was $28.4 million at December 31, 2004, compared to $28.2 million at December 31, 2003, and $18.2 million as of December 31, 2002. After a significant increase in the allowance during 2003 principally related to a larger construction loan portfolio that carries greater credit risk, the Company determined based on an analysis of the credit quality, composition of its loan portfolio, and loan loss experience, that a smaller provision was required to maintain its level of loan loss reserves at an appropriate level.

The percentage of the allowance for loan losses to nonperforming loans will not remain constant due to the nature of Doral Financial's portfolio of loans that are primarily collateralized by real estate. The collateral for each non-performing mortgage loan is analyzed to determine potential loss exposure, and, in conjunction with other factors, this loss exposure contributes to the overall assessment of the adequacy of the allowance for loan losses. On an ongoing basis, management monitors the loan portfolio and evaluates the adequacy of the allowance for loan losses. In determining the adequacy of the allowance for loan losses, management considers such factors as historical loan loss experience, known problem loans, evaluations made by bank regulatory authorities, assessment of economic conditions, and other appropriate data to identify the risks in the loan portfolio. Residential mortgage loans and consumer loans are generally evaluated as a group of homogeneous loans, while past due construction and commercial loans are evaluated for impairment individually, generally based on the fair val-

ues of the collateral. Loans deemed by management to be uncollectible are charged to the allowance for loan losses. Recoveries on loans previously charged-off are credited to the allowance. Provisions for loan losses are charged to expense and credited to the allowance in amounts deemed appropriate by management based upon its evaluation of the known and inherent risks in the loan portfolio. While management believes that the current allowance for loan losses is sufficient, future additions to the allowance may be necessary if economic conditions change substantially from the expectations used by Doral Financial in determining the allowance for loan losses.

## Investment and Trading Activities

As part of its mortgage securitization activities, Doral Financial is involved in the purchase and sale of mortgage-backed securities. Doral Financial also engages in purchases and sales of whole loans and securities primarily through its international banking entity subsidiary. At December 31, 2004, Doral Financial held securities for trading with a fair market value of $1.2 billion, approximately $266.4 million of which consisted of Puerto Rico tax-exempt GNMA securities. These tax-exempt securities are generally held by Doral Financial for longer periods prior to sale in order to maximize the tax-exempt interest received thereon. Securities held for trading are reflected on Doral Financial's Consolidated Financial Statements at their fair market value with resulting gains or losses included in current period earnings as part of net gain (loss) on securities held for trading. The fair values of Doral Financial's tax-exempt GNMA securities are based

on quotations obtained from local broker-dealers. Refer to "Critical Accounting Policies – Valuation of Trading Securities and Derivatives" for additional information on how Doral Financial determines the fair values of its trading securities.

As part of its strategy to diversify its revenue sources and maximize net interest income, Doral Financial also invests in securities that are classified as available for sale or held to maturity. As of December 31, 2004, Doral Financial held $5.0 billion of investment securities that were classified as available for sale and reported at fair value based on quoted market prices, with unrealized gains or losses included in stockholders'

equity and reported as "Accumulated other comprehensive income (loss), net of income tax" in Doral Financial's Consolidated Financial Statements. At December 31, 2004, Doral Financial had unrealized losses in other comprehensive income (loss) of $79.9 million, compared to unrealized losses of $58.9 million at December 31, 2003. As of December 31, 2004, Doral Financial held approximately $2.3 billion in securities that are classified as held to maturity and reported at amortized cost.

The following table summarizes Doral Financial's securities holdings as of December 31, 2004.

## Table Q – Investment Securities

| (In thousands) | Held for Trading | Available for Sale | Held to Maturity | Total Investment Securities |
|---|---|---|---|---|
| Mortgage-backed securities | $ 339,939 | $ 3,325,267 | $ 470,169 | $ 4,135,375 |
| Interest-only strips | 878,732 | – | – | 878,732 |
| U.S. Treasury and agency securities | 5,025 | 1,657,241 | 1,824,056 | 3,486,322 |
| Puerto Rico government obligations | 5,444 | – | 19,135 | 24,579 |
| Other | 14,403 | – | 3,420 | 17,823 |
| Total | $ 1,243,543 | $ 4,982,508 | $ 2,316,780 | $ 8,542,831 |

For additional information regarding the composition of Doral Financial's investment securities, please refer to Notes 5, 6 and 7 of Doral Financial's Consolidated Financial Statements.

### Liquidity and Capital Resources

Doral Financial has an ongoing need for capital to finance its lending, servicing and investing activities. This need is expected to increase as the volume of its loan originations and investing activity increases. Doral Financial's cash requirements arise mainly from loan originations and purchases, purchases and holding of securities, repayments of debt upon maturity, payments of operating and interest expenses, servicing advances and loan repurchases pursuant to recourse or warranty obligations.

Servicing agreements relating to the mortgage-backed securities programs of FNMA, FHLMC and GNMA, and to mortgage loans sold to certain other investors, require Doral Financial to advance funds to make scheduled payments of principal, interest, taxes and insurance, if such payments have not been received from the borrowers. While Doral Financial generally recovers funds advanced pursuant to these arrangements within 30 days, it must absorb the cost of the funds it advances during the time the advance is outstanding. At December 31, 2004 and 2003, advances to investors were $36.3 million and $29.5 million, respectively. During

the years ended December 31, 2004 and 2003, the monthly average amount of funds advanced by Doral Financial under such servicing agreements was approximately $31.5 million and $25.0 million, respectively. To the extent the mortgage loans underlying Doral Financial's servicing portfolio experience increased delinquencies, Doral Financial would be required to dedicate additional cash resources to comply with its obligation to advance funds as well as incur additional administrative costs related to increases in collection efforts. In recent years, Doral Financial has sold pools of delinquent FHA and VA and conventional mortgage loans. Under these arrangements, as under most servicing requirements, Doral Financial is required to advance the scheduled payments whether or not collected from the underlying borrower. While Doral Financial expects to recover the amounts advanced through foreclosure or, in the case of FHA/VA loans, under the applicable FHA and VA insurance and guarantee programs, the amounts advanced tend to be greater than normal arrangements because of the delinquent status of the loans. As of December 31, 2004, and 2003, the outstanding principal balance of such delinquent loans was $333.7 million and $261.4 million, respectively, and the aggregate monthly average amount of funds advanced by Doral Financial was $26.1 million and $19.8 million, respectively. During the year ended December 31, 2004, the Company sold approximately $44.4 million of residential

FHA-insured or VA-guaranteed delinquent loans and $67.0 million of conventional residential mortgage loans to third parties. During the year ended December 31, 2003, Doral Financial sold approximately $134.7 million of residential FHA-insured or VA-guaranteed delinquent loans.

When Doral Financial sells mortgage loans to third parties it generally makes customary representations and warranties regarding the characteristics of the loans sold. To the extent Doral Financial breaches any of these warranties, investors are generally entitled to obligate Doral Financial to repurchase the loan subject of the breach.

In addition to its servicing and warranty obligations, Doral Financial's loan sale activities include the sale of some non-conforming mortgage loans subject to recourse arrangements that generally obligate Doral Financial to repurchase or substitute the loans if the loans are 90 days or more past due or otherwise in default. To the extent the delinquency ratios of the loans sold subject to recourse are greater than antici-

pated, and Doral Financial is required to repurchase more loans than anticipated, Doral Financial's liquidity requirements would increase. See "Off-Balance Sheet Activities" for additional information on these arrangements.

Doral Financial's primary sources of liquidity are loan sales in the secondary mortgage market, deposits, advances from the FHLB-NY, short-term borrowings under warehouse, gestation and repurchase agreement lines of credit secured by pledges of its loans and mortgage-backed securities and unsecured debt obligations. Other sources of liquidity include proceeds from privately placed and publicly offered debt and equity financings in the capital markets.

The table below shows Doral Financial's sources of borrowings and the related average interest rate as of December 31, 2004, and 2003. Refer to Notes 17 and 19 to Doral Financial's Consolidated Financial Statements for additional information regarding Doral Financial's repurchase agreements and warehouse lines of credit.

## Table R – Sources of Borrowings

|  | As of December 31, | | | |
|  | 2004 | | 2003 | |
| (Dollars in thousands) | Outstanding Balance | Average Rate | Outstanding Balance | Average Rate |
|---|---|---|---|---|
| Deposits | $ 3,643,080 | 2.47% | $ 2,971,272 | 2.38% |
| Repurchase agreements | 6,305,163 | 2.73% | 3,602,942 | 2.46% |
| Advances from the FHLB | 1,294,500 | 3.98% | 1,206,500 | 3.89% |
| Loans payable | 279,560 | 3.17% | 178,334 | 2.12% |
| Notes payable | 1,105,202 | 4.41% | 602,581 | 7.76% |

As of December 31, 2004, Doral Financial had warehousing, gestation and repurchase agreement lines of credit (including advances from the FHLB-NY) totaling $14.8 billion of which $7.9 billion was outstanding under these facilities at year end. Of the aggregate amount of funding available under Doral Financial's warehousing and repurchase lines of credit, approximately $4.9 billion represented committed facilities under which the lender is committed to advance funds subject to compliance with various conditions. The remaining funding was available under uncommitted lines pursuant to which advances are made at the discretion of the lender. Doral Financial's committed lines of credit generally require Doral Financial to comply with various financial covenants and ratios. Failure to comply with any of these covenants permits the lender to require immediate repayment of all amounts previously advanced and to stop making further advances to Doral Financial. As of December 31, 2004, Doral Financial was in compliance with all such financial covenants and ratios.

Doral Financial's investment grade credit ratings on its debt securities allow it to obtain liquidity in the capital markets through public and private offerings of its debt securities. For example, on June 7, 2004, Doral Financial sold $115.0 million of its floating rate senior notes due December 7, 2005, and on July 20, 2004, sold $350.0 million of its floating rate senior notes due July 20, 2007. On September 1, 2004, and September 20, 2004, Doral Financial sold an additional $125.0 million and $150.0 million, respectively, of its floating rate senior notes due July 20, 2007. The $740.0 million aggregate principal amount of floating rate senior notes, issued during 2004 were sold at an average price to the public of 100.084% of the principal amount thereof, resulting in proceeds to Doral Financial of approximately $739.3 million, after selling commissions but before expenses.

If Doral Financial's credit ratings on its debt securities were to fall below investment grade, Doral Financial's ability to

obtain liquidity through the capital markets would be materially adversely affected. A decrease in Doral Financial's credit ratings could also make it more difficult for it to sell non-conforming loans subject to recourse provisions, since the purchasers of loans subject to recourse provisions rely in part on the credit of Doral Financial when purchasing such loans. A decrease in recourse sales could adversely affect the liquidity of Doral Financial because the secondary market for non-conforming loans is not as liquid as the secondary market for loans that qualify for the sale or guarantee programs of FHA, VA, FNMA and FHLMC. A decrease in Doral Financial's credit ratings could also adversely affect its liquidity because lending institutions may be less inclined to renew or enter into new lending arrangements with Doral Financial. A ratings downgrade would also adversely affect liquidity because counterparties to repurchase agreements used for funding loan origination activities or to derivative contracts used for interest rate risk management purposes could increase the applicable margin requirements under such agreements.

Under Doral Financial's repurchase lines of credit and derivative contracts, Doral Financial is required to deposit cash or qualifying securities to meet margin requirements. To the extent that the value of securities previously pledged as collateral declines because of changes in interest rates, Doral Financial will be required to deposit additional cash or securities to meet its margin requirements, thereby adversely affecting its liquidity.

A considerable amount of Doral Financial's liquidity is derived from the sale of mortgage loans in the secondary mortgage market. The U.S. (including Puerto Rico) secondary mortgage market is the most liquid in the world in large part because of the sale or guarantee programs maintained by FHA, VA, HUD, FNMA and FHLMC. To the extent these programs are curtailed or the standard for insuring or selling loans under such programs is materially increased, or for any reason Doral Financial failed to qualify for such programs, Doral Financial's ability to sell mortgage loans, and consequently its liquidity, would be materially adversely affected.

Doral Financial maintains a considerable investment in MSRs and IOs generated as part of its mortgage sale activities. While the servicing assets and IOs are recorded at the time of sale of the related mortgage loans, the cash related to such retained interest is received over the life of the asset and, therefore, does not generally provide immediate liquidity that is available to Doral Financial to fund its operations or to pay dividends.

Doral Financial's banking subsidiaries obtain funding for their lending activities through the receipt of deposits, advances from the FHLB and from other borrowings, such as term notes backed by FHLB-NY letters of credit. As of December 31, 2004, Doral Financial's banking subsidiaries held approximately $3.6 billion in deposits at an average interest rate of 2.47%. For additional information regarding deposit accounts and advances from the FHLB, see Notes 16 and 18 to Doral Financial's Consolidated Financial Statements.

The following table presents the average balance and the annualized average rate paid on each deposit type for the years indicated.

## Table S – Average Deposit Balance

| | Year ended December 31, | | | | | |
| | 2004 | | 2003 | | 2002 | |
| (Dollars in thousands) | Average Balance | Average Rate | Average Balance | Average Rate | Average Balance | Average Rate |
| --- | --- | --- | --- | --- | --- | --- |
| Certificates of deposit | $ 1,829,370 | 3.15% | $ 1,535,835 | 3.12% | $ 1,168,984 | 3.84% |
| Regular passbook savings | 416,928 | 2.27% | 268,990 | 2.51% | 183,074 | 2.81% |
| NOW accounts | 634,486 | 2.15% | 497,277 | 2.19% | 411,837 | 2.23% |
| Non-interest-bearing | 359,212 | – | 349,531 | – | 273,708 | – |
| Total deposits | $ 3,239,996 | 2.49% | $ 2,651,633 | 2.83% | $ 2,037,603 | 3.57% |

The following table sets forth the maturities of certificates of deposit having principal amounts of $100,000 or more at December 31, 2004.

### Table T – Certificates of Deposit Maturities

| (In thousands) | Amount |
|---|---|
| Certificates of deposit maturing: | |
| Three months or less | $ 347,056 |
| Over three through six months | 71,182 |
| Over six through twelve months | 214,035 |
| Over twelve months | 1,092,669 |
| Total | $ 1,724,942 |

As of December 31, 2004 and 2003, Doral Financial's retail banking subsidiaries had approximately $1.3 billion and $985.3 million, respectively, in brokered deposits obtained through broker-dealers. Brokered deposits are used by Doral Financial's banking subsidiaries as a source of long-term funds. Brokered deposits, however, are generally considered a less stable source of funding than core deposits obtained through retail bank branches. Brokered-deposit investors are generally very sensitive to interest rates and will generally move funds from one depository institution to another based on minor differences in rates offered on deposits.

Doral Financial's banking subsidiaries, as members of the FHLB-NY, have access to collateralized borrowings from the FHLB-NY up to a maximum of 30% of total assets. Advances and reimbursement obligations with respect to letters of credit must be secured by qualifying assets with a market value of 110% of the advances or reimbursement obligations. At December 31, 2004, Doral Financial's banking subsidiaries had $1.3 billion in outstanding advances from the FHLB-NY at a weighted-average interest rate cost of 3.98%. See Note 18 to Doral Financial's Consolidated Financial Statements for additional information regarding such advances.

### Regulatory Capital Ratios

As of December 31, 2004, Doral Financial, Doral Bank-PR and Doral Bank-NY were in compliance with all the regulatory capital requirements that were applicable to them as a financial holding company, state non-member bank and federal savings bank, respectively (i.e., total capital and Tier I capital to risk-weighted assets of at least 8% and 4%, respectively, and Tier I capital to average assets of at least 4%). Set forth below are Doral Financial's, and its banking subsidiaries' regulatory capital ratios as of December 31, 2004, based on existing Federal Reserve, FDIC and OTS guidelines.

### Table U – Regulatory Capital Ratios

| | | Doral Financial Banking Subsidiaries | | |
| | Doral Financial | Doral Bank-PR | Doral Bank-NY | Well-Capitalized Minimum |
|---|---|---|---|---|
| Total capital (Total capital to risk-weighted assets) | 18.9% | 22.1% | 21.5% | 10.0% |
| Tier I capital ratio (Tier I capital to risk-weighted assets) | 18.5% | 21.4% | 21.2% | 6.0% |
| Leverage ratio[1] | 11.8% | 5.7% | 8.5% | 5.0% |

(1) Tier I capital to average assets in the case of Doral Financial and Doral Bank-PR and Tier I capital to adjusted total assets in the case of Doral Bank-NY.

As of December 31, 2004, Doral Bank-PR and Doral Bank-NY were considered well-capitalized banks for purposes of the prompt corrective action regulations adopted by the FDIC pursuant to the Federal Deposit Insurance Corporation Improvement Act of 1991. To be considered a well-capitalized institution under the FDIC's regulations, an institution must maintain a Leverage Ratio of at least 5%, a Tier I Capital Ratio of at least 6% and a Total Capital Ratio of at least 10%, and not be subject to any written agreement or directive to meet a specific capital ratio.

Failure to meet minimum regulatory capital requirements could result in the initiation of certain mandatory and addi-

tional discretionary actions by banking regulators against Doral Financial and its banking subsidiaries that, if undertaken, could have a material adverse effect on Doral Financial.

The federal banking and thrift regulatory agencies have adopted a rule that imposes a dollar-for-dollar capital requirement on residual interests retained in sale or securitization transactions and a 25% limit on the amount of Tier I capital that may consist of credit-enhancing interest-only strips, a subset of residual interests. Currently, Doral Financial classifies most of the IOs retained in connection with the sale of its non-conforming loans as credit-enhancing interest-only strips under the rule and thus Doral Financial IOs are subject to

a dollar-for-dollar capital requirement for risk-based capital purposes and to the 25% concentration limit for Tier 1 capital purposes. The capital ratios set forth previously incorporate the impact of the capital rule for IOs.

Substantially all of Doral Financial's recourse obligations and IOs are recorded at the holding company level and, accordingly, the rule only impacts the regulatory requirements applicable to Doral Financial as a financial holding company, and has no impact on the banking subsidiaries. While the impact of this rule is to reduce Doral Financial's regulatory capital ratios at the holding company level, Doral Financial anticipates that it will continue to comply with all applicable capital requirements.

Subject to certain exceptions, the entire amount of assets sold with recourse, not just the contractual amount of the recourse obligation, is converted into an on-balance sheet credit equivalent amount for risk-based capital requirements. The credit equivalent amount, less any recourse liability reflected on the balance sheet, is then risk weighted for purposes of applying the applicable capital requirement. The risk weighting for residential mortgage loans is currently 50%. As of December 31, 2004, Doral Financial's outstanding balance of loans sold with full or partial recourse was $3.9 billion (2003 – $2.4 billion) and is included for purposes of the computation of the capital ratios previously set forth.

Reduced regulatory capital ratios at the financial holding company level, as compared to 2003, were principally attributable to an increase in recourse loan sales during 2004, the increase in long-term loan sales commitments entered into in 2004 and the increase of mortgage-backed securities held by the Company. Refer to Note 3 to Doral Financial's Consolidated Financial Statements for additional information regarding the regulatory capital ratios.

Doral Securities is subject to regulatory capital requirements imposed by the SEC. At December 31, 2004, Doral Securities was in compliance with its applicable regulatory capital requirement.

Doral Financial's strong capital base should allow it to continue to increase its interest-earning assets during 2005 and continue to grow its net interest income. Doral Financial expects that it will continue to have adequate liquidity, financing arrangements and capital resources to finance its operations. Doral Financial will continue to explore alternative and supplementary methods of financing its operations, including both debt and equity financings. There can be no assurance, however, that Doral Financial will be successful in consummating any such transactions.

## Assets and Liabilities

At December 31, 2004, Doral Financial's total assets were $15.1 billion, compared to $10.4 billion at December 31, 2003. The increase in assets was due primarily to an increase in the investment securities portfolio of approximately $3.1 billion, resulting from Doral Financial's strategy to increase its tax-exempt interest income by investing in mortgage-backed and U.S. Treasury and agency securities, particularly through its international banking entity subsidiary. The increase in assets also reflects an increase in cash and money market investments of $1.6 billion, resulting from a higher volume of liquid assets accumulated by the Company in anticipation of rising interest rates. Total liabilities were $13.1 billion at December 31, 2004, compared to $8.8 billion at December 31, 2003. The increase in liabilities was largely the result of an increase in securities sold under agreements to repurchase, deposit accounts and notes payable used to fund Doral Financial's increase in assets. At December 31, 2004, deposit accounts totaled $3.6 billion, compared to $3.0 billion at December 31, 2003. As of December 31, 2004, Doral Financial's banking subsidiaries had $11.7 billion in assets, including assets of Doral International, an international banking entity and wholly owned subsidiary of Doral Bank-PR, compared to $7.2 billion at December 31, 2003.

## Off-Balance-Sheet Activities

In the ordinary course of business, loans that do not qualify for the insurance or guarantee programs of FHA and VA, or the sale or exchange programs of FNMA or FHLMC ("nonconforming loans") are often sold to investors on a full or partial recourse basis pursuant to which Doral Financial retains all or part of the credit risk associated with such loan after sale. Recourse is generally limited to a period of time (generally 24 months) and, in the case of partial recourse, up to a 15% of the principal amount of the loans sold. As of December 31, 2004, the outstanding principal balance of loans sold subject to full or partial recourse was $3.9 billion. As of such date, the maximum principal amount in loans that Doral Financial would have been required to repurchase if all loans subject to recourse defaulted was $3.3 billion (see Table W – Other Commercial Commitments for a breakdown of recourse obligation by expiration period). Doral Financial's contingent obligation with respect to such recourse provision is not reflected on Doral Financial's Consolidated Financial Statements, except for a reserve of $10.8 million for estimated losses from such recourse agreements, which is included in "Accrued expenses and other liabilities." During 2004, Doral Financial repurchased approximately $171.9 million of loans subject to recourse. Historically, losses on recourse obligation have not been significant because such loans generally have low loan-to-value ratios. As of December 31, 2004, approximately $164.1 million or 4% of the principal amount in loans sold with recourse were 60 days or more past due.

From time to time, Doral Financial has sold pools of delin-quent FHA and VA and conventional mortgage loans, subject to recourse. Following these transactions, the loans are not reflected on Doral Financial's Consolidated Statements of Financial Condition. Under these arrangements, however, as under most servicing requirements, Doral Financial is required to advance the scheduled payments of principal and inter-est whether or not collected from the underlying borrower. For additional information regarding sales of delinquent loans refer to "Liquidity and Capital Resources."

Doral Financial is a party to financial instruments with off-balance-sheet risk in the normal course of business to meet the financing needs of its customers. These financial instru-ments may include commitments to extend credit and sell mortgage-backed securities and loans. These instruments involve, to varying degrees, elements of credit and interest rate risk in excess of the amount recognized in the statement of financial position.

The contractual amounts of these instruments reflect the extent of involvement Doral Financial has in particular classes of financial instruments. Doral Financial's exposure to credit losses in the event of nonperformance by the other party to the financial instrument for commitments to extend credit or for forward sales is represented by the contractual amount of these instruments. Doral Financial uses the same credit poli-cies in making these commitments as it does for on-balance sheet instruments. At December 31, 2004, commitments to extend credit and commercial and financial standby let-ters of credit amounted to approximately $596.8 million and $4.5 million, respectively, and commitments to sell mort-gage-backed securities and loans amounted to approximately $4.2 billion. Management believes that Doral Financial has the ability to meet these commitments, and that no loss will result from the same. Commitments to extend credit are agreements to lend to a customer as long as the conditions established in the contract are met. Commitments gener-ally have fixed expiration dates or other termination clauses. Demand for the Company's mortgage loans has increased to record levels with some forward sale commitments extend-ing to 2006. Generally, the Company does not enter into interest rate-lock or forward sale loan commitments with borrowers or investors. Commitments are generally to sell non-conforming loans that bear variable pass-through rates and approximate fair value. From time to time the Company enters into commitments to purchase mortgage loans, which generally entitles the Company to a yield based on variable rates tied to the 3-month LIBOR.

## Contractual Obligations and Other Commercial Commitments

The following tables summarize Doral Financial's contractual obligations, on the basis of contractual maturity or first call date, whichever is earlier, and other commercial commit-ments as of December 31, 2004.

### Table V – Contractual Obligations

| (In thousands) | | Payment Due by Period | | | |
|---|---|---|---|---|---|
| Contractual Obligations | Total | Less than 1 Year | 1-3 Years | 3-5 Years | After 5 Years |
| Deposits | $  3,643,080 | $  2,470,099 | $  782,634 | $  375,306 | $  15,041 |
| Repurchase and warehousing lines of credit [1] | 6,584,723 | 5,419,923 | 970,000 | 194,800 | — |
| Advances from the FHLB [1] | 1,294,500 | 647,500 | 547,000 | 100,000 | — |
| Notes payable | 1,105,202 | 130,354 | 720,085 | 1,770 | 252,993 |
| Other liabilities | 513,537 | 500,592 | 5,000 | 5,000 | 2,945 |
| Non-cancelable operating leases | 64,698 | 7,144 | 13,386 | 11,792 | 32,376 |
| Total Contractual Cash Obligations | $  13,205,740 | $  9,175,612 | $  3,038,105 | $  688,668 | $  303,355 |

[1] Includes $2.1 billion of repurchase agreements with an average rate of 3.88% and $872.5 million in advances from the FHLB-NY with an average rate of 4.50%, which the lenders have the right to call before their contractual maturities. The majority of such repurchase agreements and advances from the FHLB-NY are included in the less than one year category in the above table but have actual contractual maturities ranging from March 2005 to November 2014. They are included on the first call date basis because increases in interest rates over the average rate of the Company's callable bor-rowings may induce the lenders to exercise their call right.

## Table W – Other Commercial Commitments[1]

| (In thousands) | | Amount of Commitment Expiration Per Period | | | |
|---|---|---|---|---|---|
| Other Commercial Commitments | Total Amount Committed | Less than 1 Year | 1-3 Years | 3-5 Years | After 5 Years |
| Commitments to extend credit | $ 596,753 | $ 305,090 | $ 291,443 | $ 106 | $ 114 |
| Commitments to sell mortgage-backed securities and loans | 4,198,556 | 2,998,556 | 1,200,000 | -- | — |
| Commitments to purchase loans | 800,000 | 800,000 | — | — | — |
| Commercial and financial standby letters of credit | · 4,534 | 4,534 | — | — | — |
| Standby repurchase (recourse) obligations | 3,315,460 | 892,997 | 1,694,789 | — | 727,674 |
| Total | $ 8,915,303 | $ 5,001,177 | $ 3,186,232 | $ 106 | $ 727,788 |

(1) Refer to "Off-Balance Sheet Activities" for additional information regarding other commercial commitments of Doral Financial.

### Interest Rate Risk Management

*General.* Interest rate volatility is the primary market risk affecting Doral Financial. Changes in interest rates can affect the volume of mortgage loan originations, the net interest income earned on Doral Financial's portfolio of loans and securities, the amount of gain on sale of loans, and the value of Doral Financial's servicing assets, IOs, and loan and securities holdings.

Lower interest rates tend to increase demand for mortgage loans for home purchases as well as the demand for refinancing of existing mortgages. Higher interest rates make it more difficult for potential borrowers to purchase residential properties and to qualify for mortgage loans. Increases in rates could also reduce demand for refinance loans. A substantial portion of Doral Financial's total mortgage loan originations has consistently been composed of refinance loans. For the years ended December 31, 2004, 2003, and 2002, refinanced loans represented approximately 55%, 62% and 57%, respectively, of Doral Financial's total dollar volume of mortgage loans originated internally. As a result, higher interest rates may adversely affect the volume of loan originations and income related to mortgage loan sales. Although a significant portion of Doral Financial's refinance loans are for debt consolidation purposes and, therefore, are not as sensitive to increases in interest rates, a significant future increase in mortgage interest rates in Puerto Rico could adversely affect Doral Financial's business if it results in a significant decrease in refinancing of mortgage loans.

If long-term interest rates increase between the time Doral Financial commits to or establishes an interest rate on a mortgage loan and the time commitments to purchase the mortgage loan are obtained or the loan is sold, Doral Financial may realize a reduced gain or incur a loss on such sale. This risk is sometimes referred to as "lag risk." Doral Financial generally does not hedge the lag risk associated with conventional loans in the pipeline or in the process of origination, because it generally does not permit customers to lock in an interest rate prior to closing. Instead, the interest rates on these loans are generally fixed at closing based on a certain spread over a prevailing rate that adjusts weekly, based on the FHLMC auction for residential mortgages. For FNMA and FHLMC conforming loans and mortgage-backed securities, Doral Financial seeks to sell or to obtain commitments for the sale of such loans or mortgage-backed securities as soon as practicable following the funding of such loans. Conforming loans are normally sold to institutional investors or to FNMA and FHLMC. To the extent that Doral Financial does engage in offerings of mortgage products that lock in the interest rate until the closing date, it attempts to enter into forward commitments to sell such loans at the time it fixes the rates for the loans. As of December 31, 2004, the Company had no interest rate-lock commitments.

Non-conforming conventional loans are normally sold in bulk to local financial institutions through forward commitments. The sale of non-conforming conventional loans normally takes longer than the sale of conforming mortgage loans. Accordingly, Doral Financial attempts to manage this market risk through the purchase of listed options on U.S. Treasury futures contracts as well as through the purchase of option contracts in the over-the-counter market on other interest rate-sensitive instruments and interest rate collars, which tend to increase in value when interest rates increase. Options are contracts that grant the purchaser the right to buy or sell the underlying asset by a certain date for a specified price. Futures are commitments to either purchase or sell designated instruments (such as U.S. Treasury note contracts or Eurodollar certificates of deposit) at a future date for a specified price. Futures contracts are generally traded on an exchange, are marked to market daily and are subject to initial and maintenance margin requirements.

The Company's variable IOs, arising from the sale of non-conforming loan pools, are generally subject to loss in value when short-term rates increase. The amounts payable to investors

on variable IOs are tied to a floating rate based on a spread over the 3-month LIBOR that resets quarterly. Increases in the 3-month LIBOR reduce the spread received on the Company's retained interest and adversely affect the value of the IOs. Typically, this effect is mitigated by lower prepayments. The effect may also be mitigated by embedded caps or call options on such loan pools. To moderate the effect on earnings of the loss in value of IOs, the Company purchases options on futures contracts for Eurodollar instruments, interest rate caps and collars, and enters into interest rate swap agreements. Interest rate collars protect against rising interest rates, but generally limit the benefits of rising rates. An interest rate collar is a derivative instrument for which an investor pays a fixed premium that entitles the investor to receive payments so long as interest rates fluctuate within a defined range. Doral Financial is entitled to receive payments from the counterparty if the 3-month LIBOR fluctuates between certain rates (generally 3.95% to 8.5%). As short-term interest rates did not increase to levels over 3.95%, the interest rate caps and collars did not offset the losses on the value of the IOs during 2004. An interest rate swap agreement represents a mutual agreement to exchange interest rate payments, one party paying a fixed rate and another paying a floating rate tied to a reference interest rate (in this case 3-month LIBOR). To mitigate the risks related to a decline in value of Doral Financial's IOs, the Company enters into swap agreements which provide for the payment of a fixed rate and in which the Company receives the floating rate; therefore, the contract increases in value as rates increase. For additional information on Doral Financial's volume of derivative instruments, see Note 32 to Doral Financial's Consolidated Financial Statements.

Doral Financial normally holds Puerto Rico tax-exempt GNMA securities for longer periods prior to sale to maximize tax-exempt interest income. Because of their tax-exempt status, prices for Puerto Rico tax-exempt GNMA securities tend to be more stable than for U.S. taxable GNMA securities. This relative price stability for Puerto Rico GNMA securities allows Doral Financial to carry out a less aggressive hedging strategy to attempt to protect the value of these assets than what might otherwise be required for U.S. GNMA securities. Doral Financial seeks to protect itself from the market risk associated with its inventory of GNMA securities by purchasing listed options on U.S. Treasury bond futures contracts and other interest rate-sensitive instruments, as well as purchasing options on U.S. GNMA securities in the over-the-counter market.

With respect to Puerto Rico GNMA securities that are originated by Doral Financial and do not qualify for Puerto Rico tax exemption, Doral Financial implements a less aggressive hedging strategy, because it intends to sell such securities in the U.S. market as soon as practicable following completion of the securitization process, typically through forward commitments.

Declines in long-term interest rates can adversely affect Doral Financial's revenues by increasing prepayment rates and causing an increase in the amortization of servicing assets, or causing an impairment to be recognized with respect to such assets and to some extent adversely affecting the value of its IOs. Moreover, increased prepayment rates can reduce Doral Financial's servicing income by decreasing the size of Doral Financial's servicing portfolio. Traditionally, Doral Financial has not actively used synthetic hedge devices to protect its servicing income or the value of its servicing assets from the risks presented by interest rate declines. The structure of Doral Financial's balance sheet serves in part to hedge the sensitivity of its servicing income to decreases in interest rates because the market value of Doral Financial's large portfolio of fixed-rate residential mortgage loans and mortgage-backed securities tends to increase in value when interest rates decline. Doral Financial also seeks to reduce the sensitivity of its servicing income and the value of its servicing assets by maintaining a strong retail origination network that has allowed Doral Financial to increase the size of its servicing portfolio even during periods of high prepayments.

The net interest income of Doral Financial is also subject to interest rate risk because its interest-earning assets and interest-bearing liabilities reprice at different times and at varying amounts. Most of Doral Financial's interest-earning assets, including its mortgage loans and mortgage-backed securities, are fixed-rate, long-term, interest-earning assets that are not subject to repricing (except for the replacement of assets through repayments, sales and new originations), while the borrowings used to finance these positions normally reprice on a periodic basis (e.g., daily, monthly, quarterly, etc.). Doral Financial manages the risk to its net interest income through a combination of the internal management of the composition of its assets and liabilities and through the use of hedging instruments. Internal asset-liability management practices include the attraction of longer-term funds through the use of long-term repurchase agreements and other borrowings such as senior notes, term notes, FHLB-NY advances and long-term certificates of deposit, including brokered certificates of deposit. Also during 2004, the Company issued $740.0 million of unsecured floating rate debt that allowed the Company to match floating rate liabilities with floating rate assets, locking in an interest rate spread. Doral Financial also seeks to negotiate interest rate floors on the floating rate loans it originates.

Doral Financial also has used interest rate swap agreements to effectively fix the cost of short-term funding sources, which

are used to finance the funding and holding of interest-earning assets with longer maturities. An interest rate swap is an agreement where one party (in this case, Doral Financial) agrees to pay a fixed rate of interest on a notional principal amount to a second party in exchange for receiving a variable rate of interest on the same notional amount for a predetermined period of time. No actual assets are exchanged in a swap of this type, and interest payments are generally netted. As of December 31, 2004, Doral Financial, through Doral Bank-PR, had in place two interest rate swap agreements (each with a notional principal amount of $100,000,000). The Company, at the parent company level, also had in place three additional swap agreements (with an aggregate notional principal amount of $500,000,000) in an attempt to manage the risk of rising short-term interest rates on the market value of its portfolio of variable rate IOs. Doral Financial also purchases options on futures contracts for Eurodollar instruments in an attempt to manage the risk of rising interest rates on its funding costs.

Doral Financial maintains a substantial portfolio of mortgage-backed securities and other investment securities. Generally, the value of fixed-rate securities declines when interest rates rise, and conversely, increases when interest rates fall. At December 31, 2004, Doral Financial held $350.4 million of mortgage-backed securities and other investment trading securities that carried fixed-interest rates reported at fair value, with unrealized gains and losses included in earnings. In addition, at December 31, 2004, Doral Financial held $5.0 billion of investment securities (all of which carried fixed-interest rates) that were classified as available for sale and reported at fair value, with unrealized gains or losses reported as a segregated component of stockholders' equity. Accordingly, declines in the value of Doral Financial's securities held for trading and available for sale could have a negative impact on Doral Financial's earnings or financial condition. In order to hedge the interest rate risk associated with Doral Financial's portfolio of securities held for trading and available for sale, Doral Financial may use a variety of derivative instruments including listed put and call options and futures contracts on financial instruments (primarily U.S. Treasury note contracts). In determining the amount of its portfolio to hedge, Doral Financial will consider, among other things, the volatility of prices of its securities and the direction of interest rates. As noted above, the prices for Puerto Rico tax-exempt GNMA securities tend to be more stable than their U.S. counterparts.

Under Statement of Financial Accounting Standards No. 133 ("SFAS No. 133"), *Accounting for Derivative Instruments and Hedging Activities,* as amended, the Company may designate a derivative as a hedge of the fair value of a recognized fixed-rate asset or liability ("fair value" hedge). Certain hedging activities related to certain available-for-sale securities may be accounted for as a fair value hedge. In a qualifying fair value hedge, both the changes in fair value of the hedged item (in this case the available-for-sale securities) and changes in fair value of the derivative are included in net gain (loss) on securities held for trading in the Consolidated Statements of Income. As a result, any hedge ineffectiveness is reflected immediately in earnings. At the inception of a hedge transaction, the Company formally documents the hedge relationship and the risk management objective and strategy for undertaking the hedge. This process includes identification of the hedging instrument, hedged item, risk being hedged and the methodology for measuring effectiveness. During 2004, the Company recognized pre-tax losses of $7.0 million that represent the ineffective portion of the fair value hedges of its available-for-sale securities. Derivatives hedging the fair value of certain available-for-sale securities expired during the third quarter of 2004, and the Company decided to discontinue the fair value hedge for such securities. As a result of the fair value hedge discontinuance, a favorable cumulative mark-to-market valuation adjustment of approximately $27.2 million, from the inception date of the fair value hedge to its discontinuance date, increased the carrying value of the related securities and is being amortized as a reduction to the yield on the securities over the remaining life of the securities. As of December 31, 2004, the Company had no derivatives designated as hedges.

For additional information on Doral Financial's volume of derivative instruments used to manage interest rate risk, see Note 32 to Doral Financial's Consolidated Financial Statements. In the future, Doral Financial may use alternative hedging techniques including futures, options, interest rate swap agreements or other hedge instruments to help mitigate interest rate and market risk. However, there can be no assurance that any of the above hedging techniques will be successful. The Company's main objective in managing interest rate risk is to hedge against significant adverse changes in interest rates that cannot be absorbed in the normal course of business and to moderate the impact of interest rate changes over time. Doral Financial's interest rate risk management may result in significant earnings volatility in the short term. The success of the Company's interest rate risk management is largely dependent on its ability to predict the earnings sensitivity of its loan production and related servicing activities in various interest rate environments. The success of this strategy impacts Doral Financial's net income. This impact, which can be either positive or negative, can have a material effect on Doral Financial's results of operations. For additional information on the use of derivatives to manage interest rate risk, see "Derivatives" below.

*Interest Rate Sensitivity Analysis.* Doral Financial employs a variety of measurement techniques to identify and manage its interest rate risk, including the use of an earnings simulation model to analyze net interest income sensitivity to changing interest rates. The model is based on actual cash flows and repricing characteristics for on-balance and certain off-balance sheet instruments and incorporates market-based assumptions regarding the effect of changing interest rates on the prepayment rates of certain assets and liabilities. Assumptions based on the historical behavior of deposit rates and balances in relation to changes in interest rates are also incorporated into the model. This sensitivity analysis is limited by the fact that it is performed at a particular point in time based on a static balance sheet, is subject to the accuracy of various assumptions, including prepayment forecasts, and does not incorporate other factors that could impact Doral Financial's overall performance in each scenario. Accordingly, the estimates resulting from the use of the model should not be viewed as an earnings forecast. Actual results will differ from simulated results due to timing, magnitude, and frequency of interest rate changes as well as changes in market conditions and management strategies.

The Asset/Liability Management Committee, which comprises members of senior management and reports to Doral Financial's Board of Directors, monitors interest rate risk within Board-approved policy limits. Doral Financial's current interest rate risk policy limits are primarily determined by measuring the anticipated change in net interest income over a 12-month horizon, assuming a 100- and 200-basis point linear increase or decrease in interest rates. The current policy limits this exposure to a 30% reduction in net interest income for a 12-month horizon under a 200-basis point increase or decrease in interest rates.

In order to improve the Company's interest rate risk modeling capabilities, Doral Financial made significant enhancements to its modeling program during the fourth quarter of 2004. One of the most significant improvements in the model is that the mortgage loan and mortgage-backed securities portfolios are now segregated by product type, coupon and maturity, and the effect of changes in interest rate is applied to each group separately. The previous model considered these portfolios using a single instrument approach (average coupon and average remaining maturity). The changes under the new approach capture sensitivity better than the previous model.

Certain of the Company's liabilities are callable at the option of the lender. The new model utilizes an option-adjusted spread methodology to enhance its ability to estimate the probability the call will be exercised. The previous model used a static approach to estimate such probability. Under a rising rate scenario, a higher proportion of liabilities are pre-paid and hence re-priced at higher rates with the new model. These changes, together with some new derivative positions undertaken, have the effect of significantly changing the results of the sensitivity analysis when compared to the figures calculated under the old model.

The following table shows Doral Financial's net interest income sensitivity profile as of December 31, 2004.

### Table X – Interest Rate Sensitivity

| As of December 31, 2004 | |
| --- | --- |
| Change in Interest Rates (Basis Points) | Percentage Change in 12-Month Net Interest Income |
| +200 | (17.3%) |
| +100 | (11.8%) |
| -100 | 11.8% |
| -200 | 14.6% |

Given a 100- and 200-basis point linear increase in the yield curve used in the simulation model, it is estimated that Doral Financial's net interest income would decrease by 11.8% and 17.3% over one year. The decrease in net interest income could be somewhat offset by hedging gains resulting from derivative transactions used to manage Doral Financial's exposure to interest rate changes. The model assumes that the portfolios of loans held for sale reprice at least twice a year, and the portfolio of securities held for trading reprice monthly, as such assets are sold and replaced with new assets at current market rates. The simulation model does not consider the possible redeployment of the Company's money market instruments into higher-yielding tax-exempt securities. A 100- and 200-basis point parallel linear decrease in interest rates would increase net interest income by 11.8% and 14.6%, respectively, over one year. The increase in net interest income could be somewhat offset by hedging losses resulting from derivative transactions used to manage Doral Financial's exposure to interest rate changes. All these estimated changes in net interest income are within the policy guidelines established by Doral Financial's Board of Directors. In both upward and downward rate scenarios, the increase or decrease in rates was modeled over a specific time period (3-6 months) rather than applying an instantaneous shock in rates, in order to reflect what has been the historical trend of changes in market rates.

While the sensitivity model serves as a useful tool for measuring short-term risk to future net interest income, at this time it does not measure the sensitivity of the market value of Doral Financial's assets or other sources of income such as trading

activities and mortgage loan sales to changes in interest rates. For example, the rise in short-term interest rates generally has an adverse impact on the value of the Company's floating rate IOs. Refer to "Critical Accounting Policies – Retained Interest Valuation" for an estimate of how increases in interest rates adversely impact the value of Doral Financial's IOs.

*Derivatives.* As described above, Doral Financial uses derivatives to manage its exposure to interest rate risk caused by changes in interest rates beyond the control of management. Derivatives are generally either privately negotiated over-the-counter ("OTC") or standard contracts transacted through regulated exchanges. OTC contracts generally consist of swaps, caps and collars, forwards and options. Exchange-traded derivatives include futures and options. The Company currently uses the following derivatives as part of its interest rate risk management program.

- Interest Rate Swaps: represents a mutual agreement to exchange interest rate payments; one party paying a fixed rate and another paying a floating rate tied to a reference interest rate (e.g., 3-month LIBOR). Interest rate swaps are generally used by the Company to protect the spread of the variable IOs and to fix the cost of short-term funding sources in a rising interest rate environment.

- Interest Rate Caps: represents a right to receive cash if a reference interest rate rises above a contractual strike rate; therefore, its value increases as reference interest rates rise. The reference interest rate used in the Company's interest rate caps is 3-month LIBOR. Interest rate caps are generally used by the Company to protect the spread of the variable IOs.

- Interest Rate Collars: derivatives instruments for which an investor pays a fixed premium that entitles the investor to receive payments so long as interest rates fluctuate within a defined range, therefore its value increases as interest rates rise up to the cap within the negotiated range. The reference interest rate used in the Company's interest rate collars is 3-month LIBOR. Interest rate collars are generally used by the Company to protect the spread of the variable IOs.

- Put and Call Options on Mortgage-Backed Securities: represents a right to purchase/sell a mortgage-backed security at a specific price in the future. The Company utilizes put and call options, separately and in combination with short and long strategies, to protect the value of the Company's mortgage loans and mortgage-backed securities portfolio from lower market prices in a rising interest rate environment.

- Treasury and Eurodollar Futures Contracts: represents standardized exchange-traded contracts, the value of which is tied to spot Treasury or Eurodollar rates. The Company utilizes Treasury and Eurodollar futures contracts to protect the value of its investments from lower market prices and to moderate the cost of funding in a rising interest rate environment.

- Put and Call Options on Treasury and Eurodollar Futures: represents a right to purchase/sell a Treasury or Eurodollar futures contract at a specific price in the future. The Company utilizes put and call options, separately and in combination with short and long strategies, to protect the value of its investments from lower market prices and to moderate the cost of funding in a rising interest rate environment.

- Forward Sales of To-Be-Announced Mortgage-Backed Securities: represents an obligation to sell agency pass-through mortgage-backed securities that have not yet been issued at a specific price and at a specific date in the future; therefore, its value increases as mortgage rates rise. Forward sales of to-be-announced mortgage-backed securities are generally used by the Company to protect the value of its investments from lower market prices in a rising interest rate environment.

Although Doral Financial uses derivatives to manage market risk, for financial reporting purposes, its general policy is to account for such instruments on a mark-to-market basis with gains or losses charged to current operations as part of net gain (loss) on securities held for trading as they occur and may, therefore, increase the volatility of Doral Financial's future earnings. Contracts with positive fair values are recorded as assets and contracts with negative fair values as liabilities, after the application of netting arrangements. Fair values of derivatives such as interest rate futures contracts or options are determined by reference to market prices. Fair values for derivatives purchased in the over-the-counter market are determined by prices provided by external sources or valuation models. The notional amounts of long and short positions (classified by instrument type, netted by counterparty and excluding interest rate swap agreements and interest rate caps and collars related to these derivatives) totaled $9.5 billion and $8.3 billion, respectively, as of December 31, 2004. Notional amounts indicate the volume of derivatives activity, but do not represent Doral Financial's exposure to market or credit risk. Note 32 to Doral Financial's Consolidated Financial Statements contains a detailed summary of Doral Financial's activity in derivative instruments.

The following tables summarize the fair values of Doral Financial's derivatives as well as the source of the fair values.

## Table Y – Fair Value Reconciliation[1]

| (In thousands) | Year ended December 31, 2004 |
|---|---|
| Fair value of contracts outstanding at the beginning of the year | $        5,573 |
| Contracts realized or otherwise settled during the year | (131,028) |
| Fair value of new contracts entered into during the year | 125,890 |
| Changes in fair values during the year | 5,987 |
| Fair value of contracts outstanding at the end of the year | $        6,422 |

(1) Excludes the favorable cumulative mark-to-market valuation adjustment of approximately $27.2 million resulting from the fair value hedge discontinuance. See "Interest Rate Risk Management."

## Table Z – Source of Fair Value

| (In thousands) | Payment Due by Period | | | | |
|---|---|---|---|---|---|
| As of December 31, 2004 | Maturity less than 1 Year | Maturity 1-3 Years | Maturity 3-5 Years | Maturity in excess of 5 Years | Total Fair Value |
| **Source of Fair Value** | | | | | |
| Prices actively quoted | $        (4,813) | $   (1,714) | $        – | $        – | $   (6,527) |
| Prices provided by other external sources | 1,022 | 1,117 | 10,810 | – | 12,949 |
| | $        (3,791) | $   (597) | $   10,810 | $        – | $   6,422 |

The use of derivatives involves market and credit risk. The market risk of derivatives arises principally from the potential for changes in the value of derivative contracts based on changes in interest rates. Doral Financial generally manages its risks by taking risk-offsetting positions.

The credit risk of derivatives arises from the potential of a counterparty to default on its contractual obligations. To manage this credit risk, Doral Financial deals with counterparties of good credit standing, enters into master netting agreements whenever possible and, when appropriate, obtains collateral. Master netting agreements incorporate rights of set-off that provide for the net settlement of contracts with the same counterparty in the event of default. The credit risk associated with futures contracts is also limited due to daily cash settlement of the net change in the value of open contracts with the exchange on which the contract is traded.

## General Business, Economic and Political Conditions

The Company's business and earnings are sensitive to general business and economic conditions in Puerto Rico and the United States. As a Commonwealth of the United States, Puerto Rico has a U.S. dollar-based economy. The trends of Puerto Rico's economic fundamentals are directly related to those found in the U.S. economy. Significant business and economic conditions include short- and long-term interest rates, inflation and the strength of the Puerto Rico and U.S. economy. If any of these conditions deteriorate, the Company's business and earnings could be adversely affected. For example, business and economic conditions that negatively impact household income could decrease the demand for residential mortgage loans and increase the number of customers who become delinquent or default on their loans; or, a dramatically rising interest rate environment could decrease the demand for loans.

In addition, general and administrative expenses generally increase with inflation. However, the increase in real estate values in Puerto Rico in recent years has been a positive factor for Doral Financial's mortgage banking business. The average size of loans originated tends to increase as home values appreciate, which serves to increase loan origination fees and servicing income faster than the cost of providing such services. Additionally, appreciation in real estate property values reduces the loan-to-value ratio of existing loans, thereby reducing credit exposure. Interest rates normally increase during periods of high inflation and decrease during periods of low inflation. See "Interest Rate Risk Management" for a discussion of the effects of changes of interest rates on Doral Financial's operations.

The Company operates in a highly competitive industry that could become even more competitive as a result of economic, legislative, regulatory and technological changes. The Company faces competition in such areas as mortgage and banking product offerings, rates and fees, and customer service. In addition, technological advances and increased e-commerce activities have, generally, increased accessibility to products and services for customers, which has intensified competition among banking and non-banking companies in the offering of financial products and services, with or without the need for a physical presence.

The Company is heavily regulated by banking, mortgage lending and insurance laws at the federal and local levels, and proposals for further regulation of the financial services industry are continually being introduced. The Company is subject to other federal and local laws and regulations that affect its businesses, including those regarding taxation. Any failure to comply with such laws or regulations, whether actual or alleged, could expose the Company to fines, penalties or potential litigation liabilities, including costs, settlements and judgments, any of which could adversely affect the Company's earnings.

### Reclassifications

Certain amounts reflected in the Company's Consolidated Financial Statements for the years ended December 31, 2003, and 2002, have been reclassified to conform to the presentation for 2004.

### Changes in Accounting Standards Adopted in the 2004 Financial Statements

*Loan Commitments Accounted for as Derivative Instruments.* In March 2004, the U.S. Securities and Exchange Commission released Staff Accounting Bulletin ("SAB") No. 105, "Loan Commitments Accounted for as Derivative Instruments." This bulletin informs registrants of the staff's view that the fair value of the recorded loan commitments should not consider the expected future cash flows related to the associated servicing of the future loan. The provisions of SAB 105 must be applied to loan commitments accounted for as derivatives that are entered into after March 31, 2004. The staff will not object to the application of existing accounting practices to loan commitments accounted for as derivatives that are entered into on or before March 31, 2004, with appropriate disclosures. On April 1, 2004, the Company adopted the provisions of SAB 105. Doral Financial does not currently include, and prior to SAB 105 did not include, the value of mortgage servicing or any other internally developed intangible assets in the valuation of its mortgage loan commitments. Therefore, the adoption of SAB 105 did not have an impact on Doral Financial's financial condition or results of operations.

*Accounting Issues Related to Certain Features of Contingently Convertible Debt and the Effect on Diluted Earnings per Share.* In September 2004, the Emerging Issues Task Force ("EITF") reached a final consensus on Issue 04-8, "Accounting Issues Related to Certain Features of Contingently Convertible Debt and the Effect on Diluted Earnings per Share." The issue addresses the matter of when the dilutive effect of contingently convertible debt ("Co-Cos") with a market price trigger should be included in diluted earnings per share ("EPS"). Co-Cos are generally convertible into common shares of the issuer after the common stock has exceeded a predetermined threshold for a specific time period and is greater than the conversion price of the debt. The EITF reached a consensus that these securities should be treated as convertible securities and included in a dilutive EPS calculation (if dilutive), regardless of whether the market price trigger has been met.

The EITF agreed to broaden the scope of Issue 04-8 to include all issued securities that have embedded market price contingent conversion features. Therefore, this issue also applies to contingently convertible preferred stock. The EITF agreed that the final consensus would be effective for all periods ending after December 15, 2004, and would be applied by retroactively restating previously reported EPS. As of December 31, 2004, and December 31, 2003, the Company has outstanding 1,380,000 shares of its 4.75% perpetual cumulative convertible preferred stock issued in the second half of 2003. Each share of convertible preferred stock is currently convertible into 6.2856 shares of common stock, subject to adjustment under specific conditions. Refer to Note 30 to Doral Financial's Consolidated Financial Statements for additional information regarding specific conditions for the convertible preferred stock. This new accounting pronouncement resulted in the addition of 8.674 million shares of common stock to the fully diluted common stock share base by assuming the conversion of the 1.38 million outstanding shares of the Company's contingently convertible preferred stock.

### Recently Issued Accounting Standards Not Yet Adopted

*Accounting for Certain Loans or Debt Securities Acquired in a Transfer.* In November 2003, the Accounting Standards Executive Committee issued Statement of Position ("SOP") No. 03-3, "Accounting for Certain Loans or Debt Securities Acquired in a Transfer." This statement addresses accounting for differences between contractual cash flows and cash flows expected to be collected from an investor's initial investment in loans or debt securities (loans) acquired in a transfer if those differences are attributable, at least in part, to credit quality. This SOP does not apply to loans originated by the entity. This SOP prohibits "carrying over" or creation of valuation allowances in the initial accounting of all loans