acquired in a transfer that are within the scope of this SOP. The prohibition of the valuation allowance carryover applies to the purchase of an individual loan, a pool of loans, a group of loans, and loans acquired in a purchase business combination. This SOP is effective for loans acquired in fiscal years beginning after December 15, 2004. Management believes that the adoption of this statement will not have a material effect on Doral Financial's Consolidated Financial Statements.

*The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments.* In March 2004, the EITF reached a consensus on Issue 03-1, "The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments." The EITF reached a consensus on the impairment model to be used to determine when an investment is considered impaired, whether that impairment is other than temporary, and the measurement of an impairment loss. The impairment model also includes accounting considerations subsequent to the recognition of an other-than-temporary impairment and requires certain disclosures about unrealized losses that have not been recognized as other-than-temporary impairments. This impairment model is applicable for investments in debt and equity securities that are within the scope of SFAS 115, "Accounting for Certain Investments in Debt and Equity Securities" and equity securities that are not subject to the scope of SFAS 115 and not accounted for under the equity method under APB Opinion No. 18, "The Equity Method of Accounting for Investments in Common Stock" referred in Issue 03-1 as the cost method investments. The impairment model developed by the EITF to determine whether an investment is within the scope of Issue 03-1 involves a sequence of steps including the following: Step 1 – determine whether an investment is impaired. If an impairment indicator is present, as determined in Step 1, the investor should estimate the fair value of the investment. If the fair value of the investment is less than its cost, proceed with Step 2 – evaluate whether an impairment is other-than-temporary. Step 3 – if the impairment is other-than-temporary, recognize an impairment loss equal to the difference between the investment's cost and its fair value. The impairment model described above used to determine other-than-temporary impairment should be applied to other-than-temporary impairment evaluations in reporting periods beginning after June 15, 2004, subject to the provisions discussed below.

In September 2004, the Financial Accounting Standard Board ("FASB") issued proposed FSP EITF Issue 03-1a, "Implementation Guidance for the Application of Paragraph 16 of EITF Issue No. 03-1," which provides guidance for the application of paragraph 16 of EITF Issue 03-1 to debt securities that are impaired because of interest rate and/or sector spread increases. Also, in September 2004, the FASB issued FSP EITF Issue 03-1-1, "Effective Date of Paragraphs 10-20 of EITF Issue 03-1," which delayed the effective date of paragraphs 10-20 of Issue 03-1. Paragraphs 10-20 of Issue 03-1 provide guidance on the impairment model to be used to determine when an investment is considered impaired, whether that impairment is other than temporary, and the measurement of an impairment loss. Issue 03-1-1 expands the scope of the deferral to include all securities covered by EITF 03-1 rather than limiting the deferral to only certain debt securities that are impaired solely because of interest rate and/or sector spread increases. The delay of the effective date for paragraphs 10-20 of Issue 03-1 will be superseded concurrent with the final issuance of FSP EITF Issue 03-1a. Management of the Company does not anticipate that the adoption of Issue 03-1 will have a material effect on Doral Financial's Consolidated Financial Statements. The disclosures required by Issue 03-1 are included in the accompanying Consolidated Financial Statements.

*Share-Based Payments.* In December 2004, the FASB issued SFAS 123R, "Share-Based Payments." This statement is a revision of SFAS No. 123, "Accounting for Stock-Based Compensation" and it also supersedes Accounting Principle Bulletin Opinion ("APB") No. 25, "Accounting for Stock Issued to Employees," and its related implementation guidance. This statement focuses primarily on accounting for transactions in which an entity obtains employee services in share-based payment transactions. SFAS 123R eliminates the alternative to use APB 25's intrinsic value method of accounting that was provided in SFAS 123, as originally issued. This statement is effective for reporting periods that begin after June 15, 2005. Management does not expect that the adoption of this statement will have a material effect on the Consolidated Financial Statements of the Company due to the fact that in 2003, Doral Financial started to expense the fair value of stock options granted to employees using the "modified prospective" method under SFAS No. 148, "Accounting for Stock-Based Compensation-Transition and Disclosure." Under this method, the Company expenses the fair value of all employee stock options granted after January 1, 2003, as well as the unvested portions of previously granted options.

### CEO and CFO Certifications

Doral Financial's Chief Executive Officer and Chief Financial Officer have filed with the Securities and Exchange Commission the certifications required by Section 302 of the Sarbanes-Oxley Act of 2002 as Exhibits 31.1 and 31.2 to Doral Financial's 2004 Form 10-K. In addition, in 2004, Doral Financial's CEO certified to the New York Stock Exchange that he was not aware of any violation by the Company of the NYSE corporate governance listing standards, except for the inadvertent failure to timely post the Company's corporate governance guidelines on its website.

## Management's Report on Internal Control over Financial Reporting



To Our Stockholders:

The Management of Doral Financial is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rules 13a-5(f) and 15d-15(f) under the Securities Exchange Act of 1934, and for the assessment of the effectiveness of internal control over financial reporting. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes controls over the preparation of financial statements in accordance with the instructions for the Consolidated Financial Statements for Bank Holding Companies (Form FR Y-9C) to comply with the reporting requirements of Section 112 of the Federal Deposit Insurance Corporation Improvement Act (FDICIA).

Doral Financial's management, including its Chief Executive Officer and Chief Financial Officer, assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2004, based on the criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Based on our assessment under the framework in Internal Control – Integrated Framework, we have concluded that the Company maintained effective internal control over financial reporting as of December 31, 2004.

The independent registered public accounting firm, PricewaterhouseCoopers LLP, has audited management's assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2004, as stated in their report which appears on page 81 hereof.

*Salomón Levis*
Salomón Levis
Chairman of the Board and
Chief Executive Officer

*Ricardo Meléndez*
Ricardo Meléndez
Executive Vice President and
Chief Financial Officer

**INDEX TO
CONSOLIDATED FINANCIAL STATEMENTS**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | 81 |
| Consolidated Statements of Financial Condition | 83 |
| Consolidated Statements of Income | 84 |
| Consolidated Statements of Changes in Stockholders' Equity | 85 |
| Consolidated Statements of Comprehensive Income | 86 |
| Consolidated Statements of Cash Flows | 87 |
| Notes to Consolidated Financial Statements | 89 |



PricewaterhouseCoopers LLP
254 Muñoz Rivera
BBVA Tower, 9th Floor
Hato Rey PR 00918
Telephone (787) 754 9090
Facsimile (787) 766 1094

## Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders of
Doral Financial Corporation:

We have completed an integrated audit of Doral Financial Corporation's 2004 consolidated financial statements and of its internal control over financial reporting as of December 31, 2004 and audits of its 2003 and 2002 consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

Consolidated financial statements

In our opinion, the accompanying consolidated statements of financial condition and the related consolidated statements of income, comprehensive income, changes in stockholders' equity and cash flows present fairly, in all material respects, the financial position of Doral Financial Corporation and its subsidiaries at December 31, 2004 and 2003, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2004 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 2 to the accompanying consolidated financial statements, in the fourth quarter of 2004 the Company adopted the provisions of the Emerging Issues Task Force Issue 04-8, "Accounting Issues Related to Certain Features of Contingently Convertible Debt and the Effect on Diluted Earnings per Share." As a result, the calculation of diluted earnings per share for all periods presented has been retroactively adjusted to reflect the adoption of this accounting pronouncement.

Internal control over financial reporting

Also, in our opinion, management's assessment, included in the accompanying *Management's Report on Internal Control Over Financial Reporting*, that the Company maintained effective internal control over financial reporting as of December 31, 2004 based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria.

# PRICEWATERHOUSECOOPERS 🏛

Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2004, based on criteria established in *Internal Control - Integrated Framework* issued by the COSO. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Management's assessment and our audit of Doral Financial Corporation's internal control over financial reporting also included controls over the preparation of financial statements in accordance with the instructions to the Consolidated Financial Statements for Bank Holding Companies (Form FR Y-9C) to comply with the reporting requirements of Section 112 of the Federal Deposit Insurance Corporation Improvement Act (FDICIA). A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

*PricewaterhouseCoopers LLP*
San Juan, Puerto Rico
March 3, 2005

CERTIFIED PUBLIC ACCOUNTANTS PRIVATE
(OF PUERTO RICO)
License No. 216 Expires Dec. 1, 2006
Stamp 2008678 of the P.R. Society of
Certified Public Accountants has been
affixed to the file copy of this report

**Consolidated Statements of Financial Condition**

| (Dollars in thousands, except share information) | December 31, 2004 | December 31, 2003 |
|---|---:|---:|
| **Assets** | | |
| Cash and due from banks | $ 64,940 | $ 84,713 |
| Money market investments | 2,470,786 | 870,009 |
| Pledged investment securities that can be repledged: | | |
|   Securities held for trading, at fair value | 268,699 | 272,046 |
|   Securities available for sale, at fair value | 4,224,168 | 2,205,951 |
|   Securities held to maturity, at amortized cost (market value of $2,062,312 in 2004; $1,405,634 in 2003) | 2,115,388 | 1,452,035 |
|     Total pledged investment securities that can be repledged | 6,608,255 | 3,930,032 |
| Other investment securities: | | |
|   Securities held for trading, at fair value | 974,844 | 672,104 |
|   Securities available for sale, at fair value | 758,340 | 644,647 |
|   Securities held to maturity, at amortized cost (market value of $191,381 in 2004; $178,468 in 2003) | 201,392 | 188,874 |
|   Federal Home Loan Bank of NY (FHLB) stock, at cost | 86,120 | 81,720 |
|     Total other investment securities | 2,020,696 | 1,587,345 |
|     Total investment securities | 8,628,951 | 5,517,377 |
| Loans: | | |
|   Mortgage loans held for sale, at lower of cost or market | 1,560,949 | 1,966,608 |
|   Loans receivable, net of allowance for loan losses of $20,746 (2003 – $19,709) | 1,752,490 | 1,410,849 |
|     Total loans | 3,313,439 | 3,377,457 |
| Receivables and mortgage-servicing advances | 112,103 | 90,835 |
| Accounts receivable from investment sales | 40,052 | 19,520 |
| Accrued interest receivable | 66,393 | 63,771 |
| Servicing assets, net | 203,245 | 167,498 |
| Premises and equipment, net | 146,551 | 136,037 |
| Real estate held for sale, net | 20,072 | 19,253 |
| Other assets | 35,869 | 47,526 |
|     Total assets | $ 15,102,401 | $ 10,393,996 |
| **Liabilities** | | |
| Deposits: | | |
|   Non-interest-bearing deposits | $ 459,360 | $ 364,292 |
|   Interest-bearing deposits | 3,183,720 | 2,606,980 |
| Securities sold under agreements to repurchase | 6,305,163 | 3,602,942 |
| Advances from FHLB | 1,294,500 | 1,206,500 |
| Loans payable | 279,560 | 178,334 |
| Notes payable | 1,105,202 | 602,581 |
| Accounts payable from investment purchases | 325,740 | 2,245 |
| Accrued expenses and other liabilities | 176,387 | 237,682 |
|     Total liabilities | 13,129,632 | 8,801,556 |
| Commitments and contingencies (Note 25) | | |
| **Stockholders' Equity** | | |
| Preferred stock, $1 par value; 40,000,000 shares authorized; 9,015,000 shares issued and outstanding in 2004 and 2003, respectively, at aggregate liquidation preference value: | | |
|   Perpetual noncumulative nonconvertible preferred stock (Series A, B and C) | 228,250 | 228,250 |
|   Perpetual cumulative convertible preferred stock | 345,000 | 345,000 |
| Common stock, $1 par value; 500,000,000 shares authorized; 107,908,862 and 107,903,912 shares issued and outstanding in 2004 and 2003, respectively | 107,909 | 107,904 |
| Additional paid-in capital | 161,639 | 151,902 |
| Legal surplus | 22,612 | 13,806 |
| Retained earnings | 1,187,294 | 804,518 |
| Accumulated other comprehensive loss, net of income tax benefit of $4,534 in 2004 and expense of $568 in 2003 | (79,935) | (58,940) |
|     Total stockholders' equity | 1,972,769 | 1,592,440 |
|     Total liabilities and stockholders' equity | $ 15,102,401 | $ 10,393,996 |

The accompanying notes are an integral part of these financial statements.

**Consolidated Statements of Income**

| (Dollars in thousands, except per share information) | Year ended December 31, 2004 | 2003 | 2002 |
|---|---:|---:|---:|
| Interest income: | | | |
| Loans | $ 234,423 $ | 219,916 $ | 203,084 |
| Mortgage-backed securities | 100,808 | 68,864 | 82,076 |
| Interest-only strips ("IOs") | 55,568 | 37,007 | 43,959 |
| Investment securities | 156,571 | 113,430 | 68,886 |
| Other interest-earning assets | 23,477 | 13,353 | 17,595 |
| Total interest income | 570,847 | 452,570 | 415,600 |
| Interest expense: | | | |
| Deposits | 80,683 | 75,060 | 72,769 |
| Securities sold under agreements to repurchase | 120,635 | 90,514 | 98,014 |
| Advances from FHLB | 49,842 | 49,164 | 42,161 |
| Loans payable | 6,006 | 6,112 | 6,195 |
| Notes payable | 47,783 | 50,240 | 44,039 |
| Total interest expense | 304,949 | 271,090 | 263,178 |
| Net interest income | 265,898 | 181,480 | 152,422 |
| Provision for loan losses | 5,507 | 14,085 | 7,429 |
| Net interest income after provision for loan losses | 260,391 | 167,395 | 144,993 |
| Non-interest income: | | | |
| Net gain on mortgage loan sales and fees | 598,762 | 390,081 | 220,585 |
| Net (loss) gain on securities held for trading, including a loss of $131,007, a gain of $7,314 and a loss of $6,465 on the IO value, in 2004, 2003 and 2002, respectively | (200,607) | 5,591 | (4,271) |
| Net gain on sale of investment securities | 10,550 | 5,447 | 23,858 |
| Servicing income (loss), net of amortization and impairment of $35,701, $50,444, and $40,630, in 2004, 2003, and 2002, respectively | 4,893 | (15,117) | (6,665) |
| Commissions, fees and other income | 36,786 | 25,770 | 21,886 |
| Total non-interest income | 450,384 | 411,772 | 255,393 |
| Non-interest expenses: | | | |
| Compensation and benefits | 89,305 | 82,940 | 56,643 |
| Taxes, other than payroll and income taxes | 9,363 | 7,587 | 5,600 |
| Advertising | 15,079 | 15,311 | 10,974 |
| Professional services | 12,620 | 8,644 | 7,063 |
| Communication and information systems | 13,812 | 13,323 | 12,736 |
| Occupancy and other office expenses | 26,825 | 22,787 | 20,292 |
| Depreciation and amortization | 18,030 | 14,963 | 12,064 |
| Other | 24,018 | 20,247 | 14,038 |
| Total non-interest expenses | 209,052 | 185,802 | 139,410 |
| Income before income taxes | 501,723 | 393,365 | 260,976 |
| Income taxes | 12,098 | 72,066 | 40,008 |
| Net income | $ 489,625 $ | 321,299 $ | 220,968 |
| Net income attributable to common shareholders | $ 456,326 $ | 300,211 $ | 207,238 |
| Net income per common share: | | | |
| Basic | $ 4.23 $ | 2.78 $ | 1.92 |
| Diluted | $ 3.95 $ | 2.70 $ | 1.89 |
| Dividends per common share | $ 0.60 $ | 0.40 $ | 0.28 |

The accompanying notes are an integral part of these financial statements.

**Consolidated Statements of Changes in Stockholders' Equity**

| (In thousands) | Year ended December 31, 2004 | 2003 | 2002 |
|---|---:|---:|---:|
| **Preferred stock:** | | | |
| Balance at beginning of year | $ 573,250 | $ 228,250 | $ 124,750 |
| Shares issued (4.75% Perpetual cumulative convertible) | – | 345,000 | – |
| Shares issued (7.25% Perpetual noncumulative nonconvertible, Series C) | – | – | 103,500 |
| Balance at end of year | 573,250 | 573,250 | 228,250 |
| **Common stock:** | | | |
| Balance at beginning of year | 107,904 | 71,933 | 47,866 |
| Common stock issued under stock option plan | 5 | 89 | 94 |
| Treasury stock canceled and retired | – | (84) | – |
| Shares issued as a result of stock split | – | 35,966 | 23,973 |
| Balance at end of year | 107,909 | 107,904 | 71,933 |
| **Additional paid-in capital:** | | | |
| Balance at beginning of year | 151,902 | 191,216 | 217,594 |
| Issuance cost of preferred stock | – | (8,494) | (3,488) |
| Shares issued under stock option plan | 28 | 655 | 1,055 |
| Stock-based compensation recognized | 9,709 | 4,491 | – |
| Adjustment for stock split | – | (35,966) | (23,945) |
| Balance at end of year | 161,639 | 151,902 | 191,216 |
| **Legal surplus:** | | | |
| Balance at beginning of year | 13,806 | 10,777 | 8,423 |
| Transfer from retained earnings | 8,806 | 3,029 | 2,354 |
| Balance at end of year | 22,612 | 13,806 | 10,777 |
| **Retained earnings:** | | | |
| Balance at beginning of year | 804,518 | 550,554 | 375,855 |
| Net income | 489,625 | 321,299 | 220,968 |
| Cash dividends declared on common stock | (64,744) | (43,148) | (30,158) |
| Cash dividends declared on preferred stock | (33,299) | (21,088) | (13,730) |
| Cash paid in lieu of fractional shares resulting from stock split | – | (70) | (27) |
| Transfer to legal surplus | (8,806) | (3,029) | (2,354) |
| Balance at end of year | 1,187,294 | 804,518 | 550,554 |
| **Accumulated other comprehensive (loss) income, net of tax:** | | | |
| Balance at beginning of year | (58,940) | (7,675) | (12,312) |
| Other comprehensive (loss) income, net of deferred tax | (20,995) | (51,265) | 4,637 |
| Balance at end of year | (79,935) | (58,940) | (7,675) |
| **Treasury stock at par:** | | | |
| Balance at beginning of year | – | (84) | (56) |
| Shares canceled and retired | – | 84 | – |
| Shares issued as a result of stock split | – | – | (28) |
| Balance at end of year | – | – | (84) |
| **Total stockholders' equity** | $ 1,972,769 | $ 1,592,440 | $ 1,044,971 |

The accompanying notes are an integral part of these financial statements.

**Consolidated Statements of Comprehensive Income**

| (In thousands) | Year ended December 31, | | |
| --- | ---: | ---: | ---: |
| | 2004 | 2003 | 2002 |
| Net Income | $ 489,625 | $ 321,299 | $ 220,968 |
| Other comprehensive (loss) income, before tax: | | | |
|    Unrealized (losses) gains on securities arising during the period | (15,583) | (63,333) | 289 |
|    Amortization of unrealized loss on securities reclassified to held to maturity | 36 | 207 | 2,889 |
|    Reclassification adjustment for (gains) losses included in net income | (10,550) | 9,939 | 4,458 |
| Other comprehensive (loss) income before tax | (26,097) | (53,187) | 7,636 |
| Income tax benefit (expense) related to items of other comprehensive income (loss) | 5,102 | 1,922 | (2,999) |
| Other comprehensive (loss) income | (20,995) | (51,265) | 4,637 |
| Comprehensive income, net of tax | $ 468,630 | $ 270,034 | $ 225,605 |

The accompanying notes are an integral part of these financial statements.

**Consolidated Statements of Cash Flows**

| (In thousands) | Year ended December 31, | | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| **Cash flows from operating activities:** | | | |
| Net income | $ 489,625 | $ 321,299 | $ 220,968 |
| Adjustments to reconcile net income to net cash (used in) provided by operating activities: | | | |
| Stock-based compensation recognized | 9,709 | 4,491 | — |
| Depreciation and amortization | 18,030 | 14,963 | 12,064 |
| Amortization and impairment of servicing assets | 35,701 | 50,444 | 40,630 |
| Deferred tax (benefit) provision | (56,173) | 39,980 | 15,712 |
| Provision for loan losses | 5,507 | 14,085 | 7,429 |
| Amortization of premium and accretion of discount on loans, investment securities and debt | 11,813 | 9,195 | 5,852 |
| Origination and purchases of mortgage loans held for sale | (6,736,952) | (5,586,078) | (4,506,257) |
| Principal repayment and sales of mortgage loans held for sale | 3,933,575 | 3,122,828 | 2,022,251 |
| Purchases of securities held for trading | (2,938,478) | (9,130,605) | (10,374,637) |
| Principal repayment and sales of trading securities | 5,185,530 | 11,806,233 | 11,519,110 |
| Increase in interest-only strips, net | (300,608) | (218,939) | (140,337) |
| Increase in servicing assets | (71,448) | (58,061) | (46,171) |
| Increase in receivables and mortgage servicing advances | (21,267) | (24,385) | (22,725) |
| (Increase) decrease in accrued interest receivable | (2,622) | (20,613) | 3,881 |
| Increase in real estate held for sale | (21,622) | (14,950) | (9,669) |
| Decrease (increase) in other assets | 12,718 | (9,914) | (1,133) |
| (Decrease) increase in accrued expenses and other liabilities | (7,954) | 20,250 | 28,836 |
| Total adjustments | (944,541) | 18,924 | (1,445,164) |
| Net cash (used in) provided by operating activities | (454,916) | 340,223 | (1,224,196) |
| **Cash flows from investing activities:** | | | |
| Purchases of securities available for sale | (11,768,050) | (9,014,282) | (4,636,233) |
| Proceeds from sales of securities available for sale | 10,048,273 | 6,981,677 | 5,416,182 |
| Principal repayment of securities available for sale | 400,186 | 506,453 | 41,508 |
| Purchases of securities held to maturity | (664,039) | (1,225,890) | (436,115) |
| Principal repayment and maturities of securities held to maturity | 417,120 | 476,045 | 443,028 |
| (Increase) decrease in FHLB stock | (4,400) | 5,250 | (30,875) |
| Origination of loans receivable | (1,065,741) | (892,724) | (662,324) |
| Principal repayment of loans receivable | 713,894 | 491,496 | 490,558 |
| Purchases of premises and equipment | (28,544) | (36,084) | (27,045) |
| Proceeds from sales of real estate held for sale | 20,803 | 8,754 | 5,026 |
| Net cash (used in) provided by investing activities | (1,930,498) | (2,699,305) | 603,710 |

*(Continues)*

The accompanying notes are an integral part of these financial statements.

## Consolidated Statements of Cash Flows (Continued)

| (In thousands) | Year ended December 31, | | |
|---|---:|---:|---:|
| | 2004 | 2003 | 2002 |
| Cash flows from financing activities: | | | |
| Increase in deposits | $ 671,808 | $ 754,061 | $ 547,302 |
| Increase in securities sold under agreements to repurchase | 2,702,221 | 869,603 | 159,567 |
| Proceeds from advances from FHLB | 205,000 | — | 821,000 |
| Repayment of advances from FHLB | (117,000) | (105,000) | (197,000) |
| Increase (decrease) in loans payable | 101,226 | (32,668) | 49,901 |
| Proceeds from issuance of notes payable | 739,311 | — | 170,253 |
| Repayment of notes payable | (238,138) | (19,144) | (8,877) |
| Issuance of common stock, net | 33 | 744 | 1,149 |
| Issuance of preferred stock, net | — | 336,506 | 100,012 |
| Dividends paid | (98,043) | (63,519) | (43,888) |
| Cash paid in lieu of fractional shares | — | (70) | (27) |
| Net cash provided by financing activities | 3,966,418 | 1,740,513 | 1,599,392 |
| Net increase (decrease) in cash and cash equivalents | 1,581,004 | (618,569) | 978,906 |
| Cash and cash equivalents at beginning of year | 954,722 | 1,573,291 | 594,385 |
| Cash and cash equivalents at end of year | $ 2,535,726 | $ 954,722 | $ 1,573,291 |
| Cash and cash equivalents includes: | | | |
| Cash and due from banks | $ 64,940 | $ 84,713 | $ 156,137 |
| Money market investments | 2,470,786 | 870,009 | 1,417,154 |
| | $ 2,535,726 | $ 954,722 | $ 1,573,291 |
| Supplemental Schedule of Non-cash Activities: | | | |
| Loan securitizations | $ 3,214,395 | $ 2,678,184 | $ 2,032,354 |
| Reclassification of mortgage loans held for sale to loans receivable | $ — | $ — | $ 211,999 |
| Loans foreclosed | $ 22,881 | $ 18,523 | $ 12,478 |
| Shares issued as a result of stock split | $ — | $ 35,966 | $ 23,973 |
| Supplemental Information for Cash Flows: | | | |
| Cash used to pay interest | $ 296,367 | $ 270,343 | $ 260,260 |
| Cash used to pay income taxes | $ 57,141 | $ 41,242 | $ 27,132 |

The accompanying notes are an integral part of these financial statements.

**Notes to Consolidated Financial Statements**
**Years Ended December 31, 2004, 2003 and 2002**

## 1. Reporting Entity

Doral Financial Corporation ("DFC", "Doral Financial" or the "Company") is a financial holding company (refer to Note 3) engaged in mortgage banking, banking (including thrift operations), institutional securities operations and insurance agency activities through its wholly owned subsidiaries Doral Mortgage Corporation, SANA Mortgage Corporation, Centro Hipotecario de Puerto Rico, Inc., Doral Bank ("Doral Bank-PR"), Doral Bank, FSB ("Doral Bank-NY"), Doral Insurance Agency, Inc. ("Doral Insurance Agency"), Doral Securities, Inc. ("Doral Securities"), Doral Money, Inc. ("Doral Money"), Doral International, Inc. and Doral Properties, Inc. ("Doral Properties"). Doral Financial is also engaged in mortgage banking activities through HF Mortgage Bankers, organized as an operating division within the parent company.

The Company is primarily engaged in the origination, purchase, securitization and sale of FHA, VA, conventional conforming and non-conforming first and second mortgage loans, and in providing and/or arranging for interim financing for the construction of residential and other types of real estate development and permanent financing on multifamily and commercial real estate. The Company services FHA-insured, VA-guaranteed and conventional mortgage loans pooled for the issuance of Government National Mortgage Association ("GNMA"), Federal National Mortgage Association ("FNMA") and Federal Home Loan Mortgage Corporation ("FHLMC") mortgage-backed securities and collateralized mortgage obligation certificates issued by grantor trusts established by the Company ("CMO Certificates"). The Company also services loans for private investors, originates loans for investment and provides banking services through Doral Bank-PR, a Puerto Rico commercial bank, and Doral Bank-NY, a federal savings bank in New York, and insurance and institutional securities services through Doral Insurance Agency and Doral Securities, respectively.

The Company operates primarily in Puerto Rico, but it also has one mortgage banking office and six branches of Doral Bank-NY, a federally chartered savings bank in New York City.

## 2. Summary of Significant Accounting Policies

The accompanying Consolidated Financial Statements include the accounts of Doral Financial Corporation and its wholly owned subsidiaries. The Company's accounting and reporting policies conform with accounting principles generally accepted in the United States of America. All significant intercompany accounts and transactions have been eliminated in consolidation.

The following summarizes the most significant accounting policies followed in the preparation of the accompanying Consolidated Financial Statements:

### Use of Estimates in the Preparation of Financial Statements

The preparation of the Consolidated Financial Statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amount in assets and liabilities and the disclosure of contingent assets and liabilities at the date of the Consolidated Financial Statements as well as the reported amounts of revenues and expenses during the reporting periods. Because of uncertainties inherent in the estimation process, it is possible that actual results could differ from those estimates.

### Money Market Investments

Money market investments consist of fixed-income securities whose original maturity is less than three months. These investments are carried at cost, which approximates fair value due to their short-term nature. In the case of securities purchased under resale agreements, it is the Company's policy to require and take possession of collateral whose fair value exceeds the balance of the related receivable. Collateral is valued daily, and the Company may require counterparties to deposit additional collateral or return collateral pledged when appropriate. The securities underlying the agreements are not recorded in the asset accounts of the Company since the counterparties retain effective control of such securities.

### Investment Securities

Investment securities transactions are recorded on the trade date basis. At the end of the period, unsettled purchase transactions are recorded as part of the Company's position and as a payable, while unsettled sale transactions are deducted from the Company's position and recorded as a receivable. Investment securities are classified as follows:

*Securities Held for Trading:* Securities that are bought and held principally for the purpose of selling them in the near term are classified as securities held for trading and reported at fair value generally based on quoted market prices. For securities without quoted prices, fair value represents quoted market prices for comparable instruments. In certain other cases, fair values have been estimated based on assumptions concerning the amount and timing of estimated future cash flows and assumed discount rates reflecting appropriate degrees of risk. Realized and unrealized changes in market value are recorded in the securities trading activities as a part of net gains (losses) on securities held for trading in the period in which the changes occur. Interest income and expense arising from trading

instruments are included in the Consolidated Statements of Income as part of net interest income.

In connection with securitization transactions and sales of loans, the Company recognizes as IOs the rights to cash flows remaining after the payment of the servicing fees and the contractual payments to the buyers of the loans. The contractual payments to the buyers are either fixed over the life of the loans or floating based on a spread over the London Interbank Offered Rate ("LIBOR") with quarterly resetting. Actual cash flows received on the Company's portfolio of IOs, net of amortization of IO value, are included in the Consolidated Statements of Income as part of net interest income. The amortization of the IOs is determined using a method that results in an approximate level rate of return on the IOs. The rate of return on the IOs is adjusted periodically to reflect changes in expected cash flows on these instruments. These IOs are carried at fair value, which is generally determined by reference to three independent sources, including dealers' quotes and external and internal valuations based on discounted cash flow models that incorporate assumptions regarding discount and mortgage prepayment rates. In the case of the internal valuation, it is a static cash flow model that incorporates internally generated prepayment and discount rate assumptions and an expected retained interest spread based on 3-month LIBOR rates at the close of the reporting period. It is the Company's policy to use the lowest of the valuations derived from these sources. Losses and gains on the value of the IOs are recognized as part of the Company's net gains (losses) on securities held for trading in the Consolidated Financial Statements.

*Securities Held to Maturity:* Securities that the Company has the ability and intent to hold until their maturities are classified as held to maturity and reported at amortized cost. Premiums and discounts are amortized as an adjustment to interest income over the life of the related securities using a method that approximates the interest method.

*Securities Available for Sale:* Securities not classified as either securities held to maturity or securities held for trading are classified as available for sale and reported at fair value based on quoted market prices, with unrealized gains and losses excluded from earnings and reported, net of tax, in other comprehensive income which is a separate component of stockholders' equity. Cost of securities sold is determined on the specific identification method.

When securities are transferred from available for sale to held to maturity, any unrealized gain or loss at the time of transfer remains in accumulated other comprehensive income and is amortized over the remaining term of the securities.

Other-than-temporary impairment loss, if any, in the value of securities is recognized in the Consolidated Statements of Income in the period that the other-than-temporary impairment is determined.

### Mortgage Loans Held for Sale

Mortgage loans held for sale are carried at the lower of net cost or fair value computed on an aggregate portfolio basis. The amount by which cost exceeds fair value, if any, is accounted for as a loss through a valuation allowance. Changes in the valuation allowance are included in the determination of income in the period in which the change occurs. Loan origination fees and direct loan origination costs related to loans held for sale are deferred as an adjustment to the carrying basis of such loans until these are sold or securitized. The securitization of mortgage loans held for sale is recorded as a sale of mortgage loans and the purchase of mortgage-backed securities, which are generally classified as securities held for trading. The market value of mortgage loans held for sale is generally based on quoted market prices for mortgage-backed securities.

Beginning in the second quarter of 2002, conventional mortgage loans held for sale by Doral Financial's mortgage banking units are placed on a non-accrual basis after they have been delinquent for more than 180 days to the extent concern exists as to ultimate collectibility based on the loan-to-value ratio. When the loan is placed on non-accrual, all accrued but unpaid interest to date is reversed against interest income. From the beginning of 2001 to the second quarter of 2002, mortgage loans held for sale by Doral Financial's mortgage banking units were placed on a non-accrual basis if they had been delinquent for over a year and concern existed as to ultimate collectibility based on loan-to-value ratios, and only accrued interest over one year was reversed.

### Loans Receivable

Loans receivable are held principally for investment purposes. These consist mainly of construction loans for new housing development, certain residential mortgage loans originated through Doral Bank-PR, commercial real estate, land, and consumer loans.

Loans receivable are stated at their unpaid balance, less unearned interest, net deferred loan fees or costs, undisbursed portion of construction loans and an allowance for loan losses. Unearned interest on consumer loans is amortized using a method that results in a uniform level rate of return over the term of the loan. Loan origination fees and costs incurred in the origination of loans receivable are deferred and amortized using a method that approximates the interest method throughout the term of the loan as a yield adjustment.

Recognition of interest on loans receivable is discontinued when loans are more than 90 days in arrears. At that time, any interest accrued is reversed against interest income. Such interest, if ultimately collected, is credited to income in the period of the recovery. Loans for which the recognition of interest has been discontinued are designated as non-accruing. Such loans are not reinstated to accrual status until principal and interest payments are brought up to date or when conditions indicate that the Company will collect the principal and interest.

### Allowance for Loan Losses

An allowance for loan losses is provided for probable losses on loans receivable and mortgage loans held for sale. The allowance for loan losses is established based upon a review of the loan portfolio, loss experience, current delinquency rates, current economic conditions and other pertinent factors. Loan losses are charged and recoveries are credited to the allowance for loan losses, while increases to the allowance are charged to operations.

The Company measures impairment of a loan based on the present value of expected future cash flows discounted at the loan's effective interest rate or, as a practical expedient, at the loan's observable market price or the fair value of the collateral, if the loan is collateral dependent. The Company performs impairment evaluations of small-balance homogeneous loans on a group basis. For such loans, the allowance is determined considering the historical charge-off experience of each loan category (e.g. residential mortgage, auto, personal, credit cards, etc.) and delinquency levels as well as charge-off and delinquency trends and economic data. Commercial and construction loans over $2.0 million are evaluated individually for impairment. Loans that are measured at the lower of cost or fair value are excluded. Loans are considered impaired when, based on management's evaluation, a borrower will not be able to fulfill its obligation under the original terms of the loan.

### Servicing Assets and Servicing Activities

The Company pools FHA-insured and VA-guaranteed mortgages for issuance of GNMA mortgage-backed securities. Conventional loans are pooled and issued as FNMA or FHLMC mortgage-backed securities and CMO Certificates as well as sold in bulk to investors with servicing retained. The servicing functions typically performed include: collecting and remitting loan payments, responding to borrower inquiries, accounting for principal and interest, holding custodial funds for payment of property taxes and insurance premiums, supervising foreclosures and property dispositions, and generally administering the loans. The servicing rights entitle the Company to annual servicing fees based on the outstanding principal balance of the mortgage loans and the contractual servicing rate. The annual servicing fees generally fluctuate between 25 and 50 basis points, less guarantee fees. The servicing fees are credited to income on a monthly basis and recognized as earned over the life of the servicing portfolio. In addition, the Company generally receives other remuneration consisting of mortgagor-contracted fees as late charges and prepayment penalties, which are credited to income when collected.

Servicing rights retained in a sale or securitization are measured by allocating the carrying value of the loans between the assets sold and the interest retained, if any, based on their relative fair values, if practicable, at the date of sale or securitization and are presented in the accompanying Consolidated Statements of Financial Condition as servicing assets. Gain on sale of mortgages is the difference between the cash proceeds from the sale of the loan or security and its allocated cost after allocating a portion of the cost to the retained interests, and, in the case of loan sales with recourse, the recourse obligation assumed by the Company.

Considerable judgment is required to determine the fair value of the Company's servicing assets. Unlike government securities and other highly liquid investments, the precise market value of servicing assets cannot be readily determined because these assets are not actively traded in active securities markets. The fair value of the servicing assets is generally determined based on market prices for sales of similar assets. Purchased servicing assets are initially recorded at their fair value, which equals the amount paid. Doral Financial also receives, on a quarterly basis, a third party valuation of its servicing asset related to its FNMA, FHLMC and GNMA servicing portfolio. The third party valuation combines the use of a discounted cash flow model and the Company's specific economic assumptions, the most significant being prepayment speeds and discount rates, based on the Company's empirical data drawn from the historical performance of the loans underlying its servicing assets.

The servicing assets are amortized in proportion to, and over the estimated life of the underlying loans, and the amortization is recorded as a reduction of servicing income. Amortization is adjusted prospectively to reflect changes in prepayment experience. Servicing assets are also periodically evaluated for impairment. Impairment is recognized through a valuation allowance for each individual stratum of mortgage loans subject to servicing rights. The strata are based on the mortgage loans' predominant characteristics, which the Company has determined to be type of loan (government, conventional, conforming and non-conforming) and interest rates. The valuation allowance is adjusted to reflect the amount, if any, by which

the cost basis of the servicing asset for a given stratum of loans being serviced exceeds its fair value. If the servicing assets are impaired, the impairment is recognized in current-period earnings as a reduction of servicing income, and the current value of the servicing assets is adjusted through the valuation allowance. Any fair value in excess of the cost basis of the servicing asset for a given stratum is not recognized. Other-than-temporary impairment, if any, is recognized as a direct write-down of the servicing assets, and the valuation allowance is applied to reduce the cost basis of the the servicing asset. Prior to July 2002, Doral Financial recorded impairment charges as a direct write-down of servicing assets.

### Real Estate Held for Sale

The Company acquires real estate through foreclosure proceedings. Legal fees and other direct costs incurred in a foreclosure are expensed as incurred. These properties are held for sale and are stated at the lower of cost or fair value, less estimated costs to sell. Gains and losses from disposition of real estate held for sale are recorded in non-interest expenses within the other expenses caption in the accompanying Consolidated Statements of Income.

### Premises and Equipment

Premises and equipment are carried at cost, less accumulated depreciation and amortization. Depreciation and amortization are provided on the straight-line method over the estimated useful lives of the assets or the terms of the leases, if shorter, for leasehold improvements. Useful lives range from three to ten years for leasehold improvements and equipment, and thirty to forty years for office facilities.

The Company measures impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If identified, an impairment loss is recognized through a charge to earnings based on the fair value of the property.

### Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities

The Company recognizes the financial and servicing assets it controls and the liabilities it has incurred, derecognizes financial assets when control has been surrendered, and derecognizes liabilities when extinguished.

From time to time, the Company sells mortgage loans and mortgage-backed securities subject to recourse provisions. Pursuant to these recourse arrangements, the Company agrees to retain or share the credit risk with the purchaser of such mortgage loans for a specified period or up to a certain percentage of the total amount in loans sold. The Company estimates the fair value of the retained recourse obligation or any liability incurred at the time of sale and allocates such obligation to the cost of the loans.

### Securities Sold under Agreements to Repurchase

As part of its financing activities the Company enters into sales of securities under agreements to repurchase the same or substantially similar securities. The Company retains control over such securities. Accordingly, the amounts received under these agreements represent borrowings, and the securities underlying the agreements remain in the asset accounts. These transactions are carried at the amounts at which transactions will be settled. The counterparties to the contracts generally have the right to repledge the securities received as collateral. Those securities are presented in the Consolidated Statements of Financial Condition as part of pledged investment securities.

### Insurance Agency Commissions

Commissions generated by the Company's insurance agency operation are recorded when earned. The Company's insurance agency earns commissions on the sale of insurance policies issued by unaffiliated insurance companies.

### Amortization of Debt Issuance Costs

Costs related to the issuance of debt are amortized to interest expense under a method that approximates the interest method, and are included in the Consolidated Statements of Financial Condition as part of other assets.

### Interest Rate Risk Management

The Company has various mechanisms to reduce its exposure to interest rate fluctuations including, among others, entering into transactions dealing with financial derivatives such as futures contracts, options, interest rate swaps and interest rate caps and collars. Such instruments are purchased or entered into as economic hedges against fluctuations in interest rates and/or market values of specifically identified assets or liabilities. For financial reporting purposes, it is the Company's general policy to mark such instruments to market with realized and unrealized gains or losses included in the Consolidated Statements of Income as part of the net gains (losses) on securities held for trading.

From time to time, the Company may designate a derivative as a hedge of the fair value of a recognized fixed rate asset or liability ("fair value" hedge). During 2004, certain hedging activities related to certain available-for-sale securities were accounted for as a fair value hedge. In a qualifying fair value hedge, both the changes in fair value of the hedged item (in this case, available-for-sale securities) and changes in fair value of the derivatives are included in net gains (losses) on securities held for trading in the Consolidated Statements

of Income. As a result, any hedge ineffectiveness is reflected immediately in earnings. At the inception of a hedge transaction, the Company formally documents the hedge relationship and the risk management objective and strategy for undertaking the hedge. This process includes identification of the hedging instrument, hedged item, risk being hedged and the methodology for measuring effectiveness.

The Company discontinues fair value hedge when (1) it determines that a derivative instrument is no longer effective in offsetting changes in the fair value of a hedged item; or (2) a derivative instrument expires or is sold, terminated, or exercised. When fair value hedge is discontinued, the derivative instrument continues to be carried on the Consolidated Statement of Financial Condition at its fair value, with changes in its fair value recognized in current period earnings. However, changes in fair value of the previously hedged asset or liability will no longer be reflected in earnings. In the case of available-for-sale securities, such changes will again be reported in other comprehensive income. Changes to the carrying value of the available-for-sale securities during the period the hedge was outstanding are amortized over the remaining term of the securities.

### Income Taxes

The Company recognizes deferred tax liabilities and assets for the expected future tax consequences of temporary differences between the carrying amounts and the tax bases of assets and liabilities based on applicable tax laws. A valuation allowance is recognized for any deferred tax asset which, based on management's evaluation, is more likely than not (a likelihood of more than 50%) that some portion or all of the deferred tax asset will not be realized.

Doral Financial recognizes any effect of change in tax rates during the period in which such changes are enacted into law, and recognizes income tax benefits when the realization of such benefits is probable.

### Legal Surplus

The Banking Act of the Commonwealth of Puerto Rico requires that a minimum of 10% of Doral Bank-PR's net income for the year be transferred to a legal surplus account until such surplus equals its paid-in capital. The surplus account is not available for payment of dividends.

### Statements of Cash Flows

Cash and cash equivalents include cash and due from banks, securities purchased under agreements to resell, time deposits and other short-term investments with maturities of three months or less when purchased.

### Earnings per Share

Basic net income per share is determined by dividing net income, after deducting any dividends on preferred stock, by the weighted-average number of common shares outstanding during the period.

Diluted net income per share has been computed based on the assumption that all of the shares of convertible instruments will be converted into common stock, and considers the dilutive effect of stock options using the Treasury stock method.

In the fourth quarter of 2004, the Company adopted a new accounting pronouncement that resulted in the addition of 8.674 million shares of common stock to the fully diluted common stock share base by assuming the conversion of the 1.38 million outstanding shares of the Company's contingently convertible preferred stock. This new accounting pronouncement is effective for periods ending after December 15, 2004, and was applied by retroactively restating previously reported earnings per diluted share. All references in these Consolidated Financial Statements to the number of average diluted common shares and diluted earnings per share amounts have been restated accordingly. See "Recent Accounting Pronouncements" for more detail.

On October 15, 2003, the Company's Board of Directors declared a three-for-two stock split on the Company's common stock. The stock split was effected in the form of a stock dividend of one additional share of common stock issued on December 11, 2003, for every two shares of common stock held of record on November 21, 2003. The per share data contained in the Consolidated Financial Statements prior to the year ended December 31, 2003, has been adjusted to reflect the three-for-two stock split.

### Fair Value of Financial Instruments

The reported fair values of financial instruments are based on a variety of factors. For a substantial portion of financial instruments, fair value represents quoted market prices for identical or comparable instruments. In other cases, fair values have been estimated based on assumptions concerning the amount and timing of estimated future cash flows and assumed discount rates reflecting appropriate degrees of risk. Accordingly, the fair values may not represent actual values of the financial instruments that could have been realized as of year end or that may be realized in the future.

### Stock Option Plan

Effective January 1, 2003, Doral Financial expenses the fair value of stock options granted to employees using the "modified prospective" method under Statement of Financial

Accounting Standards ("SFAS") No. 148. Under this method, the Company expenses the fair value of all employee stock options granted after January 1, 2003, as well as the unvested portions of previously granted options. The compensation expense associated with expensing stock options for 2004 and 2003 was approximately $9.7 million and $4.5 million, respectively. During 2002, the Company used the intrinsic value method to account for its stock option plan. Under the intrinsic value-based method, compensation expense is recognized for the excess, if any, of the quoted market price of the stock on the grant date over the amount an employee must pay to acquire the stock. The Company did not recognize any compensation cost in 2002 because the exercise price of the options equaled the quoted market price of the stock on the date of grant.

The following table illustrates the effect on net income and earnings per common share if compensation had been recognized using the fair value method in 2002.

| (In thousands, except for per share information) | 2002 |
|---|---|
| Compensation and Benefits: | |
| Reported | $ 56,643 |
| Pro forma | $ 61,134 |
| | |
| Net Income: | |
| Reported | $ 220,968 |
| Pro forma | $ 218,229 |
| | |
| Basic Earnings Per Share: | |
| Reported | $ 1.92 |
| Pro forma | $ 1.90 |
| | |
| Diluted Earnings Per Share: | |
| Reported | $ 1.89 |
| Pro forma | $ 1.87 |

Refer to Note 28 for assumptions used to determine the fair value of the options granted.

### Comprehensive Income
Comprehensive income includes net income and other transactions, except those with stockholders, which are recorded directly in equity. In the Company's case, in addition to net income, other comprehensive income results from the changes in the unrealized gains and losses on securities that are classified as available for sale.

### Segment Information
The Company reports financial and descriptive information about its reportable segments (see Note 33). Operating segments are components of an enterprise about which separate financial information is available that is evaluated regularly by management in deciding how to allocate resources and in assessing performance. DFC's management determined that the segregation that best fulfills the segment definition described above is by line of business.

### Reclassifications
Certain amounts reflected in the 2003 and 2002 Consolidated Financial Statements have been reclassified to conform to the presentation for 2004.

### Recent Accounting Pronouncements
*Loan Commitments Accounted for as Derivative Instruments.* In March 2004, the U.S. Securities and Exchange Commission released the Staff Accounting Bulletin ("SAB") No. 105, "Loan Commitments Accounted for as Derivative Instruments." This bulletin informs registrants of the staff's view that the fair value of recorded loan commitments should not consider the expected future cash flows related to the associated servicing of the future loan. The provisions of SAB 105 must be applied to loan commitments accounted for as derivatives that are entered into after March 31, 2004. The staff will not object to the application of existing accounting practices to loan commitments accounted for as derivatives that are entered into on or before March 31, 2004, with appropriate disclosures. On April 1, 2004, the Company adopted the provisions of SAB 105. Doral Financial does not currently include, and prior to SAB 105 did not include, the value of mortgage servicing or any other internally developed intangible assets in the valuation of its mortgage loan commitments. Therefore, the adoption of SAB 105 did not have an impact on Doral Financial's financial condition or results of operations.

*Accounting Issues Related to Certain Features of Contingently Convertible Debt and the Effect on Diluted Earnings per Share.* In September 2004, the Emerging Issues Task Force ("EITF") reached a final consensus on Issue 04-8, "Accounting Issues Related to Certain Features of Contingently Convertible Debt and the Effect on Diluted Earnings per Share." The issue addresses the matter when the dilutive effect of contingently convertible debt ("Co-Cos") with a market price trigger should be included in diluted earnings per share ("EPS"). Co-Cos are generally convertible into common shares of the issuer after the common stock has exceeded a predetermined threshold for a specific time period and is greater than the conversion price of the debt. The EITF reached a consensus that these securities should be treated as convertible securities and included in a dilutive EPS calculation (if dilutive), regardless of whether the market price trigger has been met.

The EITF agreed to broaden the scope of the Issue to include all issued securities that have embedded market price contingent conversion features. Therefore, this issue also applies to contingently convertible preferred stock. The EITF agreed that the final consensus would be effective for all periods ending after December 15, 2004, and would be applied by retroactively restating previously reported EPS. As of December 31, 2004 and 2003, the Company has outstanding 1,380,000 shares of its 4.75% perpetual cumulative convertible preferred stock issued in the second half of 2003. Each share of convertible preferred stock is currently convertible into 6.2856 shares of common stock, subject to adjustment under specific conditions. Refer to Note 30 for additional information regarding specific conditions for the convertible preferred stock and the impact on the diluted earnings per share for 2004 and 2003. This new accounting pronouncement resulted in the addition of 8.674 million shares of common stock to the fully diluted common stock share base by assuming the conversion of the 1.38 million outstanding shares of the Company's contingently convertible preferred stock.

*The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments.* In March 2004, the EITF reached a consensus on Issue 03-1, "The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments." The EITF reached a consensus on the impairment model to be used to determine when an investment is considered impaired, whether that impairment is other than temporary, and the measurement of an impairment loss. The impairment model also includes accounting considerations subsequent to the recognition of an other-than-temporary impairment and requires certain disclosures about unrealized losses that have not been recognized as other-than-temporary impairments. This impairment model is applicable for investments in debt and equity securities that are within the scope of SFAS 115, "Accounting for Certain Investments in Debt and Equity Securities," and equity securities that are not subject to the scope of SFAS 115 and not accounted for under the equity method under Accounting Principle Bulletin ("APB") Opinion No. 18, "The Equity Method of Accounting for Investments in Common Stock" referred in Issue 03-1 as the cost method investments. The impairment model developed by the EITF to determine whether an investment is within the scope of Issue 03-1 involves a sequence of steps including the following: Step 1 – determine whether an investment is impaired. If an impairment indicator is present, as determined in Step 1, the investor should estimate the fair value of the investment. If the fair value of the investment is less than its cost, proceed with Step 2 – evaluate whether an impairment is other than temporary. Step 3 – if the impairment is other than temporary, recognize an impairment loss equal to the difference between the investment's cost and its fair value. The consensus on Issue 03-1 should be applied to other-than-temporary impairment evaluations in reporting periods beginning after June 15, 2004, except as described below.

In September 2004, the Financial Accounting Standard Board ("FASB") issued proposed FSP EITF Issue 03-1a, "Implementation Guidance for the Application of Paragraph 16 of EITF Issue No. 03-1," which provides guidance for the application of paragraph 16 of EITF Issue 03-1 to debt securities that are impaired because of interest rate and/or sector spread increases. Also, in September 2004 the FASB issued FSP EITF Issue 03-1-1, "Effective Date of Paragraphs 10-20 of EITF Issue 03-1," which delayed the effective date of paragraphs 10-20 of Issue 03-1. Paragraphs 10-20 of Issue 03-1 provide guidance on the impairment model to be used to determine when an investment is considered impaired, whether that impairment is other than temporary, and the measurement of an impairment loss. Issue 03-1-1 expands the scope of the deferral to include all securities covered by EITF 03-1 rather than limiting the deferral only to certain debt securities that are impaired solely because of interest rate and/or sector spread increases. The delay of the effective date for paragraphs 10-20 of Issue 03-1 will be superseded concurrent with the final issuance of FSP EITF Issue 03-1a. Management of the Company does not anticipate that the adoption of Issue 03-1 will have a material effect on Doral Financial's Consolidated Financial Statements.

*Accounting for Certain Loans or Debt Securities Acquired in a Transfer.* In November 2003, the Accounting Standards Executive Committee issued Statement of Position ("SOP") No. 03-3, "Accounting for Certain Loans or Debt Securities Acquired in a Transfer." This statement addresses accounting for differences between contractual cash flows and cash flows expected to be collected from an investor's initial investment in loans or debt securities (loans) acquired in a transfer if those differences are attributable, at least in part, to credit quality. This SOP does not apply to loans originated by the entity. This SOP prohibits "carrying over" or creation of valuation allowances in the initial accounting of all loans acquired in a transfer that are within the scope of this SOP. The prohibition of the valuation allowance carryover applies to the purchase of an individual loan, a pool of loans, a group of loans, and loans acquired in a purchase business combination. This SOP is effective for loans acquired in fiscal years beginning after December 15, 2004. Management believes that the adoption of this statement will not have a material effect on Doral Financial's Consolidated Financial Statements.

*Share-Based Payments.* In December 2004, the FASB issued SFAS 123R, "Share-Based Payments." This statement is a

revision of SFAS No. 123, "Accounting for Stock-Based Compensation" and it also supersedes APB No. 25, "Accounting for Stock Issued to Employees," and its related implementation guidance. This statement focuses primarily on accounting for transactions in which an entity obtains employee services in share-based payment transactions. SFAS 123R eliminates the alternative to use APB 25's intrinsic value method of accounting that was provided in SFAS 123, as originally issued. This statement is effective for reporting periods that begin after June 15, 2005. Management does not expect that the adoption of this statement will have a material effect on the Consolidated Financial Statements of the Company since in 2003, Doral Financial started to expense the fair value of stock options granted to employees using the "modified prospective" method under SFAS No. 148, "Accounting for Stock-Based Compensation – Transition and Disclosure." Under this method, the Company expenses the fair value of all employee stock options granted after January 1, 2003, as well as the unvested portions of previously granted options.

### 3. Regulatory Requirements

#### Holding Company Requirements

The Company is a financial holding company subject to the provisions of the Gramm-Leach-Bliley Act (the "Act"). Under the Act, bank holding companies, such as DFC, all of whose subsidiary depository institutions are "well capitalized" and "well managed," as defined in the Bank Holding Company Act of 1956 (the "BHCA"), and which obtain satisfactory Community Reinvestment Act ratings, may elect to be treated as financial holding companies ("FHCs"). FHCs are permitted to engage in a broader spectrum of activities than those currently permitted for bank holding companies. FHCs can engage in any activities that are "financial" in nature, including insurance underwriting and brokerage, and underwriting and dealing in securities without a revenue limit or a limit on underwriting and dealing in equity securities applicable to foreign securities affiliates (which include Puerto Rico securities affiliates for these purposes). Subject to certain limitations, under merchant banking rules, FHCs are allowed to make investments in companies that engage in activities that are not financial in nature without regard to the existing 5% limit for domestic investments and 20% limit for overseas investments (including Puerto Rico).

Under the Act, if the Company later fails to meet the requirements for being an FHC and is unable to correct such deficiencies within certain prescribed time periods, the Federal Reserve Board could require the Company to divest control of its depository institution subsidiaries or, alternatively, to cease conducting activities that are not permissible to bank holding companies that are not FHCs.

#### Banking Charters

Doral Bank-PR is a commercial bank chartered under the laws of the Commonwealth of Puerto Rico. Its deposits are insured by the Federal Deposit Insurance Corporation ("FDIC") through the Savings Association Insurance Fund ("SAIF").

Doral Bank-NY is a federally chartered savings bank regulated by the Office of Thrift Supervision. Its deposit accounts are also insured by the FDIC.

#### Regulatory Capital Requirements

The Company is subject to various regulatory capital requirements administered by the federal banking agencies. Failure to meet minimum capital requirements can result in certain mandatory actions, as well as additional discretionary actions, by regulators that, if undertaken, could have a direct material effect on the Company. Under capital adequacy guidelines and the regulatory framework for prompt corrective action, the Company and its banking subsidiaries must meet specific capital guidelines that involve quantitative measures of its assets, liabilities, and certain off-balance sheet items as calculated under regulatory guidelines. The Company's and its banking subsidiaries' capital amounts and classifications are also subject to qualitative judgments by the regulators about components, risk weightings and other factors.

Quantitative measures, established by regulation to ensure capital adequacy, require the Company and its banking subsidiaries to maintain minimum amounts and ratios (set forth in the following table) of Total and Tier I capital (as defined in the regulations) to risk-weighted assets (as defined), and of Tier I capital (as defined) to average assets (as defined). As of December 31, 2004, the Company and all of its banking subsidiaries met all capital adequacy requirements to which they are subject.

As of December 31, 2004, the most recent notification from the FDIC dated October 20, 2003, categorized Doral Bank-PR as "well capitalized" under the regulatory framework for prompt corrective action. To be categorized as "well capitalized," Doral Bank-PR must maintain minimum Total risk-based, Tier I risk-based and Tier I leverage ratios as set forth in the following table. There are no conditions or events since the FDIC notification that management believes have changed Doral Bank-PR's category.

Doral Bank-NY is subject to substantially the same regulatory capital requirements of Doral Bank-PR as set forth above. As of December 31, 2004, Doral Bank-NY was in compliance with the capital requirements for a "well-capitalized" institution.

DFC's, Doral Bank-PR's and Doral Bank-NY's actual capital amounts and ratios are presented in the following table. Totals of approximately $347.0 million (2003 – $180.2 million), $46,000 (2003 – $87,000), and $788,000 (2003 – $328,000) representing non-allowable assets such as goodwill, residual and credit-enhancing interest-only strips and other intangible assets, were deducted from the capital of DFC, Doral Bank-PR and Doral Bank-NY, respectively.

The federal banking and thrift regulatory agencies have adopted a rule that changes the regulatory capital treatment of recourse obligations, residual interests and direct credit substitutes. The rule imposed a dollar-for-dollar capital requirement on residual interests retained in sale or securitization transactions and a 25% limit on the amount of Tier I capital that may consist of credit-enhancing interest-only strips, a subset of residual interests.

Currently, IOs retained in connection with the sale by Doral Financial of its non-conforming loans are treated as credit-enhancing interest-only strips under the rule and thus are subject to a dollar-for-dollar capital requirement for risk-based capital purposes and to the 25% concentration limit for Tier I capital purposes. The capital ratios set forth below incorporate the impact of the capital rule for IOs.

| (Dollars in thousands) | Actual Amount | Ratio (%) | For capital adequacy purposes Amount | Ratio (%) | To be well capitalized under prompt corrective action provisions Amount | Ratio (%) |
|---|---|---|---|---|---|---|
| **As of December 31, 2004:** | | | | | | |
| Total capital (to risk-weighted assets): | | | | | | |
| DFC Consolidated | $ 1,744,946 | 18.9 | $ 738,314 | ≥8.0 | N/A | N/A |
| Doral Bank-PR | $ 647,146 | 22.1 | $ 234,111 | ≥8.0 | $ 292,638 | ≥10.0 |
| Doral Bank-NY | $ 48,270 | 21.5 | $ 17,937 | ≥8.0 | $ 22,421 | ≥10.0 |
| Tier I capital (to risk-weighted assets): | | | | | | |
| DFC Consolidated | $ 1,705,733 | 18.5 | $ 369,157 | ≥4.0 | N/A | N/A |
| Doral Bank-PR | $ 627,046 | 21.4 | $ 117,055 | ≥4.0 | $ 175,583 | ≥6.0 |
| Doral Bank-NY | $ 47,528 | 21.2 | $ 8,969 | ≥4.0 | $ 13,453 | ≥6.0 |
| Leverage Ratio:[1] | | | | | | |
| DFC Consolidated | $ 1,705,733 | 11.8 | $ 578,085 | ≥4.0 | N/A | N/A |
| Doral Bank-PR | $ 627,046 | 5.7 | $ 437,812 | ≥4.0 | $ 547,266 | ≥5.0 |
| Doral Bank-NY | $ 47,528 | 8.5 | $ 22,501 | ≥4.0 | $ 28,126 | ≥5.0 |
| **As of December 31, 2003:** | | | | | | |
| Total capital (to risk-weighted assets): | | | | | | |
| DFC Consolidated | $ 1,503,071 | 22.7 | $ 529,003 | ≥8.0 | N/A | N/A |
| Doral Bank-PR | $ 462,628 | 18.6 | $ 198,661 | ≥8.0 | $ 248,326 | ≥10.0 |
| Doral Bank-NY | $ 46,835 | 23.7 | $ 15,815 | ≥8.0 | $ 19,768 | ≥10.0 |
| Tier I capital (to risk-weighted assets): | | | | | | |
| DFC Consolidated | $ 1,471,132 | 22.3 | $ 264,502 | ≥4.0 | N/A | N/A |
| Doral Bank-PR | $ 444,054 | 17.9 | $ 99,330 | ≥4.0 | $ 148,995 | ≥6.0 |
| Doral Bank-NY | $ 46,508 | 23.5 | $ 7,907 | ≥4.0 | $ 11,861 | ≥6.0 |
| Leverage Ratio:[1] | | | | | | |
| DFC Consolidated | $ 1,471,132 | 14.6 | $ 402,128 | ≥4.0 | N/A | N/A |
| Doral Bank-PR | $ 444,054 | 6.5 | $ 273,360 | ≥4.0 | $ 341,700 | ≥5.0 |
| Doral Bank-NY | $ 46,508 | 9.2 | $ 20,302 | ≥4.0 | $ 25,377 | ≥5.0 |

(1) Tier I capital to average assets in the case of Doral Financial and Doral Bank-PR, and Tier I capital to adjusted total assets in the case of Doral Bank-NY.