# Exhibit A

# In The Matter Of:

## *UNITED STATES OF AMERICA v.*
## *MARIO S. LEVIS A/K/A SAMMY LEVIS*

---

*VOLUME 6*
*April 5, 2010*

---

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 045WLEVF.txt, Pages 768-966 (199)

**Word Index included with this Min-U-Script®**

VOLUME 6
April 5, 2010

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

Page 844

[1]     (In open court)
[2]     THE COURT:  You're excused.  Thank you very much.
[3]     (Witness excused)
[4]     THE COURT:  We'll take an early lunch because of some
[5]  scheduling issues that came up.  So let's take our lunch now
[6]  and be back at 1:30, if you would, 1:30.  Thank you very much.
[7]     (Jury excused)
[8]     THE COURT:  Can I hold the lawyers a second.
[9]     I have a letter from Mr. Black, dated April 2, and it
[10]  says that there are multiple drafts of an internal audit of
[11]  Doral and lists the government exhibit numbers, and the defense
[12]  objects to having them all come in.  I assume that can be
[13]  resolved?
[14]     MR. BRAUN:  We think it can be, your Honor.  We did
[15]  not intend to introduce them all.  We haven't had a chance to
[16]  discuss this with the defense, but I think there is a good
[17]  chance we can resolve it.
[18]     THE COURT:  Work on that and if we need to come back
[19]  to it, we will.
[20]     MR. STELLMACH:  There is one other issue.
[21]     With respect to a witness the government anticipates
[22]  calling tomorrow named Freddy Maldonado, we submitted before
[23]  trial started an in limine motion to preclude cross-examination
[24]  on certain issues, and I don't know whether the defense has
[25]  decided whether they actually do want to cross-examine

Page 845

[1]  Mr. Maldonado on those issues, but if they do, we would seek a
[2]  ruling today so we know before we call Mr. Maldonado whether
[3]  that is a subject of cross-examination.
[4]     THE COURT:  Look, we'll cover that, but let's not try
[5]  to do it at the lunch hour.  You all need your lunch hour.
[6]     MR. BRAUN:  Thank you, Judge.
[7]     THE COURT:  We'll cover it to the extent there are
[8]  issues.
[9]     (Luncheon recess)
[10]     (Continued on next page)
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 846

[1]     AFTERNOON SESSION
[2]     1:30 pm
[3]     (Trial resumes)
[4]     (In open court; jury present)
[5]     THE COURT:  Sit down, please.  Ready with your next
[6]  witness?
[7]     MR. BRAUN:  Yes, your Honor, we are.  The government
[8]  calls Randy Saluck.
[9]     THE COURT:  Okay.
[10]     RANDY SALUCK,
[11]     called as a witness by the Government,
[12]     having been duly sworn, testified as follows:
[13]  DIRECT EXAMINATION
[14]  BY MR. BRAUN:
[15]  Q.  Good afternoon, Mr. Saluck.
[16]  A.  Hi.
[17]  Q.  Where do you live?
[18]  A.  Westport, Connecticut.
[19]  Q.  What do you do for a living?
[20]  A.  I manage an investment firm in the city.
[21]  Q.  How long have you been doing that?
[22]  A.  I've been in the business for about 14 years and I've been
[23]  in this current position for about six.
[24]  Q.  Can you tell us about your educational background, where
[25]  you went to college and what you did after college?

Page 847

[1]  A.  Sure, I went to University of Pennsylvania, I went straight
[2]  through to law school where I took a major in corporate law.
[3]     I practiced law for six years, securities law and
[4]  corporate law, and I went back to business school at Wharton,
[5]  which is part of the University of Pennsylvania in
[6]  Philadelphia.  I was an investment banker at Salomon Brothers
[7]  for about a year, concentrating on mergers and acquisitions.
[8]  Then I entered the investment management business in about
[9]  1998.
[10]  Q.  Mr. Saluck, when did you graduate from business school?
[11]  A.  1997.
[12]  Q.  When did you start working in the investment field?
[13]  A.  1998.
[14]  Q.  You were with Salomon Brothers, you said, at that time?
[15]  A.  For a year after I graduated from business school as an
[16]  investment banker.
[17]  Q.  What did you do after Salomon Brothers?
[18]  A.  I worked for an investment firmed called Tindal Management.
[19]     Then I went to a company call High Field Management
[20]  because a couple of the partners left Tindal, and I rejoined
[21]  Tindal a year later.  I spent a couple of more years at Tindal
[22]  Management, and I joined Meisenbach Capital for two and a half
[23]  years.  Then I started my own fund in 2005.
[24]  Q.  You were with Tindal and you mentioned High Field Capital
[25]  Management as well?

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 6
April 5, 2010

Page 848

[1]  **A.** Right.
[2]  **Q.** As well as Meisenbach Capital?
[3]  **A.** Tindal, High Field, Tindal Meisenbach and then I started my
[4]  own fund.
[5]  **Q.** Got it. Were those all investment funds basically in the
[6]  same kind of professional activity?
[7]  **A.** Yes.
[8]  **Q.** Can you give us the approximate dates of your employment at
[9]  Meisenbach Capital Management?
[10]     **THE COURT:** How do you spell Meisenbach?
[11]     **THE WITNESS:** M E I S E N B A C H Capital. I joined
[12]  Mark, Meisenbach Capital in November of 2002 and I left in
[13]  April of 2005.
[14]  **BY MR. BRAUN:**
[15]  **Q.** What kind of business was Meisenbach Capital Management?
[16]  **A.** Meisenbach was an investment firm which had money from
[17]  pension funds, institutions, wealthy families, wealthy
[18]  individuals and invested it in the stock market basically.
[19]  **Q.** What was your job there?
[20]  **A.** I was a portfolio manager. I was hired to manage a good
[21]  chunk of the capital or the money at Meisenbach Capital. So I
[22]  made investment decisions and had a portfolio that was a pretty
[23]  large portion of Meisenbach Capital's total funds.
[24]  **Q.** In doing that work, did you have any particular type of
[25]  approach or strategy to investing?

Page 849

[1]  **A.** I am what is considered a value investor. I look for solid
[2]  companies at really cheap prices that I can hold for a period
[3]  of time, and I tend to do a lot of fundamental research.
[4]     I talk to management teams, run financial models, read
[5]  everything that I can and try to learn as much as I can about a
[6]  company before I make the investment.
[7]  **Q.** In doing that type of work, what are some of the sources of
[8]  information that you relied upon?
[9]  **A.** Public filings. Every public company has to make public
[10]  filings that disclose their operating results for the period,
[11]  whether it is a year period or quarterly period. So I look at
[12]  all of that.
[13]     I would speak to the company, speak to competitors,
[14]  look at the public filings of their competitors, 10K, 10Q, try
[15]  to find people in the industry to talk to about the companies.
[16]     I would speak to research analysts, Wall Street
[17]  analysts and read their reports and attend presentations that
[18]  companies make at different conferences and other, whatever
[19]  research I can get my hands on.
[20]  **Q.** Can you describe generally how investment decisions were
[21]  made at Meisenbach, how you made your decisions as a portfolio
[22]  manager?
[23]  **A.** Sure. After performing the amount of work or due diligence
[24]  as I saw appropriate, I would decide to buy a stock and I would
[25]  basically send an instant message or call or e-mail our trader,

Page 850

[1]  and our trader would buy the number of shares of the stock that
[2]  we wanted. I had a lot of autonomy at Meisenbach Capital.
[3]     **THE COURT:** You had what?
[4]     **THE WITNESS:** Autonomy. In other words, I had sole
[5]  investment capability, but I had to run generally what I was
[6]  doing by the owner of the firm, Mike Meisenbach.
[7]  **BY MR. BRAUN:**
[8]  **Q.** When you were at Meisenbach doing the sort of work you
[9]  described, did Doral Financial Corporation come to your
[10]  attention at some point?
[11]  **A.** Yes.
[12]  **Q.** Do you recall approximately when that was, Mr. Saluck?
[13]  **A.** At some point in early 2003.
[14]  **Q.** Do you recall how you learned about Doral, how it came to
[15]  your attention?
[16]  **A.** Somebody mentioned it, that Doral was a very good bank in
[17]  Puerto Rico, Puerto Rico was growing and Doral had a good
[18]  reputation and they were growing rapidly and they had a lot of
[19]  growth in front of them, the prospects for growth were very
[20]  strong.
[21]  **Q.** Once you became interested in the company, did you do
[22]  anything further to learn about it?
[23]  **A.** Sure. I read all the reports, I learned about the company
[24]  and generally followed it for a period of time, which means
[25]  listened to earnings calls at the end of every quarter,

Page 851

[1]  participated in analyst calls, go to conferences and speak with
[2]  management and also attend any field trips to visit the company
[3]  and other companies in Puerto Rico.
[4]     So for a while I studied the company, performed my due
[5]  diligence in order to get comfortable it was a solid
[6]  investment.
[7]  **Q.** Was there anybody in Doral's management who you spoke to
[8]  before making any investment decision relating to Doral?
[9]  **A.** Sure.
[10]  **Q.** I am talking about this period of time you are describing
[11]  now when you were learning about the company.
[12]  **A.** Sure. I met with and spoke to Sammy Levis, Ricardo
[13]  Melendez and Salomon Levis and maybe a couple of other members,
[14]  I don't remember the names.
[15]  **Q.** Do you recall the positions they held at Doral?
[16]  **A.** Sammy was the executive vice president, Ricardo I think was
[17]  an assistant to the CFO, and Salomon was the chief executive
[18]  officer or chairman or something. The positions changed over
[19]  time.
[20]  **Q.** Before making any investment decision, did you visit the
[21]  company in Puerto Rico?
[22]  **A.** I did.
[23]  **Q.** Did you have a main contact at Doral?
[24]  **A.** My main contact was Sammy Levis.
[25]  **Q.** At some point did you make a decision to invest in the

VOLUME 6
April 5, 2010

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

Page 852

[1] company?

[2] **A.** I did.

[3] **Q.** Do you recall approximately when that was?

[4] **A.** Sometime in the summer of 2003.

[5] **Q.** Why did you decide to invest in Doral at that time?

[6] **A.** Because I had gotten comfortable with the company's growth

[7] prospects and management team and the stock was at what I

[8] thought was an attractive entry point and was trading at a

[9] discount to what I thought it was worth.

[10] **Q.** Do you recall how much of Meisenbach's portfolio, how much

[11] of the funds you had to invest were put into Doral stock at

[12] that time?

[13] **A.** Sure. The first time I invested in Doral, probably a

[14] couple million dollars. I would say it was 1 percent of the

[15] fund, Meisenbach fund, and it was probably 3 percent or 2 and a

[16] half percent of my portfolio, my sub-portfolio at Meisenbach.

[17] **Q.** Mr. Saluck, from your response, was there more than one

[18] time you invested in Doral?

[19] **A.** Yes.

[20] **Q.** Okay. For now I want to talk about the first investment

[21] you made in the company.

[22] **A.** Sure.

[23] **Q.** Can you turn your attention to a document that has been

[24] marked as Government Exhibit 1101. It should be in the binder

[25] of materials you have in front of you.

Page 853

[1] **A.** I see.

[2] **Q.** Do you recognize the document that has been marked as 1101?

[3] **A.** I do.

[4] **Q.** What is it?

[5] **A.** It is an e-mail that I wrote to Sammy Levis, and I also

[6] CC'd a couple of friends of mine that manage small funds, where

[7] I wrote up in a newsletter that is read by a bunch of different

[8] funds Doral's an interesting idea for somebody to buy.

[9] It is basically a newsletter where I could share ideas

[10] with other investment professionals, and I sent it to Sammy

[11] also.

[12] **Q.** What is the date of the e-mail from you to Sammy Levis?

[13] **A.** January 15th, 2004.

[14] **Q.** Does it attach the write-up on Doral that you just

[15] described a moment ago?

[16] **A.** It does.

[17] **MR. BRAUN:** The government offers 1101 into evidence.

[18] **THE COURT:** Received.

[19] (Government Exhibit 1101 received in evidence)

[20] **BY MR. BRAUN:**

[21] **Q.** Did you write up, summarize some of the reasons for

[22] thinking Doral was a good investment opportunity, Mr. Saluck?

[23] **A.** I did.

[24] **Q.** Did there come a time when you decided to sell the stock

[25] that you held at this time in Doral Financial Corporation?

Page 854

[1] **A.** I am sorry. Could you repeat the question.

[2] **Q.** Yes. You wrote this e-mail that you just identified a

[3] moment ago as well as the attached write-up during the period

[4] of time in which you first invested in Doral. Is that correct?

[5] **A.** Yes.

[6] **Q.** Did there come a time when you sold that stock that you had

[7] purchased while at Meisenbach?

[8] **A.** Yes.

[9] **Q.** Do you recall approximately when you sold the Doral stock

[10] after this first investment?

[11] **A.** Sometime in the first quarter of 2004, I am not sure

[12] exactly when.

[13] **Q.** Why did you decide to sell the investment in Doral?

[14] **A.** Because the stock rose nicely and hit our target price, and

[15] generally when stocks hit our target price, we sell them.

[16] **Q.** What do you mean by, "target price"?

[17] **A.** We have a financial model that I developed at our fund

[18] where we look at the company's financials and project growth

[19] and what their financials might look like in the future, and

[20] based on that we derive what it should be worth 6, 8, 12 months

[21] out, and we generally look to hold stocks for at least a year.

[22] Doral went up a little bit faster than we anticipated. It was

[23] a good thing.

[24] **Q.** So you made money from the investment?

[25] **A.** Yes.

Page 855

[1] **Q.** After you sold the Doral stock, did you continue to pay

[2] attention to the company?

[3] **A.** Yes. I generally do.

[4] **Q.** What is your purpose for doing it?

[5] **A.** Well, I did a lot of work. I liked the company and you

[6] never know when you might have another great opportunity to buy

[7] the stock. That is typically what I do.

[8] **Q.** Did you continue to have contact with people at Doral

[9] management even after you sold the stock that you had held?

[10] **A.** Yes.

[11] **Q.** Who did you continue to speak to?

[12] **A.** Sammy, Ricardo.

[13] **Q.** You mentioned that Ricardo at one time was the assistant to

[14] CFO. Do you know whether he became the CFO over time?

[15] **A.** He did after the CFO retired.

[16] **Q.** Can I have you turn your attention now to a document that

[17] has been marked for identification as 1102. It should be the

[18] next document in your binder.

[19] **A.** Yes.

[20] **Q.** Can you take a moment to look at the second page and then

[21] the first page of the document.

[22] **A.** (Pause)

[23] **Q.** Can you generally describe what this document is if you

[24] recognize it?

[25] **A.** Sure. It's a chain of e-mails. I was visiting Puerto Rico

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 6
April 5, 2010

Page 856

[1] with my wife and as typical, I was hoping to do some business
[2] down there by meeting with the company.  Since I was going to
[3] Puerto Rico, I thought it made sense to spend a few hours or
[4] half a day meeting with the company because it was a good
[5] opportunity to do that and I was still very interested in the
[6] stock.
[7] Q.  What is the date of your e-mail and who was your e-mail to?
[8] A.  My first e-mail was Tuesday, November 23rd, to Sammy, and
[9] it was basically stating to Sammy that I was --
[10] Q.  Let me hold off on what the e-mail says.  Is there also a
[11] response from Mr. Levis to you?
[12] A.  There is.
[13]    MR. BRAUN:  The government moves Exhibit 1102 into
[14] evidence.
[15]    THE COURT:  Received.
[16]    MR. SREBNICK:  May I confer with counsel about a --
[17]    THE COURT:  Of course, of course.
[18]    (Pause)
[19]    THE COURT:  Are you set?
[20]    MR. BRAUN:  We are, your Honor.  We have an
[21] understanding.
[22]    THE COURT:  Okay.  On the basis of what you've done,
[23] 1102 is received.
[24]    (Government Exhibit 1102 received in evidence)
[25]    MR. BRAUN:  Thank you, your Honor.

Page 857

BY MR. BRAUN:
[2] Q.  Mr. Saluck, can you now read just the first couple of lines
[3] of your message to Sammy Levis on November 23rd, 2004.
[4] A.  Sure.  "Sammy, I will be in Puerto Rico with my wife from
[5] December 1st to the 5th.  I would like to meet with you and get
[6] an update on the company.  Also any restaurants or suggestions
[7] on what would be good to do would be most appreciated."
[8] Q.  Mr. Levis responds to your e-mail, correct?
[9] A.  He did.
[10] Q.  Turning to the portion of Mr. Levis' response, in which he
[11] addresses your request for an update on what's happening at the
[12] company --
[13] A.  Yes.
[14] Q.  -- first of all, before reading that, was this prior to any
[15] decision you made to invest again in Doral Financial?
[16] A.  It was.
[17] Q.  Could you read Mr. Levis' response to your question
[18] regarding an update on things at the company.
[19] A.  Okay, sure.  I will pass the restaurant part.
[20]    "Regarding an update, I can tell you that the story
[21] keeps getting better.  We should continue to outperform in any
[22] interest rate scenario.  Actually if rates go up, we should do
[23] even better.  The mortgage side continues booming.  We are
[24] confident in exceeding loan origination estimates of 7.5
[25] billion to about 7.7 billion.  Our commercial banking side

Page 858

[1] continues to expand and should contribute over 55 percent of
[2] net income.  The insurance side is also doing extremely well.
[3] A lot of earning potential (ammunition) behind our net interest
[4] margin still have 2 billion in cash waiting to be redeployed.
[5] Also high gain on sale should be sustained in 2005 even if
[6] rates go up.  Already sold forward most of our nonconforming
[7] and most profitable loan production.  Please feel free to
[8] contact Ricardo or Sonia.  Happy Thanksgiving.  Best regards,
[9] Sammy."
[10] Q.  Did you take the trip to Puerto Rico you referred to?
[11] A.  I did.
[12] Q.  Did you meet with Sammy Levis on that trip?
[13] A.  Sammy wasn't there, no.
[14] Q.  Did you continue following Doral after you made the trip to
[15] Puerto Rico?
[16] A.  I did.
[17] Q.  Did you continue to be interested in the company as a
[18] possible investment opportunity?
[19] A.  I did.
[20] Q.  Do you recall seeing any news release from the company in
[21] January 2005?
[22] A.  Yes.
[23] Q.  Can you turn your attention to a document that has already
[24] been admitted into evidence as Government Exhibit 194.  Do you
[25] recognize Exhibit 194, Mr. Saluck?

Page 859

[1] A.  I do.
[2] Q.  Do you recall seeing this press release when you were
[3] following Doral in January of 2005?
[4] A.  Yes.
[5] Q.  About four paragraphs down in the release there is some
[6] news about the interest-only strips.  Do you see that?
[7] A.  I do.  It is five paragraphs down?
[8] Q.  I think so.  It begins, "Investment activities for the
[9] first quarter"?
[10] A.  Five paragraphs down.
[11] Q.  What do you recall seeing in that part of the press
[12] release?  You don't need to read it, but if you could describe
[13] generally what you took away from it, what I said?
[14] A.  Sure, they wrote down or took a loss on the value of their
[15] interest-only strips.
[16] Q.  Do you recall whether that loss had been offset by anything
[17] on the positive side for Doral?
[18] A.  They had -- let me just take a look at this.
[19] Q.  If it helps you, can look at the paragraph above the one we
[20] are we were talking about relating to the IO write-down.
[21] A.  There was a tax benefit which offset the impact of the
[22] write-down of these IO strips.
[23] Q.  These IO strips, from your prior experience investing in
[24] this company and all the research you had done, had the subject
[25] come up for you?  Did you have an understanding of what those

Page 860

[1] were?
[2] A. Yes, that was very important, actually.
[3] Q. Why was it important to Doral and you as an investor in
[4] Doral?
[5] A. Because a lot of the growth came from the gain on sale
[6] which was represented by these IO strips, and the value of the
[7] IO strips was very important to the company.
[8] Q. Prior to this time period, had you learned anything from
[9] Doral regarding the way in which it valued this asset other
[10] than what it was doing internally at the company?
[11] A. Sure.
[12] Q. What had you learned in that regard by this time period,
[13] Mr. Saluck?
[14] A. I had been told that the company, in addition to valuing
[15] these strips internally at the company, they hired two
[16] independent entities, very large entities to also provide third
[17] party valuations and then what they would do is take the lowest
[18] valuation which seemed to me pretty conservative.
[19] Q. Was that at all important to you as an investor and
[20] potential investor?
[21] A. Sure.
[22] Q. Why so?
[23] A. Well, if a company is valuing something internally, they
[24] can make anything up and there is no way to verify that
[25] independently. If you have two major entities that are also

Page 861

[1] doing the same type of work and they're presumably independent,
[2] then that should give people comfort that the valuations are,
[3] in fact, accurate especially if a company is doing what they
[4] say they do, which is taking the lowest valuation.
[5] Q. Mr. Saluck, do you recall generally what interest rates
[6] were doing during this time-frame?
[7] A. Yes.
[8] Q. What is that?
[9] A. They were generally inching up a little bit a month every
[10] month they were being raised, every other month.
[11] Q. Were you following Doral's stock price during this period
[12] of time when the press release came out?
[13] A. Yes.
[14] Q. Do you recall the stock price developing in any way after
[15] the news that was announced on January 18th of '05?
[16] A. Yes.
[17] Q. What took place with the stock price?
[18] A. It went down pretty meaningfully.
[19]     THE COURT: It went down what?
[20]     THE WITNESS: The stock price declined for that period
[21] about 15, 20 percent.
[22] BY MR. BRAUN:
[23] Q. Did that draw your interest, Mr. Saluck?
[24] A. It did.
[25] Q. Did you participate in any communications with management

Page 862

[1] during that time-frame?
[2] A. Sure.
[3] Q. What do you recall doing to communicate with management or
[4] to hear from management during the post-write-down period of
[5] time?
[6] A. Well, several things. I wanted to understand why the
[7] write-down was taken, what protections were in place so that
[8] there wouldn't be future write-downs and generally spoke about
[9] the business in the hope that I was going to be able to figure
[10] something out that the other investor, the investment public
[11] didn't and that is why the stock came down.
[12]     I thought maybe I could gain insight that would help
[13] me buy the stock at a good price when people were panicking or
[14] just not sure what was going on.
[15] Q. So what did you do to try and find answers to your
[16] questions, Mr. Saluck?
[17] A. Spoke to research analysts, read every report I could,
[18] spoke to Sammy by phone and generally sharpened our pencils and
[19] tried to put it altogether and figure out if it made sense. I
[20] did have several calls with Sammy and also --
[21]     THE COURT: Calls with what?
[22]     THE WITNESS: Sammy Levis and also Ricardo Melendez.
[23] BY MR. BRAUN:
[24] Q. Do you recall participating in any investor conference
[25] calls during this period of time?

Page 863

[1] A. This is a time-frame, yes.
[2] Q. During the time-frame, the days following this write-down
[3] announcement on January 18th?
[4] A. Sure. Sorry about that.
[5] Q. No, not at all.
[6] A. Yes, there was at least one that I remember and it was a
[7] Deutsche Bank call and it was others as well where the company
[8] was trying to -- that is the one I remember specifically at
[9] that time. The company was trying to get out there and tell
[10] their story.
[11] Q. What do you recall generally about this Deutsche Bank call?
[12] Can you describe for us what kind of call this was without
[13] getting into the content of it.
[14] A. Sure. Without getting into the context, it was a call set
[15] up by Deutsche Bank. Deutsche Bank had an analyst that was
[16] positive on the stock, and he set up the call so that Sammy and
[17] David Levis would be able to explain more about why the company
[18] was doing well and this wasn't a big issue. It gave investors
[19] like myself a chance to participate and ask some questions.
[20] Q. Did you participate and ask some questions?
[21] A. I did.
[22] Q. Were there other investors on the call as well?
[23] A. Yes.
[24] Q. You said you recalled that it was Sammy and David Levis who
[25] were participating on behalf of Doral?

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

Page 864

[1]  A. Yes.

[2]  Q. Did you understand that they were related?

[3]  A. Yes.

[4]  Q. What was their relationship as you understood it?

[5]  A. I think --

[6]  Q. If you don't know exactly what it was, that is fine.

[7]  A. David, I think, might have been Sammy's father. I am not

[8]  sure. I don't remember. It was a big clan.

[9]  Q. Did you learn anything on the conference call from the

[10] Doral representatives that was relevant to you?

[11] A. Sure.

[12] Q. What do you recall learning on the conference call?

[13] A. What I learned is that they were proactive, and being what

[14] they said was very conservative in writing down the value of

[15] the IOs by using aggressive interest rate assumptions, and the

[16] idea was they were able to do that because they had a windfall,

[17] tax windfall they could use to offset that to basically smooth

[18] their earnings.

[19] Q. What do you mean by aggressive in the interest rate

[20] assumptions? Can you explain that?

[21] A. In the sense that they felt their assumptions were

[22] unrealistic and they used higher interest rates than they would

[23] ordinarily use so they could basically get the write-down

[24] finished and wouldn't have to worry about that in the future.

[25]      Essentially how I viewed that is that they were being

Page 865

[1]  super conservative so they wouldn't have to take write-downs in

[2]  the future. They also talked about how good their business was

[3]  doing.

[4]  Q. Did they say anything about management decisions to

[5]  purchase Doral stock?

[6]  A. They did, they said they had an intention to purchase

[7]  stock. I think they said something about a waiting period.

[8]  Typically you can't participate right away, you have to wait

[9]  until news is out in the public.

[10]      So you couldn't buy it right after an earnings. You

[11] have to wait a certain amount of time, but they did indicate

[12] they were going to do that.

[13] Q. Does that send any signal to you as a potential investor?

[14] A. That is a very important signal, among other things. For

[15] management to have skin in the game and put their own money

[16] into a stock when it was down, to me, meant they not only were

[17] telling people it was cheap, but they thought it was cheap with

[18] their own money. That is a big deal.

[19] Q. How do investors out in the public find out whether or not

[20] management is buying or selling stock in their company?

[21] A. After management buys stock, they're required within a

[22] certain period of time, usually 5 or 10 days, to file with the

[23] SEC, and at that time that filing is made public, so investors

[24] or anybody can access the filing by looking at the company and

[25] they can see what management has purchased. It is considered a

Page 866

[1]  very positive signal.

[2]  Q. What about if they sell stock?

[3]  A. The same thing.

[4]  Q. The same kind of report is required to be filed?

[5]  A. Yes.

[6]  Q. Did you make any decisions following this conference call

[7]  that you just described?

[8]  A. I did.

[9]  Q. What did you decide to do, Mr. Saluck?

[10] A. I thought it was time to buy the stock. I was reassured by

[11] management, and the stock looked cheap to me so I started

[12] buying it.

[13] Q. Do you recall what the nature of your investment was at

[14] that time?

[15] A. A few million dollars, I believe. I don't have the number

[16] specifically, but I think it was a couple of million dollars.

[17] Q. Did you have any opportunity to meet personally with Sammy

[18] Levis during the weeks that followed?

[19] A. Yes.

[20] Q. Do you recall when and where that meeting took place?

[21] A. I do. It was at the beginning of February 2005, and it was

[22] at the Roosevelt Hotel and it was the Brean Murray conference.

[23] Brean Murray is a brokerage firm that had an analyst that wrote

[24] reports about the company and they had a Puerto Rican

[25] conference for banks that are in Puerto Rico.

Page 867

[1]  Q. Did you attend the conference?

[2]  A. I did.

[3]  Q. Did you see Mr. Levis there?

[4]  A. Well, I did. I saw his presentation, but I also had

[5]  something called a one-on-one meeting with Sammy, which for

[6]  good clients of the brokerage firms, they'll set up individual

[7]  meetings with management teams when they're not presenting.

[8]  Q. Is the presentation made to a large group of folks?

[9]  A. The presentation is, yes.

[10] Q. So you had an opportunity after Mr. Levis made his

[11] presentation to speak with him one-on-one?

[12] A. I did.

[13] Q. Do you recall that conversation?

[14] A. Yes, very clearly.

[15] Q. Can you describe the conversation that took place between

[16] you and Mr. Levis in that one-on-one meeting at the Brean

[17] Murray conference?

[18] A. Sure. You know, a half hour, maybe 40 minutes to talk to

[19] him about any questions I would have. A lot of times you don't

[20] want to ask questions that would engender a broad answer. You

[21] don't have opportunity, and this was a great opportunity to go

[22] through his business in detail.

[23]      I asked him how his earnings were going, how the

[24] business was going. I also focused on the IOs and whether or

[25] not -- you know, what the risk was with the IOs. Like what was

VOLUME 6
April 5, 2010

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

Page 868

[1] the worst-case scenario, what could be expected and what was
[2] sort of likely or unlikely to happen.
[3] **Q.** Why were you focused on the interest-only strips during
[4] this period of time?
[5] **A.** That is a big part of the value, and sort of the growth of
[6] the company was selling mortgages to generate gain on sale, and
[7] this was the valuation of the IOs were, you know, subject to
[8] debate and there were certain people that were negative on the
[9] company that thought they were overvalued.
[10]     My goal was to try to figure out how bad could it get,
[11] if you will, and what my risk was.
[12] **Q.** What do you recall Sammy Levis saying to you in response to
[13] your questions on the interest-only strips?
[14] **A.** Sammy said something that was really important to me and
[15] the investment, which is I had known from Sammy that they had
[16] interest rate caps which are contractual caps with each of the
[17] entities that they sold their mortgages to that the interest
[18] that Doral had to pay their purchasers wouldn't exceed a
[19] certain amount.
[20]     To me, I was trying to find out where those caps were.
[21] Were they close to where the coupon rate was, in which case the
[22] IOs could be written down to almost nothing because it would
[23] leave very little for Doral to participate in in the future if
[24] they wrote them down, or was there a place where the caps would
[25] kick in and Doral would be guaranteed a certain stream of

Page 869

[1] income.
[2]     **THE COURT:** What?
[3]     **THE WITNESS:** Guaranteed a certain stream of income.
[4] When contractual caps were invoked, meaning interest rates got
[5] to the level that contractual caps were struck at, then Doral
[6] would not be required to pay any more interest to the
[7] purchasers, so their IOs couldn't be written down potentially
[8] beyond a certain point.
[9]     **THE COURT:** That was what you were interested in
[10] finding out, right?
[11]     **THE WITNESS:** I was interested in trying to understand
[12] what kind of risk the IOs represented at that point. So a big
[13] part of it is how much interest Doral can receive when the
[14] borrower pays the coupon payment. Doral received the payment
[15] and then they have to pay a certain portion out to the entity
[16] that they sold the mortgage to. Then they keep a portion.
[17]     The question was how much do they keep?
[18]     That relates directly to the value of the IO strips.
[19] If they don't keep a lot, then the IOs aren't worth much. If
[20] they get to keep more than, then the IOs are worth more. What
[21] I was trying to understand is how bad could it get for the IOs,
[22] how much could Doral keep in a bad scenario.
[23] **BY MR. BRAUN:**
[24] **Q.** When you asked your questions about where these caps were,
[25] what do you recall Mr. Levis telling you, if anything, in

Page 870

[1] response?
[2] **A.** Sure. Sammy told me that they were up against the caps,
[3] meaning they were very close, the interest rates were very
[4] close to the caps, which meant that there was at a point where
[5] the caps would kick in and Doral would not be required to pay
[6] any interest greater than where the caps were.
[7]     I asked him how much, what was the maximum risk, and
[8] he told me that the risk was about $25 million. Well, given
[9] the numbers that people were worried about and what I was
[10] worried about, that wasn't a very big deal. To me that was
[11] pretty significant in terms of my comfort in what the IOs were
[12] valued correctly.
[13] **Q.** Mr. Saluck, I think you mentioned a moment ago that from
[14] this conversation with Mr. Levis, he told you these caps were
[15] in the contracts. Is that correct?
[16] **A.** Yes.
[17] **Q.** You're familiar with something called an interest rate cap
[18] that can be bought out in the marketplace, a security or
[19] derivative instrument that the company can go buy?
[20] **A.** Yes.
[21] **Q.** Would it have made a difference to you whether or not these
[22] caps Mr. Levis described for you at the Brean Murray conference
[23] were actually in Doral's contracts with the purchasers of its
[24] mortgage loans as compared to caps you could buy in the
[25] marketplace?

Page 871

[1] **A.** Sure, because they were agreed-upon limitations on how much
[2] Doral would have to pay out. So basically if the caps were
[3] close to the current interest rates, that meant as rates went
[4] up, which they were going up, then Doral wouldn't have to pay
[5] more than a certain amount.
[6]     **THE COURT:** Doral would pay or not have to pay?
[7]     **THE WITNESS:** They would not have to pay. In other
[8] words, they would keep more of the interest that the borrower
[9] was paying. They wouldn't have to pay the buyer of their loans
[10] more than a specified amount as contained in that contract.
[11] **BY MR. BRAUN:**
[12] **Q.** How would that form of contractual cap differ from your
[13] perspective than some type of hedging instrument?
[14] **A.** Well, a hedge is different in the sense that the company
[15] would make assumptions and try to figure out what the bad
[16] scenario might look like in the future and protect against
[17] that, but a contractual cap is a specific and absolute
[18] protection against interest rates going higher. It is the
[19] highest form of protection, if you will.
[20] **Q.** When Mr. Levis told you this, was it important to you?
[21] **A.** Very.
[22] **Q.** As a result of this conversation you had with Mr. Levis at
[23] the Brean Murray conference, did you take any action?
[24] **A.** I bought more stock.
[25] **Q.** What were your reasons for doing so?

---

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 6
April 5, 2010

---

Page 872

[1] **A.** Well, several reasons: One, I thought that the street or
[2] analysts and the investment community didn't fully appreciate
[3] that Doral's risk was contained because they had these
[4] contractual caps, which meant that the value of these IOs was
[5] pretty good. I mean there was very little possibility of
[6] significant write-downs in the future.
[7]       He also told me their earnings were very strong and
[8] things were going well and they were going to meet analysts'
[9] expectations, too. The IO was the most important thing for me
[10] because it gave me confidence that I wasn't missing anything
[11] and there was a real limit to how much Doral would have to
[12] write down. That was very important.
[13] **Q.** Did you have additional conversations with Mr. Levis after
[14] this meeting that took place in New York in early February that
[15] you just described?
[16] **A.** Sure.
[17] **Q.** What kinds of communications did you have with him
[18] subsequently?
[19] **A.** Phone calls where I confirmed what he said at the Brean
[20] Murray conference about the caps and earnings and about the
[21] business in general. It was part of my ongoing due diligence
[22] which I do with every company.
[23] **Q.** Did those calls take place in February of '05 after this
[24] conference you attended?
[25] **A.** Yes.

---

Page 873

[1] **Q.** You mentioned as part of the research you do, you sometimes
[2] study analyst reports that come out?
[3] **A.** True.
[4] **Q.** Could I turn your attention to a document that has been
[5] marked for identification in your binder there as Government
[6] Exhibit 1208, 1208?
[7] **A.** Okay.
[8] **Q.** Can you describe what Exhibit 1208 is.
[9] **A.** It is a report by a company called Hibernia Southcoast
[10] Capital, a small brokerage firm that had an analyst who was not
[11] so optimistic about Doral's prospects.
[12] **Q.** What does it mean for an analyst to downgrade a rating,
[13] Mr. Saluck?
[14] **A.** Well, for an analyst -- analysts generally recommend
[15] stocks. They do business with the companies and they follow
[16] companies and they tend to write about companies that they
[17] like.
[18]       So I guess he had the company in a buy, meaning he
[19] recommended to investors that you should buy the stock of Doral
[20] and here's why. In this report he said basically we had the
[21] stock at a buy, we are downgrading it because of things that
[22] concern us, basically a signal to investors you may not want to
[23] buy the stock. If you own it, you may want to sell it.
[24] **Q.** Were those concerns analysts expressed related primarily to
[25] the IOs?

---

Page 874

[1] **A.** I know IOs were a part of this and a gain on sale margin --
[2] yeah, IOs were a big part of it and there were other elements
[3] as well.
[4]       **MR. BRAUN:** Your Honor, could I have a moment to
[5] confer with counsel?
[6]       **THE COURT:** Sure.
[7]       (Pause)
[8]       **MR. BRAUN:** Your Honor, if you could give us a moment,
[9] I am waiting to hear back from counsel.
[10]       **THE COURT:** Sure.
[11]       (Pause)
[12] **BY MR. BRAUN:**
[13] **Q.** Mr. Saluck, could I now turn your attention to Government
[14] Exhibit 1103, the next document in your binder.
[15] **A.** Let's see.
[16]       **THE COURT:** Wait a minute. You marked for
[17] identification 1208?
[18]       **MR. BRAUN:** But we have not offered it.
[19]       **THE COURT:** All right. So the next one is 1103?
[20]       **MR. BRAUN:** Correct, your Honor.
[21]       **THE COURT:** All right.
[22] **BY MR. BRAUN:**
[23] **Q.** Do you have 1103 in front of you, Mr. Saluck?
[24] **A.** I do.
[25] **Q.** You recognize what 1103 is?

---

Page 875

[1] **A.** I do.
[2] **Q.** Can you describe it generally before getting into the
[3] substance of it.
[4] **A.** Well, after the Hibernia report, which was a negative
[5] analyst report, I got worried and I sent the report to Sammy
[6] and asked him if he could comment on it and what did he think
[7] about it and could he respond, so basically rebut some of the
[8] somewhat negative points in the Hibernia report.
[9] **Q.** Is 1103 your e-mail exchange with Sammy Levis relating to
[10] the Hibernia analyst report you saw a moment ago?
[11] **A.** Yes.
[12] **Q.** The date of your e-mail to Mr. Levis is what?
[13] **A.** March 8th.
[14] **Q.** Does he respond on the same day?
[15] **A.** Yes, yes, he did, four hours later.
[16]       **MR. BRAUN:** Your Honor, the government offers 1103
[17] into evidence.
[18]       **THE COURT:** Received.
[19]       (Government Exhibit 1103 received in evidence)
[20] **BY MR. BRAUN:**
[21] **Q.** Mr. Saluck, could you read your message to Mr. Levis on
[22] March 8th.
[23] **A.** Sure. "Sammy, I have bought a bunch of your stock but
[24] wanted to speak to you before I bought more in light of the
[25] Hibernia research report. I just wanted to go through it with

---

VOLUME 6
April 5, 2010

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

Page 876

[1] you to try to understand why they came to the conclusions they
[2] laid out in the report. I hope you are well. Are you planning
[3] on addressing the issues they raised in the release? Hope you
[4] are well."
[5] Q. Can you now read Mr. Levis' response to you on the same
[6] day.
[7] A. Sure. "Referred to the attached above, which is a Word
[8] document attachment, write-up addressing point by point. After
[9] you read it, it should answer most of your questions. I am out
[10] of the office but able to respond by e-mail if you have
[11] additional questions. Nothing has changed. On Tuesday we are
[12] releasing 10K detailing a lot of new disclosure and the
[13] following day we are having our first investor conference call
[14] to answer any questions pertaining to the 10K. We will
[15] announce the details of the call tomorrow. This is a golden
[16] buy opportunity, in my view."
[17] Q. Can you turn your attention now to a document that has been
[18] marked for identification as 1109. It should be the next one
[19] in your binder.
[20] A. Yes, I have it.
[21] Q. Do you recognize 1109?
[22] A. I do.
[23] Q. What is Exhibit 1109?
[24] A. It is entitled, "Reaction to Hibernia report of March 7th,
[25] 2005."

Page 877

[1] Q. Is this what Mr. Levis attached to his e-mail to you
[2] seeking his comments on the Hibernia report?
[3] A. Yes.
[4] Q. Did it contain his defense in response to that analyst
[5] report?
[6] A. Yes.
[7]    MR. BRAUN: Your Honor, the government offers 1109
[8] into evidence.
[9]    THE COURT: Received.
[10]    (Government Exhibit 1109 received in evidence)
[11] BY MR. BRAUN:
[12] Q. Did you find the response helpful, Mr. Saluck?
[13] A. I did.
[14] Q. Can you turn past that for a moment. Can you tell us
[15] whether or not you're familiar with something called the Value
[16] Investors Club?
[17] A. I am. I am a member.
[18] Q. What is the Value Investors Club?
[19] A. The Value Investors Club is a web site for like-minded or
[20] value-oriented investors to submit investment write-ups.
[21]    If you get accepted, you're a member of the club and
[22] you have to write up and post on the web site two different --
[23] at least two ideas a year, and other investors can, if they
[24] read it, they rate you, they give you a grade, and it fosters
[25] discourse where they can go back and forth.

Page 878

[1]    If somebody disagrees with you, you can debate points.
[2] It is actually a pretty good forum to have exchange with
[3] different investors.
[4] Q. After you received the response to the Hibernia report that
[5] Mr. Levis sent you, did you post anything on Doral Financial on
[6] the Value Investors Club internet bulletin board?
[7] A. I did.
[8] Q. Can you turn your attention now to Government Exhibit 1107.
[9]    THE COURT: Wait a minute. Yes, 1103 and 1109 are in.
[10] Now we are on 1107, okay?
[11] BY MR. BRAUN:
[12] Q. 1107. Do you recognize Exhibit 1107 is in front of you,
[13] Mr. Saluck?
[14] A. Yes.
[15] Q. What is Exhibit 1107?
[16] A. My write-up of Doral, recommending the stock on March 12th.
[17] Q. In putting together this write-up, did you rely on what you
[18] had written previously regarding Doral the first time that you
[19] invested in the stock?
[20] A. Some of, but I added the recent issues regarding the
[21] Hibernia report and I took the opportunity to address that
[22] proactively because obviously somebody was going to make a
[23] comment about it and ask me about that if I didn't bring it up.
[24] Q. I want to have you look at the first four paragraphs of
[25] your Value Investors Club write-up.

Page 879

[1] A. Yeah.
[2]    MR. BRAUN: Just give me a moment, your Honor.
[3]    (Pause)
[4]    MR. BRAUN: Your Honor, we offer this exhibit into
[5] evidence.
[6]    THE COURT: Received.
[7]    MR. SREBNICK: One moment, your Honor.
[8]    MR. BRAUN: It is 1107.
[9]    (Pause)
[10]    MR. SREBNICK: Got it. Thank you, Judge.
[11]    THE COURT: Is there a question or should we read all
[12] of this?
[13]    MR. BRAUN: No. I was asking it be received into
[14] evidence, your Honor.
[15]    THE COURT: Received.
[16]    (Government Exhibit 1107 received in evidence)
[17] BY MR. BRAUN:
[18] Q. Mr. Saluck, the first 1, 2, 3, 4 paragraphs of this, do
[19] those essentially restate the substance of what you had already
[20] written during the earlier period of time in which you were
[21] invested in Doral that we see in Exhibit 1104?
[22] A. Yes.
[23] Q. Then picking up from there from what you previously wrote,
[24] you start recently a Hibernia Research Report came out and
[25] downgraded the stock?

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 6
April 5, 2010

---

Page 880

[1] **A.** Yes.

[2] **Q.** Is that where you're beginning to add to what you had

[3] previously wrote?

[4] **A.** Yes. What I was trying to do was give Sammy's response a

[5] forum, if you will.

[6] **Q.** All right. So in the paragraphs of 1107, this Value

[7] Investors Club piece that you posted that relate to the

[8] Hibernia report, what relation is there between what you posted

[9] here and what Mr. Levis had sent you?

[10] **A.** I basically took Sammy's explanation and put it in here.

[11] **Q.** Okay. That gets posted on the internet?

[12] **A.** It does.

[13] **Q.** Members of the club have access to it?

[14] **A.** Exactly. You have a password and user name.

[15] **Q.** Not any member of the public can go and see it?

[16] **A.** There are several hundred members or more but, yeah, it is

[17] not for the general public.

[18]     (Pause)

[19]     **THE COURT:** Are you asking us to read this?

[20]     **MR. BRAUN:** No, your Honor. I am just finding the

[21] next document I was to refer the witness to.

[22]     **THE COURT:** All right.

[23]     (Pause)

[24] **BY MR. BRAUN:**

[25] **Q.** In general, Mr. Saluck, that piece you posted on the

---

Page 881

[1] internet bulletin board we just discussed, you were holding

[2] Doral stock at the time, correct?

[3] **A.** Yes, I owned it, that's right.

[4] **Q.** What position generally were you taking on the internet

[5] bulletin board?

[6] **A.** That it is a good buy, I owned the stock and they would buy

[7] it. Hopefully they would agree and the stock goes up.

[8]     **THE COURT:** A little louder if you could.

[9]     **THE WITNESS:** Sure. I am trying to introduce

[10] investors to stocks I like. Everybody knows that if you post

[11] something, you probably own it and you're hoping other people

[12] agree and will buy the stock and provide additional investors

[13] with the stock which will make the stock go up over time.

[14] **BY MR. BRAUN:**

[15] **Q.** Can I turn your attention back to Government Exhibit 1104.

[16] **A.** Sure. Okay.

[17] **Q.** I want to direct your attention to the top part of this

[18] document from the March 15th time-frame. Do you see that?

[19] **A.** My e-mail?

[20] **Q.** Yes. Can you describe what this, what this document is?

[21] **A.** I sent an e-mail to Sammy and Ricardo Melendez because on

[22] the same Value Investors Club web site somebody put out a very

[23] critical piece, which is pretty unusual, the same week, and I

[24] was disturbed by some of what the person was saying and I

[25] wanted to forward it to Sammy and Ricardo and discuss it with

---

Page 882

[1] them.

[2]     **MR. BRAUN:** Your Honor, the government moves admission

[3] of Government Exhibit 1104, the e-mail Mr. Saluck just

[4] described.

[5]     **THE COURT:** Received.

[6]     (Government Exhibit 1104 received in evidence)

[7] **BY MR. BRAUN:**

[8] **Q.** Mr. Saluck, there is another document a couple of tabs

[9] forward in your binder, it is Government Exhibit 1105 that has

[10] been marked for identification.

[11] **A.** Okay.

[12] **Q.** Do you recognize that document?

[13] **A.** I do.

[14] **Q.** Is this another e-mail exchange between you and Mr. Levis

[15] from about the same time period?

[16] **A.** Yes.

[17]     **MR. BRAUN:** We move for the admission of 1105, your

[18] Honor.

[19]     **THE COURT:** Received.

[20]     (Government Exhibit 1105 received in evidence)

[21] **BY MR. BRAUN:**

[22] **Q.** Mr. Saluck, you mentioned a moment ago in your testimony

[23] that after you posted your piece on Doral Financial on the

[24] Value Investors Club web site, that somebody else posted a

[25] negative piece?

---

Page 883

[1] **A.** Yeah.

[2]     (Continued on next page)

---

VOLUME 6
April 5, 2010

Page 892

[1] assumes no changes in prepayment speeds."
[2] Q. Can you summarize what's reflected there in the table
[3] underneath that sentence, the one on top that says "changes in
[4] fair value of IO"?
[5] A. Sure. It shows you hypothetically what would happen to the
[6] value of these IOs if interest rates went up, and it chose 25
[7] basis-point increments, which is a quarter of a percent, 50
[8] basis points, which is half a percent, 100 basis points, which
[9] is 1 percent, and 200 basis points, which is 2 percent
[10] increase.
[11] Q. For example, according to this disclosure, what happens to
[12] the IOs if interest rates go up 1 percent or 100 basis points.
[13] A. The IOS, the value gets reduced by 275 million.
[14] Q. Mr. Saluck, did you have a reaction to the statement
[15] regarding the interest rate caps that you read a moment ago as
[16] well as to the information reflected in the table we just
[17] reviewed?
[18] A. I had a very clear reaction.
[19] Q. Can you describe what that reaction was?
[20] A. Somewhere close to panic, because I didn't see that
[21] anything about contractual caps in here, and there was no
[22] disclosure about contractual caps close to the current interest
[23] rate, and when I looked at this table, and I saw very minor
[24] movements in interest could cause such big write-downs in IOs,
[25] I was worried because certainly a hundred basis point increase

Page 893

[1] in interest rates, given what Greenspan was doing at the time,
[2] was plausible. And the company in their 10K said it could
[3] cause hypothetically a $275 million reduction in their IOs,
[4] which is ten times what I thought the company's maximum risk
[5] was based on what Sammy was telling me.
[6] Q. What did you mean a moment ago when you referred to
[7] Mr. Greenspan and what he was doing?
[8] A. I'm sorry. The fed was increasing interest rates. He was
[9] doing that.
[10] THE COURT: Mr. Greenspan was chairman of the Federal
[11] Reserve.
[12] THE WITNESS: Alan Greenspan, yes.
[13] BY MR. BRAUN:
[14] Q. You said they didn't say anything about contractual caps?
[15] A. No.
[16] Q. But from what you read a moment ago --
[17] THE COURT: Can you turn back to that language?
[18] BY MR. BRAUN:
[19] Q. Turn back to page 37.
[20] A. Yes.
[21] THE COURT: Right.
[22] BY MR. BRAUN:
[23] Q. When you began reading, "Generally the loans sold are
[24] subject to interest rate caps," they are saying something about
[25] caps?

Page 894

[1] A. They are, but it was very different than what I had come to
[2] understand, and they basically said the caps were somewhere
[3] near the coupon rate the borrower was paying, which means that
[4] the company, Doral, would not be required to pay more than they
[5] were getting from borrowers to the purchasers of their loans.
[6] But certainly basically the entire value of the IO could be
[7] lost because they weren't really caps the way they were
[8] explained to me.
[9] Q. What about the disclosure regarding this call option?
[10] THE COURT: Please, just a minute. What about what it
[11] says, where it says, to a lesser extent, and so forth, what did
[12] that mean to you?
[13] THE WITNESS: Well, it meant that there might have
[14] been some protection up to the interest rate or coupon of the
[15] loan, but it certainly was a lot more expansive than what I had
[16] come to know based on conversations that I had with Sammy.
[17] THE COURT: What do you mean more expansive?
[18] THE WITNESS: In other words, this is saying that the
[19] company wouldn't have to pay more than the coupon that the
[20] borrowers were paying, the underlying borrowers for the
[21] mortgages, but there was, in certain instances, some level of
[22] protection below that. However, this language was a lot
[23] different than what was represented to me. This did not imply
[24] the kind of protection that caused me to buy the stock.
[25] BY MR. BRAUN:

Page 895

[1] Q. This disclosure also mentions a call option?
[2] A. It does.
[3] Q. Did you understand what a call option would entail, what
[4] that would be about?
[5] A. I did.
[6] Q. What was your understanding of that, Mr. Saluck?
[7] A. My understanding was that if the interest rates rose to a
[8] certain level, the company, meaning Doral, could purchase back
[9] these instruments so that they could earn whatever was left on
[10] the IO strips.
[11] Q. If they were able to buy back the loans, if interest rates
[12] got high enough --
[13] A. Right.
[14] Q. -- would that afford the kind of protection that you had
[15] been led to believe existed?
[16] A. Not at all.
[17] Q. Why not, Mr. Saluck? Why wouldn't a call do the job?
[18] A. Because they would have to buy it back and spend the money
[19] they were booking as a gain. They basically sold these, booked
[20] gains, or profits over, you know, the number of years, and if
[21] they had to buy it back, that meant that they were trying to
[22] prevent further write-down of these IOs. They would buy it
[23] back at a certain price if they got cheap enough, if interest
[24] rates went up, the value of the IOs went down.
[25] Q. If they bought it back, what would happen to their

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 6
April 5, 2010

Page 896

[1] gain-on-sale income projected forward?

[2] A. It would have to be reversed, which meant that their

[3] earning stream for the past several years would be written down

[4] or basically reversed, and they would be telling the world the

[5] earnings we made in the past several years weren't real or

[6] weren't appropriate and we had to reverse them.

[7] Q. Earlier in your testimony, Mr. Saluck, there was some

[8] reference to an investor conference call that was going to take

[9] place after the 10K was filed?

[10] A. Yes.

[11] Q. Were you expecting such a conference call to occur after

[12] the filing of the 10K?

[13] A. Yes.

[14] Q. Why were you expecting the conference call?

[15] A. Well, I was hoping, praying, that the company would talk

[16] about these contractual caps and the sort of heightened risk

[17] protection and the limitations, the real risk that these IOs

[18] had that were sort of consistent with what Sammy had told me.

[19] I was hoping that they would discuss it, and if not, I planned

[20] on asking them about it in some way.

[21] Q. Did you participate in a conference call that took place on

[22] or about March 17, 2005, two days after the filing of the 10K?

[23] A. I did.

[24] Q. Do you recall whether or not Mr. Levis was one of the Doral

[25] representatives on that call?

Page 897

[1] A. He was.

[2] Q. I'm talking about Sammy Levis.

[3] A. He was.

[4] Q. Were there a couple of other Doral officials on the call as

[5] well?

[6] A. Salomon Levis was on the call, and, yeah, there were

[7] several others, including Salomon.

[8] Q. Were there various people from the investing community as

[9] well in addition to yourself?

[10] A. Many.

[11] Q. Was it a short call, a lengthy call?

[12] A. It was a long call.

[13] Q. You said they were hoping they would say something about

[14] the caps?

[15] A. Right.

[16] Q. Correct?

[17] A. Yes.

[18] Q. Did you have an opportunity to pose questions during the

[19] call?

[20] A. I asked a couple.

[21] Q. And did your questions include one relating to the

[22] contractual caps?

[23] A. Well, I did ask questions, but you have to keep in mind

[24] that I owned the stock so I didn't want to ask questions which

[25] were too difficult which might elicit answers which people

Page 898

[1] would perceive as negative which would hurt the value of my

[2] stock I was holding. It was already painful enough.

[3] Q. So, with that in mind, did you ask the question about the

[4] caps and what would your reason for doing so be?

[5] A. I did, and the reason would be to throw the company a

[6] softball to give them a chance to come back to the investment

[7] community with an answer that would explain why the company's

[8] IOs weren't at the kind of risk that it certainly read by

[9] looking at the 10K, in other words, that the risk was a lot

[10] lower and the real probability of write-down wasn't high at all

[11] because these caps as they were described to me protected the

[12] company in a very significant way.

[13] Q. Were you still hopeful that they would provide such

[14] response in spite of what was in the K?

[15] A. I was hoping.

[16] THE COURT: You were hoping, right? I didn't hear

[17] you.

[18] THE WITNESS: Yes. I was hoping. I was hanging on to

[19] my stock because I was worried, but I was very nervous that if

[20] there weren't caps that I was wrong and that all these negative

[21] arguments were right, which wouldn't have been good for my

[22] stock.

[23] BY MR. BRAUN:

[24] Q. These are negative arguments you referred to earlier,

[25] people who were more critical of Doral than you had been?

Page 899

[1] A. Sure.

[2] Q. When you posed a question during the conference call about

[3] the caps that you thought at least you had been told were

[4] there, who responded to your questions?

[5] A. I think it was Sammy.

[6] Q. What do you recall him saying as best you can recall?

[7] A. They kind of evaded the answer.

[8] THE COURT: A little louder, if you could.

[9] THE WITNESS: Sure, I'm sorry. Basically the

[10] company's response was they repeated what was in the 10K, they

[11] didn't answer directly whether or not there were contractual

[12] caps. By not saying anything they to me said they didn't have

[13] it because I couldn't understand why they wouldn't have said

[14] that they had contractual caps if they did. They wouldn't have

[15] said it if they had in fact had them. So I was hoping they

[16] would tell the same story that they'd been telling me.

[17] THE COURT: Did they or did they not?

[18] THE WITNESS: They did not say that there were

[19] contractual caps.

[20] BY MR. BRAUN:

[21] Q. Then the rest of your answer just now was your

[22] interpretation of that, correct?

[23] A. Yes.

[24] Q. They didn't come right out and say we don't have it?

[25] A. No. But they referred back to the kind of disclosure that

VOLUME 6
April 5, 2010

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

Page 900

[1] they talked about in the 10K, which to me meant clearly there
[2] were no caps. They talked about -- well, different types of, I
[3] think they referred back to the way that large cap and stuff
[4] like that --
[5]      THE COURT:  Referred back to what?
[6]      THE WITNESS:  They referred to the disclosure that was
[7] in the 10K, which was basically that they're interest rate caps
[8] which basically protect them from having to pay out on those
[9] loans more than they collect, but there was nothing in the
[10] response that suggested that they had contractual caps that
[11] were close to where interest rates were currently, which was
[12] the key distinction.
[13] BY MR. BRAUN:
[14]      Q.  Were you doing anything else when this call was taking
[15] place other than listening to the responses and the questions?
[16]      A.  Fielding very difficult phone calls from my boss and trying
[17] to, you know, it was a distressing time.  I was trying to take
[18] it all in, and I was getting hit with phone calls from my boss
[19] asking me what was going on, why is this down so much.  And I
[20] was also sort of flipping through my notes to make sure that I
[21] read this correctly and that I was, you know, that I heard what
[22] I heard, maybe, you know.  But my notes were consistent, and I
[23] was panicked.  I was upset.
[24]      THE COURT:  You were what?
[25]      THE WITNESS:  Panicked and upset because the stock was

Page 901

[1] going down a lot, it was a very large position, and it occurred
[2] to me that the company wasn't being truthful.  And I was very
[3] upset.
[4] BY MR. BRAUN:
[5]      Q.  Do you recall whether or not during the conference call
[6] anyone asked whether the management team from Doral could
[7] disclose the names of the parties that had provided the
[8] independent valuations?
[9]      A.  Yes, I do remember that.
[10]      Q.  Do you recall what the response was?
[11]      A.  We can't disclose that because they're subject to
[12] confidentiality agreements.
[13]      Q.  Following the call, Mr. Saluck, did you send an e-mail to
[14] Mr. Levis?
[15]      A.  I did.
[16]      Q.  Can you turn your attention to Government Exhibit 1106?
[17]      A.  Okay.
[18]      Q.  Do you recognize what 1106 is, Mr. Saluck?
[19]      A.  I do.
[20]      Q.  What is 1106?
[21]      A.  It's an e-mail correspondence that I had with Sammy Levis
[22] starting on Friday, March 18.  There was one response.
[23]      MR. BRAUN:  Your Honor, the government offers 1106.
[24]      THE COURT:  Received.
[25]      (Government's Exhibit 1106 received in evidence)

Page 902

[1] BY MR. BRAUN:
[2]      Q.  Mr. Saluck, in your message to Mr. Levis on the 18th, can
[3] you read the portion of it that relates to the independent
[4] valuations?
[5]      A.  Sure.  Okay.  I sent an e-mail to Sammy which said, "Sammy,
[6] you guys put out a press release saying that you know of only
[7] analysts and S&P downgrades causing stock weakness.  I think
[8] it's is pretty clear that this is a reaction to the call.  I
[9] speak with a ton of hedge funds.  The transaction with regard,"
[10] I can't read that," so I, transaction, oh, with RNG, which is a
[11] bank in Puerto Rico, "and the IO estimates have spooked people.
[12] The best thing you guys can do is find a way to make available
[13] the third-party valuations of your IO portfolios.  That could
[14] give your stock a positive analysis.
[15]      Q.  What was nor Levis' response?
[16]      A.  "We stand by our valuations."
[17]      Q.  What was your response to him?
[18]      A.  My response was, "I'm not saying you shouldn't stand by
[19] them, but don't you think by sharing them it would help the
[20] market?"  And his response was, "They won't low allow it
[21] because of legal liability, but in any event we are talking to
[22] them."
[23]      Q.  Mr. Saluck, at around this time period, did you take any
[24] action with respect to your investment in Doral or Meisenbach's
[25] investment in Doral?

Page 903

[1]      A.  Yes, I sold the stock.
[2]      Q.  What was the result?
[3]      A.  We took a huge loss.
[4]      Q.  How did that loss compare to others you may have taken?
[5]      A.  In my career or in my --
[6]      Q.  Let's say at Meisenbach.
[7]      A.  It was the largest loss we had.
[8]      THE COURT:  It was what?
[9]      THE WITNESS:  It was the largest loss we had at
[10] Meisenbach and probably the largest loss of my career.
[11]      MR. BRAUN:  Your Honor, can you give me a moment to
[12] confer with my colleagues?
[13]      THE COURT:  Sure.
[14]      MR. BRAUN:  We have no further questions, your Honor.
[15]      THE COURT:  All right.  Let's take a break.
[16]      MR. SREBNICK:  We have a juror with a question, and I
[17] have a Jencks issue I'd like to raise.
[18]      THE COURT:  We'll take our break.
[19]      (Jury excused)

Page 916

[1] **Q.** Based on just your understanding.

[2] **A.** Sure.

[3] **Q.** Just your understanding.

[4]   **THE COURT:** At the time.

[5] **BY MR. SREBNICK:**

[6] **Q.** At the time, back in 2005, early 2005.

[7] **A.** Right.

[8] **Q.** When you're considering making an investment in Doral,

[9] focusing just on that time frame.

[10] **A.** Right.

[11] **Q.** Based on all the research you had done?

[12] **A.** Okay.

[13] **Q.** All of your understanding of Doral, back then, did you

[14] understand that caps, to the extent that there were caps in the

[15] contracts, literally could range throughout the LIBOR curve

[16] shown on this draft?

[17] **A.** Sure. But, the company had grown very rapidly, so it was

[18] my view that most of the mortgages, since it had such extreme

[19] growth in the past couple years were done at lower LIBOR rates.

[20] And, secondly, the fact that Sammy told me that the caps were

[21] close to the current interest rates gave me the confidence to

[22] buy the stock.

[23] **Q.** Okay. Let's talk about those current, the ones that are

[24] more recent loan pools, somewhere along this point in the

[25] curve, so to speak, where my finger is now which. Is 2004?

Page 917

[1] **A.** Sure.

[2] **Q.** To the extent that there were -- well, the company was

[3] disclosing more and more production of loan pools, correct?

[4] **A.** True.

[5] **Q.** And so the ones that were more recently originated, to the

[6] extent that there were caps, would still have some ways to go

[7] before the cap would be triggered, correct?

[8] **A.** No, I don't agree with that.

[9] **Q.** In other words, if loans were generated in '04 --

[10]   **THE COURT:** Let him finish his answer.

[11]   **MR. SREBNICK:** I thought you were finished. Forgive

[12] me.

[13] **A.** In my view, LIBOR was going down, so if there were caps,

[14] then caps were done, in general, the company was experiencing

[15] such rapid growth, the caps in my view were generally a lot

[16] lower which gave me the confidence. However, the key again is

[17] that I was told that the caps were close to the current

[18] interest rates. I can see what was happening; I was living it.

[19] So obviously -- well, maybe it's not obvious. But to me I

[20] would not have made the investment if I didn't think there was

[21] protection, because I had a view that interest rates might

[22] increase and that was a risk. And if I didn't have caps close

[23] to where interest rates are, then it would have been very hard

[24] for me to figure out and the investing public to figure out

[25] what the potential loss was. So it was very important that I

Page 918

[1] heard that there were contractual caps that were close to where

[2] the current interest rates were, which meant to me that even if

[3] LIBOR curve went back to where it went, I would be protected

[4] because the caps would kick in at some lower rate.

[5] **Q.** And so it was important to you to understand what the risks

[6] were --

[7] **A.** Right.

[8] **Q.** -- in the event of an interest rate rising, fair statement?

[9] **A.** Exactly.

[10] **Q.** When you were considering the investment in 2005, it was

[11] after Doral had already announced the $97.5 million impairment?

[12] **A.** Yes.

[13] **Q.** That was a press release that I think the government showed

[14] to you, correct?

[15] **A.** Yes.

[16] **Q.** Government Exhibit 194.

[17] **A.** Thank you.

[18] **Q.** That's not going to help. And the paragraph beginning with

[19] the words "Investment activities," I think that was the

[20] paragraph you discussed on your direct examination.

[21] **A.** Correct.

[22] **Q.** And the company disclosed, second sentence, "The loss due

[23] to impairment on the value of the IOs of 97.5," follow along

[24] there?

[25] **A.** Mm-hmm, yes.

Page 919

[1] **Q.** As a result of increases in the three-month LIBOR. See

[2] that?

[3] **A.** Right.

[4] **Q.** And the company went on to disclose that if, contrary to

[5] what is generally expected, LIBOR decreases, a portion of the

[6] impairment charges on the value of the IOs could be recovered,

[7] right?

[8] **A.** That's what it says, yes.

[9] **Q.** And did that lead you to understand that for the

[10] impairment, the loss, so to speak, the noncash loss to be

[11] recovered, LIBOR had to go down, not up?

[12] **A.** Well, that's true, to recover the loss, that's correct.

[13] However, I was worried about additional losses.

[14] **Q.** Right.

[15] **A.** I wasn't worried about the losses that had already

[16] occurred. So to me what this suggested and based on my

[17] conversations was that as interest rates went up, there were

[18] some losses, but as you got closer to the contractual caps, you

[19] wouldn't have losses like that in the future.

[20] **Q.** And indeed, that's what was discussed at the Brean Murray

[21] conference that you attended here in New York, correct?

[22] **A.** Yes.

[23] **Q.** But I want to make sure before we go to the future, I want

[24] to make sure we're clear on the impairment, 97.5.

[25] **A.** Sure.

# Exhibit B

## DECLARATION OF MARK S. MEISENBACH

I, the undersigned, Mark Meisenbach, pursuant to 28 U.S.C. § 1746, declare that:

1.    I am the founder of Meisenbach Capital Management, Inc. ("Meisenbach") and by reason of this position, I am authorized and qualified to make this Declaration. My position at Meisenbach required me to be familiar with the company's securities trading systems and securities trading records.

2.    Meisenbach was a hedge fund founded in 1992.  I closed this fund in February 2008 after 16 years in operation.  As the founder of Meisenbach, I retained true and accurate records of the company's trading activities.

3.    I retrieved records from Meisenbach's securities trading and recording systems evidencing Meisenbach's transactions in the securities of Doral Financial Corporation (ticker symbol NYSE "DRL") in 2005.  A true and accurate summary of these records is attached as Attachment A to this Declaration.

4.    Specifically, Attachment A of this Declaration depicts (i) each date Meisenbach bought and sold DRL common stock; (ii) the number of shares in each transaction; (iii) the price per share; (iv) for purchases, the cost of each date's purchase; and (v) for sales, the proceeds from each sale.  As shown in Attachment A, Meisenbach's total return on its DRL common stock transactions in 2005 was a loss of $2,199,112.50.

5.    Attachment A also reflects certain Meisenbach options activity in DRL in 2005. As shown in Attachment A, Meisenbach's total return on its DRL options activities was a loss of $837,027.

6.    Meisenbach's total return on its DRL securities transactions may be calculated by adding the losses on Meisenbach's common stock and options activities.  This calculation yields a total net loss on Meisenbach's DRL securities transactions of approximately $3,036,139.50

7.    I further certify that the information contained in Attachment A truly reflects the trading activities of Meisenbach in DRL securities in 2005 and that this trading data was:

    (a)  recorded at or near the time of the occurrence of the matters set forth therein, by, or from information transmitted by, a person with knowledge of those matters;

    (b)  kept in the course of regularly conducted business activity; and

(c) made by the regularly conducted business activity as a regular practice.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on [*date*].  11/8/2010

Mark S. Meisenbach

# Attachment A



GOVERNMENT EXHIBIT 1111 08 Cr. 181 (TPG) (ID)

| Security | Description | Side | P/L |
|---|---|---|---|
| DRL | Common | Long | -2,199,112.5000 |
| DRL TG | Aug 35 Puts | Short | -2,932,875.00 |
| DRL TH | Aug 40 Puts | Long | 2,087,100.00 |
| DRL HJ | Aug 50 Calls | Short | 8,748.00 |
| | | | -3,036,139.5000 |

| Security | Timestamp | TradeDate | Side | Done | AvgPrc | Mgr | Trdr | Status | Acd | Nfty | Broker | Comm | Buys | Sells |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DRL | 1/20/2005 11:21:33 AM | 1/20/2005 12 | Buy | 20,000 | 43.2245 | SC | JO | DONE | A | | BMUR | 0.0200 | 864,890.0000 | |
| DRL | 1/20/2005 11:21:33 AM | 1/20/2005 12 | Buy | 30,000 | 43.6920 | SC | JO | DONE | A | | FBRC | 0.0300 | 1,311,075.0000 | |
| DRL | 1/21/2005 7:09:24 AM | 1/21/2005 12 | Buy | 10,000 | 43.8300 | SC | JO | DONE | A | | CSFB | 0.0300 | 438,600.0000 | |
| DRL | 1/24/2005 7:31:48 AM | 1/24/2005 12 | Buy | 20,000 | 42.8455 | SC | JO | DONE | A | | AMTR | 0.0500 | 857,910.0000 | |
| DRL | 1/25/2005 12:14:37 PM | 1/25/2005 12 | Buy | 10,000 | 40.9960 | SC | JO | DONE | A | | MONT | 0.0500 | 410,463.0000 | |
| DRL | 2/2/2005 11:45:14 AM | 2/2/2005 12 | Buy | 15,000 | 43.3690 | SC | JO | DONE | A | | BMUR | 0.0500 | 650,398.5000 | |
| DRL | 2/18/2005 8:10:34 AM | 2/18/2005 12 | Buy | 5,000 | 41.9060 | SC | JO | DONE | A | | VCLM | 0.0100 | 209,583.0000 | |
| DRL | 2/18/2005 8:10:34 AM | 2/18/2005 12 | Buy | 20,000 | 42.1239 | SC | JO | DONE | A | | BMUR | 0.0500 | 843,477.5000 | |
| DRL | 2/22/2005 12:18:59 PM | 2/22/2005 12 | Buy | 10,000 | 39.1690 | SC | JO | DONE | A | | JOHN | 0.0500 | 392,100.0000 | |
| DRL | 2/23/2005 9:10:37 AM | 2/23/2005 12 | Buy | 10,000 | 39.2868 | SC | JO | DONE | A | | ARCA | 0.0100 | 392,988.0000 | |
| DRL | 3/7/2005 8:06:12 AM | 3/7/2005 12 | Sell | 15,000 | 40.7231 | SC | JO | DONE | A | | ARCA | 0.0100 | | 610,846.5000 |
| DRL | 3/8/2005 12:34:26 PM | 3/8/2005 12 | Buy | 10,000 | 38.7970 | SC | JO | DONE | A | | VCLM | 0.0100 | 388,076.0000 | |
| DRL | 3/8/2005 12:34:26 PM | 3/8/2005 12 | Buy | 30,000 | 38.7182 | SC | JO | DONE | A | | IMAC | 0.0500 | 1,165,146.0000 | |
| DRL | 3/9/2005 7:16:23 AM | 3/9/2005 12 | Buy | 20,000 | 37.8210 | CH | JO | DONE | A | | SOAR | 0.0900 | 757,432.0000 | |
| DRL | 3/18/2005 7:24:38 AM | 3/18/2005 12 | Sell | 22,500 | 33.0087 | SCC | JO | DONE | A | | MCBT | 0.0500 | | 742,875.7500 |
| DRL | 3/18/2005 7:24:38 AM | 3/18/2005 12 | Buy | 35,000 | 26.2333 | SCC | JO | DONE | A | | YMIN | 0.0100 | 918,585.5000 | |
| DRL | 3/18/2005 8:06:16 AM | 3/18/2005 12 | Sell | 42500 | 21.1231 | SCC | JO | DONE | A | | WEEB | 0.01 | | 897,306.7500 |
| DRL | 3/18/2005 8:06:16 AM | 3/18/2005 12 | Sell | 215000 | 24.0060 | SCC | JO | DONE | A | | FBRC | 0.03 | | 5,150,583.0000 |
| DRL | 3/18/2005 9:40:18 AM | 3/18/2005 12 | Buy | 50000 | 20.84 | SCC | JO | DONE | A | | WEEB | 0.03 | 1,043,500.0000 | |
| | | | | | | | | | | | | | 9,600,724.5000 | 7,401,612.0000 | -2,199,112.5000 |

| Security | Timestamp | TradeDate | Side | Done | AvgPrc | Mgr | Trdr | Status | Acd | Nfty | Broker | Comm | Buys | Sells |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DRL+TH | 3/7/2005 9:44:22 AM | 3/7/2005 12 | Short | 2700 | 2.8 | SC | JO | DONE | A | | PALI | 0.02 | | 284,600.00 |
| DRL-TG | 3/18/2005 7:45:16 AM | 3/18/2005 12 | Cover | 1350 | 9.995 | SC | JO | DONE | A | | PALI | 0.02 | 1,352,025.0000 | |
| DRL-TG | 3/29/2005 1:31:04 PM | 3/29/2005 12 | Cover | 1350 | 13.65 | SC | JO | DONE | A | | PALI | 0.02 | 1,845,450.0000 | |
| | | | | | | | | | | | | | 3,197,475.00 | 284,600.00 | -2,932,875.00 |

| Security | Timestamp | TradeDate | Side | Done | AvgPrc | Mgr | Trdr | Status | Acd | Nfty | Broker | Comm | Buys | Sells |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DRL+TH | 3/7/2005 8:16:29 AM | 3/7/2005 12 | Buy | 1350 | 2.8 | SC | JO | DONE | A | | PALI | 0.02 | 380,700.00 | |
| DRL+TH | 3/29/2005 1:32:11 PM | 3/29/2005 12 | Sell | 1350 | 18.3 | SC | JO | DONE | A | | PALI | 0.02 | | 2,467,800.00 |
| | | | | | | | | | | | | | 380,700.00 | 2,467,800.00 | 2,087,100.00 |

| Security | Timestamp | TradeDate | Side | Done | AvgPrc | Mgr | Trdr | Status | Acd | Nfty | Broker | Comm | Buys | Sells |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DRL+HJ | 3/7/2005 8:47:30 AM | 3/7/2005 12 | Short | 1350 | 0.3615 | SC | JO | DONE | A | | PALI | 0.02 | | 49,950.00 |
| DRL+HJ | 3/9/2005 1:01:18 PM | 3/9/2005 12 | Cover | 1350 | 0.2852 | SC | JO | DONE | A | | PALI | 0.02 | 41,202.00 | |
| | | | | | | | | | | | | | 41,202.00 | 49,950.00 | 8,748.00 |

-3,036,139.5000

# Exhibit C

## In The Matter Of:

*UNITED STATES OF AMERICA v.*
*MARIO S. LEVIS A/K/A SAMMY LEVIS*

---

*VOLUME 18*
*April  21, 2010*

---

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 04lwlevf.txt, Pages 2789-2981 (193)

**Word Index included with this Min-U-Script®**

VOLUME 18
April 21, 2010

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

---

Page 2889

[1]     (In open court)
[2]     **THE CLERK:** Please take the witness stand.
[3]   STUART MCDERMOTT,
[4]     called as a witness by the Government,
[5]     having been duly sworn, testified as follows:
[6] **DIRECT EXAMINATION**
[7] **BY MR. BRAUN:**
[8]   **Q.** Good afternoon, Mr. McDermott.
[9]   **A.** Hello.
[10]  **Q.** Where do you live?
[11]  **A.** I live in Chicago.
[12]  **Q.** What do you do for a living?
[13]  **A.** I am an equity analyst for Holland Capital Management.
[14]  **Q.** Tell us what Holland Capital Management is and what you do
[15]  there.
[16]  **A.** It is an investment management company. We manage money
[17]  for pensions, endowments, we have a little mutual fund, and I
[18]  am an analyst. Basically my job is to try to pick stocks that
[19]  are going to increase in value, go up.
[20]  **Q.** Are you only interested in stocks that you feel are going
[21]  to increase in value?
[22]  **A.** Yes, we only pick stocks to go long. We don't short any
[23]  stocks.
[24]  **Q.** By shorting stocks, you mean investing in them with
[25]  expectation they're going to increase in value?

---

Page 2890

[1]  **A.** That's correct.
[2]  **Q.** You testified about this, but can you give us a better
[3]  sense for whose money you're investing in Holland? Who are
[4]  generally some of the nature of your clients?
[5]  **A.** I was saying we have pension funds so we would have -- the
[6]  exact clients, for example, are firefighters, teachers, they
[7]  have pensions through different states, police, just different
[8]  union organizations, those are some examples of some of the
[9]  clients we have.
[10]     (Continued on next page)
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

Page 2891

[1] **BY MR. BRAUN:**
[2]  **Q.** In your work as an analyst at Holland, is there a
[3]  particular type of company or sectors of the economy that you
[4]  focus on?
[5]  **A.** Well, I cover, I cover financials and staples, consumer
[6]  staples, so companies like, either financial companies or
[7]  banks, trust and custody of the companies. Or in staples, I'm
[8]  talking about companies like Coca-Cola, Procter & Gamble,
[9]  Pepsi, stuff like that.
[10]  **Q.** How long have have you been working at Holland Capital
[11]  Management?
[12]  **A.** I've been working there since August of 2001.
[13]  **Q.** Can you give us a sense of your educational and
[14]  professional background, prior to the time when you began
[15]  working at Holland, maybe start with college and just bring us
[16]  forward, briefly, if you could?
[17]  **A.** Okay. I went to college in Chicago at U-Chicago. I
[18]  studied philosophy there. After that, I went to law school,
[19]  went to Cornell Law School. And then after I graduated from
[20]  law school, I became a public defender with the Legal Aid
[21]  Society in Brooklyn, New York. Did that for eight years.
[22]  After that, moved back to Chicago, and while I'd been working
[23]  as a Legal Aid attorney, after some of the years, I started
[24]  getting interested in the stock market, reading a lot of books
[25]  about it, and so I realized that, it was an industry I thought

---

Page 2892

[1]  I might be able to take some of my skills as a public defender
[2]  and use them. But I realized nobody was going to hire me to
[3]  get into this industry with a public defender background, so I,
[4]  I went back to business school. I went to the U-Chicago,
[5]  graduate school of business, in 1997, and I graduated 1999.
[6]  And that's when I started working, shortly after, thereafter,
[7]  in the industry.
[8]     My first job was at Lincoln Capital Management, where I was
[9]  a junior equity analyst, and I worked for another analyst, and
[10]  we, you know, I basically did a lot of the same things I do
[11]  now. I, I built, I worked on models, on stocks, called the
[12]  companies, talked with them, read research reports and wrote,
[13]  helped the senior analyst, and I did that for about two years
[14]  and I went from there to Holland Capital Management.
[15]     **THE COURT:** Tell you what, you've got a very good
[16]  voice. For you, don't go quite so near the microphone.
[17]     **MR. BRAUN:** We've been trying to convince people to
[18]  get closer over the course of the trial. You're the first
[19]  person we've had to back up.
[20]     **THE WITNESS:** Thank you.
[21] **BY MR. BRAUN:**
[22]  **Q.** When you started at Holland, can you just remind me what
[23]  year was that?
[24]  **A.** 2001.
[25]  **Q.** Did you begin work as an equity analyst there and continue

---

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 18
April 21, 2010

Page 2893

[1] to have those responsibilities that you described through the
[2] 2005 period?
[3] A. Yes, that's true.
[4] Q. And those are still the responsibilities you have now, if I
[5] understand your testimony?
[6] A. Yes.
[7] Q. While you were at Holland, did a company called Doral
[8] Financial Corporation come to your attention?
[9] A. Yes, it did.
[10] Q. At some point, did you recommend that Holland buy Doral
[11] stock?
[12] A. I did.
[13] Q. Did Holland make such an investment?
[14] A. We did.
[15] Q. Can you tell us how Doral initially came to your attention,
[16] Mr. McDermott, about when that was?
[17] A. Well, I covered stocks in the financial services space at
[18] the time, so I would get a lot of research sent to me from the
[19] sell side. And also I'd read myself, I'd try to read as much
[20] as I can about certain financial companies. I would pay closer
[21] attention to the ones that seemed to be growing pretty well and
[22] doing quite well. So over time, I would notice some, I noticed
[23] Doral, I noticed it was doing quite well, seemed to be doing
[24] quite well. It was on my kind of radar screen, so to speak.
[25] And over the months in time, I started paying closer attention

Page 2894

[1] to it. And then I started doing more in-depth investigation of
[2] it, at a certain point, thinking this might be a stock that
[3] would qualify for our portfolios at Holland Capital.
[4] Q. And as you started paying closer attention to Doral, I
[5] think you mentioned sell side research. Can you describe just
[6] generally what that is? It's a term we're familiar with.
[7] A. Sell side research is just basically research from, I guess
[8] you'd call it Wall Street, people who publish research publish
[9] it, they give it out to the whole investment management
[10] community to take a look at, try to either say supporting the
[11] stock, you should buy it, be neutral on it, or sometimes on
[12] occasion saying sell the stock.
[13] So a lot of times people in the industry, in the sell side,
[14] a lot of the analysts there have years and years of experience,
[15] and you can say are experts on it. So I would read their
[16] research and, you know, judge for myself whether it made sense
[17] or whether, you know, I discounted it or whether I didn't.
[18] Q. Can that be a significant source of information for you in
[19] making investment decisions?
[20] A. It definitely can be.
[21] Q. And as you start doing your homework on the company and you
[22] start focusing more on the company, as you were describing with
[23] Doral, are there other published materials, written materials
[24] that you focused on?
[25] A. Yes. I would focus on company's own written materials. A

Page 2895

[1] lot of companies, in this case, if they have filings, you know,
[2] SEC filings they have. They also have presentations you can
[3] take a look at. Then there's also just research you can get
[4] from newspaper articles and so forth, and you can talk to the
[5] company as well.
[6] Q. And talking to the company, is that an important part of
[7] the process as well in making an investment decision?
[8] A. Yes, it is. It's very important.
[9] Q. Why is that so?
[10] A. You have a chance when you talk to the company a lot of
[11] times to get more detail than what's behind the filings or the
[12] presentation. A lot of times the presentations are kind of,
[13] they're kind of short, maybe 25 minutes, to a group of people.
[14] But if you call them, you can really pick their brain on more
[15] detail about issues you're curious about. So it's actually a
[16] very good source to talk to the companies.
[17] Q. As you were looking at Doral Financial more closely, did
[18] you begin to communicate with anyone in management at that
[19] company because of your interest in possibly making an
[20] investment?
[21] A. I did. It was Mario Sammy Levis.
[22] Q. And about what time, if you recall, did you begin
[23] communicating with Sammy Levis?
[24] A. I believe it was in January of 2004.
[25] Q. And at the time, were you carefully considering whether to

Page 2896

[1] make an investment decision to buy stock in Doral?
[2] A. I was. I was interested in, I had been doing some due
[3] diligence on it. I was getting more interested in it for a
[4] number of reasons, but I wanted to talk to the company and find
[5] out more details.
[6] Q. Were you able to communicate with Mr. Levis during that
[7] period for those purposes?
[8] A. Yes, I was.
[9] Q. Do you have a binder of documents in front of you, a
[10] notebook there with some materials?
[11] A. Yes.
[12] Q. Can you turn your attention now to a document that's been
[13] marked for identification as Government Exhibit 1003. It's a
[14] few tabs in to the binder there.
[15] Do you recognize this document, Mr. McDermott?
[16] A. Yes, I do.
[17] Q. Can you generally describe what it is?
[18] A. It's a research report I wrote on Doral Financial. I wrote
[19] it for my firm internally, so that we could discuss Doral as a
[20] potential investment for the company.
[21] Q. And can you describe what that internal decision-making
[22] process consists of at Holland?
[23] A. We have a team of analysts. There's about, there's five
[24] analysts and there's another person who is also considered the
[25] portfolio manager, but the analyst, basically when you have an

VOLUME 18
April 21, 2010

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

---

Page 2905

[1] A. It was a check. It was an important consideration to me
[2] if management had a history of being accurate in the past as
[3] far as what assumptions they were using. So I wanted to try to
[4] drill a little deeper and find out if I could get some comfort
[5] in that area.
[6] Q. Why are assumptions important particularly with this type
[7] of gain-on-sale accounting?
[8] A. Because in something like this, gain-on-sale accounting, a
[9] company is not exactly getting the cash flows immediately when
[10] they're booking the revenues and the earnings. So if a company
[11] was being aggressive, or dishonest, then unless they're being
[12] accurate in their assumptions, there could be problems down the
[13] road.
[14] Q. Did you receive a response from Mr. Levis to the questions
[15] that you posed in your e-mail on February 3?
[16] A. I did.
[17] Q. Can you turn your attention now to Government Exhibit 1006.
[18] And do you recognize that document?
[19] A. Yes, I do.
[20] Q. What is 1006?
[21] A. It's an e-mail response from Sammy Levis back to me, dated
[22] February 3, 2004.
[23] Q. Do you recall receiving this e-mail?
[24] A. I do.
[25]          MR. BRAUN: Your Honor, we offer 1006.

---

Page 2906

[1]          THE COURT: Received.
[2]          (Government's Exhibit 1006 received in evidence)
[3] BY MR. BRAUN:
[4] Q. In point 1 there, did Mr. Levis respond to the questions
[5] that you asked about gain on sale and management assumptions?
[6] A. Yes, he did.
[7] Q. Can you read his response on that topic and starting with
[8] the 40 percent he's talking about that is noncash gain on sale?
[9] A. Starting with the 40 percent you're saying?
[10] Q. Yes, starting with "the other 40."
[11] A. "The other 40 percent that is noncash is as the result of
[12] excess servicing IOs on bulk sales of whole loans in the local
[13] market. These are valued by two independent third-party
[14] valuations and our own internal one, and, as a matter of
[15] policy, we take the lowest. On these valuations, the
[16] assumptions have always been very conservative compared to
[17] industry standard. But, again, let me reiterate that the
[18] majority of our gain on sale is cash up front income, which do
[19] also include fees."
[20] Q. Can you read also point 6 in Mr. Levis' response to you on
[21] this date?
[22] A. Sure. "My personal view is that it is very cheap. This a
[23] company that has had record earnings five years in a row
[24] despite interest rate cycles. There are not that many
[25] companies in the banking or mortgage sector with the

---

Page 2907

[1] consistency of earnings that we have had and expect to have."
[2] Q. Focusing on his response to your question on gain on sale
[3] and in particular to your questions about how conservative
[4] Doral had been in its assumptions, Mr. Levis tells you that
[5] these IOs that it's generated from its bulk sales of loans, he
[6] says "these are valued by two independent third-party
[7] valuations and our own internal one, and as a matter of policy,
[8] we take the lowest." Was that representation important to you
[9] in your decision-making process?
[10] A. Yeah. It was important to me. Yes.
[11] Q. And why is that? Can you explain that?
[12] A. Because any time you can have somebody who is independent,
[13] who is not beholden to a company you're trying to decide
[14] whether they're being truthful or not, it helps to have an
[15] independent set of eyeballs looking at, looking at them and
[16] giving them, making a judgment. So the fact that he was saying
[17] they were taking some outside valuation companies and having
[18] them value this IO and that they were taking the lowest one
[19] made me feel better about potentially investing in Doral.
[20] Q. He makes another point lower down in the e-mail that you
[21] read regarding Doral's continued success despite different
[22] interest rate cycles. Was that an issue that you were focused
[23] on as well during this point in your decision making?
[24] A. Yes, it was.
[25] Q. And why is that?

---

Page 2908

[1] A. Because in financial services, right around the time of
[2] 2004, there were a lot of concerns about the potential for
[3] interest rates to increase going forward.
[4] Q. Why is that? Do you recall what interest rates were
[5] generally at that time?
[6] A. They were real low because I think the Federal Fund's
[7] interest rate was down at like 1 percent. But basically people
[8] were thinking that when they did increase or when they did
[9] change from where they were, they were going to start going up
[10] rather than going down or staying stable. People thought that
[11] the economy was improving, rates were going to start going up.
[12] And so, typically, a lot of financial companies, when rates
[13] increase, a lot of financial companies don't do so well. So in
[14] this case, I was looking for companies where I thought they
[15] could still do well in the face of potential rate increases
[16] coming down the pike.
[17] Q. After this e-mail exchange with Mr. Levis, did you continue
[18] to seek information regarding Doral?
[19] A. Yes, I did.
[20] Q. Did you continue to communicate with him for that purpose?
[21] A. I did.
[22] Q. At this point in time, had Holland actually made an
[23] investment in Doral, or were you still involved in considering
[24] that possibility?
[25] A. Back in February --

---

Page 2913

[1] **Q.** Let me stop you there. Can you jump down now to the next
[2] paragraph. There's another reference to Sammy Levis there.
[3] Can you read the rest of that paragraph, beginning with "while
[4] the treasurer, Sammy Levis."
[5] **A.** "While the treasurer, Sammy Levis initially answered a
[6] number of questions in writing, I and the group had some
[7] follow-ups. It turned out that the delay was caused by an
[8] e-mail glitch (our Outlook transformed the e-mail address to
[9] proper name form, but Doral's e-mail addresses are case
[10] sensitive, so he did not receive any of them.) I have now set
[11] up a conference call with him on Friday, March 5. He also gave
[12] an extremely positive presentation at the Wachovia Conference
[13] yesterday, so I feel confident at this time that we should move
[14] on the stock and initiate a position."
[15] **Q.** In the rest of your e-mail, did you pass along some of the
[16] answers to your questions that Mr. Levis had provided to you in
[17] the previous e-mails we have seen during your testimony?
[18] **A.** Yes, I did.
[19] **Q.** Did that include the information Mr. Levis had provided
[20] about the two independent third-party valuations and Doral's
[21] policy to take the lowest of its three valuations for the
[22] interest-only strips that it was generating?
[23] **A.** Yes, that's included in this e-mail.
[24] **Q.** Was the confidence that Mr. Levis expressed to you in this
[25] time period and information he provided you important in your

Page 2914

[1] decision-making process, Mr. McDermott?
[2] **A.** Yes, it was.
[3] **Q.** Based on that information and the recommendations that you
[4] were making to your group at Holland, at around this time
[5] period, did Holland make an investment in Doral and buy Doral
[6] stock?
[7] **A.** Yes, we did.
[8] **MR. BRAUN:** Your Honor, it's one. This would be a
[9] good breaking point for the government.
[10] **THE COURT:** Okay. If the jury would step out, I'll
[11] talk to the lawyers about our schedule. 2:15, ladies and
[12] gentlemen.
[13] (Jury excused)
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 2915

[1] **THE COURT:** You may step down.
[2] (Witness excused)
[3] **THE COURT:** Again, our schedule, who are the witnesses
[4] after this one?
[5] **MR. BRAUN:** Your Honor, after this witness, the
[6] government has several witnesses, all of whom are very short.
[7] We have one witness through whom we are putting in just some
[8] summary charts. I'm going to wait for Mr. McDermott to leave
[9] the courtroom before I tell you what's going to happen next.
[10] And then we have two bankers, a banker from Banco
[11] Popular, whose direct examination is less than an hour, and a
[12] banker from Banco Santander.
[13] **THE COURT:** When does the government plan to rest?
[14] **MR. BRAUN:** Tomorrow, by lunch.
[15] **THE COURT:** When?
[16] **MR. BRAUN:** By lunchtime tomorrow.
[17] **THE COURT:** Okay. We're doing pretty well. I think
[18] that the comments I'm making now are probably useless, but I'm
[19] going to make them. If you bring out testimony about
[20] Mr. Levis' general optimism, and so forth, there's no claim
[21] that he was dishonest in his general optimism. There's no
[22] claim that on. There are only two claims in the case. One is
[23] about the independent valuators and one is about the caps. The
[24] problem is if you bring out all these other things, and I hope
[25] it isn't true, but it could lead to a very lengthy

Page 2916

[1] cross-examination about these other things. And it's a little
[2] hard to say, I hope the defense can focus and all, but I think
[3] it would be well for the government to really stick to the
[4] point and bring out the points because those are the only
[5] issues. There's no issue about all of these other things he
[6] said. None at all. And with all these witnesses coming on,
[7] you've got to use the time to stick closely to the points at
[8] issue. So please do that.
[9] We'll see you at 2:15.
[10] (Luncheon recess)
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 2921

[1] **MR. BRAUN:** The government offers 1014.

[2] **THE COURT:** Received.

[3] (Government Exhibit 1014 received in evidence)

[4] **BY MR. BRAUN:**

[5] **Q.** Without pausing on the substance of this, Mr. McDermott, I

[6] want to run through a few of the documents reflecting your

[7] communications with Mr. Levis. What about Exhibit 1015, do you

[8] recognize that?

[9] **A.** Yes, I do.

[10] **Q.** What is 1015?

[11] **A.** It is some notes, handwritten notes of mine based on a

[12] conversation to myself and Sammy Levis, dated April 16th, 2004.

[13] **MR. BRAUN:** We offer 1015 into evidence, your Honor.

[14] **THE COURT:** Received.

[15] (Government Exhibit 1015 received in evidence)

[16] **BY MR. BRAUN:**

[17] **Q.** Can you now turn to 1016, Mr. McDermott. Do you recognize

[18] 1016?

[19] **A.** Yes, I do.

[20] **Q.** What is 1016?

[21] **A.** Within our firm we typically would write what we call

[22] weekly reports where we would write, in my situation I would

[23] write about all the stocks that I cover, any news that is on

[24] them, any news that I have read about or anything I found

[25] important to share with the group.

Page 2922

[1] It also has some information as far as actions I think

[2] we should take as far as either buying or selling the stocks or

[3] adding to stocks, also other stocks we're thinking about

[4] potentially looking at stocks which we don't own, and sometimes

[5] I put news in about stocks we don't own and I want to write

[6] about it because it is important to the industry or stocks I am

[7] thinking about.

[8] **Q.** What is the date on this weekly news document that you just

[9] described?

[10] **A.** April 19th, 2004.

[11] **MR. BRAUN:** We offer 1016, your Honor.

[12] **THE COURT:** Received.

[13] (Government Exhibit 1016 received in evidence)

[14] **BY MR. BRAUN:**

[15] **Q.** Can that be put up?

[16] Mr. McDermott, this document reflects that a number of

[17] sections have been covered up or redacted. The word "redacted"

[18] appears a number of times on this document?

[19] **A.** Yes.

[20] **Q.** Can you reflect what is redacted and what remains from the

[21] weekly news document that is now in evidence as 1016.

[22] **A.** On this type of document, what is taken out is anything

[23] that had nothing to do with Doral. If I was writing about

[24] another stock -- Pepsi, for example, it has been taken out,

[25] there is no information about Pepsi. Anything that had to do

Page 2923

[1] with Doral is left in here.

[2] **Q.** Okay. We'll have the computer working in a minute. It is

[3] still warming up.

[4] Mr. McDermott, can you turn to the discussion of Doral

[5] that appears in this document. It is starting on the page that

[6] begins 4-16, meaning April 16th.

[7] **A.** Yes.

[8] **Q.** Do you describe a conversation that you had with Sammy

[9] Levis during this time period?

[10] **A.** Yes, I do.

[11] **Q.** Is there any discussion of Mr. Levis' comments regarding

[12] Doral's exposure to interest rate risk with respect to its

[13] sales of mortgage loans?

[14] **A.** Yes, there is.

[15] **Q.** Can you just read just that part of your report here from

[16] April.

[17] **A.** Okay. Well, it says had a conference call with treasurer

[18] Sammy Levis about earnings release. He sounds extremely

[19] confident about Doral's prospects, highlights. Outlook is

[20] better than previously thought even with higher interest rates.

[21] 2 billion of liquidity on balance sheet, able to reinvest at

[22] higher rates when rates go up. New housing construction is

[23] stronger than they expected so Doral owns 50 to 60 percent of

[24] this market, and Doral has sold forward its entire year's worth

[25] of production. So they have already locked in their gain on

Page 2924

[1] sale revenues. No interest rate risk on these deals.

[2] Then there is another entry I made also which is rates

[3] increasing will benefit the NIM.

[4] **Q.** The net interest market?

[5] **A.** Yes, that us what that stands for, yes.

[6] **Q.** That would be the margin of what Doral's earning in

[7] interest as compared to what it is paying out in interest,

[8] correct?

[9] **A.** That's correct, yes.

[10] **Q.** Just a few more documents reflecting your communications

[11] with Mr. Levis in the '04 period that I'd like you to identify

[12] so that we can have them in evidence.

[13] I don't plan on focusing on the details in them, but

[14] just for summary purposes, Mr. McDermott, did you continue to

[15] have the same sorts of communications with Mr. Levis through

[16] the 2004 period?

[17] **A.** That's correct, yes.

[18] **Q.** Does he continue to make the same assurances to you

[19] regarding the lack of interest rate risk that Doral has in its

[20] gain on sale mortgage loan sale activities?

[21] **A.** Yes, he does.

[22] **Q.** Can you identify for us Government Exhibit 1017.

[23] **A.** 1017 is --

[24] **THE COURT:** I tell you what. I think if they're of

[25] the same nature, you can simply offer them and I'll receive

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 18
April 21, 2010

Page 2925

[1] them.

[2] MR. BRAUN: Okay. There is a handful, your Honor, and
[3] I'll read them off. There is six or seven documents. It is
[4] Government Exhibit 1017, notes from May 10th --

[5] THE COURT: All right, look, just read the numbers.

[6] MR. BRAUN: 1017, 1018, 1019, 1020, 1022.

[7] THE COURT: Those are received.

[8] (Government Exhibits 1017, 1018, 1019, 1020, 1022
[9] received in evidence)

[10] MR. BRAUN: Thank you.

[11] THE COURT: Does that finish 2004?

[12] MR. BRAUN: There is one in 2004 that I was going to
[13] pause at briefly before moving into 2005.

[14] THE COURT: All right. What is that?

[15] MR. BRAUN: That is 1023.

[16] BY MR. BRAUN:

[17] Q. Mr. McDermott, as of 2004, did interest rates continue to
[18] rise?

[19] A. Yes, they did.

[20] Q. In light of that, did you continue to consider whether the
[21] investment that Holland made in Doral was a good one, one you
[22] wanted to maintain?

[23] A. We still owned it and I continued analyzing, to be
[24] concerned whether rates are going to impact and whether they
[25] can grow through it.

Page 2926

[1] Q. Can you turn your attention to Government Exhibit 1023.

[2] A. Yes.

[3] Q. Is this one of the weekly reports that you've described
[4] earlier in your testimony?

[5] A. Yes, it is.

[6] Q. This one is dated November 29th, 2004?

[7] A. That's correct.

[8] MR. BRAUN: We offer 1023, your Honor.

[9] THE COURT: Received.

[10] (Government Exhibit 1023 received in evidence)

[11] BY MR. BRAUN:

[12] Q. Can you just read the last paragraph, Mr. McDermott, on the
[13] page that has been marked with a number ends 26.

[14] A. The last paragraph, "Outlook: Q3 was outstanding. The
[15] fundamentals remain superb. The stock trades at 10.4 forward
[16] so it is trading at less than one quarter of its near term
[17] growth late. I like the name a lot and expect very strong
[18] results to continue. Talk with the treasurer gives me
[19] confidence to continue holding at these levels."

[20] Q. Did Holland continue holding at those levels going into
[21] 2005?

[22] A. Yes, we did.

[23] Q. Can you turn your attention now to Government Exhibit 194,
[24] a few tabs forward in your book.

[25] A. Yes.

Page 2927

[1] Q. Do you recognize 194? It is already in evidence.

[2] A. Yes, I do.

[3] Q. What is Government Exhibit 194?

[4] A. It is a press release from Doral on January 18th. It is
[5] their quarterly earnings for fourth quarter and the full
[6] earnings for 2004.

[7] Q. Did this press release come to your attention around this
[8] period of time when it was issued?

[9] A. Yes, it did.

[10] Q. Can you read the first couple of sentences in the 5th
[11] paragraph down or so. It begins investment activities.

[12] A. "Investment activities for the fourth quarter of 2004
[13] resulted in a loss of 95.4 million compared to a loss of 8
[14] million for the fourth quarter of 2003. The loss on investment
[15] activities during the fourth quarter of 2004 was principally
[16] due to an impairment on the value of the company's
[17] interest-only strips IOs of 97.5 million as a result of
[18] increases in the 3 month London interbank offered rate, LIBOR,
[19] which reduced the anticipated spread of the company's variable
[20] rate IOs.

[21] Q. Let me stop you there.

[22] Do you recall seeing that bit of information in the
[23] press release that was issued in January of '05?

[24] A. Yes, I do.

[25] Q. What was your reaction to it, if any?

Page 2928

[1] A. I was disappointed at first and I was concerned.

[2] Q. What was your concern?

[3] A. Well, the stock sold off pretty substantially in the
[4] marketplace and the market was clearly worried about the fact
[5] that there was an impairment being taken on this IO, so that's
[6] kind of where the concern was coming from.

[7] Q. Do you recall what interest rates were doing during this
[8] period of time?

[9] A. I believe they were still kind of consistently moving up in
[10] a measured manner.

[11] Q. Do you recall what expectations were regarding where
[12] interest rates were continuing to go during that period of
[13] time?

[14] A. Yes, expectations were for them to continue to go up.

[15] Q. In light of that, in light of Doral's announcement it had
[16] taken this write-down to its interest-only strips because of
[17] rising interest rates, did you have concerns about Doral taking
[18] additional impairments in the future going forward from this
[19] time period?

[20] A. Yes, I did.

[21] Q. After you saw this press release, did you want to obtain
[22] additional information from Doral regarding what this
[23] impairment was all about?

[24] A. Yes, I did.

[25] Q. What did you do as a result of that?

VOLUME 18
April 21, 2010

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

Page 2929

[1] A. I called Mr. Sammy Levis to get more detail on what
[2] happened and what was behind this loss, this interest-only
[3] strip.
[4] Q. Can I turn your attention to two documents now in your
[5] binder, and can you identify what Government Exhibit 1025 is
[6] and as well as tell us what 1026 is.
[7] A. Okay. 1025 is handwritten notes of myself of mine based on
[8] a call I had with Sammy Levis on January 19th, 2005. I guess
[9] it was the day after they reported earnings.
[10] Q. What is 1026?
[11] A. 1026 is my weekly news, like a printed -- my printed, you
[12] know, my write-up of conversations I had or news I had, weekly
[13] write-up of news on stocks I cover.
[14]     As for this case, it pertains to writing about for
[15] Doral that week.
[16] Q. Does your weekly news entry on Doral reflect at least in
[17] part the substance of your conversation with Mr. Levis that
[18] took place on about January 19th of 2005?
[19] A. Yes, it does.
[20] Q. The date on your weekly news report appears to be January
[21] 17th, '05.
[22] A. That's correct.
[23] Q. Can you explain to us how a report dated January 17th,
[24] 2005, can describe a conversation that took place on January
[25] 19th, 2005 if your notes are correct?

Page 2930

[1] A. Yes. We write our weekly news reports every week.
[2] Traditionally, we put them out on Monday. We don't always put
[3] them out on Monday. Sometimes they get put out later in the
[4] week. As a practice, I would have my date always be the Monday
[5] of the week. In that particular case, January 17th was Monday,
[6] I believe, and then I probably didn't -- I was on vacation
[7] actually at first. I was in Arizona, and so I didn't do my
[8] weekly on Monday.
[9]     When I came back and I started -- I had the call with
[10] Sammy and then I did my weekly a day later, I just keep the
[11] date the same. So I kept it as of that Monday date.
[12] Q. There are entries in the report that might reflect
[13] activities that happened later that week?
[14] A. That's correct.
[15]     MR. BRAUN: The government offers 1025, which are the
[16] notes; and 1026, which is the weekly news.
[17]     THE COURT: Received.
[18]     (Government Exhibits 1025 and 1026 received in
[19] evidence)
[20] BY MR. BRAUN:
[21] Q. I want to start with 1026, Mr. McDermott, your weekly news
[22] entry on Doral Financial.
[23] A. Okay.
[24] Q. Can you read the first entry there under the Doral
[25] Financial heading, beginning with that top paragraph.

Page 2931

[1] A. The first paragraph, January 18th, reported Q4. Numbers
[2] look great at first glance, but the Achilles heel of Doral came
[3] back to bite it. Does not do conference calls. That may
[4] change now. And it had a conferencing line item regarding a
[5] write-down of its interest-only strip by 97 million. A few
[6] analysts said this was due to ineffective hedges. After
[7] talking to the treasurer, I feel very good about the results
[8] and his explanation. This is a great example of the
[9] inefficiency of markets with the stock down 11 percent, 11
[10] percent today on this misunderstanding of this news details.
[11] Q. Under the details can you now skip down to the paragraph
[12] that begins 97 M IO write-down and read that paragraph for us.
[13] A. "97 million IO write-down of the servicing strip."
[14] Q. Let me stop you just for a moment. In the line above that,
[15] does your report indicate in what follows here, what you're
[16] reading now, this is based on your conversation with the
[17] treasurer of Doral, Sammy Levis?
[18] A. Yes, I report I spoke to the treasurer and here is what he
[19] said.
[20] Q. Please continue.
[21] A. 97 million IO write-down of the servicing strip offset by
[22] unusual tax gain of about 80 million due to acceleration of
[23] deferred tax assets under a capital gains tax law change.
[24] Basically Doral saw an opportunity to write the IO well below a
[25] level that it had previously, using a very conservative

Page 2932

[1] assumption, and offset this with a gain as two one timers.
[2]     The upshot would to put the IO in a very conservative
[3] valuation, setting up one more tailwind for Doral in 2005.
[4] Unfortunately, the market did not understand. At worst, Doral
[5] is guilty of some sort of pushing out earnings by depressing Q4
[6] given its robustness.
[7] Q. Can you explain what you mean by talking about a tailwind
[8] in '05 and pushing out earnings?
[9] A. What I am saying there, sometimes companies, they kind of
[10] play games, they manage their earnings. So my understanding
[11] was that, understanding was Doral was using a more conservative
[12] valuation of the IO and taking a hit to its earnings in 2004,
[13] but that would mean that going forward in 2005 was setting it
[14] up to having already taken this charge, it would help protect
[15] earnings in 2005, so it actually was pushing out earnings for
[16] the company to the following year.
[17] Q. Can you continue reading in your report where you left off.
[18] A. Doral valued the IO with the assumption that LIBOR
[19] increases by 150 basis points in the next 12 months. They had
[20] been using 100 basis points. Had they used 100 basis points
[21] again, it would have seen a loss of 25 to 30 million, not the
[22] 97 million. Accountants gave it their blessing because there
[23] are a few out there who believe that LIBOR will increase 150
[24] basis points over the next twelve months.
[25] Q. Then it says hedges had nothing to do with this, the