UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 18
April 21, 2010

Page 2933

[1] analyst was wrong?

[2] A. Yes.

[3] Q. Are you referring to the analyst you mentioned at the top

[4] of the page who suggested that this problem may have been a

[5] result of ineffective hedges?

[6] A. Yes, a couple analysts talked about hedges being

[7] ineffective and Mr. Levis told me hedges had nothing to do with

[8] the loss.

[9] Q. Further down can you read that sentence that begins if see

[10] LIBOR.

[11] A. Okay. I wrote if see LIBOR going beyond 150 basis points,

[12] they will hedge.

[13] Q. At the bottom, I says it says will see insiders buying

[14] after the blackout period ends?

[15] A. Yes, that's correct.

[16] Q. Is that information that Mr. Levis also provided to you?

[17] A. Yes.

[18] Q. Can you read us the sentence that concludes your write-up

[19] in the January 17th weekly news for Holland reporting on the

[20] conversation you had with Mr. Levis a couple days later.

[21] A. Outlook. Q4 was terrific but controversial.

[22] Misinterpreted by the market. The fundamentals remain superb.

[23] Stock trades at 9.8 times forward. Very strong fundamental

[24] results to continue. I would not sell any here. If it gets

[25] beat up any more, I would advocate adding.

Page 2934

[1] Q. In your report, in describing what Mr. Levis has explained

[2] to you regarding this impairment, you say Doral valued the IO

[3] with the assumption that LIBOR increases by 150 basis points in

[4] the next twelve months?

[5] A. Yes.

[6] Q. Can you explain what you recall him telling you in that

[7] regard.

[8] A. I recall him telling me that Doral had decided to basically

[9] offset this tax gain that they're getting. The tax gain was

[10] for a limited amount of time on the Island of Puerto Rico.

[11] They were offsetting that by using a more conservative

[12] valuation assumption going to LIBOR plus 150, and he further

[13] explained that -- he talked more about it and said the

[14] accountants gave it their blessing, and even he mentioned that

[15] Doral asked to go to 250, can we go to 250 basis points above

[16] and the accountants wouldn't go that far.

[17] So they were allowed to go more conservative but

[18] weren't allowed to go to 250 basis points. He was explaining

[19] this was basically matching of earnings by becoming more

[20] conservative on the IO and they were offsetting that with the

[21] tax gains this quarter.

[22] Q. By forecasting LIBOR plus 150 is their valuation approach?

[23] A. That's correct.

[24] Q. Can you now turn back to your notes which are in evidence

[25] as Government Exhibit 1025.

Page 2935

[1] MR. BRAUN: Your Honor, we also offer 1025-O, which

[2] are the original version of Mr. McDermott's notes from this

[3] date.

[4] THE COURT: All right.

[5] (Government Exhibit 1025-O received in evidence)

[6] BY MR. BRAUN:

[7] Q. Do you have a copy of your notes with you there,

[8] Mr. McDermott?

[9] A. I do, yes.

[10] Q. You maintained your original notes from this time period

[11] over the years?

[12] A. Yes, I have.

[13] Q. Did you bring them to New York from Chicago?

[14] A. I did.

[15] Q. At the top of your notes underneath DRL, is that Doral's

[16] ticker symbol?

[17] A. Yes.

[18] Q. What does it say re colon?

[19] A. Regarding the 97 million loss in Q4.

[20] Q. That is described in the press release?

[21] A. That's correct.

[22] Q. Can you walk through and translate for us as best you can

[23] what is in your notes under excellent Q maybe about halfway

[24] down the page.

[25] A. Okay. I wrote IO would have to take 25 million or 30

Page 2936

[1] million, not 95 million. So what I was writing there was based

[2] on what Sammy was telling me. Had they not taken this more

[3] conservative valuation, the charge would have been 25 or 30

[4] million, not 95 million. Then I write two third parties and

[5] our own, we always take the lowest of the three. He was

[6] telling me again the valuations were being done by the bottom,

[7] the most conservative of the three, whatever it is.

[8] He said we try to be around the yield curve.

[9] Therefore, we took the valuation LIBOR plus 150 basis --

[10] Q. I didn't hear you.

[11] A. We tried --

[12] Q. You try?

[13] A. We tried to be ahead of the yield curve. He is trying to

[14] say we were trying to get ahead of the yield curve being more

[15] conservative. Therefore, we took valuation of LIBOR plus 150

[16] basis points in the next twelve months.

[17] Q. Is the yield curve you're talking about the forward curve

[18] that projects future changes in interest rates?

[19] A. Yes, that's correct.

[20] Q. Can you please continue and walk us through your notes

[21] here.

[22] A. Then that is why we didn't do that much hedging going

[23] forward beyond the 150 will hedge. He was saying that

[24] essentially this write-down wasn't a problem at all, it was

[25] actually a choice of accounting they were making to be

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 18
April 21, 2010

---

Page 2941

[1] A. No, I did not.

[2]     MR. BRAUN: We offer 1029, your Honor.

[3]     THE COURT: Received.

[4]     (Government Exhibit 1029 received in evidence)

[5] BY MR. BRAUN:

[6] Q. Were you taking notes as Mr. Levis spoke at the Brean

[7] Murray conference?

[8] A. Yes, I was.

[9] Q. Is that for the same reason you were taking notes during

[10] the previous communications you had with him?

[11] A. Yes, I tried to keep track of what the company was saying,

[12] yes.

[13] Q. Did he discuss the interest-only strip and the write-down

[14] it had taken in the presentation that he gave at the Brean

[15] Murray conference?

[16] A. Yes, he did.

[17] Q. Can you turn to the second page of your notes and under the

[18] line that says "IO" and just walk us through the next six or

[19] seven lines.

[20] A. Okay. IO, two types, fixed pass-through to investors

[21] doesn't change floating. Does change resets every 90 days.

[22] Why big impairment? LIBOR increased much faster than expected.

[23] Doral did have hedge in place. Most Doral hedges positioned

[24] for increasing rates. Company has taken steps to adjust the

[25] hedges to assume LIBOR increases faster. May see some

---

Page 2942

[1] impairment if LIBOR increases, but if reverse, we will recover.

[2] Also hedging gains.

[3] Q. Just the next line.

[4] A. He said IO is a wonderful cash cow, wonderful asset, 20

[5] percent cash yield.

[6] Q. Fine. You mentioned sell side research being one

[7] of the things you look at in making your decisions and

[8] analyzing stocks at Holland, correct?

[9] A. That's correct.

[10] Q. Can you turn your attention to Government Exhibit 1205 and

[11] tell us if you recognize that document?

[12] A. Yes, I do.

[13] Q. What is 1205?

[14] A. It is a sell side report from Hibernia Southcoast Capital,

[15] Southside Research Shop.

[16] Q. Who is the author listed on the report?

[17] A. Jay Cunningham.

[18] Q. In Mr. Cunningham's report, is this something that came to

[19] your attention when you were at Holland?

[20] A. Yes, it did.

[21] Q. Can you look at the second bullet point under the key

[22] points heading on Page 1 of Mr. Cunningham's report. This is

[23] already in evidence.

[24]     Do you see in the second bullet point that says

[25] management indicated that they have been very conservative in

---

Page 2943

[1] their rate assumptions surrounding the IO and that they are

[2] using a YEO4 three-month LIBOR of greater than 4 percent?

[3] A. Yes, I do.

[4] Q. Was that essentially consistent with what you had been told

[5] by Sammy Levis back on January 19th?

[6] A. That is consistent with that, yes.

[7] Q. Continuing, it reads our other concern is about the hedging

[8] activities for the IO. Management indicated that the hedging

[9] previously has not been as sound as they would have liked, but

[10] pointed out that the hedge effectiveness has been improving

[11] over the past several quarters.

[12]     Do you see that?

[13] A. Yes, I do.

[14] Q. So Mr. Cunningham is describing possible problems that

[15] exist with hedging at Doral?

[16] A. Yes.

[17] Q. And Mr. Levis mentioned something similar, but do you

[18] recall what he told you about any connection between the IO

[19] impairment and hedging when you spoke to him on the 19th?

[20] A. Well, he told me that hedges had nothing to do with the

[21] impairment back on the 19th.

[22] Q. Did this raise any questions in your mind as to what was

[23] going on on this issue?

[24] A. It definitely raised some questions, yes.

[25] Q. Can you turn your attention to Government Exhibit 1030

---

Page 2944

[1] which is the next tab in your book.

[2] A. (Pause)

[3] Q. What is Exhibit 1030, Mr. McDermott?

[4] A. It is a set of e-mails between myself and Mr. Levis, it

[5] looks like February 3rd, 2005.

[6] Q. Did you begin this on February 2nd? If you look at the

[7] bottom of the page?

[8] A. Yeah, mine is from February 2, 2005.

[9]     MR. BRAUN: We offer 1030, your Honor.

[10]     THE COURT: Received.

[11]     (Government Exhibit 1030 received in evidence)

[12] BY MR. BRAUN:

[13] Q. Can you read your message to Mr. Levis on February 2nd.

[14] A. Hi, Sammy. More questions on the IO and whether it was due

[15] to hedge ineffectiveness. I thought when we talked last week,

[16] you said that the hedge had nothing to do with the IO. But I

[17] just read Hibernia's report where he says that the management

[18] admits that the hedge has not been as sound as they would have

[19] liked but that the hedge has been improving for several

[20] quarters.

[21]     I do not understand these two statements together, as

[22] they seem to be in conflict. Can we talk about this?

[23] Q. Is the Hibernia report you mentioned here the one we just

[24] looked at a minute ago?

[25] A. Yes.

---

Page 2945

[1]   Q. What is Mr. Levis' response to you on February 2? Just
[2]   read the first few sentences, please.
[3]   A. I am in a road show and I'll be back on Monday. In the
[4]   meantime I can tell you that the IO hit had nothing to do with
[5]   hedging, but rather to a valuation in a period in which LIBOR
[6]   rates rose much faster. I don't have Hibernia report with me,
[7]   so I don't understand what he is referring to. If you want to,
[8]   we can discuss upon my return on Monday.
[9]   Q. All right. Going forward through this period of time did
[10]  you continue communicating with Mr. Levis about the subject of
[11]  the IOs and particularly concerns about the impairment?
[12]  A. Yes.
[13]  Q. Can you look at Government Exhibit 1031 and tell me if you
[14]  recognize that?
[15]  A. 1031 is a string of e-mails between myself and Mr. Levis.
[16]  Q. These cover a long period of time, correct?
[17]     If you turn to the page, Page 5 of this chain of
[18]  e-mails, can you tell us where they start, what date they start
[19]  at?
[20]  A. They start on February 14th of 2005.
[21]  Q. Turning back to the front, when did they end?
[22]  A. They end on March 16th, 2005.
[23]  Q. I want to limit your attention now to the time context that
[24]  we're in and stay with mid-February of 2005, all right?
[25]  A. Okay.

Page 2946

[1]   Q. Without reading it word-for-word, starting with your first
[2]   e-mail to Mr. Levis, can you just give us a general description
[3]   of what you're saying and what subject it relates to.
[4]   A. Okay. Sammy was coming to Chicago. He was doing investor
[5]   marketing when he comes out to tell his story, and so --
[6]   Q. May I interrupt you for just a moment, Mr. McDermott.
[7]      MR. BRAUN: Your Honor, can we have 1031 admitted into
[8]   evidence, please.
[9]      THE COURT: Okay.
[10]     (Government Exhibit 1031 received in evidence)
[11]     THE WITNESS: Can I go on?
[12]  BY MR. BRAUN:
[13]  Q. Please. Sorry for the interruption.
[14]  A. Sammy was coming to Chicago. I think he mentioned that to
[15]  me he was going to be coming through and I should contact sell
[16]  side firm. So I contacted them to try to get a meeting, to
[17]  make sure that I was able to talk to him in person.
[18]     At first the firm wasn't really being very helpful.
[19]  They basically -- we didn't pay them brokerage dollars so they
[20]  didn't want to set up a meeting with us. I wrote him back an
[21]  e-mail saying you know, look, you can call the show on this.
[22]  If you want to meet with us, just tell me you want to meet with
[23]  us and when we can do it.
[24]     THE COURT: Can we interrupt. Mr. Braun?
[25]     MR. BRAUN: Yes, your Honor.

Page 2947

[1]      THE COURT: Can we have something that relates to the
[2]   issues in the case?
[3]      MR. BRAUN: Yes.
[4]      THE COURT: We have a lot of discussion back and forth
[5]   of a lot of things. There are certain issues here. I have
[6]   seen reference to those issues about twice in all this
[7]   testimony. Now --
[8]      MR. BRAUN: Yes, your Honor.
[9]      THE COURT: -- at this point we cannot do this.
[10]  BY MR. BRAUN:
[11]  Q. Mr. McDermott --
[12]     THE COURT: Is there anything here remaining that
[13]  bears on the issues in the case?
[14]     MR. BRAUN: Yes, your Honor, directly so.
[15]     THE COURT: Where is it?
[16]     MR. BRAUN: At this meeting he was just discussing,
[17]  March meeting that we are just getting to.
[18]     THE COURT: All right, let's see it.
[19]     MR. BRAUN: He is trying to get set up here with Mr.
[20]  Levis.
[21]     THE COURT: All right.
[22]  BY MR. BRAUN:
[23]  Q. Mr. McDermott, this meeting that you wanted to have with
[24]  Mr. Levis, did it come to pass?
[25]  A. It did, yes, it did.

Page 2948

[1]   Q. Was he helpful in setting that meeting up and did it occur?
[2]   A. He was very helpful and it did occur.
[3]   Q. Where did it take place, sir?
[4]   A. It took place at Holland Capital's offices in Chicago, the
[5]   7th floor on North Wacker.
[6]   Q. Can you turn your attention now to Government Exhibit 1032.
[7]   A. Yes.
[8]   Q. Do you recognize 1032, Mr. McDermott?
[9]   A. Yes, I do.
[10]  Q. What is Exhibit 1032?
[11]  A. It is some preparation meeting questions for the meeting I
[12]  was going to have with Sammy Levis.
[13]  Q. These are in preparation for the meeting you just referred
[14]  to?
[15]  A. Yes.
[16]     MR. BRAUN: We offer 1032, your Honor.
[17]     THE COURT: I will receive it.
[18]     (Government Exhibit 1032 received in evidence)
[19]  BY MR. BRAUN:
[20]  Q. In preparing for the meeting, Mr. McDermott, were there a
[21]  number of questions that you wrote down relating to the
[22]  interest-only strip?
[23]  A. Yes, there were.
[24]  Q. Are those questions set forth at the bottom of the first
[25]  page of this document under the heading, "IO strip"?

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 18
April 21, 2010

---

Page 2949

[1] A. Yes, they are.

[2] Q. Were these questions that you hoped to pose to him during

[3] the meeting you planned to have during this time period?

[4] A. Yes.

[5] Q. Why did the IO strips continue to be a concern for you?

[6] A. Because that was clearly a major, major part of the story

[7] of the company and the stock, and if I could feel confident

[8] that the IO write-down was only because of conservativism, then

[9] I thought we had a really great opportunity in the stock where

[10] the market was misunderstanding.

[11] Q. Had the stock continued to fall somewhat during this period

[12] of time?

[13] A. I think it did, yes.

[14] Q. There is a date at the top of the document, March 5th, '04.

[15] Is that a typographical error?

[16] A. It should be March '05.

[17] Q. Can you turn your attention to the next document, please.

[18] A. Yes.

[19] Q. Do you recognize Exhibit 1033?

[20] A. I do. Those are my notes from the meeting where Mr. Sammy

[21] Levis came to our office and met with myself and some people

[22] from my office.

[23] Q. Who do you recall being at the meeting, Mr. McDermott?

[24] A. I was there. The head of the company, Mr. Lou Holland was

[25] there. Also Ms. Monica Walker also worked a Holland Capital,

---

Page 2950

[1] she was there. There was at least one Deutsche Bank employee,

[2] Neil Abromavage. Another individual by another firm, Stacey

[3] Ridell, who I knew and I knew she was interested in Doral, so I

[4] invited her to sit in on the meeting and also pose questions if

[5] she was interested, and she did.

[6] Q. These notes, Mr. McDermott, appear to take up about a page

[7] and a half?

[8] A. That's right.

[9] Q. Can you explain any reason why your notes might not be as

[10] extensive for the personal meeting as they would be for some of

[11] the phone calls that you discussed and that we see notes from

[12] already in your testimony?

[13] A. Yeah, there is a couple of reasons. One is part of the

[14] meeting was dominated by the head of the company, he is asking

[15] questions. He doesn't have the nitty-gritty knowledge of the

[16] company. Some of the questions he is asking, I am not taking

[17] notes on those questions.

[18] Then I tried to get as many of my questions in, but I

[19] was also trying to pay attention to in this case Sammy and

[20] trying to make eye contact, trying to talk to him, listen to

[21] what he is saying, trying to figure out where to go next, where

[22] to follow up. I am not writing as much in a face-to-face

[23] meeting.

[24] MR. BRAUN: The government moves 1033 into evidence.

[25] THE COURT: Received.

---

Page 2951

[1] (Government Exhibit 1033 received in evidence)

[2] MR. BRAUN: We also offer 1033-0, which is the

[3] original version of these notes.

[4] THE COURT: Received.

[5] (Government Exhibit 1033-O received in evidence)

[6] MR. BRAUN: Thank you.

[7] BY MR. BRAUN:

[8] Q. Can you walk us through the first couple of lines,

[9] Mr. McDermott.

[10] A. Okay. He was talking first about the 10K, going to file

[11] their 10K in a few weeks. He was saying that was going to come

[12] out relatively soon. He was saying hedging has been very

[13] effective.

[14] Then he is talking a little about credit, the

[15] mortgage, the loan, and he was saying the credits of these

[16] portfolios has been very great. He is saying, for example,

[17] these loans have a 60 percent loan-to-value ratio, $60,000

[18] average loan. Basically there has been, as far as charge-offs,

[19] loans going back, there has only been .OO1 percent of loans

[20] going bad. He said these loans are of great quality and he

[21] went on to talk about how the IO works, how the sale of these

[22] mortgages to other banks, how it works.

[23] Q. Okay.

[24] A. And he explains it in the next section.

[25] Q. Can you walk us through that.

---

Page 2952

[1] A. He says typically --

[2] THE COURT: Look, look, please, we have had all this

[3] so much. We don't have to have it from another witness. Let's

[4] get to the point, if there is one.

[5] BY MR. BRAUN:

[6] Q. Mr. McDermott, you see you make some notes that appear to

[7] relate to a discount rate, DR FHM plus 300 basis points?

[8] A. Yes.

[9] Q. And the words appear apple apple?

[10] A. Yes.

[11] Q. Going down beneath that where it begins with the words

[12] LIBOR plus 90. Is that a reference to the 90-day LIBOR?

[13] A. Yes, it is.

[14] Q. Can you walk us through the next few inches of your notes

[15] and explain to us as best you can recall what Mr. Levis was

[16] saying to you during this part of the meeting that you had with

[17] him in Chicago in early March 2005.

[18] A. Okay. Mr. Levis said all IOs have caps 200 and 300 basis

[19] points below 7 and an 8th.

[20] Q. How did that 100 to 200 basis points below 7 and an 8th

[21] connect in your understanding with all IOs have caps?

[22] A. He was saying that these caps, there is an interest rate

[23] either 5.18 or 4.18 which is the cap, the caps on these, on

[24] these IOs, and once interest rates rise to those levels, those

[25] caps are hit, and so he is saying that the buyers of the

---

**Page 2953**

[1] mortgages that Doral sold them to, those are the people on the
[2] hook for the interest rate exposure and that Doral is
[3] protected.
[4] Q. You mean once those caps are hit?
[5] A. Once the caps are hit, Doral doesn't have any more interest
[6] rate risk. He said 50 basis points away from hitting the caps.
[7] He was saying we are pretty close.
[8]     THE COURT: You mean 200-300 basis points below 7 and
[9] an 8th? What is the 7 and an 8th according to your --
[10]     THE WITNESS: Yes, your Honor, in the example he gave,
[11] he started off by saying mortgages 7, 7 and a quarter, 7.5
[12] percent, he said Doral takes off the first quarter for a
[13] servicing fee. From that lower level of 7 and one 8th, there
[14] are caps below the 7 and one 1 8th, the interest rate caps.
[15] Q. Is that where the caps are hitting 200 to 300 basis points
[16] below the 7 and an 8th?
[17] A. That is what I was led to believe, yes.
[18] Q. Were you led to believe anything regarding where these caps
[19] were from, where they created these caps?
[20] A. It was from the contracts between Doral and the banks that
[21] bought the mortgages from Doral.
[22] Q. Is it the piece of the interest that the other banks that
[23] bought these loans that is being capped at this level?
[24]     In other words, is what Doral is passing through to
[25] these other banks as far as the interest portion, is that what

**Page 2954**

[1] your understanding was as far as what was being capped?
[2] A. That was my understanding, yes.
[3] Q. 50 basis points away from hitting the caps? What was your
[4] understanding of that?
[5] A. Just, just that based on where they were assuming LIBOR was
[6] today and they were 50 basis points away from triggering those
[7] caps. So, in other words, if rates continued to rise, Doral
[8] was exposed for the next 50 basis points on average, but there
[9] were -- Doral was not exposed and instead the banks that bought
[10] the mortgages from Doral, they were exposed.
[11] Q. Walk us through the next several lines.
[12] A. Okay. 97 million impairment is temporary. We were talking
[13] about that Q4 charge. Unwinding of curve, it is long-term
[14] rates go up, it is best for Doral.
[15]     Then if unwinding of the curve, no more tightening, no
[16] way the hedges would lose 97 million.
[17] Q. The word at the very bottom of that first page, what is
[18] that?
[19] A. Hedges at the bottom.
[20] Q. During this meeting, in addition to these caps, was Mr.
[21] Levis also describing some hedging activity that Doral was
[22] engaged in?
[23] A. Yes, he was talking about it also.
[24] Q. After this meeting, did you write anything up internally at
[25] Holland to describe what took place at the meeting?

**Page 2955**

[1] A. Yes, I did.
[2] Q. Would you turn your attention to Government Exhibit 1034,
[3] please, Mr. McDermott.
[4] A. Yes.
[5] Q. Can you please tell us what 1034 is.
[6] A. It is another one of my weekly reports that went out to the
[7] group at Holland Capital.
[8] Q. What is the date on this one?
[9] A. The date is March 7th, 2005.
[10] Q. This is just a few days after the meeting you just
[11] described?
[12] A. Yes.
[13] Q. Can you turn to your entry on Doral Financial.
[14] A. Yes.
[15] Q. Can you read the first several lines of the paragraph there
[16] describing the meeting that took place that you just described
[17] in your testimony.
[18]     MR. BRAUN: I am sorry. We offer this in evidence?
[19]     THE COURT: Received.
[20]     MR. BRAUN: 1034.
[21]     (Government Exhibit 1034 received in evidence)
[22] A. We met with the Treasurer Sammy Levis March 3 in our
[23] offices. Don't worry, be happy would summarize his views. He
[24] has an answer for everything. He did not answer my primary
[25] question on the write-down of the IO strip.

**Page 2956**

[1] BY MR. BRAUN:
[2] Q. Mr. McDermott, can you stop there. What was the primary
[3] question you had that you didn't feel you had received a full
[4] answer for?
[5] A. I was trying to get more detail about how much of the
[6] write-down was due to conservative accounting, changing the
[7] valuation to LIBOR plus 150 and how much was due to interest
[8] rates increasing, and he wouldn't, he wouldn't answer that
[9] question. That is what I am talking about there.
[10] Q. Please continue.
[11] A. But he did seem to suggest there will not be any type of IO
[12] write-down this quarter. Further large losses of the IO are
[13] limited by recently placed hedges and collars on the terms.
[14] Q. The phrase collars on the terms, can you explain what you
[15] meant by that?
[16] A. Collars, collars are like caps. Collar is like a limit, so
[17] a limit or cap or collar. In terms, what I am saying collars
[18] on the terms, terms are terms in the contract. So terms in the
[19] contracts with these buyers of mortgages, there is collars,
[20] there is interest rate caps to protect Doral from much further
[21] interest rate exposure.
[22] Q. Were you referring in any way to things like interest rate
[23] caps or collars that can be bought and sold out on the
[24] securities market somewhere?
[25] A. No.

**Page 2957**

[1] Q. These were the caps on the IOs mentioned in your notes of
[2] the meeting with Mr. Levis?
[3] A. That's correct, yes.
[4] Q. Can you read just the last sentence or so in your report
[5] here.
[6] A. "I am definitely considering advocating adding."
[7] Q. Adding what?
[8] A. What I am saying is thinking about buying more Doral stock.
[9] Q. Did you write up the meeting in another report for the
[10] analyst team at Holland during this time period?
[11] A. I did.
[12] Q. Can you turn your attention to Government Exhibit 1035.
[13] What is Exhibit 1035, Mr. McDermott?
[14] A. It is just notes I wrote to the rest of the team suggesting
[15] that we increase our exposure to Doral stock so we buy some
[16] more Doral stock.
[17] Q. After you made this recommendation, did Holland actually
[18] purchase additional Doral stock?
[19] A. We did.
[20] Q. Did the meeting you had with Sammy Levis have anything to
[21] do with that decision?
[22] A. Yeah, it was a positive meeting, I thought, so, yes.
[23]     MR. BRAUN: We offer 1035 into evidence.
[24]     THE COURT: Received.
[25]     (Government Exhibit 1035 received in evidence)

**Page 2958**

[1] **BY MR. BRAUN:**
[2] Q. Can you read the first couple of paragraphs for us,
[3] Mr. McDermott, starting with the recommendation and moving down
[4] to the next substantive paragraph of the memo.
[5] A. Okay. Action requested. I would advocate adding 100 basis
[6] points to our large cap accounts for Doral, bringing positions
[7] 2.5 percent. Treasurer Sammy Levis was in our office on Friday
[8] for a meeting. Monica and Lou were also in attendance.
[9] Q. Remind us who they are.
[10] A. Two people who work at Holland. Lou Holland was the
[11] founder of the company and Monica Walker was like the second
[12] employee of the company. She is now the chief investment
[13] officer today. They were both there.
[14]     Monica and Lou were also in attendance. Sammy went to
[15] great lengths to assure us there was no problem with the
[16] hedging or gain on sale issues for their mortgage production.
[17] If we believe him, then I think the recent events have created
[18] a great buying opportunity.
[19] Q. Did you believe him in the comments he made to you at that
[20] meeting you had in Chicago?
[21] A. I did.
[22] Q. Can you read the paragraph that begins what has happened.
[23] A. What has happened: The stock has been terrible since Q4
[24] earnings were reported. At that time Doral wrote down its
[25] interest-only strip by approximately 95 million. It basically

**Page 2959**

[1] also offset that by taking advantage of a short window of
[2] capital gains tax reductions to take some unusual gains and
[3] benefit from a much lower tax rate.
[4]     According to Doral, these should be considered as
[5] offsetting in nature. Doral also contended that the reason for
[6] the write-down being at 95 million was that they used a higher,
[7] more conservative discount rate on the IO going to a LIBOR plus
[8] 90-day rate versus previously using only LIBOR. Interest rate
[9] moves also were responsible for part of the write-down.
[10] Q. Mr. McDermott, do you notice any difference between that
[11] last entry in your report, that last line or so and what you
[12] had written previously regarding the manner in which Doral had
[13] been more conservative in its IO valuation back at the time of
[14] the write-down in January of 2005?
[15] A. I do notice a difference. I wrote here in May notes, LIBOR
[16] plus 90-day write versus previously using only the LIBOR, and
[17] in the meeting he said LIBOR plus 150 as compared to LIBOR plus
[18] 100 previously.
[19] Q. You also refer here to this as relating to the discount
[20] rate on the IO strip as opposed to an interest rate valuation
[21] assumption. Is that correct?
[22] A. That's correct.
[23] Q. Is there any explanation you have for this discrepancy?
[24] A. The only thing I would say about that, both of them are
[25] important, both the discount rate and the LIBOR rate interest

**Page 2960**

[1] rate, the rate being used. I was trying to get the point
[2] across to the group that the rates were safe, but I used the
[3] word "discount," and that is a different number than LIBOR plus
[4] 150 or plus 100.
[5] Q. Was that just a small error then on your part?
[6] A. That would be an error, yes.
[7] Q. The basic point you were making was still correct in your
[8] mind?
[9] A. Yeah, my point to the group is what is a risk, this IO
[10] strip. I am trying to explain to them that Doral's practice
[11] here was being more conservative and that's why we should feel
[12] good about -- feel like it is okay to buy more stock because
[13] they're actually being more conservative.
[14] Q. Can you go down a couple of paragraphs and begin with, "As
[15] for the IO."
[16] A. As for the IO, I do not know if I believe everything that
[17] they are saying. They are being cagey to not really quantify
[18] the impact that was from rates impact from the change in
[19] valuation. What I think --
[20] Q. That is the question you referred to a moment ago you
[21] didn't feel you had quite gotten a precise answer to?
[22] A. That is correct, yes.
[23] Q. Okay.
[24] A. What I think did happen was Doral is managing earnings to a
[25] degree by using a harsher discount rate, it moves this loss

Page 2973

[1] but there's no specificity. So there's no way of knowing one
[2] way or the other. And then the other part, the second part, as
[3] far as the call option --
[4] Q. Yes, which says instead of the cap, sometimes there's a
[5] call.
[6] A. The call option is something that I never heard of before,
[7] any call, a call option. So that's new material there.
[8] Q. To your mind, would the call option work in the same manner
[9] as a cap?
[10] A. No, it would not.
[11] Q. Why not?
[12] A. Well, if you have a call option, what a call option is, it
[13] gives the owner of the call option, in this case Doral, gives
[14] Doral the right to take back the mortgages that they sold to
[15] somebody else. And the problem with that is if they do that,
[16] they have to reverse out all the revenue and all the earnings
[17] they got on, in prior periods. So it's actually from a, an
[18] accounting perspective, it's actually pretty bad for Doral, if
[19] they have to do that.
[20] Q. Does it protect their income stream from any IO?
[21] A. It definitely does not protect their income stream. They
[22] may not want to own these mortgages. If they can't sell these
[23] mortgages once they take them back or have to sell them at a
[24] lower rate, it could negatively impact their income stream and
[25] their IO, and it would impact their IO negatively, if they took

Page 2974

[1] them back.
[2] Q. If they took back the loans, bought them back?
[3] A. Right.
[4] Q. Would they have any IO at that point on those loans?
[5] A. No. Whatever they took back would be, the IO, they would
[6] have to take it, reduce it by that amount.
[7] Q. Can I turn your attention to the next page? I want to
[8] direct your attention to the second paragraph on this page. Do
[9] you see the language describing the two independent valuations
[10] that Doral was receiving for its IOs?
[11] A. Yes, I do.
[12] Q. You had been told about that?
[13] A. Yes, I have.
[14] Q. And can you read the sentence that begins, "In addition"?
[15] A. "In addition to these two independent valuations, the
[16] company prepares an internal static cash flow model that
[17] incorporates internally generated prepayment and discount rate
[18] assumptions and an expected retained interest rate spread based
[19] on three-month LIBOR rates at the close of the reporting
[20] period. As of December 31, 2004, the three-month LIBOR rate
[21] used in the internal valuation model was higher than those
[22] contracted with investors for payment prior to the next
[23] resetting dates."
[24] Q. Did that raise any concerns for you in light of what you
[25] had been told back in January regarding Doral using not LIBOR

Page 2975

[1] at the close of the reporting period but LIBOR plus 150 in
[2] order to anticipate future rises in interest rates?
[3] A. Well, it's different. It's different. But I would also
[4] point out it could be an explanation in that companies often
[5] give guidance or give commentary about where the model, what
[6] the model is saying. And just because they say here they were
[7] using a three-month LIBOR, there's nothing stopping them from
[8] using a more conservative valuation tool. They could very well
[9] have chosen to do that.
[10] Q. Even if their general model did not provide for that?
[11] A. That's correct. I mean, the model could easily be changed,
[12] have different inputs.
[13] Q. Can you turn your attention, finally, to the next page of
[14] the 10K. Do you recall seeing the table reflecting changes in
[15] value to the IOs --
[16] A. Yes, I do.
[17] Q. -- under different changes in interest rates?
[18] Did you have a reaction to that part of the report?
[19] A. Yes, I did have a reaction in that, yeah, I was --
[20] Q. Can you describe that, please?
[21] A. Well, I was somewhat disappointed and concerned. I guess I
[22] would say.
[23] Q. Why so?
[24] A. Because the table shows that if there's an immediate shift
[25] of the yield curve by 200 basis points, it shows that there's a

Page 2976

[1] substantial change in the fair value of the IOs of a negative
[2] $542 million. So that at first blush, that's a very negative
[3] number.
[4] Q. And did you notice the language above that, where it says
[5] "this analysis," showing what happens to the IOs, the
[6] three-month LIBOR increases?
[7] A. Yes, it says.
[8] Q. Net of embedded caps, right?
[9] A. Yes, it does.
[10] Q. Did that raise any concerns for you?
[11] A. Well, it doesn't seem to, doesn't really seem to make sense
[12] with what I'd been told at the March meeting about the caps
[13] being 150 or being 50 basis points away from the caps because
[14] it seemed like the risk to the, to a revaluation of this IO
[15] was, from what I was told previously, there was very limited
[16] risk to any meaningful revaluation. And that's certainly not
[17] what's being portrayed here in this disclosure.
[18] Q. So what was your overall reaction to this information,
[19] Mr. McDermott, to this part of the K and the K in general?
[20] A. Well, that point right there, the 542 million, it's very
[21] negative. So that part's, that part's negative. I mean, I
[22] guess I'm also looking, if you look down at the next level,
[23] they talk about hedges, changes in fair value, and the hedges
[24] actually correspond relatively nicely so that, for example, if
[25] you have this massive loss, 542 million, you actually,

VOLUME 18
April 21, 2010

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

Page 2977

[1] according to the hedges, if they work appropriately, we
[2] actually recoup most them, 512 million recoup. So that, that
[3] gave me some, you know, level of something, of, it's not all
[4] terrible. But certainly the 542 by itself was a surprise.
[5] Q. After you saw the K, did you decide that Holland should get
[6] rid of its Doral stock?
[7] A. No, I didn't.
[8] Q. In light of the concerns that you just described and your
[9] reaction to the K, why not? What kept you in the stock at this
[10] point?
[11] A. Okay. There were a couple reasons. Part of it, it's easy
[12] for me to have hindsight now, what I should have done, but at
[13] the time, stock was going down, this is much larger than what
[14] it had been before, what I had expected it to be, this
[15] potential loss, but I'm trying to evaluate the company, whether
[16] we should hold it as of this date based on where the stock
[17] price is and where the earnings stream is coming from. I'm
[18] trying to assess all the information. Stock had already come
[19] down quite a bit. And I was trying to figure out if in fact,
[20] even if we had these losses, first of all, the likelihood of a
[21] change of a 200 basis point jump across the yield curve, that
[22] also is really, it doesn't happen. So you have to take that
[23] into account. You can take this 542 as a kind of worst case
[24] hypothetical that wouldn't really happen.
[25] Q. Let me interrupt you for a moment. The 200 basis point

Page 2978

[1] jump parallel shift upwards, the yield curve, that relates to
[2] the bottom table, not the one on top, just says three-month
[3] change in LIBOR, correct?
[4] A. That relates to the three-month change in LIBOR, basis
[5] points, 200 basis points change, yes.
[6] Q. Got it.
[7] A. Right.
[8] Q. And that's very unlikely, that it would happen all at once?
[9] A. That's very unlikely. Companies can adjust, they can do
[10] things in the process while rates are changing so that gives
[11] you some comfort. But I'm trying to evaluate the stock and
[12] trying figure out even it's still, even if you have this
[13] noncash write-down, what is the cash flow and what is the
[14] business model of Doral at this point. And from what I can
[15] understand from what Doral is saying, on their conference call
[16] around this time, when they have a call, I think, a day or two
[17] later, they still dominate the mortgage market, mortgage
[18] banking. They still are basically the game, the king of the
[19] castle in Puerto Rico. And so I'm trying to figure out if,
[20] nothing has really changed as far as their ability to originate
[21] mortgages still and sell them, as far as that. And if they can
[22] offset this loss with proper hedges, then there's been, there
[23] is a potential that the market is willing at this point,
[24] management has lost all credibility. But if management can
[25] ever get it back, the stock still has potential. So we didn't,

Page 2979

[1] I made the decision to advocate we do not sell the stock at
[2] that time.
[3] Q. You mentioned the investor conference call that took place
[4] after the 10K was filed?
[5] A. Yes.
[6] Q. Did you listen to that call?
[7] A. I did.
[8] Q. What were your overall impressions from it?
[9] A. Well, it was really long, for one reason. It was
[10] frustrating. I think when they started talking, the stock
[11] started going down and it kept going down, and I think the call
[12] was a couple hours, over a couple hours, which is a long time
[13] for a conference call.
[14] Q. Did you participate in the call actively?
[15] A. I listened to it, but I didn't ask any questions. But they
[16] also, the management of Doral had not previously, many
[17] companies have conference calls every quarter or every so
[18] often, and Doral had never really had those. They didn't have
[19] quarterly conference calls, so this was a little bit unusual
[20] for them. So I don't know if they were nervous or if it was
[21] because of some of the disclosures, but it was a long call. I
[22] don't think the market thought they were answering the
[23] questions as the market would have liked them to answer it
[24] because the stock just kept going down throughout the call.
[25] Q. Did a number of the questions focus on the interest-only

Page 2980

[1] strips?
[2] A. Yes, they did.
[3] Q. As you sit here now, do you recall any of the precise
[4] exchanges that took place during the course of the call?
[5] A. I mean, there --
[6] Q. Or do you just have a general recollection?
[7] A. Well, I remember generally the call, there was a lot of
[8] questions about the IO, a lot of questions about perhaps
[9] selling, the would they sell the IO, would they do a buy-back.
[10] There were some questions like that. But exact, specific
[11] questions, I would have to look at notes to do that.
[12] MR. BRAUN: Your Honor, just so we have a complete
[13] record of the documents, I offer 1037 and 1038 into evidence, a
[14] weekly report and an e-mail between Mr. McDermott and
[15] Mr. Levis.
[16] THE COURT: Received.
[17] (Government's Exhibits 1037-1038 received in
[18] evidence)
[19] BY MR. BRAUN:
[20] Q. Mr. McDermott, can you turn your attention to Exhibit 1039?
[21] A. Okay.
[22] Q. Do you recall speaking with Mr. Levis by phone on about
[23] March 29 of '05?
[24] A. Yes, I do.
[25] Q. Are these your notes from that conversation?

2981

041Wlev6                        McDermott - direct

1   A.   Yes, they are.
2              MR. BRAUN:  We offer them into evidence, your Honor.
3              THE COURT:   Received.
4              (Government's Exhibit 1039 received in evidence)
5   BY MR. BRAUN:
6   Q.   Mr. McDermott, did Mr. Levis discuss anything with you
7   relating to the interest-only strip during this call that had
8   an effect on your thinking regarding whether or not to stay
9   with this investment?
10  A.   Yes, he did.
11  Q.   Can you generally describe that perhaps without going into
12  the details reflected in your notes?
13  A.   It was, there was a press release by Doral around this time
14  saying that Doral was in discussions to sell some of the IO
15  strips or all of the IO strips.  And so Sammy and I talked
16  about that and his level of confidence in selling it, and that
17  he felt like it was pretty good that they were going to, that
18  management had a credibility problem right now, but that once
19  they sold part or all of this IO strip, they would solve the
20  credibility problem, they would solve this whole hangover with
21  this IO, would bring in a nice amount of cash, they could
22  perhaps do a buy-back, buy back a bunch of their stock.  And
23  the fundamentals of the company remained strong, and all the
24  mortgage banking, and so this issue would be behind them.
25  Q.   To your thinking, would such a transaction in which Doral

041Wlev6                         McDermott - direct

1    actually sold a significant portion of its interest-only strips
2    help with the credibility issue that you were discussing with
3    Mr. Levis?
4    A.   It would be huge.
5    Q.   And why so?
6    A.   Because at this point, it was clear from the stock price
7    that most of the marketplace did not believe management's
8    assumptions.  If they were to sell a portion of the IO strip,
9    or all of it, and get anything close to where they valued it,
10   it would totally restore, say, it would show management was
11   correct, management was not being aggressive in their
12   accounting and that all along they were spot on, and this thing
13   really has its value.  It would suggest that.  So it would
14   totally improve the credibility of management in the
15   marketplace.
16   Q.   Did Mr. Levis express confidence that that deal could get
17   done?
18   A.   He did.
19   Q.   Did you believe those representations?
20   A.   I did believe that, yes.
21   Q.   After this conversation with Mr. Levis, did you have
22   communications with him and others at Doral about the prospect
23   of visiting Puerto Rico and visiting with them at Doral?
24   A.   I did have conversations, with Sammy, or e-mails with Sammy
25   about doing that, yes.

04lWlev6                         McDermott - direct

1   Q.  Were you thinking about taking a trip down to Puerto Rico
2   for that purpose during this time?
3   A.  Yes, I was.
4   Q.  Can you turn to Exhibit 1040 and 1041 as well?  Do these
5   e-mails relate to the plans that you were making with Mr. Levis
6   and others to visit Doral in the April time frame?
7   A.  Yes, they do.
8              MR. BRAUN:  We offer them into evidence, your Honor,
9   1041 and 1042.
10             THE COURT:  All right.
11             (Government's Exhibits  1041-1042 received in
12  evidence)
13  BY MR. BRAUN:
14  Q.  Mr. McDermott, during this time period, April of 2005,
15  prior to the time Doral issued any additional news regarding
16  significant development at the company, did you make a personal
17  investment in Doral's stock as well?
18  A.  I did.  I bought some stock myself.  I bought some Doral
19  stock.  About how much, I'd have to go back and look, but I
20  would estimate it's probably between 15,000 and $20,000 stock I
21  bought.
22  Q.  Does Holland have any rules governing whether or not its
23  employees can make investments in companies that Holland is
24  holding?
25  A.  We have a number of rules as far as compliance rules, so

041Wlev6                          McDermott - direct

1   you need approval from your compliance officer on every stock
2   we buy or sell personally, especially -- well, every stock,
3   pretty much, with a couple of little exceptions, especially if
4   we own something, then you got to get permission before you can
5   buy it or sell it, and all those things occurred in this
6   situation.
7   Q.  I'm sorry.  What was the last part of your testimony?
8   A.  I said all of, you know I went through the channels.  I
9   went through compliance, compliance approved it, and I
10  personally then made an investment for myself and my family in
11  Doral.
12  Q.  You described your reasons why you stuck with the stock on
13  behalf of Holland at this time in spite of the concerns and
14  reactions that you've described to the K and the conference
15  call?
16  A.  Right.
17  Q.  Were your reasons for investing in Doral personally similar
18  to the reasons that you've described in explaining why you were
19  recommending that Holland stay with this investment during this
20  time period?
21  A.  Yeah, they were similar, similar reasons.  I still felt it
22  was, it was, still a good investment in that given how much it
23  had gotten beaten up, if they could maintain their business
24  model, which it seemed like they still were, and they could be
25  vindicated on the IO, then if those two things happened,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

04lWlev6                    McDermott - direct
1    there's a lot of upside in the stock in my view.
2    Q.  And the vindication that you're referring to, that would
3    come from the kind of transaction in which Doral would sell the
4    IO, as Mr. Levis described for you?
5    A.  Yes.
6    Q.  Can you turn your attention to Government Exhibit 206?
7    This is already in evidence.
8        Do you recall seeing this press release about April 19,
9    2005?
10   A.  Yes, I do.
11   Q.  Do you recall seeing the news about the Doral's decision to
12   restate its income?
13   A.  Yes, I do.
14   Q.  Based on a change of methodology used to calculate the fair
15   value of its interest-only strips?
16   A.  Yes, I do.
17   Q.  What was your reaction to that, Mr. McDermott?
18   A.  Well, I was, I was sad and disappointed, I guess you could
19   say.
20           THE COURT:  You were what?
21           THE WITNESS:  I was disappointed and sad.
22   BY MR. BRAUN:
23   Q.  Can you turn your attention to Government Exhibit 1043?
24   What is 1043, Mr. McDermott?
25   A.  1043 is an exchange of e-mails between myself, or e-mail, I
                   SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

04lWlev6                    McDermott - direct

1    guess, one e-mail from me to Sammy.  And one e-mail back from
2    Sammy to me, back on April 22, 2005.
3              MR. BRAUN:  We offer 1043 into evidence, your Honor.
4              THE COURT:  Received.
5              (Government's Exhibit 1043 received in evidence)
6    BY MR. BRAUN:
7    Q.  Mr. McDermott, in your message to Mr. Levis on April 21,
8    2005, can you read the part of your message that begins, "Could
9    you send me a list of what LIBOR rates were used?"
10   A.  Yes.  I wrote, "Could you send me a list of what LIBOR
11   rates were used for the last eight quarters through December
12   31, 2004, to discount the IO?  I am especially interested in
13   the rates for the 9/30/04 quarter and the 12/31/04 quarter.  I
14   remember having extensive discussions with you about the rate
15   used at 12/31/04 and you telling me that Doral had moved to a
16   more conservative, (an extremely conservative measure it
17   portrayed) measure in the rate used.  This was the explanation
18   that you gave me to explain why there was the write-down in Q4?
19   I am learning now that this does not seem to have been the
20   case.  Was there any change in --"
21   Q.  You can stop there.  The representations regarding the
22   conservative measure to valuing the IO, are you referring to
23   your conversation with Mr. Levis in mid-January of '05, after
24   the impairment was announced?
25   A.  Yes, that's what we talked about there.  We did talk about

04lWlev6                     McDermott - direct

1   that at that time.
2   Q.  And when you say "I am learning now that this does not seem
3   to be the case --"
4   A.  Yes.
5   Q.  -- is that basically in part on the disclosure in the press
6   release that's Government Exhibit 206 that Doral was at this
7   point deciding to move from a method involving a current spot
8   rate to a method involving the forward yield curve?
9   A.  Yes.  Because those two are completely in conflict.  If
10  they're moving to the forward rate now, that's a lot different
11  from what he said was happening, why there was a write-down in
12  Q1, in the January conference call, in the Q4, rather.  So it
13  didn't add up.
14  Q.  That January call, I think you mentioned the conference
15  call, but I think your testimony was that it was a personal
16  call between you and Mr. Levis?
17  A.  What do you mean personal call?
18  Q.  It wasn't a conference call to --
19  A.  Oh, sorry.  Yes, it was a -- yes, a call between myself, in
20  January, when we talked about it.
21  Q.  Right.  I didn't mean for personal reasons.
22  A.  No, I understand.  And --
23  Q.  I'm sorry.  Go ahead, please.
24  A.  Well, I was just going to say, I was just trying to at that
25  point trying to get some closure on where the forward rate,

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

041Wlev6                         McDermott - direct

1   what rates were being used because it was all historical now.
2   Now we could see what they were, if he had told me one thing,
3   and it seemed like this press release was very different, and I
4   wanted to make sure, I wanted to see if there was any chance
5   they would give me those numbers now and see if they made any
6   sense at all together.
7           MR. BRAUN:  Your Honor, we have one final document to
8   cover in Mr. McDermott's testimony.  It should take just a
9   couple minutes, but Mr. Srebnick has informed me that the
10  defense has an objection to this particular document.
11          THE COURT:  Can I see it?
12          MR. BRAUN:  He mentioned it during the break, so I
13  wanted to give him the opportunity.
14          THE COURT:  Can I see the document?  What is it?
15          MR. BRAUN:  It's 1044, your Honor.
16          THE COURT:  May I see it.
17          MR. SREBNICK:  May we approach, Judge.
18          THE COURT:  Just a minute.
19          (Continued on next page)
20
21
22
23
24
25

2989

04lWlev6                    McDermott - direct
1              (At the side bar)
2              THE COURT:  I would tend to sustain the objection
3     without seeing it, on the grounds we have enough.
4              MR. BRAUN:  I missed it.
5              THE COURT:  But let me see it.  What is the problem?
6              MR. SREBNICK:  This is an after-the-fact summary of
7     this man's feelings about Sammy and Doral, and he uses the
8     phrase "I felt like I got punched in the gut."
9              THE COURT:  Sustained.
10             (Continued on next page)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2990
041Wlev6                    McDermott - direct
1              (In open court)
2              MR. BRAUN:  Your Honor, can you just give me a moment?
3    I want to see if we want to offer this with that redaction.
4              With the objection, your Honor, we won't offer the
5    document.
6              THE COURT:  All right.
7              MR. BRAUN:  And the government has no further
8    questions, I believe, for Mr. McDermott.  Let me confer briefly
9    with my friends here.
10             We're fine, your Honor.  No further questions.
11   CROSS-EXAMINATION
12   BY MR. SREBNICK:
13   Q.  May it please the Court, good afternoon, everyone.
14        Mr. McDermott, it's 4:15, so I'm probably going to have
15   some more questions for you tomorrow, but I just want to start
16   in the time I have left today asking you some questions about
17   the concept of the caps and the collars that you testified
18   about today.
19   A.  Okay, sure.
20   Q.  I know it's sort of out of time line sequence, but if we
21   could go to the exhibit that you addressed, I think it's
22   Government Exhibit 1034, and if we just look at the first page.
23   So we know what we're looking at, 1034 would have been one of
24   your typewritten reports to the Holland Capital team and
25   appears to be dated March 7 of '05.  Do you see that?

2991

041Wlev6                        McDermott - cross
1     A.   Yes, I do.
2     Q.   If we go to the second page, it appears to have a date on
3     it of 2/28?
4     A.   That's correct.
5     Q.   And I think you were explaining to the jury and to all of
6     us how that date works, if you could just remind me how that
7     works.
8     A.   Okay.  What I was explaining about was for the date at the
9     top of the weekly, those dates typically, I use a Monday date,
10    so that doesn't have to be, it could say, like, I think I was
11    using the example of January 17, even though I had a January 17
12    weekly, although the information I had in the report we were
13    discussing was January 19, from my conversation with Mr. Levis.
14    Q.   Okay.
15    A.   So this is a little different.  This just looks like 2/28
16    to me.  That's, that's got to be an incorrect date because he
17    met, he came in our office in March, the first week in March.
18    Q.   That's what I was trying to understand.
19    A.   That date's just not correct.
20    Q.   Okay.  And do we have in evidence your handwritten notes of
21    the meeting?  Is it those few pages that you took notes?  I
22    think it was 1033.
23    A.   Yes, we do have those.
24    Q.   Okay.  So if we could start there.  And does that date
25    appear to be correct, to the best of your recollection, that
                        SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

2992

041Wlev6                    McDermott - cross

1   Mr. Levis was meeting with you all on March 5 of '05?
2   A.  I'm not sure if that's correct.  That's a Saturday, and he
3   wasn't in our office on Saturday.  It was a Friday.  So I think
4   it was either March 4, but, it's, you know, it was an early
5   morning meeting.  I think it was like a 7:30 or 8:00 in the
6   morning meeting.
7   Q.  But you think it was on a date different than 3/5/05?
8   A.  Yes.
9   Q.  Now, this is a two-page document, what I have.  Do you see
10  that?
11  A.  Yes.
12  Q.  And does that comprise all of the notes that you were able
13  to take of the meeting you had with Mr. Levis when he was at
14  your office?
15  A.  Those are all my handwritten notes, yes.
16  Q.  And then you transferred some of that information into some
17  typewritten material to share with your colleagues?
18  A.  That's correct.
19  Q.  Now, it talks about, the very first line is "hedging very,"
20  what was that word there?
21  A.  It's E-F-F, effective.
22  Q.  "Hedging very effective."  And then the very last thing on
23  that page is hedges.  Do you see that on the bottom?
24  A.  Yes.
25  Q.  And then it's somewhere in between those two remarks about

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2993

041Wlev6                         McDermott - cross

```
 1   hedges that there is this business about "IOs have caps."  Do
 2   you see that --
 3   A.  Yes, I do.
 4   Q.  -- right in the middle of the page?
 5        Now, the notes don't reflect whether the IOs are capped
 6   with embedded caps or purchased caps, correct; the notes don't
 7   reflect one way or the other?
 8   A.  Well, they, yeah, I just wrote "IOs have caps," right.
 9   Q.  Doesn't say contractual caps or embedded caps or purchased
10   caps, in the notes?
11   A.  Right.  We wouldn't, I wouldn't do that, but that's true.
12   Q.  Okay.  Now, you also, and we'll come back to that in a
13   moment, did Mr. Levis give you any information about the
14   hedging that's at the top of the page and the hedging that's at
15   the bottom of the page?  Because I don't see any other
16   discussion, unless I'm missing something, about hedges, other
17   than what we see on the document here that talks about IOs have
18   caps.  Is there something else I'm missing?
19   A.  Well, they're two different things, the discussion, this is
20   over a meeting over the course of an hour.
21   Q.  Okay.
22   A.  So the hedges on the top of the page, as I was saying in
23   direct examination, he started by talking and there were some
24   questions from Mr. Holland, Mr. Lou Holland and Monica walker.
25   And he was talking about hedges being very effective, talking
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

041Wlev6                    McDermott - cross

```
 1   in generalities.  We didn't get into specifics as far as that.
 2   Q.  Okay.
 3   A.  What you're showing me here about the IOs having caps,
 4   that's a totally different discussion.
 5            THE COURT:  That was what?
 6            THE WITNESS:  That's a totally different discussion,
 7   probably half an hour later into the conversation, when I was
 8   talking, when I was talking about my questions about interest
 9   onlies, and the contractual caps.
10   BY MR. SREBNICK:
11   Q.  And then at the bottom, it comes back to this "hedges," and
12   what was the discussion there that you noted?
13   A.  You know, I just wrote one word, so -- I just wrote
14   "hedges."  Honestly, I can't say except --
15   Q.  Okay.
16   A.  Yeah, I can't say.
17   Q.  In the middle of the page, right above the caps, it says
18   "LIBOR plus 90"?
19   A.  Right.
20   Q.  The term LIBOR plus 90, can you explain that term to us?
21   What does that mean, LIBOR plus 90?
22   A.  Okay.  Well, LIBOR stands for London Interbank --
23   Q.  We know that.  But LIBOR plus 90?
24   A.  LIBOR plus 90 would be three, three months.  The curve is
25   the LIBOR rate and 90 days.
```

2995

041Wlev6                    McDermott - cross

1    Q.  Did you and Sammy discuss the LIBOR-based pass-through
2    rates that Doral was paying to its investors?  At any point, do
3    you recall discussing that concept with Mr. Levis, that Doral
4    would pay to the investors, meaning to the other banks, a
5    LIBOR-based pass-through rate?
6    A.  You mean on the floating?
7    Q.  Yes.
8    A.  The only, to answer that, I would say directly, only, if
9    you go back to the IO statements right above it, because he
10   wouldn't give out, he wouldn't give you, he said they had
11   different caps.  They have different caps, these contracts are
12   different, so they're not all the same.  And for competitive
13   reasons, he said he didn't want to disclose what they were.
14   But you could kind of back into, you know, where rates were
15   based on what he was saying from the fact that he, if you took
16   him at his word, if the caps were really 200 or 300 basis
17   points below seven and an eighth and they were 50 basis points
18   from hitting them, then you could kind of get a sense where
19   they're staying right now, where they are on interest rates, on
20   the LIBOR curve.
21   Q.  Okay.  Well, let's do that math then, as you just
22   described.  If the WAC is at seven and an eighth,
23   weighted-average coupons, as you understood it?
24   A.  It was at, I understood that after you subtract the
25   servicing fee, the servicing fee that was paid to Doral,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

041Wlev6                    McDermott - cross

1   probably about 25 basis points.
2   Q.  And if we subtract two or 300 points, is it fair to say
3   that it's either four and an eighth or five and an eighth?
4   A.  That's fair to say, yes.
5   Q.  That's a 100 point spread between the two or one percentage
6   point?
7   A.  That's true, yes.
8   Q.  Using the four and an eighth to start with, if LIBOR was
9   2.56, what would the pass-through rate then be as you would
10  understand it from that math?
11  A.  If it was 2.56, you're saying?
12  Q.  If that was LIBOR, I think we all know that LIBOR at the
13  end of '04 was 2.56.
14  A.  Right.
15  Q.  I don't think there's any debate about that.
16  A.  Right.  Well, if in fact this meeting took place on 12/31,
17  and that's where LIBOR was, then it would be 2.56 plus 50 basis
18  points, which would be 3.06.  But we're meeting in March of
19  2005.  And I'm giving Sammy the benefit of the doubt.  When
20  he's telling me 50 basis points from the caps, I'm thinking
21  they're close today.  I'm not worried about where they were
22  back in December.
23  Q.  Okay.  What I'm trying to find out is -- well, let me come
24  back to that in a moment then because I'll have to get some
25  documents, and we're going to run out of time.  Let me have you

2997

04lWlev6                    McDermott - cross
1   then take a look at the report you generated, I think, which is
2   1034, the one that had the date that we now understand is a
3   wrong date, the 2/28 date.
4          MR. SREBNICK:  Next page, please.  And if we go to the
5   center of it, if we can enlarge the whole thing, widen the
6   margins, I guess, right there.
7   Q.  And you see in the middle it starts with the word
8   "further"?
9   A.  Yes, I do.
10  Q.  And it talks about, right before it, it says "but he," and
11  I assume that means Sammy, "did seem to suggest that there will
12  not be any type of IO write-down this quarter.  Further large
13  losses of the IO are limited by recently placed hedges and
14  collars on the terms."  See that?
15  A.  I do see that, yes.
16  Q.  Are you familiar with what a collar is?
17  A.  I'm familiar with what a collar is, yes.
18  Q.  And isn't a collar an instrument that pays the owner of the
19  collar when interest rates hit a certain point and stops paying
20  when interest rates keep going up to the next point?
21  A.  That is one definition of a collar, yes.
22  Q.  Is a collar different from a cap in some ways?
23  A.  A collar and a cap can be used interchangeably.  In this
24  particular situation, I used that collar as a cap, which, past
25  a certain collar, or limit, it's a limit, a limit, it's a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

2998

04lWlev6                    McDermott - cross

1   collar of a cap.  So past a certain limit, or in this case
2   collar, Doral had no more exposure.
3            THE COURT:  This was something you wrote, right?
4            THE WITNESS:  Yes, your Honor.
5            THE COURT:  Are you telling us that you when you wrote
6   the word "collar," you meant caps?  Is that right?
7            THE WITNESS:  Well, I'm telling you that they mean the
8   same thing.
9            THE COURT:  I'm just saying, you're the author.  Is
10  that what you meant.
11           THE WITNESS:  You know what I should have done, I
12  should have written caps.  I should have wrote caps because we
13  never had any discussion about interest rate derivatives and
14  collars ever in my entire time of knowing Sammy Levis.
15  BY MR. SREBNICK:
16  Q.  That's what I was getting at.  Sammy met with you and he
17  described collars, and that's why it made it into the report,
18  didn't it?
19  A.  That's not true.
20  Q.  No?
21  A.  That's not true.
22  Q.  Do you recall looking at the 10K for Doral as part of your
23  getting familiar with Doral even before you met Sammy Levis?
24  In other words, back in '04, as you're researching the company,
25  before you actually traveled or Sammy travels to Chicago, did

Exhibit D

# DECLARATION OF BILLIE MALLIE

I, the undersigned, Billie Mallie, pursuant to 28 U.S.C. § 1746, declare that:

1.  I am employed by Holland Capital Management LLC ("Holland Capital") as Manager of Portfolio Administration and by reason of my position am authorized and qualified to make this Declaration. I have been employed by Holland Capital since June 13, 2005. My position at Holland Capital requires me to be familiar with the company's securities trading systems and securities trading records.

2.  Holland Capital is a U.S. equity and fixed income institutional investment management firm offering a range of portfolio management services for institutional investors.

3.  At the request of outside counsel for Holland Capital, I retrieved records from Holland Capital's securities trading and recording systems evidencing Holland Capital's transactions in the securities of Doral Financial Corporation (ticker symbol NYSE "DRL") from 2004 through 2005. A true and accurate summary of these records is attached as Attachment A to this Declaration.

4.  Specifically, Attachment A of this Declaration depicts (i) each date Holland Capital bought and sold DRL securities; (ii) the number of shares in each transaction; (iii) the price per share; (iv) for purchases, the cost of each date's purchase; and (v) for sales, the proceeds from each sale.

5.  Attachment A further depicts the total number of DRL securities purchased, the average cost of each share, and the total cost of all Holland Capital's DRL securities.

6.  Attachment A further depicts the depicts the total number of DRL securities sold, the average sale price of each share, and the total proceeds resulting from Holland Capital's sales of DRL securities.

7.  Holland Capital's net loss on its DRL investment may be calculated by subtracting the Total Net Sells figure on Attachment A of $16,802,813.91 from the Total Net Buys figure on Attachment A of $45,968,806.78. This calculation yields a total net loss on Holland Capital's purchases and sales of DRL stock of approximately $29,165,993.

8.  I further certify that the information contained in Attachment A truly reflects the trading activities of Holland Capital in DRL securities from 2004 through 2005 and that this trading data was:

(a) recorded at or near the time of the occurrence of the matters set forth therein, by, or from information transmitted by, a person with knowledge of those matters;

(b) kept in the course of regularly conducted business activity; and

(c) made by the regularly conducted business activity as a regular practice.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 8, 2010.

Billie Mallie

# Attachment A

| DATE | SHARES | PRICE PER SHARE | COST | PROCEEDS |
|---|---|---|---|---|
| **BUYS** | | | | |
| 3/5/2004 | 400 | 34.31 | 13,723.00 | |
| 3/10/2004 | 297,075 | 34.65 | 10,294,157.02 | |
| 3/11/2004 | 173,700 | 34.15 | 5,932,709.68 | |
| 3/12/2004 | 24,400 | 34.45 | 840,577.56 | |
| 3/25/2004 | 75 | 34.06 | 2,554.13 | |
| 3/26/2004 | 250 | 34.69 | 8,671.25 | |
| 3/29/2004 | 125 | 35.25 | 4,406.50 | |
| 3/30/2004 | 14,600 | 35.46 | 517,771.48 | |
| 4/6/2004 | 23,500 | 33.97 | 798,259.75 | |
| 4/20/2004 | 200,000 | 32.52 | 6,504,526.15 | |
| 4/21/2004 | 45,475 | 32.45 | 1,475,852.15 | |
| 4/22/2004 | 1,500 | 33.01 | 49,515.00 | |
| 4/28/2004 | 43,975 | 33.05 | 1,453,263.57 | |
| 4/30/2005 | 300 | 32.63 | 9,788.00 | |
| 5/3/2004 | 11,250 | 32.37 | 364,200.33 | |
| 5/25/2004 | 250 | 31.44 | 7,858.75 | |
| 6/4/2004 | 200 | 31.92 | 6,383.00 | |
| 7/1/2004 | 800 | 34.56 | 27,648.00 | |
| 7/21/2004 | 850 | 37.42 | 31,802.75 | |
| 8/3/2004 | 300 | 38.43 | 11,527.50 | |
| 8/6/2004 | 5,900 | 39.10 | 230,711.00 | |
| 8/10/2004 | 5,100 | 39.22 | 200,007.21 | |
| 10/29/2004 | 20,250 | 41.85 | 847,549.35 | |
| 11/18/2004 | 150 | 45.91 | 6,886.50 | |
| 12/7/2004 | 550 | 45.41 | 24,972.75 | |
| 2/28/2005 | 5,550 | 39.87 | 221,250.75 | |
| 3/2/2005 | 9,650 | 40.59 | 391,705.08 | |
| 3/8/2005 | 500 | 39.17 | 19,582.50 | |
| 3/10/2005 | 324,975 | 39.15 | 12,723,039.37 | |
| 3/31/2005 | 21,150 | 22.02 | 465,692.26 | |
| 7/1/2005 | 157,900 | 16.68 | 2,634,119.38 | |
| 9/15/2005 | 900 | 14.45 | 13,005.00 | |
| 9/30/2005 | 1,050 | 13.06 | 13,712.17 | |
| **Total Buys** | **1,392,650** | **33.14** | **$ 46,147,428.89** | |
| | | | | |
| Shares bought but not sold (a) | 5,150 | | $      178,622.11 | |
| | | | | |
| **Total Net Buys** | **1,387,500** | | **$ 45,968,806.78** | |
| | | | | |
| | | | | |
| **SELLS** | | | | |
| 3/29/2004 | 1,650 | 35.03 | | 57,797.24 |
| 4/12/2004 | 350 | 33.08 | | 11,579.47 |
| 6/10/2004 | 200 | 33.61 | | 6,722.59 |
| 6/28/2004 | 100 | 34.70 | | 3,470.41 |
| 8/11/2004 | 2,000 | 39.20 | | 78,398.16 |
| 8/19/2004 | 725 | 40.26 | | 29,191.56 |
| 8/26/2004 | 75 | 40.38 | | 3,028.17 |
| 8/30/2004 | 1,000 | 40.84 | | 40,839.04 |
| 9/2/2004 | 20,625 | 41.29 | | 851,583.46 |
| 9/15/2004 | 27,925 | 41.98 | | 1,172,245.81 |
| 9/16/2004 | 91,200 | 41.97 | | 3,827,500.03 |
| 9/21/2004 | 125 | 42.88 | | 5,360.49 |
| 9/28/2004 | 50 | 41.07 | | 2,053.45 |
| 1/7/2005 | 775 | 47.70 | | 36,969.04 |
| 2/23/2005 | 725 | 39.36 | | 28,538.68 |
| 4/7/2005 | 500 | 19.98 | | 9,992.08 |
| 4/25/2005 | 1,150 | 15.47 | | 17,795.50 |
| 4/28/2005 | 75 | 14.11 | | 1,058.57 |
| 7/19/2005 | 275 | 15.16 | | 4,169.20 |
| 8/15/2005 | 30,900 | 13.91 | | 429,955.47 |
| 8/24/2005 | 800 | 14.46 | | 11,571.51 |
| 8/26/2005 | 425 | 13.98 | | 5,943.37 |
| 8/31/2005 | 575 | 14.02 | | 8,059.41 |
| 9/23/2005 | 1,600 | 13.51 | | 21,610.13 |
| 10/24/2005 | 350 | 11.61 | | 4,062.44 |
| 10/26/2005 | 1,426,575 | 8.46 | | 12,068,501.26 |
| **Total Sells** | **1,610,750** | **11.63** | | **$   18,737,996.54** |
| | | | | |
| Shares sold but not bought (b) | 223,250 | | | $1,935,182.63 |
| | | | | |
| **Total Net Sells** | **1,387,500** | **12.11** | | **$16,802,813.91** |

(a) Shares transferred/delivered out before we closed position

(b) Shares transferred/delivered in - proceeds based upon MV as of delivered-in date since we don't know actual cost