# Exhibit E

# In The Matter Of:

*UNITED STATES OF AMERICA v.*
*MARIO S. LEVIS A/K/A SAMMY LEVIS*

---

*VOLUME 5*
*April  2, 2010*

---

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 042HLEVF.txt, Pages 621-767 (147)

**Word Index included with this Min-U-Script®**

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 5
April 2, 2010

---

Page 621

```
     042Wlev1
[1]  UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
[2]  ------------------------------------x
[3]  UNITED STATES OF AMERICA,
[4]               v.              S1 08 Cr. 181 TPG
[5]  MARIO S. LEVIS,
     a/k/a Sammy Levis,
[6]
               Defendant.
[7]
     ------------------------------------x
[8]
[9]
[10]
[11]                           April 2, 2010
                              10:05 a.m.
[12]
[13]
[14]
[15] Before:
[16]          HON. THOMAS P. GRIESA,
[17]                         District Judge
                            and a jury
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]
```

---

Page 623

```
[1]           (Trial resumed)
[2]           (In open court; jury present)
[3]        THE COURT:  Good morning, everybody.  Before the
[4]   witness is sworn, just a minute.  Sit down.
[5]        Mr. Srebnick has not completed his cross-examination
[6]   of Mr. Okusanya, but there's a witness who is going to testify
[7]   out of order who needs to finish today and cannot come back, so
[8]   we'll have that witness now.
[9]   VALERIE FRIEDHOLM,
[10]       called as a witness by the Government,
[11]       having been duly sworn, testified as follows:
[12]       THE COURT:  Go ahead.
[13]       MR. BRAUN:  Thank you, your Honor.
[14]  DIRECT EXAMINATION
[15]  BY MR. BRAUN:
[16]  Q.  Good morning, Ms. Friedholm.
[17]  A.  Good morning.
[18]  Q.  Is that microphone working now?
[19]  A.  Is it working?
[20]  Q.  I think it is.
[21]  A.  Okay.
[22]       THE CLERK:  I'll turn it up.
[23]       MR. BRAUN:  Thanks.
[24]  Q.  Ms. Friedholm, where do you live?
[25]  A.  In Boston.
```

---

Page 622

```
[1]
[2]
[3]                 APPEARANCES
[4]
[5]  PREET BHARARA,
          United States Attorney for the
[6]       Southern District of New York
     WILLIAM JOHN STELLMACH,
[7]  DANIEL BRAUN,
     JASON ANTHONY, Special
[8]       Assistant United States Attorneys
[9]
[10] BLACK, SREBNICK, KORNSPAN & STUMPF, PA,
          Attorneys for defendant Levis
[11] BY:  ROY BLACK, Esq.
          HOWARD SREBNICK, Esq.
[12]      JOSHUA E. DUBIN, Esq.
          MARIA NEYRA, Esq.
[13]          Of counsel
[14]
[15] Also Present:
     ROBERT DiBRIENZA, Special Agent FBI
[16] ERICA GLENN, Paralegal U.S. Attorney's Office
     EMMA KUROSE, Paralegal U.S. Attorney's Office
[17] JEFF HERZKA, Trial Technician
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]
```

---

Page 624

```
[1]  Q.  And what do you do?
[2]  A.  I'm a stay-at-home mom.
[3]  Q.  How many kids do you have?
[4]  A.  I have three children.
[5]  Q.  How old is the oldest?
[6]  A.  Three.
[7]  Q.  Before you were a mom, did you have a less important, but
[8]   far better-paying job?
[9]  A.  Yes, I did.  I was an analyst at Fidelity.
[10] Q.  Can you tell us what Fidelity is?
[11] A.  Fidelity is a mutual fund company.
[12] Q.  What is a mutual fund company?
[13] A.  A mutual fund company is a company that would collect money
[14]  or gives, provides individuals the ability to pool money into a
[15]  bigger fund and have it be professionally managed.  So a mutual
[16]  fund, I guess, you have one professional manager and many
[17]  people will give them money to invest in the stock market or
[18]  the fixed income market for them, for a lower fee.
[19] Q.  What kinds of people would contribute money to these funds
[20]  so that that money could be professionally managed and
[21]  invested?
[22] A.  All sorts of people, from an individual person like me, I
[23]  could walk into the Fidelity retail branch at the corner of my
[24]  street and give them a thousand dollars to invest for me, up to
[25]  a pension fund or like a GM, General Motors, pension fund, or
```

---

VOLUME 5
April 2, 2010

Page 625

[1]   an endowment like Harvard University could give Fidelity a
[2]   slice of money to invest for them.
[3]   Q.  Can you tell us what your educational background is, where
[4]   you went to college, and then after that?
[5]   A.  I went to undergrad at Colgate University in Upstate New
[6]   York, where I received a degree in chemistry.  I went to work
[7]   for GE for five years, and then went and got my MBA at Harvard
[8]   University, Harvard MBA.
[9]   Q.  When did you graduate from business school?
[10]  A.  In 2000.
[11]  Q.  When did you start at Fidelity?
[12]  A.  Right after graduation, a couple months after graduation,
[13]  the fall of 2000.
[14]  Q.  And you said you worked as an analyst there, is that
[15]  correct?
[16]  A.  Correct.
[17]  Q.  Can you describe what your responsibilities were as an
[18]  analyst at Fidelity?
[19]  A.  As an analyst, I'm responsible for one sector of the
[20]  market, taking a look at companies within that sector and then
[21]  making buy or sell recommendations on those companies to the
[22]  fund managers who actually are the ultimate decision makers
[23]  whether you buy or sell a stock and put that into the
[24]  portfolio, but they rely on analysts to have an expertise on a
[25]  smaller individual topic.

Page 626

[1]   Q.  And these recommendations that you're making, those are for
[2]   people at Fidelity investing the money that Fidelity manages in
[3]   its funds, correct?
[4]   A.  Only Fidelity, yes.  This is not for any outside parties.
[5]   It's all proprietary company -- if I wanted a fund manager to
[6]   buy or sell a stock, no one else would know that.
[7]   Q.  You're not making recommendations to the outside investing
[8]   public?
[9]   A.  No, this is just to Fidelity to try and help our
[10]  shareholders make money.
[11]  Q.  And you said you were assigned, I believe, to cover a
[12]  particular sector or sectors?
[13]  A.  Yes.
[14]  Q.  Do you recall some of the sectors that you covered while
[15]  you were working as an analyst at Fidelity?
[16]  A.  I do.  When I started there, I covered cyclical companies,
[17]  some housing-related stocks.  I did that for about a year, and
[18]  then I moved over to the consumer team where I covered the
[19]  large multicap consumer products, companies like a Procter &
[20]  Gamble, Colgate-Palmolive.  And then I did that for a couple of
[21]  years and then moved to the finance team where I did mortgage
[22]  and consumer finance.  Some of those companies would be
[23]  American Express.  I covered some thrifts like a Washington
[24]  Mutual, Sovereign Bank, and then on the consumer finance side,
[25]  a Capital One, where you have the credit card companies.

Page 627

[1]   Q.  And beginning in around the early part of 2005, did the
[2]   focus of your coverage change in any way?
[3]   A.  I added.  I had been covering the mortgage finance sector,
[4]   and I was added just the Puerto Rican banks, folded into my
[5]   coverage.
[6]   Q.  Sorry to interrupt.
[7]   A.  Yes.
[8]   Q.  Around when did you begin to look at the banks in Puerto
[9]   Rico as part of your responsibility?
[10]  A.  First quarter 2005.
[11]  Q.  At that time, did you become familiar with a company called
[12]  Doral Financial Corporation?
[13]  A.  Yes.
[14]  Q.  Had you done any previous work relating to Doral?
[15]  A.  I think I probably had been to a company meeting, just
[16]  because it was a mortgage company, and I covered the mortgage
[17]  sector so I needed to, any time a bank came into Fidelity, I
[18]  would go to the meeting and hear what they had to say.  But I
[19]  was not specifically assigned that company, so I did not have,
[20]  I didn't do a lot of work on the company, no.  So I was not
[21]  very familiar with the company.
[22]  Q.  When you started to become more familiar with the company,
[23]  that would have been in 2005?
[24]  A.  Correct.
[25]  Q.  At that time, do you know if Fidelity had an investment in

Page 628

[1]   Doral?
[2]   A.  Yeah.  We owned 10 percent, or almost 10 percent of the
[3]   company.
[4]         THE COURT:  Owned how many, you say Fidelity owned?
[5]         THE WITNESS:  Fidelity's funds in aggregate owned
[6]   approximately 10 million shares, and there's a little over a
[7]   hundred million shares outstanding.
[8]         THE COURT:  Of.
[9]         THE WITNESS:  Of Doral bank stock.  So Fidelity owned
[10]  10 percent of the company in their mutual funds.
[11]        THE COURT:  Go ahead.
[12]        MR. BRAUN:  Thank you.
[13]        THE WITNESS:  And it was primarily one fund that owned
[14]  the bulk.
[15]  BY MR. BRAUN:
[16]  Q.  Does Fidelity encompass a number of funds that all work as
[17]  part of Fidelity's mutual fund operation?
[18]  A.  Oh, sure.  There's thousands of funds in Fidelity, but
[19]  there was three or four primary funds, which were the owners of
[20]  the Doral stock at the time.
[21]  Q.  So what you're saying is between all of those funds and
[22]  what they held, that made up nearly 10 percent of the Doral
[23]  stock that was outstanding?
[24]  A.  Correct.  Outstanding, yes.  So they would be able to vote
[25]  10 percent on proxy issues, that sort of thing.

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 5
April 2, 2010

Page 629

[1] **Q.** Do you know where that placed Fidelity among Doral's
[2] investors?
[3] **A.** Other than management, which as a group owned much more,
[4] they were the largest shareholder, single-entity shareholder.
[5] **Q.** You say the recommendations that you were making went to
[6] portfolio managers at Fidelity who had the ultimate
[7] responsibility to make investment decisions?
[8] **A.** Correct.
[9] **Q.** Do you recall who the portfolio managers were who were in
[10] charge of the funds that had investments in Doral?
[11] **A.** There were three fund managers that I would say were
[12] primarily, that had a stake in Doral, Joel Tillinghast had the
[13] largest. He ran --
[14]       **THE COURT:** What was the name again?
[15]       **THE WITNESS:** Joel Tillinghast. He runs, still does,
[16] low-price stock fund. And then there was Victor Thay and Larry
[17] Rakers.
[18]       **THE COURT:** I didn't get those names.
[19]       **THE WITNESS:** Sorry. Larry Rakers. R-A-K-E-R-S.
[20]       **THE COURT:** Rakers. And was there a third?
[21]       **THE WITNESS:** Victor Thay.
[22]       **THE COURT:** The last name?
[23]       **THE WITNESS:** Thay. I think it's T-H-A-Y.
[24]       **THE COURT:** T-H?
[25]       **THE WITNESS:** T-H, yes.

Page 630

[1] **BY MR. BRAUN:**
[2] **Q.** In your work as an analyst, Ms. Friedholm, when you were
[3] coming into a new area of responsibility, what are some of the
[4] things that you do to learn about a company that you might be
[5] making a recommendation on?
[6] **A.** Me specifically, often the first thing I would do would to
[7] download the Ks and Qs, which are the past financial
[8] statements, the earnings releases and use the numbers, input
[9] them and build a financial model on the company. And then
[10] coupled with that, I would take a trip to meet senior
[11] management or a phone call if the trip wasn't available. And
[12] just take some time and listen to the management story, what
[13] are the short-term objectives for the company, what are the
[14] long-term goals, what are the growth prospects, what are the
[15] new, exciting opportunities, what are the risk factors, and let
[16] management sort of tell me the story, and then married the
[17] story with the numbers, and that would be how I would
[18] ultimately come up with an answer. Other things are involved,
[19] but come up with a buy or sell recommendation for a fund
[20] manager.
[21] **Q.** And can that process take some time, especially if you're
[22] new to a company?
[23] **A.** Definitely. It can take days, weeks, months.
[24] **Q.** So you might be working on a company for a while before
[25] you're comfortable with a recommendation?

Page 631

[1] **A.** Definitely. Especially, you know, financial stocks are a
[2] little more complicated than some other areas.
[3] **Q.** One of the things you look at when you're learning about a
[4] company are the public filings?
[5] **A.** Yes.
[6] **Q.** You mentioned the 10Ks and 10Qs. In addition to those
[7] documents filed with the SEC, would you also typically look at
[8] any press releases the company issued related to earnings or
[9] performance?
[10] **A.** I try to look at anything from the company to, if I'm
[11] trying to get an idea of what the company is doing.
[12]       **THE COURT:** Can I interrupt?
[13]       **THE WITNESS:** Yes.
[14]       **THE COURT:** The Fidelity funds already owned 10
[15] percent of Doral?
[16]       **THE WITNESS:** Correct.
[17]       **THE COURT:** You said bank. We've heard the term Doral
[18] Financial being the parent company, which I believe had the
[19] stock, am I correct?
[20]       **THE WITNESS:** Doral Financial, yes.
[21]       **THE COURT:** But my question really is: In view of the
[22] fact that the Fidelity funds already owned 10 percent of the
[23] stock of Doral Financial, what was your responsibility going
[24] into this? Obviously it wasn't deciding on a brand new
[25] investment. So what was your responsibility?

Page 632

[1]       **THE WITNESS:** My responsibility would be to protect
[2] that 10 percent, make sure it's a stock we still want to be
[3] involved with, or perhaps if we didn't, if something changed,
[4] and I wasn't comfortable with the investment, I could recommend
[5] that the company sell the stock.
[6]       **THE COURT:** All right.
[7]       **THE WITNESS:** And I'm directly measured on that. My
[8] compensation was based on, you know, if I said this is a stock
[9] Fidelity should own, and the stock goes up, I get compensated
[10] positively for that, and if it went the opposite way for me, I
[11] would get less compensation.
[12]       **THE COURT:** Just one more question. Were you
[13] responsible for Doral along with other people?
[14]       **THE WITNESS:** No.
[15]       **THE COURT:** Other analysts? Or were you the analyst
[16] beginning at that time?
[17]       **THE WITNESS:** I was the analyst.
[18]       **THE COURT:** The analyst. All right.
[19]       Go ahead.
[20] **BY MR. BRAUN:**
[21] **Q.** So there would have been an analyst covering Doral which
[22] Fidelity already owned prior to the time you picked up?
[23] **A.** Andy Haytem had coverage before I did. He transitioned it
[24] over to me in the first quarter of 2005.
[25] **Q.** Was he another analyst working at Fidelity?

VOLUME 5
April 2, 2010

Page 633

[1] A. He is, yes. He took a different assignment.
[2] Q. Do you have a binder of documents in front of you?
[3] A. I do.
[4] Q. Can you turn to the document that's been admitted into
[5] evidence as Government Exhibit 194? It should be, I think, the
[6] second tab in your binder there.
[7] A. Yes.
[8] Q. Do you recognize that document?
[9] A. Yeah. It was the press, the quarter end release from 2004
[10] from Doral Financial.
[11] Q. Did you inherit responsibility, if you recall, for this
[12] coverage before or after this press release was issued?
[13] A. After.
[14] Q. When you came in to this area of coverage and began looking
[15] at Doral, do you recall seeing this press release among other
[16] materials that you were studying that related to the company?
[17] A. Yes. I would have used this to help build the model, to
[18] read some background information when I went down to meet the
[19] company for the first time.
[20] Q. Do you believe this was the most recent official news that
[21] the company had issued as of the time it picked up the
[22] coverage?
[23] A. Yes.
[24] Q. About the fifth paragraph down, which starts with the
[25] sentence relating to "investment activities for the fourth

Page 634

[1] quarter of 2004, resulted in a loss of $95.4 million --"
[2] A. Yes.
[3] Q. Can you read the sentence that picks up after that, after
[4] where it says "quarter of 2003"?
[5] A. "The loss on investment activities during the fourth
[6] quarter of 2004 was principally due to an impairment on the
[7] valuation of the company's interest-only strip (IOs) of 97.5
[8] million as a result of the increase in three-month London
[9] Interbank Offered Rate (LIBOR) which reduced the anticipated
[10] spread of the company's variable rate IOs."
[11] Q. Do you recall reading about that in the press release?
[12] A. I do.
[13] Q. In learning about Doral, were you focused at all on
[14] questions related to the company's interest-only strips?
[15] A. Very much so. It was their primary source of income.
[16] Q. Given that and given the news regarding this write-down
[17] that occurred in the fourth quarter of 2004, did that draw your
[18] attention and raise questions that you felt you needed to focus
[19] on?
[20] A. Yes.
[21] Q. Aside from what was happening at Doral in early 2005, aside
[22] from these fourth quarter results that are described in the
[23] press release, more generally, is there anything about the
[24] nature of these interest-only strips that raised issues for you
[25] as an analyst considering whether or not this was a good

Page 635

[1] investment?
[2] A. Yes. I mean, valuing, because of the way companies are
[3] forced to do their accounting, essentially what you have to do
[4] is estimate all the future cash streams from mortgage holders,
[5] so someone gets a mortgage for their house and is going to have
[6] to pay Doral every month a certain amount of money, you have to
[7] estimate that future income stream and discount it back to
[8] present value and come up with one number of what the company
[9] is worth, so inherently is a flawed system. It's your best
[10] guess attempt at what those cash flows will be given different
[11] interest rate scenarios, given different economic environments
[12] on the island. Natural disasters could probably impact how
[13] many people pay their mortgages and don't pay their mortgages
[14] in the future. So it's a guess on some level.
[15] Q. And because on some level it requires all these estimates
[16] and forecasts, what issues does that raise for you as an
[17] investor?
[18] A. It creates uncertainty, and it would be nice to know for
[19] sure if somebody says they're going to pay you $10 that you're
[20] going to get it, but you have to use your best judgment whether
[21] that is really going to happen or really not going to happen.
[22] Q. You said a little while ago that as part of your efforts to
[23] learn about a company, you typically go and visit management?
[24] A. Definitely.
[25] Q. Did you do that with Doral?

Page 636

[1] A. I did.
[2] Q. Do you recall when that was?
[3] A. In March of 2005 was my first real discussion on the
[4] company or with company management, with senior management.
[5] Q. Did you meet with anyone from senior management on the trip
[6] to Puerto Rico that you took in March of 2005?
[7] A. Yes.
[8] Q. And who was that?
[9] A. Sammy. .
[10] Q. Who?
[11] A. Sammy Levis.
[12] Q. Do you recall meeting with anybody else from Doral in
[13] Puerto Rico in any kind of substantive way?
[14] A. No. I think the first meeting was primarily just with
[15] Sammy.
[16] Q. Do you recall whether or not that meeting was prior to the
[17] time that the company issued its 10K for the 2004 calendar
[18] year?
[19] A. Yeah, it was about a week before the K was going to come
[20] out.
[21] Q. Can you describe where the meeting took place?
[22] A. At their corporate offices, I guess. I don't know if it
[23] was their headquarters, but it was a Doral building.
[24] Q. In doing your work at Fidelity, when you met with somebody
[25] in senior management of a company that you were covering, was

VOLUME 5
April 2, 2010

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

Page 641

[1] the date. That's just so I would remember who I was talking
[2] to, when I was talking to, where I was.
[3] Q. At the top, you write "GOS IO strip servicing rights"?
[4] A. Yes.
[5] Q. And what does GOS stand for?
[6] A. Gain on sale.
[7] Q. How does that relate to the IO strip and the servicing
[8] rights, as best you can recall?
[9] A. The two, the two segments that make up the gain-on-sale
[10] number would be a component, the interest-only strip and a
[11] piece of the servicing rights. They're two separate things.
[12] Q. Can you read underneath that? There's a line that is right
[13] underneath those three items that are listed.
[14] A. Yeah, "the flatter yield curve created a $96 million
[15] accounting hit for Doral."
[16] Q. What did that relate to?
[17] A. That was what happened in the fourth quarter of 2004, which
[18] caused the interest-only portfolio to be written down.
[19] Q. And when you say flatter yield curve --
[20] A. Yes.
[21] Q. -- can you explain what you mean by that?
[22] A. Short-term rates rose while at the same time long-term
[23] interest rates didn't change at all, so you had a curve going
[24] like this, and then the short end goes up so it becomes a
[25] flatter curve.

Page 642

[1] Q. And the short end would refer to short-term interest rates?
[2] A. Right. An overnight borrowing rate, LIBOR, something that
[3] was, a bank could only borrow money for one or two days or an
[4] hour, whatever it happened to be, whereas a long-term rate, you
[5] could borrow money for 30 years.
[6] Q. Where on that spectrum of short and long-term rates would
[7] the three-month LIBOR be?
[8] A. Very close to the front end, short end of the curve.
[9] Q. So, the long end would be, say, a ten-year Treasury bond or
[10] 15-year mortgage?
[11] A. Yeah, or a 30-year mortgage, whatever, yes. So from one
[12] day to 30 years.
[13] Q. Towards the bottom of that page of notes --
[14]     THE COURT: What would be the yield curve? Am I
[15] correct or am I not that when you're talking about the yield
[16] curve, you're talking about how much money Doral can make by
[17] lending? Right?
[18]     THE WITNESS: I think the yield curve is, generally
[19] speaking, you could have a Doral yield curve, like if they lend
[20] somebody money --
[21]     THE COURT: I see. In other words, a yield curve is
[22] not specific to Doral?
[23]     THE WITNESS: No. It would be, if you borrow money
[24] for one day, I could charge you 2 percent interest rate, where
[25] if you borrow money from me for 30 years, I could charge you 7

Page 643

[1] percent.
[2]     THE COURT: Now, look, let's explain this to the jury.
[3] Just explain what the yield curve is.
[4]     THE WITNESS: It is different periods of time, if I
[5] borrow money from a bank for one day, they would charge me a
[6] certain interest rate, say, 2 percent. If I'm going to borrow
[7] the same amount of money from a bank for 30 years, they're
[8] going to charge me a higher interest rate, generally speaking,
[9] because there's more risk associated to getting paid back. So
[10] they might charge me 10 percent to borrow the money for over a
[11] 30-year period, or they'd charge me a shorter percentage, a
[12] lower percentage to borrow money for a shorter time period, one
[13] day, three months, one year, whatever.
[14]     THE COURT: What's meant by yield?
[15]     THE WITNESS: The interest rate yield.
[16]     THE COURT: Meaning?
[17]     THE WITNESS: If you borrow $100, and I charge you 10
[18] percent, the yield would be $10. So if you borrow $100 and I'm
[19] going to charge you 10 percent to do that, at the end of the
[20] time period, you're going to have to pay me back $100 plus the
[21] interest rate, which is $10. So the yield is that $10.
[22]     THE COURT: Okay. And the idea of a curve is to --
[23]     THE WITNESS: Just plot.
[24]     THE COURT: Plot?
[25]     THE WITNESS: Over time. Again, the yield --

Page 644

[1]     THE COURT: What it costs to borrow for a day, what it
[2] costs to borrow for a month, what it costs to borrow for a
[3] year, what it costs to borrow for ten years, and so forth?
[4]     THE WITNESS: Correct.
[5]     THE COURT: That's the curve.
[6]     THE WITNESS: Correct. And, generally speaking, the
[7] curve slopes upward. It costs less to borrow money for a
[8] shorter period and it costs more to borrow money for a longer
[9] period.
[10]     THE COURT: Okay.
[11] BY MR. BRAUN:
[12] Q. Do you see an illustration before you that's been marked
[13] Government Exhibit 8004?
[14] A. Is it in my binder?
[15] Q. It should be on your screen.
[16]     THE COURT: I guess the government was going to get to
[17] this.
[18]     MR. BRAUN: No, but in light of your Honor's
[19] questioning, we're trying to be as agile as we can.
[20]     If the defendant has no objection, your Honor, can we
[21] show this to the jury?
[22]     THE COURT: Sure.
[23]     MR. BRAUN: Thanks.
[24]     THE COURT: Exhibit 8004 is received.
[25]     (Government's Exhibit 8004 received in evidence)

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

Page 645

[1]      **MR. BRAUN:** Thank you.

[2]   **Q.** In your notes you're talking about a flatter yield curve?

[3]   **A.** Yes.

[4]   **Q.** Using the illustration, can you explain what you're

[5]   referring to and how the illustration demonstrates that?

[6]   **A.** At the start of the fourth quarter 2004, the blue line

[7]   represents the yield curve. So at three months, you would just

[8]   go up to see what the interest rate would be. But over that

[9]   period of time, over the fourth quarter, that blue line became

[10]   the green line, so you can see the line is flatter at the end

[11]   of the quarter versus the start of the quarter.

[12]      **THE COURT:** Okay. Give the jury and me a second to

[13]   read this.

[14]      Go ahead.

[15]      **MR. BRAUN:** Thank you, your Honor.

[16]      I'm not sure if I misspoke, or if the Court misspoke,

[17]   but just to be clear, this is Government Exhibit 8004.

[18]      **THE COURT:** Oh, I didn't hear that. 8004 is received.

[19]   **BY MR. BRAUN:**

[20]   **Q.** Are there different ways the yield curve could flatten,

[21]   Ms. Friedholm? Could long-term rates not remain constant, for

[22]   example?

[23]   **A.** Correct. The whole thing is fluid. At any point in time

[24]   long-term rates could change, in the middle of the curve could

[25]   change, short-term rates, yes. And every now and then you get

Page 646

[1]   an inverted yield curve, which is not very often, but it can

[2]   happen where the short term can actually be higher than the

[3]   long-term number, but that doesn't happen very often.

[4]   **Q.** Can I take you back to the first page of your notes from

[5]   the March 10 meeting?

[6]   **A.** Yes.

[7]   **Q.** Towards the bottom of that first page --

[8]      **THE COURT:** Can we just look again? There was a

[9]   reference to the yield curve.

[10]      **MR. BRAUN:** That was towards the top of the page where

[11]   it says "flatter yield curve equals 96MM accounting hit."

[12]      **THE WITNESS:** MM is million.

[13]      **THE COURT:** And this is something Mr. Levis told you?

[14]      **THE WITNESS:** Yes.

[15]      **THE COURT:** All right. Go ahead.

[16]   **BY MR. BRAUN:**

[17]   **Q.** Can you explain what Mr. Levis is telling you when you made

[18]   the notes at the bottom of the page, starting with the words

[19]   that look like "some impairment in Q1"?

[20]   **A.** "Some impairment in Q1 but hope to offset." As a result of

[21]   the, well, the yield curve continued to move -- flatten in Q1

[22]   of 2005, so --

[23]   **Q.** What was going on with rates in the first quarter of '05?

[24]   **A.** The fed is hiking rates steadily over, whenever they meet,

[25]   every couple months, there was a very well-telegraphed

Page 647

[1]   progression, 25 basis points higher, 25 basis points higher.

[2]   So the short end of the curve was marching upward.

[3]      **THE COURT:** And that was referred to as an increase in

[4]   rates, right?

[5]      **THE WITNESS:** Correct.

[6]   **BY MR. BRAUN:**

[7]   **Q.** And specifically short-term rates?

[8]   **A.** Correct.

[9]   **Q.** So you were explaining some impairment in Q1?

[10]   **A.** So the flatter yield curve hurt them in the fourth quarter,

[11]   and given what was happening in the interest rate environment,

[12]   that trend line was continuing to move upward, so the curve was

[13]   getting flatter. So the same thing was occurring into Q2, or

[14]   into Q1, 2005.

[15]   **Q.** First quarter?

[16]   **A.** First quarter, yes.

[17]   **Q.** But hope to offset?

[18]   **A.** Yes. They were hoping to offset this. I know that they

[19]   had added some hedges to try to counterbalance what was

[20]   occurring in the marketplace.

[21]   **Q.** Underneath that, can you explain the note that you made

[22]   there when Mr. Levis was talking to you?

[23]   **A.** So, we couldn't discuss -- well, the fourth, the end of the

[24]   year 2004 release had happened, but then all of the detail

[25]   behind that was set to be released shortly after our meeting.

Page 648

[1]   So we couldn't talk about what was going to be in the K, but he

[2]   just said there was going to be more information coming. And

[3]   obviously a lot of questions surrounding this IO portfolio, so

[4]   it was, it was coming, I had been promised that there would be

[5]   answers to my questions in those documents. And as a side

[6]   note, management was buying stock during this period.

[7]   **Q.** What's the significance of that from your perspective as an

[8]   investor?

[9]   **A.** Generally speaking, there's only one reason to buy stock,

[10]   you think that you're going to make money on it. No one would

[11]   buy stock thinking they're going to lose money. So management,

[12]   who knows the company, theoretically knows the company better

[13]   than anyone out there, if they're putting their own money to

[14]   work, it's a hugely positive sign to someone in my position.

[15]   If they're willing to put their own money at risk, it would be

[16]   likely that, if I keep doing things that Fidelity would, might

[17]   come to the same conclusion they are.

[18]   **Q.** And what if the opposite is happening, especially if the

[19]   company's --

[20]   **A.** If they're selling stock, there can be different reasons to

[21]   sell a stock. You know, say you get divorced and you have to

[22]   pay off your wife or husband or you want to buy a big house.

[23]   But, generally speaking, if you're worried the stock's going to

[24]   go down, you're definitely going to dump your stock.

[25]   **Q.** If senior management dumps their stock, is there any way

VOLUME 5
April 2, 2010

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

Page 649

[1] for the investing public to find out about it?
[2] A. There's public filings. I think they have to report that to
[3] the SEC, if they're buying or selling.
[4] Q. Can you turn to the next page of your March 10 notes?
[5] A. Yes.
[6] Q. I want to focus at the top of the page where you see some
[7] numbers there.
[8] A. Yes.
[9] Q. Starting with the seven and a half and going down to three
[10] and a quarter.
[11] A. Yes.
[12] Q. The equation there, starting with the seven and a half at
[13] the top, can you explain what you were hearing from Mr. Levis
[14] during this part of your conversation with him?
[15] A. This was an explanation of basically how Doral was making
[16] their money. They were, because they were the largest mortgage
[17] bank in Puerto Rico, they were collecting 7-1/2 percent fixed
[18] rate coupons or a fixed rate interest rate from all of the
[19] borrowers. Then they would either pay someone a quarter of a
[20] point, 25 basis points, a quarter of a percent, to manage all
[21] of that money being mailed in checks into kind of figure out
[22] where all the money goes; they could pay someone to do that or
[23] they could do that themselves. So then basically you're left
[24] with, you've got a 7-1/4 percent income stream, and you take
[25] this money.

Page 650

[1] Q. And that income stream, if I understand you, is the
[2] interest rate?
[3] A. It's the interest rate coming in from hundreds and
[4] thousands of homeowners like you and I that would be writing
[5] our check each month.
[6] Q. Minus that .25 servicing fee?
[7] A. To figure out where all the money's going.
[8] Q. Whether they're keeping it or getting rid of it?
[9] A. Yes.
[10] Q. So --
[11] A. So you're left with 7-1/4 percent interest rate earning
[12] stream, and they were selling that interest rate and they
[13] called it a pass through, or it's called a pass through. They
[14] were selling that to other investors on the island, other
[15] banks. And then they would have to pay a certain interest rate
[16] to those investors, and the 4 percent was the rate that they
[17] were paying to other investors. So, therefore, it would leave,
[18] if you're getting seven and a quarter and you're paying four,
[19] you get to keep 3-1/4 percent interest rate.
[20] Q. And that 4 percent, it says next to it "investor payment,"
[21] is that right?
[22] A. Yes.
[23] Q. So that's what Doral was passing through, the pass-through
[24] rate you referred to?
[25] A. Yes, that was what they were paying their investors.

Page 651

[1] Q. And the three and a quarter is what remains?
[2] A. Doral's profit.
[3] Q. The 4 percent pass through, was that just an example of the
[4] way it could work? What did Mr. Levis say to you about that 4
[5] percent?
[6] A. 4 percent, I guess you go down to the next bucket
[7] underneath the math.
[8] Q. Sure, yeah.
[9] A. There were two types of interest-only strips that they sold
[10] to their investors. They could either sell a fixed rate
[11] interest-only strip, or floating rate. 30 percent of the
[12] portfolio was fixed, so they would contractually say I'm going
[13] to pay XYZ Bank 3 percent, 4 percent, 2 percent, whatever it
[14] was.
[15] Q. And that doesn't move?
[16] A. And that doesn't move.
[17] And then 70, the majority of the portfolio was a floating
[18] rate, and it was based off of LIBOR, so generally whatever the
[19] quoted LIBOR rate was, you would at 100 to 150 basis points, or
[20] one to 1-1/2 percent, and pay that to, pay that to the
[21] investors. So the payment rate would change. You would make
[22] more money if rates were going down and you would make less
[23] money if rates were going up.
[24] THE COURT: Look, underneath, where it says floating,
[25] what's that line there?

Page 652

[1] THE WITNESS: It says, "It reset quarterly off of
[2] LIBOR 100 to 150 basis points."
[3] THE COURT: Now, the 100 to 150 basis points is what?
[4] THE WITNESS: 1 percent to 1-1/2 percent.
[5] THE COURT: What is the one to 1-1/2 percent?
[6] THE WITNESS: You would add that to whatever LIBOR was
[7] quoted in the paper. If LIBOR was 2 percent, you would add 1
[8] percent to that, so I would have to pay or Doral would have to
[9] pay 3 percent. LIBOR, and it would be, that was a range.
[10] THE COURT: That's what would pass through?
[11] THE WITNESS: Correct.
[12] THE COURT: LIBOR plus 100 to 150 basis points.
[13] THE WITNESS: And again, that's just a generality.
[14] There's probably hundreds of contracts they have with banks.
[15] THE COURT: But this is what he told you?
[16] THE WITNESS: Yes.
[17] THE COURT: This comes from him, right?
[18] THE WITNESS: Directly from him, yeah. They were
[19] paying LIBOR plus 1 percent to 1-1/2 percent. And LIBOR
[20] changed every quarter, so each quarter the amount they had to
[21] pay would be slightly different.
[22] BY MR. BRAUN:
[23] Q. So there are two different pass-through rates; one's fixed
[24] and one's floating. And what did Mr. Levis say about the 4
[25] percent at the time of that division into the four that you

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 5
April 2, 2010

---

Page 653

[1] wrote down back when he was talking to you?

[2]     THE COURT: Where do we see 4 percent?

[3]     MR. BRAUN: Underneath seven and a half, they subtract

[4] a quarter.

[5]     THE COURT: All right, up at the top of the page.

[6] BY MR. BRAUN:

[7] Q. Seven and a half left to split and then four goes to the

[8] banks that buy, you said?

[9] A. Yes.

[10] Q. That's the investor payment?

[11] A. Yes. So the average, the average that they were paying on

[12] the pool of fixed rate mortgages was 4 percent. So that's

[13] locked in. That doesn't change. And on the floating rate, it

[14] was, they could pay any amount 4 percent or below. There was a

[15] cap, as you see further down the page, I talk it into the cap

[16] situation, the maximum they would pay to their investors would

[17] be 4 percent.

[18] Q. As far as Mr. Levis explained to you, was that cap in a

[19] particular contract, was it an average of all floating rate

[20] contracts, could you explain that?

[21] A. Yeah, it was a -- I mean, like I said, there's thousands of

[22] contracts probably that they had, that they would sell, they

[23] would sell one pool to one bank, one pool to another bank, and

[24] every single one is different, but on average, the aggregates,

[25] 70 percent of the portfolio, which is floating rate, would

---

Page 654

[1] never, would not pay more than 4 percent.

[2] Q. Wouldn't go more than four to the other banks that bought

[3] those?

[4] A. Yeah, if rates went down really, really low, it could be

[5] less than that. But it would not go higher.

[6]     THE COURT: Can I have the reporter read the last two

[7] or three questions and answers.

[8]     (Record read)

[9]

[10]     THE COURT: Okay. Go ahead.

[11] BY MR. BRAUN:

[12] Q. So in a particular contract, it might be 3.5 and another

[13] one would be 4.5, but on average the floating rate side was

[14] capped at four. Is that your understanding?

[15] A. Yes.

[16] Q. Can you go to your notes?

[17] A. Just like the average that you're collecting from

[18] homeowners that you're receiving is 7-1/2 percent, every single

[19] mortgage isn't at 7-1/2 percent.

[20] Q. I understand. The notes that are kind of closer in to the

[21] margin on the left-hand side --

[22] A. Yes.

[23] Q. -- can you explain what you were hearing that you recorded

[24] there in your notes?

[25] A. So this was what happened in Q4 when short-term rates went

---

Page 655

[1] up, but the long end of the curve did not move, the flatter

[2] yield curve. So it would be a positive because prepayment

[3] speed, so the likelihood that someone would refinance their

[4] mortgage and you would lose that income stream went down, you

[5] wouldn't be losing mortgages because rates are going higher.

[6] Who's going to refinance if they're going to pay more to

[7] refinance than what they have. If you had a 2 percent

[8] mortgage, you wouldn't refinance to pay 4 percent. That would

[9] be dumb. But on the negative side, they would have to be

[10] paying their investors more because rates were going up and the

[11] rate that they had to pay, their floating rate, was based on

[12] the short term LIBOR rate.

[13] Q. So the negative?

[14] A. Yes.

[15] Q. Is that they have to increase payment to the other banks?

[16] A. Yes. Because that payment is based off of whatever the

[17] quoted LIBOR rate is, but, again, I say, but they have caps.

[18] So you would pay more and more and more until a certain level,

[19] and then it didn't matter how high rates went, you wouldn't be

[20] paying more than that.

[21] Q. These caps that Mr. Levis was mentioning to you, based on

[22] what he said, do you have an understanding of where they came

[23] from?

[24] A. Oh, they're written into each contract. It would talk

[25] about the terms of the loans that were in there, yes, so it was

---

Page 656

[1] a contractual cap.

[2]     THE COURT: Can you just make sure the jury and I

[3] understand? Read what's on this segment so we know what the

[4] abbreviations and the shorthands are. Just read that, please.

[5]     THE WITNESS: So at the very top, when rates are going

[6] up on the short end of the curve, not the long end of the

[7] curve. So Doral Financial would get a positive. You would --

[8]     THE COURT: The plus means a positive?

[9]     THE WITNESS: A positive to the company.

[10]     THE COURT: A positive effect?

[11]     THE WITNESS: A positive effect would be that the

[12] prepayments, so the likelihood of someone refinancing their

[13] loan and Doral losing that income stream goes down.

[14]     THE COURT: What are the words, prepayment?

[15]     THE WITNESS: Both fixed and floating. So, if you

[16] had, that impacts both the fixed and the floating rate

[17] portfolios, basically you don't have, you aren't risking losing

[18] those income streams.

[19]     THE COURT: Then going on down.

[20]     THE WITNESS: And then the negative impact to Doral is

[21] because they have to pay their investors based on this floating

[22] rate is the floating rate was going up, they had to increase

[23] payment because rate based on LIBOR, so they would have to be

[24] paying more because LIBOR was going up, but then in

[25] parentheses --

---

VOLUME 5
April 2, 2010

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

Page 657

[1]   **THE COURT:** What's underneath?
[2]   **THE WITNESS:** But have caps.
[3]   **THE COURT:** With the slash mark, underneath the word
[4]  "payment."
[5]   **THE WITNESS:** Because.
[6]   **THE COURT:** Oh, because.
[7]   **THE WITNESS:** Because rate based off LIBOR.
[8]   **THE COURT:** "Because rate based off LIBOR (but have
[9]  caps)"?
[10]   **THE WITNESS:** Yes, so there was a negative, but that
[11]  negative was minimized because of these caps. So it was a kind
[12]  of natural hedge going on in the interest rate environment.
[13]  **BY MR. BRAUN:**
[14]   **Q.** Further down on the same page, do you see a note that
[15]  begins "last Q"?
[16]   **A.** Yes.
[17]   **Q.** Can you explain the next few lines down to that Q4 equals
[18]  97?
[19]   **A.** So last quarter which would have been the end of 2004,
[20]  short-term rates were going up and long-term rates were going
[21]  down, or remaining the same, so your curve was flatter, like
[22]  that diagram you had. So you don't get the historical positive
[23]  benefit from higher rates, which would be because most people's
[24]  mortgages are based off of a long term, most people borrow
[25]  money for ten years or 15 years or 30 years, however long their

Page 658

[1]  mortgage rate is, if that doesn't change, if that doesn't go
[2]  up, short-term rates are going up, so you had to pay more, but
[3]  long-term rates were not going up, so therefore, you weren't
[4]  getting the historical positive of fewer refinances occurring.
[5]  So you were still losing refinances at the same rate and you
[6]  were paying more money to your investors, so it was a double
[7]  negative.
[8]   **Q.** That Q4, fourth quarter?
[9]   **A.** So because of this phenomena, they had to, the portfolio
[10]  that they had to estimate at the beginning of Q4 was now worth
[11]  less. So that was the 97, I think on the first page it was 96,
[12]  whatever. Close enough. Roughly $100 million.
[13]   **THE COURT:** You have 97 million here.
[14]   **THE WITNESS:** Correct. I don't know what the exact
[15]  number is. It was close to a hundred.
[16]  **BY MR. BRAUN:**
[17]   **Q.** Can you go down to the bottom of that page, the note in the
[18]  margin and then there's a note next to it? Can you explain
[19]  both of those?
[20]   **A.** In the margin, it says, "floating rate IO payments to
[21]  buyers all have caps." Same thing, I guess, we've been talking
[22]  about. "All floating rate IOs have caps," underlined, so the
[23]  spread can contract, you know, your, the spread between what
[24]  you're collecting from your mortgage holders and you're paying
[25]  to your investors can get smaller, but it will always be

Page 659

[1]  profitable. It will always stay profitable because of these 4
[2]  percent caps.
[3]   (Continued on next page)

Page 660

[1]  **BY MR. BRAUN:**
[2]   **Q.** You have what looks to be a little pi sign at the end of
[3]  that note.
[4]   **A.** That is profit, shorthand for profitability, profit. So
[5]  you're always going to make a profit. 7-1/2 percent minus 4
[6]  percent is 3-1/2 percent.
[7]   **Q.** And that 4 percent --
[8]   **THE COURT:** What is the language? Read that language
[9]  that is in the yellow.
[10]   **THE WITNESS:** All floating rate IOs have caps so the
[11]  spread can contract, but there is a huge spread so you always,
[12]  Doral would always be profitable. Doral would always make
[13]  money.
[14]   **Q.** What you were being told about this average 4 percent cap
[15]  in the contracts, was that important to you?
[16]   **A.** Yes.
[17]   **Q.** Can you explain why it was important, Ms. Friedholm?
[18]   **A.** Well, it was Doral's primary income stream. So if you are
[19]  guaranteed a 3-1/2 percent return on your money -- and the
[20]  portfolio was like $7 billion. So 3 percent times $7 billion
[21]  is a lot of money. That's what you are going to -- 3-1/4
[22]  percent, whatever, that's what you are guaranteed to make.
[23]   **Q.** Can you turn now to the front side or first page of the
[24]  notes that you said Mr. Levis drew for you.
[25]   **A.** Yes.

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 5
April 2, 2010

Page 661

[1] **Q.** Tell us again, when was this? When was he doing this?

[2] **A.** So the earlier pages where I was taking the notes was the

[3] formal presentation. We're in sitting at a table asking

[4] questions. He was presenting slides. And then at lunch, he

[5] came over to just further emphasize or further kind of make

[6] sure I understood how Doral makes money, and this was how he

[7] visually represented that interest-only portfolio, the

[8] interest-only strip.

[9]       He started the discussion, demonstration, by -- the

[10] upper right-hand corner, you see the 7-1/2 percent fixed rate.

[11] That is what they were collecting from the homeowners in Puerto

[12] Rico. They would lose a quarter percent for servicing those

[13] loans. So you're left with 7-1/4 percent revenue stream. And

[14] then they sold those off, and you can see the two lines. The

[15] top one says fixed and the bottom one says floating 30 percent.

[16] And then the 30 percent next to the fixed 30 percent of the

[17] portfolio was fixed. So at the end of the arrow it was fixed

[18] at 4 percent payment. So there was 3-1/4 percent we talked

[19] about up there. So on the 30 percent of the portfolio with

[20] fixed rate pass through, you were making 3-1/4 percent.

[21]       Now on the bottom line, the larger part, the 70 percent was

[22] the floating rate and you can see on the far left the payment

[23] was based on LIBOR, which was capped at 4 percent. So fixed

[24] rate you'd pay up to -- fixed rate you would pay 4 percent.

[25] Floating rate you would pay up to 4 percent. I was again just

Page 662

[1] visually demonstrating that math from my own page of notes.

[2] **Q.** And during this conversation, did he show you anything,

[3] other than the drawing that we see on the screen now?

[4] **A.** Yes. He brought over an example, or it was a contract,

[5] showing me how they wrote these contracts, the floating rate

[6] contracts to the other banks on the island that they were

[7] selling them to. He had redacted out the name of the bank, and

[8] then it was just one piece of paper and it said, loans --

[9] homeowner loans can be no bigger than, I don't know, X

[10] thousands of dollars. I don't remember the specifics, but a

[11] loan wouldn't be more than $50,000 to a homeowner. The loan to

[12] value on the house, on the property, couldn't exceed a certain

[13] amount. And then it said Doral would pay the investor based

[14] off of LIBOR -- LIBOR plus something, somewhere between -- I

[15] don't remember what the specific number was on that contract he

[16] showed me, with a 4 percent cap written into the contract.

[17] **Q.** And as far as -- the contract that you saw in that context,

[18] did it actually have a 4 percent in it?

[19] **A.** Yes.

[20] **Q.** After you spoke to Mr. Levis on this trip to Puerto Rico,

[21] did you continue to study Doral after you went back to your

[22] work in Boston?

[23] **A.** Yes.

[24] **Q.** When the 10K came out, do you recall that?

[25] **A.** Yes. It was like the next week or shortly after I came

Page 663

[1] back from Puerto Rico.

[2] **Q.** And do you recall reviewing the 10K?

[3] **A.** Yes. They released it and then there was a call the next

[4] day, I think, to discuss it.

[5] **Q.** What kind of call was that? Was that just a one-on-one

[6] call?

[7] **A.** No. It was a big investor call. Anyone could dial into

[8] the number and listen to management kind of go over the K, and

[9] then at the end there was a question-and-answer period.

[10] **Q.** Did you listen to that?

[11] **A.** Yes.

[12] **Q.** Do you recall actively participating in it yourself?

[13] **A.** No. I don't ask questions on big -- Fidelity keeps their

[14] questions -- Fidelity wouldn't ask a question in that

[15] environment because sometimes it would tip our hand, whether we

[16] were buying or selling a stock, if we would ask a negative or a

[17] positive question.

[18] **Q.** So you listen but remain silent?

[19] **A.** Correct.

[20]       **MR. BRAUN:** Judge, can I have just a moment?

[21]       (Pause)

[22] **Q.** Was the call a lengthy one, Ms. Friedholm?

[23] **A.** Yes.

[24]       **THE COURT:** What did you say?

[25]       **THE WITNESS:** Yes.

Page 664

[1] **Q.** Do you remember specific details of it?

[2] **A.** No, not really. It was a lot of people asking questions.

[3] There were fund managers coming into my office asking me

[4] questions during that. So it was sort of a multi-tasking

[5] environment. I'm taking notes on the call because I am going

[6] to have to write up what was said on the call, to convey that

[7] information to the fund managers.

[8]       The majority of the conversation was about the

[9] interest-only portfolio.

[10] **Q.** After that conference call, did you speak again with Sammy

[11] Levis?

[12] **A.** Yes. Fidelity had their follow-up call to ask our

[13] questions.

[14] **Q.** OK. That gives them an opportunity to ask them privately

[15] with management?

[16] **A.** Correct.

[17] **Q.** Without the rest of the investing public knowing what you

[18] focused on?

[19] **A.** Right. If you own 10 percent of the company, somebody

[20] could front run you. You don't want to tip your hat.

[21]       **THE COURT:** Just a little slower, if you could.

[22] Repeat what you just said.

[23]       **THE WITNESS:** Yes. We wouldn't want to ask our

[24] questions in a barrage public forum and tip our hand whether we

[25] might be buying more stock or selling stock. Because Fidelity

VOLUME 5
April 2, 2010

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

---

Page 665

[1] was so large, they could actually move the market. When we're
[2] buying, the stock is likely going up and if we're selling, the
[3] stock is likely going down, and people would try to front run,
[4] try to get that information and use it to their advantage.
[5] Q. Can you turn to the document in your binder that's been
[6] marked as Government Exhibit 1605, one six zero five.
[7] A. Yes.
[8] Q. Did you find it?
[9] A. Yes.
[10] Q. Sorry. I didn't know you had located it.
[11]   Do you recognize what that is?
[12] A. Yes. This is the follow-up call with Sammy on what we were
[13] talking about, the 10K release.
[14] Q. So this is you and Mr. Levis on the phone?
[15] A. Yes.
[16] Q. And are you taking these notes as you're actually speaking
[17] to him?
[18] A. Yes.
[19] Q. Maintaining them for the same reasons you described
[20] earlier?
[21] A. Yes.
[22]   MR. BRAUN: Your Honor, the government moves Exhibit
[23] 1605 into evidence.
[24]   THE COURT: Received.
[25]   (Government's Exhibit 1605 received in evidence)

---

Page 666

[1] Q. So up at the top, in the corner, it says "Sammy F/U call"
[2] it looks like.
[3] A. Follow-up call.
[4] Q. Got it.
[5]   "On 10K." That would have been the 10K that just came out,
[6] right?
[7] A. Yes. The prior day, I think on the 17th.
[8] Q. I'm sorry. Was it the K on the 17th or that conference
[9] call?
[10] A. The K was probably released two days before, but the big
[11] investor call where it was discussed was the day before we had
[12] our follow-up call. Because they generally had their calls at
[13] night.
[14] Q. Can you look towards the bottom of the first page. You
[15] mentioned I think a moment ago $7 billion in mortgages.
[16] A. Yes.
[17] Q. Is that what is referred to in your notes there?
[18] A. Yes.
[19] Q. Beneath that, where it begins "spread affected by LIBOR
[20] rates."
[21] A. Yes.
[22] Q. Can you explain the remainder of the notes on the page from
[23] that point down.
[24] A. The pass-through rate that Doral was paying was based off
[25] of LIBOR. So you had a higher LIBOR. That equals a lower

---

Page 667

[1] spread between what Doral was collecting from their mortgage
[2] holders and paying to their investors. So the spread was going
[3] down because short-term rates were going up.
[4] Q. And that spread is their IO?
[5] A. Yes.
[6] Q. OK.
[7] A. And they hedged -- they had a hedge in place but,
[8] unfortunately, the hedge was on the long end of the curve,
[9] which didn't move in this particular time period. So that
[10] hedge was ineffective. And it says they didn't get the benefit
[11] because they hedged the wrong part of the curve that was
[12] moving. So they actually took a hit from that hedge.
[13]   As a result -- I mean, essentially they screwed up the
[14] hedge. So as a result of that, they put on some more hedges to
[15] try to protect themselves in the future from having this happen
[16] again.
[17] Q. Can you explain as best you can to those of us who don't do
[18] this kind of work, what does it mean to hedge the wrong end of
[19] the curve, hedging the wrong end as opposed to the short end?
[20] A. So basically you would put a hedge in place that the
[21] opposite thing would happen. If rates went up and that was a
[22] negative for you, you would put a hedge on, so something
[23] positive would happen, to help counterbalance that negative
[24] impact. So that is what Doral thought they were doing, putting
[25] a hedge on. So if the pass-through spread, if the spread

---

Page 668

[1] contracted, they had some other financial instrument which
[2] would then give them a benefit.
[3]   Unfortunately, because they hedged the long end of the
[4] curve which didn't move, they didn't get any benefit from that
[5] hedge. The hedge was ineffective in what happened. Because a
[6] lot of times what happens is if the short end of the curve goes
[7] up, the long end goes up in parallel. So it may have been -- I
[8] don't know why they chose that, what the rationale was -- it
[9] was cheaper or something -- but their hedge was on the long
[10] end, which then didn't work.
[11]   THE COURT: This is all what Mr. Levis told you?
[12]   THE WITNESS: Correct. He told me this and was
[13] basically saying --
[14]   THE COURT: This is what your notes reflect, right?
[15]   THE WITNESS: He told me in a meeting -- on a phone
[16] call, yes.
[17] Q. Can you go to the next page of your notes.
[18] A. Yes.
[19] Q. About three-quarters of the way down the page underneath
[20] the numbers --
[21] A. Yes. Some additional impairment will be offset by hedges.
[22] Q. Yes. Can you explain what you recall him telling you in
[23] that regard?
[24] A. So basically what was happening, in the fourth quarter
[25] rates were going up and this trend was continuing into the

---

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 5
April 2, 2010

Page 669

[1] first quarter, and so obviously rather than just sit and
[2] continue to make less money, they corrected their hedges and
[3] put on some new hedges based on the short end of the curve.
[4] **Q.** And as far as some additional impairment, do you recall
[5] what you were told in that regard?
[6] **A.** That if rates did continue to go the way they were,
[7] obviously that would hurt the portfolio because they would be
[8] paying less, but it wouldn't impact -- it wouldn't be material
[9] or wouldn't be big enough to make that big of a difference
[10] because they had put these hedges on to counterbalance that.
[11] So it basically was kind of reinsuring investors they wouldn't
[12] have another $97 million write-down or $96 million, or whatever
[13] it was, nearly $100 million write-down.
[14] **Q.** Can you go to the last page of your notes.
[15] **THE COURT:** Can the reporter read the last answer,
[16] please.
[17] (Record read)
[18] **THE COURT:** Go ahead.
[19] **Q.** Ms. Friedholm, can you turn to the last page of your notes.
[20] **A.** Yes.
[21] **Q.** Do you recall what Mr. Levis was telling you during this
[22] part of your telephone call on March 18th?
[23] **A.** I do.
[24] **Q.** Can you explain that?
[25] **A.** This goes back to the fact of the accounting rules. You

Page 670

[1] have to estimate the value of this portfolio in the future, and
[2] it is inherently flawed, but you give it your best guess.
[3] Rather than a company just doing that on their own and saying,
[4] OK, this $7 billion portfolio is worth $900 million, or they
[5] did that and then they hire two outside independent firms to
[6] kind of agree with them or say, yes, the assumptions that you
[7] used seem reasonable, the margin of error seems realistic,
[8] these are a good estimate to use based on a normal, sane person
[9] would make those same conclusions.
[10] And so what Doral did, and I thought it was a smart
[11] way to value this, independently value this fund, is they had
[12] two different companies do this. One was a New York big bulge
[13] bracket firm, and they wouldn't disclose who it was, but it was
[14] a Merrill Lynch, a Morgan Stanley, a Goldman Sachs, UBS. Those
[15] are the ticker symbols. It was a big bank here in New York
[16] that was independently auditing their valuation of the IO
[17] portfolio, and then they chose a local bank on Puerto Rico, who
[18] was very familiar with the Puerto Rican banking community, to
[19] do the same thing.
[20] **Q.** OK. Again, to repeat a question Judge Griesa asked a
[21] moment ago, this is all what Mr. Levis is telling you?
[22] **A.** Yes.
[23] **Q.** That you are writing down?
[24] **A.** Sammy said they had two outside independent firms agreeing
[25] with their valuation of the interest-only portfolio, yes.

Page 671

[1] **Q.** Was that important to you, the existence of these two
[2] outside independent firms?
[3] **A.** Yes, for reasons I said before. I mean, valuing these, it
[4] is not an easy thing to do. It takes some guess, your best
[5] guess estimates, and so to have someone else say those seem
[6] reasonable to me is valuable.
[7] **THE COURT:** Is what?
[8] **THE WITNESS:** It is valuable.
[9] **Q.** Can you turn in your binder to a document that's been
[10] marked for identification as Government Exhibit 1606.
[11] **A.** Yes.
[12] **Q.** Do you recognize what that document is?
[13] **A.** Yes. These are the formal published notes for internal
[14] Fidelity fund managers to review, kind of recapping my own
[15] notes that I took on the yellow paper.
[16] **Q.** Did you draft this daily note?
[17] **A.** Yes, I did.
[18] **Q.** Was that on about March 21, 2005?
[19] **A.** Yes. So this would be following the K release, the call to
[20] all investors, and our follow-up call.
[21] **Q.** On March 18th that we just talked about?
[22] **A.** Correct.
[23] **THE COURT:** Can I just see -- does this have a date?
[24] **THE WITNESS:** It is at the bottom of the page.
[25] **THE COURT:** Just tell me what the date is.

Page 672

[1] **THE WITNESS:** 3/21/2005 at 7:57 p.m.
[2] **THE COURT:** And you wrote this?
[3] **THE WITNESS:** I wrote this and then published it in
[4] our system for anyone -- it is an electronic database. So any
[5] fund manager could look at it.
[6] **THE COURT:** Within Fidelity.
[7] **THE WITNESS:** Only within Fidelity.
[8] **MR. BRAUN:** Your Honor, the government moves that this
[9] exhibit be received. It is 1606.
[10] **THE COURT:** Received.
[11] (Government's Exhibit 1606 received in evidence)
[12] **Q.** Ms. Friedholm, can I start up at the top of the daily note?
[13] **A.** Yes.
[14] **Q.** Do you see it has a rating?
[15] **A.** Yes.
[16] **Q.** 2 buy?
[17] **A.** Yes.
[18] **Q.** Can you explain what that means.
[19] **A.** Fidelity's internal rating system goes 1 to 5. One would
[20] be a strong buy, 2 would be a buy, 3 would be a hold, 4 would
[21] be a sell, 5 would be a strong sell. So each stock has a
[22] rating associated in our system. But because I was a new
[23] analyst just picking up the stock, at the time Fidelity just
[24] had to continue the prior analyst's ratings. So Andy -- and
[25] you know that I'm not officially launched or making a

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

VOLUME 5
April 2, 2010

Page 677

[1] and research. Goldman Sachs and Merrill Lynch. I am sure
[2] people here in New York are familiar with them.
[3] **Q.** Will you turn to Government Exhibit 1607. It's just been
[4] marked for identification at this point.
[5] **A.** Yes.
[6] **Q.** It should be in your binder there.
[7] **A.** Yes.
[8] **Q.** In continuing to learn about Doral and work towards a
[9] recommendation at least, did you communicate with Mr. Levis
[10] sometimes by e-mail?
[11] **A.** Not often, but I did, yes.
[12] **Q.** Do you recognize this document? Can you describe what it
[13] is.
[14] **A.** Yes. This was an e-mail I sent to Sammy. I think I sent
[15] mine on Tuesday, March 22nd. Just after the 10K announcement,
[16] the general call, our follow-up call, I would go around and
[17] talk to fund managers and try to get their -- we would
[18] synthesize what was going on together and some questions that
[19] had come up that I couldn't answer, I wanted a little more
[20] clarification and would send them to Sammy.
[21] **Q.** Is that what we see reflected in this document?
[22] **A.** Yes. At the bottom are my three questions.
[23] **MR. BRAUN:** Your Honor, the government moves 1607 into
[24] evidence.
[25] **THE COURT:** Received.

Page 678

[1] (Government's Exhibit 1607 received in evidence)
[2] **Q.** In general, Ms. Friedholm, what subject did your questions
[3] relate to?
[4] **A.** The interest-only strip.
[5] **Q.** Did that continue to be a significant focus for you?
[6] **A.** Yes.
[7] **Q.** Why was that?
[8] **A.** Because it is their primary source of income as a company.
[9] **Q.** Did he respond and answer your questions?
[10] **A.** He did. The top is his response to my three questions.
[11] **Q.** Can you turn now to Exhibit 1609 that's been marked for
[12] identification. It should be in your binder.
[13] **A.** Yes.
[14] **Q.** Can you describe what this document is.
[15] **A.** Again, this is a formal published note following more
[16] discussions with Sammy on the interest only, what was going on
[17] with the interest-only portfolio.
[18] **Q.** What is the date of this one?
[19] **A.** March 23rd.
[20] **MR. BRAUN:** Your Honor, the government moves the
[21] admission of this document, 1609.
[22] **THE COURT:** Received.
[23] (Government's Exhibit 1609 received in evidence)
[24] **Q.** Ms. Friedholm, does your report indicate whether or not you
[25] had formed your own investment thesis?

Page 679

[1] **A.** I hadn't yet because there is no investment thesis; it just
[2] says picking it up from Andy Hatem.
[3] **THE COURT:** Keep your voice up. I'm not hearing you.
[4] Did you voice your opinion --
[5] **THE WITNESS:** I had not. Not yet.
[6] **THE COURT:** -- on this one?
[7] **THE WITNESS:** Not yet. As you can see in the
[8] investment thesis, when I guess my recommendation is on the
[9] stock, I would have an investment thesis written there, and it
[10] was just picking up from Andy Hatem.
[11] **Q.** As a result of that, does the rating scale just continue
[12] unchanged?
[13] **A.** Andy had the stock rated buy and I just continued that.
[14] That was the practice.
[15] **Q.** You have a heading there that says IO portfolio --
[16] **A.** Yes, and there some bullet points.
[17] **Q.** -- and some bullet points. Can you read what it says in
[18] the third bullet point down.
[19] **A.** There are caps in place on the floating rate portion so
[20] spread compression is limited.
[21] **Q.** What did you mean by spread compression is limited?
[22] **A.** Because rates had continued to go up in Q4, close to the
[23] level where the caps were at, 4 percent, I think the LIBOR had
[24] approached 3 percent, I don't know exactly what it was, that it
[25] was, they were reaching the maximum pain, for lack of a better

Page 680

[1] term, that Doral would experience in a rising rate environment.
[2] **Q.** Your understanding that there are caps in place on the
[3] floating rate portion?
[4] **A.** Yes.
[5] **Q.** Where did that come from?
[6] **A.** From Sammy. Yes, from Sammy discussions.
[7] **Q.** Back on March 10th?
[8] **A.** And on the follow-up calls and maybe even the e-mail. I
[9] would have to read the e-mail again. But yes.
[10] **Q.** Can you read your bottom-line section there at the bottom
[11] of the document.
[12] **A.** "Bottom line: Doral was not properly hedged for a flat
[13] yield curve in Q4 and it came back to bite them. They are an
[14] excellent mortgage originator but 70 percent of their income
[15] comes from the IO strip, which is inherently volatile, and the
[16] market didn't like covering up the derivative loss by lowering
[17] their prepayment assumptions."
[18] **Q.** The derivative loss, what do you mean by that?
[19] **A.** The ineffective hedge, when they hedged the long end of the
[20] curve and they should have been hedging the short end.
[21] **Q.** Can you turn to the document marked for identification as
[22] Government Exhibit 1610. It should be the next one in your
[23] binder.
[24] **A.** Yes. These are my handwritten notes when I was talking to
[25] the largest fund manager at Fidelity of Doral stock, Joel

VOLUME 5
April 2, 2010

UNITED STATES OF AMERICA v.
MARIO S. LEVIS A/K/A SAMMY LEVIS

Page 681

[1] Tillinghast.
[2] **Q.** What are you writing down here?
[3] **A.** I went into his office to discuss, you know --
[4]     **THE COURT:** What is the date, please?
[5]     **THE WITNESS:** April 1, 2005.
[6] **A.** It was preparation --
[7]     **THE COURT:** Do you want to introduce 1610?
[8]     **MR. BRAUN:** Yes, your Honor.
[9]     **THE COURT:** Received.
[10]     (Government's Exhibit 1610 received in evidence)
[11]     **THE COURT:** Go ahead please.
[12] **A.** It was preparation for a call that was going to be taking
[13] place. I went in to talk to Joel, the fund manager who owned
[14] the Doral stock, to find out if there is anything specific he
[15] wanted me to discuss with Sammy.
[16] **Q.** And the second point you have on your notes, what subject
[17] did he want you to discuss that is reflected there?
[18] **A.** The interest-only portfolio says "won't go to zero because
[19] of caps."
[20]     **THE COURT:** I don't understand. Is that something
[21] you're saying or he is saying or a question or a statement?
[22] What is it?
[23]     **THE WITNESS:** This is the fund manager asking me areas
[24] to talk to Sammy about to help keep us reassured --
[25]     **THE COURT:** So this is, in essence, an issue,

Page 682

[1] question.
[2]     **THE WITNESS:** This is an issue in the fund manager's
[3] mind that he had asked me to continue to dig deeper on.
[4]     **THE COURT:** So he wanted to know if it would go to
[5] zero.
[6]     **THE WITNESS:** To make sure that it won't go to zero
[7] because of these caps.
[8]     **THE COURT:** Just a minute.
[9]     (Pause)
[10] **Q.** Can you turn to the next document in your binder, which has
[11] been marked for identification as Government Exhibit 1611.
[12] **A.** Yes. This is, again, an internally published document for
[13] Fidelity only, but it is called a quick note.
[14] **Q.** What is the nature of a quick note? What are you doing
[15] with this kind of document?
[16] **A.** A quick note is generally just something, you can send it
[17] out from your BlackBerry, you can send it out from an e-mail --
[18] it is through e-mail. So it would just be if some information
[19] came out that you wanted to pass along quickly to the fund
[20] managers. Generally speaking, it is more just news facts and
[21] there is less analysis going on. A formal note that you saw
[22] earlier would be more opinions, more action items. This might
[23] just be a fact, what had happened, a way to communicate
[24] information to a mass audience quickly.
[25] **Q.** All right. What information or what news are you referring

Page 683

[1] to in this quick note?
[2]     **MR. SREBNICK:** Excuse me one second. I have an
[3] objection to this exhibit, 1611. I have an objection.
[4]     Request an opportunity to address the court.
[5]     **THE COURT:** Sure. Of course. Come up.
[6]     (Continued on next page)

Page 684

[1]     (At the side bar)
[2]     **MR. SREBNICK:** Good morning.
[3]     **THE COURT:** Good morning.
[4]     **MR. SREBNICK:** We are dealing with Government Exhibit
[5] 1611. This appears to be a document from April 7, 2005. It
[6] does not appear to be a document memorializing conversations
[7] with Sammy Levis. It is a document that is internal to
[8] Fidelity and it contains the following language: "The rumors
[9] for management needing to be back in Puerto Rico are that
[10] either more accounting issues have surfaced or they are being
[11] bought."
[12]     There is other language in the exhibit, of course.
[13]     **THE COURT:** Can I just see it. Just a minute. Let me
[14] just see it.
[15]     **MR. SREBNICK:** It is about canceling the road show.
[16]     **MR. BRAUN:** Here is a clean copy, your Honor, if you
[17] want. We would agree to redacting.
[18]     **THE COURT:** Just a minute. All right.
[19]     **MR. BRAUN:** I am not going to seek to -- that wasn't
[20] part of what I wanted to question her about. We don't need to
[21] show that to the jury in the government's view. We cannot show
[22] that right now on their screens, and just --
[23]     **THE COURT:** So what are you going to redact?
[24]     **MR. BRAUN:** What Mr. Srebnick just objected to, the
[25] rumor about the cancellation of the road show and the selling

Exhibit F

## DECLARATION OF JEFFREY GALLANT

I, the undersigned, Jeffrey Gallant, pursuant to 28 U.S.C. § 1746, declare that:

1.     I am employed by Fidelity Pricing and Cash Management Services ("Fidelity") as Vice President, Fund Accounting and by reason of my position am authorized and qualified to make this Declaration. I have been employed by Fidelity since August 2005. My position at Fidelity requires me to be familiar with the company's accounting and bookkeeping systems and their associated records. In addition, through this position, I have knowledge of the various funds that Fidelity administers.

2.     Fidelity Management and Research Company ("FMR Co.") acts as the investment adviser to the Fidelity family of mutual funds.

3.     At the request of in-house counsel for Fidelity, I retrieved records from Fidelity's recordkeeping systems evidencing the Fidelity Funds' transactions in the securities of Doral Financial Corporation (ticker symbol NYSE "DRL") from 2005 through 2006. A true and accurate summary of these records is attached as Attachment A to this Declaration.

4.     The overall performance of each fund's DRL investment is contained under the column entitled "Book G/L" on Attachment A. Numbers in parentheses reflect losses and those not in parentheses reflect gains. As reflected on Attachment A, based on trades executed in 2005 and 2006, some funds booked gains on DRL stock and others booked losses. The Fidelity Funds realized losses of $42.3 million on DRL stock transactions in 2005 and 2006.

5.     The $42.3 million loss figure reflected in Attachment A represent the net of realized gains and losses based on the differences between the Fidelity Funds' purchase prices of DRL and the sale prices realized on disposition. It does not include gains or losses that could have been realized had any of the Fidelity Funds listed in Attachment A liquidated their positions any prices, including the closing high per-share price of $49.45 on January 18, 2005, other than actual sales prices.

6.     Individual transactions supporting the summary contained on Attachment A are contained in Attachment B to this Declaration.

7.     I further certify that the information contained in Attachment A truly reflects the trading activities of the Fidelity funds in DRL securities from 2005 through 2006 and that this trading data was:

(a) recorded at or near the time of the occurrence of the matters set forth therein, by, or from information transmitted by, a person with knowledge of those matters;

(b) kept in the course of regularly conducted business activity; and

(c) made by the regularly conducted business activity as a regular practice.

I declare under penalty of perjury that the foregoing is true and correct. Executed on ____ _November 10, 2010_ .

_____
Jeffrey Gallant

# Attachment A

## ATTACHMENT A TO THE DECLARATION OF JEFFREY GALLANT

| FUND | B par | RES par | SEL par | SEL Book G/L | SEL amount Tax | SS par | SS Book | SS amount Tax | WS2 par | WS2 Book | WS2 amount Tax | WSA par | WSA Book | WSA amount Tax |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 22 | 89,050 | 1,737,475 | | 12,833,697 (166,547) | 12,596,041 (166,547) | | | | 11,100 | | 55,384 | 11,100 | | |
| 66 | 25,300 | 26,150 | | | | | | | | | | | | |
| 117 | | | | | | | | | | | | | | |
| 158 | 25,700 | 508,875 | | 3,596,610 (154,906) | 3,513,212 (154,906) | | | | | | | | | |
| 183 | 23,500 | 24,300 | | | | | | | | | | | | |
| 198 | 461,913 | 699,700 | | (6,566,066) (730,149) | (6,608,931) (730,149) | | | | 7,400 | | 36,926 | 7,400 | | |
| 219 | 110,800 | 97,500 | | (15,361,527) | (15,361,527) | | | | | | | | | |
| 256 | 700,000 | 714,370 | | | | | | | | | | | | |
| 294 | 680,200 | | | (22,576,220) | (22,576,220) | | | | | | | | | |
| 304 | 1,530,900 | 1,317,100 | | 1,105,013 | 1,105,013 | | | | | | | | | |
| 315 | 109,600 | 109,600 | | (27,426) | (27,426) | | | | | | | | | |
| 318 | 98,400 | 98,400 | | | | | | | | | | | | |
| 320 | | | | | | | | | | | | | | |
| 327 | | | | | | | | | | | | | | |
| 336 | 565,976 | 565,976 | | (6,021,321) | (6,021,321) | | | | | | | | | |
| 338 | 137,300 | 137,300 | | 217,194 | 217,194 | | | | | | | | | |
| 343 | 22,500 | 30,900 | | (181,147) | (206,597) | | | | 2,200 | | 25,450 | 2,200 | | |
| 384 | 70,200 | 70,200 | | (619,324) | (653,821) | | | | 3,900 | | 34,496 | 3,900 | | |
| 397 | 3,495 | | | | | | | | | | | | | |
| 398 | 28,446 | | | | | | | | | | | | | |
| 487 | | | | | | | | | | | | | | |
| 507 | | 24,900 | | (261,866) | (261,866) | | | | | | | | | |
| 511 | 156,100 | 191,050 | | (3,744,343) | (5,324,858) | | | | 57,500 | | 1,580,392 | 57,500 | | |
| 512 | | | | | | | | | | | | | | |
| 534 | 149,500 | 149,500 | | 231,075 | 231,075 | | | | | | | | | |
| 616 | 29,300 | 25,300 | | (186,656) | (186,656) | | | | | | | | | |
| 661 | | | | | | | | | | | | | | |
| 765 | 1,800 | 1,850 | | (11,641) | (11,641) | | | | | | | | | |
| 772 | 189,400 | 337,200 | | (1,264,777) | (1,264,777) | | | | | | | | | |
| 1173 | | | | | | | | | | | | | | |
| 1263 | 10,900 | 10,900 | | (42,153) | (42,153) | | | | | | | | | |
| 1266 | 11,100 | 11,100 | | (64,889) | (93,268) | | | | 2,300 | | 28,379 | 2,300 | | |
| 1271 | 61,722 | 61,722 | | 341,997 | 476,905 | | | | 10,500 | | 134,908 | 10,500 | | |
| 1277 | 12,300 | 28,843 | | (72,748) | (81,573) | | | | 1,000 | | 4,156 | 1,000 | | |
| 1329 | 158,900 | 158,900 | | (1,093,423) | (1,464,104) | | | | 30,000 | | 370,680 | 30,000 | | |
| 1333 | 900 | 900 | | (13,433) | (13,433) | | | | | | | | | |
| 1359 | 20,250 | 24,050 | | (147,214) | (147,214) | | | | | | | | | |
| 1389 | 100,000 | 100,000 | | (212,552) | (212,552) | | | | | | | | | |
| 1491 | 500 | | | | | | | | | | | | | |
| 5631 | 5,500 | 7,300 | | (45,860) | (51,644) | | | | 500 | | 5,784 | 500 | | |
| 5648 | 14,000 | 32,340 | | (330,146) | (331,606) | | | | | | | | | |
| 5649 | 1,500 | 14,350 | | (35,883) | (35,883) | | | | | | | | | |
| 5651 | | | | | | | | | | | | | | |
| | 5,496,652 | 7,318,051 | | (42,290,626) | (44,845,042) | | | | 126,400 | | 2,276,536 | 126,400 | | |

# Attachment B

| Class Action | Fund Name | Fund No. | Amount | Date to Fidelity |
|---|---|---|---|---|
| Doral Financial Corp | Fidelity Advisor Floating Rate High Income Fund | 161 | $2,040.10 | 7/10/2009 |
| Doral Financial Corp | Fidelity Convertible Securities Fund | 308 | $416,335.01 | 7/10/2009 |
| Doral Financial Corp | Fidelity Convertible Securities Fund | 308 | $146,407.10 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Select Portfolio Home Finance Fund | 198 | $550,072.97 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Advisor Balanced Fund | 219 | $34,362.64 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Low Priced Stock Fund | 256 | $3,122,737.38 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Advisor Small Cap Fund | 297 | $196,168.61 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Balanced Fund | 304 | $843,583.17 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Worldwide Fund | 318 | $10,172.70 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Small Cap Independence | 336 | $152,774.31 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Tax Managed Fund | 343 | $2,280.06 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Small Cap Retirement Fund | 384 | $18,537.91 | 7/10/2009 |
| Doral Financial Corporation | Spartan Total Market Index Fund | 397 | $37,668.67 | 7/10/2009 |
| Doral Financial Corporation | Spartan Extended Market Index Fund | 398 | $107,894.77 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Select Banking Portfolio | 507 | $26,693.03 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Select Construction & Housing Portfolio Fund | 511 | $215,202.37 | 7/10/2009 |
| Doral Financial Corporation | Fidelity VIP III Balanced Fund | 616 | $9,693.51 | 7/10/2009 |
| Doral Financial Corporation | Fidelity VIP III Mid Cap Portfolio | 772 | $163,814.06 | 7/10/2009 |
| Doral Financial Corporation | Fidelity VIP Value Leaders Portfolio | 1263 | $3,615.19 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Advisor Value Leaders Fund | 1266 | $2,730.20 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Blue Chip Value Fund | 1271 | $16,764.26 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Advisor Value Fund | 1277 | $3,403.37 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Strategic Dividend and Income Fund | 1329 | $21,065.57 | 7/10/2009 |
| Doral Financial Corporation | FIMM LLC Small Mid Cap Pilot Fund | 1333 | $1,128.26 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Advisor Mid Cap II Fund | 1359 | $13,574.03 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Advisor Tax Managed Stock Fund | 5631 | $575.72 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Structured Large Value Fund | 5648 | $33,670.82 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Structured Mid Cap Value Fund | 5649 | $5,269.37 | 7/10/2009 |
| Doral Financial Corporation | ASC Wasatch | 30726 | $45,471.65 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Select Equity Small Cap Pool | 50975 | $27,964.76 | 7/10/2009 |
| Doral Financial Corporation | FMTC Select Small Mid Growth Fund | 52086 | $50,767.84 | 7/10/2009 |

| | | | | |
|---|---|---|---|---|
| Doral Financial Corporation | Kemper Inv Life Ins | 52092 | $5,443.27 | 7/10/2009 |
| Doral Financial Corporation | NTCA Select Large Cap | 52172 | $23,548.88 | 7/10/2009 |
| Doral Financial Corporation | Presbyterian Church Pension | 52195 | $42,370.22 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Northstar Fund Canada | 60087 | $217,986.75 | 7/10/2009 |
| Doral Financial Corporation | Fidelity Small Cap America Fund | 60327 | $33,448.60 | 7/10/2009 |