# Exhibit G

# In The Matter Of:

## *UNITED STATES OF AMERICA v.*
## *MARIO S. LEVIS A/K/A SAMMY LEVIS*

*VOLUME 19*
*April 22, 2010*

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 04mjlevf.txt, Pages 3013-3239 (227)

**Word Index included with this Min-U-Script®**

Page 3097

[1] A. Yes, it did.
[2] Q. The assumption that you used was one given to you
[3] specifically to use in performing this particular calculation?
[4] A. That's correct.
[5] Q. Were you also asked to perform any analysis involving
[6] Doral's financial statements?
[7] A. Yes, I was.
[8] Q. And how did you go about doing that?
[9] A. I reviewed Doral's filings with the Securities and Exchange
[10] Commission.
[11] Q. And could you walk us through, in general terms, what you
[12] did to perform that analysis?
[13] A. In general terms, I looked at the company's annual report
[14] and contained in that are various pieces of financial
[15] information, including the income statement, which breaks down
[16] the prior year's revenue net profit for the firm. I used that.
[17] I also used the board of directors' report, which contains some
[18] additional detailed information. But primarily the SEC
[19] filings.
[20] Q. And if you look at Government Exhibits 812 and 813, do you
[21] recognize those?
[22] A. Yes, I do.
[23] Q. And how do you recognize them?
[24] A. I created them.
[25]     MR. STELLMACH: Your Honor, the government offers 812

Page 3098

[1] and 813.
[2]     MR. SREBNICK: Judge, I do have an objection or a
[3] concern about those two exhibits, I would ask that we go one by
[4] one and lay a foundation because I'm not sure what they say.
[5]     THE COURT: All right. 812, I think he has said where
[6] he got the materials.
[7]     MR. STELLMACH: He has, your Honor, and that he
[8] created these specific charts.
[9]     MR. SREBNICK: Forgive me. I think he said what the
[10] source is but hasn't told us what it is.
[11]     THE COURT: What do you mean? I don't understand your
[12] problem.
[13]     MR. SREBNICK: 812 is a chart that he got some
[14] numbers, we don't know what the numbers are yet. From the
[15] titles I have concerns about what this represents. I don't
[16] know what it represents.
[17]     THE COURT: Look, I'm going to overrule the objection.
[18] I think it's pretty plain. Objection overruled. 812 and 813
[19] are received.
[20]     (Government's Exhibits 812-813 received in evidence)
[21] BY MR. STELLMACH:
[22] Q. Mr. Manchak, if we could turn to Government Exhibit 812,
[23] first, and if you could, tell us where did you obtain the
[24] information that you used to create this spread sheet.
[25] A. The information used to create this spread sheet came from

Page 3099

[1] two sources, the 10K reports, the firm's annual reports, and
[2] the board of directors' reports.
[3] Q. And the title of the chart is comparison of IO sales to
[4] gross income.
[5] A. Correct.
[6] Q. What is gross income?
[7] A. Gross income is the top number, the very top income number
[8] for the two segments that was represented by Doral's
[9] financials. Their financials are broken down into two
[10] segments. One is interest income and noninterest income. From
[11] the financials before subtracting depreciation, income taxes,
[12] amortization, and other expenses, there is a top number that
[13] says, look, this is the gross amount of what we took in for
[14] that segment.
[15] Q. And where did you obtain the IOs on loan sales number?
[16] A. The IOs on loan sales numbers came from two places,
[17] actually, in the footnotes of the financials, but also in the
[18] board of directors' reports.
[19] Q. So the red bar that we see depicted there, and this is in
[20] hundreds of millions of dollars, is that right, for example, if
[21] we look at 2001, the IOs on loan sales number is 141 million
[22] plus, is that right?
[23] A. That's correct.
[24] Q. And the gross income number for that year is 576 million,
[25] is that right?

Page 3100

[1] A. That's correct.
[2] Q. So is the 141 subsumed within that 576?
[3] A. It is.
[4] Q. So you just broke it out as a separate bar to show its
[5] relationship to the overall gross income for that year?
[6] A. Yes. For example, in 2001, the IO sales represented
[7] approximately 25 percent of the gross income that Doral
[8] reported.
[9] Q. And that's the number directly beneath the red bar that we
[10] see there?
[11] A. That's correct.
[12]     THE COURT: Let me ask you this. When mortgages were
[13] sold and when Doral kept the right to keep some of the interest
[14] there would be cash coming in each year or maybe each month,
[15] representing Doral's portion of the interest, right?
[16]     THE WITNESS: I believe so.
[17]     THE COURT: Okay. Now, Doral also, I mean, so they
[18] were receiving some cash, but the evidence, and we've had lots
[19] of evidence, Doral made what we call an estimate, there was a
[20] figure derived for the present value of that expected interest.
[21] Do you know what I'm talking about?
[22]     THE WITNESS: Vaguely, yes. I've seen some reference
[23] to that in the financials. I would, I would be speculating if
[24] I was to try to explain how they did that.
[25]     THE COURT: What I want to know is what the 141 and

Page 3109

[1]     (At the side bar)
[2]     THE COURT: Okay.
[3]     MR. STELLMACH: So, your Honor, this is just the stock
[4]  chart --
[5]     THE COURT: What's the objection?
[6]     MR. SREBNICK: I think the government's trying to
[7]  offer the stock price of Doral through a period of time. Until
[8]  when, I'm not sure. I can't read the chart.
[9]     MR. STELLMACH: It goes to the end of 2005. Look, we
[10] can cut it off.
[11]    THE COURT: I don't even know what this is.
[12]    MR. STELLMACH: It's just the stock price, your Honor.
[13]    THE COURT: The stock price?
[14]    MR. STELLMACH: Of Doral. This goes, we believe, to
[15] materiality, because once the disclosures are made about the
[16] actual value of the IOs --
[17]    THE COURT: I'll receive it. I'll receive it. Okay.
[18]    (Continued on next page)

Page 3110

[1]     (In open court)
[2]     MR. STELLMACH: Your Honor, the government offers 818
[3]  and 819.
[4]     THE COURT: Received.
[5]     (Government's Exhibits 818-819 received in evidence)
[6]  BY MR. STELLMACH:
[7]  Q. Mr. Manchak, could you explain to us what time period this
[8]  covers?
[9]  A. This covers January 2, 2001, through December 30, 2005.
[10]    THE COURT: What does it deal with?
[11]    THE WITNESS: This is the stock price chart of Doral.
[12] BY MR. STELLMACH:
[13] Q. And if we go back to the larger picture, there are two
[14] graphs depicted, one at the very bottom, in white, and the
[15] other one at the top, in blue. Could you explain what the one
[16] at the bottom is?
[17] A. The bottom chart is the daily volume in the trading of the
[18] security which corresponds to the daily price movement, which
[19] is depicted in the top part of the chart.
[20] Q. When you say volume, could you explain what you mean by
[21] volume in a stock?
[22] A. Volume in a stock is a number of trading in shares on any
[23] given day.
[24] Q. So where it spikes, that's where there's a lot of shares
[25] changing hands?

Page 3111

[1]  A. Yes, that's correct.
[2]  Q. And could you just walk us through the stock price chart at
[3]  the top?
[4]  A. Sure, the symbol for Doral, DRL, this is a daily depiction
[5]  over the time period of the range that was input, the last, the
[6]  high occurred on December 8, 2003, when the stock hit 52.
[7]     MR. STELLMACH: Maybe if we could have the dates
[8]  reflected, even if we have to go back to the full screen, just
[9]  so it makes a little bit more --
[10] Q. There are two dips. Well, there are three sharp dips.
[11] Could you explain what the first two are?
[12] A. Yes. The first two, based upon my research, were caused by
[13] stock splits.
[14] Q. What's a stock split?
[15] A. A stock split occurs when the company decides, for whatever
[16] reasons, to issue more shares to the existing shareholders. In
[17] this case, on both instances, in 2002 and 2003, Doral issued a
[18] three for two stock split, which meant if you owned two shares
[19] of Doral, you now owned three shares of Doral.
[20]    MR. STELLMACH: Just before we leave the chart, if we
[21] could enlarge the section dealing with 2005, from top to
[22] bottom.
[23] Q. The decline that we see there, do you recall approximately
[24] what date that corresponds to?
[25] A. That was approximately around March 15, 2005.

Page 3112

[1]  Q. And how did the stock price behave after that date?
[2]  A. It dropped precipitously on or about that date down to
[3]  about 20, and then fell further after that.
[4]  Q. And one last chart, Mr. Manchak --
[5]     THE COURT: On this 818, I guess there are little date
[6]  figures down at the bottom, is that right?
[7]     MR. STELLMACH: That's right, your Honor. That
[8]  corresponds to both the volume and the stock price above.
[9]     THE COURT: I see 2005.
[10]    THE WITNESS: Your Honor, if you look at 819, which is
[11] in black and white, it might be a little easier for you to see.
[12] The bottom axes, 2001 through 2005, albeit blurry.
[13]    THE COURT: All right. Go ahead.
[14] BY MR. STELLMACH:
[15] Q. One last chart, Mr. Manchak. Were you asked to do anything
[16] regarding the stockholdings of the defendant and his family in
[17] Doral?
[18] A. I was.
[19] Q. What were you asked to do?
[20] A. I was asked to take the information that was reflected in
[21] the proxy statements and place it into a chart as a visual aid.
[22] Q. What's a proxy statement?
[23] A. A proxy statement is a report filed with the SEC each year
[24] prior to the annual shareholder meeting. The proxy statement
[25] contains various information, but primarily deals with a

# Exhibit H

Case 1:08-cr-00181-TPG   Document 100-12   Filed 11/10/10   Page 5 of 19

In The Matter Of:

*UNITED STATES OF AMERICA v.*
*MARIO S. LEVIS A/K/A SAMMY LEVIS*

*VOLUME 2*
*March 30, 2010*

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 03uwlevf.txt, Pages 127-270 (144)

**Word Index included with this Min-U-Script®**

Page 219

[1] Q. That is what?
[2]    THE COURT: Called the interest only, right?
[3]    THE WITNESS: Yes.
[4] BY MR. BRAUN:
[5] Q. That piece sometimes is called an interest-only strip?
[6] A. Yes, it is.
[7] Q. Is it also referred to sometimes as excess servicing?
[8] A. Excess servicing, interest-only strip, high yield, they're
[9] all basically the same thing.
[10] Q. You said that typically the portion of the interest that is
[11] passed through to the buyers, you said typically it's tied to a
[12] benchmark interest rate called LIBOR?
[13] A. Correct.
[14] Q. Is that always the case?
[15] A. No, that is not always the case.
[16] Q. In some instances were the pass-through portions of these
[17] transactions fixed at a certain number?
[18] A. Yes, there were instances where this number would be fixed
[19] and there were instances where these variables would be tied to
[20] this benchmark.
[21] Q. That benchmark, what is that?
[22] A. LIBOR is basically the interest rate that we lend to each
[23] other at. So they use that as a benchmark and add a certain
[24] percentage to make a little bit of money, I guess.
[25] Q. With the floating rate transactions --

Page 220

[1] A. Right.
[2] Q. -- where that pass-through portion was not fixed at a
[3] certain number --
[4] A. Correct.
[5] Q. -- what would happen if interest rates went down?
[6] A. If interest rates went down, you would basically see the
[7] LIBOR number tied to interest rates move down, so you have a
[8] smaller red piece and a larger blue piece so that the size of
[9] the item would grow.
[10] Q. What happens if the opposite takes place, if interest rates
[11] rise?
[12] A. If interest rates rose, you would see LIBOR would move up.
[13] You have a larger red piece, a smaller green piece. The value
[14] of the IO would be smaller.
[15] Q. Thank you, Mr. Okusanya. You can return to the witness
[16] stand now. Thank you.
[17] A. Sure.
[18]    (Pause)
[19] BY MR. BRAUN:
[20] Q. You began your work to research Doral in 2004?
[21] A. (No response)
[22] Q. You took -- you have to answer audibly.
[23] A. Yes.
[24] Q. You made a trip down there in the Summer of 2004?
[25] A. That is correct.

Page 221

[1] Q. Do you recall what was happening with interest rates during
[2] that period of time?
[3] A. Yes, I do. Interest rates had started to rise.
[4] Q. Where had they been?
[5] A. Interest rates had been, around 2003, had been historically
[6] low of about 1 percent, and then the Fed had started tightening
[7] rates and they had been rising since then.
[8] Q. When you refer to the Fed, what are you talking about?
[9] A. I am talking about the Federal Reserve.
[10] Q. Was it a surprise at that time that interest rates were
[11] rising?
[12] A. No.
[13] Q. Why not?
[14] A. It wasn't a surprise because again the rates had been in an
[15] historical low in 2003. The Federal Reserve that is
[16] responsible for setting the interest raise were vocal they were
[17] going to be raising rates on a going-forward basis.
[18] Q. In the course of your research in studying financial
[19] institutions, have you become familiar with something called
[20] interest rate risk?
[21] A. Yes, I did.
[22] Q. Can you describe what interest rate risk is, Mr. Okusanya.
[23] A. Interest rate risk basically is an assessment of how most
[24] companies do to try to figure out how would interest rates,
[25] whether they're going up or going down, how would that affect

Page 222

[1] their overall profitability or their earnings.
[2] Q. Do banks have a lot of assets and liabilities that are tied
[3] to interest rates in one way or another?
[4] A. Yes, they do.
[5] Q. In covering a publicly-traded financial company,
[6] publicly-traded bank, and trying to figure out whether it would
[7] be a good investment, is interest rate risk something that you
[8] consider?
[9] A. It is probably one of the most critical things I would
[10] consider.
[11] Q. Why is it so important, Mr. Okusanya?
[12] A. It is particularly important in financial services. Again,
[13] as you mentioned, all the assets and a lot of the liabilities
[14] are tied to interest rates, so you really need to understand
[15] how changing interest rates will affect the profitability of
[16] the entity.
[17] Q. You testified a little while ago when you were explaining
[18] the chart that with these typical transactions that Doral had
[19] with other banks in Puerto Rico that involved a floating
[20] pass-through, so where the pass-through rate is going up and
[21] down depending on what is happening with interest rates, you
[22] explained that as interest rates rose, Doral's interest-only
[23] strip would get smaller and be worth less, correct?
[24] A. That's correct.
[25] Q. And if interest rates fell, the opposite would occur,

Page 239

[1] actually a sustainable or real number.
[2] Q. You mentioned a bit earlier in your testimony something
[3] about Doral going and getting valuations of this asset from
[4] sources outside the company. Do you recall mentioning that in
[5] your testimony?
[6] A. Yes, I do.
[7] Q. Did you discuss that with members of Doral management when
[8] you visited Puerto Rico in 2004?
[9] A. Yes, I did.
[10] Q. Did you discuss it with Sammy Levis?
[11] A. Yes, I did.
[12] Q. Do you recall what Mr. Levis told you in that regard?
[13] A. Yes. Mr. Levis told me what was pretty much consistent
[14] with what they had disclosed in their 10Ks, that they did do
[15] two independent valuations of the IO strip on top of the
[16] internal one they did, and in order to be conservative, what
[17] they usually did was they would use the lowest valuation of
[18] those numbers.
[19] Q. Of those three numbers they got?
[20] A. That's correct.
[21] Q. When he told you these valuations were independent, what
[22] did that mean to you?
[23] A. It meant to me that there were third parties who were doing
[24] the valuation independent of their own internal valuation at
[25] Doral.

Page 240

[1] Q. Did Mr. Levis ever mention to you that one of the entities
[2] that provided one of these valuations had been instructed by
[3] Doral to conclude that Doral's interest-only strip was fully
[4] protected from any decrease in value due to interest rates
[5] after a certain point?
[6] THE COURT: State your question again. It's a long
[7] question.
[8] MR. BRAUN: Yes. Sorry. It was a long question.
[9] Q. In describing these independent valuations -- let me ask
[10] you first. Did he say anything about what the valuations
[11] entailed? Did he say anything about how they were being done?
[12] A. Not the independent parties. Just their own internal
[13] valuation, he did.
[14] Q. In describing the two independent valuations, did Mr. Levis
[15] ever mention to you that with respect to one of those two
[16] entities that was providing this independent valuation, that
[17] they were assuming on instructions from Doral that the
[18] pass-through portion of the interest that goes up and down with
[19] LIBOR could not go past a certain point?
[20] A. No. Not at all.
[21] Q. Not at all? Would you remember that if he said it?
[22] A. Yes, I would.
[23] Q. And why would that have stood out?
[24] A. Because the idea behind those two other parties was there
[25] would be independent valuations; they should be done

Page 241

[1] independently of what Doral was doing for their own internal
[2] valuations.
[3] Q. What does it mean for a research analyst to initiate
[4] coverage of a publicly traded company?
[5] A. Initiation of coverage is basically an analyst putting out
[6] a report with their thoughts or recommendations about the stock
[7] of a company, the first time we actually give a recommendation
[8] on the stock of a company.
[9] Q. Did you initiate coverage of Doral Financial Corporation,
[10] Mr. Okusanya?
[11] A. Yes, I did.
[12] Q. Do you recall when that was?
[13] A. That was in January of 2005.
[14] Q. Had you kept studying Doral after you went down there in
[15] the summer of 2004 and met with management?
[16] A. Yes, I had.
[17] Q. Had you continued to communicate with members of Doral's
[18] management team to obtain more information?
[19] A. Yes, I had.
[20] Q. Is that all part of the process of learning the company and
[21] making a recommendation?
[22] A. That's correct.
[23] Q. Is there anything you did prior to issuing your first
[24] report where you initiated coverage of Doral?
[25] A. Yes.

Page 242

[1] Q. What do you recall doing at that time?
[2] A. After I had written my first draft of the report, there
[3] were a couple of peer reviews that were done, you know, by some
[4] of my other, some other research analysts at UBS, to
[5] cross-check my work and look at the reports. They asked a
[6] bunch of follow-up questions, and then based on those follow-up
[7] questions, I also had follow-up conversations with the
[8] management team at Doral Financial just to make sure that I
[9] dotted my I's and crossed my T's.
[10] Q. And who do you recall speaking to as part of that process?
[11] A. Primarily, Sammy Levis, as well as Ricardo Melendez, the
[12] CFO.
[13] Q. In your conversations with Sammy Levis, do you recall
[14] discussing the subject of these contractual caps that were part
[15] of Doral's agreements with the banks buying these pools of
[16] mortgage loans?
[17] A. There was a general conversation along those lines.
[18] Q. Can you describe the substance of that conversation and
[19] what Mr. Levis said to you in that regard?
[20] A. Yes. Again, given that, with interest rates, the value of
[21] the IO changes dramatically and the idea that the company had
[22] stated in their financials that there were caps that protected
[23] them against that, I wanted to get a better sense of just, you
[24] know, how many of those caps actually existed, where there was
[25] a lot of these contracts, and typically at what point did those

Page 267

[1] Q. There's one number here we haven't explained, which is the
[2] $4.55 2005 estimate?
[3] A. Correct.
[4] Q. What's that an estimate of?
[5] A. The estimate is how much we thought the company could make
[6] earnings-wise in 2005.
[7] Q. And is that earnings per share?
[8] A. Yeah, it's an earnings per share number.
[9] Q. And you're still sticking with your target price of the
[10] stock?
[11] A. That is correct.
[12] Q. From your initiation report eight days earlier?
[13] A. Yes. We still stayed with our $60 price target.
[14] Q. Your first READ report indicates that you have some
[15] concerns?
[16] A. That is correct.
[17] Q. Can you describe, Mr. Okusanya, generally what your
[18] concerns were in reaction to the fourth quarter earnings press
[19] release that we saw a short time ago?
[20] A. Yes. Just given in the fourth quarter that they're taking
[21] such a large write-down on the interest-only strips and given
[22] my understanding that the interest-only strips were fairly,
[23] were well protected against rising interest rates, you know, I
[24] felt the two pieces of information didn't quite line up. And
[25] as a result of that, I had some concerns that continued rising

Page 268

[1] interest rates could result in more write-downs going forward.
[2] Q. Why did you think the variable floating rate IOs were
[3] generally protected from rising interest rates?
[4] A. My thoughts were based on the earlier conversations I had
[5] with management where I was given, I was given the sense that a
[6] lot those IOs or the contracts that created the IOs had had
[7] caps in them that protected them against rising interest rates.
[8] Q. Would those be caps in the contracts like you described
[9] earlier?
[10] A. That is correct.
[11] Q. Did you succeed in speaking to somebody from Doral's
[12] management on January 18 of 2005?
[13] A. Yes, I did. I spoke with Sammy that evening.
[14] Q. With Sammy Levis?
[15] A. That is correct.
[16] Q. Do you recall the conversation that you had with him on
[17] that date?
[18] A. Yes, I do.
[19]     THE COURT: On what date are we talking about?
[20]     MR. BRAUN: This is January 18 of 2005, the same date
[21] that Mr. Okusanya issued that first read report we just spoke
[22] of.
[23]     THE COURT: The first report after the earnings came
[24] out?
[25]     MR. BRAUN: Yes. The earnings come out on the 18th.

Page 269

[1] He issues his first read report. He says he's got a call
[2] placed to management, and this is the conversation that happens
[3] on that day, later on.
[4] Q. Is that correct?
[5] A. That is correct.
[6]     THE COURT: It is almost 4:30. Let's break before we
[7] get into that. I'll ask the jury to be in at 10:15 tomorrow,
[8] 10:15, please.
[9]     (Proceedings adjourned to March 31, 2010, at 10:15
[10] a.m.)

Page 270

INDEX OF EXAMINATION
Examination of:                    Page
OMOTAYO OKUSANYA
Direct By Mr. Braun .............. 195
     GOVERNMENT EXHIBITS
Exhibit No.                    Received
6202 and 6203  ................. 205
1505   .................... 207
1506   .................... 210
8002   .................... 217
8001   .................... 217
4007 A  .................... 225
1509   .................... 244
194   .................... 258
1529   .................... 263

**In The Matter Of:**

*UNITED STATES OF AMERICA v.*
*MARIO S. LEVIS A/K/A SAMMY LEVIS*

*VOLUME 3*
*March 31, 2010*

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 03VJLEVF.txt, Pages 271-449 (179)

**Word Index included with this Min-U-Script®**

Page 291

[1] investors in the mortgage pool."
[2]     Who are those investors?
[3] A. Those investors typically were other commercial banks in
[4] Puerto Rico. These investors are people who buy, who set up
[5] these contracts with Doral to buy these mortgages from the
[6] company.
[7] Q. All right. So you're not talking about investors out in
[8] the investing community?
[9] A. No, I'm not.
[10] Q. Not the investors who are receiving your reports?
[11] A. No, I'm not.
[12] Q. Can you continue with the next paragraph, sir.
[13] A. The next paragraph, "Doral assesses the fair value of its
[14] IO portfolio every quarter, and gets at least three estimates
[15] for the fair value during the assessment period. We believe
[16] management went with the most conservative estimates in the
[17] fourth quarter of 2004. Thus, even though the excess servicing
[18] assets with floating rates could indeed lose value as rates
[19] rise in 2005 due to spread compression, we think management has
[20] already taken an appropriate charge against these future
[21] losses."
[22] Q. Can you explain what you mean by that, management taking an
[23] appropriate charge against these future losses?
[24] A. What I meant by that was again given my understanding from
[25] Sammy that they had now put in a much higher interest rate

Page 292

[1] assumption into their models, the model of the new valuation
[2] they had for the IOs, you know, incorporated this expectation
[3] of higher interest rates within their models and their
[4] assumptions were even higher than what the overall market was
[5] thinking would happen with interest rates.
[6]     It seemed like they plucked all of that in their
[7] models in anticipation of that.
[8] Q. Could you continue with the next paragraph.
[9] A. We believe that the most conservative assumptions about
[10] interest rate increases which could result in a 97.5 million
[11] write-down in the current quarter would require the company to
[12] expect interest rates to rise significantly in the near future.
[13] Thus, as the earnings release states, if contrary to what is
[14] generally expected, LIBOR decreases, a portion of the
[15] impairment charges on the value of the IOs could be recovered.
[16] Q. Could you read the next sentence, sir.
[17] A. "We thus expect that there is potential for a portion of
[18] the charge to be recovered if rates do not rise as quickly as
[19] anticipated in 2005."
[20] Q. Can you explain that last sentence, please, what your
[21] thinking was in that regard.
[22] A. Yes. My thinking in regards to that was if their model had
[23] a 4 percent expectation in it, and the overall market was
[24] expecting 3-month LIBOR interest rates to be lower than that,
[25] if the market was, indeed, right and the model had too high an

Page 293

[1] interest rate expectation, they would be able to bring the
[2] interest rate down in the model, and that increases the value
[3] of the IOs, so a portion of what they wrote off before they
[4] would recover it as a result of that process.
[5] Q. Can you turn the page to Page 7 of your report.
[6] A. Yes.
[7] Q. Do you see the second bullet point on that page,
[8] Mr. Okusanya?
[9] A. Yes, I do.
[10] Q. Is that a restatement of the point you just made in your
[11] testimony?
[12] A. Yes, it is.
[13] Q. Mr. Okusanya, in this report you're expressing your view
[14] there won't be additional write-downs of the interest-only
[15] strip portfolio, right?
[16] A. That is correct.
[17] Q. And there may even be the opposite of that, a recovery of
[18] the one write-down that they had announced?
[19] A. That is correct.
[20] Q. If, contrary to what you were expecting and understanding
[21] based on everything you knew, there were additional write-downs
[22] to the interest-only strips going forward, would that be a
[23] concern?
[24] A. Yes, it would.
[25] Q. Can you describe the importance of that concern? Would it

Page 294

[1] be significant?
[2] A. It would be very significant.
[3] Q. And why?
[4] A. It would be significant from the perspective of, if you had
[5] further write-downs, then in that situation you would expect
[6] some type of impact of the stock because the earnings of the
[7] company would look worse than I was initially anticipating.
[8]     THE COURT: Impact on profits?
[9]     THE WITNESS: On profits, correct.
[10] BY MR. BRAUN:
[11] Q. Mr. Okusanya, after you issued this report on the 18th,
[12] were you in communication with any investors regarding Doral?
[13] A. I was in communication with several investors in regards to
[14] Doral.
[15] Q. What were you hearing from the investors?
[16] A. The investors were raising very similar concerns that I had
[17] in regards to what the write-down meant and how the company was
[18] valuing its interest-only strips.
[19] Q. What did you do with this January 18th report as far as
[20] communications with Doral management, Mr. Okusanya?
[21] A. I believe I sent a copy to management as well.
[22] Q. Was that typically your practice, Mr. Okusanya?
[23] A. Yes, it is. For most management teams I usually send them
[24] copies of my reports and ask for any feedback in case I got
[25] anything wrong in it.

**Page 295**

[1] Q. Did you speak to anyone in Doral management again on the
[2] 19th of January, the next day?
[3] A. I believe I did, yes, I did.
[4] Q. Who do you believe you spoke to on the 19th of January?
[5] A. I spoke to Sammy Levis again on the 19th.
[6] Q. What do you recall about that conversation, Mr. Okusanya?
[7] A. The conversation was very, very similar to the conversation
[8] I had on the 18th. What precipitated the conversation was just
[9] I was getting a lot of questions from investors and I just
[10] wanted to clarify my understanding of how the IO strips were
[11] valued.
[12] Q. Did you describe your understanding as set forth in your
[13] January 18th report?
[14] A. Yes, I did.
[15] Q. What was Mr. Levis' response?
[16] A. Mr. Levis very much repeated what he told me on the 18th in
[17] regards to what the cause of the write-down in the fourth
[18] quarter was, which was the change in assumption about interest
[19] rates.
[20] Q. Did you continue hearing concerns from investors?
[21] A. Yes, I did.
[22] Q. As a result of that, did you take any action yourself?
[23] A. Yes, I did. I put out another note I believe a day or two
[24] later based on again further questions I was asking Sammy about
[25] the IOs on the 19th.

**Page 296**

[1] Q. Why did you put out another report so quickly, a day or two
[2] later?
[3] A. The stock had been reacting very negatively to the press
[4] release. I think the stock was probably down 10 to 12 percent
[5] in two days. The volume on trading of it had gone up about 10
[6] times. My phone was ringing off the hook. Everyone wanted to
[7] have answers on this issue. So I felt it was pertinent to try
[8] to address it again through a new report.
[9] Q. Can you turn your attention now to Government Exhibit 1512
[10] that has been marked for identification. It should be in your
[11] binder.
[12] A. Yes.
[13] Q. Do you recognize this document?
[14] A. Yes, I do.
[15] Q. What is it, Mr. Okusanya?
[16] A. The document is the report that I did put out on the 20th
[17] of January again addressing the fourth quarter results of Doral
[18] Financial.
[19]    MR. BRAUN: Your Honor, the government moves this into
[20] evidence.
[21]    THE COURT: Received.
[22]    (Government Exhibit 1512 received in evidence)
[23] BY MR. BRAUN:
[24] Q. Mr. Okusanya, starting on the first page, do you see over
[25] on the right-hand side the date of your report?

**Page 297**

[1]    THE COURT: What is this number again?
[2]    MR. BRAUN: This is 1512, your Honor, 1-5-1-2.
[3]    THE COURT: All right.
[4]    THE WITNESS: Yes, I do see it.
[5] BY MR. BRAUN:
[6] Q. When did the report come out, Mr. Okusanya?
[7] A. The report came out on the 20th of January, 2005.
[8] Q. Does the report indicate the price of the stock at that
[9] time?
[10] A. Yes, it does.
[11] Q. What price was a share of Doral stock trading at on January
[12] 20th?
[13] A. Doral was trading at $44 on January 20th.
[14] Q. Do you recall where it had been a couple of days earlier
[15] before that fourth quarter press release?
[16] A. Yes, it was slightly over $49.00.
[17] Q. Can you look at the second point you make on the first page
[18] and read that paragraph, please, Mr. Okusanya.
[19] A. The second paragraph, "We believe that the IO write-down
[20] was strictly as a result of management using the tax windfall
[21] as an opportunity to conservatively value its IO strips. We
[22] found no evidence that it resulted from an ineffective hedging
[23] strategy. We've done the math and believe our theory checks
[24] out."
[25] Q. In the next paragraph, Mr. Okusanya, do you address the

**Page 298**

[1] prospect of additional write-downs?
[2] A. Yes, I do.
[3] Q. What do you say in that regard?
[4] A. In that paragraph I said, "We also believe that the
[5] probability of continued large IO write-downs in '05 is reduced
[6] given the conservative stance taken in fourth quarter 2004."
[7] Q. Can you turn to the next page.
[8] A. Yes.
[9] Q. Can you remind us what the buy 2 rating you refer to is in
[10] the heading there?
[11] A. The buy 2 rating is again our recommendation on the stock.
[12] We are still recommending investors to buy it, but again our
[13] level of conviction is a 2, which is a lower level of
[14] conviction around that rating.
[15] Q. In that paragraph do you describe what had happened to
[16] Doral stock since the press release?
[17] A. Yes, I do.
[18] Q. What do you say about that?
[19] A. I said, "After market closed on January 18th, 2004, Doral
[20] stock experienced an 11 percent drop in value and an 18 percent
[21] increase in daily trading, 18 times increase in daily trading
[22] volume during the trading hours on January 19th. We believe
[23] the significant sell-off was due to concerns about two large
[24] lumpy items in fourth quarter earnings."
[25] Q. You describe those two items we discussed?

Page 315

[1] Q. And those transactions were then creating the IOs?
[2] A. That is correct.
[3] Q. So focusing on your second question in your February 15
[4] e-mail to Mr. Levis, you were saying what is typical cap on the
[5] pass-through rate. Again, what kind of cap are you referring
[6] to there, Mr. Okusanya?
[7] A. These are contractual caps; they're actually written in the
[8] contracts that are negotiated between Doral and the buyer of
[9] these loans.
[10] Q. Can you read Mr. Levis' response on the issue of -- it's
[11] not long. Why don't you read the entire response. But I want
[12] to stop you on the piece after the MSR.
[13] A. Okay. Response, "Tayo, in nonconforming loans, we charge
[14] .25 percent servicing fee while in the FHA/VA GNMA, we charge
[15] .44 basis points. In Fannie Mae and FHLMC conforming, we also
[16] charge .25 basis points. There have been instances in the past
[17] that for both nonconforming and conforming, we have charged
[18] .375 percent, but this is the exception rather than the rule."
[19] Q. That's all about that little gray strip at the top of the
[20] illustration, correct?
[21] A. Correct.
[22] Q. All right. Your second question related to the caps in the
[23] contracts between Doral and the other Puerto Rican banks?
[24] A. That is correct.
[25] Q. Does he respond to that question in the rest of his

Page 316

[1] message?
[2] A. Yes, he does.
[3] Q. What does he say?
[4] A. He says, "Regarding caps, they are all over. But a typical
[5] cap is around 250 basis points above the initial variable net
[6] yield paid to investors. In all events, these caps are
[7] significantly lower than the WAC of the loans. So at all
[8] times, Doral will enjoy a hefty positive spread."
[9] Q. I want to focus your attention on the sentence, "But a
[10] typical cap is around 250 basis points." So what percent is
[11] that?
[12] A. 250 basis points is 2-1/2 percent.
[13] Q. Typical cap is around 2-1/2 percent above the initial
[14] variable net yield paid to the investors. Can you explain that
[15] part of the sentence, "initial variable net yield paid to the
[16] investor"?
[17] A. Yes. This is very much the same language we saw in the
[18] example of the contract that we were looking at yesterday.
[19]    MR. BRAUN: Okay. Perhaps it would be helpful to put
[20] that up for a moment. That was the second page of Government
[21] Exhibit 4007A, which is in evidence.
[22]    Can you enlarge the language in the bottom of
[23] subparagraph A there.
[24] Q. Mr. Okusanya, is this what you had in mind?
[25] A. That's correct.

Page 317

[1] Q. And can you walk us through this language again? Even
[2] without reading it, just tell us what this means.
[3] A. Yes. So in this example, in this contract, they're talking
[4] about a cap that is in no event greater than 2 percent above
[5] the above-mentioned LIBOR rate. So the cap in this contract is
[6] 2 percent. The e-mail Sammy sent me said a typical cap is
[7] around 2-1/2 percent and these caps are set once a contract has
[8] been negotiated and each time Doral actually sells a pool of
[9] mortgages to the buyer of the mortgages. So, if LIBOR, when
[10] the mortgages are sold, is 2 percent, the cap says even if
[11] LIBOR rates continue to rise going forward, it is capped at 4
[12] percent, so it's the 2 percent, plus in this example, 2
[13] percent, would get you to a 4 percent cap on LIBOR.
[14]    THE COURT: In other words, if LIBOR is 2 percent at
[15] the time of the contract --
[16]    THE WITNESS: Right.
[17]    THE COURT: -- then the cap will be 2 percent above
[18] that, or 4 percent?
[19]    THE WITNESS: That is correct.
[20]    THE COURT: Okay. Go ahead.
[21] BY MR. BRAUN:
[22] Q. Yes. One small point, Mr. Okusanya. At the bottom of that
[23] paragraph --
[24] A. Yes.
[25] Q. -- in referring to the LIBOR that forms the basis for the

Page 318

[1] pass-through rate, so what you're adding the 2 percent to in
[2] this instance --
[3] A. Right, in this paragraph --
[4] Q. I'm sorry. What I'd like you to explain is when the LIBOR
[5] gets set and it says something about when the seller informs
[6] the buyer that it has formed each group of 25 million is going
[7] to be delivered?
[8] A. Correct, correct. So when Doral, in this contract, when
[9] Doral, who is the seller, informs the buyer that they have
[10] formed a pool of mortgages with a total value of $25 million,
[11] that's when LIBOR is set for that pool, that's when the LIBOR
[12] rate on the pass-through rate is set for that pool of assets.
[13] And then the maximum interest rate, again, which is the cap, is
[14] also determined at that same time. In this example, once
[15] you've set your LIBOR, you know the cap is going to be 2
[16] percent above that LIBOR rate.
[17] Q. Okay. So if that LIBOR, when Doral says we've got 25
[18] million to give you in loans --
[19] A. Right.
[20] Q. -- if LIBOR at that point is two, you add two to that, you
[21] get four, and that's as high as it's ever going to go?
[22] A. And that's as high as LIBOR can go in that contract.
[23] Q. Or it's as high as the pass-through rate?
[24] A. I'm sorry. As high as the pass-through rate can go in that
[25] contract.

Page 323

[1] they pool these mortgages together, the WAC is the average
[2] interest rate on those pool of mortgages which they are now
[3] selling to a third party.
[4]     THE COURT: So weighted-average --
[5]     THE WITNESS: Coupon.
[6]     THE COURT: -- coupon. Coupon. Okay. Meaning the
[7] interest rate that the borrower, the average of what the
[8] borrowers are paying.
[9]     THE WITNESS: Correct.
[10]    THE COURT: Let's take our morning recess and we'll
[11] start again at 12 and have an hour before lunch.
[12]    (Recess)
[13]    THE COURT: Let me just say Friday we will sit a half
[14] a day. What I would like to do on Friday is to run until 1:30,
[15] but we'll adjourn at that time for the weekend.
[16]    All right. Let's go ahead. Thank you.
[17] BY MR. BRAUN:
[18] Q. Mr. Okusanya, can you turn back to Government Exhibit 1514,
[19] the February 15 e-mail that we were discussing before the
[20] break?
[21] A. Yes.
[22] Q. I'd actually like you to step down and come back to this
[23] illustration that we were looking at on the screen a moment
[24] ago. This is Government Exhibit 8001. At the end of his
[25] message to you, Mr. Levis says, "In all events, these caps are

Page 324

[1] significantly lower than the WAC of the loans, so at all times
[2] Doral will enjoy a hefty and positive spread."
[3] A. That's correct.
[4] Q. Can you explain your understanding of that comment and what
[5] meaning it would have for the interest-only strip?
[6] A. Sure. So in this example, the green portion is the IOs.
[7] You have a pass-through rate, again, that's LIBOR plus some
[8] percent, and then you have a cap. That's 250 basis points
[9] above this. So if you have a cap at somewhere around here,
[10] meaning lower than this WAC, no matter what happens with LIBOR,
[11] what the buyer of the loans is getting will get capped at a
[12] particular point. And so you would always have this, a fairly
[13] large green piece or fairly large IO, if the cap is much lower
[14] than this weighted-average coupon. If the cap is higher and
[15] closer to this number, then you get a smaller IO piece. So to
[16] create a large value for the IOs, you want to have your caps as
[17] low as possible to protect yourself from LIBOR going up.
[18] Q. Thank you, sir.
[19]    MR. BRAUN: If we could put that illustration on the
[20] screen. Thank you.
[21] Q. Mr. Okusanya, if the cap were not significantly lower than
[22] the WAC, if it were instead at the WAC, to what extent --
[23]    THE COURT: Wait a minute. What's the question again?
[24] If what?
[25] BY MR. BRAUN:

Page 325

[1] Q. If the cap were not significantly lower than the WAC --
[2]    THE COURT: If the cap were not?
[3]    MR. BRAUN: Correct.
[4]    THE COURT: Start again.
[5] BY MR. BRAUN:
[6] Q. Instead of a cap significantly lower than the WAC, if there
[7] were a cap at the weighted-average coupon, at the WAC, to what
[8] extent would that protect the value of the IO from rises, from
[9] increases in interest rates?
[10] A. There would be less protection in that scenario, because if
[11] you look at the graph, and we talk about a cap that's all the
[12] way up here, close to the WAC, or at the WAC, what you're going
[13] to see happen is, if you add interest rates, LIBOR keep rising,
[14] it could keep eating into the green portion, keep eating into
[15] it until you finally hit the WAC and then the whole value of
[16] the IO disappears.
[17] Q. Would a cap at the weighted-average coupon protect the IO
[18] from additional impairments, additional write-downs during this
[19] early 2005 time period we're talking about?
[20] A. Would a cap at -- no, it wouldn't.
[21] Q. And why is that?
[22] A. Again, because expectations were that interest rates would
[23] keep rising, if the cap is all the way at the top, where the
[24] WAC is, and LIBOR kept rising, the green portion or the IO
[25] portion, you would see the valuation continue to get smaller

Page 326

[1] and smaller as interest rates kept rising. So you would expect
[2] more write-downs in that scenario.
[3] Q. Mr. Okusanya, during this period of time, February of 2005,
[4] did you continue working on your coverage of Doral?
[5] A. Yes, I did.
[6] Q. What was the focus of your work during that period of time?
[7] A. Still a lot of focus in regards to the IOs and basically
[8] trying to understand the interest rate risk associated with
[9] them.
[10] Q. Why were you --
[11]    THE COURT: Wait a minute. Wait a minute. We want to
[12] hear your whole testimony. If you drop your voice, we don't
[13] hear you. So give us the benefit of your whole answer.
[14]    THE WITNESS: Sure. During that period, I was still
[15] focused heavily on doing analysis around the interest-only
[16] strips, or the IO strips, or the IO strips, and the potential
[17] impact of interest rates on the valuations of the IOs.
[18] BY MR. BRAUN:
[19] Q. Why did you continue to focus on that issue, Mr. Okusanya?
[20] A. Still very much for the same reasons. A lot of investor
[21] interest around the stock. The stock, you know, had sold off
[22] significantly, and there were a lot of investors still asking
[23] questions about the IOs and concerns about further write-downs.
[24] Q. Can you now turn your attention to the document that's been
[25] marked for identification as Government Exhibit 1531?

Page 327

[1] **A.** Yes.
[2] **Q.** Do you recognize that document?
[3] **A.** Yes, I do.
[4] **Q.** What is it?
[5] **A.** The document on March 9, 2005, is another report that I put
[6] out about Doral Financial, where I did some further analysis
[7] around these issues we've been discussing earlier.
[8] **Q.** Give me just one moment.
[9]     **THE COURT:** Date again, please. Date of the report?
[10]    **THE WITNESS:** March 9, 2005.
[11] **BY MR. BRAUN:**
[12] **Q.** I'm sorry, Mr. Okusanya. You may have said this. What's
[13] the date of this report?
[14] **A.** It's March 9, 2005.
[15]    **MR. BRAUN:** Your Honor, the government moves this into
[16] evidence.
[17]    **THE COURT:** Received. 1531.
[18]    (Government's Exhibit 1531 received in evidence)
[19] **BY MR. BRAUN:**
[20] **Q.** Mr. Okusanya, where is Doral's stock trading at by March 9,
[21] 2005?
[22] **A.** The stock at this point is trading at $37.53.
[23] **Q.** The title of your report refers to digging deep into
[24] issues. What issues in particular are you digging deep into,
[25] Mr. Okusanya?

Page 328

[1] **A.** The main issue again remained the value of the
[2] interest-only strips and potential risk for further write-downs
[3] if interest rates kept rising.
[4] **Q.** Can you read the first point there on your March 9 report?
[5] **A.** The title of the first point, "Misperception on key issues
[6] creates buying opportunity.
[7]     "Doral's stock has been down sharply year to date due to
[8] concerns about its IO strip valuation, and positioning for
[9] higher rates. Our analysis indicates that these concerns are
[10] overblown. We are reiterating our buy 2 rating."
[11] **Q.** Positioning for higher rates, what sort of rates?
[12] **A.** Higher interest rates.
[13] **Q.** In the next point, you describe your view of the prospects
[14] for additional large IO write-downs.
[15] **A.** Yes, I do.
[16] **Q.** What do you say about that?
[17] **A.** It's the third point I make in that bullet, where I say,
[18] actually, it's the second bullet, but the third point I make in
[19] the second bullet, where I say, "We see less risk of large IO
[20] write-downs from rising rates."
[21] **Q.** Did the prospects of such additional write-downs continue
[22] to be a source of substantial concern for you?
[23] **A.** For myself and as well as for investors.
[24]    **THE COURT:** Wait a minute. What was your view as of
[25] this time again?

Page 329

[1]    **THE WITNESS:** My view continued to remain that we saw
[2] less risk of large IO write-downs from further increases in
[3] interest rates.
[4] **BY MR. BRAUN:**
[5] **Q.** Are you still very much focused on precisely that question?
[6] **A.** That is correct.
[7] **Q.** Can you turn to the next page of your report, page 2?
[8] **A.** Yes.
[9] **Q.** Can you read the first sentence?
[10] **A.** First sentence, "Doral's stock is down 29 percent this
[11] year, primarily due to concerns about the appropriateness of
[12] the company's IO valuation assumptions, as well as the
[13] positioning of the company for a higher interest rate
[14] environment."
[15] **Q.** What's the first sentence of your next paragraph?
[16] **A.** "Based on our analysis, we believe that concerns about the
[17] company's accounting for IO strips are overblown."
[18] **Q.** Can you read the first two sentences of the next paragraph,
[19] "We believe"?
[20] **A.** "We believe that better disclosure in the forthcoming 10K
[21] on March 15 should help alleviate perceived accounting and
[22] interest rate risks. In addition, we expect that the
[23] conference call on March 17, 2005, to discuss the 10K will
[24] serve as a catalyst for the stock."
[25] **Q.** Can you remind us, this 10K that you're expecting on March

Page 330

[1] 15, what is that?
[2] **A.** The 10K again is the annual filing that any public company
[3] files with the regulatory body, the SEC. They had completed
[4] their 2004 year, they had put out the press release, and then
[5] typically 10Ks take about 90 days later to come, which was
[6] about that March 15 date.
[7] **Q.** Were you expecting Doral's 10K to be filed on the 15th?
[8] **A.** Yes, I was.
[9] **Q.** Why was that?
[10] **A.** It was an indication from the management team that they
[11] would file it on that date.
[12] **Q.** Who on management?
[13] **A.** Specifically, Sammy Levis.
[14] **Q.** You also refer to a conference call you're expecting on
[15] March 17?
[16] **A.** That is correct.
[17] **Q.** Why were you expecting a conference call on the 17th, after
[18] the filing of the 10K on the 15th?
[19] **A.** The management team had also decided they were going to
[20] host that conference call to help investors walk through the
[21] 10K.
[22] **Q.** How did you find out about the March 17 conference call?
[23] **A.** It had been communicated to me by Sammy Levis.
[24] **Q.** Can you go to the next page of your report. There's a
[25] paragraph numbered six there, towards the top of the page.

Page 359

BY MR. BRAUN:
Q. Mr. Okusanya, can you explain what led to this e-mail.
A. Yes. In conversations I had with Sammy earlier on, they were preparing for the conference call on the 17th about the 10K, and Sammy had requested if I could send him some information about questions I had been receiving from investors about Doral and the earnings release in preparation for this conference call on the 17th.
Q. So what did you do in response to that request from Mr. Levis?
A. In response, I put together a document with various questions that I felt that investors had been asking me which I felt were pertinent for that issue to be ready to answer on the call on the 17th.
Q. Did those questions include questions about the IO valuation we have been discussing during your testimony?
A. Yes, it did.
Q. Why is that?
A. It included that. It was probably the most important thing that investors wanted answered at that point, the valuation and the IOs and the continued risk of IO write-downs if interest rates kept rising.
Q. The e-mail, did it attach your suggested questions that Mr. Levis should be prepared to address?
A. Yes, it did.

Page 360

Q. Can you turn the page of the exhibit now. Do you recognize the next few pages, Mr. Okusanya?
A. The next few pages are the write-up that I sent Sammy of the different questions that investors were concerned about.
Q. What was the first topic that you led with in putting these questions together?
A. The first topic was the IO valuation.
Q. There are some various issues related to the IO valuation that you were describing there?
A. That is correct.
Q. Can you turn the page to the next page of your list of questions.
A. Yes.
Q. At the top under 4 A, could you take a moment to look over that paragraph.
A. (Pause)
Q. Mr. Okusanya, the whole paragraph might be important for context, but the question I want to ask you relates to the end of the Paragraph 4 A, where you say also it appears that a lot of these derivitives are caps and floors on interest rates so at some point management has to actually exercise these options to protect from rising rates. Will you be able to provide any color as to when you could possibly start to exercise to lock in margins?
Do you see where I am reading?

Page 361

A. Yes, I do.
Q. These kinds of derivitives that are caps and floors, are these the same or different than the contractual caps you were describing earlier in your testimony?
A. These are different from the contractual caps.
Q. Can you explain the difference, Mr. Okusanya.
A. Yes. The contractual caps are actually built into these contracts when Doral is selling these pool of mortgages to a secondary party. These caps and floors are derivative instruments that Doral went out and actually purchased in the market.
Q. What are you asking about with respect to management's exercise of options?
A. Most of these derivitives were options, were basically options. In order for options to work, you have to make a decision whether you are going to exercise the option or not. It is very different from the contractual caps. Those are in place. You don't have to do anything versus these were management has to take some type of action to make them work.
   THE COURT: Look, I don't want to interfere with your questioning, but it does concern me if we simply slide over some of these concepts, which you're not doing, but I think you have your idea of the order of the case.
   It concerns me to wait and have any explanation of the options, derivitives, these things that have been going on. So

Page 362

I guess I have a couple of questions in my mind, but why don't you see what you could do to help us out.
   MR. BRAUN: Sure.
BY MR. BRAUN:
Q. Mr. Okusanya, see what you can do to help us out. What is the basic nature of this type of instrument, a derivative that is an option? Can you explain how that works, Options 101.
A. Sure. Options are basically instruments that their value depends on an underlying instrument. Basically what you're trying to do with an option is based on the value of the underlying instrument, you determine whether you are going to be able to make money or not by exercising that option.
Q. Okay. In order to explain that a little further, can you give us maybe a hypothetical example of the kind of option you're talking about?
A. Sure. You can talk about an option on some type -- an option on interest rates, for example. So I will buy an instrument if interest rates are roughly 5 percent.
Q. Okay.
A. If interest rates move to 6 percent, that in that situation you have to ask yourself the question do I exercise the option or not.
Q. What do you have the option to do? What are you exercising? How would it work?
A. You have the option to again buy this underlying instrument

Page 383

[1] A. That's a call option, so I have an option to buy something
[2] back. It's a call option.
[3]     THE COURT: What good would that do to Doral?
[4]     THE WITNESS: What that basically would do is the IO
[5] would disappear because the transaction that created it at the
[6] very beginning has now been reversed out because they bought
[7] the mortgages back.
[8]     THE COURT: This would be if they were losing.
[9]     THE WITNESS: Yeah, you would exercise the option,
[10] Doral would exercise the option if they were losing money on
[11] the IOs, if they started losing money on the IOs.
[12]     THE COURT: And that's a form of hedging.
[13]     THE WITNESS: That is a form of hedging, correct.
[14]     THE COURT: Go ahead.
[15] BY MR. BRAUN:
[16] Q. And that call option, the report indicates, says that they
[17] can exercise that call, buy the whole pool back?
[18] A. Correct.
[19] Q. If the pass-through rate reaches a predetermined rate below
[20] the weighted-average coupon of the loans?
[21] A. That is correct.
[22] Q. So it's on its way up to that WAC level, at some point they
[23] say we can buy everything back?
[24] A. Correct.
[25] Q. And I think you mentioned this. What happens to the IO?

Page 384

[1] A. It disappears.
[2] Q. Can you turn the page now, Mr. Okusanya?
[3]     THE COURT: Listen, let me just make sure. If the
[4] interest rates are going up, and the rate is getting higher and
[5] higher --
[6]     THE WITNESS: The pass-through rate.
[7]     THE COURT: -- that creates a danger of another
[8] write-down.
[9]     THE WITNESS: Correct.
[10]     THE COURT: Loss.
[11]     THE WITNESS: That is correct.
[12]     THE COURT: Now, if they can simply buy those
[13] contracts back, they don't have the profit, but by buying them
[14] back, they eliminate the loss.
[15]     THE WITNESS: That's correct.
[16]     THE COURT: And if they had bought an option for a
[17] reasonably low price, then they have bought the right to
[18] eliminate the loss for a reasonably low price, right?
[19]     THE WITNESS: That is correct.
[20]     THE COURT: Okay.
[21] BY MR. BRAUN:
[22] Q. Can you turn the page now, Mr. Okusanya.
[23] A. Yes.
[24] Q. Can you just read the first sentence at the top of 38?
[25] A. "The determination of the fair value of MSRs and IOs at

Page 385

[1] their initial recording and on an ongoing basis requires
[2] considerable management judgment."
[3] Q. Any disagreement with that statement, sir?
[4] A. None at all.
[5] Q. Can you go to the next paragraph and read the first two
[6] sentences there?
[7] A. It says, "To determine the fair value of its IO portfolio,
[8] Doral Financial engages in two external valuations with parties
[9] independent of the company and of each other. One of them
[10] consists of dealer market quotes for similar instruments and
[11] the other one consists of a cash flow valuation model in which
[12] all economic and portfolio assumptions are determined by the
[13] preparer."
[14] Q. Had you received that information about these two external
[15] valuations previously, before you saw this report?
[16] A. Yes, I had.
[17] Q. Who had told you about that?
[18] A. They had, Doral. In the prior year 10K, the 2003 10K also
[19] had similar language, and it was also something I had discussed
[20] with Sammy during the process of talking about the company and
[21] how they valued their IOs.
[22] Q. Was the information contained in this report, this part of
[23] the information about these two external valuations, consistent
[24] with what you had learned in the past from reading and speaking
[25] to the folks at Doral?

Page 386

[1] A. Yes, it was.
[2] Q. Had Sammy Levis ever said anything to you about this
[3] external valuation that involved a cash flow valuation model in
[4] which all the economic and portfolio assumptions are determined
[5] by the preparer?
[6] A. All he had, all I ever knew about the, that external cash
[7] flow model was an independent party. He had attested to me
[8] that it was an independent party that did the valuation.
[9] Q. Did he say anything to you about how that worked, what
[10] Doral did to obtain the external value situation involving the
[11] cash flow valuation?
[12] A. Not particularly.
[13] Q. Had you asked him who they were obtaining these independent
[14] valuations from?
[15] A. Yes, I had.
[16] Q. And did you receive a response from Sammy Levis?
[17] A. The response I received was they had confidentiality
[18] agreements with those external parties so they couldn't release
[19] the names.
[20] Q. Mr. Okusanya, can you continue just reading the rest of
[21] that paragraph, from "in addition to"?
[22] A. "In addition to these two independent valuations, the
[23] company prepares an internal static cash flow model that
[24] incorporates internally generated prepayment and discount rate
[25] assumptions and an expected retained interest rate spread based

[1] on three-month LIBOR rates at the close of the reporting
[2] period. As of December 31, 2004, the three-month LIBOR rate
[3] used in the internal valuation model was higher than those
[4] contracted with investors for payment prior to the next
[5] resetting dates. It is Doral Financial's policy to record as
[6] the fair value of the IOs the lowest of the three valuation
[7] sources."
[8] Q. Can you turn the page now, sir?
[9] A. Sure.
[10] Q. Do you see there's a chart towards the bottom of the page,
[11] under the heading "changes in fair value of the IOs"?
[12] A. Yes.
[13] Q. Can you read the language just above that table? There's a
[14] sentence there.
[15] A. It says, "The following table summarizes, as of December
[16] 31, 2004, the estimated change in the fair value of the
[17] company's securities held for trading (other than IOs),
[18] including derivative instruments that Doral Financial" -- I'm
[19] sorry. Is that the right one?
[20] Q. Yeah. My mistake. I meant to direct your attention to the
[21] sentence above the chart on top, that says, there's a chart
[22] entitled "changes in fair value of the IO."
[23] A. Oh, okay.
[24] Q. You're reading below that chart. I want to go just above
[25] it and read that language there.

[1] A. Sure. It says, "The following table summarizes the
[2] estimated change in the fair value of the company's IOs, net of
[3] embedded caps, given several hypothetical increases in the
[4] three-month LIBOR and assumes no changes in the prepayment
[5] speeds."
[6] Q. In that language, where it says "net of embedded caps,"
[7] what did you understand that to mean?
[8] A. That meant these valuations included the effect of all the
[9] contractual caps that they had in the contracts.
[10] Q. Can you describe for us generally what information is
[11] reflected in that table entitled "changes in fair value of
[12] IOs," kind of walk us through what that means?
[13] A. Sure. So basically what this table does is it's a
[14] sensitivity analysis about what increases in interest rates
[15] will do to the fair value of the IOs. So, in the first column,
[16] it says at 25 basis points, that's .25 percent increase in
[17] interest rates, will reduce the IO valuation by 69.9 million.
[18]     The second column, if you have a 50 basis points, or
[19] .5 percent increase in interest rates, the fair value of the
[20] IOs would go down 138.8 million. If you had 100 basis points,
[21] or 1 percent increase in interest rates, you would have the IO
[22] value go down 274.7 million. And if you had a 200 basis
[23] points, or 2 percent increase in three-month LIBOR, the fair
[24] value of the IOs would go down $542.2 million.
[25] Q. Do you remember seeing this table when you looked at the

[1] 10K?
[2] A. Yes, I do.
[3] Q. Do you remember having a reaction to this table?
[4] A. Yes, I do.
[5] Q. Can you please describe and explain that reaction?
[6] A. Shock, befuddlement, surprise.
[7] Q. And why, sir?
[8] A. A lot, we had gone through some of the research reports
[9] that I put out earlier on, and those reports, again, my
[10] conclusion about the IOs were that, you know, maybe in a worst
[11] case scenario you might get an additional $20 million
[12] write-down on the IOs. This table was suggesting that you
[13] could have losses that are much bigger than the number that I
[14] was anticipating.
[15] Q. So, again, according to this table, if interest rates go up
[16] 1 percent, was that within the realm of possible expectations
[17] for the calendar year 2005?
[18] A. Yes, it was.
[19] Q. What would 1 percent rise in interest rates for the
[20] three-month LIBOR interest rate in particular do to the value
[21] of the IO?
[22] A. It would reduce the value of the IOs by $274.7 million.
[23] Q. There is an additional table that you see below that.
[24] A. Yes.
[25] Q. Can you read the language between the two tables?

[1] A. The language says, "The following table summarizes, as of
[2] December 31, 2004, the estimated change in the fair value of
[3] the company's securities held for trading (other than IOs),
[4] including derivative instruments that Doral Financial uses to
[5] manage its interest rate risk given several increases in the
[6] treasury yield curve."
[7] Q. So the derivative instruments, the hedges we've been
[8] talking about, right?
[9] A. Right.
[10] Q. And did Doral have other assets that fell into the category
[11] of securities held for trading?
[12] A. Yes, they did.
[13] Q. So can you describe for us what the meaning of that is,
[14] what are they representing here?
[15] A. What Doral is representing in this table is when you
[16] exclude the IOs, and you take a look at changes in the fair
[17] value of other assets that they hold in this category, this
[18] asset that they hold for trading purposes, as well as the
[19] derivatives used to hedge those assets, if you had changes in
[20] interest rates, this is what would happen to the fair value of
[21] those securities and as well as the hedges used against those
[22] securities.
[23]     THE COURT: I don't quite put all that together. What
[24] does that mean?
[25]     THE WITNESS: Sure. When you look at the IOs, and on

Page 395

[1] A. That is correct.
[2] Q. Do you recall whether or not such a call actually occurred?
[3] A. The call did occur.
[4] Q. Did you participate in the call?
[5] A. Yes, I did.
[6] Q. Can you describe generally what one of these calls is?
[7] A. The calls generally are an opportunity for management to
[8] address the investment community. They typically talk about
[9] their results. They will talk a little bit about their overall
[10] outlook for the company, and then after they do that, the call
[11] is opened up for a question-and-answer session.
[12] Q. And so management is participating in the call, and who
[13] else is there, interacting with management?
[14] A. The investor, any investor that is interested in speaking
[15] with management typically attends, phones in to the call.
[16] Q. What about research analysts?
[17] A. Research analysts as well are included in that.
[18] Q. Do you recall who participated in the call representing
[19] Doral?
[20] A. Yes. The three participants from Doral were Sammy Levis,
[21] Salomon Levis, who is the CEO, and Ricardo Melendez, who was
[22] the CFO.
[23] Q. Did you listen to the entire call?
[24] A. Yes, I did.
[25] Q. Do you recall about how long it was generally?

Page 396

[1] A. Probably about two and a half hours.
[2] Q. During the course of that, do you recall whether or not
[3] there were questions raised regarding caps that Doral had in
[4] its contracts with the other bank that would limit the extent
[5] to which the pass-through rate could rise with rising interest
[6] rates?
[7] A. There were, there were maybe two or three questions along
[8] that line from different investors and analysts.
[9] Q. As best you can recall, what was the response to those
[10] questions?
[11] A. With the caps, there was, generally Sammy did mention, very
[12] similar as he had mentioned in the past, that again all these
[13] caps are negotiated on a contract-by-contract basis, and that
[14] the caps generally, that they all negotiate on a
[15] contract-by-contract basis, and I believe in the call he
[16] mentioned that a significant amount of these contracts did have
[17] the caps too.
[18] Q. Did he say anything specific about where the caps were,
[19] what level?
[20] A. I cannot, I cannot recall what level he said they were at.
[21] I think the only thing I had at that point was what was
[22] mentioned in the 10K.
[23]     THE COURT: I didn't understand that. He what?
[24]     THE WITNESS: I can't recall whether he actually
[25] mentioned at what level the caps were on the call.

Page 397

[1] BY MR. BRAUN:
[2] Q. Do you recall whether or not Mr. Levis was asked about the
[3] identities of the external parties that were providing
[4] independent valuations of the interest-only strips?
[5] A. Yes, I do.
[6] Q. Was he asked that question?
[7] A. He was asked that question.
[8] Q. Do you recall his response?
[9] A. His response was very similar to what he had told me in the
[10] past, that they were under confidentiality agreements so he
[11] couldn't release the names.
[12] Q. Over the course of this call, Mr. Okusanya, did you have a
[13] general reaction to what was taking place in the questions and
[14] answers between the investing community and Doral's management?
[15] A. Yes.
[16] Q. What was your reaction? What was your sense?
[17] A. There was a lot of frustration on the call. I think a lot
[18] of analysts and investors on the call still felt they weren't
[19] getting answers for the questions that they were asking, and I
[20] think there were also a few that were basically asking the
[21] management team to somehow or other validate the IO assumptions
[22] that they had, in some way or another.
[23]     THE COURT: We'll take our afternoon recess, please.
[24]     (Recess)
[25]     THE COURT: All right. Go ahead, please. Sit down.

Page 398

[1] BY MR. BRAUN:
[2] Q. Mr. Okusanya, I want to take you back a couple of days. We
[3] talked about the 10K on the 15th.
[4] A. Okay.
[5] Q. And the conference call took place on the 17th.
[6] A. Okay.
[7] Q. And on the 16th, you put out the first read report that you
[8] talked about. Can I turn your attention to Government Exhibit
[9] 1520, which is in your binder, but it's back a couple of tabs?
[10] A. Yes.
[11] Q. What is Government Exhibit 1520?
[12] A. It is an e-mail that I sent to Sammy on Wednesday, March
[13] 16.
[14]     THE COURT: March what?
[15]     THE WITNESS: March 16, 2005.
[16] BY MR. BRAUN:
[17] Q. Is that the day between the 10K and the investor conference
[18] call on the 17th?
[19] A. That is correct.
[20]     MR. BRAUN: The government asks that this be received
[21] into evidence, your Honor.
[22]     THE COURT: Received.
[23]     (Government's Exhibit 1520 received in evidence)
[24] BY MR. BRAUN:
[25] Q. Can you summarize your message to Mr. Levis?