UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                    :

      - v. -                                 :        08 Cr. 181 (TGP)

MARIO S. LEVIS,                              :
      a/k/a "Sammy Levis,"

                              :

             Defendant.

                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTIONS FOR A NEW TRIAL AND FOR BAIL PENDING APPEAL

PREET BHARARA
United States Attorney for the
Southern District of New York

WILLIAM STELLMACH
MARC LITT
DAVID MILLER
Assistant United States Attorneys

JASON ANTHONY
Special Assistant United States Attorney

    - Of Counsel -

The Government respectfully submits this memorandum in opposition to defendant Mario Levis's motions for a new trial and bail pending appeal, in which he complains about Your Honor's preclusion of certain arguments related to hedging, and elements of the jury charge. Those complaints, however, are based on a fundamental  misunderstanding of the law, and Levis has fallen well short of meeting his high burden under Rule 33 of proving that the jury's verdict should be set aside "in the interests of justice."  Similarly, Levis has also failed to raise a "substantial question of law or fact" likely to result in reversal or a new trial, and he therefore cannot satisfy his burden for bail pending appeal.  For the reasons below, the defendant's motions should be denied.

A.      **RELEVANT BACKGROUND**

On April 29, 2010, following a month-long trial, a jury found the defendant guilty on securities fraud and wire fraud charges arising from his efforts to mislead investors in Doral Financial Corporation ("Doral") regarding the risks that certain of its assets faced from rising interest rates, as well as the method by which Doral was valuing those assets.

1.      **The Misrepresentations Regarding Contractual Caps**

As Your Honor knows, the defendant served as the Treasurer and Executive Vice President of Doral, the largest mortgage lender in Puerto Rico.  After issuing mortgage loans, Doral then sold groups or "pools" of loans to other Puerto Rican financial institutions, in deals that the defendant personally negotiated.

Typically, under the terms of the loan-sale transactions that Doral, through the defendant, entered into during the relevant time period, banks that purchased the pools of loans were entitled to collect (1) all payments of the outstanding principal balance of the loans in the pool, and (2) a

1

portion of the interest payments, called the "pass-through rate." Doral, in turn, retained (1) a fixed fee for continuing to service the mortgage loans (called a Mortgage Servicing Right or "MSR"), and (2)  the right to collect the difference, or "spread," between the pass-through portion of the interest payments and the remainder of the interest that the borrowers paid.  This "spread"—Doral's share of the interest paid on the pooled loans that other banks had purchased—was an asset known as an interest only strip, or "IO."

Moreover, during the relevant time period from 2001 through 2005, Doral often retained "floating rate" IOs under the terms of its loan-sale transactions; that is, the pass-through rate paid to the purchaser of the loans was based on an interest rate— specifically, the London Interbank Offered Rate, or "LIBOR," which fluctuated— plus a fixed specified percentage (typically about 1.5%).  Accordingly, with respect to these floating-rate IOs, Doral's spread varied inversely with changes in interest rates: as LIBOR increased, the pass-through rate paid to the purchasers of the loans increased, and in an opposite and corresponding way, Doral's income from its IOs decreased.

In January 2005, due to rising interest rates, Doral wrote off $97.5 million in income that it had previously recorded from the IOs.  That write-off, in turn, prompted a wave of questions from investors and analysts regarding the potential for future write-offs as interest rates continued to climb, as experts widely predicted and the market was predicting.  The defendant, however, repeatedly assured investors and analysts that Doral had negotiated in its loan sale agreements with the banks provisions that functioned as "caps" on the banks' pass-through rate. In brief, as the defendant falsely represented, if interest rates ever rose above the cap, there would be no effect on the pass-through that Doral paid to the banks: the caps would function as a ceiling

on the pass-through rate.  Moreover, the defendant repeatedly told numerous analysts that these non-existent caps were close to being hit, meaning that there would be no further significant write-offs in the future because the caps functioned to protect Doral's IO against rising interest rates.  As proven at trial, only a relative handful of Doral's sales contracts contained such contractual caps and the vast majority of Doral's loan portfolio was completely exposed to the risk that rising interest rates would further diminish Doral's IO income, as they eventually did by hundreds of millions of dollars.

    **2.**    **The Misrepresentations Regarding Independent Valuations**

    **a.**    **Spot Rate v. Forward Curve Methodologies**

As mentioned above, Doral capitalized and recorded its anticipated future income from the IOs, which rapidly became a highly significant source of the company's income and revenue. Because Doral's actual income from the IOs depended on the spread between a fluctuating interest rate (that is, LIBOR) and the underlying average interest rate on the pooled loans, which did not change, Doral was required to incorporate an important assumption regarding future interest rates in valuing its portfolio of IOs.  The method that Doral employed in that regard was to use an assumption that LIBOR would remain fixed at a certain level, called a "spot rate," that existed at a particular point in time during the financial quarter in which Doral was evaluating its IOs.  This spot-rate method, of course, did not account for anticipated changes in interest rates that could have a substantial impact on Doral's IO income.  In order to address that variable, Doral could have incorporated a "forward curve"—that is, a publicly available market forecast of future changes in interest rates—into the model it used for valuing its IOs; however, it did not do

so until April of 2005, following a precipitous decline of its stock price when Doral changed its

IO valuation model to incorporate the forward curve.

> b.      The "Independent Valuations"

With respect to the "independent" valuations, Doral — through, for example, the

defendant's personal statements to investors and market analysts, and through public reports filed

with the SEC — repeatedly stated, among other things, that in addition to determining the value

of its IOs using its own internal model, it (1) obtained two external valuations from sources that

were independent of each other and independent of Doral, and (2) then selected the lowest of the

three alternative values for purposes of its own books and its public filings.

As proven at trial, however, the external valuations were in fact not independent and did

not serve as a meaningful check on the reliability of Doral's internal model.  In fact, one external

valuation purportedly prepared by the Government's cooperator Jose Lopez at Morgan Stanley

was supposedly based on a method in which the valuator obtained "market quotes" for the IOs —

meaning, prices that prospective buyers were willing to pay for similar assets in the marketplace.

As Mr. Lopez admitted, his "valuation" consisted of nothing more than recopying a series of

figures that the defendant sent him, signing his name, and returning those figures to the

defendant; in other words, Lopez did no actual work to evaluate Doral's IOs, and his "valuation"

was a complete fabrication.

The other external valuation was performed by a group of investment bankers employed

at Banco Popular.  Several witnesses from Banco Popular testified at trial, including Natalia

Guzman and Gregory Kaufman.  As they explained, the defendant never informed them that

Banco Popular's valuation was supposed to be independent.  Accordingly, they developed and

applied a valuation model for Doral's IOs that incorporated several important assumptions dictated by the defendant regarding the characteristics and predicted performance of Doral's IOs. Thus, although Doral and the defendant made representations to the market indicating that this valuation work was "independent"—and similarly, that all of the assumptions used in the valuation were those of the external valuators—those representations were false.  In fact, the investment bankers performing this valuation believed, based largely on the defendant's assurances, that their work was being used only for Doral's internal purposes, and therefore allowed the defendant to alter assumptions and manipulate data.  Doral also provided false information to these investment bankers—for example, the defendant directed them to assume that the pass-through rate across all of the loan pools could not rise above 3.4%—that had the effect of significantly influencing and distorting the results of the valuation.

In January 2005, after Doral wrote-off nearly $100 million from the IOs, a number of investors, attempting to get comfort, pressed the defendant to identify the sources of the independent valuations, whose names were not disclosed in the SEC filings.  However, the defendant advised investors that he could not disclose the sources of the independent valuations due to confidentiality agreements.  In fact, no such agreements existed.

Later, as interest rates continued to rise, Doral filed a Form 10-K with the Securities and Exchange Commission on March 15, 2005 announcing that the magnitude of potential impairments that future increases in LIBOR would have on the stated value of the IOs, without taking into account any mechanisms that Doral had in place to limit or counteract such impairments.  For example, an increase in LIBOR of 0.25 percent would impair the value of Doral's IOs by approximately $70 million, while a 2 percent increase in LIBOR would impair the

value of Doral's IO by approximately $540 million.  Doral continued to maintain in the 10-K, however, that it was using two independent valuations to value the IOs.  After the 10-K's filing, external consultants that had been retained by Doral in 2004 to satisfy regulatory concerns, reported to Doral's Board of Directors that the IOs should be valued using a forward curve, and that the value of the IOs should therefore be lowered hundreds of millions of dollars.  Doral then discovered that the purported "independent" valuations were, in fact, not independent.  On April 19, 2005, Doral announced publicly that it was going to change its valuation methodology and that the expected result would be an earnings restatement in the range of $400 to $600 million.

### 3.    The Court's Rulings Regarding Hedging

Despite the defendant's express representations to investors and analysts that there were caps on the pass-through rate contained in the loan sale agreements, defense counsel at trial repeatedly elicited testimony and offered evidence relating to Doral's hedging strategies.  As explained during trial, Doral purchased several hedging instruments that could function, if properly managed, to limit certain risks from rising long-term interest rates.[1]  The defense then extensively explored, through lengthy questioning of Government witnesses, the extent of Doral's hedging strategy, suggesting that the hedges provided the equivalent protection against rising interest rates as a contractual cap.  At various times, the defense referred to a "hedge cap"

---

[1]     In addition to the IOs, however, Doral had other assets with interest rate risk and never engaged in "hedge accounting" in which it attempted to match particular assets with corresponding hedges such that anyone could state that the IOs (or any other asset class) were, in fact, fully hedged.  Moreover, the evidence also established that Doral's hedging strategy was fundamentally flawed.  Doral's hedges were based on the misassumption that long-term interest rates would rise together with short-term rates, a "parallel shift" in long- and short-term interest rates.  In fact, the interest rate curve "flattened," meaning only short-term rates rose and that Doral's hedges actually offered little or no protection for its IOs.  (See Tr. at 641-48.)

or an "external cap" to distinguish hedges from contractual caps – in an apparent effort to blur the important distinction between these concepts.  (<u>See</u> Tr. at 739-42, 1861-64, 2298-2305, 3060-68.)

### a.    Pre-Charge Instructions to the Jury

At trial, the Government called Julio Micheo, the former president of Doral Securities, to testify regarding the Federal Reserve's directive that Doral hire an outside consulting company to evaluate the IOs, which led to the exposure of the fraud.  In addition, Micheo also testified, particularly on cross-examination and re-direct, about numerous short-comings concerning Doral's hedging strategy, and the fact that there was no basis for anyone to believe that the IOs were fully protected through hedging against rising interest rates.[2]  At the conclusion of his

---

[2]    In light of the defendant's decision not to testify, and the extensive cross-examination of Government witnesses regarding hedging, his complaints regarding his inability to put in evidence regarding his defense are not supported by the record.  In particular, the defendant claims he was improperly prohibited from calling an expert to testify regarding the use of different valuation methodologies—which were never at issue—and the nature of Doral's hedging strategy.  During trial, the Government called several fact witnesses familiar with Doral's hedging, including Mr. Micheo and the company's external auditor, and the defense was similarly free to do so.  Moreover, the Government sought to call Robert Zizka, a witness who oversaw an evaluation of Doral's risk management for the First Manhattan group during 2004 and 2005.  In connection with that work, Mr. Zizka and his colleagues—as the defense well know from their receipt of pre-marked exhibits and 3500 material—completed a careful examination of Doral's hedges and hedging practices.  Mr. Zizka's testimony was precluded, however, when Your Honor granted a defense motion to exclude his testimony.  Any purported expert testimony regarding the "reasonable basis" of the defendant's beliefs (Def. Br. 13), however, would clearly not have satisfied the requirements of Fed. R. Evid. 702, as well as running afoul of Rule 704's prohibition against testimony regarding the ultimate issue on trial; such testimony was also properly excluded under Rules 401 and 403, and the Government respectfully submits that the Court can make the basis for its rulings even more clear, and thus more difficult to mischaracterize, by clarifying the bases for its ruling.

The record also shows that neither the Court nor the Government were provided with any proffer or disclosures regarding potential expert testimony until shortly before the witness was going to testify.  (The defense, citing Fed. R. Crim. P. 16(g), contended in pretrial

testimony, the Court expressed concern that the trial was unnecessarily expanding into an area—the nature and extent of Doral's hedges—that was not relevant to the charges against the defendant, noting that the Indictment charged the defendant very specifically with making false representations concerning the existence of contractual caps on the pass-through rate.  (Tr. 2771-2781.)

The following day, April 21, 2010, the Court attempted to place the issues in the trial in context for the jury:

> Now, you have heard, including today, testimony about hedges. Whether it was wise of the lawyers to go into subject of hedges as much as they have is a question, but these are fine lawyers, and what happens in a trial, there may be very specific issues, but the surrounding circumstances are discussed with the jury. Background is discussed with the  jury, and so forth.  But that doesn't mean that all of that is really part of the specific issue.
>
> Now I repeat as a matter of law in this case, I have ruled, I will reaffirm this to you when I instruct you, that the issue of hedges is totally irrelevant to these counts I'm talking about, whether they existed, whether they were successful, whether they were unsuccessful.  The question is: Did the defendant make a representation about caps being embedded in the contracts significantly lower than the so-called WAC?  Did he make that statement?  Was that true or untrue?  And if it was untrue, did he know it was untrue?  The question of truth is basically were there caps.  Not whether there hedges but were there caps, and there is a difference as a matter of law.

---

discussions with the prosecution trial team that the defense's prior requests for discovery did not explicitly include expert discovery, and that they were therefore under no obligation to produce expert discovery.)  At that point, the defense provided various resumes, a lists of publications, and PowerPoints that two experts were prepared to present the next day.  Approximately 10 minutes before going to the courtroom the next morning, the defense produced revised PowerPoints, and then another new set in court.  Even if the strictures of the rules regarding experts could have been satisfied, the circumstances under which defense counsel intended to call their experts were prejudicial to the Government, which had been deprived of any information sufficient to prepare for a Daubert hearing or any actual expert testimony.

(Tr. 3001-3002.)  The Court also advised the jury that hedging would be "relevant to a certain degree" on the independent valuation portion of the case.  Defense counsel moved for a mistrial, which the Court denied.  In making this motion, defense counsel protested that there had been no instruction regarding materiality or reasonable doubt, without any further explanation of the objection based on materiality.  (Tr. 3004-3006.)

The next day, the Court gave a clarifying instruction in which it reminded the jury that its final instructions at the close of the case would control, and also advised that hedging was potentially relevant "in certain ways" that he was not foreclosing:

> Before we start, I just want to make a remark to you.  Yesterday afternoon, I spoke to you about the issues raised by the indictment, particularly those portions in the indictment which charge misrepresentations about the existence of caps embedded in the mortgage sale contracts and the level of those caps.  I will give you final instructions at the very end of the case, but the reason I spoke to you yesterday was this: This is a complex case.  The issues are framed by the indictment, and those issues were referred to in the opening statements, but a lot has happened since those opening statements.  My purpose yesterday was to make clear to you the allegations in the indictment dealing with the phases of the case I spoke to you about.  But I want to correct something this morning.
>
> I may have indicated that the matter of hedges was entirely irrelevant to this phase of the case.  *That goes too far*.  It is true that the existence of hedges is not in and of itself a defense to these allegations in the indictment, which are about alleged statements regarding caps in the contracts.  But evidence about hedges may be relevant in certain ways which the lawyers will develop in their arguments before you which I am not foreclosing.

(Tr. 3024-25) (emphasis added).

###### b.        The Charge Conference

At the charge conference, the Government stated that it believed hedges were potentially relevant to a materiality defense, as the defense had suggested, but only to the extent that the defendant was arguing that, to Doral's investors, it was irrelevant whether the caps on the pass-through rate were contained in the loan sale contracts with the banks or instead took the form of hedging instruments.  (Tr. 3331-3334; 3374-75.)

The defense, however, explained that it viewed hedges as relevant to materiality from the defendant's perspective, not from that of a reasonable investor:

> If Mr. Levis at the time he made these statements, and let's assume just [as] in Rossamando [that] the statements were false and knowingly false, let's just assume that because they were that in Rossamando as well, if Mr. Levis believed at the time he made the statements that the existence of hedges and external caps, et cetera, reduced the risk to zero of any false statements about embedded caps, in our view, that means he is not guilty of wire fraud.

(Tr. 3366.)

In closing, defense counsel in fact argued that there was sufficient information available regarding Doral's hedges to place investors, and Government witnesses in particular, on notice that these hedges provided the caps which the defendant was discussing with them (notwithstanding repeated e-mails and conversations referencing contractual caps).  Thus, the defense was allowed to, and did, make arguments related to hedging as grounds for a defense on materiality, albeit not from the perspective of the defendant's subjective viewpoint, as they had wished.

The jury instruction regarding hedging, as it applied to materiality, was consistent with the standard instruction in this Circuit.  (Tr. 3317-19.)   Specifically, the Court instructed that

materiality was "to be judged in the context of the total mix of information

available to investors," but that it was no defense if the defendant knowingly misled investors

about the existence of contractual caps even if he believed that hedges existed that provided the

equivalent protection.  (Tr. 3317-18.)

**B.   APPLICABLE LAW**

   **1.   Motion for a New Trial**

Rule 33 of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's

motion, the court may vacate any judgment and grant a new trial if the interest of justice so

requires."  Fed. R. Crim. P. 33(a).  It confers broad discretion upon a trial court to set aside a jury

verdict and order a new trial in order to avert a perceived miscarriage of justice.  See United

States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992).

A defendant seeking a new trial bears the burden of demonstrating the "essential

unfairness of the [original] trial."  United States ex rel. Darcy v. Handy, 351 U.S. 454, 462

(1956).  In adjudicating a Rule 33 motion, a court is entitled to weigh the evidence and, in so

doing, to evaluate the credibility of witnesses.  See Sanchez, 969 F.2d at 1413.  A court,

however, should exercise its discretion under Rule 33 sparingly, granting a new trial only in

exceptional circumstances.  See id. at 1414. Indeed, "motions for a new trial are disfavored in

this Circuit."  United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995).

   **2.   Motion for Bail Pending Appeal**

With enactment of the Bail Reform Act of 1984, Congress "reverse[d] the

presumption in favor of bail [pending appeal] that had been established under the prior

statute[.]"[3]  United States v. Miller, 753 F.2d 19, 22 (3d Cir. 1985); United States v. Randell, 761 F.2d 122, 124-25 (2d Cir. 1985).  Section 3143(b) now gives effect to Congress's view that "once a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even to permit it in the absence of exceptional circumstances." Miller, 753 F.2d at 22 (quotation marks omitted).

Accordingly, Section 3143(b)(1)(B) requires detention except where "the judicial officer finds," in relevant part, "that the appeal . . . raises a substantial question of law or fact likely to result in (i) reversal, [or] (ii) an order for a new trial."  18 U.S.C. § 3143(b).  The Second Circuit has explained that a "substantial question" is "a 'close' question or one that very well could be decided the other way."  Randell, 761 F.2d at 125.  In addition, even where a question raised on appeal is "substantial," the Court must still consider "whether that question is 'so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal or a new trial.'"  Id. at 125.  The defendant bears the burden of showing that such a substantial question exists.  Id.

## C.  **DISCUSSION**

### 1.  **The Court Properly Precluded Argument Related to Hedging**

During the charge conference, and at various stages in the trial, defense counsel explained to Your Honor that he intended to argue that hedging, from the defendant's perspective, rendered any false statements to investors immaterial.  That argument was flatly inconsistent with the law.

In his opening, defense counsel said, in passing, that there were two ways to protect the

---

[3]        Throughout his brief, the defendant mistakenly frames the standard as depending on whether the claims he raise are "fairly debatable."  As Your Honor knows, that is not the standard; indeed, if it were, virtually every defendant would receive bail pending appeal.

IOs: contractual caps negotiated with the banks purchasing the loan pools which created the IOs, and "external caps" created by hedges that Doral purchased in the market. (Tr. 190.) Throughout the trial, the defense then elicited testimony and focused on exhibits related to Doral's hedging strategies, prompting the court to inquire as to the relevance of any "caps" created by hedges when the testimony from witnesses related to contractual caps. The Government explained that it had elicited testimony about hedges only in connection with the misrepresentations regarding the independence of the external valuations, explaining that it intended to prove that the defendant was in fact manipulating the valuations, thereby robbing them of any purported independence. Accordingly, the Government elicited evidence showing that the defendant advised Popular to assume, in valuing Doral's IOs, that there was a 3.4% cap—without clearly indicating what the source of that cap was—on the pass-through rate across all of the loan pools. In addition, we proved that the assumption was a false one because no such cap existed in the contracts (as became clear in the evidence relating to the misrepresentations concerning existence of caps), nor did any such cap exist through Doral's hedges. From the Government's perspective, the evidence concerning the limitations and shortcomings of Doral's hedges was only relevant to proving that this 3.4% cap did not exist, and we therefore offered it only for that narrow purpose.[4]

---

[4]    Every investor and analyst called by the Government confirmed that, from their perspective, there was a considerable difference between contractual caps and hedges, primarily because of the certainty offered by the former in contrast to the latter. (See Tr. at 361-72, 781-83, 870-72, and 1402-03.) Unlike contractual caps, hedges need to be monitored and actively managed, and even supposed experts frequently make mistakes. Indeed, Doral itself mismanaged its hedging strategy and effectively hedged itself against increases in long-term interest rates when in fact short-term interest rates rose. (Tr. at 641-48.) Furthermore, as the outside consultant hired at the direction of the Federal Reserve discovered, Doral never inventoried its hedges: it had no way of calculating whether the hedges it was purchasing were actually

Largely through extensive cross-examination of the Government's witnesses (which frequently exceeded the length of their direct examinations), the defendant likewise delved into the extent and nature of Doral's hedges. At the charge conference, counsel stated that his belief that hedges were relevant to a materiality defense because "if Mr. Levis believed at the time he made the statements that the existence of hedges and external caps, et cetera, reduced the risk to zero of any false statements about embedded caps, in our view, that means he is not guilty of wire fraud." (Tr. 3366.) That is plainly wrong. It is well-established that "material" facts are those "that a reasonable investor would have considered significant in making investment decisions." See, e.g., Basic v. Levinson, 485 U.S. 224, 231 (1988). Moreover, to satisfy materiality, the Government needed to prove that "there must be a substantial likelihood that the disclosure of the omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. at 231-32. Your Honor's instruction to the jury regarding their treatment of hedging in the context of materiality, based on how materiality was argued to you through trial, is therefore entirely consistent with the law.[5]

In arguing the relevance of hedging to a defense based on a lack of fraudulent intent, the defendant myopically focuses on several excerpts from the charge conference where the

_____

protecting any particular class of assets, like the IOs. (Tr. at 2700-01, and 2735.) Thus, to the extent that the defendant wished to argue that IO portfolio was fully hedged, he was unable to do so, or even contend that he had taken comfort from any purported belief that the portfolio was so hedged because no one at the company could give any such assurance.

[5]     Prior to closings, the Government again memorialized for the record its objection to the proposed defense charge based on the defense's misunderstanding of materiality as it related to hedging. (Tr. 3425-26.)

Government suggested that hedging was also potentially relevant to the defendant's intent.[6]  For instance, hedges were conceivably relevant if the defense chose to argue that, in describing contractual caps to investors, the defendant had actually meant hedges and misspoke.  However, defense counsel was notably silent in embracing such a theory.  The defendant cannot now begin raising arguments that he never made to Your Honor regarding the relevance of hedges to any defense based on a lack of fraudulent intent.  In any event, such an argument undoubtedly would have been precluded, and justifiably so, because of the lack of any evidentiary basis for it: the defendant did not testify, and failed to elicit any testimony in cross-examination suggesting that he confused hedges with contractual caps.

In sum, the arguments that the defendant made regarding the relevance of Doral's hedges to a materiality defense were improper, and he never even made the argument regarding fraudulent intent that he now raises.

### 2.    The Court Properly Instructed the Jury Regarding Securities Fraud

The defendant next contends that the Court committed reversible error on the securities fraud charge when instructing the jury regarding the "willfulness" element—specifically, the defendant argues that willfulness was omitted as an element and that the Court erred in only defining it as "an intent to deceive" without additional language requiring the jury to find "a realization on the defendant's part that he was doing a wrongful act."  (Def. Br., 25-26.)  Those claims are baseless.

---

[6]    In making those observations, the Government explicitly noted that it was simply reacting "on the spur of the moment" (Tr. 3366), and after further consideration, the next day fully endorsed the Court's proposed instruction for the very reasons explained in this brief.  (Tr. 3425-26.)  Again, defense counsel never advised either the Court or the Government that they had misconstrued the defense's arguments.

First, the record flatly belies the claim that Your Honor failed to instruct the jury on the willfulness element.  In providing an overview of the questions which the jury needed to answer, the Court expressly instructed the jury that it needed to determine whether the defendant "intended to deceive, that is, he intended that investors and analysts would believe the false statements."[7]  (Tr.  3717.)  Later, the Court expanded on that checklist and more fully instructed the jury regarding the need to find whether the defendant acted with the intent to deceive:

> If he made the representations about the caps, and if those representations were false, then they don't become of a different nature because he may have known of something else like hedging. The issue is whether he made the representation about the caps and whether they were false and <u>whether he knew that they were false and whether he intended by those misrepresentations to have—to deceive, that is—to have those representations believed</u>.

(Tr. 3718) (emphasis added).  In short, intent was clearly identified as an element for the jury.

Second, the instruction was legally sufficient.  Section 32(a) of the Securities Act of 1934 criminalizes the "willful" violation of various provisions of the Act, as well as rules and regulations promulgated under the Act.  <u>See</u> 15 U.S.C. § 78ff.  The two leading cases in this Circuit interpreting the term "willfully" under Section 32(a) are <u>United States v. Dixon</u>, 536 F.2d 1388 (2d Cir. 1976), and <u>United States v. Peltz</u>, 433 F.2d 48 (2d Cir. 1970), both of which make clear that the Government is <u>not</u> required to prove that a defendant specifically intended to violate the securities laws.  Rather, under <u>Dixon</u> and <u>Peltz</u>, the Government must prove only "a realization on the defendant's part that he was doing a wrongful act," so long as this act was in

---

[7]     Indeed, Your Honor plainly told the jury that you were merely providing a "checklist" that was not intended "to include in it all the definitions I've given you."  (Tr. 3720.)

fact "wrongful under the securities laws" and "involved a significant risk of effecting the violation that has occurred." Dixon, 536 F.2d at 1397; Peltz, 433 F.2d at 54-55.

The charge, taken as a whole, clearly satisfied those requirements. Your Honor instructed the jury that it needed to determine whether the defendant made knowingly false representations regarding the existence of contractual caps and independent valuations, and did so with the intent to deceive. These instructions required the jury to find a form of scienter more stringent than "willfulness" for purposes of the securities laws—namely, that the defendant knowingly made false representations with the intent to deceive. Clearly, for the jury to have found, as they did, that the defendant acted with such intent, it follows necessarily that they found that there was "a realization on the defendant's part that he was doing a wrongful act." Dixon, 536 F.2d at 1397; Peltz, 433 F.2d at 54-55; cf. United States v. Tucker, 345 F.3d 320, 335 (5th Cir. 2003) (affirming conviction where jury was charged that the Government was required to prove that the defendant acted "knowingly or willfully," instead of "knowingly and willfully," finding, among other things, that "the district court's placement of the definition of 'intent to defraud' immediately following the elements of the [securities fraud] count effaced any confusion the jury might have encountered concerning the requisite mens rea"). Moreover, as discussed below, the jury instructions provided in connection with the wire fraud counts, and the guilty verdicts returned on those counts, further demonstrate that Levis could not have been prejudiced by any shortcoming in the instruction on willfulness. It will also be significant, on appeal, that Levis did not request a legally correct instruction on the elements of securities fraud. Rather, his proposed instruction contained an intent requirement that the Second Circuit has expressly rejected. See U.S. v. Kaiser, 609 F.3d 556, 569-70 (2d Cir. 2010).

Thus, far from omitting a willfulness instruction, Your Honor's instruction on intent in fact exceeded the requirements under the law in this Circuit.

### 3.      The Court Properly Instructed the Jury Regarding Wire Fraud

The defendant similarly misconstrues the wire fraud instruction.  The wire fraud statute, like the mail fraud statute, prohibits the use of interstate wires in connection with a scheme "for obtaining money or property by means of false or fraudulent pretenses."  18 U.S.C. § 1343.  The Second Circuit has long-recognized that this requirement is satisfied when a defendant denies a victim of the right to control their assets by depriving them of information necessary to make discretionary economic decisions through fraudulent representations.  See, e.g., United States v. Carlo, 507 F.3d 799, 802 (2d Cir. 2007) (causing real estate developers to make economic decisions about viability of development projects based on misleading information about funding for those projects, deprived developers of "material information necessary to determine for themselves whether to continue their development projects" – i.e., their interest in controlling own assets); United States v. Dinome, 86 F.3d 277, 280, 284 (2d Cir.1996) (intentionally supplying false information on mortgage application was proper basis for mail fraud conviction because it deprived the bank of right to control its assets); United States v. Rodolitz, 786 F.2d 77, 80-81 (2d Cir.1986) (where defendant set up elaborate scheme to conceal fraudulent nature of insurance claims, "the government needed to prove only that [defendant] employed a deceptive scheme intended to prevent the insurer from determining for itself a fair value of recovery").

The defendant mistakenly cites several cases in which this "right to control" theory was found inapplicable where other elements, such as materiality, were not satisfied.  However, as

numerous victims testified, the defendant's misrepresentations concerning the contractual caps and independent valuations were absolutely material to investment decisions related to Doral.

Similarly, defense counsel objected to the wire fraud charge on the grounds that the defendant had to intend to cause the recipient of any misrepresentations financial harm.  The defense essentially argued that Levis could be convicted of wire fraud only if he intended to steal investor's money, and that he had a good faith defense if he believed, notwithstanding any misrepresentations, that investors would ultimately not suffer any losses:

> We believe that it is only a wire fraud if Mr. Levis' statements are intended to cause the listener to rely upon them to the listener's financial detriment, and that is where we think this business about hedging becomes absolutely critical because <u>if Mr. Levis believed in good faith that reliance on his statements would not cause any financial detriment to the listener precisely because Doral in his view had hedged the IO portfolio with purchase caps, et cetera, then his statements are not part of a scheme to defraud.</u>  By that I mean a scheme to cause the investors to sustain a financial detriment.

(Tr. 3337) (emphasis added).

That argument betrays a fundamental misunderstanding of the law.  An essential element of this crime is intent to defraud.  The Government must prove that the defendant engaged or participated in a fraudulent scheme with an understanding of its fraudulent or deceptive character and with an intention to be involved in the scheme and to help it succeed with a purpose of causing actual financial harm to another.  <u>United States v. Guadagna</u>, 183 F.3d 122, 129 (2d Cir. 1999).  As explained above, the financial harm requirement is satisfied by a defendant making material misrepresentations to investors.  Of course, as Your Honor instructed, a defendant's

honest belief in the truth of representations made by her is a complete defense, however inaccurate the statements may turn out to be. (Tr. 3719-3720.)  Nevertheless, fraudulent intent may be proven by showing that the defendant made misrepresentations with knowledge that the statements were false.  Id.  Moreover, the fact that a defendant believes (rightly or wrongly) that he will 'ultimately' be able to work things out so that the victim suffers no loss is no excuse for the real and immediate loss contemplated to result from defendant's fraudulent conduct.  See United States v. Rossomando, 144 F.3d 197, 201 (2d Cir.1998).

In sum, the Court's instruction regarding the wire fraud counts and good faith fully comported with the law of this Circuit.  The defendant's attempt to argue that he was convicted under an "honest services" theory when there were no allegations of kickbacks, bribery, or self-dealing, and where such a theory was expressly rejected by the Court and the Government, misstates the facts, the law, and the nature of the charges in the Indictment.

### 4.    The Defendant's Speedy Trial Rights Were Not Violated

Finally, the defendant complains that his right to a Speedy Trial was violated.  (Def. Br., 40.)

By way of background, defense counsel repeatedly requested adjournment of the trial in this case: the original March 2, 2009 trial date was adjourned at the defense's request until September 14, 2009, and then again at their request until March 22, 2010.  In January 2010, the defense requested an indefinite adjournment, based on its receipt of additional materials from the Government in December 2009.  The defense later sought dismissal of the indictment by arguing that the prosecution had orchestrated the defense request for the adjournment until March 22, 2010 by misleading opposing counsel into believing that certain materials that it was producing

20

were critical to the case.  Your Honor rejected those claims at the final pretrial conference on March 23, 2010.[8]

Now, following a month-long trial, the defense again complains that the prior continuances which it requested were not accompanied by sufficiently detailed findings by Your Honor explaining that the ends of justice were satisfied pursuant to 18 U.S.C. § 3161(c)(1). (Def. Br., 41.)  Notwithstanding the lack of any factual predicate for those claims, Your Honor nevertheless endorsed a letter from the Government dated March 25, 2010 in which you clarified the bases for the prior continuances and more than satisfied the requirements of Section 3161(c)(1).  (See Ex. A, a copy of the endorsed letter dated March 25, 2010.)  Indeed, because there is no requirement that the basis for the continuances be made contemporaneously with the order granting them, to the extent that defense counsel persists in this motion, Your Honor could make further findings in connection with sentencing in which you further articulate the basis for the prior continuances.

### 5.    The Defendant's Motion for Bail Pending Appeal Should Be Denied

In moving for bail pending appeal, the defendant incorporates the same arguments that he made in his motion for a new trial.  Those arguments, however, fail for the reasons discussed above, and the defendant therefore has failed to meet his burden of raising a "substantial question of law or fact" likely to result in reversal, a new trial, or a probationary sentence.

---

[8]    These allegations were rebutted in considerable detail in the Government's letter to Your Honor dated January 26, 2010.

## **CONCLUSION**

The Government respectfully submits that the defendant's motions for a new trial and bail pending appeal should be swiftly denied.

Dated:   New York, New York
              November 12, 2010

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York


By: _____/s/_____

WILLIAM STELLMACH
MARC LITT
DAVID MILLER
Assistant United States Attorneys

JASON ANTHONY
Special Assistant United States Attorney

22