

BLACK
SREBNICK
KORNSPAN
STUMPF
TRIAL ATTORNEYS

Roy Black
Howard M. Srebnick
Scott A. Kornspan
Larry A. Stumpf
Maria Neyra
Jackie Perczek
Mark A.J. Shapiro
Jared Lopez

Jessica Fonseca-Nader
Kathleen P. Phillips
Marcos Beaton, Jr.
Jenifer J. Soulikias
Noah Fox
Joshua Shore

Email:   RBlack@royblack.com

November 15, 2010

Honorable Thomas P. Griesa
United States District Judge
500 Pearl Street, Room 1630
New York, New York 10007-1312

> Re:   *United States v. Levis*, No. 08-CR-181 (TPG)
> **Defendant's Reply Sentencing Memorandum**

Dear Judge Griesa:

We write to reply to the Government's Sentencing Memorandum (Doc. #100). The government's proposed adjustments should be rejected because the government has failed to carry its burden of proving that the adjustments are applicable under the Sentencing Guidelines.[1]

---

[1] The government explained its theory of loss for the first time in its Sentencing Memorandum, which consists of a 45-page brief, with hundreds of pages of exhibits. Mr. Levis reiterates his position that the government lacks "good cause" for untimely filing its objections to the PSR. *See* Fed.R.Crim.P. 32(i)(1)(D). The government's objections should not be considered.

Judge Griesa
November 15, 2010
Page 2

### I. Loss

The government's memorandum is notable for what it lacks – any analysis of, much less adherence to, the Second Circuit's established methodology for measuring loss in securities fraud cases. The omission does not appear to be a mere oversight. Rather, we submit, it constitutes a recognition by the government that the loss in this case, if any, "reasonably cannot be determined." *See* U.S.S.G. §2B1.1 n.3(B).

The government asserts that the loss is approximately $75 million, which equals the combined net realized trading losses in Doral stock purportedly suffered by investors Meisenbach, Holland, and Fidelity, for the following calendar years.

| Investor | Time Period | Net Loss |
|---|---|---|
| Meisenbach Capital: | 2005 | $3,036,139 |
| Holland Capital: | 2004-05 | $29,165,993 |
| Fidelity: | 2005-06 | $42,290,626 |
| **Total** | | **$74,492,758** |

For the reasons explained below, the methodology utilized by the government to arrive at these figures is flawed and inconsistent, yielding a total number that is inaccurate and unreliable.[2]

### A. The Government Ignored the Required Methodology

The methodology for determining loss in a securities fraud case has been the subject of a number of Second Circuit cases. *See, e.g., United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007); *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006); *United States v. Kumar*, 617 F.3d 612, 631-32 (2d Cir. 2010). That methodology involves several steps.

First, the district court must identify the "fraud period." *Ebbers*, 458 F.3d at 126 (holding that "the loss is that suffered by those investors who bought or

---

[2] Neither the government nor the PSR attempts to attribute to Mr. Levis, for "loss" purposes, the restitution amount sought by Doral for expenses incurred in connection with its internal investigation, civil lawsuits, and Restatement.

held WorldCom stock ***during the fraud period* ...**"). The ending date of the fraud period is particularly critical because the calculation of loss may not include any losses suffered by an investor as a result of a decline in the stock price long after disclosure of the fraud. *United States v. Olis*, 429 F.3d 540, 548 (5th Cir. 2005) (observing that loss could not include the drop in stock price that occurred more than a week after the announcement of the restatement of earnings) (*Olis* cited with approval in *Rutkoske, supra*); *cf. United States v. Reifler*, 446 F.3d 65, 125-26 (2d Cir. 2006) (loss for restitution purposes does not include losses on stocks purchased after conspiracy ended). Moreover, the loss to a particular investor must be offset by all gains realized by the investor from the purchase and sale of a particular stock during the fraud period. *United States v. Laurienti*, 611 F.3d 530, 557 (9th Cir. 2010).

Second, the district court must identify what losses were proximately caused by a defendant's misconduct. In this regard, it is not enough to prove "transaction causation," *i.e.*, reliance. *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336, 341-42 (2005). Rather, the government must also prove "loss causation." *Id.* This requires the Court to focus on the decline in the price of the stock after the truth was revealed, and to exclude "the portion of a price decline caused by other factors..." *Rutkoske*, 506 F.3d at 179. "[T]he court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes." *United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007).

The government does not even pay lip service to this well-established methodology for determining loss or damages in securities fraud cases. The government makes no effort to limit the loss to an identifiable "fraud period." Instead, the government readily acknowledges that its loss figure was simply "the aggregate loss suffered by victims to whom Levis directly made misrepresentations" for different calendar years. (Doc.#100, at p.27). The government does not appropriately calculate trading gains realized by investors during the applicable fraud period nor offset the losses by the appropriately calculated gains. Finally, the government does not even attempt to disentangle the many other factors that caused the decline in Doral's share price. Thus, the government's loss figure incorrectly assumes that the entire decline in Doral's share price was the result of Mr. Levis's misrepresentations, and that ***none*** of the

Judge Griesa
November 15, 2010
Page 4

decline was the result of any other factors such as, for example, Doral's decision to switch from the "spot rate" to the "forward curve."

### B. The Government Cherry-Picks the Loss Periods to Maximize Trading Losses and Ignore Trading Gains

The Superseding Indictment charged that the fraud occurred from in or about 2001 until April 2005. In its Sentencing Memorandum, the government claims that the fraud with respect to the external valuations occurred from 2001 until the April 19, 2005, announcement that Doral intended to incorporate the forward curve and write down its IO portfolio by between $400 and $600 million. (Doc. #100, at pp. 11, 21). With respect to the caps, the government claims in its Sentencing Memorandum that the fraud occurred between February 1, 2005, and April 19, 2005. (Doc. #100, at pp.19-20). Even affording investors a few extra days to absorb the April 19, 2005 disclosure, the government's "fraud period" ended no later than April 21, 2005.[3]

Yet, notwithstanding its own factual allegations regarding the "fraud period," the government's loss methodology disregards the concept of a fraud period entirely. Instead, the government inexplicably utilizes a different, result-oriented, "loss period" for each investor. For Fidelity, the government uses the calendar years 2005-06; for Meisenbach, the government opts for only 2005; and, for Holland, the government relies on 2004-05. The government then aggregates the realized losses during those "loss periods." As demonstrated below, the

---

[3] Mr. Levis respectfully submits that the period of the alleged fraud actually ended one month earlier, on March 17, 2005. The 2004 Form 10-K and Annual Report, issued on March 15, 2005, disclosed the true sensitivity of the IO portfolio to a hypothetical rise in interest rates. Thus, any fraud with respect to the "caps" necessarily ended with that disclosure. Mr. Levis also submits that, with the Annual Report's disclosure that Doral was using the "spot rate," the market already had enough information to reject the usefulness of the "external valuations." Thus, Mr. Levis submits that the alleged fraud was disclosed on March 15, 2005. Even assuming a reasonable time for the market to absorb the disclosure, the "fraud period" ended no later than March 17, 2005.

government's figures include investor losses from purchases/sales of Doral's stock that occurred long **after** the alleged fraud was disclosed, and exclude the substantial gains that these investors realized during the fraud period but **before** the fraud was disclosed. Moreover, as explained in Section I.C., *infra*, the government's analysis incorrectly assumes that the entire decline in Doral's share price over the loss period is attributable to Mr. Levis.

The government's failure to utilize the correct methodology is reason enough to reject the reasonableness and reliability of the government's estimate. That failure is proof enough that the loss reasonably cannot be determined. Beyond that, however, the evidence affirmatively shows that the losses claimed by the government are grossly overstated.

### 1. *Fidelity*

The $42.3 million in net realized losses claimed by Fidelity for 2005-06 paints an incomplete and misleading picture. First, and most significant, the government's methodology conveniently ignores trading **gains** that Fidelity realized in 2001-04. To be sure, Fidelity actually realized an overall **net gain** of more than **$54.4 million**, not including dividends, during the overall "fraud period" alleged by the government (2001 through April 21, 2005). *See* Affidavit of John Barron (**attached as Exhibit #1**), at pp.2-3, ¶¶10-12. Thus, Fidelity was a net winner in Doral, not a net loser. The government was certainly aware of these trading gains, but inexplicably chose not to include them in the loss analysis.[4]

Second, the government's methodology includes losses that were realized **after** the fraud period alleged by the government, including losses that Fidelity realized because it continued to hold Doral shares while it declined from an

---

[4] In response to a *Brady* request made by Mr. Levis on November 11, 2010, the government provided, among other documents, a spreadsheet of Fidelity's trades for the period of January 1, 2001, through May 31, 2005. *See, e.g.,* Fidelity Spreadsheet, 1/1/01 through 5/31/05 (**attached as Exhibit #2**). Barron used these spreadsheets. *See* Barron Affidavit (Exh. #1), at p.3, ¶11.

BLACK SREBNICK KORNSPAN STUMPF

average share price of $28 on March 17, 2005, to less than $3 per share in December 2006 (more than 20 months after the fraud period). The realized losses include Doral shares that Fidelity owned and continued to hold after April 21, 2005, as well as shares that Fidelity **purchased** after April 21, 2005. Of the $42.3 million that Fidelity purportedly lost in 2005-06, approximately $38 million was lost **on purchases** of Doral shares after March 17, 2005, the alleged "fraud period" proposed by Mr. Levis.

Third, in calculating the realized losses for 2005-06, the government uses a last-in/first-out accounting methodology. Fidelity, however, began purchasing Doral stock at low prices at least as early as 2001 and continued purchasing as the price increased. By matching up the sales in 2005 and 2006 with the more recent purchases, the government inflated the realized loss in 2005 and 2006.

Finally, the government's methodology fails to include the tens of millions of dollars in dividend payments that Fidelity received from 2001 through 2005 as a result of its Doral holdings. Accordingly, no loss can be attributed to Mr. Levis from Fidelity's purchase and sale of Doral's shares during the fraud period.

### 2. *Holland Capital*

The $29.3 million in trading losses claimed by Holland Capital in 2004-05 should be rejected for several reasons. First, Holland's realized losses include losses on 181,000 shares that Holland **purchased** from March 31, 2005, through September 30, 2005, after the disclosure of the 2004 Annual Report. (Doc. #100-10, at p.31); See Barron Affidavit (Exh. #1), at p.4, ¶18.

Second, almost all of Holland's realized trading losses were caused by its own decision to continue holding Doral shares **after** the disclosure of the alleged fraud. In particular, Holland sold 1,426,575 shares on October 26, 2005, at a share price of $8.46. (Doc. #100-10, at p.31). But the price of Doral's shares at the end of the alleged "fraud period" claimed by Mr. Levis (*i.e.*, March 17, 2005) was, on average, approximately $28. Holland's decision to hold onto more than 1.4 million shares as it declined **an additional $20 per share** after the end of the fraud period accounts for almost all of Holland's realized losses.

BLACK SREBNICK KORNSPAN STUMPF

Third, Holland's records are internally inconsistent and inherently unreliable. *See* Barron Affidavit (Exh. #1), at p.4, ¶18. For example, GX1045 listed selected historical trades purportedly made by Holland, including a purchase of 70,000 shares on June 11, 2004, a day on which the stock market was closed for President Ronald Reagan's funeral. *See* GX1045 (**attached as Exhibit #3**), at HCM2-013. Yet, no purchase in that amount is found anywhere near June 11, 2004, on the records recently provided by Holland and relied on by the government. *Compare* Doc. #100-10, at p.31, *with* Exh. #3, at HCM2-013. Was that purchase made and did Holland realize a gain? Are there other unrecorded purchases and sales? As another example, Holland's new records include a figure of 223,250 "shares sold but not bought" and 5,000 "shares bought but not sold," without any further explanation. *See* Doc. #100-10, at p.31; Barron Affidavit (Exh. #1), at p.4, ¶18.

Fourth, the Holland analysis does not include any dividends earned by Holland while it owned its shares of Doral.

Finally, the Declaration of Billie Mallie (Doc. #100-10, at p.28), attached to the government's Sentencing Memorandum, does not discuss any trades in Doral shares that Holland may have executed prior to 2004, during the fraud period. That Declaration does not negate the possibility that Holland realized gains prior to 2004.

### 3.   *Meisenbach Capital*

For Meisenbach, the government utilizes a "loss period" of calendar year 2005 to arrive at a realized loss amount of $3,036,139 for both stock and options trades. This figure substantially misrepresents Meisenbach's losses.

Meisenbach's representative, Randy Saluck, testified at trial that he first invested "a couple million dollars" with Doral "[s]ometime in the summer of 2003," sold it "[s]ometime in the first quarter of 2004" when the price hit its target, and made money from the investment. (Tr.852, 854). Saluck did not identify the purchase price or sale price, but Doral's share price (adjusted for a 3:2 stock split) increased during this time period and also generated substantial dividends. According to the government, the trading records for Meisenbach no

longer exist. (Tr.904). Thus, it is impossible to tell whether Meisenbach was a net winner or net loser during the fraud period.

The government's loss figure also includes $837,000 in losses that Meisenbach realized on options trades (puts) in March 2005, including options that were "out of the money." (GX-1111; Doc. #100-9, at p.18). Options are inherently speculative. This particular options portfolio would realize gains only if Doral's stock price, which was above $40 per share at the time the initial option trades were executed, declined to a particular price range. Even more significant, these particular options trades would have lost money if Doral's share price **increased**. Mr. Levis cannot be held responsible because the price of Doral's stock did not hover in the precise range wagered by Meisenbach. Finally, Saluck did not testify about any options trades at all, so it is entirely possible that Meisenbach realized gains from an options portfolio in 2003-04.

### C. The Government's Loss Analysis Fails to Exclude Other Factors That Caused Doral's Price Decline

The government's loss analysis ignores the issue of "proximate causation." The government does not attempt to disentangle the underlying value of Doral's stock or to exclude the portion of Doral's share decline caused by other factors. *Dura Pharmaceuticals, supra; Rutkoske, supra.* The government simply **assumes** that the entirety of the decline in Doral's shares over each "loss period" was caused by the disclosure of the truth about the caps and external valuations.

As the Court will recall, the watershed event in the history of Doral's financial reporting was the correction of its accounting methodology to incorporate the "forward curve" instead of the "spot rate." *See* GX206; Superseding Indictment, pp.9-10, at ¶18; Tr.2670. Mr. Levis was not involved in the choice of methodology. And, as the government conceded at trial, there was nothing criminal associated with the use of the spot rate or the accounting change. (Tr.431, 2667). Thus, any analysis of trading losses must invariably account for, and disentangle, the effect on Doral's share price of the use of the spot rate and the subsequent change to the forward curve.

Judge Griesa
November 15, 2010
Page 9

      The 2004 Form 10-K and Annual Report ("2004 Annual Report") disclosed that Doral was using the "spot rate." The 2004 Annual Report also disclosed significant new information about Doral's revenue from mortgage production, assumptions that influenced the internal valuation of the IO portfolio (*i.e.*, prepayment speed and discount rate), and a host of other industry-wide and firm-specific factors. On March 17, 2005, following the disclosure of the 2004 Annual Report, Doral held its first ever 2004 10K Earnings Call. *See* Transcript of 2004 10K Earnings Call (DX10) ("Earnings Call") (*see* Doc. #99, at Exh. B). The callers asked questions about many subjects, including but not limited to Doral's internal valuation assumptions, its level of mortgage originations, adequacy of hedging, the prospect of a share repurchase program, new taxes on financial institutions in Puerto Rico, a particular mortgage swap transaction with competitor R&G.

      Given the volume of information disclosed in the 2004 Annual Report, and the questions posed during the Earnings Call, the overwhelming majority of which had nothing to do with caps, it reasonably cannot be determined whether, or to what extent, the fall in Doral's share price was proximately caused by the alleged actions of Mr. Levis. The analysts themselves expressed concern with other then-existing problems. These problems are discussed in more detail below.

          **1.**    ***Skepticism About Mortgage Production Growth***

      The growth of Doral as a company was the result of its capture of the mortgage origination market in Puerto Rico. During the relevant period (2001-05), Doral was the largest mortgage originator in Puerto Rico, with close to 50% of the total origination market share. GX-1509 (**attached as Exhibit #4**), at p.3. Thus, it is not surprising that, historically, Doral's share price was closely correlated to the level of its loan production. From June 30, 1998, until December 31, 2004, the computed correlation coefficient, which measures the strength of the relationship between two variables, was 98%. *See* Barron Affidavit (Exh. #1), at pp.1-2, ¶¶4-6. From June 30, 1998, through September 30, 2009, the correlation coefficient was 94%. *Id.* at p.2, ¶6.

Judge Griesa
November 15, 2010
Page 10

In the 2004 Annual Report, Doral disclosed that of the $7.8 billion in mortgage production for 2004, purchases of mortgage loans accounted for $2.9 billion, or **37%** of total mortgage production. See 2004 Annual Report, at p.54. This disclosure was significant because the profit margins on originated mortgages were far higher than on mortgages purchased in the secondary market. To compound this concern, the 2004 Annual Report revealed that at least $200 million of the mortgages purchased for 2004 included a "swap" transaction between Doral and R&G. Id. at p.116. In other words, rather than conduct a swap of only the interest-rates (e.g., fixed rate for floating rate), Doral actually swapped the fixed mortgages themselves for floating rate mortgages and then double-counted the floating rate mortgages it had purchased as "mortgage production." The 2004 Form 10-K issued by R&G similarly detailed this swap.

The emergence of the double-counted "mortgage swap" alarmed the market because investors would question whether all of the purchases were inflating Doral's mortgage production numbers.[5] Indeed, the R&G transaction was questioned on the Earnings Call and in subsequent analyst reports. See Earnings Call, at pp. DCF00189409-10, 189417-18. Namely, investors began to question the integrity of including mortgage purchases in the mortgage production number. See, e.g., id. at p.189418. According to Randy Saluck, the Meisenbach representative, the R&G transaction "spooked" the market. (Tr.902).

Using the regression analysis, the estimated impact on the stock price if the market removed all mortgage ***purchases*** from the mortgage production data, and just valued Doral on its own mortgage originations, is telling. Namely, "a 37% reduction in loan production would result in a predicted 43% reduction in share price." See Barron Affidavit (Exh. #1), at p.2, ¶9. Not coincidentally, Doral's share price fell by approximately 44% within the three days after the issuance of the 2004 Annual Report (from $38.29 on March 15, 2005 to $21.50 on March 18, 2005). The reasonableness of this analysis is confirmed by the fact that Doral later removed mortgage purchases from the mortgage production number in the Restatement. When viewed using this analysis, the decline in

---

[5] Mr. Levis was not responsible for the decision to swap mortgages with R&G or to categorize the purchased mortgages as mortgage production.

Judge Griesa
November 15, 2010
Page 11

Doral's stock price after the disclosure of the 2004 Annual Report may be attributed entirely to only this factor.

Aside from the market's concerns about mortgage purchases, the slowdown in mortgage **originations** also concerned the market. According to the report of Omotayo Okusanya, an analyst who covered Doral and testified for the government at trial, the 2004 Annual Report revealed that "growth in nonconforming loans (which generates Doral's high gain on sale margin) slowed in 4Q04 by about 12% on a quarter over quarter basis." GX1523 (**attached as Exhibit #5**), at UBS_S026512. According to Okusanya, this would affect Doral's earnings per share by as much as $0.12. Id. Okusanya also attributed the decline in Doral's share price, in part, to "slowing loan originations." Id. at UBS_S026502.

### 2.  Concerns About Doral's Audited Internal Assumptions

The valuation of Doral's IO portfolio necessarily depended upon assumptions about the speed with which borrowers would prepay their mortgages and the discount rate. The assumptions that Doral used to arrive at an **internal** fair value of its IO portfolio were published **quarterly**. Those assumptions were audited and approved by PWC which tested Doral's internal valuation every quarter. Significantly, Doral first disclosed in its 2004 Annual Report that it was using the spot rate, rather than the forward yield curve, to value the IO portfolio. See Superseding Indictment, at p.17, ¶34; 2004 Annual Report, at p.37.

After the release of the 2004 Annual Report, investors began to question whether the audited assumptions used by Doral to value its IO portfolio were too aggressive. The Earnings Call was dominated by questions about Doral's assumptions. See Earnings Call, at pp. 189411-14, 189418-19, 189427-36. Indeed, investors appeared to be concerned about the changes in the assumptions. At least one analyst listed the sustainability of the internal I/O assumptions as the first explanation for the decline in Doral's share price in March 2005. See Exh. #5, at UBS_S026502. Mr. Levis played no role in those internal assumptions.

### 3. Threatened Special Tax on Banks in Puerto Rico

On or about March 15, 2005, the very same day that the 2004 Annual Report was released, Governor Anibal Acevedo Vila of Puerto Rico proposed new legislation to impose a special 5% tax on the net interest income of financial institutions. See Puerto Rico Herald, March 24, 2005 (**attached as Exhibit #6**). The proposal was made amid concerns about the budget deficit in Puerto Rico. The second question at the Q4 2004 Earnings Call concerned this possible tax increase. See Earnings Call, at p.189408. This proposal, among other factors, caused all Puerto Rico bank stocks to decline on March 16, 2005. See Exh. #6. Okusanya estimated that the proposed legislation would impact Doral's earnings per share by as much as $0.16, and he attributed the decline in Doral's share price, in part, to the threatened local tax legislation. See Exh. #5, at p.UBS_S026513.

### 4. Credit Concerns – Credit Rating Downgrade

The Annual Report notes that "[i]f Doral Financial's credit rating on its debt securities were to fall below investment grade, Doral Financial's ability to obtain liquidity through the capital markets would be materially adversely affected." See 2004 Annual Report, at p.66-67. The 2004 Annual Report further noted that "[a] decrease in DRL's credit rating could also make it more difficult for it to sell non-conforming loans subject to recourse provisions, since the purchasers of loans subject to recourse provisions rely in part on the credit of Doral Financial when purchasing such loans." Id. Once the share price of Doral began to fall after the release of the 2004 Annual Report, it would have been natural for investors to become concerned about the effect of the drop in Doral's stock price on its credit rating. This would have created a snowball effect, leading to more selling. On March 22, 2005, Moody's changed the ratings outlook on Doral to "negative" from stable, citing a heightened risk that Doral could take actions to bolster shareholder value to the detriment of creditor protection.

### 5. Other Firm-Specific Factors

The Earnings Call revealed a number of other issues that concerned investors, including but not limited to whether Doral's mortgage sales were "true

Judge Griesa
November 15, 2010
Page 13

sales" that permitted the recognition of earnings, or whether the mortgage purchasers had certain recourse guarantees against Doral that would preclude the recognition of the transactions as sales. *See* Earnings Call, at p.189409.

### 6.   *Other Market Forces – the "Perfect Storm"*

On March 16, 2005, **all** Puerto Rico bank stocks declined in value. *See* Exh. #6. According to the Puerto Rico Herald, analysts attributed the decline to a "perfect storm" of factors, including the release of Doral's Form 10-K, an investigation by the SEC of W Holding, and the possible increase in taxes on the Puerto Rico financial sector. *Id.* The share price of a number of Puerto Rico banks (*e.g.*, Banco Popular) continued to decline in subsequent days. This decline in the share price of comparable companies indicates the existence of other market forces at work. *Rutkoski*, 506 F.3d at 179.

### 7.   *Summary of Factors*

In sum, it "reasonably cannot be determined" whether, and to what extent, the disclosure of the truth regarding Mr. Levis's alleged misrepresentations regarding the caps and the external valuations affected Doral's share price. The government has not produced an "event study" nor offered any expert testimony to link the decline in the share price to the offense conduct in this case. Evidence that investors lost money after relying on Mr. Levis to either purchase or hold their shares in Doral does not establish that Mr. Levis "proximately caused" their loss.

## II.   **Gain**

When the loss from the offense "reasonably cannot be determined," the Guidelines instruct courts to use gain as an alternative. *See* U.S.S.G. §2B1.1 n.3(B). Mr. Levis agrees with the PSR's recommendation that the Court utilize gain, but disagrees with the PSR's adoption of Doral's methodology for calculating the gain to Mr. Levis. *See* Barron Affidavit (Exh. #1). The most logical measure of Mr. Levis's gain should reflect the difference between the bonus he actually received for 2001-04, which was based on the financial results originally reported by Doral, and the bonus he would have received had it been based on

Judge Griesa
November 15, 2010
Page 14

Doral's restated financials.[6] As reflected in the revised PSR, at ¶¶59-60, that gain is $38,000.

The revised PSR, however, relies upon the calculation submitted by Doral, which simply combines the bonus that Mr. Levis received in 2000 ($410,000) with the bonus he received in 2003 ($425,000). PSR, at ¶72. According to the PSR, the total amount – $835,000 -- represents an amount to which Mr. Levis was not entitled based on the restated numbers.

We object to this calculation, and would note that the bonus in 2000 was outside the time period charged in this case. See Superseding Indictment, at ¶¶17, 50, 52. Moreover, the calculation assumes that Mr. Levis was not entitled to any bonus in 2003. Yet, even based on the restated numbers, Doral had substantial earnings in 2003 and Mr. Levis was entitled to a bonus of $387,000. See Barron Affidavit (Exh. #1), at pp.4-5, ¶¶19-22. Thus, the "gain" is $38,000 ($425,000 less $387,000).

### III.   Number of Victims

Mr. Levis opposes the government's request for an enhancement of six (6) levels for the number of victims (>250) under U.S.S.G. §2B1.1(b)(2)©, both because the government's objection was untimely and on the merits. If the Court uses gain as the measurement of loss, there are no victims.

A "victim" means "any person who sustained any part of the actual loss determined under subsection (b)(1)." See U.S.S.G. §2B1.1, n.1 (Definitions). The government argues that the enhancement is applicable because Fidelity had more than 250 investors. (Doc. #100, at p.35). But, as noted above, Fidelity actually realized a **net gain** in Doral shares.[7] Moreover, the government cites no

---

[6] The bonus he earned in 2004 – calculated at $660,000 – is not included because Mr. Levis was terminated on August 19, 2005, before actually receiving that bonus.

[7] The government does not suggest that either Holland Capital or Meisenbach Capital had more than 250 investors.

Judge Griesa
November 15, 2010
Page 15

law for the proposition that each investor in a mutual fund should be treated as a separate "victim" under the Guidelines. There is no evidence that any, much less 250, of these Fidelity investors actually relied on Mr. Levis's statements or suffered an actual loss as a result of Mr. Levis's statements.

The government also argues that the 2004 Annual Report reported that Doral had 482 shareholders. The government does not identify who or how many, if any, suffered a loss during the fraud period. Many of Doral's shareholders had purchased their shares years before at a low cost basis. Many may have already sold part of their position for a substantial gain. The government bears the burden. There is no evidence that more than 250 of the 482 shareholders suffered a loss during the fraud period.

### IV. **Conclusion**

For the foregoing reasons, Mr. Levis respectfully submits that the Court should reject the government's proposed application of the Sentencing Guidelines and impose a reasonable sentence in this case. A reasonable sentence is one that is sufficient, but not greater than necessary to achieve the goals of sentencing. A sentence consistent with the 24-30 months advisory range in the initial PSR would be reasonable.

Respectfully submitted,

*[signature]*

ROY BLACK
HOWARD SREBNICK
SCOTT SREBNICK

cc: USPO Ross Kapitansky
AUSAs Miller/Litt