# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

08 Cr. 181 (TPG)

- v. -

MARIO S. LEVIS,
   a/k/a "Sammy Levis,"

Defendant.

---

## AFFIDAVIT OF JOHN E. BARRON, CPA

John E. Barron being duly sworn, deposes and says

1.      I am a Certified Public Accountant (CPA) and a Director in the Litigation and Corporate Financial Advisory Services practice for the firm of Marks Paneth & Shron, LLP (MPS), maintaining an office at 622 Third Avenue, New York, NY 10017.

2.      My prior experience includes approximately 23 years with the firm of Deloitte & Touche, including 12 years as an audit partner in the firm's financial services group. A copy of my curriculum vita is annexed hereto as Exhibit G of this affidavit.

3.      I was retained by counsel to Mr. Levis in October 2009 to serve as an accounting expert in the above captioned matter.

### Regression Analyses of Doral's Share Prices and Total Loan Production

4.      I have been asked by counsel to Mr. Levis to prepare a regression analysis of share prices and total loan production of Doral Financial Corporation ("Doral") to determine the correlation coefficient[1] over certain specified periods. The first correlation analysis begins with the quarter ended June 30, 1998 and ends with the quarter ended December 31, 2004. The second correlation analysis begins with the quarter ended June 30, 1998 and ends with the quarter ended September 30, 2009.

---

[1] Correlation coefficient is a statistical measure of association or strength of the relationship between two variables. A correlation coefficient of 0 indicates that the variables are absolutely independent, and a correlation of 1.0 indicates a perfect correlation. Correlation can be used to predict the value one variable based on the value of the other variable.

5.      For both correlation analyses, I was instructed to use daily share prices for Doral Financial Corporation as reported by Bloomberg and calculated the average quarterly share prices based on the average price for the following quarter. For example, the average share price for the quarter ended June 30, 1998 was based on the average of the daily prices for the quarter ended September 30, 1998. The source of the Doral Financial Corporation's loan production amounts came from information contained in Doral's Form 10-Q filed for each quarter or, when the Form 10-Qs were not timely filed in 2005, I used loan production amounts reported in Doral's press releases filed on Form 8-K. Quarterly loan production amounts are provided in Exhibits A (1998 to 2004) and B (1998 to 2009).[2]

6.      For the periods from the quarter ended June 30, 1998 through December 31, 2004, the computed correlation coefficient was 98%. For the periods from the quarter ended June 30, 1998 through September 30, 2009, the computed correlation coefficient was 94%. Both analyses indicate a high degree of correlation. Scatter plot diagrams of the variables are provided in Exhibits C (1998 to 2004) and D (1998 to 2009).

## Computation of Predicted Reduction in Doral Share Price Based Upon a 37% Reduction in Loan Production

7.      I have been asked by counsel to Mr. Levis to prepare a computation of predicted reduction in share price for Doral based on an assumed 37% reduction in loan production. For purposes of this analysis, I used fourth quarter 2004 loan production of $2,033 million.

8.      In calculating the predicted reduction in share price, I applied a formula determined by me from the above described regression analysis of Doral's average quarterly share prices and Doral's quarterly loan production, beginning with the quarter ended June 30, 1998 and ending with the quarter ended September 30, 2009. The computed formula is $y = 0.4718x - 138.4$, where y is the Doral average quarterly share price and x is Doral's quarterly loan production. This formula is shown in Exhibit D. Quarterly loan production amounts used in the regression analysis are presented in Exhibit B. The methodology used in determining the average quarterly share prices and the quarterly loan production amounts is described in paragraph 5, above.

9.      As shown in the attached analysis as set forth in Exhibit E, a 37% reduction in loan production would result in a predicted 43% reduction in share price.

## Computation of Fidelity's Gains and Losses on Stock Sales For 2001 Through April 20, 2005

10.      I have been asked by counsel to Mr. Levis to prepare a summary of book gains and losses as reported by Fidelity Investments on the sale of common stock of Doral for each of the calendar years beginning with the year ended December 31, 2001

---

[2] Through December 31, 2004, the amounts represent total loan production. For subsequent quarters, the amounts represent internal loan production.

and ending with the year ended December 31, 2004 and for the period from January 1, 2005 through April 21, 2005.

11.     I obtained schedules of stock trades from counsel to Mr. Levis which showed trade dates, cost, proceeds, and book gains or losses for trades reported within calendar years 2001 through 2006. I added the individual book gains and losses shown in the schedules to arrive at totals for each period.  I did not verify the accuracy or completeness of the information shown on the schedule.

12.     Based on my calculations using the information provided by counsel to Mr. Levis, Fidelity Investments realized a total net book gain of approximately $ 54.4 million for the period from January 1, 2001 through April 21, 2005.  The information is summarized in the following table:

| Year of Sale | Net Gains (Thousands) |
|---|---|
| 2001 | $ 3,387 |
| 2002 | 24 |
| 2003 | 26,098 |
| 2004 | 18,213 |
| 2005 | 6,707 (through April 21, 2005) |
| Total | $54,429 |

## Computing Realized Gains and Losses for Meisenbach Capital

13.     I have been asked by counsel to Mr. Levis to prepare a summary of book gains and losses as reported by Meisenbach Capital Management ("Meisenbach") on the sale of common stock of Doral for each of the calendar years beginning with the year ended December 31, 2001 and ending with the year ended December 31, 2004 and for the period from January 1, 2005 through April 21, 2005.

14.     I obtained schedules of stock trades from counsel to Mr. Levis which showed trade dates, cost, proceeds, and book gains or losses for trades reported in 2005 and reviewed it.  I also reviewed excerpts from the testimony of Randy Saluck, Portfolio Manager of Meisenbach Capital Management from 2002 through 2005.

15.     Based on my review of this information, I am unable to compute the realized gains and losses for the requested periods as I have determined that Meisenbach's schedule is incomplete.  Meisenbach's schedule does not include any information with respect to purchases and sales in periods prior to 2005. Mr. Saluck testified that Meisenbach began investing in Doral's stock in 2003 and sold the stock in 2004 once it hit Meisenbach's target price. Mr. Saluck testified that the stock went up faster than anticipated and the sale in 2004 produced a profit. Information with respect to the amount of these profits realized in 2004 has not been provided.

## Computing Realized Gains and Losses for Holland Capital Management

16.     I have been asked by counsel to Mr. Levis to prepare a summary of book gains and losses as reported by Holland Capital Management ("Holland") on the sale of common stock of Doral for each of the calendar years beginning with the year ended December 31, 2001 and ending with the year ended December 31, 2004 and for the period from January 1, 2005 through April 21, 2005.

17.     I obtained schedules of stock trades from counsel to Mr. Levis which showed trade dates, cost, proceeds, and book gains or losses for each day reported within 2005 and reviewed it. I was also provided with Government Exhibit 1045 which listed selected historical trades made by Holland.  I was also provided with an affidavit from Billie Mallie, an employee of Holland, stating that he retrieved records of Holland's securities transactions in Doral shares from 2004 through 2005.

18.     Based on my review of this information, Holland's schedule did not agree with Government Exhibit 1045.  For example, I found six purchases on Government Exhibit 1045 that did not appear on Holland's schedule of stock buys and sells obtained from counsel to Mr. Levis.  In addition, the totals shown on Government Exhibit 1045 for units, cost, net proceeds, and what appears to be a net loss amount do not agree with Holland's schedule and the schedule of stock trades that I received from counsel to Mr. Levis shows 223,250 Doral shares described as "sold but not bought" for which the actual cost was not known.  It is unclear how these items may have affected the computation of loss.  Finally, according to Mr. Mallie's affidavit, Holland did retrieve trades before 2004.  For these reasons, I am unable to compute Holland's realized gains and losses for the requested time periods.  In the course of my review of the schedules it was noted that: (1) Holland's computation of losses included losses on 181,000 shares of Doral that were purchased from March 31, 2005 through September 30, 2005, and (2) approximately 90% of the total sales occurred on October 26, 2005.

## 2003 Restated Bonus of Doral's Treasurer

19.     I have been asked by counsel to Mr. Levis to prepare a computation of the bonus due to Doral's Treasurer using the restated 2003 net income results.

20.     Doral's 2002 Proxy Statement states that Doral entered into a two year employment agreement, dated as of March 5, 2002 with its Treasurer, which became effective as of January 1, 2002 and expired on December 31, 2003.  The Proxy Statement and the Treasurer's Employment Agreement state that the Treasurer would receive a base salary of $400,000 and annual incentive compensation ("bonus") equal to 5% of Adjusted Net Income in excess of an amount equal to a 15% return on common stockholders' equity, with an annual limit of $825,000 on total compensation.

21.     Based on the Proxy Statement and the Employment Agreement, Adjusted Net Income is defined as Doral's annual consolidated net income after taxes and after

adding back incentive compensation payable to the Treasurer and Doral's other executive officers and the deduction of dividends on preferred stock.

22.      Based on the information included in Doral's Proxy Statements for the years 2002 to 2006 and Doral's restated financial statements and accompanying information contained in Doral's Form 10-K/A for 2004, I performed the attached computation of the Treasurer's incentive compensation as set forth in Exhibit F. Based on these computations, I determined that the Treasurer would have been entitled to a bonus of $387,000 for 2003. As reported in Doral's Proxy Statement, the Treasurer was paid a bonus of $425,000 for 2003 and thus would owe Doral $38,000.

John E. Barron, C.P.A.

Sworn to and subscribed to before
me this 15th day of November 2010

Notary Public, State of New York

MARIA M. LOPEZ
Notary Public, State of New York
No. 4684831
Qualified in Kings County
Commission Expires 10/31/13

5

EXHIBIT A

# Doral Financial Corporation
## Loan Production and Average Stock Prices
## For the Period June 1998 thru September 2009

| Month | Day | Year | Loan Production for Quarter in Millions | | Average Stock Price | |
|---|---|---|---|---|---|---|
| 6 | 30 | 1998 | $ | 544 | $ | 153.72 |
| 9 | 30 | 1998 | $ | 567 | $ | 154.53 |
| 12 | 31 | 1998 | $ | 815 | $ | 171.14 |
| 3 | 31 | 1999 | $ | 702 | $ | 156.67 |
| 6 | 30 | 1999 | $ | 751 | $ | 135.89 |
| 9 | 30 | 1999 | $ | 601 | $ | 109.18 |
| 12 | 31 | 1999 | $ | 668 | $ | 91.58 |
| 3 | 31 | 2000 | $ | 782 | $ | 102.82 |
| 6 | 30 | 2000 | $ | 820 | $ | 123.32 |
| 9 | 30 | 2000 | $ | 780 | $ | 163.82 |
| 12 | 31 | 2000 | $ | 792 | $ | 230.18 |
| 3 | 31 | 2001 | $ | 915 | $ | 264.58 |
| 6 | 30 | 2001 | $ | 1,051 | $ | 309.96 |
| 9 | 30 | 2001 | $ | 1,093 | $ | 302.04 |
| 12 | 30 | 2001 | $ | 1,150 | $ | 302.82 |
| 3 | 31 | 2002 | $ | 1,190 | $ | 315.64 |
| 6 | 30 | 2002 | $ | 1,252 | $ | 343.97 |
| 9 | 30 | 2002 | $ | 1,329 | $ | 357.78 |
| 12 | 31 | 2002 | $ | 1,398 | $ | 408.86 |
| 3 | 15 | 2003 | $ | 1,461 | $ | 541.65 |
| 6 | 30 | 2002 | $ | 1,606 | $ | 592.38 |
| 9 | 30 | 2003 | $ | 1,681 | $ | 661.02 |
| 12 | 31 | 2003 | $ | 1,731 | $ | 660.81 |
| 3 | 31 | 2004 | $ | 1,841 | $ | 660.68 |
| 6 | 30 | 2004 | $ | 1,945 | $ | 785.02 |
| 9 | 30 | 2004 | $ | 1,986 | $ | 883.15 |
| 12 | 31 | 2004 | $ | 2,030 | $ | 801.53 |

EXHIBIT B

# Doral Financial Corporation
## Loan Production and Average Stock Prices
## For the Period June 1998 thru September 2009

| Month | Day | Year | Loan Production for Quarter in Millions | | Average Stock Price | |
|---|---|---|---|---|---|---|
| 6 | 30 | 1998 | $ | 544 | $ | 153.72 |
| 9 | 30 | 1998 | $ | 567 | $ | 154.53 |
| 12 | 31 | 1998 | $ | 815 | $ | 171.14 |
| 3 | 31 | 1999 | $ | 702 | $ | 156.67 |
| 6 | 30 | 1999 | $ | 751 | $ | 135.89 |
| 9 | 30 | 1999 | $ | 601 | $ | 109.18 |
| 12 | 31 | 1999 | $ | 668 | $ | 91.58 |
| 3 | 31 | 2000 | $ | 782 | $ | 102.82 |
| 6 | 30 | 2000 | $ | 820 | $ | 123.32 |
| 9 | 30 | 2000 | $ | 780 | $ | 163.82 |
| 12 | 31 | 2000 | $ | 792 | $ | 230.18 |
| 3 | 31 | 2001 | $ | 915 | $ | 264.58 |
| 6 | 30 | 2001 | $ | 1,051 | $ | 309.96 |
| 9 | 30 | 2001 | $ | 1,093 | $ | 302.04 |
| 12 | 30 | 2001 | $ | 1,150 | $ | 302.82 |
| 3 | 31 | 2002 | $ | 1,190 | $ | 315.64 |
| 6 | 30 | 2002 | $ | 1,252 | $ | 343.97 |
| 9 | 30 | 2002 | $ | 1,329 | $ | 357.78 |
| 12 | 31 | 2002 | $ | 1,398 | $ | 408.86 |
| 3 | 15 | 2003 | $ | 1,461 | $ | 541.65 |
| 6 | 30 | 2002 | $ | 1,606 | $ | 592.38 |
| 9 | 30 | 2003 | $ | 1,681 | $ | 661.02 |
| 12 | 31 | 2003 | $ | 1,731 | $ | 660.81 |
| 3 | 31 | 2004 | $ | 1,841 | $ | 660.68 |
| 6 | 30 | 2004 | $ | 1,945 | $ | 785.02 |
| 9 | 30 | 2004 | $ | 1,986 | $ | 883.15 |
| 12 | 31 | 2004 | $ | 2,030 | $ | 801.53 |
| 3 | 31 | 2005 | $ | 1,200 | $ | 305.72 |
| 6 | 30 | 2005 | $ | 1,450 | $ | 297.66 |
| 9 | 30 | 2005 | $ | 1,270 | $ | 205.93 |
| 12 | 31 | 2005 | $ | 1,236 | $ | 219.89 |
| 3 | 31 | 2006 | $ | 876 | $ | 157.50 |
| 6 | 30 | 2006 | $ | 487 | $ | 108.53 |
| 9 | 30 | 2006 | $ | 329 | $ | 88.48 |
| 12 | 31 | 2006 | $ | 325 | $ | 44.82 |
| 3 | 31 | 2007 | $ | 268 | $ | 30.51 |
| 6 | 30 | 2007 | $ | 308 | $ | 21.40 |
| 9 | 30 | 2007 | $ | 354 | $ | 19.36 |
| 12 | 31 | 2007 | $ | 401 | $ | 19.41 |
| 3 | 31 | 2008 | $ | 372 | $ | 18.57 |
| 6 | 30 | 2008 | $ | 383 | $ | 13.63 |
| 9 | 30 | 2008 | $ | 318 | $ | 7.88 |
| 12 | 31 | 2008 | $ | 254 | $ | 4.40 |
| 3 | 31 | 2009 | $ | 242 | $ | 3.39 |
| 6 | 30 | 2009 | $ | 292 | $ | 2.87 |
| 9 | 30 | 2009 | $ | 249 | $ | 3.27 |

EXHIBIT C



Average Stock Price and Loan Production



**EXHIBIT E**

**Doral Financial Corporation**
**Predicted Reduction in Share Price Based on a 37% Reduction in Loan Production**

| | |
|---|---:|
| Loan Production Amount (in millions) | $ 2,033 |
| 37% reduction in Loan Production | -752 |
| Reduced Loan Production Amount | $ 1,281 |

Share prices based on regression formula:

| | |
|---|---:|
| Price based on $2,033 Loan Production (0.4718 x 2,033 - 138.4) | $ 821 |
| Price based on $1,281 Loan Production (0.4718 x 1,281 - 138.4) | $ 466 |
| Predicted reduction in share price | $ 355 |
| Predicted percentage reduction in share price (355/821) | 43% |

Updated MSL Bonus Computations from Restated Financial Statements       EXHIBIT F
US v. Levis
For Restatement Period
(dollar amounts in OOOs)

|  | 2003 |
|---|---|
| **Computation of Restated NI Available to Common Shareholders** | |
| **Restated Net Income** | 142,138 |
| | |
| **Add: Bonuses Paid to Highly Compensated Executives** | |
| Salomon Levis | 1,800 |
| Zoila Levis | 750 |
| Edison Velez | 300 |
| Julio Micheo | 392 |
| Fernando Rivera Munich | 100 |
| Mario S. Levis | 425 |
| Richard Bonini | 225 |
| Ricardo Melendez | |
| David R. Levis | 406 |
| **Restated NI Before Bonuses to Highly Compensated Executives** | 146,536 |
| | |
| Less:  Cash Dividends Paid on Preferred Stock | (21,088) |
| | |
| **Restated Adjsted Net Income** | 125,448 |
| | |
| **Computation of Average Common Shareholders' Equity** | |
| | |
| **Restated Stockholders' Equity** | 1,182,362 |
| | |
| **Less:  Preferred Stock** | |
| Preferred Stock, 7% | (74,750) |
| Preferred Stock, 8.35% | (50,000) |
| Perpetual cumulative convertible preferred stock (4.75%) | (345,000) |
| Perpetual noncumulative nonconvertible, Series C (7.25%) | (103,500) |
| **Total Preferred Stock** | (573,250) |
| | |
| **Common Stockholders's Equity** | 609,112 |
| | |
| **Computation of Adjusted Net Income as Percentage of Average Common Stockholders' Equity** | |
| | |
| Average of Current and Prior Year Restated Common Stockholders' Equity | 592,620 |
| | |
| **Restated NI Before Bonuses** | 125,448 |
| | |
| **Restated Return on Equity (ROE) Before Executive Bonuses** | 21% |
| | |
| **Computation of Levis Bonus Using Restated ROE** | |
| | |
| Resated NI Eligible for Bonus (Exceeding 15% Restated ROE) | 6% |
| | |
| MSL's Bonus is 5% of Restated ROE in Excess of 15% | 0.31% |
| | |
| **Restated MSL Bonus Due Before Cash Compensation Limit is Applied** | 387 |
| | |
| **MSL Bonus Subject to Cash Compensation Limits per Employment Contract Terms** | |
| | |
| Total Cash Compensation Limit | 825 |
| Less: Annual Salary | (400) |
| Net Bonus Allowed | 425 |
| | |
| Net MSL Bonus Entitled To Per Contract | 387 |
| Net MSL Bonus Received per Proxy Statements | 425 |
| | |
| **Annual Bonus Excess (Deficit) Due To (From) MSL due to Restatement** | (38) |

EXHIBIT G

# JOHN E. BARRON
# CURRICULUM VITAE

## PROFESSIONAL EXPERIENCE

2003 to Date   **Marks Paneth & Shron LLP,** Director, Litigation and Corporate Financial Advisory Services

1987 to 2003   **Deloitte LLP**

1998 to 2003   Audit Partner - New York

- Clients:  Fortress Investments and Anthracite Capital, alternative mortgage investment hedge funds, Morgan Stanley and Merrill Lynch real estate investment funds, Kajima Construction Company
- AA and PwC Peer Review Team
- Firm-designated Financial Instruments Specialist

1987 to 1998   Audit Partner - Atlanta

- Clients:  Real estate and mortgage loan investment and pension investment advisory funds  of Equitable Life Assurance Society and Metropolitan Life,  Summit Properties and Childress Klein Properties real estate investment trusts
- Developed National Audit Valuation Support Guidelines
- National Practice Office Review Team
- National Director of REIT Accounting and Auditing Services

1976 to 1987   **Penner Financial Group,** Chief Financial Officer - commercial real estate investment and finance

1970 to 1976   **Haskins & Sells** – accounting and auditing services relayed to savings and loan associations, and a bank sponsored real estate mortgage investment trust

## PROFESSIONAL ACTIVITIES

Adjunct professor of accounting and auditing at CUNY, Baruch College

2010 New York State Society of CPAs Auditing Standards Committee

2003 to 2006   New York State Society of CPAs- Professional Ethics Committee

1993 to 1998   National Association of Real Estate Investment Trusts:

## EDUCATION

University of Florida- B.S. in Business Administration-Accounting, with Honors

## PROFESSIONAL CERTIFICATION and MEMBERSHIPS

Certified Public Accountant, New York

American Institute of Certified Public Accountants

## CONTACT INFORMATION

Marks, Paneth & Shron LLP          jbarron@markspaneth.com
622 Third Avenue                   (212) 201-3258
New York, NY 10017

## CASES IN WHICH JOHN E. BARRON HAS PROVIDED EXPERT TESTIMONY

Securities and Exchange Commission in the matter related to AA Capital Partners, Inc.,
Gerard A. M. Oprins, CPA, Wendy McNeeley, CPA, Respondents, testified at
Administrative Proceedings on July 28 and 29, 2010

Comet Systems, Inc. Shareholders' Agent, Plaintiff, v. MIVA, Inc.. f/k/a FindWhat.com
Testimony at deposition on February 27, 2008

CILP Associates L.P. and Cohen Pooled Assets L.P. against Lipper Convertibles, L.P.
and PricewaterhouseCoopers, U.S. District Court, Sothern District of New York,
Testimony at deposition on December 13, 2006

MSDW 140 Broadway Property, L.L.C. V. Brown Brothers Harriman & Co.
New York, New York American Arbitration Association Testimony at deposition on May
24, 2005

Richard P. Friedman and SIGS Publications, Inc. v. Ralph Anderson, Rockaway Partners,
and Eisner LLP - State Supreme Court, State of New York, County of New York
Testimony at deposition on March 8, 2006

## OTHER CASES RETAINED AS AN EXPERT

Ohio Public Employees Retirement System and State Teachers Retirement System of
Ohio, Plaintiffs, v. Federal National Mortgage Association, and certain officers and
KPMG

United States v. Mario S. Levis in the matter related to Doral Financial Corp.

Skilled Investors v. Weiser LLP in the matter related to Sagam Management Corp., registered investment advisor.

Consultation in the matter of Kingate Euro Fund Limited and Kingate Global Fund Limited, in Liquidation

Consultation in the matter of Vault partners LLC and Vault Global Opportunities L.P.

Class action litigation against Royal Bank of Scotland Group PLC

Bondholders of Le-Nature's Inc., v. Wachovia Capital Markets, LLC, Ernst & Young LLP, BDO Seidman, LLP, Gregory J. Podlucky, and Robert Lynn

Marcia Copeland vs. Bank of America and GRP Financial

Able Fund, Able Euro Fund, Bank of Bermuda Guernsey, Banque de Luxembourg, et al., Plaintiffs, against J. Robert Dobbins, Dobbins Offshore Capital LLC, Dobbins Offshore Ltd., KPMG Accountants N.V. and Citco Fund Services (Curacao) N.V., Defendants.

Theo Bullmore and Philip Stenger, official liquidators of Beacon Hill Master Fund, against Ernst & Young Cayman Islands, Ernst & Young LLP, and Beacon Hill Asset Management, LLC