UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| - v. - | : | 08 Cr. 181 (TGP) |
| MARIO S. LEVIS, <br> a/k/a "Sammy Levis," | : | |
| | : | |
| Defendant. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# GOVERNMENT'S MEMORANDUM IN
# RESPONSE TO DEFENDANT'S SENTENCING SUBMISSION

 

PREET BHARARA
United States Attorney for the
Southern District of New York

DAVID I. MILLER
MARC LITT
Assistant United States Attorneys

JASON ANTHONY
Special Assistant United States Attorney

- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| - v. - | :   08 Cr. 181 (TGP) |
| MARIO S. LEVIS, <br>     a/k/a "Sammy Levis," | : |
| | : |
| Defendant. | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**GOVERNMENT'S MEMORANDUM IN
RESPONSE TO DEFENDANT'S SENTENCING SUBMISSION**

The Government respectfully submits this memorandum in response to the sentencing submission of defendant Mario S. Levis, a/k/a "Sammy Levis" ("Levis"), filed November 10, 2010 ("Levis's Submission"). Levis's Submission misses the mark for several reasons. As set forth in the Government's November 10, 2010 Sentencing Submission (the "Government's Submission"), a Guidelines sentence sufficiently promotes general deterrence, punishes Levis for his crimes, and is reasonable and appropriate. Furthermore, such a sentence is warranted, reasonable, and appropriate.

**A.    The Government Did Not Waive Its Right to Object to the PSR**

Levis asserts in his submission that the Government's Guidelines position should be disregarded because the Government submitted its Guidelines position to the Probation Officer 20 days after – instead of within 14 days – the initial Presentence Report ("PSR") was released. (Levis's Submission at 6-8). Essentially, Levis argues that he has not been provided the requisite notice, far enough in advance of sentencing, in order for the defense to prepare its position adequately. This argument is disingenuous.

First, Levis had notice of the Government's loss position well in advance of the November 10, 2010 scheduled *Fatico* hearing. On or about October 18, 2010, the Government notified Levis's counsel that it did not intend to call an expert witness at the *Fatico* hearing. (*See* Exhibit A hereto). On October 19, 2010, the Probation Office provided the initial PSR to the parties. Soon thereafter, and well before November 2, 2010 (14 days after the initial PSR's submission), the parties discussed the Government's intention to call investor victims to testify at the *Fatico*.[1] Accordingly, Levis knew before November 2, 2010 what the Government's loss theory would be.

On November 3, 2010, the Government sent an email to Levis's counsel detailing the Government's sentencing positions in this case – including on loss amount and victims, and attached loss analyses for two of the victims – and notifying Levis's counsel of the Government's belief that a *Fatico* hearing was no longer necessary. (*See* Exhibit D hereto). In this e-mail, the Government indicated its intention to submit affidavits from investor victims, and the Government proposed a briefing schedule. On November 4, 2010, Levis's counsel indicated that they had no objection to the submission of affidavits or the proposed briefing schedule. (*See* Exhibit E hereto).

Thus, until the beginning of November, the parties understood that Guidelines computation issues, such as loss amount, would be resolved at the scheduled November 10 *Fatico* hearing. And the parties likewise understood that the final PSR was not going to be

---

[1] Notably, when there was an issue with the timing of one of the potential witness's testimony, the Government suggested alternative plans for testimony, including moving the *Fatico* hearing to December. (*See* Exhibit B hereto). Levis's counsel, however, stated that they are unavailable after the November 16, 2010 sentencing date so that the *Fatico* needed to proceed on November 10. (*See* Exhibit C hereto).

2

issued until *after* the *Fatico* hearing.  Regardless, as demonstrated above, Levis had clear notice that the Government disagreed with Levis's position on the loss caused by his fraud well before November 2, 2010.  In fact, when the Government submitted its Guidelines position to the probation officer on November 8, 2010, the Government's only objections were to Levis's computation of the loss enhancement under U.S.S.G. § 2B1.1(b)(1), and the PSR's omission of the enhancement for the number of victims (more than 250) under U.S.S.G. § 2B1.1(b)(2).  (*See* Exhibit F hereto).[2]

Second, Levis has not articulated how he has been prejudiced in the process.  Indeed, Levis today filed a 104-page memorandum and exhibits, including an expert report with regression analysis.

Third, Levis's counsel contends that they have not received trading records for those investor victims included in the Guidelines loss computation.  This is another red herring.  The Government provided the defense the loss analyses submitted by Meisenbach, Holland Capital, and Fidelity.  Furthermore, it is the undersigned's understanding that the defense was provided trading records for Holland Capital Management and Fidelity in discovery before trial. (*See* HCM 000001 and HCM2 000000005-14 for Holland Capital, and FID 269-318 for Fidelity). The Government has no other trading records, and had the defense wanted additional records, it could have obtained them under Fed. R. Crim P. 17(c).

---

[2] Contrary to Levis's submission at 7, the Government was not obligated to provide anything beyond the position it articulated in its November 8, 2010 email.  Specifically, the Government was not required under Rule 32 to provide an in-depth factual/legal "proximate cause" analysis to the probation officer.  The defense has remained free to argue to the Court, as it has, that the Government has not sufficiently proven causation.

3

In sum, Levis's claim that the Government somehow "waived" its right to object to the initial PSR because of a purported lack of notice to Levis's counsel should be rejected. Furthermore, under Fed. R. Crim. P. 32, the Court may find that, for the reasons articulated above, there is good cause to consider the Government's objections even if they were submitted over 14 days after the initial PSR.  *See* Fed. R. Crim. P. 32(b)(2) ("The court may, for good cause, change any time limits prescribed in this rule."); Fed. R. Crim. P. 32(i)(1)(D) (court "may, for good cause, allow a party to make a new objection at any time before sentence is imposed.").

**B.     The Government Has Proven Loss By a Preponderance of Evidence**

Levis next argues that the Government has not, and cannot, establish that Levis's misrepresentations proximately caused investors's losses.  But the Government, in fact, did just that at trial and in its Submission.

As the Government showed in its Submission, Meisenbach Capital Management, Holland Capital Management, and Fidelity traded and/or held Doral stock based on Levis's direct misrepresentations concerning independent valuations and contractual caps, and suffered an approximate loss of $75 million.[3]  (*See* Government's Sentencing Submission at 25-33).  There

---

[3]  Levis argues that, in calculating the applicable loss amount, Fidelity's gains from its investment in Doral during the 2002-2004 period should offset any losses suffered by Fidelity in 2005-2006.  This argument should be rejected.  The Guidelines do not reward defendants for gains caused by a defendant's fraud in calculating the Guidelines loss amount.  For example, in a Ponzi scheme, the commentary to the Guidelines makes clear that the losses suffered by one investor shall not be reduced by the gains incurred by another investor.  *See* U.S.S.G. § 2B1.1 comment. (n. 3(F)(iv)).  Similarly, a fraudster's payments to an investor to prompt the investor to either invest additional funds or maintain their investment ("lulling payments"), are not offset against losses suffered by that same investor.  *See United States v. Alfonso*, 479 F.3d 570, 572-73 (8th Cir. 2007) (holding that "the district court properly declined to offset victims' gains on one investment against their losses on subsequent investments."); *United States v. Carrozzella*, 105 F.3d 796, 805 (2d Cir. 1997) ("We have held that loss in fraud cases includes the amount of property taken, even if all or part has been returned . . . .  One reason for this rule is that, as in

can be no reasonable dispute that Levis caused these investors to trade or hold Doral stock on

Levis's misrepresentations.[4]  Furthermore, the Government demonstrated that Levis's lies caused

Doral's stock price to plummet because the interest-only strips (the "IOs"), to which Levis's lies

related, were Doral's principal asset.  (*See id.* at 34-42).  Investors made investment decisions

based on the value of Doral's IOs, and once the true nature of its value was revealed, analysts and

---

Carrozzella's case, the return of money as interest or other income is often necessary for the scheme to continue."), *abrogated in part on other grounds by United States v. Kennedy*, 233 F.3d 157 (2d Cir 2000); *United States v. Mucciante*, 21 F.3d 1228, 1237-38 (2d Cir. 1994) ("Although [defendant] returned some of [victim-1's] money, and repaid [victim-2] and [victim-3], he did so as part of a meretricious effort to maintain their confidences.  He is therefore not entitled to credit for sums returned, or for sums spent for [vicitim-1's] benefit.").

     This logic applies with equal force here.  The gains that Fidelity's trading operations realized in the 2002-2004 period from purchases and sales of Doral stock were, in part, caused by misrepresentations by Levis about the valuation of Doral's most important asset.  One need look no further than what happened to Doral's stock price in 2005 when its financial statements were restated and the fraud was revealed to conclude that the fraud scheme artificially inflated the price of Doral's stock.  Thus, Doral's gains during the 2002-2004 trading period are analogous to lulling payments made in a Ponzi scheme:  Fidelity continued to invest during that period due, in part, to Levis's fraudulent misrepresentations, but when Levis's fraud was revealed, Fidelity lost millions of dollars.  As with lulling payments that are not offset against a victim's losses, when it comes time to assess the magnitude of his wrongdoing, Levis should not benefit from a significant byproduct of his fraud.  Notably, the case cited by Levis, *United States v. Laurienti*, 611 F.3d 530 (9th Cir. 2010), is inapposite.  In that case, the court offset losses that were suffered by an investor who had purchased "house stocks" touted by the victim's brokerage house – the pumped stocks subsequently plummeted – by the gains received from purchasing other touted "house stocks."  Those facts stand in stark contrast here where Fidelity was essentially lulled into investing in Doral stock on multiple occasions, but subsequently lost millions when the fraud was uncovered on Doral's principal asset.

     [4]  Levis suggests that misrepresentations concerning caps could not have affected investor decisions because they "were not made in any public filings or disseminated by Mr. Levis to the *public at large*."  (Levis's Submission at 10 (emphasis added)).  Notably, Levis ignores trial witness testimony showing Levis lied about contractual caps directly to specific investors – as discussed in the Government's Submission – which caused those investors to buy or hold Doral stock.  Moreover, Levis made misrepresentations to analysts in the apparent hope that they would transmit those misrepresentations to the investing public in their reports and recommendations concerning Doral stock.

investors lost their confidence in Doral, its management, and the purported value of its principal asset.  (*See id.*).  Consequently, for the reasons set forth in the Government's Submission, and as demonstrated by the documentary evidence and witness testimony at trial, the Government has shown by a preponderance of the evidence that Levis's misrepresentations caused the losses at issue.  A conservative estimate of that loss, for just those three investors, is approximately $75 million.[5]

Levis's arguments in his Submission fail to undermine the Government's showing.  First, Levis contends that the cap misrepresentations did not effect Doral's share price in February 2005.  (*See* Levis's Submission at 10).  But this ignores the full story.  Doral's stock price stabilized in early February 2005 because, in large measure, of the cap misrepresentations.  As discussed in the Government's Submission, analysts such as Messrs. Omotayo Okusanya and Jay Cunningham wrote positive reports and reiterated their recommendations based on Levis's lies regarding caps and that the IOs had purportedly been valued conservatively.  (*See* Government's Submission at 35-37).  In essence, Levis's representations gave professional analysts and, by extension, investors comfort that Doral was properly valued and this contributed to the stock's stabilization.  For example, the misrepresentation about the existence of caps was of great significance to Valerie Friedholm, who, in 2005, analyzed Doral stock for Fidelity, which held a 10% ownership interest in Doral.  If Fidelity had learned of Levis's lies and sold off its position in Doral, this would surely have effected Doral's stock price.

---

[5] As the Government argued in its Submission, the Government contends that, under 18 U.S.C. § 3553(a), the Court should take into account the ultimate market impact and loss, including the hundreds of victims of Levis's fraud, in fashioning an appropriate sentence.

Second, Levis contends that his misrepresentations concerning the independence of Morgan Stanley and Popular Securities's valuations did not inflate Doral's share price. (*See* Levis's Submission at 10). This argument blinks reality. As discussed in the Government's Submission, investors and analysts relied on the existence of these independent valuations in assessing the value of the IOs. (*See* Government's Submission at 38-40). Indeed, PWC relied upon the accuracy and legitimacy of these valuations in its yearly audits of Doral's financial statements.[6] (*See id.*). And Doral's Form 10-Ks, which included the financial statements PWC audited, made numerous representations to investors about the source of the reported values for Doral's IOs. (*See id.*). Because of Levis's corruption of the valuation process, and inflation of the IO's value through purported "independent" valuations, the inflated internal methodology was blessed by accountants and utilized by Doral and its prospective and actual investors to assess the public value of the IOs. Of course, once First Manhattan recognized that the IOs were overvalued, and the Doral Board became so aware, the Company announced its intention to restate earnings.

While it is true that Levis did not dictate that Doral's internal model use a spot-rate methodology (*see* Levis's Submission at 11), Levis did interfere with the objectivity of the external valuators. If Levis had obtained a market quote for the IOs, that quote would have incorporate the forward curve. (*See* April 12, 2010 Trial Testimony (excerpts of which are

---

[6] Contrary to Levis's statements in his Submission at 10, PWC never independently valued the IOs. Rather, as part of its audit procedures, PWC tested Doral's internal model using PWC's own methodology as a quality check. (*See* April 9, 2010 Trial Testimony of Carlos Mendez (excerpts of which are attached hereto as Exhibit G) at 1538-39). In fact, Carlos Mendez testified that the external valuations were the most significant audit evidence supporting the IO's value. (*See id.* at 1539-40).

attached hereto as Exhibit H) at 1741-43). Indeed, Popular Securities wanted to value the IOs using a forward-curve methodology, which would have substantial decreased its value, but Levis lied to Popular and told them that the pass-through rate was capped at 3.4%, in order to convince them not to use the forward-curve methodology. (*See* Government's Submission at 12-13).

The bottom line is this: If Levis had actually obtained independent valuations of the IOs, Doral's IOs would have never been wildly over-valued in the first place, and Doral's stock price would have never been set up for its precipitous fall. In this manner, Levis's lies about the nature of the supposedly independent Morgan Stanley and Popular valuations were responsible for inflating the price of Doral stock from 2001 through 2004 and for the investor losses that occurred when interest rates rose and Doral valued its assets properly. Following Doral's disclosures about the true value of its assets, Doral suffered a market capitalization loss amounting to billions of dollars. Thus, as demonstrated at trial, in the Government's Submission, and herein, the Court should reject Levis's argument that "'it reasonably cannot be determined' whether, and to what extent, the disclosure of the truth regarding Mr. Levis's misrepresentations regarding the caps and the external valuations affected Doral's share price." (Levis's Submission at 12).

**C.    Effect of a Discount in the Loss Amount**

There can be no reasonable dispute that Levis is responsible for losses suffered by Meisenbach Capital, Holland Capital, and Fidelity, and for some measure of the overall market loss. But even if the Court were to discount any such loss to account for loss factors other than Levis's fraud – and the Government submits that it should not – discounting this loss amount still yields a sentence well above Levis's proposed 24 to 30-month sentence.

As discussed more fully in the Government's Submission, the Government's current Guidelines computation is as follows: the base offense level is seven (§ 2B1.1(a)(1)); because the loss exceeded $50,000,000 but did not exceed $100,000,000, the base offense level is increased by 24 offense levels (§ 2B1.1(b)(1)(M)); because the offense involved 250 or more victims, the base offense level is increased by six levels (§ 2B1.1(b)(2)(C)); and because the offense involved a violation of securities law and, at the time of the offense, the defendant was an officer or director of a publicly traded company, the base offense level is further increased by four levels (§ 2B1.1(b)(17)(A)). Levis's offense level is thus 41. Levis has no prior criminal convictions and is thus in Criminal History Category I. Accordingly, Levis's Guidelines sentencing range is 324 to 405 months' imprisonment.

Levis's argument that he is responsible for *none* of the loss suffered by even the three investors listed above – much less the hundreds of investors who lost money in Doral stock – makes no sense. But even if Levis was not held responsible for the full measure of the $75 million loss suffered by the three victims who relied on Levis's direct misrepresentations on caps and independent valuations, the Government submits that his Guidelines sentence would still be quite substantial:

| Discount from $75 Million Loss | Resulting Loss Amount | U.S.S.G. § 2B1.1 Enhancement | Total Offense Level (Including Other Adjustments) | Guidelines Sentence |
|---|---|---|---|---|
| 50% | $37,500,000 | Add 22 Levels | OL 39 | 262-327 |
| 75% | $18,750,000 | Add 20 Levels | OL 37 | 210-262 |
| 90% | $7,500,000 | Add 20 Levels | OL 37 | 210-262 |
| 95% | $3,750,000 | Add 18 Levels | OL 35 | 168-210 |
| 99% | $750,000 | Add 14 Levels | OL 31 | 108-135 |

Furthermore, even if the Guidelines enhancement for the number of victims (250 or more) is excluded from the calculation, the Guidelines sentence is still substantially higher than what Levis claims is appropriate:

| Discount from $75 Million Loss | Resulting Loss Amount | U.S.S.G. § 2B1.1 Enhancement | Total Offense Level (Excluding Enhancement for Number of Victims) | Guidelines Sentence |
|---|---|---|---|---|
| 50% | $37,500,000 | Add 22 Levels | OL 33 | 135-168 |
| 75% | $18,750,000 | Add 20 Levels | OL 31 | 108-135 |
| 90% | $7,500,000 | Add 20 Levels | OL 31 | 108-135 |
| 95% | $3,750,000 | Add 18 Levels | OL 29 | 87-108 |
| 99% | $750,000 | Add 14 Levels | OL 25 | 57-71 |

Accordingly, even if this Court was to discount Levis's responsibility for Meisenbach Capital, Holland Capital, and Fidelity's loss **by 99%**, the Guidelines sentence is still 108 to 135 months' imprisonment. And if this Court were to discount the loss amount by 99% and exclude

an enhancement for the number of victims impacted by Levis's fraud, the Guidelines sentence is still 57 to 71 months' imprisonment.

D.   **Levis's Financial Loss Is of No Consequence**

Levis argues that he never exploited his misrepresentations because he never sold Doral stock when it was artificially inflated and lost millions of dollars when Doral's price crashed. (*See* Levis Submission at 12-14). But this argument misses the mark. Levis perpetrated his fraud to keep his stock portfolio, once valued at more than $60 million, at the level that it was. His motivation was to keep and accumulate more wealth through the value of his portfolio in the face of rising interest rates, which were sure to reduce substantially the IO's value. The mere fact that Levis lost money as a result of his fraudulent conduct's ultimate revelation does not mean that his conduct is somehow out of the Guidelines' heartland, warranting a downward departure under U.S.S.G. § 5K2.0, or befitting of a variance under 18 U.S.C. § 3553(a).

Finally, while the Government refers the Court to its Submission for a more lengthy discussion of why a Guidelines sentence is warranted under 18 U.S.C. § 3553(a), the Government notes that Levis's representation that he "did not seek to profit from the misrepresentations" (Levis's Submission at 16) is baffling.[7] It is clear from the trial testimony and documentary evidence that Levis perpetrated his fraud to maintain the value of Doral's most prized asset: the IOs. And why would he do that? As Levis notes in his own submission, his

---

[7] The Government notes that Levis is wrong that the "need to avoid unwarranted sentencing disparities," *see* 18 U.S.C. § 3553(a)(7), is not implicated here because there are no co-defendants. This factor is designed not only to ensure sentencing consistency between and among co-defendants, but also to ensure that there are not unwarranted sentencing disparities nationwide among similarly-situated defendants. And as the Government noted in its Submission at 44, a very substantial sentence here would simply not implicate any "unwarranted" disparity with other similarly situated felons.

11

personal wealth was wrapped up in Doral's stock value. If that stock was to go down substantially, Levis would be harmed. Thus, Levis's motive to lie is crystal clear: it was pure greed and self-enrichment.

## CONCLUSION

As demonstrated in the Government's Sentencing Submission, and in this Response to Levis's Submission, Levis committed serious offenses that spanned several years and caused substantial damage to individual investors, his former employer, and public confidence in the market. Levis's conduct demonstrates that a sentence within the Guidelines advisory range of 324 to 405 months' imprisonment is reasonable and would meet the statutory imperatives of Section 3553(a). In any event, the Court should sentence Levis to a significant sentence that would promote general deterrence and sufficiently punish Levis for the widespread impact of his crimes.

Dated:   New York, New York
         November 15, 2010

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney
                              Southern District of New York


                        By:          /s/
                              DAVID I. MILLER
                              MARC LITT
                              Assistant United States Attorneys
                              (212) 637-2295 / 2484

                              JASON ANTHONY
                              Special Assistant United States Attorney