

**BLACK**
**SREBNICK**
**KORNSPAN**
**STUMPF**

TRIAL ATTORNEYS

February 2, 2011

Honorable Thomas P. Griesa
United States District Judge
500 Pearl Street, Room 1630
New York, New York 10007-1312

Re: *United States v. Levis*, No. 08-CR-181 (TPG)
Defendant's Submission on Restitution

Dear Judge Griesa:

We respectfully submit Mr. Levis's response to the Government's January 4, 2011, letter regarding restitution, which incorporated the Victim Impact Statement submitted by Doral to the United States Probation Office on November 5, 2010.

To summarize, none of the alleged investor "victims" in this case has sought restitution. Rather, the only entity on whose behalf the government is seeking restitution is Doral, Mr. Levis's former employer. The government, however, has not carried its burden of proving Doral's entitlement to any restitution as a matter of law. Accordingly, no restitution should be ordered in this case.

I. **Overview**

On April 29, 2010, the jury convicted Mr. Levis of securities and wire fraud arising out of alleged misrepresentations that Mr. Levis made about Doral's portfolio of interest-only strips ("IO"). The misrepresentations allegedly fell into two categories. First, Mr. Levis represented to the investing public that Doral's internal valuation of its IO portfolio was lower than two external valuations that Doral had obtained from "independent" parties. Second, Mr. Levis represented to a few investors and analysts that the pass-through rates owed to secondary buyers of Doral's mortgage portfolio were capped at rates substantially below the interest rate owed. On November 16, 2010, this Court sentenced Mr. Levis to 60 months in prison, but allowed his continued release on bond pending appeal. The Court deferred the determination of restitution pending submissions by the parties.

Mr. Levis was NOT charged with, much less convicted of, bank fraud or an accounting fraud scheme. Moreover, Doral was not alleged to be a victim of any of the offenses of conviction. Nonetheless, Doral seeks restitution in the outrageous sum of $131,607,549.91. Specifically, Doral asserts that it is entitled to the following four categories of restitution: (1) amounts it expended in settling shareholder class actions totaling $95,000,000; (2) legal and investigative fees and costs in the amount of $30,080,654.91; (3) accounting fees Doral incurred in restating its financials in the amount of $5,691,900; and (4) alleged unjustly earned compensation paid to Mr. Levis in the amount of $835,000.

Doral's claim for restitution is based on the false premise that Mr. Levis's narrow categories of alleged misstatements to investors caused Doral's problems over a five year period. In essence, Doral wants Mr. Levis to bear the financial burden for the *accounting* irregularities and mistakes at Doral.

Doral is not entitled to restitution because it has failed to demonstrate that its losses were the direct result of, or proximately caused by, Mr. Levis's offense conduct. As explained below, virtually all of the costs claimed by Doral were the result of its switch in accounting methodology, which led to a Restatement of earnings, thereby triggering an internal investigation, class action lawsuits and an SEC investigation. Yet, as the government repeatedly acknowledged during trial, Mr. Levis was not charged with manipulating the internal methodology or inflating the reported financials. Moreover, as this Court remarked at sentencing, there was no proof that Mr. Levis's conduct caused Doral to restate its earnings:

> Nor am I going to rely on any idea that Mr. Levis's conduct resulted in some specific inflation of the balance sheet or earnings statement figures about IOs, *because the government has not proven that*. That would be a big job to prove. That would take a lawsuit in itself. And we are not going to do that at this sentence. *It was not done at the trial*, and we're not going to start a new basically almost another lawsuit in connection with imposing a sentence.

Tr. Sentencing (11/16/10), at p. 46 (emphasis added) (attached as *Exhibit A*); *see also id.* at pp.13-14. Accordingly, and for the reasons set forth below, this Court should reject the government's request for restitution.

2

## II. Applicable Legal Principles

Doral seeks restitution under the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. §3663A. That statute defines a "victim" as "a person *directly and proximately* harmed as a result of the commission of an offense for which restitution may be ordered...." 18 U.S.C. § 3663A(a)(2).

"[I]n determining whether an entity qualifies as a 'victim,' a sentencing court can only consider the offense or offenses for which the defendant was convicted." *United States v. Battista* 575 F.3d 226, 231 (2d Cir. 2009) (citing *Hughey v. United States*, 495 U.S. 411, 413 (1990)).[1] Thus, restitution may be ordered "only for the loss caused by the specific conduct that is the basis of the offense of conviction." *Hughey*, 495 U.S. at 413. It may *not* be ordered "for losses stemming from all conduct attributable to the defendant, including conduct unrelated to the offense of conviction." *Id.* at 418. That is, the MVRA requires "proximate causation," and "[u]nder ordinary concepts of causation, a victim cannot be compensated for moneys which it would have parted with in any event." *U.S. v. Eisen*, 1991 WL 180402, at *1 (E.D.N.Y. Sept. 3, 1991).

Moreover, "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. §3664(e). Disputes about the proper amount of restitution "shall be resolved by the court by the preponderance of the evidence." *Id.*

Finally, the Court need not order restitution upon a finding that "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide any restitution to a victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B); *United States v. Agate*, 613 F.Supp.2d 315, 323 (E.D.N.Y. 2009). This provision calls for "a weighing of the burden that would be imposed on the court by adjudicating restitution in the criminal case against the burden that would be imposed on the victim by leaving him or her to other available legal remedies...."

---

[1] Although *Hughey* was decided under the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. §3663, its reasoning has been cited in the context of the MVRA because the language of both statutes focus on the losses from "the offense." *Compare* 18 U.S.C. §3663(a)(1)(B)(i)(I) *with* 18 U.S.C. §3663A(a)(1).

3

BLACK SREBNICK KORNSPAN STUMPF

U.S. v. Kones, 77 F.3d 66, 69 (3d Cir. 1996). "Nothing in the legislative history evidences an expectation that a sentencing judge would adjudicate, in the course of the court's sentencing proceeding, all civil claims against a criminal defendant arising from conduct related to the offense . . . The kind of case that Congress had in mind was one in which liability is clear from the information provided by the government and the defendant and all the sentencing court has to do is calculate damages." *Id.*

With these principles in mind, each of the four categories of restitution will be addressed (from highest to lowest dollar amounts).

### III. Doral's Claims Should Be Rejected

#### A. *Class Action Settlement ($95,000,000)*

Guised as a claim for restitution, Doral seeks indemnification from Mr. Levis for $95,000,000 that Doral paid to settle eighteen, class action shareholder lawsuits (consolidated as one action) that were filed between April 20, 2005, and June 14, 2005. Doral devotes a mere one-and-a-half page of its Victim Impact Statement to discussing the class action lawsuits because this claim for restitution is patently without merit.

As noted above, *Hughey* requires proof that the specific conduct underlying the offense of conviction proximately caused the losses claimed. Doral makes no attempt to link the settlement of the class action to any of the specific misstatements that formed the bases for Mr. Levis's offenses because no identifiable link exists.

The shareholder lawsuits were filed against **all** directors and several officers, including but not limited to Mr. Levis. The timing of the lawsuits – beginning on April 20, 2005 – was no coincidence. The lawsuits were prompted by the April 19, 2005, announcement that Doral would need to restate its financial statements as a result of the change of methodology (from the spot rate to the forward yield curve) in the internal valuation of its IO portfolio. The primary allegation of the lawsuits related to the switch in methodology. It is clear that Doral settled the shareholder lawsuits primarily because the change of accounting methodology, announced on April 19, 2005, caused a substantial drop in Doral's market value. The change of methodology was not the basis for the offenses of conviction, and Mr. Levis was not responsible for the "spot rate" methodology in any event. To be sure, the Court remarked during trial that the government did not claim "that there is any crime committed by using one

4

BLACK SREBNICK KORNSPAN STUMPF

methodology versus another methodology." *See* Trial Transcript, at p. 442 (attached as *Exhibit B*), at p. 442. Moreover, during sentencing, the Court stated:

> [I]t is my memory that the indictment did not charge, nor did the government attempt to prove at the trial that the valuations of the IO strips contained in Doral financial reports were false.

*Exhibit A*, at p.12.

"[T]he government must show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal connection between the conduct and the loss is not too attenuated (either factually or temporally)." *United States v. Cutter*, 313 F.3d 1, 7 (1st Cir. 2002). The government has offered no evidence to prove that even one penny of the settlement amount can be attributed to resolving allegations regarding Mr. Levis's statements to investors about caps or the external valuations. At sentencing, the government could not prove that the disclosure of Mr. Levis's offense conduct proximately caused a drop in Doral's stock price. Thus, it defies logic that Doral would have settled the class action lawsuits for $95 million because of liability concerns over Mr. Levis's offense conduct. Accordingly, Doral is not entitled to restitution for the amount it paid to settle the consolidated shareholder lawsuits.

### B.  *Legal and Investigative Fees ($30,080,654.91)*

Doral seeks restitution for legal and investigative fees it has incurred over the course of approximately five years, beginning with the date it hired Latham & Watkins LLP., ("L&W") to conduct an internal investigation into the circumstances that led up to the Restatement. Doral's Victim Impact Statement attaches invoices from a number of law firms spanning a five year period, including approximately three years worth of professional fees incurred before Mr. Levis was even indicted. At a minimum, the fees for these years have nothing to do with the criminal investigation into Mr. Levis's alleged misstatements to investors.

Doral is proceeding under 18 U.S.C. §3663A(b)(4), which states that an order of restitution requires a defendant to:

BLACK SREBNICK KORNSPAN STUMPF

> [I]n any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

Significantly, a district court is not required to award attorney's fees to a victim under the MVRA. *United States v. Weitzman*, 2010 WL 3912735, *1 (S.D.N.Y. Sept. 15, 2010) ("Under the MVRA, this Court has discretion to include certain attorney's fees in a restitution order."). Moreover, in order to award any such fees, the expenses must have been "necessary" and "incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." *Id.*; *accord United States v. Amato*, 540 F.3d 153, 159-63 (2d Cir. 2008). Accordingly, "any attorney's fees to be included under this provision *must* be tied to the investigation and prosecution of the criminal case." *Weitzman*, 2010 WL 3912735, at *1. Legal fees not directly "associated with assisting the government in the investigation and prosecution of the defendant's criminal offenses . . . are not compensable" as restitution. *Battista*, 575 F.3d, 226, 234 (2d Cir. 2009).

Doral's request for restitution should be denied because it fails to particularize those fees that were "necessary" and tied to the criminal case. For example, approximately half of the requested fees (approximately $15 million) were paid to L&W and Ernst & Young ("E&Y") to conduct the internal investigation authorized by the Audit Committee of Doral. *See* Victim Impact Statement, at p. 23. Another $12.7 million was paid to Cleary Gottlieb Steen & Hamilton LLP., ("Cleary") to defend Doral in the internal investigation and the various government investigations which followed. The costs relating to the internal investigation were the result of the decision taken by the Audit Committee and the Board of Directors to change the internal valuation methodology from the spot rate to the forward yield curve, thereby requiring a Restatement. *Id.* at p.13.

To be sure, the internal investigation involved the following subject matters:

> Whether Doral performed an internal valuation of the interest-only strips in accordance with GAAP (this was the valuation figures reported on Doral's financial statements);

6

BLACK SREBNICK KORNSPAN STUMPF

- Whether correct prepayment speeds and discount rates were used to value the $97 million impairment in the fourth quarter of 2004;

- Whether Doral correctly valued its mortgage servicing rights;

- Whether certain of the sales of the underlying loans were in fact true sales;

- Whether Doral improperly booked a fourth quarter 2004 transaction with R&G Financial solely to meet revenue targets;

- Review of accounting for derivatives and whether Doral adequately recognized forward contracts that met the definition of a derivative under SFAS 133; and

- Other accounting practices.

*See generally* Section 9A of Doral's Restated 2004 10-K.[2]

Other investigations followed the internal investigation, including probes by the SEC, the Federal Reserve and the FDIC. The Federal Reserve and FDIC matters dealt with issues of capital adequacy and liquidity, and were unrelated to the offenses of conviction. *See* Excerpt of Doral's Second Quarter 2009 Form 10-Q (excerpt attached as ***Exhibit C***). The crux of the SEC complaint was that Doral "improperly accounted for the purported sale of non-conforming loans" due to true sale issues, likewise not part of the offenses charged against Mr. Levis in this case. *See* SEC Complaint (attached as ***Exhibit D***).

None of those matters related to the facts underlying the offenses of conviction.

---

[2] The government has not proven, nor could it, that Doral would not have been required to restate its financials and perform an internal investigation but for Mr. Levis's actions. In other words, Doral would have restated its financials and authorized the internal investigation regardless of Mr. Levis's conduct. *See United States v. Cutter*, 313 F.3d 1, 7 (1st Cir. 2002) ("[R]estitution should not be ordered if the loss would have occurred regardless of the defendant's misconduct....").

7

BLACK SREBNICK KORNSPAN STUMPF



A review of the specific invoices submitted by Doral to support its request for more than $30 million in legal and investigative fees illustrates the grossly inappropriate nature of Doral's claim. For example, Cleary's invoices demonstrate the breadth of the work that they undertook, including interviewing employees, collecting documents to respond to an SEC subpoena, reviewing news articles on Doral, work on the civil class action, as well as matters that have nothing to do with the Restatement, much less with Mr. Levis's offense conduct.

Other invoices fail to provide sufficient particularity or any connection to the criminal investigation or prosecution. For example:

> - The invoices of E&Y, an accounting firm retained to assist Doral in the internal investigation, contain no time entries or descriptions of time -- therefore it is impossible to determine what E&Y was working on or whether that work was directly and proximately caused by the commission of Mr. Levis's offense;

8

- The L&W invoices fail to include time entries or descriptions and therefore suffer from the same problems as do the E&Y invoices;

- The Morvillo law firm invoices demonstrate that this firm represented individuals interviewed during the internal investigation. Much of the work appears to address matters unrelated to Mr. Levis or his case.

- The PMA law firm invoices show that virtually all of the work was not related to Mr. Levis or his case. For example, there are entries for gathering information for meetings with Doral's BOD, working on Doral press releases and financial statements. The invoices also show work on the internal investigation.

- The invoices of Sidley Austin LLP., show that this law firm represented Salomon Levis on issues unrelated to Mr. [Mario] Levis's criminal case and that Salomon Levis himself was investigated by the SEC and USAO.

- The Skadden law firm invoices show that the firm represented Peter Hoffman and John Hughes, two former members of Doral's BOD. Virtually all of the work is unrelated to Mr. Levis or the offenses with which he was charged. Neither Hoffman nor Hughes was called as a witness in Mr. Levis's case.

- The invoices of Wilkie Farr & Gallagher, LLP., show that this firm represented Ricardo Melendez, the former CFO of Doral, who himself was investigated by both the SEC and USAO. This work was unrelated to Mr. Levis or the offenses for which he was charged. Melendez likewise was not called as a witness at Mr. Levis's trial.

Where, as here, a dispute over the legitimacy of legal expenses threatens to complicate or prolong the process, the more appropriate course of action is to avoid a restitution mini-trial. Restitution may not be imposed if the determination of complex issues of fact relating to causation would unduly complicate or prolong the sentencing

BLACK SREBNICK KORNSPAN STUMPF

process. 18 U.S.C. 3663A(c)(3)(B) ("This section shall not apply ... if the court finds, from facts on the record, that ... (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide any restitution to a victim is outweighed by the burden on the sentencing process.").

Here, there are numerous complex factual issues related to Cleary's invoices that would unduly complicate or prolong the sentencing process, including whether Cleary would have been required to perform certain work *but for* Mr. Levis's actions, whether that work was necessary and whether the fees sought arise out of Doral's status as a victim that *was directly and proximately harmed as a result of the commission of the offense*. Doral also makes no effort to break down these fees and has attached to Mr. Peace's declaration what appears to be virtually all of its invoices on this matter from June of 2005 through April of 2010. The complex factual issues also extend to the additional invoices submitted by Doral as set forth above.

### C. *Accounting Restatement Costs ($5,691,000)*

The government seeks restitution for $5,691,000 in accounting fees that Doral paid to PriceWaterhouseCoopers for their work in connection with the Restatement. *See* Victim Impact Statement, at p.27. This request can be summarily rejected. As noted above, and as the Court remarked at trial and at sentencing, Mr. Levis was not responsible for, nor was he charged with any offenses relating to, the financial accounting or choice of methodology that triggered Doral's Restatement.

### D. *Alleged Unjust Compensation ($835,000)*

Finally, the government demands restitution for the bonus payments made by Doral to Mr. Levis in 2000 and 2003. Specifically, Doral seeks to recoup the $410,000 bonus it paid to Mr. Levis in 2000 and the $425,000 bonus it paid in 2003. *See* Victim Impact Statement, at p.26. Doral has no claim to the bonus for 2000 because it was outside the scope of the Superseding Indictment, and therefore not part of the offense of conviction. *See Hughey, supra.*

And, as for 2003, Doral is incorrect that Mr. Levis would have received no bonus for 2003 under the restated numbers. Rather, Mr. Levis's bonus would have been $387,000. *See* Affidavit of John E. Barron, C.P.A. (attached as *Exhibit F*), at ¶22.

10

BLACK SREBNICK KORNSPAN STUMPF

Thus, at most, the gain to Mr. Levis was $38,000 from the restated financials. *Id.* Even so, because Mr. Levis was not responsible for, nor charged with, matters related to the internal valuation, his conduct did not proximately cause Doral to pay him the additional compensation. Moreover, the cash compensation actually paid to Mr. Levis was well within line of other executives with similar experience. Finally, Mr. Levis legitimately earned a bonus for 2004 of $660,000, which Doral never paid him, so this amount should offset any allegedly unjust compensation that Mr. Levis earned in prior years.

### IV. Conclusion

Doral is exploiting the restitution process to recoup millions of dollars in expenses for losses not "proximately caused" by Mr. Levis and for which he is not legally responsible. The claim by its general counsel, Enrique Ubarri, Esq., that Doral "has not recovered from this episode" is belied by the facts, including the payment to Doral's CEO of $20.9 million in compensation in less than three years, from May 2006 through December 2008, (among the highest compensation paid out in our nation's banking system), and by its own statements that its capital "exceeds well capitalized benchmarks," *see* Feb. 2, 2010, Press Release (attached as *Exhibit G*), and that Doral "has been transformed into a sound institution." *See* Excerpt of December 2009 Investor Presentation (attached as *Exhibit H*). Moreover, as recently as December 7, 2010, Doral submitted a formal letter to purchase FirstBank Corporation, the second largest bank in Puerto Rico and a financial institution that is twice the size of Doral. *See* Exhibit 99.1 to Doral's December 7, 2010 8-K (attached as *Exhibit I*).

For the foregoing reasons, the government has failed to meet its burden and the claim for restitution filed by the government on behalf of Doral should be rejected.

Respectfully submitted,

ROY BLACK
HOWARD SREBNICK

cc: USPO Ross Kapitansky
AUSA David Miller

FTL 108,008,220v1 2-1-11

11

BLACK SREBNICK KORNSPAN STUMPF