# Exhibit A

1

0BGMLEVS1

1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    UNITED STATES OF AMERICA,
3
4                 v.                        08 Cr. 181 (TPG)
4
5    MARIO LEVIS,
5
6                      Defendant.
6
7    ------------------------------x
7
8                                          New York, N.Y.
8                                          November 16, 2010
9                                          2:35 p.m.
9
10
10   Before:
11
11                      HON. THOMAS P. GRIESA,
12
12                                        District Judge
13
13
14                         APPEARANCES
14
15   PREET BHARARA
15        United States Attorney for the
16        Southern District of New York
16   DAVID MILLER
17   MARC O. LITT
17        Assistant United States Attorneys
18   JASON ANTHONY
18        Special Assistant United States Attorney
19
19   BLACK SREBNICK KORNSPAN & STUMPF
20        Attorneys for Defendant
20   BY:  ROY BLACK
21        HOWARD SREBNICK
21        SCOTT SREBNICK
22        MARIA NEYRA
22        MARCOS BEATON, JR.
23
23   ALSO PRESENT:  ROBERT DiBRIENZA, FBI
24                  EMMA KUROSE, Paralegal
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

2

0BGMLEVS1

```
 1                  (Case called)
 2                  MR. MILLER:  Good afternoon, David Miller for the
 3     United States and with the government at counsel table is
 4     Assistant U.S. Attorney Marc Litt, Special Assistant Attorney
 5     Jason Anthony, FBI special agent Robert DiBrienza, and a
 6     paralegal from the U.S. Attorney's Office, Emma Kurose.
 7                  MR. BLACK:  Good afternoon, your Honor, Roy Black,
 8     Howard Srebnick, Scott Srebnick, Maria Neyra, and Marcos Beaton
 9     at counsel table this afternoon.  Good afternoon, your Honor.
10                  THE COURT:  There have been very extensive written
11     submissions both by the government and the defense.  And after
12     studying those I have a number of questions.  But I think that
13     for the sake of a proper public record I don't want to start,
14     as it were, in the middle of things.  And it seems to me that
15     it would be a good idea to simply start in the normal course
16     and have the defense lawyer present what you would like to
17     present, and then the government, and then I will ask my
18     questions.
19                  So I would like to start, obviously, with Mr. Black to
20     see what you would like to present.  Incidentally, I think on
21     the record I am required to ask you in court whether you and
22     your client have gone over the presentence report?
23                  MR. BLACK:  Yes, sir, we have.
24                  THE COURT:  You have?
25                  MR. BLACK:  Yes.  We have gone over it with the
```

3

0BGMLEVS1

```
 1   client.  He's well aware of the findings and all of that.
 2            THE COURT:  Why don't you go ahead then with what you
 3   would like to present.  Why don't you use the podium, if you
 4   would like to, and I think the sound will be a little better.
 5            MR. BLACK:  Yes, sir.  Thank you, your Honor.
 6            I would like to make the following suggestion to the
 7   Court that I think will greatly reduce the amount of time that
 8   we need to spend on this this afternoon.  As you know, we have
 9   filed objections to the presentence report and we have filed a
10   lot of papers.
11            However, having said that, we are prepared to accept
12   as findings by the Court the guidelines computation as set out
13   by the probation department in the presentence report.  All the
14   papers have been submitted to this Court.  There is no
15   additional evidence that this Court need examine.  Probation
16   was advised of everybody's position on the loss.  The probation
17   decided that loss could not reasonably be determined.
18   Therefore, probation used gain as the alternative method of
19   determining what the guidelines sentence ought to be.
20   Probation used the client's bonus materials that he received
21   over the years to calculate the gain.  Probation came up with a
22   guideline number of 25, which is 57 to 71 months.
23            Mr. Levis is prepared to withdraw all his objections
24   to the guideline computation regarding loss and gain and
25   extend -- instead, accept the findings of the probation
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

0BGMLEVS1

1   department as the findings of the Court.
2           The government has decided to waive its Fatico hearing
3   and instead proceed by written submissions to the Court, which
4   the Court obviously has obtained.  Therefore, there is no
5   hearing necessary on any factual issue regarding these matters.
6   The Court can concur with probation regarding the findings of
7   the amount of gain.  There is really no disagreement among the
8   parties on gain.  The government has not filed any kind of
9   objection or made any statement or made any disagreement
10  regarding the computation of gain.
11          Regarding any alleged losses by alleged victims in
12  this case, we agree with the government that the Court can at a
13  later date have a restitution hearing.  And 18 U.S.C. 3663 and
14  3664 gives the Court 90 days within which to have a restitution
15  hearing, and we believe that is the proper way of proceeding
16  ahead with that.
17          If the Court adopts the guidelines as set forth by the
18  presentence report, all we need to do is go ahead with the
19  traditional type of sentencing under 3663(a).  We don't need
20  any witnesses, any hearing.  The Court then has the discretion,
21  based upon that, to enter what is a reasonable sentence, and
22  the Court can determine restitution at a date to be set later.
23  That is our suggestion and our position to the Court this
24  afternoon, your Honor.
25          THE COURT:  I want to look at the presentence report
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              5
          0BGMLEVS1
 1    for just a minute, please.
 2              I see, and I think this is what you're referring to,
 3    page 34 of the presentence report, I think the probation
 4    department had originally decided on a range of 24 to 30 months
 5    and there they revised this to a range of 57 to 71 months and
 6    that's what you're referring to.  Is that right, Mr. Black?
 7              MR. BLACK:  Yes, sir.
 8              THE COURT:  What does the government say to what
 9    Mr. Black proposes?
10              MR. MILLER:  Your Honor, a couple of points, if I may.
11    As a threshold matter, obviously, and your Honor's I'm sure is
12    aware of this based on the government's submissions, the
13    government believes in fact that there is an appropriate loss
14    amount here to be computed and, accordingly, the guideline
15    range is, in fact, quite different from 57 to 71 months, as set
16    forth in the revised PSR.  And if the Court would indulge me
17    for a couple of minutes, I would like to briefly highlight a
18    couple of the points that we made in our submissions to
19    exemplify why that's the case.
20              As an initial matter, the government took the position
21    in, obviously, its sentencing submission and, of course, in its
22    response, your Honor, that a conservative estimation of the
23    loss in this case is approximately $75 million, aggregated up
24    from three particular victims who had representatives to which
25    Mr. Levis, the defendant, made direct misrepresentations
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

6

0BGMLEVS1

1   regarding the independent valuations and the contractual caps.
2   They traded or held Doral stock based upon those
3   misrepresentations and, according to the government, took the
4   position that from a guidelines perspective a conservative
5   estimate of loss is that $75 million.
6          Now, of course, as the Court, I'm sure, is well aware,
7   we also took the position that under 18 United States Code
8   3553(a), particularly (a)(1), the nature and the circumstances
9   of the offense that, in fact, the overall harm that was caused,
10  the overall loss that was caused by the defendant to the market
11  is substantially higher than that.  Of course, as the Court is
12  well aware, there was almost $4 billion in market cap loss
13  caused by the plummeting of Doral stock.
14          (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

0BGTLEV2

1          MR. MILLER:  Now as the government also said in its
2     submission, the government was not able to make a reasonable
3     estimate of the total market loss as a result of the
4     defendant's loss.  The government is not taking a position from
5     a guidelines perspective that the defendant's fraud caused
6     approximately $4 billion in loss.
7          What the government, of course, is saying, is that
8     there are numerous victims in this case, but taking a very
9     conservative estimate of loss, three victims lost in aggregate
10    approximately $75 million from the fraud, but that under
11    3553(a), in fashioning an appropriate sentence, the Court
12    should, and of course can, take into consideration the overall
13    effect, the overall financial harm to investors to Doral and to
14    the market as a whole.  So as a general position, that is the
15    government's position concerning guidelines computation and
16    3553(a).
17          Additionally, as the PSR notes appropriately, the
18    defendant was an officer or director of a publicly traded
19    company, and the offense involved securities fraud,
20    accordingly, the four-point enhancement is appropriate.
21          The two issues then with respect to guidelines
22    computation in the PSR -- and obviously the position that the
23    defense is taking, which is, of course, is in polar opposite to
24    what the government is arguing -- is number one, the loss can
25    be reasonably estimated, and a conservative estimate of that

8

0BGTLEV2

1    loss is approximately $75 million.  Accordingly, under 2B1.1,
2    there is an appropriate enhancement of 24 offense levels, given
3    that the fraud is between $50 and $100 million in loss.
4           Additionally, the government showed in its submission
5    that there were more than 250 victim of this fraud.  We showed
6    this as a result of 10K, which noted in January of 2005 that
7    there were approximately 482 investors, as I recall, in Doral
8    stock at that point in late January 2005.  And that even if you
9    were take one of the institutional victims, such as Fidelity,
10   who had numerous investors in their mutual funds that were
11   invested in Doral stock, they, too, were harmed by Doral stock
12   plummeting as a result of the defendant's fraud.
13          Now I understand and the government understands that
14   the defense is saying, well, you got half that equation right,
15   that causation as a transactional matter perhaps the government
16   has proved, but the government has not proved proximate loss,
17   loss causation.
18          Well, we respectfully disagree with that, your Honor.
19   And in the government's submission we set out, particularly
20   under 3553(a), at length, how the defendant's fraud -- and we
21   need not repeat all the specifics.  Your Honor, of course,
22   presided over the trial, is well aware of the specifics and
23   well aware of what is in the government's sentencing
24   submission -- but how the defendant's fraud impacted the value
25   of Doral's most important principal asset, the interest-only

9

0BGTLEV2

1    strips, and how that effect took place in the marketplace.
2    Specifically, analysts, investors who relied upon the fact that
3    these IOs were supposedly independently valued by -- they
4    didn't know who, but we know now Morgan Stanley and Popular
5    Securities, as well as direct misrepresentations by the
6    defendant that these IOs supposedly had contractual caps, not
7    market purchased caps, not hedges that had been purchased in
8    the marketplace, but contractual caps on the IO's value.  So
9    there was no down side.  That's what some of the investors
10   testified at trial, that's what the evidence showed, that's
11   what the government went through in its submission.
12            So ultimately, when you take the fact that analysts,
13   like from UBS -- you're well aware of the testimony from trial,
14   your Honor, that demonstrated that the IOs -- it was a big
15   deal.  The IOs were extremely significant to Doral's value, and
16   marketplace investors and analysts looked to the IO's value in
17   determining whether or not they were going to buy or sell or
18   hold Doral stock.
19            And that's what this is all about, your Honor, because
20   even if the government can't put its finger on the fact that
21   there is $3.6 or $3.5 billion of loss that was caused
22   specifically by the defendant, what the government can show and
23   has shown in its papers, number one, a conservative estimate of
24   loss is approximately $75 million, and number two, there was a
25   market financial impact that was caused by the defendant's

0BGTLEV2

1    loss.
2              And I want to address a second, your Honor, the
3    defense's submission last night --
4              THE COURT:  Look, look --
5              MR. MILLER:  -- on the experts.
6              THE COURT:  Just a second.  What I really wanted to
7    see is if you agreed or disagreed with the format which
8    Mr. Black proposed.  And I assume that the government would not
9    agree, but I think we'll get into -- if we go into areas in a
10   substantial way, we'll come back.
11             I take it you do not agree with Mr. Black's proposed
12   format, right?
13             MR. MILLER:  Well, we do not agree with respect to the
14   fact that the guidelines range of 57 to 71 should be adopted.
15             THE COURT:  Now let me just see how we proceed, and
16   I'll get back to you obviously.
17             It is, to say the least, not out of line for Mr. Black
18   to make the proposal he did.  The probation department, after
19   preparing a very lengthy presentence report and considering
20   that report and revising the conclusions, has come up with what
21   we discussed, the range that was discussed, and has come up
22   with the conclusion that loss is not sufficiently able to be
23   determined to be a basis for a guideline calculation, and that
24   what should be done is to use the alternative, which I think
25   certainly under the guidelines can be done, what was the gain

0BGTLEV2

1  to the defendant.
2          Now since the probation department, after, again,
3  having issued a very lengthy presentence report incorporating
4  undoubtedly the factual summaries of the government in its
5  lengthy factual summary, that's what the probation department
6  recommends.
7          Now what I say to that is that the government very
8  strongly disagrees with that approach.  And I think that it
9  would probably be ill advised, and I think probably readily
10  reversible error if I failed to go into the issues about loss
11  that have been raised by the government and have indeed been
12  contested by the defense.  The defense has entered into those
13  issues, and it would be something I just really would hardly
14  seriously consider going on with the sentence without any
15  discussion and perhaps even a lengthy discussion of the issues
16  about loss.  It isn't that I won't ultimately come back and use
17  what the probation department proposes, but to have a sentence
18  hearing and essentially ignore the issues about loss, I just
19  can't do that.
20          So what I would like to do is to come back to
21  Mr. Black and see how you would suggest approaching a
22  consideration at this hearing of the issues about loss.
23          Now the papers on that subject are extensive.  The
24  issues are rather extensive.  I don't want to turn the sentence
25  hearing into a trial.  This is a sentence hearing, so things

0BGTLEV2

```
 1   have to be confined to some extent, but they have to be
 2   explored.
 3          It might help if I raised the questions that are on my
 4   mind.  I don't know whether I'm starting at the right end or
 5   not, but I want to raise one question at the outset, and that
 6   is this, the government in its sentencing memorandum states, at
 7   page 1, that the valuations of the IO strips were inflated.  At
 8   page 11, the government alleges that the valuations were
 9   artificially inflated.  Then at the very end of the
10   government's sentencing memorandum, the government, I think it
11   is on pages 41 and 42, there is a discussion of Doral's stock
12   price.  And of course, this is in relation to the valuation of
13   the IO strips.  And I think the government's contention is that
14   the valuation of the IO strips being inflated had an effect of
15   at least temporarily inflating the stock price.
16          Now I have a question, and it starts out this way, it
17   is my memory that the indictment did not charge, nor did the
18   government attempt to prove at the trial that the valuations of
19   the IO strips contained in the Doral financial reports were
20   false.  Other allegations were made in the indictment, which we
21   know about, and other things were the subject of the
22   government's proof.  And the government did not need to allege
23   or prove that the valuations contained in the balance sheets or
24   the income statements in the periodic reports were false.  The
25   government didn't need to prove that.  The government relied on
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0BGTLEV2

1    other things and made its case.
2            But now, in connection with the sentence, and in
3    discussing the loss, the government wants to talk about the
4    loss caused by the stock price.  That's why the government
5    refers to a loss in capital value of billion of dollars.  Now
6    that depends on whether those valuations were false and did
7    they falsely inflate the stock price.  But that has not been
8    proved.  It wasn't proved at the trial, I don't see that it's
9    proved in anything before me.  And it does not necessarily
10   follow that because Mr. Levis is guilty of what he was found
11   guilty of at trial that this conduct has the effect of making
12   those balance sheet and income statement figures false.
13           And it is important to me, it is important to the
14   record in this case to be clear about whether Mr. Levis is
15   responsible for having the price of Doral stock inflated.  That
16   is a serious matter.  And the government is saying that he was
17   responsible for having the stock price of Doral inflated.  I do
18   not see -- and I am perfectly willing to be educated on this --
19   I do not see that the government has shown that to be the case.
20   No matter how one might assume that it had to be, one cannot
21   assume that it had to be.
22           The fact that Mr. Levis spoke to certain investors, to
23   certain analysts, the fact that Mr. Levis did other things
24   which he is charged with doing, it does not necessarily follow
25   that that conduct caused the false inflation of the balance

0BGTLEV2

1    sheet figures and income statement figures and thus caused the
2    stock price to be inflated.  And I would like the government to
3    take a clear cut position of what the government is contending.
4            Now let me -- before trying to get answers, I also
5    think that there are issues about whether the losses that are
6    attributed to the three investors or investment entities, that
7    the government adds up to $75 million, I think there are quite
8    serious issues about whether those losses are properly
9    calculated.  And the government has its side, the defense has
10   its side, as I think the latest memorandum discusses those
11   losses in some detail as to when they took place and so forth
12   and so on.
13           Now I am afraid -- and there are other issues about
14   loss, but I am afraid that we better have the patience to have
15   some kind of reasonable discussion of those issues on the
16   record here and to have the Court voice a view about those
17   issues.  And I think if we don't do that, and I don't do that,
18   I think that the record will be woefully incomplete.  And I
19   don't want that in the district court and I certainly don't
20   want to invite what I think would be a pretty certain reversal
21   by the Court of Appeals for simply not doing the job.
22           So let me just start back with Mr. Black again.  Let
23   me say this, that I originally thought -- and maybe you don't
24   remember this, but in our telephone conference I suggested that
25   we might have a conference in advance of the sentence.  Now I

0BGTLEV2

1  didn't press that.  There's a lot of traveling involved.  It
2  isn't as if everybody is located in 30 minutes away in
3  Manhattan.  So I certainly didn't press the idea of a
4  conference and then a sentence, but I do think there is a fair
5  amount to discuss, and so I didn't want to impose a lot of
6  extra traveling, certainly, on all of you, but I think there's
7  a fair amount to do.
8           So let me go back to Mr. Black and see how you would
9  like to approach it.
10          MR. BLACK:  Mr. Srebnick is going to handle the loss
11  issue.
12          THE COURT:  OK.
13          MR. HOWARD SREBNICK:  Good afternoon, Judge.  And you
14  may hear from another Srebnick as well.  My brother Scott is
15  here to address some of the specifics.
16          But just as a general outline, I do believe the Court
17  accurately summarized where the record stood both before the
18  trial began when the government agreed to abandon any claim
19  that the valuation methodology used by Doral -- spot versus
20  forward were the magic words we were debating before trial.
21  The government abandoned any claim that that in some way
22  constituted the fraud.  And the Court may recall that the
23  restatement that ultimately happened to Doral was a conversion
24  from the spot rate methodology to the forward rate methodology,
25  which is not part of this case.

16

0BGTLEV2

```
 1              THE COURT:  I'm going to interrupt you.  I go beyond
 2    that.  I'm well aware of that, but I go beyond that and I
 3    say -- and I could be wrong -- that the government didn't --
 4    regardless of the method, that the government did not claim and
 5    did not prove falsity of those valuations under any method.
 6    And I'm sure you're not going to disagree with that, so I don't
 7    want to waste time, and I imagine that will be something for
 8    the government to deal with, but you don't have to sell me on
 9    any of that.
10              But what would you like to go into aside from that?
11              MR. HOWARD SREBNICK:  What I think is most
12    important -- I think my brother would be best to address
13    this -- what the government does is confuse an investor's
14    reliance upon statements made by Sammy Levis in deciding
15    whether to buy or hold a stock.  And the government's
16    submission is filled with their view that there were certain
17    investors who relied on Sammy Levis in deciding to either buy
18    more stock or hold on to Doral stock.
19              But the government fails to meet the standard set in
20    the Second Circuit to prove that the decline in the stock price
21    was caused by Sammy Levis.  In other words, it is not enough to
22    simply prove that there were investors who bought stock because
23    they relied on statements made by Sammy Levis about caps or
24    something else.  What the Second Circuit says is that the
25    government, in order to use the word "inflate" the loss figures
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

0BGTLEV2

1   for sentencing purposes, needs to prove more than that.
2           And on that point I ask my brother to address the
3   Court.
4           MR. SCOTT SREBNICK:  May it please the Court.
5           I think we can all agree that the government bears the
6   burden at this sentencing hearing.  And it bears the burden for
7   two reasons.  First, because under the guidelines, the
8   government is required to prove the applicability of
9   enhancements that it seeks, and it is seeking an enhancement
10  for loss.  The second reason it bears the burden is because the
11  probation office has -- after thoroughly reviewing the evidence
12  and the facts, has arrived at its recommendation.  And because
13  the government is objecting to that recommendation, the
14  government bears the burden of proving its objections.
15          So given that the government bears the burden, what
16  that burden requires is that the government articulate or
17  advance a loss figure that complies with the Second Circuit's
18  methodology for determining loss.
19          And now this is not something that is the subject of
20  some debate.  The methodology is actually laid out very clearly
21  in a case called United States v. Rutkoske, which we cite in
22  our papers, which is nowhere to be found in the government's
23  submission, and that case is 506 F.3d, 170, and it's from 2007.
24          Rutkoske is very important because it sets forth
25  several factors that the government must at least identify and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0BGTLEV2

1   comply with in order to satisfy its burden of proving loss.
2   The first is that the government must identify a fraud period.
3   And for that point --
4           THE COURT:  You mean a time period?
5           MR. SCOTT SREBNICK:  Correct, a time period.
6           We know that the indictment alleges that the fraud in
7   this case occurred from 2001 until April 19, 2005, which was
8   the date that Doral issued a press release announcing that it
9   intended to restate earnings.  That is the last date identified
10  in the indictment of any relevant conduct here.  And the only
11  date after that is the few months later when Mr. Levis resigns
12  from Doral in August of 2005.  And the government's sentencing
13  submission actually identified April 19 as a relevant date.
14          We submitted if there was any fraud here, it was
15  disclosed, made public, revealed March 15th with the disclosure
16  of the 10K that showed the sensitivity of the IOs to arise in
17  interest rates.  So there's some debate about when the fraud
18  period ends, but regardless of that debate that we have with
19  the government, it's clear that in the Second Circuit the
20  government has to at least identify a fraud period.
21          And that's important because in Rutkoske, the
22  government made the same mistake it is making now before your
23  Honor, advancing the same flawed methodology it's advancing now
24  before your Honor, and the Second Circuit sent it back for
25  resentencing.  In that case, there was a pump and dump where a

0BGTLEV2

1  brokerage house was selling stocks and was inflating the value
2  of the certain stocks under its control, and the government
3  called an expert to who identified some period for determining
4  loss that ended three months after the end of the charged
5  conspiracy.  And the government's end date corresponded to when
6  the blue sheets -- was the last date that stock prices were
7  published on the blue sheets, but had no relationship to the
8  end of the conspiracy --
9           THE COURT:  I got to say to you, the Second Circuit is
10  the Second Circuit, but I don't understand the theory.  It
11  seems to me just an elementary proposition that somebody could
12  commit fraud during a particular period and that could cause
13  loss after that period.  I mean I can't understand the idea
14  that the loss that is used for any purpose, civil liability or
15  for sentencing or anything else, that it would have to be loss
16  that occurred during the period of the fraud.  That makes no
17  sense to me.
18           MR. SCOTT SREBNICK:  Here's the concept, your Honor,
19  the concept is not when the fraud occurred but when it
20  terminated and was disclosed to the public.  That's the
21  concept.  The end date of the fraud is when it's disclosed to
22  the public.
23           THE COURT:  I see, in other words, if the facts become
24  public, the truth becomes public, and somebody buys after that,
25  they really can't sensibly claim that it was the result of the

0BGTLEV2
```
 1    fraud.
 2              MR. SCOTT SREBNICK:  Correct, right.  That's point
 3    number one.
 4              THE COURT:  OK.
 5              MR. SCOTT SREBNICK:  The second point, which is a
 6    corollary of that, is that if the shareholder investor
 7    continues to hold the stock after the disclosure of the fraud,
 8    that's an independent business decision that is made with all
 9    available information knowing that there is a fraud and there's
10    a duty to mitigate.  And the courts recognize that once the
11    investor knows about the fraud, once it's been disclosed, once
12    the market price factors in the disclosure of the fraud, if the
13    investor continues to hold the stock, the additional decline in
14    the price of the stock after that date is not attributable to
15    the defendant.  And that's elementary, that's in Supreme Court
16    case law on civil damages in fraud cases which has been
17    accepted by the Second Circuit.  That's the concept of the
18    fraud period.
19              THE COURT:  All right.
20              MR. SCOTT SREBNICK:  So the government, while it
21    identifies the fraud has having been terminated, disclosed with
22    the issuance of the press release of April 19, doesn't use that
23    fraud period to determine losses.  What it does as to each of
24    three different investors, it picks a totally arbitrary fraud
25    period that's based on calendar years involving realized
```

```
                0BGTLEV2
 1   losses.  For example, Fidelity --
 2               THE COURT:  Let me get something.  Just a second.
 3               Give me one minute.  I want to find something in the
 4   record.
 5               (Pause)
 6               THE COURT:  OK.  Which one did you want to start with,
 7   Fidelity?
 8               MR. SCOTT SREBNICK:  Let's start with Fidelity, your
 9   Honor.  With Fidelity the government chooses a loss period of
10   calendar years 2005, 2006, those two years, and arrives at a
11   loss calculation of $42,290,000 based on realized stock trades
12   in 2005 and 2006.
13               Well, we know by the government's own acknowledgment
14   in its pleading that the fraud period ends April 19, and even
15   if you accept that you had a couple of days for the market to
16   absorb the disclosure of the truth, you're at April 21.  The
17   government's numbers -- and I don't think there's any dispute
18   about it -- includes purchases by Fidelity of millions of
19   shares of Doral stock after April 21, 2005, millions of shares.
20   In fact, Fidelity held on to the bulk of its shares of Doral
21   until December of 2006 when the stock price was roughly $3 a
22   share.
23               So after the disclosure of the fraud, Fidelity made an
24   independent decision that the stock was now appropriately
25   priced, that the price of the stock reflected all of the new
```

0BGTLEV2

1  information about what happened, because it has gone down, and
2  it continued to hold the stock as it declined from $28 a share
3  on March the 16th or 17th to I think $16 a share on April the
4  21st to $3 a share in December of 2006.  The bulk of the $42
5  million of losses claimed by Fidelity for those two years
6  involve transactions that occur after the end of the fraud
7  period.  No dispute about it.  No dispute.
8        Now putting aside -- there's a separate issue, two
9  other issues relating to Fidelity, and actually they relate to
10 all three of the investors.  The law requires that the Court
11 offset losses by any gains that an investor make from realized
12 trades in the stock.  And for 2005, 2006, the government
13 actually does that.  It does offset those losses with stock
14 trades that constitute realized gains, and that's how it
15 arrives at its figure.
16        But for 2001 through 2004, while the government claims
17 that the stock was artificially inflated, Fidelity earned 50 --
18 or more than $50 million, actually it was I believe from 2001
19 through April 21 of 2005, the end of the fraud period, Fidelity
20 actually was a net winner in Doral stock of more than $54
21 million.  Fidelity was Doral's largest outside shareholder and
22 actually benefited from the gain in Doral stock and realized
23 gains throughout the entire period of the fraud -- of the
24 alleged fraud.
25        The government's position is gains ought not to be
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

23

0BGTLEV2

1   offset against loss, but it actually does it itself in 2005 and
2   2006.  The only case cited by either party on the issue of
3   offsetting gains against losses was a Ninth Circuit case that
4   deals with securities fraud involving a publicly traded
5   company, the only case that deals with securities fraud
6   involving a publicly traded company, a 9th Circuit case called
7   U.S. v. Laurienti, 611 F.3d 530, says that a court must offset
8   losses by stock gains by the same victim during the fraud
9   period.
10          In response to that, the government cites three cases,
11   all of which are Ponzi schemes.
12          THE COURT:  Say that again, what you just said.
13          MR. SCOTT SREBNICK:  Yes, during the fraud period,
14   which the government has identified as 2001 in the indictment
15   until April 19, 2005, the disclosure of the fraud, if the
16   government is going to hold a defendant responsible for trading
17   losses during that period, those losses need to be offset by
18   any trading gains by the investor during that period.  The only
19   case cited by either party that deals with that precise set of
20   circumstances is a case from the Ninth Circuit called U.S. v.
21   Laurienti, 611 F.3d 530.
22          The government cites three cases saying the defendant
23   should not get credit for money that's returned to a victim in
24   a Ponzi case.  But this is not a Ponzi scheme case.  In those
25   cases, what the courts have said is when a fraudster starts

0BGTLEV2

```
 1   returning money to the Ponzi scheme victims to lull them into
 2   giving more money, the fraudster ought not get credit for the
 3   money he returned, it's all the money he obtained as a result
 4   that ought to be the fraud.
 5            THE COURT:  But let me say this, that I have to
 6   confess I haven't given a lot of thought to this, because a lot
 7   of cases come along and there are suits by people who buy when
 8   the stock is high and they sell when the truth is out and the
 9   stock has collapsed.  But if somebody buys let's say in 2001
10   when a stock is $2 a share, and if that stock goes up and up
11   and up and in early 2005 -- I'm using a hypothetical figures,
12   because I actually don't know all -- there is probably
13   something in the record but I'm using hypothetical figures --
14   $2 a share bought is the price of the purchase in early 2001,
15   stock goes up to 50 in early 2005, and then -- and the claim is
16   that that rise to some extent is because of false information
17   injected into the market, and then the truth comes out a little
18   later and the stock goes down, way down, say to 10.  The fellow
19   who bought at $2 and saw his stock go up to 50, if nothing else
20   had happened, he would have a gain of $48 a share, right?
21            MR. SCOTT SREBNICK:  Yes.
22            THE COURT:  If everything stopped there.  Now he comes
23   along and says -- well, I don't know what he would claim, but
24   the fact is under my hypothesis it was pumped -- up to 50 by
25   fraud, and when the truth comes out it goes down to 10.  Has he
```

25

0BGTLEV2

```
 1   got no claim?  I suppose he doesn't.
 2            MR. SCOTT SREBNICK:  No loss.
 3            THE COURT:  Because he had a -- he watched his paper
 4   valuations go up, he didn't buy.  So what has happened to him,
 5   he had a gain of -- if the clock stops at $10, he has a gain of
 6   $8 a share, right?
 7            MR. SCOTT SREBNICK:  Yes.
 8            THE COURT:  Now how do you crank that idea into
 9   Fidelity?
10            MR. SCOTT SREBNICK:  That's partially what happened,
11   except that Fidelity actually realized gains, sold shares at a
12   price that the government is claiming was inflated.
13            THE COURT:  When did it -- I have got your reply
14   memorandum about Fidelity, so it's in front of me, but you go
15   into it, if you would, please.
16            MR. SCOTT SREBNICK:  Well, we know for a fact that
17   Fidelity began purchasing shares at least as early as 2001
18   because those are the records that we have been provided by the
19   government in response to our Brady request.
20            THE COURT:  What were they buying at then?
21            MR. SCOTT SREBNICK:  I don't know the exact price, but
22   it was very low.  It was low.  And it was low enough that
23   ultimately Fidelity is a substantial net winner in Doral stock
24   during the fraud period.
25            THE COURT:  Did it sell?
```

0BGTLEV2

1           MR. SCOTT SREBNICK:  It sold some at high prices, and
2      then it bought some more and sold.  And then ultimately it had
3      a large position which, had it sold on April 21, 2005 -- and I
4      use that date because that incorporated an additional two days
5      after the end of the fraud period, two days -- had it sold on
6      April 21, 2005 when the fraud was disclosed, so to speak, then
7      Fidelity would have been a net winner of $54 million.
8           What happened is between April 21 of 2005 and
9      December 31 of 2006, it chose to not only hold on to its
10     holdings that had been repriced based on the issuance of the
11     10K and the April 17 press release, it chose to buy additional
12     millions of shares in Doral stock thinking that it was now a
13     bargain.
14          THE COURT:  Let me ask you this.  In the exhibits -- I
15     should have looked at them all, but in the exhibits before me
16     is there a chart of the stock price from beginning to end or
17     beginning of the relevant period?
18          MR. SCOTT SREBNICK:  I don't believe so.
19          THE COURT:  I certainly wish I had that.  It's very
20     hard to get along without that.
21          MR. MILLER:  Your Honor, I believe it's at Government
22     Exhibit 818 to our initial submission.
23          THE COURT:  I remember this at the trial.  This is so
24     hard to read, it's terrible.
25          MR. MILLER:  Your Honor, so the Court is aware, the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

27

0BGTLEV2

1    first two dips in the stock price is the result of stock splits
2    versus the large dip that the third one, and that correlates to
3    March of 2005, your Honor.
4            THE COURT:  Is there anyplace that shows what time
5    we're talking about?
6            MR. MILLER:  On the bottom, your Honor.
7            THE COURT:  Where?
8            MR. MILLER:  Your Honor, the bottom it has the years,
9    and there are hash marks you can see.  Just above looks like a
10   ticker line at the bottom with various countries, Australia,
11   Brazil, Europe, above there you can see there are years 2001
12   through 2005.
13           THE COURT:  OK.  Well, this is not so bad.  It looks
14   like the stock price was somewhere in the mid-30s in early
15   2001, and I think that the high was $49 and some cents in very
16   early 2005.
17           I think you made your point about Fidelity, let's go
18   to the next one.
19           MR. SCOTT SREBNICK:  The next one, Holland, as stated
20   in our memo, purchased 181,000 shares after the fraud time
21   period that the government alleged in the indictment, and found
22   by the jury, I suppose, and actually sold 1.4 million shares
23   six months after the disclosure of the fraud.  That's under the
24   government's loss calculations.  They include the sale of more
25   than 1.4 million shares six months after the disclosure of the

0BGTLEV2
```
 1   fraud when the price had gone down substantially more.
 2              The third investor, Meisenbach --
 3              THE COURT:  Let's go back to Holland, I wasn't with
 4   you.  Start again, please.
 5              MR. SCOTT SREBNICK:  Holland -- if I may have a
 6   moment.
 7              Holland's losses include the sale of -- the realized
 8   loss includes the sale of 1,426,000 shares on October 26, 2005,
 9   at a share price of $8.46.  That's six months after the
10   disclosure of the alleged fraud under the period claimed by the
11   government, seven months after the disclosure under the period
12   that we assert is the right one.  And at the period we assert
13   is correct, the price of the stock averaged $28, so you're
14   talking about a $20 decline in the share price between the time
15   the 10K is revealed where Holland gets a copy of the 10K and
16   when it decides to sell the stock, long after Mr. Levis left
17   the company.  It also includes --
18              THE COURT:  Let me ask you this, according to the
19   briefs, after the 10K came out -- what the government's brief
20   says is that the stock price declines sharply from $38.29 to
21   $21.50 by the close of the market on March 18.  The 10K came
22   out on March 15.
23              Now in your memorandum, you say, looking at the bottom
24   of page 6 -- this is your latest memorandum, I think -- the
25   price of Doral shares at the end of the alleged fraud period
```

29

0BGTLEV2

```
 1   claimed by Mr. Levis, that is March 17, 2005, was on average
 2   approximately $28.  What do you mean "on average?"
 3             MR. SCOTT SREBNICK:  Meaning the price that day.  I
 4   took the beginning price, the ending price, and the fluctuation
 5   of the price on the 17th and came up with an average price for
 6   the 17th of March.
 7             THE COURT:  Did it then start up a little bit?
 8             MR. SCOTT SREBNICK:  No, it went down on the 18th.
 9             THE COURT:  Well, the government has these figures.
10   Page 14 of their main brief, it says after the 10K came out on
11   March 15, the stock price declined sharply from 38.29 to $21.50
12   by the close of the market on March 18.  Is that inaccurate?
13             MR. SCOTT SREBNICK:  That's correct, that's three days
14   later.  The 10K is released the evening of March 15.  At that
15   time the stock price is $38.10.  By the end of business three
16   days later on the 18th, the stock price is $21 and whatever
17   number --
18             THE COURT:  50 cents.
19             MR. SCOTT SREBNICK:  50 cents, correct.
20             THE COURT:  But you have this figure $28.  In other
21   words, $28 was on the way down?
22             MR. SCOTT SREBNICK:  Correct.
23             THE COURT:  OK, I got you.
24             Now look, what was the stock price after the April 19
25   announcement?  The government has -- for some reason, I don't
```

```
0BGTLEV2
```

 1   know what that is.
 2           Does anybody know that?  That would be very helpful.
 3           MR. SCOTT SREBNICK:  Your Honor, I know on the 21st of
 4   April it was around $16 a share on the 21st of April.
 5           THE COURT:  Now can you start it -- please, I'm asking
 6   you to repeat again about Holland.  What happened?
 7           MR. SCOTT SREBNICK:  Holland purchased I believe
 8   181,000 shares after -- I believe after the April 21 fraud
 9   period ends.
10           THE COURT:  Did they own shares before?
11           MR. SCOTT SREBNICK:  Yes.
12           THE COURT:  Did they own shares before March 31 or
13   March 15, et cetera, et cetera?
14           MR. SCOTT SREBNICK:  Yes.
15           THE COURT:  What about that?
16           MR. SCOTT SREBNICK:  They did own shares.  What
17   happens is they don't sell them upon the disclosure, they hold
18   them for another six months as the price continues to decline
19   by $20 from the date that we assert is the alleged fraud period
20   by about 8 or $9, or $8 from the date the government claims was
21   the end of the fraud period.  So they continue to hold for at
22   least another $8 drop, 1.4 million shares.
23           THE COURT:  And they added.
24           MR. SCOTT SREBNICK:  And they added afterwards,
25   correct.

0BGTLEV2

```
 1              THE COURT:  Then let's go on to Meisenbach.
 2              MR. SCOTT SREBNICK:  Meisenbach claims a loss of $3
 3     million for the loss period that they claim is 2005.
 4              The reason that is significant is because Mr. Saluck,
 5     who was the Meisenbach representative who testified at trial,
 6     testified that Meisenbach purchased Doral stock during the
 7     summer of 2003 and sold during the first quarter of 2004, and
 8     when Doral hit its price target and made money
 9     he did not have any records, and nor have we been provided any
10     by the government as to how much the gain was during that
11     period.  But we suspect it was significant because the price
12     did go up during that period and because it hit Salik's price
13     target.
14              So the figure used by the government does not include
15     that.  It also includes options trades.  And this is
16     particularly problematic, because Mr. Saluck ended up doing
17     what is called a spread on puts.  And I'm not an expert on this
18     type of strategy, but $837,000 of losses that the government is
19     claiming is part of the 3 million is part of an options
20     strategy, sort of a hedge, buying and selling puts that would
21     have actually lost in value if Doral stock had gone up.  So he
22     was actually betting against a large rise and also betting
23     against a large fall, but was hoping that the price of the
24     stock would remain within a particular range in order to take
25     advantage of this instrument called a put or option spread.
```

0BGTLEV2

```
 1              So now the government wants to hold Mr. Levis
 2   responsible because the stock price did not actually fall for a
 3   period of time within the target range that Saluck was
 4   predicting through his hedging instruments, these puts.  So
 5   that's part of -- a significant part of the $3 million loss
 6   that Meisenbach is claiming, that's 800,000.  And if you take
 7   out the gains that Saluck admitted to at trial, we believe, as
 8   to Meisenbach, there is no loss.
 9              In fact, Saluck added more shares on March 16, 2005,
10   after the disclosure of the 10K, he's purchasing shares after
11   he learns about the sensitivity analysis that is in the 10K
12   that discusses what will happen if there is a rise in interest
13   rates to the valuation of the IOs.
14              THE COURT:  Meisenbach bought after the 10K?
15              MR. SCOTT SREBNICK:  Yes, it did.  It bought the day
16   after the release of the 10K, bought -- on March 16, bought an
17   additional 12,500 shares.
18              THE COURT:  Let's do this, the government's allegation
19   for sentencing purposes of the $75 million loss is the
20   combination of the alleged losses of Fidelity, Holland and
21   Meisenbach.  And if I could turn to the government now and
22   let's try to see what the government's response is to what
23   Mr. Srebnick just said and try to get this resolved, this piece
24   of the case, which is a big piece of the case, let's get that
25   resolved.
```

33

0BGTLEV2

```
 1                  Could the government respond.
 2                  MR. MILLER:  Sure.  Quick question, though, your Honor
 3      posed a question at the very beginning of all this regarding
 4      what the indictment charged and what was proved at trial.
 5      Would your Honor like me to wait on that?
 6                  THE COURT:  Absolutely.
 7                  MR. MILLER:  Sorry, your Honor, wait?
 8                  THE COURT:  Yes, go ahead, please.
 9                  MR. MILLER:  Your Honor, I think the defense put it
10      very well when they tried to explain what they think is the
11      government's position on this and which in fact is not.  And
12      that is, it's not as if the government is abandoning the claim
13      that using the spot versus the forward curve somehow
14      perpetrated a fraud.  That's not what the government is
15      claiming here.  That's not what the government claims in its
16      submission, and that's not what the government is arguing
17      today.
18                  What the government is saying, your Honor, is that the
19      defendant, through his misrepresentations regarding independent
20      valuations, essentially corrupted the process by which the IOs
21      would have been properly valued, given the rising interest
22      rates and rising LIBOR, through his corruption of the process,
23      caused the price to be artificially inflated.
24                  And what we mean by that, your Honor, is as follows:
25      Obviously your Honor is well aware of the testimony and
```

34

0BGTLEV2

1    evidence about Morgan Stanley's -- the corruption of their
2    valuation through Joe Lopez and his testimony, that basically
3    he was just adopting the numbers wholesale from the defendant
4    and Popular Security's testimony through employees that
5    basically said they also they wanted to go with a forward curve
6    but the defendant told them don't worry, everything is capped
7    at about 3.4 percent, so you can stick with your spot rate
8    valuation, you're good.
9            So you had these two independent valuations that, in
10   essence, actually were higher than Doral's internal valuation
11   on all of this.  And so Doral said take the three -- if you
12   look at the three as a whole, well, we're being conservative
13   because we're using our internal one, which is lower than the
14   two independent valuations.
15           Of course, this was part of the fraud that was charged
16   and by which Mr. Levis was convicted after trial.  This also
17   had an affect, obviously -- as spelled out in the government's
18   papers and what we argued today -- with respect to the market
19   price.  Under 3553(a), the defendant's fraud with respect to
20   the independent valuations caused the severe financial harm
21   suffered to Doral and to the industry as a whole because of the
22   fact that Doral, through its public statements, through
23   statements to analysts, through its 10K, said don't worry, our
24   IOs have been independently valued.  But we're not even going
25   with those values, we're going with more conservative

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0BGTLEV2

1   valuation, the internal valuation.
2           THE COURT:  Let me interrupt you.  I hear you, but you
3   see the issues at the sentence, the best way I can say what is
4   going on in my mind is the issues are a matter of degree.  And
5   I believe that Mr. Levis was properly convicted and the issues
6   on which he was convicted are quite clear.
7           I also believe that the misrepresentations, which I'm
8   not going to try to summarize, but they're very well
9   summarized, that the government's main memorandum is a very
10  good memorandum.  It summarized the case very well.  I don't
11  believe those misrepresentations were without affect, I don't
12  believe they were without harm, but it matters -- for purposes
13  of applying the guidelines, it matters to me in imposing
14  sentence, that harm is defined.
15          The sentencing guidelines calibrate the sentencing
16  range according to certain definite amounts of money or certain
17  ranges, and there are times that it doesn't work out that you
18  can find those amounts or those ranges.  It doesn't mean
19  there's no harm, but you just can't calibrate things according
20  to those tables in the guidelines.
21          Now it makes a difference to me in connection with
22  this sentence whether it is proper to say that Mr. Levis's
23  conduct resulted in the inflation of the balance sheet and
24  earnings statement figures and thus an inflation of the stock
25  price or that you can't go that far.  Again, it doesn't mean

0BGTLEV2

1   there was no harm, but it is a very big -- it's a boulder, it's
2   a big thing if $800 million or so of IO assets based on the IOs
3   is a false figure and he's responsible for that.  That's a very
4   big thing.
5           And basically the government is claiming that that is
6   the case.  The government is not applying a table to that, but
7   you're saying that that is the case, and you want the Court to
8   rely on that.  And that is a contention that I take seriously,
9   whether it should be -- I should really follow that line of
10  argument and so forth or not.  And the government has not set
11  this forth as something that is frosting on the cake, I mean
12  that is something the government urges is the case, that those
13  figures were inflated and the balance sheet and earnings
14  statement and that that was the fault of Mr. Levis and that
15  that led to inflation of the market price this stock.
16          That's what the government alleges, right?
17          MR. MILLER:  I think, your Honor, I would say
18  generally, yes, that in fact --
19          THE COURT:  How do you mean not -- what's not
20  generally?
21          MR. MILLER:  The government is not contending that the
22  use of the spot rate methodology was itself unlawful.
23          THE COURT:  No, listen, don't get off on that.  I'm
24  not talking about whether the difference of spot method and
25  forward curve -- and the government is not saying -- I don't

37

0BGTLEV2

1  read the government at all as saying that the spot rate was
2  wrong or illegal or cooked, but the government is really saying
3  that regardless of what method was used, Levis's
4  misrepresentations had the effect of inflating those figures.
5        Am I correct?  If you're not contending that, let me
6  know it.
7        MR. MILLER:  That is correct, your Honor.  And if I
8  may, your Honor --
9        THE COURT:  Go ahead.
10        MR. MILLER:  A couple of quick points in this regard.
11  I don't want it to belabor what your Honor already understands
12  with respect to the defendant's representations, in the
13  government's view, we believe causing the price to be
14  overinflated, market analysts relying upon the fact that there
15  were independent valuations, which there were not, and
16  contractual caps, which there were not, in trading and
17  recommending the buying or selling of Doral stock during the
18  operative period of time.
19        I would note that the government, of course, is not
20  saying that Mr. Levis is responsible for the entire market
21  capitalization loss.  I think in our submission we make clear
22  we are going with this conservative estimate and we are arguing
23  under 3553(a) that there is this severe financial impact.
24        To the extent that your Honor believes that Mr. Levis
25  is not even fully responsible for the $75 million in what the

38

0BGTLEV2

1  government views is a very conservative estimate of loss, in
2  our response submission to your Honor at page 10, response to
3  the defendant at page 10, we set forth charts at which we show
4  what would happen, your Honor, if the guidelines loss that the
5  government believes has been proven from a reasonable estimate
6  standpoint was discounted.
7        We show, your Honor, what would happen if it was a
8  50 percent discount net loss, 75, a 90, even a 99 percent
9  discount, meaning that Mr. Levis was only responsible for one
10  percent of the losses suffered by Fidelity, Meisenbach Capital
11  and Holland Capital, even if you go with that assumption that
12  he's only responsible for one percent of their losses, which we
13  argue is a very aggressive way to go and we don't we agree with
14  it, but even if you go that direction, the guidelines range is
15  substantially higher than set forth in the PSR or initially
16  contended by the defense in their submission.
17        And this is on page 10.  The guidelines range, even
18  with a 99 percent discount, meaning Mr. Levis was only
19  responsible for one percent of the losses suffered by the three
20  investors through his fraud -- which we contend is not subject
21  to reasonable dispute -- the guidelines sentence is 108 to 135.
22        THE COURT:  If you crank in the 250 people.
23        MR. MILLER:  And even if you back out the enhancement
24  for the number of victims of 250 or more, if you say that
25  Mr. Levis is only responsible for just one percent of the loss

0BGTLEV2

1   that is suffered by those three victim, then with backing out
2   the 250 plus victims you get to the guidelines range that was
3   shown in the PSR.
4          The government submits, your Honor, through its
5   submissions, and as argued today and proven most importantly at
6   trial, that based upon the misrepresents regarding independent
7   valuations and caps that analysts relied upon, investors relied
8   upon in trading, that ultimately Mr. Levis is surely
9   responsible for at least, and we contend much more, than one
10  percent of the loss suffered by these victims.
11         THE COURT:  Now let's go to Fidelity and Holland and
12  all, what's your response to what the defense says?
13         MR. MILLER:  Yes, your Honor.  With respect to these
14  three victims, there's sort of two overarching points that I
15  think affect all the arguments here.  Number one, when is the
16  fraud time period?  Number two, this offsetting losses with
17  gains incurred.
18         First with respect to the time period, again, the
19  government is not running away from Rutkoske.  The government
20  believes that it's proven by a preponderance of evidence that
21  these losses, certainly at least one percent of which are
22  caused by Mr. Levis's fraud.  But what the government is saying
23  is with respect to the time period, the fraud time period, yes,
24  it goes up through April of 2005, but the point is that the
25  fraud -- this is not a traditional securities fraud, either

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

40

0BGTLEV2

1  criminal or civil case where you have a fraud that is
2  concealed, there's a disclosure, the stock price plummets and
3  that's the end.
4          I think we have set forth -- and your Honor obviously
5  heard more trial evidence in this case than I think most -- how
6  this fraud worked, which was a systemic, manipulative, very
7  detailed scheme that lasted a long time, and that wasn't --
8  didn't just all the sudden everything was hunky dory and the
9  price was good and everybody was settled from a loss
10 perspective as of April 2005.
11         In fact, even just looking at the last point that the
12 defense counsel mentioned with respect to Meisenbach, Randy
13 Saluck, what he did trading for Meisenbach and all the options
14 trading that was going on, even right after the 10K was
15 released.  Yes, he did that, but in fact it was before the
16 investor called two days later, and he was even doing a large
17 chunk of that options trading because he still believed, based
18 on the representations from the defendant, that there were
19 contractual caps.
20         My point, you Honor, is there is no magic date from a
21 loss perspective to which to cut this off.  There were
22 unrealized losses, for example, that Fidelity had through stock
23 that they held through the indictment period because they still
24 believed, based on representations from the defense and based
25 on market trading, that there was still an upshot.  But there

0BGTLEV2

1  wasn't, because all of this happened.  This fraud -- but for
2  the defendant's fraud, the government contends would not have
3  happened -- if everything had been valued appropriately, if the
4  defendant hadn't systematically manipulated the process so that
5  everybody knew what the appropriate value was of the IOs, and
6  how it was being independently valued, if it was all, and if
7  when were no contractual caps, then the stock price would have
8  reflected that reality.
9           But unfortunately, even after the 10K comes out in
10 March and after April when there's the release that Doral is
11 intending to restate earnings up to half a billion dollars, it
12 doesn't say in there:  By the way, the defendant represented
13 that there were contractual caps on the IOs, and that's a fraud
14 and now it's been disclosed, so run for the hills.  That's not,
15 from a loss perspective --
16          THE COURT:  Let me interrupt you.  That's an
17 interesting point.  I think you're right that neither the 10K
18 nor the press release of April 19 literally says there are no
19 caps in the contracts.  That's what you're saying, right?
20          MR. MILLER:  Yes, sir.
21          THE COURT:  And I think you're right, but I have sort
22 of taken it for granted, and maybe too much for granted, that
23 what was said was a very clear implication that there wasn't
24 the protection that would be afforded by such caps.  I mean if
25 there were really those caps, I can't imagine the write downs

42

0BGTLEV2

1  that occurred in April -- they were big write downs, weren't
2  they?
3            MR. MILLER:  Yes, your Honor.  It was the intention to
4  write down.  Ultimately the write down happened later on.
5            THE COURT:  But tell me, why would there be these
6  write downs if there were these caps?
7            MR. MILLER:  Again, your Honor, I think by that point
8  there is a inference to be drawn that investor confidence in
9  Doral was shaky.
10           THE COURT:  I asked you a very specific question.  You
11 raised a very valid point, there was no literal statement about
12 caps, and that's a good point.  But my question to you is why
13 would there be the -- I don't remember, but we all agree there
14 was a huge write down in April or a prediction that there would
15 be a big write down, why would there be these big write downs
16 if there were caps?
17           MR. MILLER:  Your Honor, the defendant and others from
18 Doral in fact represented on calls that there were market
19 purchase caps, that there were hedges that were being purchased
20 in the market place.
21           I take your point, your Honor, that look, with respect
22 to particular investors, like Randy Saluck and others who
23 perhaps got direct misrepresentations from the defendant that
24 by the way, don't worry because there are contractual caps, and
25 then they see the press release is announcing an intention to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

0BGTLEV2

```
 1   write this down by half a billion dollars that they should have
 2   run for the hills.  And in effect, a number of these investors,
 3   including I believe Meisenbach did sell off a large portion of
 4   their position.  For some of these investors at some point it
 5   became a matter of arbitrage or buying when the stock price had
 6   gone down in a hope, a faint hope that it would go back up.
 7             THE COURT:  You're not making a unreasonable arguments
 8   at all.  I think there were and there always will be investors
 9   who will either buy when things are very low or they will hang
10   on when things are very low because they feel that there's
11   still something to their investment in the company and so
12   forth, they feel that there is some substance.
13             Let me just ask you this, does Doral still exist?
14             MR. MILLER:  Yes, your Honor, Doral still exists.
15             THE COURT:  Is it listed on the New York Stock
16   Exchange?
17             MR. MILLER:  Yes, your Honor.
18             THE COURT:  Did it have any recovery from whatever it
19   was, $8.
20             MR. MILLER:  With the Court's indulgence, your Honor.
21             (Pause)
22             MR. MILLER:  Your Honor, at this point it's my
23   understanding, talking with co-counsel, that it trades
24   currently at I believe a dollar and change, but because of
25   reverse stock splits, it technically is worth a matter of
```

44

0BGTLEV2

1    pennies.
2              THE COURT:  So it really did not recover, although the
3    company still exists, the stock.
4              MR. MILLER:  I think that's correct, your Honor.  And
5    if I may, counsel just pointed out to something --
6              THE COURT:  But of course there's a lot of history
7    that occurred.  I'm not really trying to get into that.
8              MR. MILLER:  Yes, your Honor.  But there's one point I
9    did forget to mention, and this goes to Fidelity.  If I can, as
10   a result of this point, segue into this offsetting losses
11   issue.
12             One thing I will mention with respect to Fidelity,
13   your Honor, as Valerie Friedholm testified at trial before your
14   Honor, Fidelity had approximately a ten percent position in
15   Doral.  I mean dumping that position, if Fidelity had unloaded
16   its shares in April of 2005, I mean it's clear what would have
17   happened at that point not only to the stock but to Doral -- to
18   Fidelity's investment.
19             So I don't want to belabor the point which we have
20   already discussed, your Honor, about how there's a time period
21   with respect to the offense charged in the indictment and then
22   obviously there are unrealized losses and effects after that
23   time period from a loss computation perspective.
24             But going forward on the next point, your Honor,
25   offsetting gains versus loss.  This theory that the defense has

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0BGTLEV2

1    come up with -- and they cited to a Ninth Circuit decision,
2    which we contend, and as is submitted in our response brief, is
3    inapposite -- really attempts to reward from a guidelines
4    perspective a defendant's fraud.  And we contend that this is
5    not the way the guidelines are structured or intended.  In
6    fact, we cite to the Ponzi scheme example because we think not
7    only is it a great example of why the guidelines try to avoid
8    it, but it has, in some respects, direct applicability here.
9            In a Ponzi scheme, obviously, as the case law we cited
10   both from the Eighth Circuit and the Second Circuit show, an
11   investor's lulling gains --
12           THE COURT:  Let me just interrupt you.  We could go
13   on, and I'm interrupting a very good argument that you're
14   making, and the arguments by both sides have been very good.
15   We could go on and on and on.  There is a lot of detail
16   analysis that could be made, and for my purposes it is not
17   useful.  I want to make the findings that I need to make, and I
18   want to do the job that is necessary, both because it should be
19   done in the district court, and I also don't want to have the
20   case go up to the Court of Appeals and have the Court of
21   Appeals feel that the judge did not do the necessary -- cover
22   the necessary bases at the sentence.
23           But if anybody wants to know how I'm going to sentence
24   and the basis for it, I'll tell you very frankly, as I should,
25   that is this -- I do not believe that a definite calculable

0BGTLEV2

1  loss has been shown so that that section of the guidelines,
2  that table can be applied.  And if I should make specific
3  findings -- maybe I should, but I am not going to try to do
4  that.  I'm not going to try to do a detailed analysis of the
5  Fidelity situation and the Holland situation and the Meisenbach
6  situation.  I will simply say that enough problems have been
7  shown with those loss figures urged by the government that I do
8  not believe that those loss figures should be used as such in
9  the sentence.  Nor am I willing to go through the exercise of
10 discounting them by a certain percentage, as suggested in the
11 latest memorandum of the government.  That does not help me in
12 deciding what a sentence should be.
13         This is not a civil action where someone is seeking to
14 recover damages.  This is a sentence.  It depends on my
15 judgment as to what is just, and those calculations don't help
16 in that.  Nor am I going to rely on any idea that Mr. Levis's
17 conduct resulted in some specific inflation of the balance
18 sheet or earnings statement figures about IOs, because the
19 government has not proven that.  That would be a big job to
20 prove.  That would take a lawsuit in itself.  And we are not
21 going to do that at the sentence.  It was not done at the
22 trial, and we're not going to start a new basically almost
23 another lawsuit in connection with imposing a sentence.
24         What I believe is the case, I believe that Mr. Levis
25 is guilty of what the jury convicted him of, and there was a

0BGTLEV2

```
 1   certain degree of elaboration and certainly a degree of
 2   decision to carry out certain misrepresentations about the
 3   existence of the caps and about the existence of independent
 4   evaluators.  And those representations were made in various
 5   directions, as the trial record shows.  That was not without
 6   effect.  That was not without causing harm.  But I can't
 7   quantify the harm in terms of a dollar amount, and I won't try
 8   to do it.  And I don't believe that any number of further hours
 9   would be useful to try to arrive at such definition.
10             So I'm going to impose a sentence on the basis of what
11   I have talked about, and so from now on for the rest of this
12   hearing I would like to see obviously if Mr. Black or any of
13   the other defense lawyers have something to add.  I, of course,
14   would like to see if Mr. Levis would like to make a statement,
15   which he is entitled to do.  And if the government has anything
16   further along the lines I'm talking about, I would be happy to
17   hear from the government, but I would like to proceed on the
18   basis that I am talking about and conclude this sentencing
19   proceeding.
20             Mr. Black, you're welcome to speak.
21             MR. BLACK:  Your Honor, we're going to -- we have some
22   very short witnesses, about two minutes each, to tell -- family
23   members to say something about Mr. Levis.  Would that be all
24   right?
25             THE COURT:  Of course.
```

48

0BGTLEV2

```
 1              MR. BLACK:  Mr. Beaton is going to handle that.
 2              MR. BEATON:  Good afternoon, your Honor.  As you can
 3    see, we're joined by quite an outpouring of support today on
 4    behalf of Mr. Levis.  And although the Court sat through five
 5    weeks of testimony and evidence, very little of what the Court
 6    heard describes who Sammy Levis is and what he means to these
 7    folks.  Mr. Levis is a devoted father, husband, member of the
 8    community.
 9              And so with the Court's permission, I would like to
10    bring up some of the folks of Mr. Levis's family, members of
11    community and friends to address the Court here at the podium.
12              THE COURT:  You can certainly do that.
13              MR. BEATON:  The first person I would invite up is
14    David Rafael Levis, that is Mr. Levis's younger brother and
15    former colleague at Doral Financial.
16              MR. LEVIS:  Your Honor, my name is David R. Levis, and
17    I am Sammy Levis's younger brother.  I'm sorry, this is really
18    emotional for me.
19              Your Honor, an extremely important question to answer
20    before you decide the future of my brother and our very close
21    family is who is really Sammy Levis.  When Sammy was nine years
22    old, I was born.  By the time I was five, Sammy was like my
23    second father.  He was my hero.  Throughout the years, he
24    taught me many important things.  He looked out for me and
25    loved me, and he guided me to help me become what I am today.
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

0BGTLEV2

1  Sammy never smoked.  Sammy never did any drugs.  In college he
2  was a well rounded and balanced individual who worked very hard
3  for everything he achieved.  Sammy was the best role model.
4          Today, he has become the role model and second father
5  to my three children.  He always takes my place when I cannot
6  go to an event, and for that, and all the time we spend
7  together as a family, they love him dearly.
8          In 1998 I began working at Doral Financial
9  Corporation.  Although it was a public company, it was always
10 considered our family business.  At that time, Sammy was
11 executive VP and treasurer.  My uncle Solomon was chairman and
12 CEO, my aunt was the president.  My father David was director
13 emeritus and past chairman and CEO, all three founders of Doral
14 Financial Corporation.  My sister Aidiliza was president of one
15 of the mortgage subsidiaries, and some of my cousins and other
16 family members worked throughout the company in various
17 positions, including me, who served as president of HF Mortgage
18 Bankers.
19         Your Honor, I am proud of my brother Sammy.  He's an
20 exemplary professional.  His peers respect him.  His peers
21 respected him and his employees loved him.  I always -- I was
22 always very proud of the company, always very proud to work
23 with Sammy.
24         Unfortunately, as you know, about five and a half
25 years ago a long investigation from the SEC began at Doral

0BGTLEV2

```
 1   Financial.  Thereafter, Sammy was indicted, and our family has
 2   never been the same.  It has been the most difficult five and a
 3   half years any family can endure.  Even though Sammy is strong,
 4   and everyone in our family --
 5           THE COURT:  Can I just suggest -- I have wonderful
 6   letters from the family and I am very happy to hear from people
 7   in court, but I think it does not help either Mr. Levis or
 8   anybody to have lengthy statements, if you don't mind me saying
 9   so.
10           MR. LEVIS:  I'll stop now.  Your Honor, Sammy is a
11   very decent man, a man who is not perfect, a man who has made
12   mistakes.  Sammy is a good person.  I understand you have the
13   grave responsibility to make sure justice is served.
14   Nevertheless, this case is very different than most, and my
15   brother is not a regular defendant.
16           Your Honor, I know my brother well, and my brother is
17   not by a definition a bad person.  Sammy never, never enriched
18   himself.  He never sold a single stock.  Sammy would never,
19   ever, ever intentionally harm anyone.  I and all my family can
20   attest to that.  I urge you to please consider all the facts
21   and make sure justice is served in the most merciful way
22   possible taking into account who Sammy Levis really is.
23           Thank you, your Honor.
24           THE COURT:  Thank you.
25           MR. BEATON:  The next person I ask to come up is
```

51

0BGTLEV2
1    Jessica Vega Mendez.  Ms. Mendez is an Army veteran who, at a
2    chance meeting with Mr. Levis, received a huge gift.
3              She's going to need the benefit of an interpreter,
4    your Honor.
5              THE COURT:  I would again suggest any statements be
6    short.  It's more helpful if they reach the point rather
7    briefly.
8              MR. BEATON:  Yes, sir.
9              THE COURT:  Because we need to conclude.
10             MR. BEATON:  Yes, sir.
11             MS. MENDEZ:  Good afternoon.  I am Jessica Vega
12   Mendez, and I wanted to express to you what Sammy has done in
13   my life.  In the year 2004, after trying for two years to get
14   pregnant, my gynecologist at the Veterans Administration
15   Hospital referred me to a fertility clinic.  After a medical
16   evaluation and beginning the process of taking medication,
17   which was funded by the Veterans Administration, there came the
18   moment of the egg aspiration.  And the Veterans Administration
19   informed me they would not fund the in vitro process.  And at
20   that point, my entire world came to a complete turn.
21             At a follow-up visit I met Julianna, Sammy's wife.
22   She saw me crying and she approached me.  She asked me what was
23   happening to me, and I told her about my situation.  For my
24   next visit, much to my surprise, she came to the office.  She
25   approached me again and she told me Jessica, when I got home I

52

0BGTLEV2

1  talked to my husband about your situation, and he told me he
2  was going to fund the in vitro process.
3         At that moment we both started crying because God had
4  answered my prayers and took this completely unknown person in
5  my life, somebody I never met before, and he gave me the
6  biggest thing anybody could have in their lives, the biggest
7  thing I have in my life, which is my son.  Enrique is now five
8  years old.  He's a very happy child, loving, very smart.  And I
9  owe all of this first to God and then to Sammy, who has been my
10 angel.
11             THE COURT:  Thank you very much.
12             MR. BLACK:  Your Honor, please we decided not to -- we
13 have others but we decided not to call them.  But I ask
14 Mr. Sammy Levis to come up, and make a statement.
15             THE COURT:  All right.
16             THE DEFENDANT:  Thank you, your Honor.
17             First of all, my counsel, Mr. Black, advised me that I
18 can't talk much about the case given the fact that they are
19 appealing the case.  So therefore, I want to be very brief.
20             If you don't mind giving me a couple of minutes, I
21 want to introduce a couple of persons that came from San Juan,
22 Puerto Rico.  My dad is over there, my mother, sister, brother,
23 who you just heard, but most importantly, one more person who
24 has been with me for 16 years and still has been with me up to
25 now, that's my wife.  And I want her to stand up over there.

0BGTLEV2

1   Let me tell you, whatever happens to me today, a lot of people
2   envy me because I have her.
3           Finally, let me just say there are two other persons
4   who are not here, and those are the real victims of this case,
5   one of them is my daughter, Anna Victoria, and she's eight
6   years.  In about a week, on the 22nd she's going to be nine
7   years old, a girl scout.  Second, my youngest daughter, Maria
8   Alexandra.
9           You know, a lot of people will say, well, you know,
10  you should have thought about them when doing the alleged
11  things that the government when has accused me of doing.  But
12  one thing I will tell you, your Honor, I never, never, never
13  intended to do any harm to anyone.  That's not me.  That's not
14  the Sammy Levis that you have heard so much about.  Sammy
15  Levis, as my brother just mentioned, never even had drugs other
16  than alcohol, never in my life.  All I have been trying to do
17  is good.  And for those investors, I am very sorry of what I
18  did.  I never intended to do any harm.  Matter of fact, I am
19  one of those investors who believed in the company founded by
20  my father and aunt 30 years ago in 1972.  And I was very proud
21  of that, and I am very proud of the history.  That company is
22  still a very good bank in Puerto Rico.
23          So I am pleading with you, your Honor, for the sake of
24  my daughters, who need me, my wife and the rest of my family,
25  be as lenient as you can.  I'm ready.  And as matter of fact,

54

0BGTLEV2

1    at the end of this hearing it will be my pleasure, your Honor,
2    to shake your hand in respect of your decision.  The same as I
3    did when this trial ended, I shook the hand of the everyone at
4    that table, which I will shake the hand of the new people that
5    I have seen here, because that's me.
6            I believe in the U.S. government system, and the
7    reason I shook their hands is because I believe in that system,
8    and out of respect to them, respect of what they think.  Your
9    Honor, thank you, and I am pleading with you right now to be
10   just, and in respect, I will understand the decision that
11   you're about to make.
12           Thank you very much.  Thank you for the opportunity.
13           MR. BLACK:  Your Honor, that concludes the
14   presentation we want to make.  I would like to maybe say a few
15   words on behalf of Mr. Levis.  When I was thinking about
16   appearing before you today, how much of a human endeavor this
17   is -- and I know the Court mentioned this in the call that we
18   had that you know that this is more than just dealing with a
19   chart or a guidelines or numbers or statistics, but you sort of
20   have to determine what the harm is and who the person is and
21   come to a sentence that you think is just.
22           And I know that you made that point with us, and of
23   course Congress made the same point in passing the statute
24   3553(a) going through all the various circumstances and details
25   that ought to be considered.  And there's a couple that I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

55

0BGTLEV2

1  wanted to bring to the Court's attention that I think really
2  bear upon this sentence beyond the numbers that we have been
3  talking about.
4        It is true that Mr. Levis did not choose his words
5  well, that people were misled, that there was harm done.
6  However, he never affected the balance sheet of the
7  corporation.  I know the Court asked that question pointedly
8  throughout this hearing.  I don't know that anybody really
9  answered you directly.  But I can tell you that the published
10  figures of the Doral Financial Corporation did not come from
11  Sammy Levis, they came from the internal audit that was
12  verified by the outside auditors, and those were the figures
13  that were reported.
14        It is true that the corroboration that was put in the
15  10K was corrupted, according to the jury's verdict, and that
16  there were misstatements about what types of caps there were on
17  the contract.  But the reported figures that went to the
18  investing public were not corrupted by Mr. Levis.
19        As to mitigating circumstances, I know that you have
20  heard this from everyone, he did not sell a single share.  He
21  bought over a million dollars worth of stock right in the
22  middle of this going on in the January and February 2005
23  period, which I think shows his faith in this company, the same
24  faith that he has said to you today.  He did not loot the
25  company.  He did not in any way show any extravagance.  He did

0BGTLEV2

```
 1    not create shell corporations to funnel money out of the
 2    company.  He did not steal money from the company.  He didn't
 3    buy $6,000 shower curtains.  He didn't buy yachts and homes.
 4    He didn't flaunt any kind of ill-gotten gains from the company.
 5    He never stole any money from the company.  None of those
 6    things were done.  And those are the kinds of things that this
 7    Court and other courts, particularly in this district, see.
 8    And that is what the fraud guidelines were designed for, the
 9    people first of all who are thieves, and then second of all,
10    the people who do things that put money directly in their own
11    pocket.  It is to punish that greed that we saw over and over
12    again in the last decade that created these guidelines.
13             In addition, in dealing with the customers of the
14    bank, these were not subprime loans, these were not adjustable
15    rate mortgages, these were not homeowners who were defrauded in
16    any way or lost their homes or lost their savings or lost
17    everything they had.  Not a single one of the homeowners that
18    obtained mortgages from Doral Financial Corporation were
19    affected by what happened here.
20             We also know from the evidence that came out from the
21    trial that while it is true Mr. Levis sent e-mails and what
22    have you, whenever there was a meeting, nobody he have talked
23    to him, they all talked to David Levis.  Never once in
24    face-to-face meetings did they ever ask him anything about the
25    company because they did not want anything from him about the
```

0BGTLEV2

1  company, but all these conversations were directed to his
2  father.
3          In addition, we know from the exhibits that we
4  introduced, these e-mails that he sent to the outside valuators
5  all came from information either from his father, David Levis,
6  or from his uncle Solomon Levis, who was the CEO of the
7  company.  He did not create these figures.  He was the
8  messenger.  These are matters that I think are important in
9  terms of mitigating what he is responsible for.
10         As to his personal life, I know you just heard
11 somewhat about how charitable he is, but more importantly than
12 even them, his sister had Hodgkin's disease in stage four.
13 This got him and his family deeply devoted to helping children
14 who suffered the horrible disease of cancer.  And they created
15 this charity, Children Who Want To Smile.
16         In the papers that we submitted to the Court, there
17 are two that I want to bring to your attention.  First was
18 Lillian Sanchez, who is the CEO of the American Cancer Society
19 of Puerto Rico, who said that Sammy, through his hard work, his
20 diligence and his caring, helped provide free medical
21 assistance to the poor people, the poor children of Puerto Rico
22 who suffered this horrible disease of cancer.
23         The second letter I wanted to emphasize is from
24 Alberto Moreno, a man who worked directly with Sammy Levis for
25 15 years in this charity.  And he gives an anecdote when they

58

0BGTLEV2

1    had a year end meeting, a meeting of the foundation and some of
2    the people came, he said this woman came up to him and said
3    that she had two children who had cancer who were cured because
4    of Sammy's help.  It's that kind of direct involvement in
5    people's lives that I think is important when you're evaluating
6    who a person is.
7            The government has asked for very harsh sentences in
8    this case, but before we get to that, Sammy will suffer for the
9    rest of his life because of this.  He was in the financial
10   industry.  He had trained for it.  He worked in it.  He has now
11   lost that, and he has lost any chance to ever be employed in
12   that industry again.  He will never be able to use his
13   education and his training in any kind of a worthwhile
14   occupation.  He can still be a productive member of society, he
15   can still be a member of his family, he can still take care of
16   his wife and two children, but he has lost that forever.  And
17   that is a punishment.
18           Also his wealth has either been lost or forfeited.  We
19   know at one time his stockholdings were $60 million, and we
20   introduced evidence to show that that is reduced to less than
21   $500,000.  These are things that are part of the punishment
22   that he suffered.  And since he was convicted of this crime,
23   I'm not saying it was an unjust punishment, but it is
24   punishment.
25           The government asked for a sentence that is equated to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

59

0BGTLEV2

1   a life sentence.  When I think about that, the only thing I
2   could think about is this a man who never again deserves to be
3   in our society, a society of men and women.  Is this man an
4   outlaw that should be isolated from his society forever?  I
5   don't think the man that you heard about during the trial and
6   have heard about today is the type of man who ought to be
7   forever isolated from society.
8         This is not some person who committed violence, a drug
9   trafficker who has done things that are so horrible that he has
10  to be taken away from society.  Nor in the fraud context is he
11  a Bernard Madoff who took I don't know how much money from
12  people to enrich himself to buy yachts and homes in New York in
13  Long Island and Palm Beach, those kinds of things.  He is
14  simply not that kind of person.  He is a person who can be
15  punished but not broken, a person who can survive his
16  punishment to come back to be a useful member of this society.
17       Your Honor, I started as a lawyer in 1970 just before
18  your Honor ascended the bench.  And in those days, in 1970 and
19  '71 there were 200,000 people in the prisons in the United
20  States.  Today we have 2.3 million people in prison because in
21  the last 30 years -- excuse me, 40 years, we have said over and
22  over again that prison is always the answer.  So now we have
23  2.3 million Americans in prison.
24       With a population of less than five percent of the
25  world's population, we have over 25 percent of the world's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

60

0BGTLEV2

1   prisoners.  We have more prisoners than Russia and China
2   combined.  And I won't go into the figures, but we have far
3   more than any country on earth.  And people have begun to speak
4   about that, not defense lawyers, but people far more important
5   than us.  Justice Kennedy spoke at the American Bar
6   Association, and he said a country which is secure in its
7   institutions, confident in its laws, should not ashamed of the
8   concept of mercy.  As the greatest of poets has said, mercy is
9   the mightiest in the mightiest, it becomes the throne monarch
10  better than his crown.  Judge Richard Posner of the Seventh
11  Circuit said the same thing in an article he wrote in The New
12  Republic, that we should not become eager enlisters in this
13  process of just sending people to prison.
14          Our Attorney General, Eric Holder, went to the last
15  American Bar Association convention, and he says it's time to
16  get smart on crime, take the focus away from putting so many
17  offenders behind bars.  There's a lot to be said about that.
18  Instead of being tough on crime, I think we have to be smart on
19  it, and we have to look at human beings and determine are they
20  people who can be saved.
21          That's why at the beginning of today I told the Court
22  that even though the probation department's calculations were
23  higher than ours, I could not say that the work they did was
24  not reasonable.  And I agreed that we would withdraw our
25  objections to it, because here's an independent third party

61
0BGTLEV2

1 taking a look at this case and giving which I think is a
2 reasonable guidelines calculation that this Court ought to
3 start with.  And I just happen to think it's a reasonable way
4 of looking at this case.
5          And the end result here, your Honor -- and I know your
6 Honor has articulated this yourself that you will look at this
7 as one man to another, as what a human being should be punished
8 for, not some chart, not some artificial amount, not some
9 extremely harsh sentence that doesn't meet the actions in the
10 case.
11          (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

62

0BGMLEV3

1              MR. BLACK:  And while there is harm done here and
2    there are people who have suffered financial losses
3    nevertheless, I think a reasonable sentence that the Court
4    should entertain is within the range suggested by the probation
5    department.  Thank you, your Honor.
6              THE COURT:  Government have anything?
7              MR. MILLER:  Yes, your Honor.  Some brief remarks.
8    Just initially, your Honor, I just wanted to make sure under
9    Crosby that your Honor was making a finding with respect to the
10   presentence report and adopting the guidelines calculation in
11   the PSR.  I am not sure --
12             THE COURT:  I'll come to that.
13             MR. MILLER:  Thank you, your Honor.
14             One procedural matter, your Honor.  As defense counsel
15   pointed out, I think some time earlier today, and the
16   government mentioned in one of its submissions, it is
17   requesting a deference of a restitution calculation order which
18   can be done under 3663 --
19             THE COURT:  The government agrees with that?
20             MR. MILLER:  Yes.  There is a 90-day period, so we are
21   requesting that.
22             Thank you, your Honor.
23             Just briefly, your Honor, of course, is well aware of
24   the trial evidence.  Your Honor presided over the trial.  In
25   fact, government counsel, at least two of the Assistant U.S.

0BGMLEV3

1    Attorneys here, were not even here.  Regardless of that fact,
2    your Honor, and as your Honor is well aware, the defendant's
3    crimes in this case were calculated, were brazen, and were
4    motivated by greed.  And how is it motivated by greed if he
5    didn't even benefit, the defense asks?
6          Well, of course they allude to this, and the
7    government certainly goes head on into this, and that is the
8    value of his stock holdings.  He doesn't have the millions and
9    millions and millions of dollars that he had and perhaps would
10    have continued to have but for the fact that Doral's house of
11    cards came crumbling down.  And so, ultimately, the motivation
12    here was his personal holdings, which were calculated in the
13    millions and millions of dollars.  And when his lies about the
14    independent valuations and his lies about the caps could no
15    longer be contained, and Doral's house did come tumbling down,
16    as the government argued today and as it argued in its
17    submission and as it argues under 3553(a), there was a
18    significant financial harm to investors.
19          And given the scope of the defendant's conduct and the
20    effect on the financial markets, on the banking system, on
21    banks in Puerto Rico even specifically, your Honor, there is a
22    need here, your Honor, for a strong significant sentence not
23    only to punish the defendant but to deter others from
24    perpetrating the same kind of conduct.  And just looking at
25    3553(a), your Honor, as we set forth in our submission, the

64

0BGMLEV3

1  nature and the circumstances of the offense demand a
2  significant sentence.
3          The history and characteristics of the defendant are
4  also telling because the defendant had a close family, people
5  who loved him.  We have a defendant here who was not without
6  means.  His family had millions and millions of dollars of
7  wealth.  This was not a one-time offense.  This was an offense
8  and a fraud that was perpetrated over several years.  There was
9  not some exigency in the defendant's personal life that
10  demanded and motivated this kind of fraud.
11          There is also a need under 3553(a) to afford
12  deterrence, to deter other professionals, other officers,
13  directors, public corporations that this kind of securities
14  fraud and wire fraud will not stand and that a message needs to
15  be sent not just to the banking industry in Puerto Rico but to
16  the United States at large that this kind of conduct will not
17  stand when it has such a large impact on a publicly-traded
18  company and on the financial markets generally.
19          Finally, with respect to 3553(a), the need to avoid
20  unwarranted sentencing disparities, this is not a
21  run-of-the-mill case.  As we point out in our sentencing
22  submission, a significant sentence in this case will not create
23  any kind of unwarranted sentencing disparities.  They will be
24  warranted, your Honor, if there is a significant sentence
25  afforded here, and the government submits that there should be

0BGMLEV3

 1   one.
 2              Ultimately, your Honor, and I think this was telling
 3   in Mr. Levis' statement just minutes ago, he did not accept
 4   responsibility for his fraud.  He used the word allege, he
 5   talked about the jury's finding, but not specifically the fact
 6   that he perpetrated this fraud as was found.
 7              THE COURT:  He pleaded not guilty and it would be
 8   inconceivable to me that he would get up and basically plead
 9   guilty.  He pleaded not guilty.  He intends to appeal from the
10   verdict.
11              MR. MILLER:  That's absolutely his right, your Honor,
12   of course.
13              THE COURT:  In his right mind he would not do what
14   you're suggesting he should have done.
15              MR. MILLER:  Regardless, your Honor, and we weren't
16   trying to suggest otherwise, the point is that a jury found him
17   guilty, found him guilty of these offenses which had
18   significant harm and, accordingly, the government requests, the
19   government submits that a significant offense like this offense
20   warrants a significant sentence.  And as we set forth in our
21   papers, a significant sentence here will meet not only the
22   guidelines standard but also 18 United States Code 3553(a) for
23   the factors that are set forth therein as we described in our
24   submission.  Thank you.
25              One other thing, your Honor, as counsel reminds me,

66

0BGMLEV3

1    with respect to forfeiture, we have a forfeiture order to hand
2    up to your Honor, a general order of forfeiture that can be
3    amended at a future date.  But, obviously, given the fact even
4    if your Honor is to find, for example, that the guidelines
5    should be computed from a gains perspective, there are still
6    fraud proceeds that were gained and, accordingly, forfeiture is
7    appropriate, so I have a forfeiture order to hand up to the
8    Court, your Honor.
9              THE COURT:  Thank you, all.
10             We will proceed to the sentence.  It is my duty to
11   make a determination of what the guideline range is as properly
12   calculated, and I think that my remarks already have made it
13   clear that any attempt to calculate based on either some
14   specific monetary loss or some -- and I'll add some specific
15   monetary gain, those considerations do not really form the real
16   basis of my decision.
17             But the law requires that I do make a finding of a
18   guideline range, and I believe that closest thing to reality is
19   what the probation department has decided upon and so that I
20   will simply state that I do accept the guideline range of 57 to
21   71 months.  I find that the guideline range suggested by the
22   government of 324 months to 405 months is so far out of any
23   conceivable just treatment of this sentence that it is
24   completely unhelpful.  That would involve a sentence of
25   somewhere between 27 and 34 years and it is inconceivable to me

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

67

0BGMLEV3

 1   that that kind of a sentence would even be seriously
 2   considered.
 3           Now, I am not going to base my sentence literally on
 4   what the probation department bases its calculation.  I am not
 5   going to take some concept of gain and use that as a basis for
 6   imposing sentence.  My objective is to carry out the law.  My
 7   objective is to apply the factors that are in Title 18 United
 8   States Code Section 3553.
 9           But what all that adds up to, in my view, are two
10   things.  One is to carry out my responsibility to enforce the
11   law, and that means that there must be a sentence for a term of
12   imprisonment.  But at the same time my other objective is not
13   to destroy an individual.  I've said several times I thoroughly
14   agree with the jury verdict here and crimes were committed.
15   And these were not trivial crimes.  They were matters of
16   substance.  But they do not merit the destruction of a human
17   being by imposing such a harsh sentence that it would be
18   difficult to recover from that sentence.
19           And I want to say very quickly that it may very well
20   be that Mr. Black is correct, that Mr. Levis cannot get back
21   into working in the financial realm, but I would be regretful
22   if that were the case.  I've always felt that if somebody has a
23   calling and a talent, then what the whole legal process would
24   hope for in case a crime is committed is that the person can,
25   in the familiar way of speaking, pay the person's debt to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

68

0BGMLEV3
1  society and then be finished with it.
2          Now, that's very hard to do in the real world, but
3  that's what should be done if it can be done and to the extent
4  it can be done.  And so I don't see why Mr. Levis has to become
5  a piano player or something else.  I don't see why he can't go
6  back to his calling.  It's not my business to decide that.  But
7  I just want to say that as the judge in this case.  He has not
8  done something that removes him from all consideration of
9  exercising his talents.  He has done something wrong, but not
10 everything wrong.  So, again, my objective is to enforce the
11 law and also to avoid destroying an individual.  Those are my
12 objectives.
13          Now, as to what the sentence should be, of course, we
14 are talking about a prison term.  We hear that the sentence
15 should be significant or substantial, or whatever it is.  It
16 doesn't take a huge amount of years to constitute a substantial
17 and significant sentence.  A prison sentence deprives someone
18 of their liberty.  And to be deprived of your liberty in a
19 significant way does not need to be 27 years or 30 years or 33
20 years or anything like that.  It happens that I am going to
21 impose a sentence within the guideline range, but I want to
22 make it clear that I'm really not paying a lot of attention to
23 that guideline range.  I'm not paying much attention at all to
24 it.  I'm paying attention to what I believe should be done,
25 considering all the things that are appropriate for

69

0BGMLEV3

1  consideration, and I'm imposing a sentence of 60 months, or
2  five years in prison.  I believe that that is a significant and
3  a substantial amount of prison time, and I don't need to say
4  why I think that.  It simply is.  But it can be served, it can
5  be over with, and Mr. Levis can get back doing what he can do
6  in his community and his family and his circumstances.  And I
7  do not believe that the five-year sentence will be disabling.
8  I do not wish it to be.
9         Now, that sentence is imposed on Count One, on Count
10  Three, and Count Five, and those sentences, plural, are to be
11  served concurrently.
12         As far as supervised release, I'm imposing a sentence
13  of two years' supervised release following the prison terms
14  and, again, those sentences of supervised release are on each
15  of Counts One, Three, and Five, and those sentences of
16  supervised release are to be served concurrently.
17         I have given serious consideration of whether a fine
18  should be imposed, and I don't think it would be meaningful to
19  have a small fine of a few dollars.  At the same time, I
20  believe that Mr. Levis and his family have indeed experienced
21  serious losses, and I believe that the prison term is enough.
22  And I think financially he and his family have to recover.
23         I think we have agreed on the issue of restitution
24  that will be something that will be deferred, and I'll rely on
25  the lawyers to work with my deputy clerk to set a schedule for

70

0BGMLEV3

1    that.  There is a special assessment of $100 per count or $300
2    total.  The government has stated that it has a forfeiture
3    order.  Has the defense seen the forfeiture order?
4              MR. MILLER:  I just handed a copy to defense, your
5    Honor.  It's a general order of forfeiture.
6              THE COURT:  Is there any issue about the forfeiture
7    order?
8              MR. S. SREBNICK:  The only thing that strikes me with
9    respect to the order of forfeiture is I don't recall whether
10   after the verdict of the jury whether there was an inquiry of
11   the parties about whether the jury ought to determine the issue
12   of forfeiture.
13             THE COURT:  I'm sure there was no such inquiry.  I
14   don't think we thought about it.
15             MR. S. SREBNICK:  I don't think anybody thought about
16   it.  Certainly that was not on the defense mind at the time.
17             THE COURT:  Where does that lead us?
18             MR. S. SREBNICK:  I'm looking at the rule now.  And
19   the rule, Rule 32.2(b)(5), seems to require an inquiry of the
20   parties, and then if either party requests that the jury
21   determine forfeiture that it's a jury call because there is a
22   jury right, right to a jury trial on forfeiture.  I haven't had
23   a chance to research this issue.
24             THE COURT:  What is there to forfeit?
25             MR. LITT:  Your Honor, if I could.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

0BGMLEV3

1          THE COURT:  Have we got a real issue?  Has he got a
2     lot of wealth to forfeit?  What is the issue?
3          MR. LITT:  Forfeiture is part of criminal punishment,
4     as your Honor is aware.  And it took proceeds of crimes away
5     from convicted defendants.  32.2(b) --
6          THE COURT:  What proceeds did he realize from the
7     crime?
8          MR. LITT:  The PSR, which the Court adopted, indicated
9     he realized $835,000.
10         THE COURT:  I didn't adopt the findings.  I just said
11     that I would use that range.
12         MR. LITT:  I misunderstood that, your Honor.
13         THE COURT:  You understand now.
14         MR. LITT:  Well, there is no right to a jury trial on
15     forfeiture, unless the government is seeking to forfeit
16     specific property, and that was not what the indictment sought,
17     and so it's not an issue.
18         THE COURT:  What is sought?
19         MR. LITT:  What is sought is a money judgment, general
20     order of forfeiture of proceeds of the crime.  It's up to the
21     government to identify the proceeds of the crime.
22         THE COURT:  When do you do that?
23         MR. LITT:  We can do -- as long as the Court orally
24     pronounces forfeiture as part of the sentence and signs the
25     general order of forfeiture, it can be amended thereafter.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0BGMLEV3

1  Until it is amended, it doesn't relate to any specific sum or
2  specific property.  It's up to the government to come forward
3  and seek to amend it and for the Court to approve that.
4           THE COURT:  I am going to take the view right now that
5  the government has a right to have this.  Now, if that is
6  mistaken, then that can be raised, but I just don't want to get
7  into that this afternoon in any detail.  I'll sign the order.
8  And if there is a problem about the order, it just has to be
9  raised later.  But I think the government is entitled to have
10 it signed now.
11          MR. LITT:  I would just note, your Honor, that the
12 Court -- doing so only will have effect if the Court orally
13 pronounces forfeiture as part of the defendant's sentence.
14          THE COURT:  I'll do that.  In other words, part of the
15 sentence is there must be a forfeiture of the proceeds of the
16 crime, if any.  That's fine.
17          Is there anything else?
18          MR. LITT:  With respect to the sentence?
19          THE COURT:  Is there anything else for this afternoon?
20          MR. LITT:  Well, there is the issue of bail pending
21 appeal.  There is a motion pending on that subject.  The
22 government has submitted its opposition.  The government does
23 not believe that the defendant has raised a substantial
24 question of fact or law that's likely to result in a reversal
25 or a new trial.  And there is a strong --

73

0BGMLEV3

1          THE COURT:  Let's look at the statute.  What statute
2     applies?
3          MR. LITT:  3143(b), specifically (b)(1)(B):  That the
4     appeal is not for the purpose of delay and raises a substantial
5     question of law or fact likely to result in (i) reversal, (ii)
6     an order for a new trial.
7          THE COURT:  What does the defense say?
8          MR. H. SREBNICK:  There appears to be no dispute that
9     Mr. Levis is not a risk of flight, not a danger to the
10    community.
11         The only thing left is whether we as trial lawyers
12    have preserved for appellate purposes substantial issues.  And
13    the Second Circuit, like most circuits, defines that to be a
14    legal question that is fairly debatable.  We believe, as we
15    outlined in the written motion that was filed several months
16    ago, that we certainly have preserved several issues that are
17    fairly debatable, certainly with regard to the rejection of
18    certain jury instructions that we proposed, citing the Dixon
19    case in the Second Circuit, the decision to exclude parts of
20    the defense expert testimony, expert witness evidence that was
21    submitted with respect to closing argument by the government,
22    which the Court may recall and which you had to instruct the
23    jury that Mr. Braun basically called Mr. Black and myself
24    liars, which clearly violates Second Circuit law, and even the
25    government had to concede that mistake.

74

0BGMLEV3

1   These are fairly debatable issues that we have
2   preserved and, if we are correct on appeal, would result in a
3   new trial.  And given that Mr. Levis has complied with all the
4   conditions of bail to date, given that the sentence is one that
5   he certainly will recover from, as your Honor points out, I
6   believe the statute affords him the privilege of continuing on
7   bail pending appeal.
8       THE COURT:  The thing is, there surely are appealable
9   questions, without any doubt.  Now, for me to say that they are
10  likely to result in a reversal or a new trial, I'm the trial
11  judge and I made all those rulings.  And it would be rather
12  surprising if I sat here and said I'm likely to get reversed.
13  But no trial judge knows what the Court of Appeals is going to
14  do.
15      What I do know is that there were very substantial
16  issues raised on which I made rulings excluding certain issues,
17  excluding certain arguments and so forth.  I think I made
18  certain rulings and then the government lawyers didn't
19  completely take advantage of them.  So the record is not as bad
20  for the defense as if I had had my way.  But there certainly
21  are appealable questions, and I would order that bail be
22  continued.
23      That concludes the proceeding.
24      MR. MILLER:  Your Honor, one thing, your Honor.  The
25  Court is required to provide notice to the defendant of his

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

75

0BGMLEV3
1    right to appeal the sentence, your Honor.
2             THE COURT:  The defendant has a right to appeal from
3    the sentence.
4             Thank you.
5                               o0o
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25