# Exhibit B

271

03VJLEV1

1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   UNITED STATES OF AMERICA,
3
4            v.                      S1 08 Cr. 181 TPG
4
5   MARIO S. LEVIS,
5   a/k/a Sammy Levis,
6
6            Defendant.
7
7   ------------------------------x
8
9
10
11                                  March 31, 2010
11                                  10:25 a.m.
12
13
14
15  Before:
15
16            HON. THOMAS P. GRIESA,
16
17                                  District Judge
17                                  and a jury
18
19
20
21
22
23
24
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

```
                                                             272
      03VJLEV1
 1
 2
 3                              APPEARANCES
 3
 4
 5    PREET BHARARA,
 5         United States Attorney for the
 6         Southern District of New York
 6    WILLIAM JOHN STELLMACH,
 7    DANIEL BRAUN,
 7    JASON ANTHONY, Special
 8         Assistant United States Attorneys
 8
 9
10    BLACK, SREBNICK, KORNSPAN & STUMPF, PA,
10         Attorneys for defendant Levis
11    BY:  ROY BLACK, Esq.
11         HOWARD SREBNICK, Esq.
12         JOSHUA E. DUBIN, Esq.
12         MARIA NEYRA, Esq.
13                    Of counsel
14
15    Also Present:
15         ROBERT DiBRIENZA, Special Agent FBI
16         ERICA GLENN, Paralegal U.S. Attorney's Office
16         EMMA KUROSE, Paralegal U.S. Attorney's Office
17         JEFF HERZKA, Trial Technician
17
18
18
19
20
21
22
23
24
25
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

03VJLEV1

```
 1                (Trial resumes)
 2                (In open court; jury present)
 3                THE COURT:  Good morning, everybody.  Let's resume.
 4                THE CLERK:  I remind the witness that you're still
 5     under oath.
 6     DIRECT EXAMINATION (Continued)
 7     BY MR. BRAUN:
 8     Q.  Good morning, Mr. Okusanya.
 9     A.  Good morning.
10     Q.  At the end of the afternoon yesterday you were testifying
11     about some events that took place on January 18th of 2005,
12     correct?
13     A.  Correct.
14     Q.  We discussed the earnings release that Doral issued on that
15     date?
16     A.  Correct.
17     Q.  And that earnings release including news that Doral had
18     taken a 97 and a half million dollar write-down on their
19     interest-only strips, correct?
20     A.  That is correct.
21     Q.  I would like to just to pick up where we left off.  I would
22     like to turn your attention back to the first read report that
23     you issued on that report.  This is Government Exhibit 1529
24     that is in evidence.  I think you testified yesterday that you
25     had placed a call to management at this time and had not spoken
```

03VJLEV1

1  to them?
2  A.  That is correct.
3  Q.  In the third --
4          THE COURT:  I didn't understand the question.  What
5  was it?
6          MR. BRAUN:  Judge Griesa, Mr. Okusanya just repeated
7  that he had placed a call to Doral's management at this time
8  but had not spoken to them when he issued this first read
9  report.
10 BY MR. BRAUN:
11 Q.  The third point of your first read report on the 18th of
12 January expresses a concern, Mr. Okusanya?
13 A.  That is correct.
14 Q.  Could you just read what that concern was from the third
15 point of your January 18th first read.
16 A.  Yes, that third point says, "Given the large amount of
17 write-downs in the third quarter of 2004, $61.2 million pretax
18 and fourth quarter of 2004, $97.5 million pretax, we do have
19 some concerns about the potential negative earnings impact of
20 continued IO write downs in 2005 as interest rates continue to
21 rise."
22 Q.  Did you succeed in speaking to somebody in Doral management
23 on the 18th of January after you issued this first read?
24 A.  Yes, I did.
25 Q.  Who did you speak to, Mr. Okusanya?

03VJLEV1
```
 1   A.  I spoke with Sammy Levis.
 2   Q.  Do you recall the conversation that you had with Mr. Levis
 3   at that time?
 4   A.  Yes, I do.
 5   Q.  Did you take notes during that conversation, Mr. Okusanya?
 6   A.  Yes, I did.
 7   Q.  Is it your practice, when you take such notes, to maintain
 8   them as part of your file?
 9   A.  Yes, I do.
10   Q.  Have you had the opportunity to review your notes prior to
11   your testimony today?
12   A.  Yes, I have.
13   Q.  During this conversation that you had with Sammy Levis on
14   the 18th of January, Mr. Okusanya, did you ask about the 97 and
15   a half million dollar write-down of the interest-only strips?
16   A.  Yes, I did.
17   Q.  As you suggested in your January 18th report, was that a
18   significant focus of your concern at that time?
19   A.  Yes, it was.
20   Q.  Do you recall what Sammy Levis said in response to your
21   question about the write-down?
22   A.  Yes, I do.
23   Q.  Did you ask him what had caused the write-down?
24   A.  Yes, I did.
25   Q.  What explanation did he give you, Mr. Okusanya?
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

276

03VJLEV1

1   A.  The explanation I was given that day was that the company
2   was revising its estimates about his expectations of what
3   future interest rates would look like and that they had raised
4   that assessment, basically raised their interest rate
5   expectations from 2 and a quarter percent to roughly 4 percent,
6   and again they're expecting an increase in interest rates so
7   the value of the IO was coming down.
8   Q.  I see.  Was it your understanding that they had factored in
9   that 4 percent figure in determining the value of the IO?
10  A.  Yes, it was.
11  Q.  Is that one of the critical assumptions you described
12  yesterday in your testimony about how this future stream of
13  income from the IOs needs to be evaluated?
14  A.  Yes, it is.
15  Q.  At this time, in early 2005, were interest rates still
16  below 3?
17  A.  Yes, they were.
18  Q.  Okay, so this 4 percent figure, that is something they're
19  anticipating in the future?
20  A.  Yes, they were.
21  Q.  Did you also raise questions when you spoke to Sammy Levis
22  on January 18th about any hedging issue that might be taking
23  place at Doral?
24  A.  Yes, I did.
25  Q.  Why did you ask him a question about Doral's hedging?

03VJLEV1

```
 1   A.  I asked again because most companies, financial companies,
 2   interest rate risk is a big part of what you need to consider
 3   about their earnings.  Many of these companies do hedge against
 4   that interest rate risk.  The company had taken a fairly large
 5   write-down during the quarter, and I wanted to understand all
 6   of the different pieces that made up that write-down.
 7               THE COURT:  You wanted to understand what?
 8               THE WITNESS:  All the different pieces that made up
 9   that write-down.
10   BY MR. BRAUN:
11   Q.  And so was the issue of hedging one part of that issue that
12   you wanted to get an understanding of?
13   A.  Yes, it was.
14   Q.  What do you recall being told about hedging in this
15   conversation?
16   A.  I recall being told that the hedges weren't -- the hedges
17   worked well during the fourth quarter.
18               THE COURT:  I am not understanding you.  What did he
19   say again about the hedging?
20               THE WITNESS:  Sammy told me that the hedges worked
21   properly during the quarter, and we actually worked through
22   some math to indicate that it probably did.
23               THE COURT:  I am not getting this.  He said they
24   worked well in the fourth quarter?
25               THE WITNESS:  Correct.
```

03VJLEV1

```
 1                THE COURT:  And then what else did he say?
 2                THE WITNESS:  And that he and I -- he walked me
 3      through the math of it in the financials to indicate that the
 4      hedges probably worked well during the fourth quarter.
 5                THE COURT:  He walked you through the math, is that
 6      what you're saying?
 7                THE WITNESS:  That's correct.
 8                THE COURT:  Okay.
 9      BY MR. BRAUN:
10      Q.  These hedges that you were discussing, Mr. Okusanya, these
11      are the kind of derivative instruments that are bought --
12                THE COURT:  Why don't you ask him to say.
13                MR. BRAUN:  Yes, sir.
14      BY MR. BRAUN:
15      Q.  What are these hedges that you were discussing?
16                THE COURT:  Did he describe the particular types of
17      hedges that were used?
18                THE WITNESS:  Yes, he did.
19                THE COURT:  What did he say?
20                THE WITNESS:  He and I sat down with the press
21      release.  During the quarter they had taken a loss on the
22      overall hedging positions of about $95 million.
23                THE COURT:  Just a minute.
24                (Pause)
25                THE COURT:  Have you just said -- let me see if I have
```

279

03VJLEV1

1   this right -- you said that the company took a $95 million loss
2   on the overall hedging positions in the fourth quarter?
3           THE WITNESS:  That is correct.
4           THE COURT:  All right.  Go ahead with what else he
5   told you.
6           THE WITNESS:  Yes, 97.5 million of that was related to
7   the IOs as reported in the press release, and so --
8           THE COURT:  Wait a minute.  97.5 million of what?
9           THE WITNESS:  Of the 95.1 million in losses, there was
10  a 97.5 million loss associated with just the interest-only
11  strips, the IOs.
12          THE COURT:  97.5 is bigger than 95?
13          THE WITNESS:  Correct, which means on the other hedges
14  they actually made a gain.  So they had a 97.5 million loss on
15  the IOs, a 2 million gain on all the other hedging positions,
16  for a net number of 95.5, which was reported as the total loss.
17          THE COURT:  Just a minute.
18          (Pause)
19          THE COURT:  Okay.  I guess we should all understand
20  that.  I don't really quite understand it, I am sorry to say.
21          MR. BRAUN:  I am a bit confused by one thing as well,
22  Mr. Okusanya.  Perhaps this will clarify.
23  BY MR. BRAUN:
24  Q.  When you were answering the judge's questions a moment ago,
25  you were describing the interest-only strip I believe as a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

280

03VJLEV1

```
 1   hedge.  Can you help explain this.
 2   A.   Sure.  With Doral there are a whole bunch of instruments on
 3   their financials, assets on their financials that they're
 4   trying to protect from increases in interest rates.
 5   Q.   Is the IO one such asset?
 6   A.   The IO is one such asset, and there are several other of
 7   the assets.
 8           Now, with the IOs, the way they protected those
 9   instruments, the primary, primary way they protected these
10   instruments was with these contractual caps we talked about.
11   We showed an example earlier on about how that is written to
12   the language of the contracts.
13           Then there are other assets, and what they typically
14   do with those other assets to protect them from rising interest
15   rates, they go out and actually buy derivitives or hedging
16   instruments in the markets as we talked about.
17           The net impact, the net impact of all those
18   transactions during the quarter was 95 million, a loss of 95
19   million.  They lost 97 and a half million on the IO side and
20   gained 2 million on the other stuff, for a net of, net loss of
21   95.5.
22           What I was concerned about during the quarter --
23           THE COURT:  Can I interrupt you.  You are talking
24   about losing 95 million but gaining 2 million.  So I don't
25   quite put all of that together.
```

281

03VJLEV1

```
 1              THE WITNESS:  They lost, the net loss was 95.5, and
 2      there are two components to that.
 3              THE COURT:  The net loss on all these assets that had
 4      relationship to interest rates?
 5              THE WITNESS:  Correct, that they were trying to
 6      prevent from high interest rates was 95.5.
 7              THE COURT:  What you're saying, I think, is that if
 8      you take the IOs separately --
 9              THE WITNESS:  Correct.
10              THE COURT:  -- there was a loss of 97.5 million?
11              THE WITNESS:  Correct.
12              THE COURT:  Or write-down?
13              THE WITNESS:  Correct.
14              THE COURT:  Is a write-down the same as a loss?
15              THE WITNESS:  Yes, it is.
16              THE COURT:  All right.  So it is a loss or write-down
17      of 97.5 million, and in order to have a --
18              THE WITNESS:  Total loss.
19              THE COURT:  -- a total loss of only 95 million, the
20      other hedges or devices or instruments, there had to be a gain
21      on the other things?
22              THE WITNESS:  Correct.
23              THE COURT:  To cut the IO loss down to 95?
24              THE WITNESS:  Correct.
25              THE COURT:  The net of everything was 95?
```

03VJLEV1

```
 1                THE WITNESS:  Correct.
 2                THE COURT:  So when you said that the net loss of
 3     everything was 95, the loss part of that really was the IOs?
 4                THE WITNESS:  That is correct.
 5                THE COURT:  The other things gained?
 6                THE WITNESS:  That is correct.
 7                THE COURT:  A net of 2?
 8                THE WITNESS:  That is correct.
 9                THE COURT:  Okay.
10                THE COURT:  May we have a show of hands of the jury if
11     you understand all of that.  Well, look at that group!  They
12     get an A this morning.
13                MR. BRAUN:  Can we put up Government Exhibit 194
14     again.  Can you enlarge the paragraph that begins, "Investment
15     activities for the fourth quarter of '04," it is about five
16     paragraphs or down or some.
17     BY MR. BRAUN:
18     Q.  Mr. Okusanya, can you read the first couple of sentences of
19     that.
20     A.  Sure.  It says --
21                THE COURT:  194 is the press release of January 18th,
22     right?
23                MR. BRAUN:  Yes, your Honor, the earnings press
24     release.
25                THE WITNESS:  It says, "Investment activities for the
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

283

03VJLEV1

```
1    fourth quarter of 2004 resulted in a loss of 95.4 million,
2    compared to a loss of $8 million for the fourth quarter of
3    2003.  The loss on investment activities during the fourth
4    quarter of 2004 was principally due to an impairment on the
5    value of the company's interest-only strips, IOs, of 97.5
6    million as a result of increases in the 3-month London
7    interbank offered rate ("LIBOR") which reduced the anticipated
8    spread of the company's variable rate IOs."
9    Q.  Are those the same figures you were just discussing in your
10   testimony?
11   A.  Correct.
12   Q.  Based on your conversation with Mr. Levis in which you
13   discussed the interest rate assumption that you described, the
14   4 percent as well as what you just described with the hedging,
15   what was your overall reaction to that, Mr. Okusanya?
16   A.  My overall reaction to that, I walked away feeling positive
17   because --
18             THE COURT:  Your overall reaction was what?
19             THE WITNESS:  Was positive to the analysis that Sammy
20   had discussed with me because it made me feel comfortable that
21   the IOs -- if what he was telling me was correct, it made me
22   comfortable that the IOs were unlikely to have further
23   write-downs going forward.
24             THE COURT:  Okay, just a minute.
25             (Pause)
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

03VJLEV1

```
 1              THE COURT:  That was because you felt that he was
 2   taking into account the possible further rise in interest rates
 3   and how he was accounting at that time?
 4              THE WITNESS:  That is correct.
 5   BY MR. BRAUN:
 6   Q.  Still on January 18th, 2005, Mr. Okusanya, after this
 7   conversation with Sammy Levis that you just described, did you
 8   issue another report?
 9   A.  Yes, I did.
10   Q.  Can you now turn your attention to Government Exhibit 1510.
11   It is in your binder.  Do you have the document there,
12   Mr. Okusanya?
13   A.  Yes, I do.
14   Q.  Do you recognize it?
15   A.  Yes, I do.
16   Q.  Would you describe what it is, please.
17   A.  Yes, it is a note that I put out on the 18th of January,
18   2005 with my further thoughts on the fourth quarter earnings
19   results from Doral Financial.
20   Q.  Who did you put this report out to?
21   A.  I put it out to the investment community.  Again it is that
22   list of thousands of investors that I kept.
23              MR. BRAUN:  Your Honor, the government moves 1510 into
24   evidence.
25              THE COURT:  Received.
```

03VJLEV1

```
 1              (Government Exhibit 1510 received in evidence)
 2   BY MR. BRAUN:
 3   Q.  Mr. Okusanya, can you read the third point on the first
 4   page of your January 18th report.
 5   A.  Yes.  The third point, the title of it is, "IO write-down
 6   is conservative, creating upside potential.  The details, we
 7   spoke with management about the IO write-down, and we are no
 8   longer concerned that it relates to an issue with the company's
 9   hedging program.  The write-down is due to Doral's conservative
10   approach to valuing its excess servicing asset."
11   Q.  Can I stop you there for a moment.  Excess servicing asset,
12   what is that?
13   A.  It is the same thing as the IO, it is just a different name
14   for it.
15   Q.  Please continue.
16   A.  "We expect that there is potential for a portion of the
17   charge to be recovered in 2005, if interest rates do not rise
18   as quickly as anticipated."
19   Q.  What was the general neighborhood of interest rates at this
20   time again, Mr. Okusanya?
21   A.  A little over 2 percent.
22              THE COURT:  I didn't hear.
23              THE WITNESS:  It was a little over 2 percent at this
24   point in time, what interest rates were.
25   BY MR. BRAUN:
```

286

03VJLEV1

```
 1   Q.  Can you now turn to Page 5 of --
 2            THE COURT:  Before you do that, can you go back to
 3   that paragraph.  Was it or was it not your understanding after
 4   talking with Mr. Levis, and information you got before that,
 5   that as far as the IOs, the handling of the interest rate issue
 6   was done by the caps rather than hedges?
 7            Am I right or wrong on that?  I don't really know so I
 8   am just asking what you --
 9            THE WITNESS:  You are right on that.  The way the
10   interest rate risk was managed, from my understanding when I
11   spoke with Sammy, the interest rate risk was managed in the IOs
12   with the contractual caps that were put in the contracts.
13            THE COURT:  As far as other assets of Doral, there
14   were hedges, right?
15            THE WITNESS:  Correct.
16            THE COURT:  Okay.  Thank you.
17   BY MR. BRAUN:
18   Q.  Mr. Okusanya, can you go to Page 5 of your report.
19   A.  Yes.
20   Q.  Can you read the first paragraph under the heading, "Tax
21   break could have created opportunity to be conservative in
22   other areas."
23   A.  Yes.  It says, "Investment activities for the fourth
24   quarter of 2004 resulted in a loss of 95.4 million, compared to
25   a loss of 8 million for the fourth quarter of 2003.  The loss
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

287

03VJLEV1

1   on investment activities during the fourth quarter of 2004 was
2   principally due to an impairment on the value of the company's
3   interest-only strips (IOs) of 97.5 million as a result of
4   increases in the 3-month London interbank offered rate
5   ("LIBOR"), which reduced the anticipated spread of the
6   company's variable rate IOs."
7   Q.  Just a question on terminology.  Yesterday you explained
8   what LIBOR was, an interest rate that banks charge to each
9   other?
10  A.  Correct.
11  Q.  What is 3-month LIBOR?
12  A.  3-month LIBOR is the rate banks charge to each other to
13  borrow or lend to each other for a three-month period.
14  Q.  A little further down, Mr. Okusanya, in the same page of
15  your report, after you mention the tax break on the one hand
16  and the IO write-down on the other, do you again summarize your
17  concerns following that press release that was issued on the
18  18th?
19  A.  Yes, I do.
20  Q.  Again can you tell us the two concerns that you note there
21  in your report.
22  A.  Yes, the two concerns I noted, the first one was the
23  write-down, the IO write-down be as a result of the issue with
24  the company's hedging program.
25            The second point was the total -- second concern was
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

288

03VJLEV1

```
 1  given the large amount of write-downs in the third quarter of
 2  2004 as well as the fourth quarter of 2004, could there be a
 3  potential for negative earnings impact of continued IO
 4  write-downs in 2005 as interest rates continue to rise.
 5  Q.  What is the next paragraph.
 6  A.  The next paragraph, "This raised some concerns for us
 7  initially about the quality of earnings for the fourth quarter.
 8  We posed both these questions to management during our
 9  conference call, and found that our initial concerns were
10  unwarranted."
11            THE COURT:  You posed -- I am not with you.  The
12  paragraphs that are being shown to me and the jury now are from
13  that second report you issued on the 18th, right?
14            THE WITNESS:  That is correct.
15            THE COURT:  You posed those issues and then you said,
16  "This raised some concerns for us initially about the quality
17  of earnings for the fourth quarter.  We posed both these
18  questions to management during our conference call, and found
19  that our initial concerns were unwarranted."
20            So that was a response to those concerns, right?
21            THE WITNESS:  That is correct.
22            THE COURT:  That you voiced there?
23            THE WITNESS:  That is correct.
24            THE COURT:  Okay.  All right.
25  BY MR. BRAUN:
```

289

03VJLEV1

1   Q.  And this conference call with management, was that your
2   telephone conversation with Sammy Levis you described a short
3   time ago?
4   A.  That is correct.
5   Q.  And this report is coming out after that?
6   A.  That is correct.
7   Q.  In this report when you refer to your conversations with
8   management, what are you talking about?
9   A.  I am referring to my conversations with Sammy Levis.
10   Q.  Can you continue reading under that smaller heading the
11   next couple of paragraphs, Mr. Okusanya.
12   A.  Yes.  "After conversations with management, we now have
13   more confidence that the IO write-down in the fourth quarter is
14   not related to an issue with the company's hedging program."
15        "We now believe that the IO write-downs relates to
16   management taking a conservative approach to valuing its excess
17   servicing asset, given the windfall from taxes experienced
18   during the quarter."
19   Q.  In what way, Mr. Okusanya, did you understand management to
20   be taking a conservative approach to the valuation of the IO or
21   the excess service?
22   A.  In the conversation I had with Sammy that evening, he had
23   indicated to me that the reason that the value of the IOs had
24   come down was they had changed their assumptions in the model
25   and were now resuming interest rates were going to be going,

290

03VJLEV1

1    3-month LIBOR interest rates were going to be going all the way
2    up to 4 percent within the model.
3               At that point most economists in the market were
4    generally expecting interest rates would probably go up to
5    three and a half, three and a quarter, so they were putting in
6    an assumption that was a little bit higher than the rest of the
7    market and bringing down the values of the IO.
8    Q.  Mr. Okusanya, can you continue reading the next paragraph
9    that starts on Page 5 and continues on to Page 6.
10   A.  "The company's interest-only portfolio of securities had a
11   value of 818 million at the end of third quarter 2004.  This
12   portfolio is made up entirely of excess servicing assets.
13   About 70 percent of the company's excess servicing assets are
14   floating rate assets, whereby the company pays a variable
15   pass-through rate to investors in a pool of mortgage loans with
16   a fixed rate.  The present value of the excess spread between
17   the fixed rate on the mortgages (received by Doral from the
18   customer paying the mortgage) and the current LIBOR based
19   pass-through rate (paid to investors in the mortgage pool)
20   shrinks during interest rate increases, thus resulting in a
21   decrease in valuation (and subsequent write-off) in floating
22   rate excess servicing assets or floating rate interest-only
23   strips."
24   Q.  Stop for a moment.  You refer in that paragraph to the
25   LIBOR-based pass-through rate and then in parens, "paid to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

291

03VJLEV1

```
 1    investors in the mortgage pool."
 2            Who are those investors?
 3    A.  Those investors typically were other commercial banks in
 4    Puerto Rico.  These investors are people who buy, who set up
 5    these contracts with Doral to buy these mortgages from the
 6    company.
 7    Q.  All right.  So you're not talking about investors out in
 8    the investing community?
 9    A.  No, I'm not.
10    Q.  Not the investors who are receiving your reports?
11    A.  No, I'm not.
12    Q.  Can you continue with the next paragraph, sir.
13    A.  The next paragraph, "Doral assesses the fair value of its
14    IO portfolio every quarter, and gets at least three estimates
15    for the fair value during the assessment period.  We believe
16    management went with the most conservative estimates in the
17    fourth quarter of 2004.  Thus, even though the excess servicing
18    assets with floating rates could indeed lose value as rates
19    rise in 2005 due to spread compression, we think management has
20    already taken an appropriate charge against these future
21    losses."
22    Q.  Can you explain what you mean by that, management taking an
23    appropriate charge against these future losses?
24    A.  What I meant by that was again given my understanding from
25    Sammy that they had now put in a much higher interest rate
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

03VJLEV1

1   assumption into their models, the model of the new valuation
2   they had for the IOs, you know, incorporated this expectation
3   of higher interest rates within their models and their
4   assumptions were even higher than what the overall market was
5   thinking would happen with interest rates.
6           It seemed like they plucked all of that in their
7   models in anticipation of that.
8   Q.  Could you continue with the next paragraph.
9   A.  We believe that the most conservative assumptions about
10  interest rate increases which could result in a 97.5 million
11  write-down in the current quarter would require the company to
12  expect interest rates to rise significantly in the near future.
13  Thus, as the earnings release states, if contrary to what is
14  generally expected, LIBOR decreases, a portion of the
15  impairment charges on the value of the IOs could be recovered.
16  Q.  Could you read the next sentence, sir.
17  A.  "We thus expect that there is potential for a portion of
18  the charge to be recovered if rates do not rise as quickly as
19  anticipated in 2005."
20  Q.  Can you explain that last sentence, please, what your
21  thinking was in that regard.
22  A.  Yes.  My thinking in regards to that was if their model had
23  a 4 percent expectation in it, and the overall market was
24  expecting 3-month LIBOR interest rates to be lower than that,
25  if the market was, indeed, right and the model had too high an

293

03VJLEV1

```
 1   interest rate expectation, they would be able to bring the
 2   interest rate down in the model, and that increases the value
 3   of the IOs, so a portion of what they wrote off before they
 4   would recover it as a result of that process.
 5   Q.  Can you turn the page to Page 7 of your report.
 6   A.  Yes.
 7   Q.  Do you see the second bullet point on that page,
 8   Mr. Okusanya?
 9   A.  Yes, I do.
10   Q.  Is that a restatement of the point you just made in your
11   testimony?
12   A.  Yes, it is.
13   Q.  Mr. Okusanya, in this report you're expressing your view
14   there won't be additional write-downs of the interest-only
15   strip portfolio, right?
16   A.  That is correct.
17   Q.  And there may even be the opposite of that, a recovery of
18   the one write-down that they had announced?
19   A.  That is correct.
20   Q.  If, contrary to what you were expecting and understanding
21   based on everything you knew, there were additional write-downs
22   to the interest-only strips going forward, would that be a
23   concern?
24   A.  Yes, it would.
25   Q.  Can you describe the importance of that concern?  Would it
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

294

03VJLEV1

1    be significant?
2    A.  It would be very significant.
3    Q.  And why?
4    A.  It would be significant from the perspective of, if you had
5    further write-downs, then in that situation you would expect
6    some type of impact of the stock because the earnings of the
7    company would look worse than I was initially anticipating.
8              THE COURT:  Impact on profits?
9              THE WITNESS:  On profits, correct.
10   BY MR. BRAUN:
11   Q.  Mr. Okusanya, after you issued this report on the 18th,
12   were you in communication with any investors regarding Doral?
13   A.  I was in communication with several investors in regards to
14   Doral.
15   Q.  What were you hearing from the investors?
16   A.  The investors were raising very similar concerns that I had
17   in regards to what the write-down meant and how the company was
18   valuing its interest-only strips.
19   Q.  What did you do with this January 18th report as far as
20   communications with Doral management, Mr. Okusanya?
21   A.  I believe I sent a copy to management as well.
22   Q.  Was that typically your practice, Mr. Okusanya?
23   A.  Yes, it is.  For most management teams I usually send them
24   copies of my reports and ask for any feedback in case I got
25   anything wrong in it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

03VJLEV1

```
 1    Q.  Did you speak to anyone in Doral management again on the
 2    19th of January, the next day?
 3    A.  I believe I did, yes, I did.
 4    Q.  Who do you believe you spoke to on the 19th of January?
 5    A.  I spoke to Sammy Levis again on the 19th.
 6    Q.  What do you recall about that conversation, Mr. Okusanya?
 7    A.  The conversation was very, very similar to the conversation
 8    I had on the 18th.  What precipitated the conversation was just
 9    I was getting a lot of questions from investors and I just
10    wanted to clarify my understanding of how the IO strips were
11    valued.
12    Q.  Did you describe your understanding as set forth in your
13    January 18th report?
14    A.  Yes, I did.
15    Q.  What was Mr. Levis' response?
16    A.  Mr. Levis very much repeated what he told me on the 18th in
17    regards to what the cause of the write-down in the fourth
18    quarter was, which was the change in assumption about interest
19    rates.
20    Q.  Did you continue hearing concerns from investors?
21    A.  Yes, I did.
22    Q.  As a result of that, did you take any action yourself?
23    A.  Yes, I did.  I put out another note I believe a day or two
24    later based on again further questions I was asking Sammy about
25    the IOs on the 19th.
```

296

03VJLEV1

1   Q.  Why did you put out another report so quickly, a day or two
2   later?
3   A.  The stock had been reacting very negatively to the press
4   release.  I think the stock was probably down 10 to 12 percent
5   in two days.  The volume on trading of it had gone up about 10
6   times.  My phone was ringing off the hook.  Everyone wanted to
7   have answers on this issue.  So I felt it was pertinent to try
8   to address it again through a new report.
9   Q.  Can you turn your attention now to Government Exhibit 1512
10  that has been marked for identification.  It should be in your
11  binder.
12  A.  Yes.
13  Q.  Do you recognize this document?
14  A.  Yes, I do.
15  Q.  What is it, Mr. Okusanya?
16  A.  The document is the report that I did put out on the 20th
17  of January again addressing the fourth quarter results of Doral
18  Financial.
19          MR. BRAUN:  Your Honor, the government moves this into
20  evidence.
21          THE COURT:  Received.
22          (Government Exhibit 1512 received in evidence)
23  BY MR. BRAUN:
24  Q.  Mr. Okusanya, starting on the first page, do you see over
25  on the right-hand side the date of your report?

297

03VJLEV1

```
 1                THE COURT:  What is this number again?
 2                MR. BRAUN:  This is 1512, your Honor, 1-5-1-2.
 3                THE COURT:  All right.
 4                THE WITNESS:  Yes, I do see it.
 5   BY MR. BRAUN:
 6   Q.  When did the report come out, Mr. Okusanya?
 7   A.  The report came out on the 20th of January, 2005.
 8   Q.  Does the report indicate the price of the stock at that
 9   time?
10   A.  Yes, it does.
11   Q.  What price was a share of Doral stock trading at on January
12   20th?
13   A.  Doral was trading at $44 on January 20th.
14   Q.  Do you recall where it had been a couple of days earlier
15   before that fourth quarter press release?
16   A.  Yes, it was slightly over $49.00.
17   Q.  Can you look at the second point you make on the first page
18   and read that paragraph, please, Mr. Okusanya.
19   A.  The second paragraph, "We believe that the IO write-down
20   was strictly as a result of management using the tax windfall
21   as an opportunity to conservatively value its IO strips.  We
22   found no evidence that it resulted from an ineffective hedging
23   strategy.  We've done the math and believe our theory checks
24   out."
25   Q.  In the next paragraph, Mr. Okusanya, do you address the
```

298

03VJLEV1

```
 1   prospect of additional write-downs?
 2   A.  Yes, I do.
 3   Q.  What do you say in that regard?
 4   A.  In that paragraph I said, "We also believe that the
 5   probability of continued large IO write-downs in '05 is reduced
 6   given the conservative stance taken in fourth quarter 2004."
 7   Q.  Can you turn to the next page.
 8   A.  Yes.
 9   Q.  Can you remind us what the buy 2 rating you refer to is in
10   the heading there?
11   A.  The buy 2 rating is again our recommendation on the stock.
12   We are still recommending investors to buy it, but again our
13   level of conviction is a 2, which is a lower level of
14   conviction around that rating.
15   Q.  In that paragraph do you describe what had happened to
16   Doral stock since the press release?
17   A.  Yes, I do.
18   Q.  What do you say about that?
19   A.  I said, "After market closed on January 18th, 2004, Doral
20   stock experienced an 11 percent drop in value and an 18 percent
21   increase in daily trading, 18 times increase in daily trading
22   volume during the trading hours on January 19th.  We believe
23   the significant sell-off was due to concerns about two large
24   lumpy items in fourth quarter earnings."
25   Q.  You describe those two items we discussed?
```

03VJLEV1

```
 1   A.  Correct, the tax benefit as well as the IO write-down.
 2   Q.  Can you continue reading underneath those two bullet
 3   points.
 4   A.  "We believe the interest-only portfolio write-down in
 5   particular could have created concerns that the company may
 6   have had an issue with its derivative book not properly hedging
 7   the interest-only portfolio in the fourth quarter and that
 8   there could be potential for more IO write-downs in 2005 as
 9   LIBOR rates rise."
10   Q.  Now, lower on the page can you pick up from the sentence
11   that begins, "Based on our analysis."
12   A.  "Based on our analysis, we believe that there is some
13   misunderstanding in the market about the nature of the lumpy
14   items in fourth quarter earnings and believed that:  1.  The
15   write-down of interest-only strips during the quarter had
16   nothing to do with an ineffective derivative matching
17   strategy."
18   Q.  Is that hedging?
19   A.  That is hedging, correct.
20   Q.  Can you continue.
21   A.  And, "2.  The company could potentially benefit from a
22   reversal in the valuation of the IO strips in 2005, as well as
23   an even lower tax environment due to the temporary 50 percent
24   reduction in long-term capital gains rates in Puerto Rico."
25   Q.  Just the next sentence.
```

300

03VJLEV1

```
 1   A.  "We thus believe that the recent sell-off in Doral stock
 2   creates an attractive buying opportunity for a stock that
 3   otherwise exhibits very strong fundamentals, and which has
 4   several EPS" -- that is earnings per share -- "upside
 5   opportunities in 2005."
 6   Q.  Can you turn to the next page now, Mr. Okusanya.
 7   A.  Yes.
 8   Q.  Can you read the sentence that begins, "We find it
 9   interesting."
10   A.  Three lines down from the top under the heading noisy
11   fourth quarter results, we find it interesting that the 77
12   million benefit from taxes was an almost perfect offset to a
13   97.5 pretax loss (79 million after tax loss) in the fourth
14   quarter from the write-down of interest-only strips due to
15   rising interest rates.
16   Q.  And the next sentence.
17   A.  "This indicated to us that management might have used the
18   windfall on the tax benefit to be a bit more conservative in
19   the valuation of the interest-only strips."
20   Q.  Was that, indeed, your conclusion, Mr. Okusanya?
21   A.  That is correct, that was my conclusion.
22   Q.  After again summarizing your questions and concerns, going
23   beneath those two bullet points, can you read what you say
24   about your communications with management.
25   A.  I said, "We, however, posed both these questions to
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

301

03VJLEV1

```
 1   management during conference calls on the 18th and 19th of
 2   January and found that our initial concerns were unwarranted."
 3   Q.  Those communications you referred to on the 18th and 19th
 4   of January, Mr. Okusanya, what were those?
 5   A.  Those were the telephone conversations I had with Sammy
 6   Levis.
 7   Q.  Can you turn to the next page, to Page 4 of your report.
 8   A.  Yes.
 9   Q.  Earlier in this report you indicated that you had done some
10   math and that what they were telling you made sense?
11   A.  That is correct.
12   Q.  Can you read Paragraph 1 towards the bottom of the page
13   there, Mr. Okusanya.
14   A.  Paragraph 1, "We created a simple IO valuation model using
15   prepayment and discount rate assumptions previously disclosed
16   by the company in their 2003 10-K as well as a 3.5 percent
17   expected LIBOR rate, which we believe is in the ballpark of
18   management's previous assumptions about a forecasted LIBOR rate
19   for the 2005 year end."
20   Q.  Let me stop you there.  Beginning with the end of that, you
21   refer to a 3.5 expected LIBOR rate which we believe was in the
22   ballpark of management's previous assumptions?
23   A.  Right.
24   Q.  Can you explain that and as well as your understanding
25   about the different assumptions you understood management to be
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

03VJLEV1

```
 1   using in figuring out that impairment for the fourth quarter.
 2   A.  Sure.  Again when we talk about IO valuations, there are a
 3   couple of things, a couple of data points you really need to
 4   value in IO.  One again is interest rate expectations because
 5   that determines just how large a portion of that pool of cash
 6   that the management team is going to have.
 7           You also need to have an understanding of how long
 8   those assets are going to be in place because the longer
 9   they're in place, the more cash you're going to be getting.
10           The third part, as we discussed yesterday, was with
11   that series of cash flows, you need to come up with some type
12   of discount rate to discount all of that back to come up with
13   with a valuation.
14   Q.  Leaving aside two factors I want to come back to in a
15   moment, the prepayment rate, how fast all these loans are
16   paying off, right?
17   A.  Right.
18   Q.  And the discount rate which you just mentioned a moment
19   ago, what are you saying here about management's interest rate
20   projections and how you understood them to be changing?
21   A.  What I'm saying here is from the conversation I had with
22   Sammy on the 18th and the 19th, I was told that within their
23   model what they had done was they had raised their interest
24   rate projections to about 4 percent, and my understanding was
25   the old assumption used to be roughly about three and a half.
```

303

03VJLEV1

```
 1   Q.  So by raising that projected interest rate, what effect
 2   would that have on the IO value?
 3   A.  It would reduce the valuation of the IO strips.
 4              THE COURT:  Let's make sure we all understand what you
 5   mean by "discount," and is this correct:
 6              If a bank or if Doral had a right to receive payments
 7   from borrowers over 30 years, and let's say the total of the
 8   payments is a hundred million dollars, now if for some reason
 9   the bank or Doral was able to receive cash now rather than to
10   have it gradually paid over 30 years, then whoever provides
11   that cash by maybe buying those loans and so forth,
12   ordinarily -- I am not talking about this case -- ordinarily
13   they would expect to discount the hundred million because a
14   hundred million dollars worth of payments over 30 years if you
15   get cash now -- well, you explain it.  What is this?  You can
16   do it better than I did.
17              THE WITNESS:  Along the lines of what you were saying,
18   a hundred million dollars of cash payments over 30 years is not
19   worth the same as cash you can get if you got the actual cash
20   payment up front now because there is a time value of money.
21   If you got the cash today, there are many things you could do
22   with it to still create that hundred million dollar stream.
23              THE COURT:  Somebody who is owed a hundred million
24   dollars over 30 years is willing to take less than a hundred
25   million if he can get the cash now?
```

304

03VJLEV1

```
 1              THE WITNESS:  That is correct.
 2              THE COURT:  That is the discount?
 3              THE WITNESS:  That's correct.
 4              THE COURT:  Okay.  All right.
 5  BY MR. BRAUN:
 6  Q.  Can you turn to Point 5 on the next page, Mr. Okusanya.
 7  Can you read that.
 8  A.  "Point 5.  We then increased the LIBOR rate from 3.5
 9  percent to 4 percent in our model."
10  Q.  Can you describe generally what you're describing in this
11  report, what your process is here.
12  A.  Yes, my process was based on all the assumptions that the
13  company uses to value its IO strips, and based on the
14  conversation I had with Sammy about the changes that they were
15  making in some of their assumptions, I was attempting to
16  recreate, you know, an IO valuation to see if that charge they
17  took, the $97.5 million --
18              THE COURT:  What?
19              THE WITNESS:  If the charge, the write-down that they
20  took of $97.5 million made sense to me.
21  BY MR. BRAUN:
22  Q.  When you moved the interest rate assumption from a
23  forecasted 3.5 percent, right, which was still ahead of where
24  interest rates were --
25  A.  Right.
```

03VJLEV1

1    Q.  -- you moved it all the way up to 4 percent, what was the
2    outcome of this rough model you were doing on your own?
3    A.  In my rough model, it implied that there should have been a
4    write-down of about $105 million, which was close enough to the
5    97.5 million that I felt comfortable with what I had been told
6    by Sammy Levis.
7    Q.  Can you, on Page 6 -- sorry -- still on Page 5,
8    Mr. Okusanya, underneath the table that shows the numerical
9    analysis that you did, can you read the sentence that begins,
10   "Given our analysis."?
11   A.  Yes.  Given our analysis, we believe that the most
12   conservative assumptions about interest rate increases which
13   could result in a 97.5 million write-down --
14            THE COURT:  Would result.
15            THE WITNESS:  -- which would result, I am sorry, in a
16   97.5 million write-down in the current quarter would require
17   Doral management to expect 90-day LIBOR rates to increase to
18   about 4 percent by year end.
19            Given that there are some economic forecasts for
20   90-day LIBOR to be less than 4 percent by the end of 2005, we
21   thus reiterate the following statement which we found
22   interesting in the company's earnings release statement -- if,
23   contrary to what is expected, LIBOR decreases, a portion of the
24   impairment charges on the value of the IOs could be recovered.
25            (Continued on next page)
                 SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

```
       03vWlev2                    Okusanya - direct
 1     BY MR. BRAUN:
 2     Q.  Can you just, to finish, read the sentence that appears at
 3     the top of page 6?
 4     A.  "Given the above statement, we thus expect that there is
 5     potential for a portion of the IO write-down to be recovered if
 6     rates do not rise as quickly as anticipated in 2005.
 7     Q.  So if rates only went up to, say, three and a half or 3.75,
 8     based on what you understood from your conversations with
 9     management, what would you expect that effect to be on Doral's
10     IOs?
11     A.  I would he expect them to be able to reverse out a portion
12     of the charge, of the 97.5 million write-down they had taken in
13     the fourth quarter.
14     Q.  When you say reverse out, what do you mean?
15     A.  That means of the 97.5 million write-down, they would take
16     some of it back into income.
17     Q.  Did you continue after issuing this report to focus on some
18     of the same issues at Doral?
19     A.  Yes, I did.
20     Q.  Why were you continuing to focus on the same issue?
21     A.  You could still see that the stock was still going down.
22     There was still a lot of investor interest or investor concern
23     around --
24               THE COURT:  What was going down?  I didn't get that.
25               THE WITNESS:  The stock.
                     SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

```
03vWlev2                      Okusanya - direct
 1              THE COURT:  Oh, the stock price was going down.
 2              THE WITNESS:  The stock price was still going down.
 3   A.  There was still a lot of trading volume, and I was still
 4   getting a lot of phone calls from investors asking questions
 5   about their financial and the fourth quarter earnings release
 6   in particular.
 7   Q.  Did you continue to communicate with Sammy Levis in looking
 8   at these issues?
 9   A.  Yes, I did.
10   Q.  Can you turn your attention to the next document in your
11   binder, which has been marked for identification as 1511?
12   A.  Yes.
13   Q.  Can you describe what this document is, Mr. Okusanya?
14   A.  It is an e-mail I sent to Sammy, asking him further
15   questions about the IOs.
16   Q.  Does the document also contain a response from him to you?
17   A.  Yes, it does.
18              MR. BRAUN:  Your Honor, the government --
19              THE COURT:  The dates plural, or whatever it is.
20   BY MR. BRAUN:
21   Q.  What is the date of your message to Mr. Levis?
22   A.  The date is Friday, January 21, 2005.
23   Q.  I'm sorry.  I may not have been clear.  Your message to
24   him, not his response to you.
25   A.  I'm sorry.  My message to him was Thursday, January 20, in
```

308

```
        03vWlev2                    Okusanya - direct
 1      2005.
 2      Q.  What about January 21?
 3      A.  January 21 was Sammy's response to me, so he responded a
 4      day later.
 5              MR. BRAUN:  Your Honor, we move that 1511 be admitted.
 6              THE COURT:  Received.
 7              (Government's Exhibit 1511 received in evidence)
 8      BY MR. BRAUN:
 9      Q.  What are you saying in your message to Mr. Levis?
10      A.  In my message to Sammy, I'm trying to clarify the IO
11      strips, just what portion of the IOs are fixed rate IOs versus
12      floating rate IOs.
13              THE COURT:  Versus what?
14              THE WITNESS:  Floating rate IOs.
15      BY MR. BRAUN:
16      Q.  Can you remind us again what the distinction is between
17      fixed and floating rate IOs?
18      A.  Yes.  The distinction is just the pass-through amount that
19      we were talking about before when we showed the chart.  If it's
20      a fixed rate IO, the pass-through amount is a fixed number.
21      And if it's a variable rate IO, then it's a floating rate
22      number.  And typically in the Doral situation it's a floating
23      rate based off LIBOR.
24              MR. BRAUN:  Could you put up 8001 for a moment on the
25      screen.
```

03vWlev2                          Okusanya - direct

1   Q.  Is this what you were referring to, Mr. Okusanya, a moment
2   ago?
3   A.  That is correct.
4   Q.  And so this would be an illustration of which type of IO?
5   A.  This is a variable rate IO because the pass-through rate
6   again is based on LIBOR.
7   Q.  So that's floating?
8   A.  Correct, because LIBOR changes.
9   Q.  Can you go back to Government Exhibit 1511 now, the e-mail.
10      Why were you trying to confirm your understanding of what
11  portion of Doral's IOs were fixed as opposed to floating?
12  A.  I was trying to confirm it just to ensure that my
13  understanding of the valuation process was correct.  With a
14  fixed rate IO, because you know what that spread is going to
15  be, it's going to be a fixed number through the life of the
16  loan, you're not concerned about interest rate risk.  But for a
17  floating rate IO where LIBOR is constantly changing, you are
18  concerned about changes in interest rates, and I just wanted to
19  make sure I understood what piece was what because that
20  affected the valuation of the IOs.
21  Q.  Does Mr. Levis in his response to you on January 21 confirm
22  your understanding?
23  A.  Yes, he does.
24  Q.  What does he say in that regard?
25  A.  He says in terms of the mortgages that are underlying the

03vWlev2                    Okusanya - direct

1   entire IO, 70 percent of the IOs are floating and 30 percent of
2   them are fixed.
3   Q.  Mr. Okusanya, earlier in your testimony, and I believe
4   earlier today in response to Judge Griesa's questions, you said
5   your understanding was that the main way Doral was protecting
6   itself from interest rate risk on these IOs was through the
7   contractual provisions that you described.  Is that correct?
8   A.  That is correct.
9   Q.  Can you tell us again when you recall seeing examples of
10  those provisions?
11  A.  I saw examples of those provisions when I went to visit the
12  management team in Puerto Rico in August of 2004.
13  Q.  From that conversation and subsequent conversations up to
14  this point in time, what was your understanding, what
15  understanding had you been given, about the extent to which
16  such provisions existed in Doral's contracts with the banks
17  that had bought mortgage loans from Doral?
18  A.  My understanding at that point was that the majority of
19  these contracts did have caps in them.
20  Q.  At this point in time, did you feel you had a very specific
21  understanding of precisely where those caps were?
22  A.  I had a general understanding.  But I didn't have a
23  specific one.
24  Q.  Did you try and obtain more information about that from
25  Mr. Levis?

```
                                                            311
        03vWlev2                      Okusanya - direct
 1      A.  Yes, I did.
 2      Q.  Can you turn your attention now to Government Exhibit 1514,
 3      which has been marked for identification?  It should be in your
 4      binder.
 5      A.  Yes.
 6      Q.  What is Government Exhibit 1514?
 7      A.  Government Exhibit 1514 is another e-mail I sent to Sammy
 8      Levis on February 15, 2005, asking for further information
 9      about the IOs.
10              THE COURT:  The date again, please.
11              THE WITNESS:  It's an e-mail I sent to Sammy on
12      February 15, 2005, asking about further information on the IOs.
13      BY MR. BRAUN:
14      Q.  Does the same document contain a response from Mr. Levis on
15      the same date?
16      A.  Yes, it does.
17              MR. BRAUN:  Your Honor, the government moves Exhibit
18      1514 into evidence.
19              THE COURT:  Received.
20              (Government's Exhibit 1514 received in evidence)
21      BY MR. BRAUN:
22      Q.  Let me focus first on your questions for Mr. Levis.  What
23      subject matter are you asking about in question No. 1?
24      A.  In question No. 1, I am asking more about the
25      mortgage-servicing rates and the valuation of those assets.
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

03vWlev2                    Okusanya - direct
1                MR. BRAUN:  Can you put up 8001 again briefly.
2    Q.  The mortgage-servicing rates, Mr. Okusanya, are they
3    illustrated there on the illustration?
4    A.  Yes, that's the MSR.  MSR is short for mortgage-servicing
5    rates.
6    Q.  So that would be the little gray strip at the top of that
7    chart?
8    A.  That's correct.
9                MR. BRAUN:  Could we go back to the February e-mail
10   exchange now, which is 1514.
11   Q.  So the first question asks about that issue, correct?
12   A.  That is correct.
13   Q.  Can you now read question No. 2, Mr. Okusanya?
14   A.  Question No. 2, "What is a typical cap on the pass-through
15   rate for the nonconforming loans sold to the other commercial
16   banks?"
17   Q.  What type of cap are you referring to there, Mr. Okusanya?
18               THE COURT:  Let me just interrupt before you go
19   further.  This is focusing on nonconforming loans?
20               THE WITNESS:  Correct.
21               THE COURT:  Why that focus here?
22               THE WITNESS:  It's the nonconforming loans that
23   generate the IOs, not the conforming loans.
24               THE COURT:  And nonconforming loans again are what?
25               THE WITNESS:  Those are loans that again don't have,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

03vWlev2                    Okusanya - direct

1   they're loans that don't meet certain standards, and so as a
2   result of that, those loans are difficult to sell in the
3   mortgage markets.
4           THE COURT:  They are difficult to sell.
5           THE WITNESS:  They're difficult to sell in the
6   mortgage markets, and so what you typically see is those type
7   of loans, if you want to sell them, get negotiated on a
8   one-on-one basis, similar to what Doral was doing with the
9   other commercial banks in Puerto Rico.
10          THE COURT:  Can the reporter read the answer.
11          (Record read)
12          THE COURT:  I didn't understand that each loan was
13  sold separately.  I thought they were bundled together.
14          THE WITNESS:  They are bundled together.  But for each
15  individual loan, you need to determine whether it's a
16  conforming loan or a nonconforming loan.  And then to do these
17  sales, you pool together a whole bunch of the conforming loans
18  or nonconforming loans.  With these contracts, what Doral does
19  is they pool together the nonconforming loans and then
20  negotiate these contracts with third parties and then sell
21  those nonconforming loans to that third party and generate an
22  IO in the process.
23          THE COURT:  Not that it's an issue here probably, but
24  just to understand what you're talking about, they also had
25  conforming loans, right?

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

314

03vWlev2                      Okusanya - direct

1           THE WITNESS:  That is correct.
2           THE COURT:  And were the conforming loans bundled
3    together and sold to banks also?
4           THE WITNESS:  Typically what you saw with the
5    conforming loans, when they're bundled together and sold, they
6    were usually sold to either like Fannie Mae or Freddie Mac or
7    one of the U.S. Government-sponsored entities.
8           THE COURT:  But not to Puerto Rican banks.
9           THE WITNESS:  Not typically.
10          THE COURT:  All right.  That's helpful.
11          Go ahead now.  I'm sorry.
12          MR. BRAUN:  No trouble.
13   Q.  You mentioned a moment ago in response to the judge's
14   questions, Fannie Mae and Freddie Mac?
15   A.  Correct.
16   Q.  Government-sponsored entities?
17   A.  Correct.
18   Q.  Where did the standards come from that differentiate
19   conforming versus nonconforming loan?
20   A.  They do come from Fannie and Freddie.  So Fannie and
21   Freddie say if a loan meets these particular standards, we have
22   no problems buying them.
23   Q.  And you said it was the large pools of the nonconforming
24   loans that Doral was selling to the other banks in Puerto Rico?
25   A.  Correct.

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

315

03vWlev2                        Okusanya - direct

1    Q.  And those transactions were then creating the IOs?
2    A.  That is correct.
3    Q.  So focusing on your second question in your February 15
4    e-mail to Mr. Levis, you were saying what is typical cap on the
5    pass-through rate.  Again, what kind of cap are you referring
6    to there, Mr. Okusanya?
7    A.  These are contractual caps; they're actually written in the
8    contracts that are negotiated between Doral and the buyer of
9    these loans.
10   Q.  Can you read Mr. Levis' response on the issue of -- it's
11   not long.  Why don't you read the entire response.  But I want
12   to stop you on the piece after the MSR.
13   A.  Okay.  Response, "Tayo, in nonconforming loans, we charge
14   .25 percent servicing fee while in the FHA/VA GNMA, we charge
15   .44 basis points.  In Fannie Mae and FHLMC conforming, we also
16   charge .25 basis points.  There have been instances in the past
17   that for both nonconforming and conforming, we have charged
18   .375 percent, but this is the exception rather than the rule."
19   Q.  That's all about that little gray strip at the top of the
20   illustration, correct?
21   A.  Correct.
22   Q.  All right.  Your second question related to the caps in the
23   contracts between Doral and the other Puerto Rican banks?
24   A.  That is correct.
25   Q.  Does he respond to that question in the rest of his

                     SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

```
         03vWlev2                    Okusanya - direct
 1   message?
 2   A.  Yes, he does.
 3   Q.  What does he say?
 4   A.  He says, "Regarding caps, they are all over.  But a typical
 5   cap is around 250 basis points above the initial variable net
 6   yield paid to investors.  In all events, these caps are
 7   significantly lower than the WAC of the loans.  So at all
 8   times, Doral will enjoy a hefty positive spread."
 9   Q.  I want to focus your attention on the sentence, "But a
10   typical cap is around 250 basis points."  So what percent is
11   that?
12   A.  250 basis points is 2-1/2 percent.
13   Q.  Typical cap is around 2-1/2 percent above the initial
14   variable net yield paid to the investors.  Can you explain that
15   part of the sentence, "initial variable net yield paid to the
16   investor"?
17   A.  Yes.  This is very much the same language we saw in the
18   example of the contract that we were looking at yesterday.
19          MR. BRAUN:  Okay.  Perhaps it would be helpful to put
20   that up for a moment.  That was the second page of Government
21   Exhibit 4007A, which is in evidence.
22          Can you enlarge the language in the bottom of
23   subparagraph A there.
24   Q.  Mr. Okusanya, is this what you had in mind?
25   A.  That's correct.
```

03vWlev2                    Okusanya - direct

1   Q.  And can you walk us through this language again?  Even
2   without reading it, just tell us what this means.
3   A.  Yes.  So in this example, in this contract, they're talking
4   about a cap that is in no event greater than 2 percent above
5   the above-mentioned LIBOR rate.  So the cap in this contract is
6   2 percent.  The e-mail Sammy sent me said a typical cap is
7   around 2-1/2 percent and these caps are set once a contract has
8   been negotiated and each time Doral actually sells a pool of
9   mortgages to the buyer of the mortgages.  So, if LIBOR, when
10  the mortgages are sold, is 2 percent, the cap says even if
11  LIBOR rates continue to rise going forward, it is capped at 4
12  percent, so it's the 2 percent, plus in this example, 2
13  percent, would get you to a 4 percent cap on LIBOR.
14          THE COURT:  In other words, if LIBOR is 2 percent at
15  the time of the contract --
16          THE WITNESS:  Right.
17          THE COURT:  -- then the cap will be 2 percent above
18  that, or 4 percent?
19          THE WITNESS:  That is correct.
20          THE COURT:  Okay.  Go ahead.
21  BY MR. BRAUN:
22  Q.  Yes.  One small point, Mr. Okusanya.  At the bottom of that
23  paragraph --
24  A.  Yes.
25  Q.  -- in referring to the LIBOR that forms the basis for the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

318

03vWlev2                        Okusanya - direct
 1   pass-through rate, so what you're adding the 2 percent to in
 2   this instance --
 3   A.  Right, in this paragraph --
 4   Q.  I'm sorry.  What I'd like you to explain is when the LIBOR
 5   gets set and it says something about when the seller informs
 6   the buyer that it has formed each group of 25 million is going
 7   to be delivered?
 8   A.  Correct, correct.  So when Doral, in this contract, when
 9   Doral, who is the seller, informs the buyer that they have
10   formed a pool of mortgages with a total value of $25 million,
11   that's when LIBOR is set for that pool, that's when the LIBOR
12   rate on the pass-through rate is set for that pool of assets.
13   And then the maximum interest rate, again, which is the cap, is
14   also determined at that same time.  In this example, once
15   you've set your LIBOR, you know the cap is going to be 2
16   percent above that LIBOR rate.
17   Q.  Okay.  So if that LIBOR, when Doral says we've got 25
18   million to give you in loans --
19   A.  Right.
20   Q.  -- if LIBOR at that point is two, you add two to that, you
21   get four, and that's as high as it's ever going to go?
22   A.  And that's as high as LIBOR can go in that contract.
23   Q.  Or it's as high as the pass-through rate?
24   A.  I'm sorry.  As high as the pass-through rate can go in that
25   contract.

319

```
03vWlev2                      Okusanya - direct
```
1   Q.  Even if LIBOR goes higher?
2   A.  Even if LIBOR goes -- that's the cap.  So even if rates are
3   going up, it's capped at this number.
4   Q.  Can you turn back to the February 15 e-mail exchange with
5   Mr. Levis.  So in that example, it was two.  He says typically,
6   it's about 250 basis points over the LIBOR, that initial
7   variable yield, the LIBOR at the time the group is formed?
8   A.  That is correct.
9   Q.  Can you read the rest of his response to you again that
10  begins, "In all events"?
11          MR. SREBNICK:  Excuse me, Judge.  I have an objection
12  and request a clarification.
13          THE COURT:  What's the objection and what
14  clarification do you request?
15          MR. SREBNICK:  The contract says that the cap is 250
16  basis points, not above LIBOR but above the initial variable
17  net yield paid to investors.
18          THE COURT:  What's the variable net yield?  What did
19  you understand that to be?
20          That's a good question.
21          THE WITNESS:  The initial variable net yield paid to
22  investors, I understood it to mean the pass-through rate.
23  BY MR. BRAUN:
24  Q.  Can you continue reading the rest of the e-mail?
25          THE COURT:  Wait a minute.  In other words, you had

```
03vWlev2                    Okusanya - direct
 1  the initial yield, but to take care of the possibility of
 2  interest rates increasing, you had the cap.
 3            THE WITNESS:  Correct.
 4            THE COURT:  That's why it said 250 basis points above,
 5  or 2-1/2 percent above, the initial variable net yield.
 6            THE WITNESS:  Correct.
 7            THE COURT:  Now, you tell us.  What was your
 8  understanding of how that initial variable net yield was
 9  calculated?
10            THE WITNESS:  The initial variable net yield is
11  calculated again if it's the pass-through rate within the
12  contract.  So if you could pull up a sample of the contract
13  again, I think it would be helpful.
14            MR. BRAUN:  Sure.  That's 4007A.  And I think it's the
15  language towards the bottom of paragraph 7A at the top of that
16  page.
17            THE WITNESS:  So if you look at this contract, it
18  says, could you, it says there's a "through interest rate."
19  It's probably the word "pass-through interest rate" missing
20  before that.
21            So in this paragraph, the second sentence, it says,
22  "The variable pass-through interest rate will be equal to 135
23  basis points plus the offer quotation for the rate of interest,
24  which is LIBOR."  So in this example, the pass-through rate is
25  LIBOR plus 135 basis points.  That is the same as the net yield
```

```
     03vWlev2                    Okusanya - direct
 1   that's being paid out.  So, again, when you have this pool of
 2   25 million that has been identified by Doral to the buyer, if
 3   LIBOR at that point is 2 percent, then the pass-through rate at
 4   that particular point is this 2 percent plus the 1.35 percent,
 5   which is 3.35 percent.
 6              THE COURT:  But it is ultimately based on LIBOR.
 7              THE WITNESS:  It is ultimately based on LIBOR.
 8              THE COURT:  And that's what is shown in the
 9   next-to-last sentence, "The initial variable pass-through
10   interest rate which will be applicable to the first
11   distribution date will be determined based on LIBOR.  Right?
12              THE WITNESS:  Correct.
13              THE COURT:  But you add 135 basis points to that.
14              THE WITNESS:  That is correct.
15              THE COURT:  And that's under that contract.
16              THE WITNESS:  That is correct.
17              THE COURT:  Okay.  I think we have that.
18   BY MR. BRAUN:
19   Q.  I want to take you back to your e-mail on February 15.
20              THE COURT:  Let's get the basis points.  100 basis
21   points is 1 percent?
22              THE WITNESS:  That is correct.
23              THE COURT:  So if you're talking about 35 basis
24   points, you're talking about --
25              THE WITNESS:  .35.
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

03vWlev2                    Okusanya - direct

```
 1              THE COURT:  .35 percent.
 2              THE WITNESS:  Correct.
 3              THE COURT:  If you're talking about 135 basis points,
 4    it's 1.35 percent?
 5              THE WITNESS:  That is correct.
 6              THE COURT:  Etc., etc.  Okay.
 7    BY MR. BRAUN:
 8    Q.  Mr. Okusanya, can you go back to the February 15 response
 9    you got from Mr. Levis?
10    A.  Yes.
11    Q.  You say, "In all events, these caps are significantly
12    lower."  Can you read that sentence.  I'm sorry.  He says, "in
13    all events."
14    A.  Yes.  The sentence says, "In all events, these caps are
15    significantly lower than the WAC of the loans."
16    Q.  Stop.  What's WAC?
17    A.  WAC is the weighted-average coupon of the loans.
18    Q.  What does that mean?
19    A.  Again, if you pull up the illustration that we had of the
20    IO strip, I think it's helpful.  And that WAC, that's the
21    weighted-average coupon, you can see it represents pretty much
22    the entire stack.  It is the interest rate, the average
23    interest rate that Doral is getting on the pool of mortgages
24    that it put together.  So, again, Doral's primary business is
25    they made mortgages, they charge you an interest rate on it,
```

323

03vWlev2                          Okusanya - direct

1    they pool these mortgages together, the WAC is the average
2    interest rate on those pool of mortgages which they are now
3    selling to a third party.
4                THE COURT:  So weighted-average --
5                THE WITNESS:  Coupon.
6                THE COURT:  -- coupon.  Coupon.  Okay.  Meaning the
7    interest rate that the borrower, the average of what the
8    borrowers are paying.
9                THE WITNESS:  Correct.
10               THE COURT:  Let's take our morning recess and we'll
11   start again at 12 and have an hour before lunch.
12               (Recess)
13               THE COURT:  Let me just say Friday we will sit a half
14   a day.  What I would like to do on Friday is to run until 1:30,
15   but we'll adjourn at that time for the weekend.
16               All right.  Let's go ahead.  Thank you.
17   BY MR. BRAUN:
18   Q.  Mr. Okusanya, can you turn back to Government Exhibit 1514,
19   the February 15 e-mail that we were discussing before the
20   break?
21   A.  Yes.
22   Q.  I'd actually like you to step down and come back to this
23   illustration that we were looking at on the screen a moment
24   ago.  This is Government Exhibit 8001.  At the end of his
25   message to you, Mr. Levis says, "In all events, these caps are
                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

```
03vWlev2                    Okusanya - direct
```

1  significantly lower than the WAC of the loans, so at all times
2  Doral will enjoy a hefty and positive spread."
3  A.  That's correct.
4  Q.  Can you explain your understanding of that comment and what
5  meaning it would have for the interest-only strip?
6  A.  Sure.  So in this example, the green portion is the IOs.
7  You have a pass-through rate, again, that's LIBOR plus some
8  percent, and then you have a cap.  That's 250 basis points
9  above this.  So if you have a cap at somewhere around here,
10  meaning lower than this WAC, no matter what happens with LIBOR,
11  what the buyer of the loans is getting will get capped at a
12  particular point.  And so you would always have this, a fairly
13  large green piece or fairly large IO, if the cap is much lower
14  than this weighted-average coupon.  If the cap is higher and
15  closer to this number, then you get a smaller IO piece.  So to
16  create a large value for the IOs, you want to have your caps as
17  low as possible to protect yourself from LIBOR going up.
18  Q.  Thank you, sir.
19         MR. BRAUN:  If we could put that illustration on the
20  screen.  Thank you.
21  Q.  Mr. Okusanya, if the cap were not significantly lower than
22  the WAC, if it were instead at the WAC, to what extent --
23         THE COURT:  Wait a minute.  What's the question again?
24  If what?
25  BY MR. BRAUN:

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

03vWlev2                    Okusanya - direct

```
 1   Q.  If the cap were not significantly lower than the WAC --
 2            THE COURT:  If the cap were not?
 3            MR. BRAUN:  Correct.
 4            THE COURT:  Start again.
 5   BY MR. BRAUN:
 6   Q.  Instead of a cap significantly lower than the WAC, if there
 7   were a cap at the weighted-average coupon, at the WAC, to what
 8   extent would that protect the value of the IO from rises, from
 9   increases in interest rates?
10   A.  There would be less protection in that scenario, because if
11   you look at the graph, and we talk about a cap that's all the
12   way up here, close to the WAC, or at the WAC, what you're going
13   to see happen is, if you add interest rates, LIBOR keep rising,
14   it could keep eating into the green portion, keep eating into
15   it until you finally hit the WAC and then the whole value of
16   the IO disappears.
17   Q.  Would a cap at the weighted-average coupon protect the IO
18   from additional impairments, additional write-downs during this
19   early 2005 time period we're talking about?
20   A.  Would a cap at -- no, it wouldn't.
21   Q.  And why is that?
22   A.  Again, because expectations were that interest rates would
23   keep rising, if the cap is all the way at the top, where the
24   WAC is, and LIBOR kept rising, the green portion or the IO
25   portion, you would see the valuation continue to get smaller
```

03vWlev2                    Okusanya - direct
1    and smaller as interest rates kept rising.  So you would expect
2    more write-downs in that scenario.
3    Q.  Mr. Okusanya, during this period of time, February of 2005,
4    did you continue working on your coverage of Doral?
5    A.  Yes, I did.
6    Q.  What was the focus of your work during that period of time?
7    A.  Still a lot of focus in regards to the IOs and basically
8    trying to understand the interest rate risk associated with
9    them.
10   Q.  Why were you --
11              THE COURT:  Wait a minute.  Wait a minute.  We want to
12   hear your whole testimony.  If you drop your voice, we don't
13   hear you.  So give us the benefit of your whole answer.
14              THE WITNESS:  Sure.  During that period, I was still
15   focused heavily on doing analysis around the interest-only
16   strips, or the IO strips, or the IO strips, and the potential
17   impact of interest rates on the valuations of the IOs.
18   BY MR. BRAUN:
19   Q.  Why did you continue to focus on that issue, Mr. Okusanya?
20   A.  Still very much for the same reasons.  A lot of investor
21   interest around the stock.  The stock, you know, had sold off
22   significantly, and there were a lot of investors still asking
23   questions about the IOs and concerns about further write-downs.
24   Q.  Can you now turn your attention to the document that's been
25   marked for identification as Government Exhibit 1531?

327

03vWlev2                          Okusanya - direct

1     A.  Yes.
2     Q.  Do you recognize that document?
3     A.  Yes, I do.
4     Q.  What is it?
5     A.  The document on March 9, 2005, is another report that I put
6     out about Doral Financial, where I did some further analysis
7     around these issues we've been discussing earlier.
8     Q.  Give me just one moment.
9             THE COURT:  Date again, please.  Date of the report?
10            THE WITNESS:  March 9, 2005.
11    BY MR. BRAUN:
12    Q.  I'm sorry, Mr. Okusanya.  You may have said this.  What's
13    the date of this report?
14    A.  It's March 9, 2005.
15            MR. BRAUN:  Your Honor, the government moves this into
16    evidence.
17            THE COURT:  Received.  1531.
18            (Government's Exhibit 1531 received in evidence)
19    BY MR. BRAUN:
20    Q.  Mr. Okusanya, where is Doral's stock trading at by March 9,
21    2005?
22    A.  The stock at this point is trading at $37.53.
23    Q.  The title of your report refers to digging deep into
24    issues.  What issues in particular are you digging deep into,
25    Mr. Okusanya?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
      03vWlev2                    Okusanya - direct
 1    A.  The main issue again remained the value of the
 2    interest-only strips and potential risk for further write-downs
 3    if interest rates kept rising.
 4    Q.  Can you read the first point there on your March 9 report?
 5    A.  The title of the first point, "Misperception on key issues
 6    creates buying opportunity.
 7         "Doral's stock has been down sharply year to date due to
 8    concerns about its IO strip valuation, and positioning for
 9    higher rates.  Our analysis indicates that these concerns are
10    overblown.  We are reiterating our buy 2 rating."
11    Q.  Positioning for higher rates, what sort of rates?
12    A.  Higher interest rates.
13    Q.  In the next point, you describe your view of the prospects
14    for additional large IO write-downs.
15    A.  Yes, I do.
16    Q.  What do you say about that?
17    A.  It's the third point I make in that bullet, where I say,
18    actually, it's the second bullet, but the third point I make in
19    the second bullet, where I say, "We see less risk of large IO
20    write-downs from rising rates."
21    Q.  Did the prospects of such additional write-downs continue
22    to be a source of substantial concern for you?
23    A.  For myself and as well as for investors.
24         THE COURT:  Wait a minute.  What was your view as of
25    this time again?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

03vWlev2                    Okusanya - direct

1          THE WITNESS:  My view continued to remain that we saw
2      less risk of large IO write-downs from further increases in
3      interest rates.
4      BY MR. BRAUN:
5      Q.  Are you still very much focused on precisely that question?
6      A.  That is correct.
7      Q.  Can you turn to the next page of your report, page 2?
8      A.  Yes.
9      Q.  Can you read the first sentence?
10     A.  First sentence, "Doral's stock is down 29 percent this
11     year, primarily due to concerns about the appropriateness of
12     the company's IO valuation assumptions, as well as the
13     positioning of the company for a higher interest rate
14     environment."
15     Q.  What's the first sentence of your next paragraph?
16     A.  "Based on our analysis, we believe that concerns about the
17     company's accounting for IO strips are overblown."
18     Q.  Can you read the first two sentences of the next paragraph,
19     "We believe"?
20     A.  "We believe that better disclosure in the forthcoming 10K
21     on March 15 should help alleviate perceived accounting and
22     interest rate risks.  In addition, we expect that the
23     conference call on March 17, 2005, to discuss the 10K will
24     serve as a catalyst for the stock."
25     Q.  Can you remind us, this 10K that you're expecting on March

330

03vWlev2                    Okusanya - direct
1   15, what is that?
2   A.  The 10K again is the annual filing that any public company
3   files with the regulatory body, the SEC.  They had completed
4   their 2004 year, they had put out the press release, and then
5   typically 10Ks take about 90 days later to come, which was
6   about that March 15 date.
7   Q.  Were you expecting Doral's 10K to be filed on the 15th?
8   A.  Yes, I was.
9   Q.  Why was that?
10  A.  It was an indication from the management team that they
11  would file it on that date.
12  Q.  Who on management?
13  A.  Specifically, Sammy Levis.
14  Q.  You also refer to a conference call you're expecting on
15  March 17?
16  A.  That is correct.
17  Q.  Why were you expecting a conference call on the 17th, after
18  the filing of the 10K on the 15th?
19  A.  The management team had also decided they were going to
20  host that conference call to help investors walk through the
21  10K.
22  Q.  How did you find out about the March 17 conference call?
23  A.  It had been communicated to me by Sammy Levis.
24  Q.  Can you go to the next page of your report.  There's a
25  paragraph numbered six there, towards the top of the page.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

```
03vWlev2                    Okusanya - direct
 1   A.  Yes.
 2   Q.  Can you please read that paragraph?  And then I'd like to
 3   walk you through certain parts of it.
 4   A.  Sure.  "We estimate that potential for future write-downs
 5   of the IO strips could be up to 20 million if 90-day LIBOR
 6   rates rise to 4 percent.  We believe the company is actively
 7   hedging against this event.  90-day LIBOR rates above 4 percent
 8   have minimal impact due to caps on the pass-through rates paid
 9   on most of the securitized loans which support the IO strips."
10   Q.  Can you stop there for a moment.  The first sentence --
11   A.  "We estimate" -- go ahead.
12   Q.  Let me summarize and ask you a question.  You're estimating
13   that the potential for future write-downs may be up to $20
14   million?
15   A.  Correct.
16   Q.  If 90-day LIBOR rates rise to 4 percent?
17   A.  Correct.
18   Q.  You previously testified that based on your conversations
19   with Sammy Levis, January 18 to January 19, it was your
20   understanding that they had already factored in a 4 percent
21   interest rate expectation in determining the values of the IOs,
22   correct?
23   A.  That is correct.
24   Q.  Based on that, if LIBOR rose to 4 percent, there wouldn't
25   be write-downs?
```

```
03vWlev2                    Okusanya - direct
```

1    A.  That is correct.
2    Q.  Why are you here saying there might be a write-down of up
3    to 20 million?
4    A.  The reason I said that was further conversations with Sammy
5    Levis about what they had done with their valuations, it seemed
6    like the 4 percent number I had been led to believe earlier on
7    was not a hard and fast, fixed number.  It seemed like they
8    were close to 4 percent in their assumptions but not exactly at
9    4 percent.
10   Q.  And so if they weren't at 4 percent, what's the risk, if
11   there's also a possibility of a 20 million?
12   A.  So if they weren't quite at 4 percent, and you still saw
13   interest rates move slightly above where they were to 4
14   percent, you would still have some impact because of the rising
15   interest rates beyond what they were forecasting.
16   Q.  And is that what you thought they were hedging against?
17   A.  That is correct.
18   Q.  Can you read again the next sentence that begins, "We
19   believe"?
20   A.  "We believe the company is actively hedging against this
21   event."
22   Q.  And then continue, please.
23   A.  "90-day LIBOR rates above 4 percent have minimal impact due
24   to caps on the pass-through rates paid on most of the
25   securitized loans which support the IO strips."

333

03vWlev2                      Okusanya - direct

1    Q.  I think we'll come to this in more detail a bit later in
2    your report, but can you describe generally how you're getting
3    to your conclusion regarding these caps?
4    A.  Yes.  Basically, what I was doing was based on information
5    Sammy had given me.  Again, they had talked about, in the
6    e-mail he sent me earlier on, he had mentioned that most of
7    the, the typical cap comes into place 250 basis points above
8    the pass-through rate.  And what I had done was I did some
9    analysis in regards to what I felt LIBOR rates typically were
10   when they had sold these loans.  Came to the conclusion that
11   LIBOR rates for the loans that they had sold, LIBOR was roughly
12   about one and a half percent when they sold these loans, you
13   have a two and a half percent cap on top of that, and so my
14   assumption was once LIBOR hits 4 percent, all the caps are in
15   place, and even if you have higher interest rates beyond that,
16   it would not affect the valuation of the IOs.
17   Q.  Can you continue reading that paragraph, beginning with,
18   "In addition"?
19   A.  Yes.  "In addition, should LIBOR rates end the year closer
20   to 3.5 percent as the forward yield curve currently indicates,
21   we estimate that Doral could legitimately reverse about 60
22   million of the fourth quarter 2004 IO write-down back into
23   income."
24   Q.  That was the $97-1/2 million write-down we talked about
25   earlier?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

```
03vWlev2                    Okusanya - direct
```

1   A.  Correct.
2   Q.  You say should LIBOR rates end the year closer to 3-1/2 as
3   the forward yield curve currently indicates, can you explain
4   that?
5   A.  Yes, I can.
6   Q.  I don't think we've talked about the forward yield curve,
7   at least not in any significant way.
8   A.  Sure.  The forward yield curve basically indicates where
9   expectations for interest rates are going to be in the future,
10  and it's what a lot of investors and analysts look at to get an
11  indication of where interest rates could be going and what
12  potential impact it could have again on companies that have
13  interest rate risk.  The curve at that point was indicating
14  rates could probably end up closer to about three and a half.
15  Again, Doral, my understanding from Doral was for their IO
16  strips, they are putting an assumption close to four, and so if
17  it never went that high, some of the losses that they recorded
18  in fourth quarter of that 97-1/2 million, they would be able to
19  reverse some of it out because their assumptions were too high.
20          THE COURT:  Could I ask this.  Going back, you said,
21  "We believe the company is actively hedging against the event,"
22  and then you talk about the caps.  Was there some kind of
23  hedging that you were thinking of here in addition to the caps?
24          THE WITNESS:  No, there wasn't.  The hedging I'm
25  referring to in this statement is the contractual caps.

335

03vWlev2                          Okusanya - direct

```
 1              THE COURT:  All right.
 2   BY MR. BRAUN:
 3   Q.  Can you turn to page 7?
 4   A.  Yes.
 5   Q.  And starting at about page 5 of your report, and continuing
 6   on for a number of pages, including seven and then continuing
 7   on over a number of pages after that, can you describe
 8   generally what you're doing in this part of your research, in
 9   in this part of your report?
10   A.  Yes, I can.  Again, with the IOs, there are three main
11   assumptions that go into the valuation of the IOs.  There's
12   interest rate expectations, which we talked about.  There's the
13   discount rate we talked about, and then there's also how long
14   these loans are outstanding.  What I was trying to do in these
15   pages was look at the reasonableness of Doral's assumption
16   around those three inputs into the IO valuation.
17   Q.  The assumption --
18              THE COURT:  Let's just have a quick review.  What
19   you're saying is that you understood there were three basic
20   factors going into this estimation.  One was how long the loans
21   were?
22              THE WITNESS:  Correct.
23              THE COURT:  Then how much --
24              THE WITNESS:  How long.
25              THE COURT:  How much all those payments should be
```

03vWlev2                    Okusanya - direct

 1   discounted to make a valuation?
 2              THE WITNESS:  Correct.
 3              THE COURT:  And then the interest rate situation?
 4              THE WITNESS:  Correct.
 5              THE COURT:  Okay.  Go ahead.
 6   BY MR. BRAUN:
 7   Q.  What is prepayment speed, Mr. Okusanya?
 8   A.  Yes.  One of the assumptions we're talking about is how
 9   long these loans are going to be outstanding for.  Prepayment
10   speed basically tells you how quickly loans are getting paid
11   off.  So the faster the prepayment speed, people are paying off
12   their loans, the loans are outstanding for a very short period.
13   The shorter the prepayment speed, the loans are not getting
14   paid off quite as quickly, the loans would be outstanding for a
15   much longer period.
16              THE COURT:  I didn't understand.
17              THE WITNESS:  Prepayment speeds basically tell you how
18   quickly loans are --
19              THE COURT:  Prepayment what?
20              THE WITNESS:  Prepayment speeds.
21              THE COURT:  Speeds?
22              THE WITNESS:  Yes.  Tell you how quickly loans are
23   getting paid off.  So if you have a high prepayment speed,
24   borrowers are paying off their loans very quickly, so the life
25   of the loan is very short.  And if you have a low prepayment

337

03vWlev2                        Okusanya - direct

1   speed, it's taking people longer to pay off their debt, so that
2   debt is outstanding for a much longer period.
3   BY MR. BRAUN:
4   Q.  How does this factor of prepayment speed, the assumption
5   regarding how long these loans are going to be out there,
6   affect an IO valuation?
7   A.  Yes.  Again, with the IOs, because you have to figure out
8   for how long you're going to be getting this payment, you know,
9   the longer the loan's outstanding, you get more payments and so
10  typically the value of the IO should go up.  And the shorter --
11  and then if you have a higher prepayment speed, the loans are
12  paying off faster, so you don't get that cash stream for as
13  long, the value of the IOs should come down.
14  Q.  How much interest is paid on a loan that has been paid in
15  full?
16  A.  Zero.
17  Q.  So there's nothing for Doral and the other banks buying the
18  loans to divide if the loans aren't there anymore; they were
19  paid?
20  A.  Exactly.  Once the loan is paid off, that's it.
21  Q.  Mr. Okusanya, we talked a little bit about the secondary
22  mortgage market today.  Did that market exist widely in the
23  United States as well?
24  A.  Yes.
25  Q.  Mortgage lenders here in the United States were making

338

03vWlev2                         Okusanya - direct

1    mortgage loans and selling them?
2    A.  That is correct.
3    Q.  And did interest-only strips exist outside the island of
4    Puerto Rico?  Do they exist more generally in the mortgage
5    banking sector of the economy?
6    A.  Yes, they do.
7    Q.  Did this factor of prepayment speed have to be determined
8    in that market for these other banks as well?
9    A.  Yes, they do.
10   Q.  Now, as part of what you were doing in really trying to
11   carefully examine all of the assumptions that had gone into
12   Doral's IO valuation, were you taking into account to any
13   degree other prepayment information that generally existed out
14   in the world?
15   A.  Yes, I was.
16   Q.  Can you describe what you were doing in that regard?
17   A.  Yes.  What I was doing in that regard was, I was looking at
18   other IO strips that were, other IO strips that were out in the
19   market and then trying to understand from those IO strips, what
20   kind of characteristics those strips were exhibiting and trying
21   to figure out if they were different from the characteristics
22   that the Doral strips were exhibiting.
23              (Continued on next page)
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

339

03VJLEV3                        Okusanya - direct

1    Q.  With respect to prepayment speed in particular, this notion
2    of how fast the loans are paying off, what did you describe
3    with respect to prepayment speed in the United States as
4    compared to what Doral was dealing with in Puerto Rico?
5    A.  What I generally found was that prepayment speeds in the
6    United States were about three times faster than in Puerto
7    Rico.  So people were paying off their loans faster in the U.S.
8    than in Puerto Rico.
9    Q.  Can you go to Page 7 of your report.
10   A.  Yes.
11   Q.  Underneath that table at the top -- first of all, what is
12   PSA?
13   A.  PSA is a definition that is used to standardize prepayment
14   speeds.  It is pretty much prepayment speed assumption.  A
15   hundred PSA is 6 percent.  That basically means 6 percent of
16   all loans are paid off in a year.  If you have a 200 PSA, that
17   is now two times 6 percent, so 12 percent of all loans are paid
18   off within a year.
19            THE COURT:  Again, I am sorry.  I missed something.
20   What does PSA stand for?
21            THE WITNESS:  Prepayment speed assumption.
22            THE COURT:  Prepayment speed assumption?
23   BY MR. BRAUN:
24   Q.  Underneath --
25            THE COURT:  You gave something about a number or two
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

340

03VJLEV3                        Okusanya - direct

1  numbers?
2              THE WITNESS:  Yes.
3              THE COURT:  Go over that again.
4              THE WITNESS:  Absolutely.  It is standardized where
5  100 PSA equals 6 percent.  That means 6 percent of all loans
6  are paid off within a year.  If you have a 200 PSA, that is
7  double the number, so 12 percent of all loans are paid off
8  within a year.
9              THE COURT:  Okay.  Thank you.
10 BY MR. BRAUN:
11 Q.  Underneath the table at the top of the page, in that
12 paragraph that appears between the two sets of numbers, can you
13 read what it says in your report about prepayment speed in the
14 U.S. as compared to Puerto Rico.
15 A.  Sure.  Slower repayment speeds increase the weighted
16 average life of loans, and as a result, significantly increase
17 the valuation of IO strips in Puerto Rico.  PSA values that are
18 about a third of PSA values in the United States should
19 increase IO valuations by about 150 percent, all else being
20 equal.
21 Q.  Can you then continue underneath the table.
22 A.  It says the major players in Puerto Rico's nonconforming
23 mortgage origination market actively limit prepayment risk in
24 the nonconforming mortgage market due to their market
25 dominance.  Key industry practices that lower prepayment speed

03VJLEV3                      Okusanya - direct
1    include --
2    Q.  Can I stop you for a moment.  What is your understanding of
3    why a mortgage bank would want to limit prepaid?
4           If people are paying off their loans faster, why are
5    they trying to limit it?
6    A.  You could limit it from the perspective of again if you
7    have an IO strip, are you expecting to get cash from that IO
8    strip.  The longer the IO is outstanding, the more cash you get
9    from it.  That could be a driver for why you would want to slow
10   down the payment of those loans.
11   Q.  Could you read the next two bullet points.
12   A.  The first bullet point, "Almost all of Puerto Rico's
13   nonconforming loans have prepayment penalties.  Prepayment
14   penalties are not as prevalent in the U.S. mortgage market due
15   to the large number of players in the origination market, as
16   well as GSE rules."
17   Q.  What are GSE rules?
18   A.  GSE rules are basically government sponsored entities,
19   Fannie Mae and Freddie Mac as we were talking about early on.
20           THE COURT:  GSA stands for?
21           THE WITNESS:  Government sponsored entities.
22           THE COURT:  Okay.
23   BY MR. BRAUN:
24   Q.  What is a prepayment penalty?
25   A.  A prepayment penalty basically is any type of penalty a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

342

03VJLEV3                          Okusanya - direct
1    borrower would face if you tried to pay their loans early.
2    Q.  Can you read the next paragraph.
3    A.  The second paragraph, "Puerto Rican mortgage originators
4    still have the ability to charge significant points on new
5    mortgage loans, unlike in the U.S. where the ability to charge
6    points has waned significantly due to competition.  Charging
7    points discourages prepayment of mortgage loans through
8    refinancings."
9    Q.  What does that mean, charge of points?
10   A.  Basically when you go out and try to borrow money, borrow
11   money to buy a house, some banks will charge you an up-front
12   fee called a point.  That is typically a percentage of what the
13   house is worth.  In Puerto Rico, it was a fairly common
14   practice to do that.
15   Q.  Can you explain again why were you trying to get a handle
16   on prepayment speed and prepayment speed in Puerto Rico in
17   particular?
18   A.  Yes.  The reason why I was trying to do this was again
19   simply because IO valuations at Doral were so much larger than
20   what you saw at typical U.S. mortgage banks.  I was trying to
21   get an understanding of why you were seeing those differences
22   by taking a look again at all the inputs that go into an IO
23   valuation and trying to see why is it so different in Puerto
24   Rico and does it make sense for it to be different in Puerto
25   Rico.

343

03VJLEV3                    Okusanya - direct
1    Q.  Can you turn to Page 12 of your report, please,
2    Mr. Okusanya.
3    A.  Yes.
4    Q.  Can you read the first paragraph that appears on the top of
5    that page.
6    A.  It says, "The key driver behind the IO write-down in fourth
7    quarter 2004 was the shrinkage in the excess servicing spread
8    as a result of rising 90-day LIBOR rates.  Although the high
9    end of forecasts call for 90-day LIBOR to rise above 150
10   basis --
11            THE COURT:  Rise about.  You said, "above."
12            THE WITNESS:  Sorry, rise about, I apologize, "to rise
13   about 150 basis points in 2005, we are not expecting much more
14   spread shrinkage (and potential write-downs) on Doral's IO
15   strips, even if 90-day LIBOR rises above 4 percent.  This is
16   because most of the securitization contracts have caps on the
17   pass-through rate."
18   BY MR. BRAUN:
19   Q.  What contracts are you referring to?
20   A.  These are the contracts between Doral and the buyers of
21   these mortgage that created the IOs.
22   Q.  Continue, please.
23   A.  "Although cap limits tend to be contract specific, we
24   believe that most caps are about 250 basis points above the
25   initial variable rate paid to investors."
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

344

03VJLEV3                        Okusanya - direct
1              MR. BRAUN:  Can you put Government Exhibit 1514 back
2     up, please.
3              THE COURT:  Can you keep that on the board for just a
4     minute.  I would like to make a note.
5              MR. BRAUN:  The previous document, your Honor?
6              THE COURT:  Yes.
7              MR. BRAUN:  That was Page 12 of -- yes.  Thank you.
8              (Pause)
9     BY MR. BRAUN:
10    Q.  The information in your report, Mr. Okusanya, about where
11    most of the caps are, 250 basis points above the initial
12    variable yield, can I direct you now back to Government Exhibit
13    1514.  Is this e-mail where you obtained that information?
14    A.  That is correct.
15             THE COURT:  What is the exhibit number?
16             MR. BRAUN:  It is 1514, your Honor.
17             THE COURT:  Okay.
18    BY MR. BRAUN:
19    Q.  Can you continue, Mr. Okusanya, on the next paragraph on
20    Page 12 of your March 9th report.
21    A.  The next paragraph, "We estimate that the current
22    underlying principal balance of the outstanding mortgages that
23    support Doral's IO strips represents about 1.5 years, 1.5 years
24    of nonconforming mortgage loan origination.  Over the past 18
25    months, the average 90-day LIBOR rate has been about 1.5
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

345

03VJLEV3                              Okusanya - direct
1   percent, implying that most payout rates cap out with 90 day
2   LIBOR at about 4 percent."
3   Q.  Can you just summarize your math there.
4   A.  Yes, so the math I was working with, what I did was all the
5   mortgage loans that basically support these IOs, I try to
6   figure out at what point again did Doral deliver these
7   mortgages because that's the point that you set LIBOR.
8           When I looked at that, I determined that most of these
9   mortgages were only about a year and a half old, and over that
10  entire time period LIBOR was just about 1.5 percent.
11          Now, based on the information I received from Mr.
12  Levis that most of the caps come in 250 basis points above
13  that, my conclusion was that once LIBOR hits 4 percent, which
14  is just 1.5 percent that was set when the delivers were
15  delivered, plus the 250 basis points or two and a half percent
16  cap, you would get to a maximum of 4 percent and the caps would
17  be in place.
18  Q.  Now, can you continue reading the rest of that paragraph.
19  A.  Yes.  "Given our belief that the management team at Doral
20  is currently valuing the IO strips with a year-end assumption
21  of LIBOR close to 4 percent, we do not expect that rising
22  90-day LIBOR rates should have a material impact on the
23  valuation of the current IO strips in 2005."
24  Q.  Again, can you explain that conclusion.
25  A.  Yes.  So based on the analysis I was doing, my expectations
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

346

03VJLEV3                    Okusanya - direct

1   are that caps would kick in, all the caps would be in place
2   when LIBOR hits about 4 percent.  Based on the earlier
3   conversations I had had with Mr. Levis, I was under the
4   impression that within their valuation models, they were
5   already forecasting a world where LIBOR would be close to 4
6   percent.  So my conclusion was the caps would kick in and you
7   should not have any further deterioration of the value of the
8   IO strips.
9   Q.  Can you continue in the next paragraph, "We are
10  estimating."
11  A.  Yes, "We are estimating a maximum impact of $20 million,
12  which occurs if management's current 90-day LIBOR forecast is
13  not quite 4 percent, which is where we believe most of the caps
14  effectively kick into place.  Management also increased its
15  derivitives book in the fourth quarter by buying Eurodollar
16  options to hedge against any potential increase in LIBOR rates
17  in 2005.  The notional amount" --
18  Q.  Let meet stop you there.  If interest rates, their
19  assumption is a forecast at not quite 4, and interest rates
20  actually go to 4, is that where this $20 million could take
21  place?
22  A.  That's correct.
23  Q.  You mentioned management also has increased its derivitives
24  book and these Eurodollar options?
25  A.  Correct.

03VJLEV3                    Okusanya - direct

1   Q.  Can you explain that.
2   A.  Yes.  In order to get more comfort around this issue of
3   potential risks to the IO valuations if interest rates come up,
4   you know, in my conversations with Mr. Levis, one thing he also
5   made me aware of was apart from the contractual caps that they
6   had in the contracts, what the company had also done was
7   actually go out into the market and actually buy derivitives to
8   also protect themselves or protect the IOs against rising
9   interest rates.
10  Q.  Would such protection be necessary if they were -- why
11  would such protection be necessary given the existence of the
12  caps?
13  A.  In my opinion, it shouldn't be, but they had gone out and
14  done it just as extra protection.
15  Q.  Can you --
16              THE COURT:  Just a minute, please.
17              MR. BRAUN:  Yes.
18              (Pause)
19              THE COURT:  Go ahead.
20  BY MR. BRAUN:
21  Q.  -- can you read in the bottom paragraph on this page
22  starting with --
23              THE COURT:  There is something.  What is meant by,
24  "notional amount"?
25              THE WITNESS:  Yes, when you go out and actually buy,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

348

```
03VJLEV3                    Okusanya - direct
 1   you know, derivitives or, you know, instruments you can also
 2   use to hedge against interest rate risk, there needs to be a
 3   basis for what you're doing.
 4             THE COURT:  There needs to be a what?
 5             THE WITNESS:  A basis for what you're trying to hedge.
 6   That basis is called a notional amount.  It is just a dollar
 7   figure.
 8             If you go out and say I'm buying instruments to hedge
 9   against, you know, $4 billion, that $4 billion is what is known
10   as the notional amount of that hedge.
11             THE COURT:  Now, look, I think it is probably safe to
12   say that either the jury nor I, none of us are really into this
13   subject enough to know what that paragraph means in terms of
14   the hedging and so forth.
15             Now, it may not be anything that you want to bring out
16   now or ever in the case, but if it is important for us to
17   understand all of this, we would have to have a little more
18   education.  Maybe you want to defer that, with the
19   understanding that it is deferred or maybe you don't need to
20   get into it at all.  I take it you're not going to get into it
21   now?
22             MR. BRAUN:  That's correct, although we have no
23   objection to going into it.
24             THE COURT:  I don't want to do it on my own, no, no,
25   no.  The jury just understands that that subject is being
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

349

```
03VJLEV3                    Okusanya - direct
```

1   deferred as far as any detailed exploration.  That is fine.
2   BY MR. BRAUN:
3   Q.  Turning your attention to the next paragraph in your
4   report, Mr. Okusanya --
5   A.  Yes.
6   Q.  -- after reciting again that language from the January 18th
7   press release, could you read beginning with the words, "Given
8   the above statement."
9   A.  "Given the above statement, we believe there is potential
10  for a portion of the IO write-downs to be recovered if rates do
11  not rise as quickly as anticipated in 2005.  We note that the
12  forward LIBOR curve currently forecasts a year-end LIBOR rate
13  of 3.25 to 3.15 percent, below Doral's assumption, which we
14  believe is closer to 4 percent."
15  Q.  So if interest rates rose only from three and a quarter to
16  three and a half, in that range, what are you saying the effect
17  that would have on Doral's IO valuation and why?
18  A.  I am saying of the 97.5 million loss that they took, a
19  write-down that they took in the fourth quarter, you would
20  reverse a portion out of that because again that 97.5 loss was
21  based on a model that already assumes a 4 percent interest rate
22  scenario.  So if rates come in lower than that, you get a
23  portion of that back.
24  Q.  Can you turn to the next page, the top of Page 13, where
25  you marked that chart with the numbers at the top.  Thank you.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

03VJLEV3                     Okusanya - direct
1              Can you explain what is reflected in this chart,
2    Mr. Okusanya?  Could you walk us through it.
3    A.  Yes.  This chart is my analysis of the sensitivity of the
4    IO valuation to different LIBOR rates, and so again what the
5    chart is showing is, you know, at -- what the chart is
6    basically saying is LIBOR rates end up being lower going
7    forward, they get a portion of the -- recovered portion of the
8    97.5 percent -- 97.5 million loss that occurred in the fourth
9    quarter of '09, and if LIBOR rates kept going up, you would
10   lose a maximum of $20 million because again my assumption in
11   the model was once LIBOR rates hit 4 percent, all the caps are
12   kicking in so you can't lose any further money.
13   Q.  It looks like from the language above the table, you're
14   assuming management expectations of 3.875?
15   A.  Correct.
16   Q.  So you've come off 4 a little bit?
17   A.  Yes, I have.
18   Q.  Again can you explain why that is.
19   A.  The reason why again, from several of the conversations I
20   had with Sammy, the 4 percent number seemed like it wasn't a
21   fixed number.  I walked in with the impression they were less
22   to 4 but not quite there.
23   Q.  Just taking a couple of lines for examples on your table
24   here, if LIBOR goes to 3.25, what would you expect to occur
25   with the IO valuation?

351

03VJLEV3                        Okusanya - direct

1    A.  I would expect them to recover $97.5 million.
2    Q.  If LIBOR increased to 3 and a half, what would Doral do?
3    A.  They would recover 60 million of the 97.5 million loss that
4    they wrote off in the fourth quarter.
5    Q.  If LIBOR goes all the way up to 4, which is above your
6    3.875 assumption, what would happen?
7    A.  Then they would have to take a further write-down of $20
8    million.
9    Q.  What do the parentheses indicate in the 20?
10   A.  It is a loss.
11   Q.  But that number, that 20 million loss, if LIBOR continues
12   to rise past 3.75 -- sorry -- my mistake -- past 4, you keep
13   saying it is a $20 million loss?
14   A.  Correct.
15   Q.  And explain why the loss doesn't get larger as interest
16   rates rise.
17   A.  Again based on my analysis on the information I received
18   from management, my understanding was once LIBOR got to roughly
19   about 4 percent, all the caps in all the contracts that they
20   have would kick in.  So as a result of that, further increases
21   in LIBOR would not impact the cash flow that they're getting
22   from the IO strips.
23   Q.  Can you turn your attention now to the next document in
24   your binder.  It has been marked for identification as
25   Government Exhibit 1517.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
     03VJLEV3                    Okusanya - direct
 1   A.  Yes.
 2   Q.  Do you recognize this document?
 3   A.  Yes, I do.
 4   Q.  What is it?
 5   A.  It is an e-mail that I sent to Sammy Levis as well as
 6   Salomon Levis and David Levis that is a copy of the report, of
 7   the March 9th report that I published.
 8   Q.  On what date do you send this e-mail to Sammy Levis,
 9   Salomon Levis and David Levis?
10   A.  It is sent on Thursday, March 10th, 2005.
11   Q.  The attached report, is that the report that we've just
12   been discussing in your testimony, the March 9th report?
13   A.  That is correct.
14               MR. BRAUN:  Your Honor, the government moves Exhibit
15   1517 into evidence.
16               THE COURT:  Received.
17               (Government Exhibit 1517 received in evidence)
18   BY MR. BRAUN:
19   Q.  Remind us who is Salomon Levis?
20   A.  Salomon Levis was the chairman and CEO of Doral Financial.
21   Q.  The David Levis you referred to in this e-mail?
22   A.  The David Levis I referred to is Sammy's father, who was
23   also part of the company but not in a formal -- he didn't have
24   a formal title.
25               THE COURT:  Salomon was head of the company, right?
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

353

03VJLEV3                          Okusanya - direct

 1             THE WITNESS:  Correct.
 2             THE COURT:  Salomon, S A L O M O N, all right.
 3   BY MR. BRAUN:
 4   Q.  Mr. Okusanya, could I direct your attention to the next
 5   document which has been marked for identification as 1518.
 6   A.  Yes.
 7             MR. BRAUN:  Your Honor, may I have just a moment to
 8   confer with defense counsel?
 9             THE COURT:  Sure.
10             (Pause)
11   BY MR. BRAUN:
12   Q.  Mr. Okusanya, there is a portion of 1518 that is an e-mail
13   from you?
14   A.  That is correct.
15   Q.  Can you describe what that is.
16   A.  That is an e-mail that any time I put a report together, I
17   always sent an e-mail and send the report out to investors.
18   Again it is that list of thousands of investors that I am in
19   contact with.  This is an example of that e-mail, and
20   specifically this one is the report that I put out on March
21   9th, 2005.
22             MR. BRAUN:  The government moves Exhibit 1518 into
23   evidence.
24             THE COURT:  Received.
25             (Government Exhibit 1518 received in evidence)
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

```
03VJLEV3                    Okusanya - direct
1              THE COURT:  So you e-mail to your customers the
2     highlights?
3              THE WITNESS:  I typically put the highlights in the
4     bullet and also attach a copy of the report, too.
5              THE COURT:  Okay.
6     BY MR. BRAUN:
7     Q.  Is this an example of one of those e-mails that contain a
8     summary of the report you send out to your investors that you
9     are in contact with?
10    A.  That is correct.
11    Q.  And this one is on March 9th, '05?
12    A.  Yes, it is.
13    Q.  It is the same, the highlights on the first page of that
14    March 9th report?
15    A.  That is correct.
16             MR. BRAUN:  The next document will take five minutes
17    now.  Do you want to break now or press on?
18             THE COURT:  Let's break now.  2:15, please.
19             (Jury excused)
20             (Luncheon recess)
21             (Continued on next page)
22
23
24
25
```

355

03VJLEV3                         Okusanya - direct

```
 1              AFTERNOON SESSION
 2              2:15 pm
 3              (Trial resumes)
 4              (At side bar)
 5              THE COURT:  What about this thing about Monday?
 6              MR. BRAUN:  I am sorry.  We're having a lot of trouble
 7    getting witnesses here both from Puerto Rico and other parts of
 8    the United States because of people's religious services on
 9    Sunday and their desire to be with their family on Sunday.
10              They're available on Monday, but they're all saying is
11    there any way we can travel on Monday instead of Sunday?  In
12    order to get them here to testify on Monday, we need to take
13    them away from Easter, and we don't want to do that.
14              We spoke to the defense, and I know they're amenable
15    to starting on Tuesday next week instead of Monday.  This would
16    not take us off our three week government case estimate, we
17    don't believe, and so that's what we wanted to propose to your
18    Honor so we could accommodate the witnesses on Easter Sunday.
19              MR. BLACK:  We don't object at all.
20              THE COURT:  I think it is a good idea.  I take it you
21    really could not fill Monday otherwise?
22              MR. STELLMACH:  That's right.
23              MR. BRAUN:  We would be bringing people away from
24    Easter Sunday.
25              THE COURT:  We don't want to do that.  I'll just
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

356

03VJLEV3                      Okusanya - direct
1   explain that to the jury and the reason.
2              (Continued on next page)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

357

03VJLEV3                        Okusanya - direct
1               (In open court; jury present)
2               THE COURT:  Sit down, please.
3               The government attorneys have -- something has come up
4       about the series of government witnesses who need to come from
5       Puerto Rico or other places out of town, and a lot of this was
6       scheduled to be on Monday.
7               Now, these people are available on Monday, but in
8       order to be here on Monday to testify, they would need to
9       travel on Easter Sunday, and they have said they would like to
10      be home with their families on Easter Sunday, and both lawyers
11      are very cooperative with each other, both sides have agreed
12      that we can take the day Monday off.
13              The government assures us that that really will not
14      interfere with the overall schedule which we told you about.
15      We certainly want to accommodate these people.  It is a
16      legitimate request for personal reasons and religious
17      observances, and so we will not sit on Monday.  So we will
18      recess at 1:30 on Friday and resume on Tuesday morning.
19              Okay.  Let's go ahead.
20              MR. BRAUN:  Thank you, your Honor.
21      OMOTAYO OKUSANYA, resumes
22      DIRECT EXAMINATION continued
23      BY MR. BRAUN:
24      Q.  Mr. Okusanya, good afternoon.
25      A.  Good afternoon.
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

03VJLEV3                         Okusanya - direct

1   Q.  A bit earlier in your testimony you were talking about one
2   of your reports, and the report indicated that you were
3   expecting Doral to file its 10K for the 2004 year on March 15th
4   of 2005, correct?
5   A.  That is correct.
6   Q.  Do you recall something in your report mentioning a
7   conference call that was also expected to take place?
8   A.  Yes, the report also mentioned there would be a conference
9   call discussing the 10K that management was hosting on March
10  17th, 2005.
11  Q.  You learned about those things from your conversations with
12  Sammy Levis?
13  A.  That is correct.
14  Q.  Can you turn your attention to a document in your binder
15  marked for identification as Government Exhibit 1519.
16  A.  Yes.
17  Q.  Do you recall this exhibit, Mr. Okusanya?
18  A.  Yes, I do.
19  Q.  Can you describe generally what it is.
20  A.  It is an e-mail that I sent to Sammy Levis on Monday, March
21  14th.
22          MR. BRAUN:  Your Honor, we ask this be admitted into
23  evidence.
24          THE COURT:  Received.
25          (Government Exhibit 1519 received in evidence)
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

359

```
03VJLEV3                    Okusanya - direct
 1   BY MR. BRAUN:
 2   Q.  Mr. Okusanya, can you explain what led to this e-mail.
 3   A.  Yes.  In conversations I had with Sammy earlier on, they
 4   were preparing for the conference call on the 17th about the
 5   10K, and Sammy had requested if I could send him some
 6   information about questions I had been receiving from investors
 7   about Doral and the earnings release in preparation for this
 8   conference call on the 17th.
 9   Q.  So what did you do in response to that request from Mr.
10   Levis?
11   A.  In response, I put together a document with various
12   questions that I felt that investors had been asking me which I
13   felt were pertinent for that issue to be ready to answer on the
14   call on the 17th.
15   Q.  Did those questions include questions about the IO
16   valuation we have been discussing during your testimony?
17   A.  Yes, it did.
18   Q.  Why is that?
19   A.  It included that.  It was probably the most important thing
20   that investors wanted answered at that point, the valuation and
21   the IOs and the continued risk of IO write-downs if interest
22   rates kept rising.
23   Q.  The e-mail, did it attach your suggested questions that Mr.
24   Levis should be prepared to address?
25   A.  Yes, it did.
```

03VJLEV3                          Okusanya - direct

1    Q.  Can you turn the page of the exhibit now.  Do you recognize
2    the next few pages, Mr. Okusanya?
3    A.  The next few pages are the write-up that I sent Sammy of
4    the different questions that investors were concerned about.
5    Q.  What was the first topic that you led with in putting these
6    questions together?
7    A.  The first topic was the IO valuation.
8    Q.  There are some various issues related to the IO valuation
9    that you were describing there?
10   A.  That is correct.
11   Q.  Can you turn the page to the next page of your list of
12   questions.
13   A.  Yes.
14   Q.  At the top under 4 A, could you take a moment to look over
15   that paragraph.
16   A.  (Pause)
17   Q.  Mr. Okusanya, the whole paragraph might be important for
18   context, but the question I want to ask you relates to the end
19   of the Paragraph 4 A, where you say also it appears that a lot
20   of these derivitives are caps and floors on interest rates so
21   at some point management has to actually exercise these options
22   to protect from rising rates.  Will you be able to provide any
23   color as to when you could possibly start to exercise to lock
24   in margins?
25            Do you see where I am reading?

03VJLEV3                    Okusanya - direct
1   A.  Yes, I do.
2   Q.  These kinds of derivitives that are caps and floors, are
3   these the same or different than the contractual caps you were
4   describing earlier in your testimony?
5   A.  These are different from the contractual caps.
6   Q.  Can you explain the difference, Mr. Okusanya.
7   A.  Yes.  The contractual caps are actually built into these
8   contracts when Doral is selling these pool of mortgages to a
9   secondary party.  These caps and floors are derivative
10  instruments that Doral went out and actually purchased in the
11  market.
12  Q.  What are you asking about with respect to management's
13  exercise of options?
14  A.  Most of these derivitives were options, were basically
15  options.  In order for options to work, you have to make a
16  decision whether you are going to exercise the option or not.
17  It is very different from the contractual caps.  Those are in
18  place.  You don't have to do anything versus these were
19  management has to take some type of action to make them work.
20          THE COURT:  Look, I don't want to interfere with your
21  questioning, but it does concern me if we simply slide over
22  some of these concepts, which you're not doing, but I think you
23  have your idea of the order of the case.
24          It concerns me to wait and have any explanation of the
25  options, derivitives, these things that have been going on.  So

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

362

```
03VJLEV3                    Okusanya - direct
```

1  I guess I have a couple of questions in my mind, but why don't
2  you see what you could do to help us out.
3          MR. BRAUN:  Sure.
4  BY MR. BRAUN:
5  Q.  Mr. Okusanya, see what you can do to help us out.  What is
6  the basic nature of this type of instrument, a derivative that
7  is an option?  Can you explain how that works, Options 101.
8  A.  Sure.  Options are basically instruments that their value
9  depends on an underlying instrument.  Basically what you're
10  trying to do with an option is based on the value of the
11  underlying instrument, you determine whether you are going to
12  be able to make money or not by exercising that option.
13  Q.  Okay.  In order to explain that a little further, can you
14  give us maybe a hypothetical example of the kind of option
15  you're talking about?
16  A.  Sure.  You can talk about an option on some type -- an
17  option on interest rates, for example.  So I will buy an
18  instrument if interest rates are roughly 5 percent.
19  Q.  Okay.
20  A.  If interest rates move to 6 percent, that in that situation
21  you have to ask yourself the question do I exercise the option
22  or not.
23  Q.  What do you have the option to do?  What are you
24  exercising?  How would it work?
25  A.  You have the option to again buy this underlying instrument
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

363

03VJLEV3                    Okusanya - direct
1  that we are talking about, this underlying asset.
2           THE COURT:  Let me just ask this:  This is a tough
3  subject.  Let's suppose that you're running Doral and you're
4  concerned about interest rates increasing, and you want to
5  hedge or protect against maybe very big losses, hundreds of
6  millions of dollars.  I am speaking very hypothetically, not
7  realistically.
8           Let's say hundreds of millions of dollars in losses if
9  interest rates increase.  Now, you want to protect against that
10 by hedging.  Now, my understanding is that what you'll want to
11 do if you're concerned about, let's say, a loss of -- I'll use
12 a billion dollars because it has to go to do -- I don't think
13 it is -- my figures are not this case, the jury understands
14 that.
15          You're concerned about the loss of a billion dollars
16 if interest rates increase.  So you want to buy something, some
17 kind of a security or contract that will pay you a billion
18 dollars if interest rates increase.  Is that right?
19          THE WITNESS:  That is one of the things you could do.
20          THE COURT:  Let's take that one.  That means that
21 somebody is willing to enter into a contract with you to pay
22 you the billion dollars if interest rates increase, but he
23 wants to make money if interest rates do something else, right?
24          THE WITNESS:  That is correct.
25          THE COURT:  So I'll pay him not a billion dollars for
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

03VJLEV3                        Okusanya - direct

1  that contract, I'll pay a relatively small amount of money,
2  maybe a few hundred thousand dollars.  So he gets the few
3  hundred thousand dollars in cash and he bets, in effect, that
4  the interest rates are going to go down.
5         Now, what I am saying in a way doesn't make sense to
6  me, but you tell us in those terms what people do because
7  certainly options are a situation where I will, I will agree
8  to, say, sell some stock if the stock goes to a hundred.  The
9  other fellow agrees to buy the stock if the stock goes to a
10 hundred.
11         I sell him the option, he pays me a little cash.
12         THE WITNESS:  Right.
13         THE COURT:  Now, if the stock goes to 110, he is in
14 very good shape because he buys the stock for a hundred, right?
15         THE WITNESS:  That's correct.
16         THE COURT:  If it only goes to 90, he is certainly not
17 going to exercise the option and I've got his cash?
18         THE WITNESS:  You have his cash, exactly.
19         THE COURT:  That is the kind of thing that goes on?
20         THE WITNESS:  Yes.
21         THE COURT:  Tell us in terms of protecting against the
22 rise in interest rates, what's kind of options could be done?
23         THE WITNESS:  Sure.  So in Doral's situation or in
24 most banks' situations where you're trying to protect against
25 rising interest rates, you can go out, and what the company has

03VJLEV3                    Okusanya - direct
1   done from a contractual perspective again is put in these caps,
2   number one.
3   BY MR. BRAUN:
4   Q.  Let me stop you there.  I am sorry.  To the extent they
5   have caps in the contracts --
6   A.  Right.
7   Q.  -- that limits their exposure to rising interest rates, is
8   there any need to hedge that?
9   A.  There is no need to hedge.  That is again built into the
10  contracts.
11  Q.  To the extent they're unprotected by the contracts, then
12  they've got some risk?
13  A.  Yes.
14          THE COURT:  Then they hedge?
15          THE WITNESS:  Then they hedge and go out --
16          THE COURT:  You didn't tell us how they might do it.
17          THE WITNESS:  Yes.  So one of the things they could do
18  again is instead of having it in the contracts, contractually,
19  they could actually go out and buy caps.  You can go into the
20  market and also buy caps.
21          THE COURT:  What does that actually mean.
22          THE WITNESS:  That basically means you would enter a
23  contract with someone else, and what that cap basically does is
24  if -- I am trying to pick my words carefully so I can explain
25  it as simply as possible -- if you go out and buy a cap,
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

03VJLEV3                    Okusanya - direct

1   basically you enter into a contract with another party, and
2   with the cap it is going to have language to the extent saying
3   if interest rates end up at a particular point, if interest
4   rates hit a particular level, then at that point anything above
5   that level you are paying me rather than me paying you.
6           And so in that situation if you end up with a cap, if
7   you end up with a cap, if rates go above that, you are
8   protected because you are no longer responsible for anything,
9   any increase in interest rates above that.
10          THE COURT:  Now, in order to buy the -- I just buy
11  that, right?
12          THE WITNESS:  Yes.
13          THE COURT:  In other words, I pay this person.  He is
14  not betting on anything -- wait a minute.  He agrees to pay me
15  if the interest rates go above a certain amount?
16          THE WITNESS:  Correct.
17          THE COURT:  He agrees to pay me, and you will figure
18  out what he is going to pay me to take care of my possible
19  loss, right?
20          THE WITNESS:  Correct.
21          THE COURT:  And for that, for his agreement to do
22  that, I pay him some cash?
23          THE WITNESS:  That is correct.
24          THE COURT:  Now, the benefit to him is if the interest
25  rates don't go up, he's got his cash and he doesn't have to pay

367

03VJLEV3                          Okusanya - direct

```
 1   me?
 2               THE WITNESS:  That is correct.
 3               THE COURT:  So we are both --
 4               THE WITNESS:  You have taken different sides of a bet.
 5               THE COURT:  Okay.
 6               THE WITNESS:  That is a cap.
 7               THE COURT:  That is buying a cap?
 8               THE WITNESS:  That is buying a cap, correct.
 9               THE COURT:  That is hedging?
10               THE WITNESS:  That is hedging.
11               THE COURT:  Okay.
12               THE WITNESS:  Apart from the cap, the other way you
13   could do it again is to go out and buy an option.  An option is
14   different -- they're both derivitives, but they're different
15   types of derivitives.  We talked about the cap.
16               Then the option is again you go out and negotiate, go
17   out and negotiate with another party, where the two of you end
18   up in a contract, but this time you have an option to do
19   something if interest rates hit a particular point.
20               In Doral's case --
21               THE COURT:  Do something like what?
22               THE WITNESS:  To actually exercise the option and buy
23   the underlying asset.  In Doral's case, for example, if you
24   have -- what they're trying to protect them against is rising
25   interest rates.  What they're going to do is -- one of the
```

```
03VJLEV3                    Okusanya - direct
 1   things they could do is go out and buy an option that if
 2   interest rates continue to rise, I'm going to buy an instrument
 3   that, if interest rates continue to rise, I am actually -- that
 4   is a loss on the IOs, but I want the option to get into an
 5   instrument that if interest rates are rising, that value, that
 6   instrument, the value of that instrument is actually rising.
 7   The loss I make on the IOs, I get this gain on this other
 8   instrument by exercising the option by getting into that
 9   contract.
10            Again, it is very different because it is an option.
11   I don't necessarily have to do it.  I just want the option to
12   do it.
13   BY MR. BRAUN:
14   Q.  Mr. Okusanya, is there commonly a time-frame in which this
15   sort of option would have to be exercised?
16   A.  Yeah, typically there is.  The options always have time
17   lines.  The time lines could vary.
18   Q.  If you wanted to protect yourself for an extended period of
19   time into the future, 7, 8, 10 years, would an option that you
20   hold today necessarily do that?
21   A.  It would if the option covered that entire time period.  So
22   if you bought a 10-year option or five-year option, it would
23   protect you for a long period versus if you bought a
24   three-month option or your six-month option which protects you
25   for a shorter period.
```

03VJLEV3                          Okusanya - direct
 1              THE COURT:  Let me interrupt.  What you're trying to
 2      protect against is having these interest-only strips where
 3      you're losing money?
 4              THE WITNESS:  Correct.
 5              THE COURT:  Now, if you could buy some bonds, some
 6      securities, some contract where you would make money if
 7      interest rates rose, then you could offset your loss on your
 8      interest-only strips with this thing which makes money if
 9      interest rates go up?
10              THE WITNESS:  That is exactly right.
11              THE COURT:  That is your basic idea of the option, so
12      that you have a right if interest rates go up to exercise the
13      option and buy this other thing which increases, has increased
14      in value?
15              THE WITNESS:  When interest rates are going up, that's
16      correct.
17              THE COURT:  Okay.  I think that is as well as we can
18      do for the moment.  We'll be back to that subject, I am sure.
19              MR. BRAUN:  I am sure, your Honor.
20      BY MR. BRAUN:
21      Q.  Mr. Okusanya, yesterday when we were talking about this
22      same subject in kind of more general terms, it was in the early
23      January time-frame, even before you initiated coverage in
24      Doral, you were talking about the difficulty of matching a
25      hedge to a risk, and I think the metaphor you used was it is

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

370

03VJLEV3                          Okusanya - direct

1  sometimes hard to match an apple of your hedge to the apple of
2  your risk?
3  A.  Right.
4          (Continued on next page)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

03vWlev4                    Okusanya - direct

1  BY MR. BRAUN:
2  Q.  In this context, given that we've had a little more
3  discussion of this subject, could you explain that challenge in
4  this context?
5  A.  Sure.  I mean, within this context, now that we -- with the
6  IOs, we know the IOs have variable interest rates, IOs have
7  variable pass-through rates.  Those variable pass-through rates
8  are set at different points in time.  And so with the variable
9  interest rates, or with the pass-through rate, they have
10  different values throughout time.  It is very difficult to go
11  out and find derivatives that match up exactly to that.  And
12  it's also difficult because with the pool of assets that you
13  have, that you've sold to someone else, you're never quite sure
14  how long those assets are going to be around for.  This is the
15  whole concept of the prepayment speed again.  They could be
16  around for a long time.  They could be around for a shorter
17  time.  Again, it's very hard to go out and find derivatives
18  that can match up to that time frame when you exactly are not
19  100 percent sure what that time frame is going to be, because
20  the prepayment speeds keep changing.
21          THE COURT:  Let me say this.  You have heard the word
22  "derivatives."  25 years ago, nobody talks about derivatives in
23  the investment world.  I don't think they did.  At least I
24  didn't hear about it.  So derivatives is something that is now
25  a kind of word, it is a word, it's a term, it's a concept that

```
03vWlev4                    Okusanya - direct
 1   is very important in the investment world.  It means an
 2   investment vehicle that is derived from, is dependent on, is
 3   related to something else; may be related to a stock, to a
 4   bond, to a treasury note.  It could be an option.  It could
 5   take different forms.  But in this case, you're beginning to
 6   hear about derivatives, and after you've finished with this
 7   case and when you're reading about your investments, you'll
 8   begin to see a lot about derivatives.  It's a term that is
 9   becoming very important.
10            Go ahead.
11   BY MR. BRAUN:
12   Q.  Mr. Okusanya, you sent Mr. Levis these questions on the
13   14th in response to his request?
14   A.  That's correct.
15   Q.  And you were expecting the 10K the 15th, correct?
16   A.  That is correct.
17   Q.  Did Doral file its 10K for the 2004 calendar year on March
18   15 of 2005?
19   A.  Yes, they did.
20   Q.  Did you receive it?
21   A.  Yes, I did.
22   Q.  When did you receive it?
23   A.  I received it the evening of March 15.
24            MR. BRAUN:  Your Honor, just one moment.
25            Can I approach, Judge.
```

                 03vWlev4                   Okusanya - direct
 1              THE COURT:  Sure.
 2   BY MR. BRAUN:
 3   Q.  Mr. Okusanya, do you recognize what's been marked for
 4   identification as Government Exhibit 6024?
 5   A.  I believe it's 6204.
 6   Q.  I misspoke.  Thank you.  6204.  You're not the only one
 7   correcting me.
 8              THE COURT:  Is that the exhibit number?
 9              MR. BRAUN:  6204, your Honor.
10              THE COURT:  All right.
11   A.  I do recognize it.
12   Q.  And what is it?
13   A.  This is the 10K that Doral filed for the year ended
14   December 31, 2004.
15              MR. BRAUN:  Your Honor, we move the admission of this
16   document into evidence.
17              THE COURT:  Received.
18              (Government's Exhibit 6204 received in evidence)
19              MR. BRAUN:  Thank you.
20   Q.  You were still covering Doral at this time, Mr. Okusanya?
21   A.  Yes, I was.
22   Q.  Can you explain whether or not it was important for you to
23   get a hold of this public filing quickly?
24   A.  It was very important.
25   Q.  Why was that?
                     SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

03vWlev4                          Okusanya - direct

1   A.  Again, it was the, a lot of the financial information that
2   people had been looking for to have a better understanding of
3   the IOs would have been contained in this document.
4   Q.  Do you recall how you got this 10K report?
5   A.  I, I believe I went online to get it from the SEC Web site.
6   Q.  And where were you at the time?
7   A.  I was in my office.
8   Q.  Mr. Okusanya, it was a large document, as you saw.  There's
9   an excerpt of it, several pages from it, in your binder, at tab
10  6204.  Do you see that?
11  A.  Yes, I do.
12  Q.  In going through the 10K, how quickly did you come to the
13  company's discussion of interest-only strips?
14  A.  Fairly quickly.  It was the first thing I went to when I
15  got the report.
16  Q.  Why was that?
17  A.  Just given the importance again being placed on the IO
18  valuations.
19  Q.  Behind the two cover pages, Mr. Okusanya, you come to
20  another page that's got a 37 at the bottom of it.  And then
21  could you turn one more to page, the one with the 38 at the
22  bottom of it?
23  A.  Yes.
24  Q.  I'm sorry.  Can I turn you back to 37?  My mistake.
25  There's a paragraph there at the bottom called, under the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

03vWlev4                    Okusanya - direct

1    heading retained interest valuation.
2    A.  I see it.
3    Q.  Can you read that for us?
4    A.  Yes.  It says, "Doral Financial's sale and securitization
5    activities generally result in the recording of two types of
6    retained interest:  MSRs and IOs.  MSRs represent the estimated
7    present value of the normal servicing fees (net of related
8    servicing costs) expected to be received on the loan over the
9    expected term of the loan."
10   Q.  Is that the gray part of the illustration we were looking
11   at earlier, the MSR?
12   A.  Yes, it is.  It's the mortgage-servicing rate.
13   Q.  Please continue.
14   A.  "IOs represent the estimated present value of the excess of
15   the weighted average fixed coupon on the loans, of the loans
16   underlying the mortgage pool sold over the sum of (1) the
17   contractual interest rate required to be paid to investors, and
18   (2) a normal servicing fee after adjusting such amount of
19   expecting losses and prepayments."
20   Q.  So, if you start with the whole coupon, the whole average
21   mortgage rate that the borrowers are paying, and you subtract
22   off the MSR, and you subtract off everything Doral has to pass
23   through to the buyers of the pool, what are you left with?
24   A.  You're just left with the income stream related to the IOs.
25   Q.  Can you continue in this paragraph?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

03vWlev4                        Okusanya - direct

1   A.  Yes.  It says, "The contractual rate payable to investors
2   may be either a fixed or floating rate.  In the case of
3   nonconforming loan pools, which constitute 94 percent of the
4   IOs portfolio, it is generally a floating rate based on a
5   spread over the three-month LIBOR that resets quarterly.
6   Generally, the loans sold are subject to interest rate caps set
7   at or below the weighted-average coupon (less the servicing
8   fee) on the pools of loans and to a lesser extent based on the
9   spread above the initial contractual pass-through rate at the
10  time of sale, which does not exceed the weighted-average coupon
11  on the loans."
12  Q.  Mr. Okusanya, can I stop you there?  The statement you just
13  read about the interest rate caps, do you recall seeing that in
14  the 10K when you received it in your office that evening?
15  A.  Yes, I do.
16  Q.  Did you have a reaction to that when you saw it?
17  A.  Yes, I did.
18  Q.  Can you describe the nature of your reaction?
19  A.  It was more shock than anything else.
20  Q.  What shocked you about that, Mr. Okusanya?
21  A.  The language was very different from what I understood how
22  the caps worked or how the caps were in place at the company.
23  Q.  And can you explain why, what the difference is?
24  A.  The major difference was, then the language here says, "the
25  caps are to a lesser extent based on the spread above the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

03vWlev4                    Okusanya - direct
1   initial contractual pass-through rate."  Prior --
2              THE COURT:  Start where it says "Generally," just so
3   that the jury and I go over this a little bit slowly and absorb
4   it.  Just read that again.
5              THE WITNESS:  So it says, "Generally, the loans sold
6   are subject to interest rate caps set at or below the
7   weighted-average coupon."
8              THE COURT:  That's what we had referred to as WAC,
9   right?
10             THE WITNESS:  Correct.
11             THE COURT:  And that's the average of all the loans,
12  right?
13             THE WITNESS:  That's the average interest on all the
14  loans, correct.
15             THE COURT:  The average interest on all the loans.  So
16  set at or below the weighted-average coupon less the servicing
17  fee, that little gray strip.
18             THE WITNESS:  Correct, "on the pool of loans and to a
19  lesser extent based on a spread above the initial contractual
20  pass-through rate at the time of the sale, which does not
21  exceed the weighted-average coupon on the loans."
22             THE COURT:  Go ahead with your answer.
23  A.  So the reason way I was surprised at seeing this was, the
24  conversations I had had with Sammy over the past several
25  months, the e-mails I had received from Sammy on February 15, I

03vWlev4                          Okusanya - direct
1   believe, you know, seemed to -- indicated to me that the caps
2   again were set at this 250 basis points number we had talked
3   about, above LIBOR, and just given that LIBOR rates were so
4   low --
5   Q.  I'm sorry.  Above LIBOR or above --
6   A.  Above LIBOR plus the spread.  So above the pass-through
7   rate.  But just given that LIBOR rates were so low at that
8   point and you had this again cap of 250, I felt very
9   comfortable from my prior reports indicating that the caps
10  would probably kick in around LIBOR at 4 percent.  This
11  language says those type of caps are, those type of caps are
12  not the typical caps that, are not the typical caps that they
13  have in the contracts because the language says, this is done
14  to a lesser extent, and I was always under the impression it
15  was more typical based on the e-mails I had received from Sammy
16  and conversations I had had with Sammy.  What seemed to be more
17  typical based on what was in this 10K is that the caps are set
18  at or below the weighted-average coupon.
19  Q.  The weighting average coupon less the servicing fee?
20  A.  Less the servicing fee, correct.
21  Q.  So the cap in that instance would be right beneath that
22  gray strip on the illustration, correct?
23  A.  That is correct.
24              THE COURT:  Can we just work with the language just a
25  little bit?

03vWlev4                        Okusanya - direct

1              Do I understand you correctly that you, prior to this,
2     thought that the typical case was embraced in that language "to
3     a lesser extent based on a spread above the initial contractual
4     pass-through rate at the time of sale"?
5              THE WITNESS:  That is correct.
6              THE COURT:  Which does not exceed -- the language is a
7     little difficult.  Let's just start with the wording "based
8     on."  How do you relate that language to what you understood,
9     because you've spoken in a little different terminology?
10    Right?
11             THE WITNESS:  Correct.  It would be helpful if we
12    could put up again that IO chart.
13             MR. BRAUN:  Do you want to come down and use the
14    chart?
15             THE WITNESS:    We could do that or we could put it on
16    the screen.
17             THE COURT:  Okay.  Go ahead.
18             THE WITNESS:  So the language that's in the 10K that
19    was just released says the caps, that are in these contracts,
20    are set, generally set at or below WAC.  So the caps are being
21    set somewhere just below the gray bar.  What that suggests is
22    if you have interest rates rising, then this IO strip piece
23    could get wiped away, because the caps are all the way --
24             THE COURT:  I understand that.  My question was,
25    remember the language in the 10K?  It starts out "to a lesser
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

03vWlev4                        Okusanya - direct

1  extent, based upon."  I just wanted to have you relate that
2  language to what you had understood to be the typical
3  situation.
4              Do you understand my question?
5              THE WITNESS:  Yes, I do, sir.
6              THE COURT:  Okay.
7              THE WITNESS:  And so with that language, it's more
8  focused on to a lesser extent, it says the caps are set at a
9  spread above the pass-through rate.  And if you have the
10 pass-through rate at LIBOR plus a spread, again, when we had
11 the contractual example we talked about earlier, it was LIBOR
12 plus 135 basis points, it was saying these caps, there are less
13 of these caps in the contracts, but that these caps are set
14 just a spread above this pass-through rate number.
15             THE COURT:  Okay.  Now, look, on that chart, you've
16 got what you talked about before, you've got LIBOR, that's the
17 dotted line?
18             THE WITNESS:  Correct.
19             THE COURT:  And then the pass-through rate would be
20 set at something above LIBOR, and you said, I think, 1-1/2
21 percent or something like that.
22             THE WITNESS:  Correct.
23             THE COURT:  What was it, 2-1/2?
24             THE WITNESS:  The e-mails that I received from Sammy
25 said the typical example would be 2-1/2 percent.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

03vWlev4                        Okusanya - direct

1                THE COURT:  2-1/2 percent.  So it would be LIBOR,
2     which would be a percentage.
3                THE WITNESS:  Correct.
4                THE COURT:  Plus another 2-1/2 percent above that, and
5     that's the pass-through rate, right?
6                THE WITNESS:  The pass-through rate would be LIBOR
7     plus a spread that was in the contract.
8                THE COURT:  That's what I'm saying.  Pass-through rate
9     would be LIBOR plus the spread.
10               THE WITNESS:  Right.
11               THE COURT:  Now, do I understand you, and I'm not
12    trying to put words in your mouth, I just want to have the jury
13    and me understand you, that the language in the 10K indicated
14    to you that the untypical case was where the cap would be down,
15    somewhere closer to the pass-through rate.
16               THE WITNESS:  Correct.  That is correct.  And so, the
17    disconnect I had with what I believed versus what the 10K was
18    telling me, the 10K says the caps are closer towards where the
19    weighted-average coupon is.
20               THE COURT:  The top.
21               THE WITNESS:  So it's all the way at the top.  The
22    conversations I had with Sammy, the e-mails I had received from
23    Sammy, indicated that the caps were slightly north of the
24    pass-through rate, which is closer to the bottom.
25               THE COURT:  Okay.  Can we go back to the 10K language?
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

```
        03vWlev4                  Okusanya - direct
 1   And let's look at that language that says, "to a lesser extent
 2   based on a spread above the initial contractual pass-through
 3   rate," and that's what you're talking about, right?
 4              THE WITNESS:  That is correct.
 5              THE COURT:  All right.  Go ahead.
 6   BY MR. BRAUN:
 7   Q.  Continuing with that language, Mr. Okusanya, "in certain
 8   instances," can you just read that sentence?
 9   A.  "In certain instances, in lieu of a cap, Doral Financial
10   has a call option on the pool of loans if the pass-through rate
11   reaches a predetermined rate below the weighted-average coupon
12   on the loans."
13   Q.  This call option, do you have an understanding of that?
14   A.  Yes, I do.
15   Q.  What's your understanding of how this call option would
16   work?
17   A.  The call option basically works the following way.  With
18   the IO strips, again, if interest rates are going up, the value
19   of the IOs are coming down.  Doral had in certain instances an
20   option such that if interest rates reached a particular point
21   and the value of the IOs kept deteriorating, what they could do
22   is go back to the person they sold the loans to and say I'll
23   buy them back from you.
24   Q.  And that buying back of this whole pool of loans, that's a
25   call?
```

383

03vWlev4                     Okusanya - direct

1   A.  That's a call option, so I have an option to buy something
2   back.  It's a call option.
3              THE COURT:  What good would that do to Doral?
4              THE WITNESS:  What that basically would do is the IO
5   would disappear because the transaction that created it at the
6   very beginning has now been reversed out because they bought
7   the mortgages back.
8              THE COURT:  This would be if they were losing.
9              THE WITNESS:  Yeah, you would exercise the option,
10  Doral would exercise the option if they were losing money on
11  the IOs, if they started losing money on the IOs.
12             THE COURT:  And that's a form of hedging.
13             THE WITNESS:  That is a form of hedging, correct.
14             THE COURT:  Go ahead.
15  BY MR. BRAUN:
16  Q.  And that call option, the report indicates, says that they
17  can exercise that call, buy the whole pool back?
18  A.  Correct.
19  Q.  If the pass-through rate reaches a predetermined rate below
20  the weighted-average coupon of the loans?
21  A.  That is correct.
22  Q.  So it's on its way up to that WAC level, at some point they
23  say we can buy everything back?
24  A.  Correct.
25  Q.  And I think you mentioned this.  What happens to the IO?

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

384

03vWlev4                          Okusanya - direct
1   A.  It disappears.
2   Q.  Can you turn the page now, Mr. Okusanya?
3             THE COURT:  Listen, let me just make sure.  If the
4   interest rates are going up, and the rate is getting higher and
5   higher --
6             THE WITNESS:  The pass-through rate.
7             THE COURT:  -- that creates a danger of another
8   write-down.
9             THE WITNESS:  Correct.
10            THE COURT:  Loss.
11            THE WITNESS:  That is correct.
12            THE COURT:  Now, if they can simply buy those
13  contracts back, they don't have the profit, but by buying them
14  back, they eliminate the loss.
15            THE WITNESS:  That's correct.
16            THE COURT:  And if they had bought an option for a
17  reasonably low price, then they have bought the right to
18  eliminate the loss for a reasonably low price, right?
19            THE WITNESS:  That is correct.
20            THE COURT:  Okay.
21  BY MR. BRAUN:
22  Q.  Can you turn the page now, Mr. Okusanya.
23  A.  Yes.
24  Q.  Can you just read the first sentence at the top of 38?
25  A.  "The determination of the fair value of MSRs and IOs at
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

```
03vWlev4                        Okusanya - direct
```

1   their initial recording and on an ongoing basis requires
2   considerable management judgment."
3   Q.  Any disagreement with that statement, sir?
4   A.  None at all.
5   Q.  Can you go to the next paragraph and read the first two
6   sentences there?
7   A.  It says, "To determine the fair value of its IO portfolio,
8   Doral Financial engages in two external valuations with parties
9   independent of the company and of each other.  One of them
10  consists of dealer market quotes for similar instruments and
11  the other one consists of a cash flow valuation model in which
12  all economic and portfolio assumptions are determined by the
13  preparer."
14  Q.  Had you received that information about these two external
15  valuations previously, before you saw this report?
16  A.  Yes, I had.
17  Q.  Who had told you about that?
18  A.  They had, Doral.  In the prior year 10K, the 2003 10K also
19  had similar language, and it was also something I had discussed
20  with Sammy during the process of talking about the company and
21  how they valued their IOs.
22  Q.  Was the information contained in this report, this part of
23  the information about these two external valuations, consistent
24  with what you had learned in the past from reading and speaking
25  to the folks at Doral?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

386

03vWlev4                          Okusanya - direct

1    A.  Yes, it was.
2    Q.  Had Sammy Levis ever said anything to you about this
3    external valuation that involved a cash flow valuation model in
4    which all the economic and portfolio assumptions are determined
5    by the preparer?
6    A.  All he had, all I ever knew about the, that external cash
7    flow model was an independent party.  He had attested to me
8    that it was an independent party that did the valuation.
9    Q.  Did he say anything to you about how that worked, what
10   Doral did to obtain the external value situation involving the
11   cash flow valuation?
12   A.  Not particularly.
13   Q.  Had you asked him who they were obtaining these independent
14   valuations from?
15   A.  Yes, I had.
16   Q.  And did you receive a response from Sammy Levis?
17   A.  The response I received was they had confidentiality
18   agreements with those external parties so they couldn't release
19   the names.
20   Q.  Mr. Okusanya, can you continue just reading the rest of
21   that paragraph, from "in addition to"?
22   A.  "In addition to these two independent valuations, the
23   company prepares an internal static cash flow model that
24   incorporates internally generated prepayment and discount rate
25   assumptions and an expected retained interest rate spread based

387

03vWlev4                          Okusanya - direct

1   on three-month LIBOR rates at the close of the reporting
2   period.  As of December 31, 2004, the three-month LIBOR rate
3   used in the internal valuation model was higher than those
4   contracted with investors for payment prior to the next
5   resetting dates.  It is Doral Financial's policy to record as
6   the fair value of the IOs the lowest of the three valuation
7   sources."
8   Q.  Can you turn the page now, sir?
9   A.  Sure.
10  Q.  Do you see there's a chart towards the bottom of the page,
11  under the heading "changes in fair value of the IOs"?
12  A.  Yes.
13  Q.  Can you read the language just above that table?  There's a
14  sentence there.
15  A.  It says, "The following table summarizes, as of December
16  31, 2004, the estimated change in the fair value of the
17  company's securities held for trading (other than IOs),
18  including derivative instruments that Doral Financial" -- I'm
19  sorry.  Is that the right one?
20  Q.  Yeah.  My mistake.  I meant to direct your attention to the
21  sentence above the chart on top, that says, there's a chart
22  entitled "changes in fair value of the IO."
23  A.  Oh, okay.
24  Q.  You're reading below that chart.  I want to go just above
25  it and read that language there.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

03vWlev4                        Okusanya - direct

1    A.  Sure.  It says, "The following table summarizes the
2    estimated change in the fair value of the company's IOs, net of
3    embedded caps, given several hypothetical increases in the
4    three-month LIBOR and assumes no changes in the prepayment
5    speeds."
6    Q.  In that language, where it says "net of embedded caps,"
7    what did you understand that to mean?
8    A.  That meant these valuations included the effect of all the
9    contractual caps that they had in the contracts.
10   Q.  Can you describe for us generally what information is
11   reflected in that table entitled "changes in fair value of
12   IOs," kind of walk us through what that means?
13   A.  Sure.  So basically what this table does is it's a
14   sensitivity analysis about what increases in interest rates
15   will do to the fair value of the IOs.  So, in the first column,
16   it says at 25 basis points, that's .25 percent increase in
17   interest rates, will reduce the IO valuation by 69.9 million.
18        The second column, if you have a 50 basis points, or
19   .5 percent increase in interest rates, the fair value of the
20   IOs would go down 138.8 million.  If you had 100 basis points,
21   or 1 percent increase in interest rates, you would have the IO
22   value go down 274.7 million.  And if you had a 200 basis
23   points, or 2 percent increase in three-month LIBOR, the fair
24   value of the IOs would go down $542.2 million.
25   Q.  Do you remember seeing this table when you looked at the

03vWlev4                        Okusanya - direct

1  10K?
2  A.  Yes, I do.
3  Q.  Do you remember having a reaction to this table?
4  A.  Yes, I do.
5  Q.  Can you please describe and explain that reaction?
6  A.  Shock, befuddlement, surprise.
7  Q.  And why, sir?
8  A.  A lot, we had gone through some of the research reports
9  that I put out earlier on, and those reports, again, my
10  conclusion about the IOs were that, you know, maybe in a worst
11  case scenario you might get an additional $20 million
12  write-down on the IOs.  This table was suggesting that you
13  could have losses that are much bigger than the number that I
14  was anticipating.
15  Q.  So, again, according to this table, if interest rates go up
16  1 percent, was that within the realm of possible expectations
17  for the calendar year 2005?
18  A.  Yes, it was.
19  Q.  What would 1 percent rise in interest rates for the
20  three-month LIBOR interest rate in particular do to the value
21  of the IO?
22  A.  It would reduce the value of the IOs by $274.7 million.
23  Q.  There is an additional table that you see below that.
24  A.  Yes.
25  Q.  Can you read the language between the two tables?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

390

03vWlev4                        Okusanya - direct

1   A.  The language says, "The following table summarizes, as of
2   December 31, 2004, the estimated change in the fair value of
3   the company's securities held for trading (other than IOs),
4   including derivative instruments that Doral Financial uses to
5   manage its interest rate risk given several increases in the
6   treasury yield curve."
7   Q.  So the derivative instruments, the hedges we've been
8   talking about, right?
9   A.  Right.
10  Q.  And did Doral have other assets that fell into the category
11  of securities held for trading?
12  A.  Yes, they did.
13  Q.  So can you describe for us what the meaning of that is,
14  what are they representing here?
15  A.  What Doral is representing in this table is when you
16  exclude the IOs, and you take a look at changes in the fair
17  value of other assets that they hold in this category, this
18  asset that they hold for trading purposes, as well as the
19  derivatives used to hedge those assets, if you had changes in
20  interest rates, this is what would happen to the fair value of
21  those securities and as well as the hedges used against those
22  securities.
23          THE COURT:  I don't quite put all that together.  What
24  does that mean?
25          THE WITNESS:  Sure.  When you look at the IOs, and on
                   SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

391

```
03vWlev4                        Okusanya - direct
```

1   the balance sheet where the IOs sit, IOs are considered trading
2   securities.  And Doral --
3              THE COURT:  Considered what?
4              THE WITNESS:  As a trading security.
5              And Doral also holds several other trading securities.
6   And they, the same way they hedge the IOs or try to hedge the
7   IOs or have contracts, or have contractual caps in the IOs,
8   they also try to hedge interest rate risk on their other
9   trading, on their other trading securities.
10             What this table is telling us is when you take out the
11  IOs, just look at my other trading securities and look at my
12  hedges against those trading securities, this is what would
13  happen to the valuation of that group if interest rates are
14  changing.
15             THE COURT:  If interest rates what?
16             THE WITNESS:  If interest rates are increasing.
17             THE COURT:  Are increasing?
18             THE WITNESS:  Correct.
19             THE COURT:  Okay.  Go ahead.
20  BY MR. BRAUN:
21  Q.  What's reflected on the table then, Mr. Okusanya?
22  A.  So the table reflects increases, the impact of increases in
23  interest rates again on these derivative instruments and these
24  other trading securities excluding the IOs.  And the table says
25  if interest rates increase 25 basis points, again, these pool

03vWlev4                          Okusanya - direct
1   of other trading assets and the derivatives used to hedge them,
2   would increase $34 million.  If interest rates increased 50
3   basis points, you would see an increase of $76.3 million.  If
4   interest rates increased 100 basis points, this pool of assets
5   would increase $187.1 million.  And if these pool of assets
6   increased 200 basis points, if interest rates increased 200
7   basis point, I'm sorry, these pool of assets and the
8   derivatives attached to them, the valuation would increase by
9   $512 million.
10  Q.  What was your reaction to that information?  And
11  specifically, did it give you any degree of comfort from your
12  reaction to the effective interest rates on the IOs as set
13  forth in the chart above?
14  A.  This disclosure gave me comfort around the fact that when
15  it came to other securities, it seemed like Doral had a large
16  amount of hedges such that valuations would actually increase
17  when interest rates go up.  So when it came to other
18  securities, I felt comfortable that they had hedges in place
19  for a rising interest rate environment that would be beneficial
20  to them.  But the prior disclosure here, just as relates to the
21  IOs, you know, suggested a very different thing to me, that you
22  could see fairly large write-downs on the IOs if you had rising
23  interest rates.
24  Q.  When you saw the 10K, did you put out a report?
25  A.  Yes, I did.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

03vWlev4                    Okusanya - direct
1   Q.  Can you turn your attention now to the next exhibit in your
2   binder, Government Exhibit 1530?
3   A.  Yes.
4   Q.  What is this, Mr. Okusanya?
5   A.  This is another first read that we put out.  It was my
6   initial thoughts on the 10K after we had read through it.
7               THE COURT:  What's the date of this report?
8               THE WITNESS:  The date is 16th of March, 2005.
9               MR. SREBNICK:  Judge, may I have a moment with
10  counsel.
11              THE COURT:  I didn't understand.  What?
12              MR. BRAUN:  Defense counsel has asked for a moment.
13  He's trying to locate the exhibit.
14              THE COURT:  Of course.
15              MR. BRAUN:  Would you just give us a moment, Judge,
16  we're trying to locate an extra copy for counsel.
17              MR. SREBNICK:  Thank you.
18              MR. BRAUN:  Your Honor, the government asks that this
19  be received into evidence.
20              THE COURT:  Received, 1530.
21              (Government's Exhibit 1530 received in evidence)
22              THE COURT:  Proceed.
23              MR. BRAUN:  Thank you.
24  Q.  Mr. Okusanya, do you see the rating on this report?
25  A.  Yes, I do.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

03vWlev4                    Okusanya - direct

1  Q.  What is the rating here?
2  A.  The rating says buy 2 and then in parentheses UR.
3  Q.  And up to this point, what had been the rating?
4  A.  It had just been buy 2.
5  Q.  What is the UR in parentheses that has been added?
6  A.  The UR stands for under review.
7  Q.  What does it mean to be under review?
8  A.  At UBS when we put a stock under review, it basically means
9  we need to do much, we need to do more work on it; there's some
10  concerns we have about what we're seeing, but at the end, we
11  really can't put two and two together with regards to what
12  we're seeing, so we need to do much more work before we can
13  make a formal recommendation.
14  Q.  What is Doral stock trading at on about March 16?
15  A.  The stock is trading at $38.29.
16  Q.  Can you read the top point on your first read here?
17  A.  Yes.  It says, "IO and interest rate disclosures likely
18  seen as negatives."  Then it says, "Last night after the close,
19  Doral released its 2004 10K.  Our review indicates that
20  disclosures about (1) interest rate sensitivity (2), reduction
21  in IO valuation assumptions and (3), slowing loan origination
22  could all be seen as negative and create pressure on the
23  stock."
24  Q.  You mentioned before that you were expecting a conference
25  call to take place on March 17?

03vWlev4                        Okusanya - direct

1    A.  That is correct.
2    Q.  Do you recall whether or not such a call actually occurred?
3    A.  The call did occur.
4    Q.  Did you participate in the call?
5    A.  Yes, I did.
6    Q.  Can you describe generally what one of these calls is?
7    A.  The calls generally are an opportunity for management to
8    address the investment community.  They typically talk about
9    their results.  They will talk a little bit about their overall
10   outlook for the company, and then after they do that, the call
11   is opened up for a question-and-answer session.
12   Q.  And so management is participating in the call, and who
13   else is there, interacting with management?
14   A.  The investor, any investor that is interested in speaking
15   with management typically attends, phones in to the call.
16   Q.  What about research analysts?
17   A.  Research analysts as well are included in that.
18   Q.  Do you recall who participated in the call representing
19   Doral?
20   A.  Yes.  The three participants from Doral were Sammy Levis,
21   Salomon Levis, who is the CEO, and Ricardo Melendez, who was
22   the CFO.
23   Q.  Did you listen to the entire call?
24   A.  Yes, I did.
25   Q.  Do you recall about how long it was generally?

03vWlev4                    Okusanya - direct

1   A.  Probably about two and a half hours.
2   Q.  During the course of that, do you recall whether or not
3   there were questions raised regarding caps that Doral had in
4   its contracts with the other bank that would limit the extent
5   to which the pass-through rate could rise with rising interest
6   rates?
7   A.  There were, there were maybe two or three questions along
8   that line from different investors and analysts.
9   Q.  As best you can recall, what was the response to those
10  questions?
11  A.  With the caps, there was, generally Sammy did mention, very
12  similar as he had mentioned in the past, that again all these
13  caps are negotiated on a contract-by-contract basis, and that
14  the caps generally, that they all negotiate on a
15  contract-by-contract basis, and I believe in the call he
16  mentioned that a significant amount of these contracts did have
17  the caps too.
18  Q.  Did he say anything specific about where the caps were,
19  what level?
20  A.  I cannot, I cannot recall what level he said they were at.
21  I think the only thing I had at that point was what was
22  mentioned in the 10K.
23          THE COURT:  I didn't understand that.  He what?
24          THE WITNESS:  I can't recall whether he actually
25  mentioned at what level the caps were on the call.

03vWlev4                        Okusanya - direct

1   BY MR. BRAUN:
2   Q.  Do you recall whether or not Mr. Levis was asked about the
3   identities of the external parties that were providing
4   independent valuations of the interest-only strips?
5   A.  Yes, I do.
6   Q.  Was he asked that question?
7   A.  He was asked that question.
8   Q.  Do you recall his response?
9   A.  His response was very similar to what he had told me in the
10  past, that they were under confidentiality agreements so he
11  couldn't release the names.
12  Q.  Over the course of this call, Mr. Okusanya, did you have a
13  general reaction to what was taking place in the questions and
14  answers between the investing community and Doral's management?
15  A.  Yes.
16  Q.  What was your reaction?  What was your sense?
17  A.  There was a lot of frustration on the call.  I think a lot
18  of analysts and investors on the call still felt they weren't
19  getting answers for the questions that they were asking, and I
20  think there were also a few that were basically asking the
21  management team to somehow or other validate the IO assumptions
22  that they had, in some way or another.
23              THE COURT:  We'll take our afternoon recess, please.
24              (Recess)
25              THE COURT:  All right.  Go ahead, please.  Sit down.
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

```
      03vWlev4                    Okusanya - direct
 1    BY MR. BRAUN:
 2    Q.  Mr. Okusanya, I want to take you back a couple of days.  We
 3    talked about the 10K on the 15th.
 4    A.  Okay.
 5    Q.  And the conference call took place on the 17th.
 6    A.  Okay.
 7    Q.  And on the 16th, you put out the first read report that you
 8    talked about.  Can I turn your attention to Government Exhibit
 9    1520, which is in your binder, but it's back a couple of tabs?
10    A.  Yes.
11    Q.  What is Government Exhibit 1520?
12    A.  It is an e-mail that I sent to Sammy on Wednesday, March
13    16.
14              THE COURT:  March what?
15              THE WITNESS:  March 16, 2005.
16    BY MR. BRAUN:
17    Q.  Is that the day between the 10K and the investor conference
18    call on the 17th?
19    A.  That is correct.
20              MR. BRAUN:  The government asks that this be received
21    into evidence, your Honor.
22              THE COURT:  Received.
23              (Government's Exhibit 1520 received in evidence)
24    BY MR. BRAUN:
25    Q.  Can you summarize your message to Mr. Levis?
```

03vWlev4                          Okusanya - direct

1   A.  Yes.  It's an e-mail I sent Sammy.  I wanted to confirm the
2   formula that the company used to calculate the discount rates
3   used to value the IOs.
4   Q.  And what is his response to you on the same date?
5   A.  He responds to me that my understanding of how the formula
6   is calculated is correct.
7   Q.  And can you actually read his response?
8           THE COURT:  Let's just look at your e-mail.  Just a
9   minute.
10          THE WITNESS:  Sure.
11          THE COURT:  What does your e-mail mean?
12          THE WITNESS:  My e-mail to Sammy was, again, when you
13  want to value the IOs, one of the things that you need is the
14  discount rate, and the company historically had used a formula
15  to calculate.
16          THE COURT:  They had used historically.
17          THE WITNESS:  A formula.
18          THE COURT:  Okay.
19          THE WITNESS:  To calculate what the discount rate they
20  would use.  I wanted to confirm from Sammy that that formula
21  was correct.
22          THE COURT:  Is that formula expressed in the e-mail?
23          THE WITNESS:  Yes.
24          THE COURT:  What was that formula?
25          THE WITNESS:  It says, I believe, the formula to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

03vWlev4                          Okusanya - direct

1   calculate the discount rate is the higher of the interest rate
2   on Fannie Mae 30 year net yield or ten-year treasuries, plus
3   300 basis points.
4               THE COURT:  Higher of?
5               THE WITNESS:  It's in the higher of these two numbers.
6               THE COURT:  What are the two numbers.
7               THE WITNESS:  The two numbers are what ten-year
8   Treasury yields are, which is an interest rate, and then what
9   Fannie Mae 30-year net yields are, which is another interest
10  rate.
11              THE COURT:  Comparison between 30-year net yield and
12  ten-year Treasury.
13              THE WITNESS:  Exactly.  Take the higher of those
14  number, add 300 basis points, or 3 percent, and that's the
15  discount rate that the company was going to use to calculate
16  the present value of the cash flows that you get for the IOs.
17              THE COURT:  All right.  Go ahead.
18              THE WITNESS:  And then Sammy responds to me:  "You are
19  right about the formula.  I am very busy, but relaxed.  Remind
20  people that I own over 2 percent (management 20 percent) of the
21  stock fully paid by my own capital, and I am not losing any
22  sleep over it.  Thanks for your help and looking forward to the
23  call and your roadshow with my kick-ass attitude."
24  BY MR. BRAUN:
25  Q.  Mr. Okusanya, in the e-mail, he indicates that he owns over

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
        03vWlev4                    Okusanya - direct
 1   2 percent and that management owns 20 percent?
 2   A.  That's correct.
 3   Q.  Can that be a significant factor for people in the
 4   investing community in looking at a company and its stock?
 5   A.  That's true.
 6   Q.  And in what way is that significant?
 7   A.  It's significant because typically, if management owns a
 8   large amount of the stock, the idea is their incentive
 9   structures are very aligned with shareholders because they also
10   want the stock to do well given they own so much of it.
11   Q.  When a member of senior management, such as Mr. Levis, if
12   he were to sell stock, is there anything that he would have to
13   do?
14   A.  Yes.  We talked earlier on that the SEC regulates public
15   companies, so what he would have to do is file a report with
16   the SEC that he did indeed sell stock.
17   Q.  And would that report be publicly available?
18   A.  Yes, it would be.
19   Q.  If there's a public report indicating that members of
20   senior management are selling their stock, can that also send a
21   signal to the investing community?
22   A.  Yes, it can.
23   Q.  What type of signal can that send?
24   A.  Just given management knows, are typically the ones who
25   know the most about the companies and they're insiders, what
```

402

03vWlev4                    Okusanya - direct

1    you see most investors do if there's meaningful selling in the
2    stock, people take that as a negative sign that something bad
3    is about to happen.
4                (Continued on next page)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

03VJLEV5                        Okusanya - direct
1    Q.  You meaning meaningful selling by management?
2    A.  Meaningful selling by management, correct.
3    Q.  Can you turn ahead now to Government Exhibit 1523.  Do you
4    recognize this document, Mr. Okusanya?
5    A.  Yes, I do.
6    Q.  What is 1523?
7    A.  1523 is also a report I was writing on Doral Financial on
8    March 23rd, 2005.
9    Q.  Do you know whether you ever completed an issued this
10   report?
11           If you need to take a few moments, I don't know if you
12   recognize whether it is a final issued report or not?
13   A.  I did not issue this report.
14   Q.  Did it nonetheless reflect some of your thinking at the
15   time?
16   A.  Yes, it did.
17           MR. BRAUN:  Your Honor, the government moves the
18   admission of 1523.
19           MR. SREBNICK:  One moment, your Honor.
20           (Pause)
21           MR. SREBNICK:  Your Honor, Judge under the 800 series
22   of Federal Rules of Evidence, we object.
23           THE COURT:  I don't see it.  What is the grounds for
24   admitting this?
25           MR. BRAUN:  We're not offering it for its truth.  We
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

```
     03VJLEV5                    Okusanya - direct
 1   are offering it for a reflection of Mr. Okusanya's thinking and
 2   analysis at the time.
 3           THE COURT:  You can ask him about his thinking and
 4   analysis, and if he needs to have his memory refreshed, but I
 5   think the objection is well taken.  As of the present moment,
 6   I'll sustain the objection.
 7   BY MR. BRAUN:
 8   Q.  Mr. Okusanya, do you recall whether or not --
 9           THE COURT:  Look, there is no reason why -- it is
10   marked for identification, and he can have it with him and he
11   can refer to it, but I am not going to receive it into evidence
12   right now.
13   BY MR. BRAUN:
14   Q.  Mr. Okusanya, did you continue covering and rating Doral
15   during this period of time?
16   A.  We had suspended coverage of the stock at that period of
17   time so I was not giving it an investment recommendation on the
18   name at that point in time.
19           THE COURT:  You had suspended covering the stock?
20           THE WITNESS:  That is correct.
21           THE COURT:  When did you do that?
22           THE WITNESS:  We suspended covering the stock two days
23   after we issued the "under review" report.
24           THE COURT:  Two days what?
25           THE WITNESS:  Two days after we issued the report
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

03VJLEV5                    Okusanya - direct
1  where we put the stock under review.  So I believe that report
2  was on the 17th of March, so we suspended it on the 19th of
3  March.
4  BY MR. BRAUN:
5  Q.  Do you recall what happened to the price of the stock
6  following that investor conference call on March 17th?
7  A.  Yes, the stock dropped even further.
8  Q.  Do you recall roughly where it was during the latter part
9  of March when you were drafting this report?
10  A.  The stock had probably dropped to the low 20's by then.
11  Q.  To what did you attribute that drop in stock price,
12  Mr. Okusanya?
13           MR. SREBNICK:  Objection.
14           THE COURT:  Overruled.
15  A.  Continued concern again about the valuation of the IOs and
16  the potential risk for further write-downs if interest rates
17  continued rising.
18  BY MR. BRAUN:
19  Q.  Did you form any view yourself as to what Doral would need
20  to do in order to address those concerns that you were aware
21  of?
22           THE COURT:  Wait a minute.  Wait a minute.  Let's make
23  sure the defense lawyer hears the question.  Can the reporter
24  read it?
25           MR. SREBNICK:  I have it, Judge, right here.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

03VJLEV5                    Okusanya - direct

1               THE COURT:  I didn't know whether you were objecting
2    or not?
3               MR. SREBNICK:  No objection, Judge.
4               THE COURT:  All right.
5               THE WITNESS:  I did form an opinion about that.
6    BY MR. BRAUN:
7    Q.   What was your view in that regard?
8    A.   My view was there was still a lot of confusion about the
9    valuation of the IOs and management needed to provide more
10   transparency to get investors comfortable with the valuation.
11   Q.   How could it do that, Mr. Okusanya?
12              Were there particular things that you thought would
13   need to be done?
14   A.   There were several options that the management team could
15   have used to get people comfortable.
16              What I thought would be the right thing to do or could
17   be a way to do it is either provide again investors with these
18   independent valuations so people can actually reference those
19   as credible sources of valuation, or they could actually
20   attempt to sell the IO strips as well and actually monetize it
21   so if there is a buyer for these things at a certain value, you
22   know exactly what they're worth.
23   Q.   (Pause)  In this draft report, Mr. Okusanya, did you
24   discuss your reaction to the part of the 10K that showed the
25   effects on the IO valuation due to rising interest rates?

03VJLEV5                          Okusanya - direct
1   A.  Yes, I did.
2   Q.  Do you recall what you said in that regard?
3           THE COURT:  Look, I sustained an objection to the
4   document.  I said he can testify as to, you know, what he
5   heard, what he did and to some extent he can testify as to his
6   views and conclusions perhaps, but certainly if I sustain an
7   objection to the document, I wouldn't want the document read.
8           MR. BRAUN:  It was not my intention to do that, Judge.
9   Thank you.
10          MR. SREBNICK:  I can simplify.  I will withdraw the
11  objection to the admissibility of that.
12          THE COURT:  Fair enough.  We are all clear on that.
13          MR. SREBNICK:  Thank you.
14          THE COURT:  Thank you.  Go ahead.
15  Q.  Mr. Okusanya, can I turn you to the first page?
16  A.  Yes.
17  Q.  Does it indicate at the top it was suspended?
18  A.  Yes, it does.
19  Q.  Is there something you say on the first page about Doral's
20  hedging?
21  A.  Yes, there is.
22  Q.  Can you read that paragraph there under your third bullet
23  point.
24  A.  The third bullet point, the title says, "Successful hedging
25  program key to managing earnings down side."
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

408

03VJLEV5                        Okusanya - direct

1              It says, "We believe the key to managing increased IO
2   and interest risk exposure at Doral will be a successful
3   hedging program.  We believe Doral was underhedged in 2004, and
4   expect 75 to $100 million in charges as the company adjusts its
5   hedging positions."
6   Q.  Was this new conclusion you reached since the filing of the
7   10K?
8   A.  That's correct.
9   Q.  What was it about the 10K that led you to its conclusion?
10  A.  What led me to the conclusion was the sensitivity analysis
11  that the company had put in the 10K about just how large a
12  write-down you can get from the IOs if interest rates kept
13  increasing.
14  Q.  Can you turn to the next page of your report.
15  A.  Yes.
16  Q.  Can you read in the top paragraph from the word,
17  "unfortunately."
18  A.  It says, "Unfortunately, we do not believe the conference
19  call held on March 17th helped alleviate investor concerns.  As
20  a result, the stock has lost about 45 percent of its value
21  since the release of the 10K."
22  Q.  Do you know why "45" is shaded?
23  A.  Yes, I do know why it was shaded.  It was shaded because I
24  hadn't released the report yet and so the number would change
25  by the time I actually had a release date.

409

03VJLEV5                          Okusanya - direct

1  Q.  Can you continue.
2  A.  "We believe that the main investor concerns about the
3  company are:  1.  The sustainability of IO assumptions;
4             2.  Potential for more IO write-downs;
5             3.  Overall interest rate sensitivity;
6             4.  Slowing loan origination; and
7             5.  Potential negative EPS, earnings per share, impact
8  from new local tax legislation.
9  Q.  What is the heading that appears underneath that?
10  A.  The heading says, "Current stock price gives no value to
11  interest-only strips."
12  Q.  That current stock price, is that the price of stock was
13  trading at at the time?
14  A.  Yes.
15  Q.  Can you read in the paragraph that begins from our report
16  issued on March 9th, about halfway down there is a sentence
17  that begins, "We expect."
18  A.  That sentence says, "We expect that the market will
19  continue to give zero value to Doral's gain on sale business
20  model until management can provide clear evidence that the
21  company's IO strips are fairly valued."
22  Q.  Can you continue.
23  A.  "We believe management can only achieve this by:
24             1.  Providing more transparency into the assumptions
25  used internally by the company to value is IO strips;

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

03VJLEV5                        Okusanya - direct

1             2.  Providing transparency into the external
2   valuations done by independent third parties on the IO strips;
3   or
4             3.  Selling some or all of the IO strips in the MBS
5   market to establish a market price.
6   Q.  What is the MBS market?
7   A.  The MBS market is a mortgage-backed securities market.
8   Q.  Can you skip ahead to Page 10 -- actually, Page 9 of your
9   report.
10  A.  Yes.
11  Q.  Did you essentially restate that sensitivity table showing
12  the effect on the IO values as interest rates rise that had
13  been set forth in the 10K?
14  A.  Yes, I did.  That is what is identified as Chart 6 there.
15  You can see it's sourced as a company report, the company
16  report being the 10K.
17  Q.  Can you read what is underneath that chart, your analysis
18  there starting below the chart.
19  A.  Yes.  It says "These amounts are significantly above our
20  expectations as at third quarter of 2004, and are also a
21  significant contributor to investor anxiety about the company's
22  IO strips."
23            "We believe that the following statement from the 10K
24  provides insight into why the potential for IO write-downs are
25  much larger than we previously anticipated."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

03VJLEV5                        Okusanya - direct

1           "Generally, the loans sold (which generates the IO
2     strips (are subject to interest rate caps set at or below the
3     Weighted Average Coupon) less the servicing fee on the pools of
4     loans and to a lesser extent based on a spread above the
5     initial contractual pass-through rate at the time of sale,
6     which does not exceed the waited average coupon on the loans."
7     Q.  What are you quoting from there?
8     A.  I am quoting from the 10K released early on in March.
9     Q.  You testified about that language previously, correct?
10    A.  Yes, I did.
11    Q.  Can you continue.
12    A.  "It thus appears that most of the caps on the spread earned
13    from the sale of nonconforming loans are set closer to the WAC
14    or average mortgage rate on the loans underlying the IO strips,
15    rather than a spread above the initial contractual pass-through
16    rate at the time of sale (typically around 250 basis points).
17    This has the effect of not fully protecting the company's IO
18    strips from impairment until LIBOR rates are closer to
19    around -- about 7 percent, rather than our previous estimate of
20    4 percent.
21           "Our previous estimate was based on a 250 basis points
22    spread above our estimate of the average LIBOR rate at which
23    most of the nonconforming loans underlying the IO strips were
24    originated.  For more details, please refer to our report from
25    March 9th, 2005 entitled after digging into issues, reiterating

03VJLEV5                    Okusanya - direct

1   our buy 2 rating."
2   Q.  That is the same March 9th report you described in your
3   testimony?
4   A.  That is correct.
5   Q.  Mr. Okusanya, can you turn to pages 16 and 17 of your
6   report.
7   A.  Yes.
8   Q.  Can you describe generally the process that you're going
9   through to come to this table at the top of Page 17.
10  A.  On Page 17, what I was basically doing in this report is
11  given the IOs generate -- we are talking about gain on sale --
12  what I was doing with the model was trying to figure out what
13  the gain on sale margins had been in 2004, and then based on
14  that number try to forecast what I thought the gain on sale
15  margins would be in 2005, apply that to a forecast of what I
16  thought, and use that to forecast what I thought the earnings
17  for the company could be in 2005, so I was doing a forward
18  forecast of what I thought the earnings of Doral could be a
19  year later.
20  Q.  Based on your analysis, Mr. Okusanya, what effect would
21  further impairments on the IOs have on the earnings of the
22  company?
23  A.  Further IO impairments would reduce earnings or profits of
24  the company.
25  Q.  To what degree?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

413

03VJLEV5                        Okusanya - direct

1  A.  To a significant degree just given so much of historical
2  earnings had come from gain on sales as a result of the IOs.
3  Q.  Towards the bottom of Page 17, in the paragraph there that
4  continues on to 18, can you read from where it says we do not
5  expect Doral to switch its business model.
6  A.  Sure.  It says, "We do not expect Doral to switch its
7  business model from gain on sale to a whole loan sale model any
8  time soon."
9  Q.  What would be the difference between those two models?
10 A.  When the whole loan -- with the whole loan sale model, you
11 don't end up with a gain on sale.
12 Q.  What are you doing with a whole loan model?
13 A.  You're just selling the whole thing.  You're not holding
14 onto any pieces of it.  You're not holding onto the principal,
15 you're not holding onto any part of the interest.  You sell
16 everything off.
17 Q.  All right.  Can you continue.
18 A.  This is because a whole loan sale model limits the ability
19 to sell loans to the local commercial banks at a variable
20 pass-through rate.  Local commercial banks make up about 45
21 percent of the buyers of Doral's loans, and require a variable
22 pass-through rate for their as set-liability matching
23 requirements.
24          Most of these banks are funded short, and thus desire
25 variable rate assets on their balance sheets.  Doral would thus

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

414

03VJLEV5                          Okusanya - direct

1   be a very large and important part of its seller base if it
2   converted to a wholesale loan model.  It is also unclear at
3   this point how easy it would be to sell Doral's nonconforming
4   loans to GNMA and GSE's.
5   Q.  Can you explain what your point is here as far as the other
6   banks in the equation.
7   A.  Sure.  The reason why this product -- one of the reasons
8   why this product was very popular in Puerto Rico was if you
9   look at a typical bank in Puerto Rico, a lot of their funding
10  costs are variable rate costs, and so as since everyone was
11  expecting interest rates to go up, their overall funding costs
12  were going up.
13          But in Puerto Rico many of the loans that banks have
14  in Puerto Rico are fixed rate loans, and so their yields on
15  their assets were fixed.  But all their funding costs were
16  going up, so they were going to see a compression of their
17  earnings.
18          What they all desired was to have new assets on their
19  books that had variable rates so as interest rates are going
20  up, yes, your funding costs are going up, but what you're
21  earning on these assets are also going up, too, so they protect
22  your margins.  So Doral was offering them such a product by
23  telling them I'll sell to you this loan pool that has this
24  variable pass-through rate.
25  Q.  Mr. Okusanya, we talked a little while ago about a March
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

03VJLEV5                          Okusanya - direct

1  16th e-mail between you and Sammy Levis in which he made
2  reference to a road show he was looking forward to.
3  A.  Correct.
4  Q.  What is this kind of road show?
5  A.  Yes, a road show is usually an event that an investment
6  bank like UBS where I worked would host a management team and
7  take the management team on the road to meet either existing or
8  potential investors so they could talk about their companies
9  and the outlook of their companies.
10  Q.  Had you discussed with Mr. Levis any plan to do such a road
11  show with him during this period of time?
12  A.  Yes, I had, we were planning to do a road show in early
13  April of 2005.
14  Q.  When had you been discussing those plans from, how far back
15  did those discussions go?
16  A.  Maybe roughly four to six weeks before.
17  Q.  Did you, in fact, continue with the plan and go on the road
18  show with Mr. Levis?
19  A.  Yes, we did.
20  Q.  Where did you go?
21  A.  It was a five-day road show.  The plan was to do a couple
22  of cities in the United States and we were also going to go to
23  Europe as well.
24  Q.  Did you complete that process?
25  A.  No, we didn't.  We completed the U.S. leg of the road show,

03VJLEV5                    Okusanya - direct

1   but just as we were about to head to Europe, Sammy informed me
2   that he had to cancel the rest of the road show.
3            THE COURT:  When was this?
4            THE WITNESS:  The road show was from April 4 to April
5   8th of 2005.
6   BY MR. BRAUN:
7   Q.  A short time after that did any significant news come out
8   of Doral?
9   A.  Yes.
10  Q.  Were you still following the company at the time?
11  A.  We were suspended on the stock, but I was still following
12  the company.
13           THE COURT:  You were personally following.  Is that
14  right?
15           THE WITNESS:  That's correct.
16  BY MR. BRAUN:
17  Q.  Were you still following it in connection with your work at
18  UBS?
19  A.  Yes, I was.  The intention, when a stock goes suspended,
20  you still follow the name, hoping on the idea is if it ever
21  gets to the point where you're comfortable with your thesis
22  again, you reinstate coverage.
23           THE COURT:  Who actually sponsored the road show?
24           THE WITNESS:  The road show was sponsored by UBS.
25  BY MR. BRAUN:

417

```
        03VJLEV5                    Okusanya - direct
 1      Q.  Could I turn your attention to Government Exhibit 206.  It
 2      should be in your binder.
 3      A.  Yes.
 4      Q.  Do you recognize it?
 5      A.  Yes, I do.  This is a press release from Doral Financial.
 6              THE COURT:  I am sorry?  What exhibit?
 7              MR. BRAUN:  It is No. 206, your Honor.  It has been
 8      marked for identification.
 9              MR. SREBNICK:  Judge, this is a matter that we raised
10      pretrial, an objection.  We would like to preserve that
11      objection.
12              THE COURT:  Say that again.
13              MR. SREBNICK:  We would like to preserve our objection
14      to Government Exhibit 206.
15              THE COURT:  All right.  Overruled.
16              MR. BRAUN:  Has the document been received into
17      evidence.
18              THE COURT:  Yes, it is.
19              (Government Exhibit 206 received in evidence)
20      BY MR. BRAUN:
21      Q.  When did this press release come out, Mr. Okusanya?
22      A.  This press release came out on April 19th, 2005.
23      Q.  Do you recall seeing it at the time?
24      A.  Yes, I do.
25      Q.  Can you read the first paragraph, please.
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

418

```
03VJLEV5                    Okusanya - direct
```
1   A.   The first paragraph says, "Mr. Salomon Levis, chairman of
2   the board and chief executive officer of Doral Financial
3   Corporation, today announced that after consulting with various
4   financial institutions and other firms with experience in
5   valuation issues, the company has determined that it is
6   appropriate to correct the methodology used to calculate the
7   fair value of its portfolio of fueling rate interest-only
8   strips, IOs.  The company's preliminary estimate is that this
9   correction will result in a decrease in the fair value of its
10   floating rate IOs of between 400 million to 600 million as of
11   December 1st, 2004."
12              THE COURT:  December 31.
13              THE WITNESS:  December 31st, I am sorry, 2004.
14              The required adjustment cannot be taken as a charge in
15   current period earnings but instead will have to be reflected
16   in those periods during which the origination of floating rate
17   IOs had a material impact on the company's financial
18   statements.
19              The after tax effect of the required adjustments as of
20   December 31st, 2004 is estimated to range between 290 million
21   to 435 million.  The company has not yet determined how such
22   net impact will be distributed among the affected periods.  The
23   required charge to income will be a noncash item and will not
24   reduce the amount of the company's cash and cash equivalence as
25   of December 31st, 2004.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

419

```
03VJLEV5                    Okusanya - direct
```

1    Q.  Mr. Okusanya, what is a restatement?  What are they
2    announcing here?
3    A.  A restatement basically is an acknowledgement that there
4    were some errors in the accounting, in the financials that the
5    company has put out and you need to correct those errors.
6    Q.  According to this announcement, what was the reason why
7    Doral was going to have to restate its financials in the range
8    of four to six hundred million dollars?
9    A.  The reason given in the press release was the company
10   determined that it had to correct the methodology it was using
11   to calculate the value of the IOs.
12   Q.  Can you look at the bottom of the third paragraph, about
13   four lines up from the bottom there is a sentence that begins,
14   "The company has historically used."
15   A.  It says, "The company has historically used the contractual
16   or actual 90-day LIBOR rate at the end of each reporting period
17   to compute the value of its IOs and gain on sale.  The use of
18   actual 90-day LIBOR rates instead of the forward LIBOR curve to
19   value its floating rate IOs can have either a positive or
20   negative impact on valuation depending on the relationship of
21   existing 90-day LIBOR rates to the forward LIBOR curve at the
22   time of valuation."
23             THE COURT:  Ladies and gentlemen, we'll recess this
24   evening, and tomorrow we'll start promptly at 10:00 o'clock,
25   10:00 o'clock, and I'll hold the lawyers.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

420

03VJLEV5                    Okusanya - direct

```
 1              (Jury excused)
 2              THE COURT:  You may step down.  Thank you.
 3              THE WITNESS:  Thank you.
 4              THE COURT:  Sit down, please.  I would like to talk
 5    about that last exhibit.  My memory is that the government has
 6    always taken the position and still takes the position that
 7    there was nothing wrong with the method and that the government
 8    is not seeking to use Exhibit 206 to show that there was
 9    something wrong with the method.
10              MR. BRAUN:  I would like to wait until Mr. Okusanya is
11    out.
12              (Pause)
13              THE COURT:  All right.  Right?
14              MR. BRAUN:  Well, what we have said to the court is
15    not whether the method is not the fraud, that the company did
16    not commit a fraud by using a particular method.  That is not
17    the theory of our case.  What is important for the government
18    is what the defendant said about what the company was doing to
19    folks like Mr. Okusanya and then what was revealed later on
20    about what it had actually been doing.
21              So, for example, it is significant in the government's
22    view that if Mr. Okusanya, explained in his testimony, back in
23    January of 2005 when he was initiating coverage of Doral, he
24    had some conversations with Sammy Levis, and during those
25    conversations he was led to believe that the LIBOR rates that
```

421

03VJLEV5                         Okusanya - direct
1    the company was using to evaluate its interest-only strips was
2    not the LIBOR rate that existed at the time but that in order
3    to be conservative -- and I am sure your Honor recalls this
4    testimony -- the company had used a LIBOR of 4 percent or in
5    the neighborhood of 4 percent which was ahead, well ahead of
6    where interest rates were at the time.
7             So they had looked forward to say --
8             THE COURT:  Wait a minute.  My memory of the evidence
9    is that this witness said Mr. Levis told him that the reason
10   for a $97 million write-down was the use of 4 percent as a
11   projected LIBOR rate.
12            MR. BRAUN:  Correct.
13            THE COURT:  Okay.  Now, where do you go from there?
14            MR. BRAUN:  We go from here to the news reported in
15   this press release that they have to take an impairment because
16   they've determined that they need to change their method.
17            Again we are not saying the method is the fraud, but
18   it is important from the government's perspective that in the
19   course of announcing this restatement, that they say --
20            THE COURT:  Can you put it on the screen again?
21            MR. BRAUN:  Yes.  Can you put up the language we were
22   just looking at.
23            (Pause)
24            MR. BRAUN:  Sorry, Judge.  We shut down the computer
25   and we're waiting for it to come back up.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

422

03VJLEV5                          Okusanya - direct
1              THE COURT:  That's all right.
2              (Pause)
3              THE COURT:  You focus on what you believe is of
4     interest to the government.
5              MR. BRAUN:  There is a few reasons why this is of
6     interest to the government, your Honor, and I would like to be
7     able to mention several reasons.
8              At the bottom of the third paragraph, and I am
9     starting about four lines up from the bottom, and they're
10    saying the company has historically used the contractual or
11    actual 90-day LIBOR rate at the end of each reporting period to
12    compute the value of its IOs.
13             THE COURT:  Let me look at that.
14             MR. BRAUN:  Sure.
15             (Pause)
16             THE COURT:  It says the use of actual 90-day LIBOR
17    rates instead of the forward LIBOR curve to value its floating
18    rating IOs can have either a positive or negative impact on
19    valuation depending on the relationship of existing 90-day
20    LIBOR rates to the forward LIBOR curve at the time of
21    valuation.  I guess that would be pretty obvious.  What is the
22    government interested in?
23             MR. BRAUN:  With this witness because there are
24    different reasons we are interested in this announcement for
25    different witnesses, for Mr. Okusanya what is relevant here,
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

03VJLEV5                    Okusanya - direct

1   what is important here to the government and what we believe
2   what Mr. Okusanya will explain is that when he is reading the
3   company has historically used the contractual or actual 90-day
4   LIBOR rate at the end of each reporting period to compute the
5   value of its IOs and gain on sale, and then says the use of
6   actual 90-day LIBOR rates instead of the LIBOR curve, which is
7   the projection of where interest rates are going to go, that
8   this is very different than what he has been told going back to
9   January of '05, which as your Honor just summarized, he was
10  told they were using 4 percent and that they were being
11  conservative because they were getting ahead of where interest
12  rates were expected to go.
13          He has further explained that back during that period
14  of time, your Honor, interest rates were somewhere above 2, but
15  had not gone certainly to 4 and that most projections did not
16  have them going that high.  So he believed that Doral was, as
17  it told him and as is reflected in his reports, being
18  particularly conservative with its interest rate assumptions
19  and that the 97 a half million dollar impairment was caused
20  because Doral had taken an opportunity, especially given that
21  large one-time tax benefit it had, to be particularly
22  conservative in its IO valuations and to be conservative by
23  using an interest rate that was well ahead and well above where
24  interest rates were at the time.
25          What is being said here, what he understands is being

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

03VJLEV5                      Okusanya - direct
1    said here and what other evidence that we'll present later will
2    make clear as well, that was not the method that Doral had been
3    using.  The method --
4               THE COURT:  What was not the method?
5               MR. BRAUN:  What Doral had been doing, your Honor, was
6    not projecting ahead in any way what interest rates were going
7    to be in order to evaluate IOs.  They weren't doing that in
8    January of 2005 as they told Mr. Okusanya.  That was false.
9    They weren't doing that ever.
10              They were changing their method at this time to take
11   into account future, expectations of future interest rates.  Up
12   until this time what they were doing was taking the LIBOR rate
13   that existed as of a particular quarter, as of a particular
14   point in time during the quarter when they were evaluating this
15   asset on a quarterly basis.
16              Let's say, for example, September 2003, LIBOR is at
17   about 2, the 30-day LIBOR, excuse me, the three month or 90-day
18   LIBOR we were talking about is about 2.  Under Doral's method,
19   which is sometimes called the spot rate method, they're saying
20   LIBOR is at 2 now, we are going to plug 2 into our internal
21   model and we are going to assume that LIBOR is not going to
22   change at all into the future.
23              THE COURT:  Say the last again.  I didn't quite get
24   it.
25              MR. BRAUN:  If LIBOR is at 2 in September of 2004 and
                      SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

425

03VJLEV5                        Okusanya - direct
1   that is when they're doing their valuation, they're going to
2   take the relevant LIBOR number, 90-day or three month LIBOR,
3   what is it right now -- 2, for example -- and that's the number
4   they're going to plug in to determine the value of their
5   interest-only strips.
6           How much are these IOs going to be producing over
7   their anticipated life if interest rates remain the way they
8   are at this moment in time, at this spot rate of 2 percent?  If
9   that stays right where it is and doesn't go up or down, what
10  are the IOs going to be bringing in or their anticipated life?
11  That was the method the company was using.  That was the
12  company, that was the method the company used up until the time
13  when they decided that they had to change their method.
14          THE COURT:  What is the date of this?
15          MR. BRAUN:  This is April 19th of 2005 and they're
16  saying we have to restate our income because we've decided we
17  need to change our method.  What we had been doing was --
18          THE COURT:  Show me -- wait a minute.  It has gone
19  blank again.  Let me see what they say about the change, that
20  they're going to contend.  Where is that language?
21          MR. BRAUN:  That is in the top paragraph.
22          THE COURT:  Where is the language?
23          MR. BRAUN:  Today announced --
24          THE COURT:  Yes, right, right.
25          (Pause)
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

03VJLEV5                          Okusanya - direct

```
 1               THE COURT:  Where do they say what this change is?
 2               MR. BRAUN:  They say they're changing to the --
 3     they're saying --
 4               THE COURT:  Is this the paragraph?
 5               MR. BRAUN:  Here it is at the bottom.  In the top
 6     they're saying we have to change our method and here are the
 7     consequences.  In Paragraph 3 the language we were looking at a
 8     moment ago, they're saying what they were doing historically
 9     and what they're going to be doing in the future.
10               THE COURT:  All right.  Just a minute.
11               MR. BRAUN:  Yes.
12               (Pause)
13               THE COURT:  I guess the meaning of this is they're
14     going to start using the forward LIBOR curve.
15               MR. BRAUN:  That's right.  Why it is relevant to
16     Mr. Okusanya is the notion they're using a current interest
17     rate as of a particular reporting period using LIBOR at a
18     current time period instead of some type of forecast like they
19     were describing to him in January of '05, it is quite
20     inconsistent and it makes a tremendous difference.
21               THE COURT:  Well, the thing is -- look, I don't want
22     to argue the case at all, but the 4 percent projection or
23     whatever you want to call it was the basis for the write-down,
24     and I guess it would be implicit that something else was done
25     before the write-down and that --
```

427

03VJLEV5                        Okusanya - direct
1           MR. BRAUN:  What they could have told Mr. Okusanya
2   back in January is that they were using this spot rate
3   methodology and that they were taking current interest rates in
4   each quarter and just plugging them in and assuming they
5   wouldn't change.  That is not in and of itself against the law.
6   That is not in and of itself a fraud.
7           What is a fraud is all of the deception, all right?
8           THE COURT:  My point is, it is not useful to probably
9   get into this, but as long as it has come up, and this will be
10  a jury question, not a question for me, but I don't think you
11  can interpret the witness' testimony saying anything more than
12  that write-down, the January write-down which was as of the
13  year-end was the result of projecting a 4 percent.
14          MR. BRAUN:  That's right.
15          THE COURT:  And that is certainly not the same thing
16  as saying we used it each and every quarter in 2004 as we were
17  going along.  It was just about the write-down.
18          MR. BRAUN:  That's correct.  But the write-down, it
19  will become clear, was not a result of them looking forward,
20  what they were doing to get 4 percent or anything else.  What
21  they were doing at the end of '04 was the same thing they had
22  been doing historically, which is using LIBOR at the time they
23  were doing their valuation and that impairment they told you
24  resulted from using a particularly conservative interest rate
25  assumption was not as a result of that at all.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

03VJLEV5                          Okusanya - direct
 1              THE COURT:  You're not getting my point, and I think
 2     there has to be something said to the jury to clarify what use
 3     is being suggested by the government for this exhibit.
 4              MR. BRAUN:  I am sorry to interrupt.
 5              THE COURT:  If the government is contending that prior
 6     to this exhibit Mr. Levis had always said in each and every
 7     quarter of 2004 and in the regular calculations, if he had said
 8     well, we are using a projection of 4 percent, of course this
 9     would be inconsistent with that because this is saying we did
10     not use a projection, we're changing to a projection.
11              But there is no testimony that Mr. Levis told the
12     witness that they were regularly using a projection.
13              MR. BRAUN:  That is true, but he did tell them that is
14     what resulted in the write-down.
15              THE COURT:  The write-down only.
16              MR. BRAUN:  The write-down is, of course, a result of
17     the company's valuation of the asset.  So if the company had
18     been evaluating the asset at the end of 2004 by taking LIBOR at
19     the time, which is exactly what they were doing, your Honor,
20     and we'll demonstrate that.
21              THE COURT:  In other words, you're saying, the
22     government contends the $97 million write-down was not based on
23     a 4 percent projection but was based on the LIBOR at that time?
24              MR. BRAUN:  That is what they used in their quarterly
25     evaluation and that is why --

03VJLEV5                          Okusanya - direct

1             THE COURT:  What quarterly evaluation?
2             MR. BRAUN:  They evaluate this asset every quarter.
3             THE COURT:  You're saying they used the LIBOR rate at
4     the time each and every quarter and are you saying that they
5     used it in the $97 million write-down?
6             MR. BRAUN:  Yes, your Honor.
7             THE COURT:  Well, then, that would be inconsistent
8     with this, of course.
9             MR. BRAUN:  That is our view.  It is also, this
10    announcement, your Honor, they decided to change to this method
11    is relevant for reasons that are unrelated to Mr. Okusanya.
12            Specifically one of the external valuations, the one
13    that Popular Securities was doing back in 2003, the evidence
14    will show Popular Securities decided on its own that when they
15    were going to evaluate Doral's IOs, they needed to move to the
16    forward curve.  They needed to stop assuming the interest rates
17    weren't going to move and they needed to do precisely what
18    Doral decided in '05 was the better way to go.
19            They're supposed to be independent, right?
20            When they tell Doral we've decided that we need to
21    start incorporating anticipated future increases in interest
22    rates which are really starting to occur now, interest rates
23    are projected to rise, and in 2004 they began to rise, what Mr.
24    Levis and his father say in response to Popular Securities is
25    no, you should know that we are protected from interest rates,

430

03VJLEV5                        Okusanya - direct

1  we are protected from increases in interest rates because of
2  caps and hedges that we have, and you should, in doing your
3  model, if you're going to use the forward curve, you need to
4  understand that our pass-through, the pass-through rate we are
5  going to be providing to the other banks, this red portion of
6  the illustration here, what they said to Popular Securities and
7  what Popular Securities did, your Honor, was to assume that
8  this could not get any higher than 3.4 percent, and so it
9  stopped.
10          Popular Securities, when they were using the forward
11 curve, simply cut it off and they basically turned into a spot
12 rate of sorts where the pass-through rate could not rise above
13 3.4 even if LIBOR kept pushing up.  And so what is significant
14 about Doral's decision to change its method in 2005, your
15 Honor -- by the way, Popular Securities, as the court will
16 hear, was simply accepting the defendant's  representation that
17 that was the case because they didn't think they were
18 independent.  They thought they were just helping Doral do what
19 Doral wanted them to do and that is what they went forward and
20 did.
21          What is significant about 2005 when they decide to
22 change their method is that this write-down of 400 to $600
23 million, if they had really been doing what they were saying
24 they were doing, which is to take their own valuation, compare
25 it to independent valuations and take the lowest one, if they

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

431

03VJLEV5                    Okusanya - direct
 1   had just let Popular Securities do what it wanted to do, then
 2   this 400 to $600 million restatement, it just wouldn't have
 3   happened because Popular Securities would have been coming out
 4   there all along.
 5           If they wanted to take the lowest of the three, that
 6   is what they would have had to do.
 7           THE COURT:  All right.  It seems to me, and I
 8   certainly want to hear from the defense lawyer, but it seems to
 9   me that something has to be said about some degree of
10   limitation on the significance of this exhibit because a juror
11   could easily focus on the paragraph which talks about a
12   correction.  Can we go back to the first paragraph.  (Pause)
13           It says that it is appropriate to correct the
14   methodology.  Now, that could be taken by the jury to mean that
15   the methodology used before was incorrect, and the government
16   doesn't contend it was incorrect and unlawful.  The government
17   doesn't contend that.
18           MR. BRAUN:  There is a difference between incorrect
19   and unlawful.  We are not going to stipulate it is correct
20   because people concluded it wasn't and that is important, but
21   we are not --
22           THE COURT:  Wait a minute.  We have to wind this up.
23           MR. BRAUN:  Sure.
24           THE COURT:  The jury could misconstrue what is
25   relevant to them about this document.  I want to hear from the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

03VJLEV5                      Okusanya - direct

1   defense lawyer, but my suggestion is this:  I would simply say
2   what the government has said to me, and that is the government
3   doesn't contend that it was wrongful for Doral to use one
4   method versus another method.
5           What the government contends is that there were
6   misrepresentations about the method used.  That is about all I
7   can propose to say.
8           MR. BRAUN:  Sure.  The government doesn't oppose
9   something like that.  We would be happy to offer something.
10          THE COURT:  We had this long conversation.  Yes, sir.
11          MR. SREBNICK:  Mr. Srebnick on behalf of Mr. Levis.
12          THE COURT:  All right.
13          MR. SREBNICK:  If I can ask that we all take a look at
14  Government Exhibit 6204, the 10K that was published a month
15  earlier.  If I can get the cooperation of the government table,
16  it would be Page 38 of Government Exhibit 6204, the paragraph
17  that begins with the words, "To determine the fair value."
18          I think the jury has already heard from a previous
19  exhibit that Doral disclosed that it was using a static model,
20  not the forward yield curve.  That was the announcement made by
21  Doral in March through the 10K.
22          To the extent that the government --
23          THE COURT:  What language?
24          MR. SREBNICK:  In the middle of the paragraph, it
25  says, "In addition to these two independent valuations, the

433

03VJLEV5                    Okusanya - direct
1    company prepares an internal static cash flow model that
2    incorporates internally-generated prepayment and discount rate
3    assumptions and an expected retain interest rate spread based
4    on three-month LIBOR rates at the close of the reporting
5    period."
6            So the disclosure is made in this document what the
7    model is that Doral had been using.  To the extent that the
8    government wants to say that that disclosure is inconsistent
9    with what Mr. Okusanya understood Sammy Levis to have told
10   Mr. Okusanya, the government has proven that point through this
11   exhibit.
12           The next exhibit that the government is trying to
13   introduce is the one that then uses the offending language, in
14   our opinion, about incorrect methodology, hundreds and millions
15   of dollars of writeoffs as a result of those "errors" to use
16   the witness' terminology.
17           Is the court following me?
18           THE COURT:  I do.
19           MR. SREBNICK:  So I think that the government's
20   Exhibit No. 206 is just inflaming the jury by highlighting the
21   impact of the change in the methodology and sending the message
22   to the jury that the spot rate methodology was wrong, and that
23   is why we had objected pretrial, and we ask the court revisit
24   that issue.  It may be too late given the testimony, in which
25   case we would ask for a mistrial.  In any event, that was the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

03VJLEV5                       Okusanya - direct

1  point, the government has tried to use this --
2              THE COURT:  Well, look, really this exhibit and
3  testimony should not be in.  I think I can strike it and all.
4  I don't have to grant a mistrial.
5              If the write-downs really come from a change in
6  methodology, I think what I've got to ask you to do right now,
7  does somebody have literally a physical copy of that Exhibit
8  206?  Do I have it in the book?
9              MR. BRAUN:  Yep.
10             THE COURT:  Now, look, what I wish you would do is to
11 just take -- have you a got a yellow highlighting pencil or
12 something and highlight what you believe is relevant in this
13 document for the jury.
14             MR. BRAUN:  It will take us a second to read through
15 it, Judge.  We don't want to make a mistake.
16             THE COURT:  That's all right.
17             (Pause)
18             MR. BRAUN:  We are highlighting the document now,
19 Judge.
20             THE COURT:  Okay, please.
21             MR. BRAUN:  Briefly in response to --
22             THE COURT:  Well, look, look, why don't you finish
23 highlighting it and then why doesn't Mr. Srebnick come up and
24 we'll all look on the highlighted and we'll mark that as a
25 court exhibit or whatever you want to do.  Whenever you're

435

03VJLEV5                       Okusanya - direct

1   finished with the highlight?
2              MR. BRAUN:  Yes, we are done.
3              (At the sidebar)
4              (Pause)
5              THE COURT:  Well, the problem is you've got the whole
6   first paragraph highlighted, and that is -- let's just go
7   through line by line.  It is hard to read.
8              "The chairman today announced that after consulting
9   with various financial institutions and other firms with
10  experience and so forth, the company has determined that it is
11  appropriate to correct the methodology used to calculate the
12  fair value of its portfolio of IOs."  I am skipping a little
13  bit.
14             Now, that is exactly by itself, that would be without
15  an explanation, standing by itself, that would be misleading to
16  the jury.
17             Let's go to the next sentence.  "The company's
18  preliminary estimate is that the correction will result in a
19  decrease of the fair value of the floating rate IOs between 400
20  million and 600 million as of December 31, 2004."  Without
21  explanation, that would be misleading to the jury.
22             Let's go on.  "The required adjustment cannot be taken
23  as a charge in the current period," and so forth, but instead
24  it talks about the timing of the charge.  I don't see how that
25  is of any possible relevance to the case.

436

03VJLEV5                        Okusanya - direct
 1          Then it talks about the after-tax effect as being so
 2   many millions range.  The company has not yet determined how
 3   such impact will be distributed among the affected products.
 4   That is not very relevant.
 5          The requests to charge will be a noncash, it won't
 6   affect the cash.  That is of nil importance.
 7          Look, I don't see anything in here that is not
 8   misleading to the jury without explanation, and Mr. Srebnick
 9   was quite right in calling our attention to the fact that the
10   10K does say that what they've been doing is using the current
11   LIBOR.  So it seems to me the defense is really right.
12          MR. BRAUN:  May I have a chance, your Honor?
13          THE COURT:  I guess you can have a chance.
14          MR. BRAUN:  A couple of things.  With respect to this
15   particular witness, Mr. Srebnick may have his argument as to
16   why Mr. Okusanya should have read the 10K in the manner that he
17   has described, but as the next document we were about to get to
18   shows, that is not, in fact, what happened here.  Mr. Okusanya
19   did not read the 10K in the way Mr. Srebnick has, but he did
20   react to this document.
21          THE COURT:  Now, let me interrupt you.
22          MR. BRAUN:  Yes.
23          THE COURT:  I'll come back to you.  This, I need a
24   quick clarification of what the government is claiming.  What
25   is the period of time over which you claim the defendant made

```
         03VJLEV5                    Okusanya - direct
 1       his misrepresentations?  What is it?
 2                MR. BRAUN:  It is from 2001, and those
 3       misrepresentations relate to a part of the case you haven't
 4       heard yet.
 5                THE COURT:  Of course, of course.
 6                MR. BRAUN:  They relate to misrepresentations about
 7       existence of the first of external valuations.
 8                THE COURT:  Give me the period of time.  I know this
 9       is the first witness and he is talking about a particular
10       period of time.  I am asking you the question I am asking.
11                MR. BRAUN:  The indictment says that -- the government
12       is claiming there were additional misrepresentations following
13       this because what this gives rise to, we haven't had the chance
14       to mention this, when the company decides it has --
15                THE COURT:  I asked you a question.  What period of
16       time, during what period of time do you claim the defendant was
17       making the misrepresentations he's charged with making,
18       beginning when and ending when?
19                MR. STELLMACH:  Beginning in 2001 and continuing
20       through to the summer of 2005.
21                THE COURT:  All right, to the summer of 2005.  Now, I
22       take it that -- well, I am going to ask you, does the
23       government claim that the 10K was false and misleading?
24                MR. BRAUN:  Yes, in one significant respect.
25                THE COURT:  In what?
```

438

03VJLEV5                          Okusanya - direct
 1              MR. BRAUN:  In claiming that Doral was continuing and
 2    had continued to receive independent valuations in which all
 3    economic assumptions had been made by the external valuators.
 4              THE COURT:  I take it that is the only thing you're
 5    claiming about the 10K, right?
 6              MR. BRAUN:  Yes, that and at least to some people but
 7    not others showed that what they had been told previously was
 8    not true, and so the reactions to the 10K --
 9              THE COURT:  Please, please.  The 10K has a lot of bad
10    news, right?  And so you're not claiming that bad news is false
11    and misleading, right?
12              MR. BRAUN:  Correct.
13              THE COURT:  You're claiming that there was a
14    misstatement about the independent valuations?
15              MR. BRAUN:  Right.
16              THE COURT:  Now, along comes this document of --
17              MR. BRAUN:  April 19th.
18              THE COURT:  -- April 19.  Do you claim that this
19    document was false and misleading?
20              MR. BRAUN:  No.
21              THE COURT:  Okay.  Let me ask a question, which there
22    was even after the 10K, there was the road show, at least part
23    way?
24              MR. BRAUN:  Yes.
25              THE COURT:  And then you're claiming that despite the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

439

03VJLEV5                        Okusanya - direct
1  bad news in the 10K, in which obviously along with other things
2  caused the stock to go way, way down, you say that the
3  defendant, his misrepresentations continued until what?
4           MR. STELLMACH:  Through the summer of 2005.
5           THE COURT:  Through the summer?  Now, what was he
6  doing after the 10K, after the bad news according to the
7  government?
8           MR. STELLMACH:  Well, the press release leads to an
9  internal investigation.  The board of directors at the company
10  hires outside lawyers.
11           THE COURT:  What press release?
12           MR. STELLMACH:  This press release.
13           THE COURT:  The one we are talking about?
14           MR. STELLMACH:  Yes.  Leads to an internal
15  investigation by lawyers at Latham & Watkins.  The board of
16  directors at Doral hires Latham & Watkins to come in and
17  conduct an internal investigation.  In the course of the
18  investigation they interview the defendant as well as several
19  other employees of Doral.
20           In the course of those interviews which were the basis
21  of a suppression motion the defense withdrew, the defendant
22  made a number of admissions and statements in an attempt to
23  conceal many of the prior misrepresentations that he had made
24  to investors.
25           THE COURT:  But, look, let me limit my question.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

03VJLEV5                          Okusanya - direct
```
 1              Misrepresentations to investors, did anything occur
 2   after the 10K?
 3              MR. BRAUN:  Yes.
 4              THE COURT:  What?
 5              MR. BRAUN:  He made misrepresentations in the investor
 6   conference call on March 17th.
 7              THE COURT:  All right.  After that?
 8              MR. BRAUN:  I am trying to think whether we have
 9   specific evidence of misrepresentations following that and
10   before the press release, about a month in-between there.  He
11   goes on the road show but cuts it short.  There is one witness
12   who comes to mind.
13              THE COURT:  Is somebody going to testify that he was
14   making misrepresentations during the road show?
15              MR. BRAUN:  No, your Honor.
16              THE COURT:  All right.  I don't think Exhibit 206
17   should be part of the record.  It is dated April 19.  It is
18   after the time when you say he stopped making his -- after the
19   time you say he was making his misrepresentations to investors.
20              Now, if the witness -- I have trouble with his name --
21   if the witness saw this but didn't see the 10K which is
22   something you said a few minutes ago, what is the significance
23   of that?
24              MR. BRAUN:  The witness saw the 10K.  Mr. Srebnick's
25   view is it contained the very same information.
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

03VJLEV5                          Okusanya - direct

```
 1              THE COURT:  You said to me that one reason to admit
 2   this is that this has the information about the prior practice
 3   of only using the --
 4              MR. STELLMACH:  Spot rate.
 5              THE COURT:  -- the spot rate, and you said well, this
 6   should come in because this witness saw this information but
 7   didn't take in the 10K.  Am I mistaking your argument?
 8              MR. BRAUN:  Perhaps only slightly, your Honor.  He saw
 9   the 10K.  He reacted to it in the way he has described.  He did
10   not fully appreciate the information revealed here regarding
11   the nature of the spot rate being used.
12              THE COURT:  That could very well be.
13              MR. BRAUN:  He can be criticized or cross-examined on
14   that.
15              THE COURT:  Nobody is criticizing.  Here is my point:
16              So what?  The fact is, for whatever significance it
17   has, and it may have a lot of significance, the fact is at
18   least according to the 10K, that they were using the spot rate.
19   If there was any misrepresentation about that, well, that is
20   part of the case, of course.
21              This document is not necessary to establish, I don't
22   believe, this document is not necessary to establish that they
23   were using the spot rate whenever they were using it, right?
24              MR. BRAUN:  Correct.
25              THE COURT:  Okay.  As far as the witness' knowledge,
```

442

03VJLEV5                         Okusanya - direct
 1  unless this is sort of part of some testimony about
 2  misrepresentation by the defendant, it doesn't make a lot of
 3  difference when he learned about the use of the spot rate.
 4           MR. STELLMACH:  Your Honor, leaving aside the issue
 5  about the timing of the document, the other significance of the
 6  document is that it quantifies the amount, the range of the
 7  writeoff that could result from the switch in methodology.  It
 8  is that switch in methodology that motivated the defendant's
 9  misrepresentations.
10           THE COURT:  Misrepresentations when?
11           MR. STELLMACH:  From beginning in 2001.  There are
12  basically two ways to calculate the value of the IO.
13           THE COURT:  It seems to me were getting mixed up.  You
14  have said that you do not claim there is any crime committed by
15  using one methodology versus another methodology.
16           MR. STELLMACH:  That is absolutely right.
17           THE COURT:  Now, if the change in methodology results
18  in a writeoff, well, just given that proposition standing
19  alone, that does not indicate the commission of a crime.
20           MR. STELLMACH:  The switch in methodology itself
21  doesn't, but it was the defendant's attempt to prevent that
22  switch in methodologies that led to the misrepresentations.
23           THE COURT:  Wait a minute.  Say that slowly.
24           MR. STELLMACH:  Sure.  Let me just step back if I
25  could to focus it back on these two different methodologies.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

443

03VJLEV5                    Okusanya - direct
1    There is the spot rate and the forward curve.  Doral had
2    throughout this period been using a spot rate.
3                THE COURT:  Right.
4                MR. STELLMACH:  A number of people including the
5    auditors and people inside Doral questioned that.  They thought
6    a more appropriate method would be this forward curve.
7                THE COURT:  Okay.
8                MR. STELLMACH:  And so the defendant assures people,
9    argues for the spot rate is perfectly fine because we have
10   these two independent valuations from outside sources that back
11   up the number that we're using internally.
12               In other words, these two external independent
13   valuations are actually producing higher valuations of the IOs
14   than the spot rate model, and people rely on that
15   representation in continuing to accept the use of the spot
16   rate.
17               THE COURT:  The representation about the caps?
18               MR. STELLMACH:  About the independent valuations.
19               THE COURT:  The independent?  All right.
20               MR. STELLMACH:  And so people rely on the fact that
21   this spot rate model is backed up by these two independent
22   valuations.  The reason the defendant is telling that
23   misrepresentation about the independent valuations is because
24   he doesn't want the company to switch to a forward curve
25   because the forward curve would result in exactly the size and
                  SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

03VJLEV5                    Okusanya - direct
1    nature of the impairment that is described in this press
2    release.
3              In other words, the defendant is telling his lies
4    about the independent valuations to prevent the magnitude of
5    this impairment.
6              THE COURT:  Look, then --
7              MR. BRAUN:  He is told about --
8              THE COURT:  -- just a minute.  The government is then
9    claiming that, as I understand it, as a matter of law one
10   method is as legal as the other?
11             MR. STELLMACH:  Yes.
12             THE COURT:  As long as it is used without a fraud and
13   so forth?
14             MR. STELLMACH:  Exactly.
15             MR. BRAUN:  Yes.
16             THE COURT:  Now, what you're saying is that there was
17   misrepresentation about what was going on with the spot rate.
18   There was misrepresentation about what was going on, and what
19   was going on was the use of the spot rate.
20             MR. BRAUN:  Again the valuations.
21             THE COURT:  In the valuation.  What you're saying is
22   that this document is relevant because it shows, it is part of
23   your case that there was misrepresentation about the spot rate.
24             MR. STELLMACH:  In order to continue using the spot
25   rate, that's right.  I think your Honor's earlier proposed
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

445

03VJLEV5                    Okusanya - direct
 1    language about a limiting instruction actually hit it on the
 2    head.  The government isn't saying there is a fraud in the use
 3    of one method or another, just that there were
 4    misrepresentations made in connection with the methodology.
 5              MR. BRAUN:  Perhaps the one piece factually that might
 6    be helpful in explaining our position is that we're going to
 7    put on evidence the defendant knew that a change in methodology
 8    was being proposed back to February of 2005 that would result
 9    in a decrease in the IO value of precisely this magnitude, and
10    that was an important part of his motivation in making the
11    misrepresentations he was making in the earlier part of 2005.
12    They had this consultant referred to here, First Manhattan
13    Group telling him in February of 2005, your method, it needs to
14    be changed and it is going to result in a decrease of about
15    $500 million in your IO value.
16              They don't announce they're doing that until April,
17    but they're being told by their consultants that that should
18    happen in February and again in March.
19              THE COURT:  Look, what you have is this is an
20    explanation of what the government's theory is, okay?
21              Now, they say that the document is relevant to that
22    theory, not a theory that one method of valuation is per se
23    wrong and another is per se right, but they have their theory
24    which I won't try to repeat.  They say it is relevant to that
25    theory.  What do you say?
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

03VJLEV5                     Okusanya - direct

1            MR. BLACK:  Your Honor, before we even get to that, we
2    had brought this issue before the court that the government is
3    claiming that the spot rate is wrong and you should have gone
4    to the forward yield curve and that's what they're using First
5    Manhattan for.  The government time and time again says no,
6    that is not our case.
7            Our case is misrepresentations about the caps and
8    about the two external valuations.  They got this superseding
9    indictment specifically with the reason to focus this case on
10   those two sets of misrepresentations, not a misrepresentation
11   of the spot rate and not a misrepresentation that they're
12   worried about changing from the spot rate to the forward yield
13   curve.  None of that is in the superseding indictment.  It is
14   only caps and two external independent valuators who are not
15   external or are not independent.
16           What the government is now doing particularly through
17   this document, and the court saw it today, is shocking the jury
18   with an amount of 400 to $600 million because the methodology
19   was not correct.  This puts upon us the burden of now trying to
20   prove that the methodology was correct.  So I believe that what
21   the court should do is:  Number one, strike this exhibit;
22   secondly, instruct the jury to disregard everything that was
23   brought in through this exhibit and what the witness said.  If
24   the court does not do that, in the alternative, we move for a
25   mistrial.

447

```
03VJLEV5                    Okusanya - direct
```

1        THE COURT:  Well, look, I was with you part way, but
2   you lost me at the end because I don't think they are really,
3   they are really not arguing that the use of the spot rate was
4   wrong.  They're not arguing that.
5            We have stood here for --
6            MR. STELLMACH:  An hour.
7            THE COURT:  -- a long time.
8            MR. BLACK:  The proof of the pudding --
9            THE COURT:  Wait a minute.  They're not really doing
10  that.  Obviously, the spot rate was used.  It is inevitably
11  part of their case that there were misrepresentations by this
12  defendant as to what was done.  Well, what was done was the
13  spot rate.  That has been in the case since, you know, we
14  started here.
15           It seems to me what the government is saying now is
16  that this document is relevant to that case.  Let me just say
17  to you, if I felt that what the government is doing is trying
18  to start in on a case about the spot rate is in itself bad, I
19  am not going to permit that to be -- I mean that has been, it
20  has been stated as long as I can remember that that is not the
21  government's case and certainly they can't start putting on
22  that kind of a case now.
23           If this document was relevant only for that kind of an
24  argument, I wouldn't receive it.  But I have to tell you that
25  what they have articulated now is different from that and it

03VJLEV5                    Okusanya - direct
1   really is consistent with their case that there were
2   misrepresentations by this defendant about the use of the spot
3   rate, the result of the spot rate, the different elements that
4   were, you know, gone through and so forth.
5           So with the way I view the government's argument now,
6   it seems to me the document is relevant and admissible, but I
7   would say this:  That it would be good for me to give an
8   instruction to the jury, although the problem is I don't want
9   to give an instruction which has me articulating the
10  government's case.
11          I think that overnight -- I am convinced of this --
12  the document -- look, let's be realistic.  The jury is being
13  presented with a huge amount of information and a lot of
14  documents.  So the idea that they carry this document in their
15  minds and all, I know that may be unrealistic but that doesn't
16  make any difference.  The document is the document.
17          At some point in the deliberations they'll have this
18  document.  They will look at it.  You'll argue about it.  It is
19  being testified about, so they have to be given a clarifying
20  instruction.  So I will overrule the objection and deny a
21  motion to strike and all.  But I want to have you come up with
22  some language that I can use to give the jury a limiting
23  instruction, and it has got to be done without having me argue
24  the government case.  Let's leave it at that.  Thank you.
25              (Adjourned until Thursday, April 1, 2010, at 10:00)
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

```
                                                          449
 1                       INDEX OF EXAMINATION
 2    Examination of:                           Page
 3    [ ]*[,] OMOTAYO OKUSANYA                   273
 4                     GOVERNMENT EXHIBITS
 5    Exhibit No.                               Received
 6     1510   . . . . . . . . . . . . . . . . . 285
 7     1512   . . . . . . . . . . . . . . . . . 296
 8     1511   . . . . . . . . . . . . . . . . . 308
 9     1514   . . . . . . . . . . . . . . . . . 311
10     1531   . . . . . . . . . . . . . . . . . 327
11     1517   . . . . . . . . . . . . . . . . . 352
12     1518   . . . . . . . . . . . . . . . . . 353
13     1519   . . . . . . . . . . . . . . . . . 358
14     6204   . . . . . . . . . . . . . . . . . 373
15     1530   . . . . . . . . . . . . . . . . . 393
16     1520   . . . . . . . . . . . . . . . . . 398
17     206  . . . . . . . . . . . . . . . . . . 417
18
19
20
21
22
23
24
25
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```