# Exhibit D

Peter H. Bresnan (PB 9168)
Cheryl J. Scarboro
Reid A. Muoio (RM 2274)
Jason M. Anthony

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-6030
(tel) 202/551-4597 (Bresnan)

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x
                                    )
SECURITIES AND EXCHANGE COMMISSION, )
                                    )
                Plaintiff,          )
                                    )
          v.                        )
                                    )   COMPLAINT
DORAL FINANCIAL CORPORATION,        )
                                    )
                Defendant.          )
- - - - - - - - - - - - - - - - - - x



06 CV 7158

JUDGE SPRIZZO

Plaintiff Securities and Exchange Commission (the "SEC") alleges as follows:

## NATURE OF THE ACTION

1. The SEC brings this financial fraud action against Doral Financial Corporation, a NYSE-listed Puerto Rican bank holding company. Doral Financial overstated income by approximately $921 million or 100 percent on a pre-tax, cumulative basis between 2000 and 2004. Accounting irregularities enabled the company to report an apparent 28-quarter streak of "record earnings" and facilitated the placement of over $1 billion of debt and equity. Since Doral Financial's accounting and disclosure problems began to surface in early 2005, the market price of the company's

common stock plummeted from almost $50 to under $10 or 80%, thereby reducing equity market value by over $4 billion.

2. By engaging in such conduct, Doral Financial violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 10b-5, 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13], promulgated thereunder.

3. Since learning of the accounting problems, Doral Financial's Board of Directors brought in a new management team, restated the company's financials and took other significant remedial action. The latter includes entering into consent orders with the Board of Governors of the Federal Reserve System and the Federal Deposit Insurance Corporation.

## JURISDICTION

4. This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa]. Doral Financial has, directly or indirectly, made use of the means or instrumentalities of interstate commerce and/or of the

mails in connection with the transactions described in this Complaint.

### DEFENDANT

5.  Doral Financial Corporation ("Doral Financial" or the "company") is a financial holding company with mortgage banking operations in Puerto Rico and New York City.

6.  Doral Financial was the leading residential mortgage lender in Puerto Rico during the relevant period. The volume of loans originated and purchased by Doral Financial during 2004 and 2003 was approximately $7.8 billion and $6.5 billion, respectively. Doral Financial reported consolidated assets of $17.8 billion and consolidated stockholders' equity of $1.3 billion as of December 31, 2004, in its restated financials.

7.  Doral Financial's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and listed on the NYSE. There were 107,921,799 shares outstanding as of March 9, 2005.

8.  Doral Financial's stock price steadily increased from approximately $10 per share in early 2000 to almost $50 in early 2005 (with two 3 for 2 splits). In 2002 U.S. Banker ranked Doral Financial "The Best" out of the 100 largest banking companies in the United States. Doral Financial's chief executive officer made Forbes' Top 10 list of "Best Performing Bosses" in 2003 and 2004.

## SUBSTANTIVE ALLEGATIONS

## DORAL FINANCIAL'S MORTGAGE LOAN SALE TRANSACTIONS

9.   Doral Financial has traditionally emphasized the origination of 15 to 30 year first mortgage loans secured by single family residences. Conventional loans that do not meet the underwriting requirements for sale or exchange under standard Federal Home Loan Mortgage Corporation ("FHLMC") or Federal National Mortgage Association ("FNMA") programs are referred to as "non-conforming" loans. The principal deviations that do not permit non-conforming loans to qualify for such programs are more flexible requirements for income verification or credit history, and loan amounts in excess of those permitted by FNMA or FHLMC. Doral Financial uses its own credit system to evaluate these loans and generally requires lower loan-to-value ratios and higher borrower equity.

10.   Doral Financial customarily sold or securitized most of the residential mortgage loans that it originated and purchased through various channels. Non-conforming loans were generally sold in bulk to local financial institutions in negotiated transactions. When Doral sold a pool of loans to an investor it agreed to pay the purchaser a specified pass-through rate for the entire pool being purchased. Amounts received on the mortgages above the pass-through rate were retained by Doral Financial as servicing rights and, if applicable, interest-only strips

("IOs"). The pass-through rate paid to the investors may have been a fixed rate or more often a variable rate generally based on a spread over the three-month London Interbank Offered Rate ("Libor"). The servicing fee rate retained by Doral Financial was fixed and contractually specified.

11. The purported present value of the future cash flows retained by Doral Financial in excess of the pass through rate payable to investors and the servicing fee rate retained by Doral Financial was recorded on the company's financial statements as IOs. The fair values assigned to the IOs reduced the carrying amount of the loans sold. The gain realized on the sale of the loans was determined by the difference of the sales price for the loan over the carrying amount. Net gains from mortgage loan sales and fees were Doral Financial's principal source of income during the relevant period, as originally reported. The majority of those profits was attributable to the IOs.

12. Doral Financial retained IOs with recorded fair values of $509 million in 2004, $281 million in 2003, $197.9 million in 2002, $141.4 million in 2001 and $72.7 million in 2000, as originally reported. These valuations resulted from the accounting and disclosure irregularities described below. As of December 31, 2004, 2003, 2002, 2001 and 2000, the carrying value of IOs reflected in the balance sheet was $878.7 million, $578.1 million, $359.2 million, $236.5

million and $158.0 million, respectively, as originally reported. Those values were significantly overstated for the reasons described below.

### DORAL FINANCIAL OVERVALUED ITS IOs

13. To value its IOs for financial reporting purposes, Doral Financial obtained two valuations from third parties, compared them to the valuation produced by its internal model, and recorded the IOs in its consolidated financial statements at the lowest of the three valuations. There were at least four problems with the way this apparently reasonable accounting policy was applied in practice.

14. First, Doral Financial's internal model used the so-called "spot rate" methodology to compute the value of its IOs and gain on sale. The spot rate was the contractual or the actual 90-day Libor rate at the end of each reporting period. Doral Financial assumed for accounting purposes that interest rates remained fixed for the life of the underlying mortgages at the spot rate. Doral Financial's independent accountants, PricewaterouseCoopers LLP ("PwC"), were aware that the company's internal model used this methodology. However, this assumption was inconsistent with market practice, which would have assumed an expected interest rate spread based on implied forward Libor rates ("forward curve"). Incorporating the forward curve into Doral Financial's internal model would have reduced the

value of its IOs and gains recognized on sales of the underlying mortgages.

15. Second, Doral Financial's former treasurer and the former director emeritus improperly influenced the third-party valuation work to obtain results that were higher or similar to the valuations resulting from the internal model. This influence included providing inaccurate information to at least one of these third parties about the IOs orally over the phone. Had they not been misled, this third party might have assigned a value to Doral Financial's IOs that was substantially lower than the value resulting from the internal model.

16. Third, in connection with the company's efforts to enhance its interest rate risk management practices, Doral Financial senior management, including the former chief executive officer ("CEO") and the former chief financial officer ("CFO"), was informed by late 2004 that the market would value the IOs using the forward curve and that the company's spot rate methodology significantly overstated the value of the portfolio. This information was not appropriately communicated to the company's governing bodies or independent accountants, PwC, prior to the release of the financial results for the year ended December 31, 2004.

17. Fourth, the former CFO and the former director emeritus used questionable assumptions and flawed data to calculate a $97.5 million impairment charge to the IOs for

the fourth quarter of 2004, as a result of which the impairment was significantly understated. The $97.5 million impairment charge was announced publicly in an earnings press release at the close of the market on January 18, 2005. Doral Financial's closing stock price plummeted $5.80 or 12% the next day, from $49.45 to $43.05, and continued to fall.

18. Doral Financial disclosed publicly its use of the spot rate methodology for the first time in its Form 10-K for 2004 which was filed after the close of the market on March 15, 2005. Doral Financial's closing stock price plummeted after the filing of the Form 10-K for 2004, falling $6.64 or 17% to $31.65 on March 16, $4.19 or 14% to $26.31 on March 17, and $4.89 or 19% to $21.50 on March 18, 2005. These disclosures also triggered a series of downgrades by analysts and rating agencies in March and April 2005. On April 14, 2005, an analyst at Merrill Lynch downgraded Doral Financial to "sell" from "neutral" because of the possibility of a restatement. Doral Financial's closing stock price dropped $2.24 or 12% to $17.07 on this news.

19. The morning of April 19, 2005, Doral Financial announced publicly that it had determined to correct the methodology used to value its IOs to incorporate the forward curve and that doing so would decrease the value of its IO portfolio by $400 to $600 million. Doral Financial's

closing stock price dropped $0.70 or 4.6% to $16.15 on that day. According to Doral Financial's Form 10-K/A, income was overstated by approximately $283.1 million on a pre-tax, cumulative basis during the relevant period because of IO valuation issues.

### DORAL FINANCIAL IMPROPERLY RECOGNIZED GAIN ON SALE FROM ITS TRANSACTIONS WITH FIRSTBANK

20. The largest buyer of Doral Financial's non-conforming mortgages during the relevant period was FirstBank Puerto Rico ("FirstBank"). FirstBank is a wholly-owned banking subsidiary of First BanCorp., a NYSE-listed financial services company. Doral Financial improperly recognized gain on sales of approximately $3.9 billion in mortgages to FirstBank between 2000 and 2004.

21. These transactions were not true sales under generally accepted accounting principles ("GAAP") because of oral agreements or understandings between Doral Financial's former treasurer and former director emeritus and FirstBank senior management providing recourse beyond the limited recourse established in the written contracts. As a result, the company improperly recognized gain on sale from these transactions. The oral recourse agreements or understandings with FirstBank were not captured by Doral Financial's financial reporting process or appropriately communicated to the audit committee, PwC or the company's internal and external counsel.

9

22. After the close of the market on October 25, 2005, Doral Financial announced publicly that it was investigating the true sale issue. On October 26, 2005, Doral Financial's closing stock price dropped $2.25 or 20% on this news. Ratings agencies downgraded Doral Financial's senior debt on October 27 and 28, 2005. On December 15, 2005, Doral Financial announced its intention to restate its financials to account for the transactions with FirstBank as loans payable secured by mortgage loans and to reverse the gains previously recognized.

23. As reflected in Doral Financial's Form 10-K/A, income was overstated by approximately $595.5 million on a pre-tax, cumulative basis during the relevant period because of the FirstBank true sale issue and certain contemporaneous purchase and sale transactions discussed below.

CONTEMPORANEOUS PURCHASE AND SALE TRANSACTIONS

24. Doral Financial managed earnings through a series of contemporaneous purchase and sale transactions with other Puerto Rican financial institutions totaling approximately $846.9 million. These involved the generally contemporaneous purchase and sale of mortgage loans from and to local financial institutions where the amounts purchased and sold, and other terms of the transactions, were similar. Doral Financial entered into approximately $200.1 million worth of these transactions during the fourth quarter of 2004 with one Puerto Rican financial institution and

approximately $646.8 million worth during 2000 and 2001 with other local financial institutions.

25. On December 15, 2005, Doral Financial announced that it had determined to reverse the gains recognized on these transactions because there was insufficient contemporaneous documentation to substantiate their business purpose. For some periods, the gains on sale originally recorded in connection with such transactions had a material impact on the company's consolidated financial statements.

### DORAL FINANCIAL'S RESTATEMENT

26. Doral Financial completed the restatement process in February 2006. According Doral Financial's Form 10-K/A, income was overstated by approximately $921 million on a pre-tax, cumulative basis during the relevant period. Doral Financial attributed approximately $595.5 million of that amount to the FirstBank true sale and contemporaneous purchase and sale issues and $283.1 million to IO valuation issues (the balance of approximately $42 million was attributed to four other accounting adjustments).

27. Doral Financial's net income (in thousand) and diluted earnings per common share (in dollars) for fiscal year 2000 through 2004 were restated as follows:

| Fiscal year | Net Income | | | Diluted EPS | | |
|---|---|---|---|---|---|---|
| | Original | Restated | Change | Original | Restated | Change |
| 2004 | $489,625 | $214,794 | (56%) | $3.95 | $1.63 | (59%) |

11

| 2003 | 321,299 | 142,138 | (56%) | 2.70 | 1.10 | (59%) |
| 2002 | 220,968 | 166,882 | (24%) | 1.89 | 1.40 | (26%) |
| 2001 | 143,851 | 97,709 | (32%) | 1.31 | 0.86 | (34%) |
| 2000 | 84,656 | 29,428 | (65%) | 0.82 | 0.24 | (71%) |

28. As a result of these accounting irregularities, the financial statements Doral Financial incorporated into its periodic filings and offering documents, together with the associated earnings press releases and other materials disseminated to the investing public, were materially false and misleading from at least early 2000 through early 2005.

**RELEVANT BENEFIT AND INJURY**

29. Doral Financial's accounting and disclosure irregularities enabled the company to report an apparent 28-quarter streak of "record earnings" and facilitated the placement of over $1 billion of debt and equity.

30. On the equity side, Doral Financial raised $345 million through a Private Investment in Public Equity ("PIPE") in late 2003 and early 2004. Doral Financial obtained millions of dollars more in this PIPE than it would have had its true financial condition been known to the market. On the debt side, Doral Financial further benefited from the irregularities by paying millions of dollars less in interest on certain bond offerings.

31. Since the accounting and disclosure problems began to surface in early 2005, the market price of Doral Financial's common stock plummeted from almost $50 to under

$10 or 80%, thereby reducing equity market value by over $4 billion.

### FIRST CLAIM FOR RELIEF

(Violations of Section 17(a)
of the Securities Act)

32. Plaintiff SEC hereby incorporates ¶¶ 1 through 31 with the same force and effect as if set out here.

33. In the manner described in ¶¶ 1 through 32, defendants Doral Financial, in the offer or sale of securities, by the use of means or instruments of interstate commerce or by the mails, directly or indirectly (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material facts or omissions of material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities, in violation of Section 17(a) of the Exchange Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF

(Violations of Section 10(b) and
Rule 10b-5 of the Exchange Act)

34. Plaintiff SEC hereby incorporates ¶¶ 1 through 33 with the same force and effect as if set out here.

13

35. In the manner described in ¶¶ 1 through 34, defendant Doral Financial, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails, directly or indirectly (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts or omissions of material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon persons, in violation of Section 10(b) of the Exchange Act [15 U.S.C § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

### THIRD CLAIM FOR RELIEF

#### (Violations of the Reporting Provisions of the Exchange Act)

36. Plaintiff SEC hereby incorporates ¶¶ 1 through 35 with the same force and effect as if set out here.

37. In the manner described in ¶¶ 1 through 36, defendant Doral Financial violated Sections 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 promulgated there under [17 C.F.R. §§ 240.12b-20, 240.13a-1], by filing reports with the SEC that inaccurately reflected the company's financial performance and provided other untrue and inaccurate information to the public.

## FOURTH CLAIM FOR RELIEF

(Violations of the Books and Records and Internal Control
Provisions of the Exchange Act)

38. Plaintiff SEC hereby incorporates ¶¶ 1 through 37 with the same force and effect as if set out here.

39. In the manner described in ¶¶ 1 through 38, defendant Doral Financial failed to make and keep accurate books and records and to devise and maintain an adequate system of internal accounting controls in violation of Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that this Court enter a judgment:

(i) permanently enjoining defendant Doral Financial, and its officers, agents, servants, employees, attorneys, and those in active concert or participation with it who receive actual notice by personal service or otherwise, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 10b-5, 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13], promulgated thereunder;

(ii) ordering defendant Doral Financial to disgorge all ill-gotten gains from the conduct alleged herein, with prejudgment interest;

(iii) ordering defendant Doral Financial to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

(iv) granting such other relief as this Court may deem just and appropriate.

Dated: September, 19, 2006

_/s/ Peter H. Bresnan_ (PB-9168)

Peter H. Bresnan (PB 9168)
Cheryl J. Scarboro
Reid A. Muoio (RM 2274)
Jason M. Anthony

Attorneys for Plaintiff
Securities and Exchange
    Commission
100 F Street, N.E.
Washington, D.C. 20549-6030
(tel) 202/551-4597 (Bresnan)

16